## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| 1199SEIU UNITED HEALTHCARE WORKERS EAST, | ) ) ) | No. 1:20-cv-24069-RNS |
| Plaintiff, | ) ) ) | Hon. Robert N. Scola, Jr., District Judge |
| v. | ) ) | |
| LOUIS DEJOY, Postmaster General and Chief Executive Officer of the United States Postal Service; and the UNITED STATES POSTAL SERVICE, | ) ) ) ) ) ) ) | Hon. Jonathan Goodman, Magistrate Judge **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND** |
| Defendants. | ) ) | **DECLARATORY RELIEF** |

## FIRST AMENDED COMPLAINT

Plaintiff 1199SEIU UNITED HEALTHCARE WORKERS EAST, by its undersigned attorneys, hereby complains against Defendants LOUIS DEJOY, Postmaster General and Chief Executive Officer of the United States Postal Service, and the UNITED STATES POSTAL SERVICE, stating as follows:

### INTRODUCTION

1.      In the middle of a pandemic and on the eve of a national election, Defendant Postmaster General Louis DeJoy has made illegal and unprecedented changes to the policies of the United States Postal Service that will delay ballots and disenfranchise thousands of citizens in Florida.

2.      For well over a century, the Postal Service has been an integral part of our nation's state-based election infrastructure. Citizens have been casting ballots absentee since at least the Civil War and for just as long the Postal Service has

1

been responsible for making sure ballots arrive in time to be counted. Congress has repeatedly enacted laws requiring the Postal Service to facilitate the right to vote by mail in state-run elections.

3.     In recognition of this obligation, the Postal Service had long adhered to policies providing for the expeditious handling of election mail. Among other things, the Postal Service has taken measures to ensure that election mail is identifiable, is delivered in time to be counted, and is treated as First-Class mail (or better), regardless of the amount of postage paid.

4.     Disregarding these entrenched policies, Defendant DeJoy has recently made unlawful changes to Postal Service policies, which have had and will continue to have profound effects on the delivery of election mail. For example, Defendant DeJoy has caused a substantial number of high-speed sorting machines to be removed and has acknowledged those machines have been disassembled and cannot be timely replaced. More sorting machines have been removed in Florida than any other state in the nation except California. Defendant DeJoy's changes in policy have caused a substantial and potentially irreversible decline in the time necessary to deliver First-Class mail.

5.     In addition, Defendant DeJoy has sowed confusion and uncertainty by insisting that in the upcoming election ballots will be delivered to voters only in accordance with the postage paid, even while state officials and voters preparing for the upcoming election have already relied on the Postal Service's prior policies of speeding all ballots to and from voters regardless of the postage paid.

6.      In 30 states, including Florida, ballots will be rejected and voters disenfranchised if the Postal Service does not deliver their ballots on or before Election Day, even if the voters have complied with all deadlines set by the states that run the election. Whether those ballots will be counted depends quite literally on the Postal Service timely delivering ballots in accordance with its policies in place prior to Defendant DeJoy's recent changes. As things now stand, tens of thousands of citizens of Florida will be disenfranchised.

7.      Compounding the problem, this election is particularly dependent on mailed ballots because of the ongoing COVID-19 pandemic. The virus, which is easily spread between people through respiratory droplets and close contact, has killed nearly a quarter million Americans, and millions of citizens are opting to vote by mail rather than in person, in order to avoid the risk of spreading or contracting the virus at a polling place or other central location.

8.      The coronavirus disproportionately threatens elderly and medically vulnerable individuals. In addition, the rate of infection and harm caused by the coronavirus in the United States has fallen disproportionately on Black, Latino, and other racial minority populations.

9.      For many voters, including those who know or suspect they are infected with the virus, those at high risk, and those who live with or are in regular contact with those at high risk, voting by mail is the only safe option to exercise their right to vote. Healthcare workers and others working essential jobs will choose

to vote by mail in order to protect themselves and their coworkers, patients, and the broader community.

10.     An exceptionally large proportion of Americans are thus likely to rely on the Postal Service to cast their ballot in the November general election. Yet, the politically-motivated Defendant DeJoy has chosen to implement sweeping changes to the Postal Service's election mail policies and broader operations in violation of the Postal Service's statutory duty to give the public a formal opportunity to be heard on significant changes to mail service and in violation of its statutory obligation to give priority to important letter mail when making policy.

11.     Defendant DeJoy's unlawful actions have jeopardized citizens' right to vote.

12.     In response, States, organizations, and individuals have filed lawsuits in federal district courts across the United States, in order to ensure that the policy changes do not disrupt the upcoming election. The U.S. District Courts for the Eastern District of Washington, the Southern District of New York, the District of Columbia, and the Eastern District of Pennsylvania have entered nationwide preliminary injunctions preventing Defendant DeJoy's changes from taking effect, requiring the Postal Service to return its operations to the status quo ante, which will protect the constitutional right to vote, and require election mail to be expedited. *Washington v. Trump*, No. 1:20-CV-03127-SAB (E.D. Wash. Sep. 17, 2020); *Jones v. United States Postal Service*, No. 20 Civ 6516 (S.D.N.Y. Sep. 21,

2020); *New York v. Trump*, 20 Civ. 2340 (D.D.C. Sep. 27, 2020); *Pennsylvania v. DeJoy*, 2:20 Civ. 4096 (E.D. Pa. Sep. 28, 2020).

13.     Plaintiff and its members have an interest in the fair administration of the upcoming election in Florida. They seek to vote and assist others in voting, and they are directly burdened by the Postal Service's policy changes. In particular, Plaintiff and its members work in the healthcare industry and depend on their ability to vote by mail. Indeed, many of them will cast ballots by mail. In addition, Plaintiff has already and continues to devote resources to voter education and voter assistance as a result of the sudden changes in Postal Service policies.

14.     Without court intervention, Defendant DeJoy's illegal actions will slow mail that all citizens depend upon and threaten to cancel the votes of hundreds of thousands of voters in November while undermining the integrity of the election at large. These illegal actions will also disenfranchise Plaintiff's members and thousands of other Florida citizens.

15.     Among other relief, Plaintiff seeks enforcement of the nationwide injunctions issued against the Postal Service, an ordering requiring the Postal Service to make and disclose arrangements for the daily pickup or delivery of mailed ballots with Florida county officials, and timely information about compliance in Florida with the existing injunctions and the decline in delivery times for First-Class mail in Florida, so that healthcare worker members and other voters can make informed decisions about whether they can rely upon vote-by-mail procedures.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1339, 28 U.S.C. § 1343, 39 U.S.C. § 409, and the Constitution of the United States.

17.     The Court is authorized to award the requested declaratory relief by 28 U.S.C. §§ 2201.

18.     The Court is authorized to award the requested injunctive relief by the Constitution, 28 U.S.C. § 2202; 28 U.S.C. § 1651; and the Court's equitable powers.

19.     The Court is authorized to award attorney's fees and costs pursuant to 28 U.S.C. § 2412.

20.     Venue is proper under 28 U.S.C. § 1391(e) and 39 U.S.C. § 409(b). Defendants are the Postal Service and the head of that agency sued in his official capacity. A substantial part of the events and omissions giving rise to the claims occurred in this judicial district. Many of Plaintiff's members, on whose behalf Plaintiff brings this action, reside in this judicial district.

## PARTIES

21.     Plaintiff 1199SEIU UNITED HEALTHCARE WORKERS EAST ("1199SEIU") is the largest local union of healthcare workers in the nation, with more than 450,000 members in Florida, Massachusetts, New York, New Jersey, Maryland, and Washington, D.C. Since its founding in 1932, 1199SEIU has championed equality, justice, and democracy. With more than 26,000 healthcare workers and 10,000 retiree members in Florida, 1199SEIU and its members expend considerable resources on voter education and engagement, in order to ensure that

its members and other citizens of Florida have the opportunity to exercise their right to vote.

22.     As healthcare workers serving on the front lines of our response to the COVID-19 pandemic, members of 1199SEIU are especially reliant on their ability to cast ballots by mail. In addition, 1199SEIU has had to divert and expend substantial resources attempting to adapt to the delays in the delivery of election mail discussed in this complaint.

23.     Defendant LOUIS DEJOY is the Postmaster General of the United States and Chief Executive Officer of the UNITED STATES POSTAL SERVICE. DeJoy was appointed by the Board of Governors of the Postal Service in June 2020.

24.     Defendant UNITED STATES POSTAL SERVICE is an independent establishment of the executive branch of the government of the United States. 39 U.S.C. § 201. USPS is charged by statute with establishing "policies for postal services" that "shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

## FACTS

## I.     THE ESSENTIAL ROLE OF THE U.S. POSTAL SERVICE IN ELECTIONS

25.     The Postal Service dates to before the Declaration of Independence when, in 1775, the Second Continental Congress established the United States Post Office with Benjamin Franklin as its first Postmaster General. In 1792, the Congress created the U.S. Post Office Department, the direct predecessor of the

current Postal Service. U.S. Const. art. I, sec. 8, cl. 7. Since its founding, the Postal Service has been intimately connected with the governance and democratic processes of the nation.

26.     Congress has reorganized the Postal Service several times since, most prominently by the Post Office Act of 1872, which created the contemporary U.S. Postal Service, removing it from the cabinet and establishing it as an independent agency. The 1970 Postal Reorganization Act reaffirmed the historic role and function of the Postal Service "to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people." 39 U.S.C. § 101(a).

27.     The Post Office has played an integral part in American elections since at least the Civil War, when soldiers fighting in the Union army voted in their home state elections using absentee ballots.[1] During the First and Second World Wars, nearly all states allowed service members abroad to cast their ballots by mail.

28.     For more than a century, states have likewise relied on the Postal Service to allow all manner of citizens—service members and civilians alike—to cast their ballots when they are physically unable to go to the polls on Election Day, whether due to travel, illness, disability, or for other reasons.[2]

---

[1] *See* David A. Collins, *Absentee Soldier Voting in Civil War Law and Politics* (2014), https://digitalcommons.wayne.edu/cgi/viewcontent.cgi?article=2042&context=oa_dissertations

[2] *See* P. Orman Ray, *Absent Voters*, AM. POL. SCI. REV. 8:442–445 (1914), https://www.jstor.org/stable/1946177?seq=1#metadata_info_tab_contents; *History of Absentee Voting in the State Constitution of Connecticut*, https://www.cga.ct.gov/2012/rpt/2012-R-0379.htm.

29.     Today, all 50 states allow absentee voting by mail. Every one of them relies on the Postal Service to ensure that their citizens' ballots are delivered in time to be counted in accordance with state law.

30.     Since the 1980s, a growing number of states have given their citizens the option to vote by mail for any reason, without the need for a specific justification. Today, 34 states and the District of Columbia offer their citizens the option of "no excuse" absentee voting and some have chosen to make mail voting the default means of casting a ballot.

31.     In every jurisdiction in the United States, the Postal Service is thus an integral part of the voting infrastructure. It is as essential to the proper functioning of our nation's democracy as poll workers and voting machines.

32.     Because of the Postal Service's essential role in elections, problems with mail delivery can jeopardize the individual right to vote and the overall integrity of elections.

## II.    THE LONGSTANDING POSTAL SERVICE POLICY OF GIVING SPECIAL TREATMENT TO ELECTION MAIL

33.     The Postal Service, as a matter of policy and consistent with congressional directives, has long given special treatment to election mail to ensure its timely delivery. This complied with the Postal Service's statutory obligation to make policies that "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

34.     Congress has also recognized the Postal Service's crucial role in facilitating voting by enacting laws requiring the Postal Service to facilitate the right to vote by mail in state-run elections. An example is the Uniformed and Overseas Citizens Absentee Voting Act of 1986, which requires the Postal Service to "carr[y] expeditiously and free of postage" any "balloting materials" between such voters and their state election officials. It also allows the Postal Service to increase rates on other postage-paid mail to compensate for the cost of providing this essential election service without charge. 39 U.S.C. §§ 3406, 3627.

35.     The importance of election mail is reflected in numerous other federal statutes as well. The National Voter Registration Act, for example, permits voters to register by mail and requires the Postal Service to deliver registration materials at reduced rates because the "right of citizens of the United States to vote is a fundamental right" and the government has a "duty . . . to promote the exercise of that right." 39 U.S.C. § 3629; 52 U.S.C. §§ 20501, 20501.

36.     In recognition of its obligation to institute policies that promote expeditious handling of election mail, which is undeniably "important letter mail," within the meaning of 39 U.S.C. § 101(e), the Postal Service has had a longstanding policy of affording special treatment to election mail so that it is delivered in a timely fashion regardless of the amount of postage paid.

37.     To prioritize election mail, it must be identifiable, and for that reason the Postal Service has developed special tools to identify election mail and to

improve its visibility. Customized Service Type Identifiers are used for ballots,[3] and a green container tag (Tag 191) is used to designated trays and sacks of ballot mail.[4] Additionally, an "Official Election Mail" logo "serves to identify Official Election Mail for Postal Service workers and distinguish it from the thousands of other pieces of mail that are processed daily."[5]

38.     Once election mail is identified, the Postal Service's express policy has been to treat it as First-Class mail even if a lower class of postage—or no postage at all—was paid.

39.     An official Postal Bulletin published in 2014 explicitly states, in bold type, "**[S]hort-paid and unpaid absentee balloting materials must never be returned to the voter for additional postage. Postage is collected from the election office upon delivery or at a later date.**" U.S. Postal Service, Postal Bulletin 22391, Requirements and Tips for Handling Official Election Mail and Political Campaign Mail (June 12, 2014).[6]

40.     A subsequent Q&A in the same Postal Bulletin is even more explicit that election mail should be sped along to its destination, even if sent with insufficient postage:

> If ballots are found in the mailstream without postage or with insufficient postage, should the normal procedures for short-paid mail be followed?

---

[3] Available at https://postalpro.usps.com/node/8463.
[4] Available at https://about.usps.com/kits/kit600/kit600_online_015.htm.
[5] Available at https://about.usps.com/publications/pub631.pdf.
[6] Available at:https://about.usps.com/postalbulletin/2014/pb22391/html/cover_003.htm#ep1381326.

> No. Short-paid and unpaid absentee balloting materials must never be returned to the voter for additional postage. Postage is collected from the election office upon delivery or at a later date.

*Id.* The bottom-line instruction to postal workers on this topic was, "Do not delay delivery of balloting materials." *Id.*

41.     This longstanding policy of taking special measures to ensure the delivery of election mail has been acknowledged by the Postal Service's Inspector General, who concluded last year that treatment of election mail as First-Class "was how this mail was generally handled." Office of Inspector General, United States Postal Service, "Audit Report: Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections" at 7 (Nov. 4, 2019).[7]

42.     The policy of special treatment for election mail has also been relied upon for years by state election officials and by courts and litigants.

43.     For example, in the settlement agreement reached earlier this year between the Florida election officials and the consolidated plaintiffs in *Nielsen v. DeSantis* in the U.S. District Court for the Northern District of Florida, the Florida Secretary of State agreed to direct county election supervisors "to instruct voters who call seeking additional [mail-in ballot] delivery options as follows: (a) If you cannot afford a stamp, then you can still place your vote-by-mail ballot in the mail for delivery because the U.S. Postal Service treats such ballots as first class mail." Resolution of Claims ¶ 2, *Nielsen v. DeSantis*, No. 4:20-cv-236 (N.D. Fla. July 20, 2020) (ECF No. 601-1).

---

[7] Available at https://www.uspsoig.gov/sites/default/files/document-library-files/2019/19XG010NO000.pdf at 7.

44.     Similarly, in litigation earlier this year challenging the requirement to affix postage to absentee ballots as an unconstitutional poll tax, the Georgia Secretary of State relied on this USPS policy to argue that no postage was in fact required. *See Black Voters Matter Fund v. Raffensperger*, No. 1:20-CV-01489-AT, 2020 WL 4597053, at *26 (N.D. Ga. Aug. 11, 2020).

45.     In addition, in the days leading up to an election, the Postal Service has historically made special efforts to identify election mail to ensure it arrives in time to be counted. Such efforts have included expediting election mail even ahead of First-Class mail.

46.     This policy commitment to give special treatment to election mail follows directly from the Postal Service's essential role as an integral part of each state's election system. The Postal Service is not merely a third-party service provider that happens to transport ballots on behalf of voters. It is an essential government service with a statutory obligation and longstanding policy commitment to take all feasible steps to ensure that voters' ballots are counted when they are cast by mail.

47.     The Postal Service's policy of taking special measures such as treating election mail as First-Class or better regardless of postage paid has been critical to ensuring that nearly all election mail is delivered on time. The Inspector General explained in an analysis of election-mail delivery during the 2018 midterm election that "the Postal Service's nationwide service performance score for Election and Political Mail was 95.6 percent, or slightly below its goal of 96 percent." Office of

Inspector General, United States Postal Service, "Audit Report: Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections" at 1 (Nov. 4, 2019).[8] The large majority of facilities handling high volumes of election mail "averaged 98.3 percent on-time performance." *Id.*

## III.   DEFENDANT DEJOY'S SWEEPING POLICY CHANGES

### A.   Changes To Election Mail Policies

48.   Despite the Postal Service's key role in our nation's elections, it has recently and unlawfully changed its policies governing election mail and it has made other nationwide changes to mail services that, separately and together, will delay the delivery of ballots and will result in large numbers of ballots being discarded because they will arrive after state deadlines.

49.   In official statements in May 2020, the Postal Service has stated that, contrary to its longstanding policy, it will treat election mail as belonging to the class of mail for which postage has been paid. Thus, for example, instead of treating all ballots as First-Class mail (or better) and delivering those ballots to and from voters under the previous 2-3 day service standard, the new policies treat election mail according to the postage paid and pursuant to a much slower service standard. The new policies state that, because of this new and slower treatment, election mail may not reach or be returned by voters in time to meet deadlines set by state law.

50.   The Postal Service appears to have first published this policy on May 29, 2020, when USPS General Counsel Thomas Marshall issued a letter to

---

[8] Available at https://www.uspsoig.gov/sites/default/files/document-library-files/2019/19XG010NO000.pdf.

approximately 11,500 election officials and state political party officials making the election mail policy explicit. *See* Letter from Thomas Marshall Re: Election Mail (May 29, 2020) ("May Letter").[9]

51.     The May Letter acknowledges "that many voters will choose to use the mail to participate in upcoming elections, including the 2020 General Election in November" because of "the impacts of the COVID-19 pandemic." *Id.* Nevertheless, the May Letter states that USPS will do no more than adhere to its ordinary service standards. It explains that "[t]he two main classes of mail that are used for Election Mail are First-Class Mail and USPS Marketing Mail, the latter of which includes the Nonprofit postage rate." *Id.* The letter articulates the ordinary service standards for each class of mail: "It is important to note that First-Class Mail and Marketing Mail have different delivery standards, and that delivery times further depend on the origin and destination of a given mailpiece. Most domestic First-Class Mail is delivered in 2-5 days. Most domestic Marketing Mail is delivered in 3-10 days." *Id.* The letter then emphasizes that the Postal Service will not give any special treatment to election mail: "However, the Postal Service cannot guarantee a specific delivery date or *alter standards to comport with individual state election laws*." *Id.* (emphasis added).

---

[9] Available here: https://about.usps.com/newsroom/national-releases/2020/2020-05-29-marshall-to-election-officials-re-election-mail.pdf. The figures about the number of recipients come from a subsequent letter that Mr. Marshall submitted on August 11, 2020, to Congressperson Maloney, chair of the House Oversight and Reform Committee, available here: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/USPS%20to%20COR%2008-11-20%20re%20Election%20Prep.pdf.

52.     The May Letter explicitly acknowledges that some voters will be disenfranchised because their ballots will be delivered after Election Day, even if the voter complies with all state deadlines for requesting and submitting ballots: "[V]oters should be aware of the possibility that completed ballots mailed less than a week before [Election Day] may not, in fact, arrive by the state's deadline."

53.     Between July 29 and 31, 2020, the Postal Service's General Counsel sent individualized letters to the chief election officers in 46 states. These letters reiterated the Postal Service's new policy of insisting on the postage paid and disavowing any special treatment of ballots.

54.     The Postal Service's letter to Florida Secretary of State Laurel Lee, dated July 29, 2020, reiterated that election mail will only be processed in accordance with delivery standards for ordinary mail: "While the specific transit times for either class of mail cannot be guaranteed, and depend on factors such as a given mailpiece's place of origin and destination, most domestic First-Class Mail is delivered 2-5 days after it is received by the Postal Service, and most domestic Marketing Mail is delivered 3-10 days after it is received." *See* Letter from Thomas Marshall to Secretary Laurel Lee (July 29, 2020) ("July Letter").[10]

55.     As in 32 other states, ballots in Florida will not be counted if they are not received by election officials by Election Day. Even if a Florida voter mails their ballot well before Election Day, and even if the ballot otherwise complies with all of

---

[10] Available at p.11 of this PDF: https://context-cdn.washingtonpost.com/notes/prod/default/documents/d1b752f9-f8c9-4c18-b548-4eb9668c672a/note/36253644-7029-4dd3-bd1c-f824054400c2.

the state's requirements, the ballot will not be counted, and the voter will be disenfranchised, if the Postal Service does not timely deliver the ballot.

56.     The July Letter forthrightly admitted the Postal Service would not deliver some ballots in time to be counted under Florida's election laws because, under these ordinary mail delivery standards, there is not enough time for a blank ballot to be mailed to a voter and returned unless a voter requests their ballot well before the state's deadline for requesting one.[11]

57.     The July Letter specifically identified Florida's 10-day cutoff for requesting absentee ballots—and its 8-day deadline for election supervisors to mail out blank absentee ballots—as creating a "significant risk that the voter will not have sufficient time to complete and mail the completed ballot back to election officials in time for it to arrive by the state's return deadline." *Id.*

58.     In other words, the Postal Service has acknowledged that its adherence to its new policies will result in additional ballots being rejected as untimely even though voters complied with all state deadlines.

59.     The May Letter and the July Letter disavow the Postal Service's longstanding policy of taking special measures to expedite ballots, upgrade postage on ballots, and deliver ballots speedily despite insufficient postage.

---

[11] "Under our reading of your state's election laws, as in effect on July 27, 2020, certain state-law requirements and deadlines appear to be incompatible with the Postal Service's delivery standards and the recommended timeframe noted above. As a result, to the extent that the mail is used to transmit ballots to and from voters, there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted." *Id.*

60.     In response to public outcry, the USPS has made statements suggesting it will devote "excess" First-Class capacity to Election Mail, but these pledges are hollow. In recent months, the Postal Service has dramatically reduced First-Class capacity by decommissioning sorting machines and has directed trucks to leave on time even when fully or partially empty. Defendant DeJoy has not affirmed prior policy or issued any guidance to postal workers pertaining to the 2020 general election to ensure that as many ballots as possible are delivered in time to be counted, irrespective of the ordinary service standards that USPS targets for other letter mail.

### B.     Other Policy Changes Slowing the Mail

61.     In addition to changing the Postal Service's policies regarding election mail, Defendant DeJoy unlawfully implemented additional new policies that have upended the normal operations of the Postal Service nationwide. Those changes have had the effect of slowing mail delivery across the country in advance of the election, further jeopardizing the votes of those who vote by mail and undermining the integrity of the election.

62.     Defendant DeJoy assumed his current position as Postmaster General on June 15, 2020. Within weeks, he oversaw sweeping changes to Postal Service operational policies, some of which Defendant DeJoy has admitted were implemented at his explicit direction.

63.     On July 10, 2020, frontline postal workers were briefed on a number of the major changes. A memo entitled "Mandatory Stand Up Talk: All Employees"

18

explained that "late trips [of trucks or delivery vehicles] are no longer authorized or accepted" and that no "additional transportation will be authorized." The memo stated that no second trips would be permitted by mail carriers to transport additional mail. The memo warned that "one aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or mail on the workroom floor or docks (in [Processing & Distribution Centers]), which is not typical."

64.     Moreover, workers were also told that the trucks had to leave on time—even five minutes early—whether the mail was yet loaded on the trucks or not.

65.     This "leave mail behind" policy departed from the longstanding policy of the Postal Service, which was to transport all mail on a daily basis, even if it meant holding trucks for some amount of time to load all the day's mail, and even if it meant conducting a second trip in a single day.

66.     The policy has resulted in substantial delays in the delivery of mail. For example, some mail trucks have departed empty and mail left behind has accumulated at massive processing centers, creating backlogs in a system that is not designed to store mail. In addition, because of the pile up, shipments have been turned away because facilities have no space to process them.

67.     Another memo issued on or around the same day, entitled "New PMG's Expectations and Plans," stated that the "agency will prohibit overtime and strictly curtail the use of other measures local postmasters use to ameliorate staffing

19

shortages." This "no overtime" policy departed from the longstanding practice of USPS, which relied on significant overtime in order to attempt to deliver the mail within established service standards.

68.     The elimination of overtime has also created substantial delays in the delivery of mail, as USPS relied on overtime pay to ensure that mail was timely delivered. The elimination of overtime was particularly damaging given the fact that USPS was already suffering from staffing shortages due to COVID-19.

69.     On August 5, 2020, Defendant DeJoy met with congressional leadership to discuss dramatic increases in delayed and undelivered mail. During that meeting, he admitted that he had instituted policy changes shortly after assuming his position, including reductions in overtime, elimination of mail transportation trips, implementation of new mail sorting and delivery policies, and reduction in mail sorting equipment.[12]

70.     In mid-August, news reports nationwide disclosed that the Postal Service was scrapping a large number of its high-throughput mail sorting machines from processing facilities across the country. The *Washington Post* reported that a union grievance filed against the Postal Service stated that plans were to decommission 671 sorting machines, approximately 10% of the total nationwide. USPS has since stated in court filings that it has in fact removed 711 machines, which is double the number it has typically removed in a typical recent year. In

---

[12] Letter from Congresswoman Pelosi and Senator Schumer to Defendant DeJoy dated August 6, 2020.

Florida, 59 sorting machines were removed—more than any other place in the country except for California.

71.     Some processing facilities have been left with only a single sorting machine, meaning that mail is significantly delayed if that machine happens to malfunction and requires service. Postal workers have expressed serious concerns that the reduction in sorting capacity will slow down mail delivery.

72.     In response to public outcry and congressional hearings, Defendant DeJoy released an official statement on August 18, 2020, stating that no additional mail processing equipment would be removed, that no facilities would be closed, and that overtime would be "approved as needed." The statement also stated that the Postal Service would "engage standby resources" as of October 1 "to satisfy any unforeseen demand."

73.     Defendant DeJoy's August 18, 2020 statement did not acknowledge that more than 700 sorting machines had already been decommissioned and did not address the "leave mail behind" policy.

74.     In subsequent testimony before House and Senate oversight committees, Defendant DeJoy acknowledged that the changes implemented at the Postal Service had resulted in significantly slowed service and substantial delays in delivery of First-Class mail.

75.     USPS has also since asserted that many decommissioned sorting machines were disassembled and cannot be replaced.

76.     Moreover, the changes that Defendant DeJoy enacted, and which have slowed down mail delivery, are not limited to leaving mail behind, curtailing overtime pay and decommissioning sorting machines, as described above. In addition, the USPS also removed mailboxes and reduced operating hours, further exacerbating the problem. For example, USPS announced that post offices in many States, including in Florida, would have reduced hours.

## IV.   THE EFFECT OF DEJOY'S NEW POLICIES ON MAIL VOTING IN THE UNITED STATES

77.     By taking these steps, Defendants have endangered the integrity of the vote in the November general election and have put at risk the ballots of hundreds of thousands of individuals, including tens of thousands in Florida, who will rely on the mail to cast their ballots.

78.     The speed and accuracy with which the Postal Service delivers completed ballots will determine the fate of voters' ballots. Anything less than the most expeditious and diligent delivery of completed ballots means that voters who would otherwise have cast a ballot will lose their vote on account of the Postal Service's delay.

79.     As a result of Defendants' policy changes, people across the country have reported extraordinary delays in delivery of all U.S. Mail, including medicines, social security checks, and other essential mail.

80.     In addition, the policy changes discussed above have and will continue to have a tremendous effect on election mail specifically.

81.     In the November 2018 General Election—before the COVID-19 pandemic—23.1% of all ballots comprising 28 million votes were cast by mail.

82.     The sheer number and proportion of citizens voting by mail means that even a relatively small degradation in the Postal Service's treatment of election mail can have a major impact on the results of an election. The Postal Service's diligence and speed are thus not only a matter of concern to individual voters but also to the public's confidence in our electoral system.

83.     The Postal Service is obligated by law to enact regulations establishing service standards for each class of mail. The Postal Service's performance standard for 2-day First-Class mail is 96.5%.[13]

84.     As discussed above, the Postal Service's policy of giving special treatment to election mail including treating it as First-Class mail has been critical to ensuring the on-time delivery of election mail.

85.     With the policy changes that Defendant DeJoy enacted, the Postal Service cannot meet its standards for on-time delivery.

86.     The share of First-Class mail that was delivered on time across the United States fell by more than nine percentage points after Defendant DeJoy implemented his policy changes. According to agency data analyzed and reported by Senator Gary Peters in "Failure to Deliver: Harm Caused by U.S. Postmaster General DeJoy's Changes to Postal Service Mail Delivery," in the first full week of

---

[13] First-Class mail has a 2-day service standard if the origin and destination are served by processing and distribution facilities that are within a 6-hour drive from one another. 3, 4, and 5-day service standards apply to mail traveling longer distances. *See* 39 C.F.R. § 121.1.

July, before Defendant DeJoy enacted his new policies, 90.6% of First-Class mail was on time; in the second week of August, after the changes had taken effect, that number dropped to 81.5%.

87.     Senator Peters' investigation found that 350 million pieces of First-Class mail—nearly 7% of the nation's total First-Class mail—were delayed in the five weeks after Defendant DeJoy's changes were implemented. 85 million pieces of First-Class mail were delayed in their delivery in the second week of August alone.

88.     Without special treatment of election mail, approximately 1 out of every 5 ballots will not be timely delivered.

89.     The effects of the Postal Service's policy and operational changes will be felt most acutely in states that have a strict Election Day deadline for ballots to be received, such as Florida.

90.     Florida voters, in particular, stand to suffer from these changes because Florida law allows voters to request ballots up until ten days before Election Day and allows election supervisors to wait until eight days before Election Day to mail out blank ballots. Under the Postal Service's prior policies, this did not prevent ballots from being returned in time to be counted.

91.     But because after Defendant DeJoy's policy changes the Postal Service is now frequently missing its 2-day or 3-5-day targets, many Florida voters will not have sufficient time to receive their ballot, complete it, and send it back in time to be delivered by Election Day.

92.     In addition, the planned and ongoing removal of sorting machines in Florida alone will result in a loss of sorting capacity of 200,000 to 300,000 pieces of mail per hour.

93.     These policy changes affect voters disproportionately depending on where they live. The following chart shows the decline in delivery time for First-Class mail during 2020, as well as the disparities between regions of Florida:

| Week | First Class Mail | | |
|---|---|---|---|
| | South Florida | Suncoast | Gulf Atlantic |
| 1/4/2020 | 91.89% | 90.93% | 92.29% |
| 4/4/2020 | 91.43% | 92.58% | 92.24% |
| 7/1/2020 | 91.77% | 93.04% | 93.72% |
| 9/26/2020 | 84.38% | 88.41% | 82.56% |

94.     Defendant DeJoy's policy changes and their resulting delays operate, in effect, as a trap for the unwary: individuals who fully comply with state laws, diligently mail their ballots, and rely on the Postal Service's posted delivery commitments will be disenfranchised because of the Postal Service's sweeping election-eve policy changes.

## V.     THE PANDEMIC EXACERBATES THE HARM CAUSED BY DEJOY'S POLICY CHANGES

95.     Defendant DeJoy's changes to Postal Service policies are even more consequential to the upcoming election in light of the COVID-19 pandemic, which has dramatically increased the proportion of voters opting to vote by mail.

96.     COVID-19 is a deadly respiratory disease that is spread through the air when an infected person coughs, sneezes, or talks in proximity to others. Initial research suggests that the risk of infection is higher indoors, in places with poor ventilation, and in places where larger numbers of people congregate together or in close succession.

97.     More than 6.5 million people in the United States have contracted COVID-19. More than 200,000 people have died. Many more have suffered grave, debilitating illness.

98.     Certain groups of people are at higher risk for severe complications and death from COVID-19, including older adults and those suffering from cancer, chronic kidney disease, pulmonary disease, obesity, serious heart conditions, sickle cell disease, diabetes, and immunocompromised people, among others.

99.     COVID-19 has had a particularly harmful impact on racial minorities. Black and Latino people are disproportionately represented in essential work settings, are more likely to live in multigenerational families, and have higher rates of COVID-19 infection compared to White people. Age-adjusted hospitalization rates are roughly five times higher for racial minorities, and Black and Latino adults are dying from COVID-19 at more than 2.4 times and 1.5 times (respectively) the rate of White people.

100.    In Florida, too, the pandemic has disproportionately impacted racial minorities. The age-adjusted death rate in Florida is higher for every category of

racial minority. For Black people, it is more than three times higher, and for Latinos it is more than two times higher.

101.    Because of the increased risk of contracting and dying from COVID-19, elderly and medically vulnerable populations in Florida, as well as Black, Latino, and other racial minority populations, are less likely to vote in person and more likely to rely on voting by mail.

102.    At present, Florida has had more COVID-19 cases and deaths in absolute numbers and per capita than most states in the nation. Nearly 700,000 Floridians have contracted COVID-19 and more than 13,000 have died. In recent weeks, between 2,000 and 4,000 Floridians per day have been diagnosed with COVID-19. Florida also has a disproportionate share of high-risk individuals, with significantly more residents and voters above 65 years of age than the country as a whole.

103.    Polling sites and early voting locations are places where there is an elevated risk of transmission of COVID-19 due to the larger number of people congregating or passing through such facilities and the increased likelihood for viral spread indoors.

104.    Voters who are at higher risk for serious complications of COVID-19, or who live, work or otherwise come into close contact with vulnerable people, may not be willing to take the chance of contracting COVID-19 by coming to the polls or to an early-voting location.

105.    Voters who are infected with COVID-19 or who have been exposed or who may be infected should not vote in-person in order to avoid further spreading the virus. Some voters will be subject to mandatory self-quarantine or similar measures that leave them with no legal (or responsible) option other than voting by mail.

106.    Voting by mail is the safest option for voters concerned about contracting or spreading COVID-19 because it can typically be accomplished without coming within six feet of any other person, and it does not require attending a particular physical location frequented by others. Public health experts recommend voting by absentee ballot as the best method to vote in order to avoid contracting or spreading the virus.

107.    COVID-19 also makes voting in person on Election Day or at in-person early voting locations more difficult. Public health precautions and shortages of experienced poll workers—many of whom were senior citizens who are now unwilling to risk infection at the polls—have slowed ordinary in-person voting procedures, leading to long lines and uncertainty at the polls.

108.    The COVID-19 pandemic has thus had a massive effect on voting patterns, vastly increasing the share of voters who have chosen to vote using absentee ballots.

109.    Indeed, there have been dozens of statewide elections since the pandemic began. In all or nearly all of those elections, the percentage of individuals

voting absentee has increased dramatically, often increasing from single-digit or low-teens to well over 50%.

110.   In Florida's most recent primary election, held on August 18, 2020, the number of vote-by-mail ballots has vastly outpaced prior years, with more than 2.1 million votes cast by mail, compared with only 1.35 million and 1.28 million in the 2018 and 2016 primaries, respectively.

111.   The number and proportion of voters voting by mail in the November general election is expected to be even higher.

112.   The increase in the share of mailed ballots means that there are many people who are voting by mail for the first time. Such voters are unfamiliar with vote-by-mail procedures and are much more likely to have their ballots rejected for technical reasons—for example because they sent their ballot close to the election (as provided by state law) but it arrived after Election Day (and is thus rejected under state law).

113.   A nationwide study of mail-in ballots during the 2020 primary season counted more than 550,000 mail-in ballots that had been rejected nationwide.

114.   In states such as Florida, where absentee ballots must be received by Election Day, one of the most common reasons absentee ballots are rejected is that the Postal Service simply does not deliver the ballot to election officials in time to count it.

115.    That the Postal Service is likely to deliver election mail after Florida's election-night deadline is readily apparent by the Postal Service's concerning performance during Florida's 2020 primary elections:

- According to a study conducted by the Stanford-MIT Healthy Elections Project, during Florida's March 17, 2020 presidential primary, Florida rejected 18,504 vote-by-mail ("VBM") ballots—1.34% of all VBM ballots cast. The study notes that late delivery was a "major cause" of their disqualification.[14]

- The problem got worse during Florida's August 18, 2020 primary election. According to reporting, more than 35,500 VBM ballots were rejected, amounting to 1.5% of the total vote. According to expert analysis, of those rejected, nearly 66% were disqualified because they were late.

- Absentee ballot rejections were not evenly or proportionately distributed across the state. A single county—Miami-Dade—accounted for close to one quarter of VBM ballots that were tossed out statewide, most of which were received after the deadline or without a signature.[15]

---

[14] Diana Cao, *Florida Election Analysis* 15, HEALTHYELECTIONS.ORG (June 24, 2020), available at: https://healthyelections.org/sites/default/files/2020-09/Florida%20Election%20Memo.pdf.    The study notes that its source of relevant data "did not contain information about why these mail ballots were unsuccessful; however, they appear to be due to two major causes: ballots that were returned on time but had a defect that prevented them from being counted, and ballots that arrived after 7:00 p.m. on Election Day."

[15] Marc Caputo, Gary Fineout, *More than 35,000 mail-in ballots were rejected in Florida primary*, POLITICO (Sept. 17, 2020), https://www.politico.com/states/florida/story/2020/09/17/more-than-35-000-mail-in-ballots-were-rejected-in-florida-primary-1317327

- In the same primary, almost 1,300 VBM ballots were not delivered in time to be counted in Volusia County—more than double that of the 2018 and 2016 primaries.[16]

- In addition, during the same August 2020 primary, news reporting noted the following: (a) Roughly 700 Manatee County primary VBM ballots were not counted because they arrived after the 7 p.m. deadline;[17] (b) Sarasota County had 574 VBM ballots that arrived after the primary deadline and were not counted;[18] (c) Orange County received 1,299 VBM ballots late, including 114 that were postmarked before election day;[19] (d) Lake County officials estimated there were 500 to 600 VBM ballots received after the deadline;[20] and (e) in Flagler County, where 27,073 primary ballots were cast, 79 VBM ballots arrived late.[21]

116.   Historically, this proportion of discarded ballots is well above the margin of victory in many Florida elections.

---

[16] Nicole Griffin, *Nearly 1,300 Mail-In Ballots Arrived After Election Day in Volusia*, SPECTRUM NEWS 13 (Sept. 1, 2020), https://www.mynews13.com/fl/orlando/2020-elections/2020/09/01/more-than-1000-mail-in-ballots-not-counted-in-volusia-county

[17] Zac Anderson, *Florida voters request nearly 4.6 million mail ballots; elections officials urge prompt action*, SARASOTA HERALD-TRIBUNE (Sept. 19, 2020), https://www.heraldtribune.com/story/news/2020/09/18/florida-send-out-4-5-million-absentee-ballots-general-election-and-officials-urging-voters-mail-them/3483957001/

[18] *Id.*

[19] *Volusia elections chief complains about mail-in ballots that U.S. Post Office didn't deliver on time*, ORLANDO SENTINEL (Aug. 28, 2020), http://www.orlandosentinel.com/politics/2020-election/os-ne-2020-primary-ballots-arrive-late-20200828-krd6zmo2p5gfdk7c7ve5t4kmxa-story.html

[20] *Id.*

[21] Marc Harper, *1,500+ Volusia mail ballots arrived late; Lisa Lewis: 'Upsetting'*, THE DAYTONA BEACH NEWS-JOURNAL (Aug. 28, 2020), https://www.news-journalonline.com/story/news/politics/elections/2020/08/27/volusias-lisa-lewis-calls-late-arriving-mail-ballots-upsetting/3428765001/

117.    There is a substantial likelihood that, on its present course, the Postal Service will be unable to ensure timely delivery of the exceptionally high volume of election mail in Florida for the November 3rd election.

118.    As of October 14, 2020, more than 5.7 million mail ballots have been requested in Florida, an increase of more than 60% compared to the 2016 general election. As of this filing, approximately two thirds of those ballots have not been received, 52,000 have been returned as "undeliverable," and more than 10,000 have been invalidated for voter error, requiring voters to take corrective action in order for their votes to be counted.

119.    The likelihood that a ballot will go uncounted falls disproportionately on first-time voters, younger voters, and Black and Hispanic voters, diminishing the voting power of groups that are already historically underrepresented in elections.

120.    According to a study published by the Stanford-MIT Healthy Elections Project, voters in the 18–29 age group were more than twice as likely to have their mail-in ballot go uncounted. Black and Hispanic voters were twice as likely to have their ballots not accepted for counting, as compared with non-Hispanic white voters. *See* Diana Cao, Florida Election Analysis (June 24, 2020).[22]

121.    The number and proportion of mail-in ballots in the November general election is likely to be higher than anything this country has ever seen. That combined with strict deadlines by which ballots must be received—even if mailed

---

[22] https://healthyelections.org/sites/default/files/2020-06/Florida%20Election%20Memo.pdf.

timely by the voter—means that the speed and reliability of the Postal Service will directly determine the fate of an unprecedented number and proportion of ballots.

## VI.   DEJOY'S POLICY CHANGES ARE UNLAWFUL

122.   Defendants implemented the policy changes discussed above illegally.

123.   A brief explanation of the structure and function of the Postal Service is appropriate to understanding why Defendant DeJoy's actions were unlawful.

124.   Since 1970, the Postal Service has operated as an independent establishment in the executive branch, headed by a Board of Governors. The Board of Governors comprises eleven governors, nine of whom are directly appointed by the President, with the advice and consent of the Senate following consultation with the leadership in both houses of Congress. The nine governors serve staggered seven-year terms and may not be removed by the President except for cause. No more than five of the nine governors may adhere to the same political party.

125.   The Postmaster General is appointed directly by the nine governors and may be removed by them at will. The Postmaster General serves as Chief Executive Officer of the Postal Service and also sits as an additional member of the Board of Governors.

126.   The Deputy Postmaster General is appointed and removed by the Senate-confirmed governors, together with the Postmaster General, and sits as the final member of the Board of Governors.

127.   The Board of Governors has delegated authority to the Postmaster General to exercise the powers of the Postal Service to the fullest extent permitted by statute.

33

128.    Presently, there are only six of nine Senate-confirmed governors, and the position of Deputy Postmaster General is vacant. All of the currently serving, Senate-confirmed governors were appointed by President Trump.

129.    The Postal Service is overseen and regulated by the Postal Regulatory Commission ("PRC").

130.    The PRC has significant authority to review and approve major actions of the Postal Service including setting prices, establishing standards and performance, and changing policies that affect mail service nationwide.

131.    While the Postmaster General and Board of Governors have broad authority for daily management of the Postal Service, the PRC plays a crucial role to ensure that the Postal Service acts in the public interest and according to law.

132.    To this end, the PRC has significant powers, including the authority to conduct public, on-the-record hearings at which an officer of the PRC represents the interests of the public; it has authority to issue subpoenas and the power to direct the Postal Service to adjust rates; it even has the power to levy fines against the Postal Service.

133.    The PRC comprises five Senate-confirmed appointees removeable only for cause, each of whom serves a staggered six-year term. No more than three members of the Commission may adhere to the same party.

134.    The PRC currently has a full complement of five members, two of whom were appointed by President Trump.

135.    The Postal Reorganization Act of 1970 restricted the authority of the Postmaster General and Board of Governors to make changes that would affect postal service on a substantial nationwide basis. In particular, it provided that the Postmaster General and Board of Governors may not make such policy changes without PRC oversight and a full opportunity for the public and its representatives to be heard in formal, on-the-record hearings.

136.    Specifically, 39 U.S.C. § 3661(b) requires that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."

137.    In response to any such proposal from the Postal Service, the PRC may not issue the advisory opinion required by statute "until an opportunity for hearing on the record under section 556 and 557 of the title 5 has been accorded to the Postal Service, users of the mail, and an officer of the [PRC] who shall be required to represent the interests of the general public." 39 U.S.C. § 3661(c).

138.    Congress's specific command that "users of the mail" must have an opportunity to be heard on the record underscores the important role that such proceedings play in ensuring that the Postal Service remains directly answerable to the public it serves when making nationwide changes.

35

139.     Moreover, the required procedures under 5 U.S.C. §§ 556-557 are the most formal, trial-like administrative hearings available under the Administrative Procedure Act. At such hearings, the PRC has authority to administer oaths, receive testimony and other evidence, preside over examinations and cross-examinations of witnesses, take depositions, issue subpoenas, and rule on the admissibility of evidence. 5 U.S.C. § 556(c)-(d). The agency's opinion must be based on the testimony, exhibits, and other papers filed on the record at the proceeding. 5 U.S.C. § 556(e). The PRC has issued regulations laying out comprehensive and exacting procedural rules to govern such hearings. 39 C.F.R. §§ 3020.101-.123.

140.     Following such hearings, the PRC may issue its advisory opinion, which "shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under [Title 39 of the U.S. Code]." 39 U.S.C. § 3661(c). Only then may the Postal Service enact its proposed changes.

141.     Each and every one of the policy changes implemented by Defendant DeJoy and discussed in this complaint were imposed without Defendant DeJoy or any other member of the Postal Service or Board of Governors filing a proposal with the PRC and without seeking the required advisory opinion under 39 U.S.C. § 3661. This is the case despite that these policy changes have profound nationwide effect.

142.     As a result, the Postal Service policy changes implemented by Defendant DeJoy—both those affecting the mail generally and those affecting election mail in particular—have been adopted in violation of federal law.

36

## VII.   PLAINTIFF IS INJURED BY DEJOY'S POLICY CHANGES

143.   1199SEIU is the largest local union of healthcare workers in the nation, with more than 450,000 members in Florida, Massachusetts, New York, New Jersey, Maryland, and Washington, D.C. Since its founding in 1932, 1199SEIU has championed equality, justice, and democracy. 1199SEIU represents 26,000 healthcare workers and 10,000 retiree members living throughout the State of Florida, including in Miami-Dade, Broward, and Palm Beach counties, and it has an office within the Southern District of Florida.

144.   Members of 1199SEIU suffer direct injuries as a result of Defendants' actions. Because 1199SEIU members are hospital and nursing home workers serving on the front lines of our response to the COVID-19 pandemic, they are especially reliant on their ability to cast ballots by mail. Similarly, 1199SEIU's retiree members, due to their age and other infirmities, rely on their ability to cast mail ballots. 1199SEIU brings this lawsuit to vindicate their rights.

145.   Slow, unreliable, or delayed mail delivery will disenfranchise a large number of 1199SEIU members. For many 1199SEIU members, casting a ballot by mail is the only safe means to vote. Voting at in-person polling locations or even traveling to drop-boxes risks transmission of the virus to or from 1199SEIU members, who work in medical settings and directly with vulnerable patients, and retirees, whose own disabilities and health conditions prevent them from going into public spaces during the pandemic.

146.   Moreover, 1199SEIU members who have had direct exposure to COVID-infected people—or who themselves have tested positive for the virus—may

be required to self-quarantine at home for at least fourteen days and thus will have no option but to vote by mail.  Additionally, 1199SEIU members work long hours, including mandatory overtime shifts to cover the shifts of co-workers who are ill or required to quarantine, and therefore may not be able to get to a polling place during voting hours.  1199SEIU members who intend to vote in person early or on Election Day may find themselves unable to do so —and reliant exclusively on the mail—if they are exposed to COVID or diagnosed positive in the weeks immediately before the election. Those voters are at very high risk of being disenfranchised because the Postal Service fails to deliver and return absentee ballots in time to be counted.

147.    1199SEIU retired members, the overwhelming majority of whom are over the age of 65 and many of whom also suffer from serious medical conditions or live with someone who does, rely on their ability to vote by mail because either they are unable to vote in person or because, due to the ongoing pandemic, it is not safe for them to do so.  Additionally, many retiree members do not drive or do not own cars and would have to rely on public transportation to get to polling sites, increasing the difficulty of voting in person for retiree members with disabilities and heightening the risk of exposure to COVID-19 if they try to vote in person.

148.    In addition to the injuries suffered by its members, 1199SEIU itself is harmed by Defendants' actions and policies.

149.    As part of its mission, 1199SEIU expends considerable time, effort, and resources encouraging its members and others to vote in national, state, and local

elections. 1199SEIU engages in voter registration efforts, door-to-door canvassing, issue education, and training on voting methods, among other activities. For example, 1199SEIU regularly contacts members to notify them about upcoming elections and to educate them about voting mechanics as well as the positions of candidates on various issues. 1199SEIU also organizes other assistance necessary for its members to cast their ballot, such as providing transportation to polling locations and responding to members' questions about the election.

150.     As part of these efforts, 1199SEIU expends significant time, resources, and effort educating its members and others about the various methods of casting a ballot, including voting by mail, and works to make sure that individuals are able to cast their votes effectively.

151.     1199SEIU's resources come ultimately from dues paid by members of the union, many of whom work hard for relatively low pay, but who have nonetheless chosen to dedicate part of their pay to supporting the union's voter mobilization work and other voter education activities.

152.     Because of the coronavirus pandemic and the unique risks faced by its members, 1199SEIU has in recent months placed significant emphasis on educating and mobilizing members and others around voting by mail. As a result, like other Floridians, many 1199SEIU members will be voting by mail for the first time. Because voting by mail involves added complexities and risk of error, educating voters on mail voting involves considerable expenditure of resources.

153.    1199SEIU's efforts and plans have been and will be seriously disrupted by Defendants' changes to the Postal Service's policies and operations. Slowed mail delivery and the sheer uncertainty regarding the reliability of the Postal Service have forced and will force 1199SEIU to divert and expend substantial resources attempting to explain these changes to its members and voters.

154.    These efforts include, for example, expanding efforts to educate voters about voting by mail, having follow-up conversations with members and voters regarding the new risks and uncertainties of voting by mail, counseling voters about how to cancel a vote-by-mail ballot should they wish to vote in person instead, monitoring the speed of mail delivery in counties across the state, retraining organizers and staff regarding voting methods and the risks of mail voting, contacting members with updated information about county-specific hours and locations of vote-by-mail drop-boxes, helping members track whether their mail ballot has been received by their local supervisor of elections, and redirecting resources toward non-mail voting methods, including diverting resources to provide personal protective equipment and safe transportation to voters who wish to travel to a central drop-box or early voting location rather than mail their ballot.

155.    These injuries are compounded by the uncertain and constantly changing reports regarding the Postal Service's handling of election mail. Defendants have forced 1199SEIU to expend considerable resources to grapple with that uncertainty and to prepare a variety of previously-unnecessary contingency plans. Moreover, Defendants' actions have and will outright frustrate 1199SEIU's

efforts to the extent that its work mobilizing members and others to vote safely by mail sometimes results in those members' disenfranchisement because the Postal Service delivered their ballots too late to be counted.

## VIII. THE FIVE NATIONWIDE INJUNCTIONS AGAINST THE POSTAL SERVICE'S POLICY CHANGES

156.   In *State of Washington, et al. v. Trump, et al.*, No. 1:20-CV-03127-SAB (E.D. Wash.), fourteen States sued the Postal Service over the changes to postal operations and the handling of election mail described above. The States' claims include allegations that Defendant DeJoy's policy changes violated the Postal Service's statutory mandate under 39 U.S.C. § 3661 to hold a hearing and to seek an advisory opinion from the Postal Regulatory Commission before implementing policy changes that will affect service on a "substantially nationwide basis." The plaintiffs moved for a preliminary injunction to reverse the illegal changes.

157.   After holding a hearing on the plaintiffs' motion, the court granted it, concluding that the States have demonstrated a substantial likelihood of success on their § 3661 claim and meet the other requirements for a grant of preliminary injunctive relief. *Washington*, 2020 WL 5568557 at *6 (E.D. Wash. Sept. 17, 2020).

158.   The court's order enjoins the Postal Service on a nationwide basis from implementing or enforcing the policy changes that have slowed mail service, including "instructing mail carriers to leave mail behind for processing or delivery at a later date," disallowing additional delivery trips and other extra work needed to ensure timely mail delivery, and "deviating from the USPS's long-standing policy of treating election mail in accordance with First-Class Mail delivery standards

41

regardless of the paid class." *Id.* The order also enjoins any additional removal of processing equipment and requires that such equipment be returned to service where necessary to meet First-Class mail delivery standards for election mail. *Id.*

159.   In *Mondaire Jones et al. v. United States Postal Service et al.*, No. 20-CV-6516 (S.D.N.Y.), the plaintiffs, who seek to represent a class of similarly situated individuals, are candidates for office and voters from around the country. Their suit, in which they bring claims under the Fifth Amendment for equal protection violations and under the First Amendment, challenges the same Postal Service policy changes described in this complaint and in *Washington v. Trump*.

160.   The plaintiffs moved for a preliminary injunction. Following a hearing, the court granted their motion in part on Fifth Amendment grounds and, alternatively, on First Amendment grounds. *Jones*, 2020 WL 5627002 at *28 (S.D.N.Y. Sept. 21, 2020).

161.   In *New York v. Trump*, 1:20 Civ. 2340 (D.D.C.), three States, the City of New York, and the City and County of San Francisco sued the Postal Service over the changes to postal operations and the handling of election mail described above. Like the plaintiffs in *Washington v. Trump* and here, their claims include that these changes violated the Postal Service's statutory mandate under 39 U.S.C. § 3661 and would hamper mail-in voting in the upcoming general election. The plaintiffs moved for a preliminary injunction.

162.   The court found that the plaintiffs demonstrated a substantial likelihood of success on their § 3661 claim and met the other requirements for a

grant of preliminary injunctive relief, and it enjoined the Postal Service on a nationwide basis from implementing or enforcing the policy changes that have slowed mail service.

163.    In *Pennsylvania v. DeJoy*, 2:20 Civ. 4096 (E.D. Pa.), seven States sued the Postal Service over the changes to postal operations and the handling of election mail described above. Among other things, the lawsuit alleges that Defendant DeJoy's policy changes violated the Postal Service's statutory mandate under 39 U.S.C. § 3661. The plaintiffs moved for a preliminary injunction to reverse the illegal changes.

164.    The court ordered expedited discovery, including depositions of two Postal Service witnesses. After a hearing was held, which incorporated the depositions testimony and the testimony from the injunction hearing in the Southern District of New York in *Jones*, the court entered an injunction. The court found that the plaintiffs demonstrated a substantial likelihood of success on their § 3661 claim and met the other requirements for a grant of preliminary injunctive relief, and issued a nationwide injunction mirroring the one entered in *Jones* and thereby enjoining the Postal from implementing or enforcing the policy changes that have slowed mail service.

165.    In *Vote Forward v. DeJoy*, No. 20-2504 (D.D.C.), a number of plaintiffs filed suit alleging that Defendants' policy changes violated the law and the plaintiffs' constitutional rights. Again, the district court ordered injunctive relief, holding that Defendants' actions violated the right to vote because "the potential for

43

voter disenfranchisement is immense" and the Postal Service's actions "caused and will continue to cause inconsistency and delays in the delivery of mail . . . placing at particular risk voters residing in [the] states that require mail ballots to be received, not just post-marked, by Election Day." *Vote Forward*, 2020 WL 5763869.

## LEGAL CLAIMS

### COUNT I

### Unauthorized and Unlawful Agency Action

166.    Plaintiff incorporates by reference each of the paragraphs in this Complaint as if restated fully herein.

167.    Non-statutory judicial review of the Postmaster General's actions is appropriate because Defendants' actions are *ultra vires*, in excesses of statutory authority, and contrary to statutory command.

168.    Defendants have implemented policy and operational changes, including to the Postal Service's handling of Election Mail, that have had and will continue to have a major effect on the mail delivery service. These changes affect service on a nationwide basis.

169.    Defendants have implemented these policy and operational changes without seeking an opinion from the Postal Regulatory Commission, as required by law, 39 U.S.C. § 3661(b), and without observing the procedures, including public notice and opportunity for comment, to which the public and Plaintiff are entitled, § 3661(c).

170.    Defendants' actions in adopting these policy and operational changes are *ultra vires* and contrary to law.

## COUNT II

## Arbitrary and Capricious Agency Action

171.    Plaintiff incorporates by reference each of the paragraphs in this Complaint as if restated fully herein.

172.    Non-statutory judicial review of the Postmaster General's actions is appropriate given that Defendants' actions are arbitrary and capricious and contrary to statutory command.

173.    Defendants have implemented policy and operational changes, including to the Postal Service's  handling of Election Mail, that have had and will continue to have a major effect on the mail delivery service.

174.    Defendants' formal pronouncements since May 2020 regarding election mail have reversed a longstanding policy of giving election mail special treatment by delivering mail even with insufficient (or no) postage, and by expediting ballots to ensure that as many as possible are received by state deadlines.

175.    Defendants have not offered any reasoned justification for the Postal Service's change in policy. Defendant DeJoy has also made contradictory statements, claiming not to have changed policy or practices regarding election mail even while disavowing the historic policy and practice of affording ballots special treatment.

176.    Defendants' actions have sowed confusion and mistrust regarding the mail as a means of casting a ballot. Defendant DeJoy's actions have jeopardize both

individual voters' ability to rely on the mail to cast ballots and the integrity of the election overall by potentially disenfranchising voters unnecessarily. Defendant DeJoy's actions also disproportionately burden first-time voters, younger voters, and Black and Hispanic voters.

177.    Defendants' policy changes are unlawful because they are arbitrary and capricious. They also violate the Postal Service's statutory obligation to "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail" including Election Mail. 39 U.S.C. § 101(e).

**COUNT III**

**Unconstitutional Burden on the Right to Vote**

178.    Plaintiff incorporates by reference each of the paragraphs of this Complaint as if restated fully herein.

179.    Under the First, Fifth, and Fourteenth Amendments, any restriction burdening the right to vote is subject to constitutional scrutiny. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

180.    Defendants' actions impose a serve burden on Plaintiff's and its members' constitutionally protected voting rights by making it difficult or impossible for them to vote by mail. Defendants' actions will result in many vadily cast ballots going uncounted because, through no fault of the voters, the ballot is not returned to elections officials before the state deadline.

181.   As a result, Defendants' actions have imposed and will impose a severe and sometimes prohibitive burden on Plaintiff's and its members' right to vote.

182.   Moreover, Defendants' actions have forced Plaintiff to divert resources from other election-related activities toward ensuring ballot access to a large population of its members and others in order to ensure that they will not be disenfranchised.

183.   Defendants have no countervailing legitimate government interest in inhibiting election mail during a pandemic.

184.   Unless enjoined by the Court, Defendants will continue violating the right to vote under the First, Fifth, and Fourteenth Amendments.

## COUNT IV

### Violation of Equal Protection

185.   Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

186.   The Fifth and Fourteenth Amendments prohibit the government from denying to any person the equal protection of the laws.

187.   "Having once granted the right to vote on equal terms, [the government] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

188.   Defendants' actions arbitrarily advantage voters in some jurisdictions within Florida and disadvantage voters who reside in others, including especially voters in Southern Florida.

189.     In so doing, Defendants have violated Plaintiffs' right to equal
protection.

190.     Unless enjoined by the Court, Defendants will continue violating the
Fifth and Fourteenth Amendments.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

1.     Declare that Defendants' conduct violates the requirements of 39
U.S.C. § 3661 and are *ultra vires*, void, and/or arbitrary and capricious, and enjoin
Defendants' unlawful conduct.

2.     Declare that Defendants' conduct violates the Constitution and enjoin
Defendants' unlawful conduct.

3.     Order Defendants to make and/or disclose arrangements and
scheduling for the timely collection, processing, delivery, and transfer of mailed
ballots to the custody of the Supervisor of Election in each Florida county,
consistent with Plaintiffs' request for injunctive relief accompanying this First
Amended Complaint.

4.     Order Defendants to provide this Court and Plaintiff with daily
updates, with respect to each Florida zip code, on a) the percentage of First-Class
mail delivered within three days of mailing; b) the percentage of ballots delivered
from state election authorities to Florida residents within three days of mailing; c)
the percentage of ballots delivered from residents to state election officials within
that zip code within three days of mailing.

5.     Award attorney's fees and costs pursuant to 28 U.S.C. § 2412.

6.      Grant any other relief that the Court deems just and proper.

RESPECTFULLY SUBMITTED,

**1199SEIU**

By: /s/ Igor Hernandez
One of Plaintiff's Attorneys

Jonathan Manes*
RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
160 E Grand Ave, 6th Fl
Chicago, IL  60611
Tel: 312-503-0012
Fax: 312-503-0891
jonathan.manes@law.northwestern.edu

David J. Bradford*
Daniel J. Weiss*
Ashley M. Schumacher*
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654-3456
Telephone:  (312) 222-9350
Fax:  (312) 527-0484
dbradford@jenner.com
dweiss@jenner.com
aschumacher@jenner.com

Nayiri Pilikyan*
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, California  90071-2054
Telephone:  (213) 239-5700
Fax:  (213) 239-5199
npilikyan@jenner.com

Gayle Horn*
Anand Swaminathan*
Steve Art*
Julia Rickert*
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607

(312) 243-5900
steve@loevy.com

Igor Hernandez (Florida Bar Number 106386)
CORNISH HERNANDEZ GONAZLEZ
2525 Ponce de Leon Blvd. Suite 300
Coral Gables, FL 33134
(305) 501-8021
Ihernandez@chglawyers.com

*Admitted *pro hac vice*