UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

1199SEIU UNITED HEALTHCARE
WORKERS EAST,

Plaintiff,

v.

LOUIS DEJOY, in his official capacity as
United States Postmaster General, and the
UNITED STATES POSTAL SERVICE,

Defendants.

Case No. 20-cv-24069-RNS

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

I.     Current USPS Operating Policies for Handling of Election Mail ...................... 2

     A.    USPS Will Continue Longstanding Efforts to Ensure Timely Delivery of Election Mail ........................................................................................ 2

     B.    USPS Increased Efforts in Support of November Election ...................... 3

     C.    Operational Instructions and Guidance in Support of the November Election .................................................................................................... 4

          1.    September 21, 2020 Clarifying Operational Instructions ........... 5

          2.    September 25, 2020 Additional Resources Memorandum ........ 6

          3.    October 13, 2020 Supplemental Guidance Memorandum ......... 6

          4.    October 20, 2020 Extraordinary Measures Memorandum ........ 6

II.    Florida Specific Efforts ........................................................................... 8

ARGUMENT ............................................................................................................ 8

I.     Plaintiff's sought relief will hinder—rather than help—the expeditious delivery of Election Mail .......................................................................................... 8

II.    Plaintiff is unlikely to prevail on the merits of its claims ............................ 11

     A.    The Court lacks subject-matter jurisdiction over Plaintiffs' claims. ................... 11

     B.    Plaintiffs are unlikely to prevail on their claim that USPS had to observe the procedures in section 3661 prior to implementing the alleged policy changes. ................................................................................. 12

          1.    District Courts Lack Subject-Matter Jurisdiction Over Complaints Regarding 39 U.S.C. § 3661 ........................................... 12

          2.    Plaintiff is unlilley to prevail on its claim that USPS had to observe the procedures in section 3661 prior to implementing the alleged policy changes ...................................................... 13

     C.    Plaintiff is unlikely to establish that the alleged USPS policy changes is violated Plaintiff's members' right to vote. ........................................... 16

      D.     Plaintiff is unlikely to establish that USPS's failure to require all local postal units in Florida to adopt the same election mail protocols violates the equal protection component of the Fifth Amendment. ................................... 17

III.     Plaintiff fails to establish irreparable harm ...................................................................... 19

IV.     The balance of equities counsel against Plaintiff's requested relief ................................ 20

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Celebrezze*,
　460 U.S. 780 (1983) ........................................................................................... 16, 17

*Arcia v. Fla. Sec'y of State*,
　772 F.3d 1335 (11th Cir. 2014) ............................................................................... 12

*Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*,
　502 U.S. 32 (1991) ................................................................................................... 16

*Bovard v. U.S. Post Office*,
　47 F.3d 1178 (10th Cir. 1995) ................................................................................. 13

*Buchanan v. U.S. Postal Serv.*,
　508 F.2d 259 (5th Cir. 1975) ............................................................................. 14, 15

*Burdick v. Takushi*,
　504 U.S. 428 (1992) .......................................................................................... 16, 17

*Bush v. Gore*,
　531 U.S. 98 (2000) ................................................................................................... 18

*City of Los Angeles v. Lyons*,
　461 U.S. 95 (1983) ................................................................................................... 12

*Clapper v. Amnesty Int'l USA*,
　568 U.S. 398 (2013) ................................................................................................ 11

*Commonwealth of Pennsylvania v. DeJoy*,
　No. CV 20-4096, 2020 WL 5763553 (E.D. Pa. Sept. 28, 2020) ............................ 15

*FHR TB, LLC v. TB Isle Resort, LP*,
　865 F. Supp. 2d 1172 (S.D. Fla. 2011) .................................................................. 20

*Foster v. Pitney Bowes Corp.*,
　549 F. App'x 982 (Fed. Cir. 2013) ......................................................................... 13

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
　561 U.S. 477 (2010) ................................................................................................ 13

*Griffin Indus., Inc. v. Irvin*,
　496 F.3d 1189 (11th Cir. 2007) .............................................................................. 18

*Havens Reality Corp. v. Coleman*,
　455 U.S. 363 (1982) ................................................................................................ 12

iii

*In re Equifax., Inc., Customer Data Sec. Breach  Litig.*,
   371 F. Supp. 3d 1150 (N.D. Ga. 2019) ................................................................ 11

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
   548 F.3d 110 (D.C. Cir. 2008) ........................................................................... 13

*LeMay v. U.S. Postal Serv.*,
   450 F.3d 797 (8th Cir. 2006) ............................................................................. 13

*Libertarian Party v. D.C. Bd.of Elections & Ethics*,
   682 F.3d 72 (D.C. Cir. 2012) ............................................................................. 17

*McDermott v. Potter*,
   No. C09-0776RSL, 2009 WL 2971585 (W.D. Wash. Sept. 11, 2009) ...................... 13

*Mittleman v. Postal Regul. Comm'n*,
   757 F.3d 300 (D.C. Cir. 2014) ........................................................................... 14

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
   437 F.3d 1256 (D.C. Cir. 2006) ................................................................... 14, 16

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
   No. 18-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020) ..................... 14, 15

*New Georgia Proejct v. Raffensperger*,
   2020 WL 5877588 (11th Cir. 2020) .................................................................... 20

*Nyunt v. Broad. Bd. of Govs.*,
   589 F.3d 445 (D.C. Cir. 2009) ........................................................................... 14

*Pep-Wku, LLC v. U.S. Postal Serv.*,
   No. 1:20-cv-0009-GNS, 2020 WL 2090514 (W.D. Ky. Apr. 30, 2020) .................. 13

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) .............................................................................................. 9

*Republican Natl'l Comm. v. Democratic Nat'l Comm.*,
   140 S. Ct. 1205 (2020) ...................................................................................... 20

*Rodriguez v. Hemit*,
   No. C16-778 RAJ, 2018 WL 3618260 (W.D. Wash. July 30, 2018) ...................... 13

*Rosario v. Rockefeller*,
   410 U.S. 752 (1973) .......................................................................................... 17

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) .......................................................................... 19

iv

*Striley v. U.S. Postal Serv.*,
    No. 16-CV-07233-HRL, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017) ...................................... 13

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) ............................................................................................... 11, 19

*Telecomms Res. & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ............................................................................................ 13

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ...................................................................................................... 12

*Wexler v. Anderson*,
    452 F.3d 1226 (11th Cir. 2006) ................................................................................. 18, 19

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*,
    379 U.S.411, 420 (1995) ................................................................................................. 13

## STATUTES

39 U.S.C. § 3661 ....................................................................................................... 13, 14, 19

39 U.S.C. § 3662 ............................................................................................................ 12, 13

39 U.S.C. § 3663 ................................................................................................................. 12

## OTHER AUTHORITIES

https://www.leonvotes.gov/Vote-By-Mail/Mail-Ballot-Drop-Boxes ........................................... 17

https://www.votemarion.gov/Election-Info/Mail-Ballot-Drop-Box-Locations ............................ 17

**INTRODUCTION**

After sitting on the sidelines for months, and witnessing other parties in other courts obtain injunctions against USPS, Plaintiff has now decided to ask this Court, on the eve of the election, to institute fundamental changes to the operations of the Postal Service that would impact every local postal unit in Florida. There should be no misunderstanding—Plaintiff's belated request for relief would serve to disrupt the Postal Service's delivery of Election Mail in this critical period.

For two months, USPS has been involved in a series of cases involving the same alleged USPS policies and same legal theories at issue here.  In response, USPS has either settled with plaintiffs or taken actions to comply with court orders that are extraordinary in their commitment to the timely delivery of election mail.  USPS Headquarters has (i) ceased enforcing the allegedly illegal policies at issue, and (ii) clarified, repeatedly, for USPS employees that these policies are not in effect. USPS has faithfully complied with these injunctions, and has gone even further, committing *additional* resources to ensure that Election Mail will be  delivered in a timely manner.

Plaintiff now demands an affirmative injunction, seeking to impose significant changes in how the Postal Service processes Election Mail with the ballot deadline days away.  These changes will fundamentally alter how and where mail is processed; and Plaintiff seeks these changes with no consideration for the existing operational plans that the Postal Service is focused on effectuating.  In essence, Plaintiff wants the Postal Service to design an entirely new transportation and mail processing system for the last days before the Election, *from scratch*, in a manner that would only delay the mail.  This request is extraordinary, and as the Supreme Court has instructed, courts should not impose changes that risk disrupting voting on the eve of an election.

Although Plaintiff recycles the legal theories from cases that have been pending for months, their requested relief is of an entirely different character, and not simply because it is requested at such a late stage.  In other cases, the plaintiffs sought relief that was connected to undoing the purported actions that were the subject of their legal claims. For example, the plaintiffs challenged an alleged USPS policy that prohibited all late and extra trips, and thus the plaintiffs sought injunctive relief preventing USPS from enforcing that purported policy.

Here, by contrast, the relief sought by Plaintiff is unrelated to USPS's alleged policy changes that give rise to this, and related, lawsuits. Plaintiff does not demand that USPS cease enforcing the challenged policies; nor could they, in light of the fact that they have been ended

1

(and will remain that way through the election). Instead, Plaintiff demands that USPS simply adopt an entirely new Election Mail policy that would apply *only* to the State of Florida.

Critically, this relief—sought less than two weeks before the election—is patently unreasonable. Different local facilities face different circumstances. Requiring all of them to radically change their Election Mail practices, and adopt a uniform standard, would result in disastrous consequences for the timely delivery of mail in Florida in light of the confusion it would create, with many of the changes impossible to do. Nor does Plaintiff show how this policy would actually assist the expeditious delivery of ballots. To the contrary, only Defendants provide evidence concerning the impact of this policy, and that evidence demonstrates the likelihood that the changes would frustrate, rather than assist, the timely delivery of Election Mail.

The Court should reject Plaintiff's belated request for extraordinary emergency relief on the eve of the upcoming election.

## BACKGROUND

### I.      Current USPS Operating Policies for Handling of Election Mail

Election Mail includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications). *See* Declaration of Robert Glass ("Glass Dec.") ¶ 3.  USPS has long regarded Election Mail as having special importance. The USPS is treating the November election with even greater care, with an anticipated relative upsurge in Election Mail volume due to COVID-19-related mitigation efforts. USPS analysis has concluded that, even if every registered voter in the United States used a mail-in ballot in the Election, the associated volume would represent only two to five percent of the total mail volume in October and November 2020, *id.* ¶ 42, paling in comparison to spikes in volume that USPS handles every winter holiday season.  *Id.* ¶ 43; Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 23.

### A.      USPS Will Continue Longstanding Efforts to Ensure Timely Delivery of Election Mail

As detailed below and in USPS's declarations and public statements, USPS has been planning for the November Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered.  Glass Dec. ¶¶ 42-44. USPS will continue to employ longstanding practices to facilitate the use of Election Mail by states, and to

enhance USPS's handling of Election Mail.  These include extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots.  *See generally id*. ¶¶ 3-41.   This year, the volume and frequency of USPS's communications have *increased* to address the COVID-19 pandemic.  *Id.* ¶ 32.

USPS has also consistently urged voters to return their completed ballots early.  *See, e.g.*, *id.* ¶ 42; Ex. 1 (USPS FY2019 Annual Report to Congress) at 2.

Operationally, USPS has taken special measures for many years, and is doing so again this year, to ensure the timely delivery of Election Mail:

- Where possible, USPS physically identifies and tracks the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost. Glass Dec. ¶¶ 11-14.

- USPS devotes excess First-Class Mail processing capacity to Election Mail, regardless of its class when entering the USPS network to process it ahead of other mail. *Id.* ¶¶ 21-22.

- USPS facilities deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day). *Id.* ¶ 19.

- Using an Advanced Facer Cancellation System (AFCS), USPS systematically postmarks (also referred to as "cancelling") all completed ballots returned by mail that are readily identifiable as ballots. *Id.* ¶ 34-41.

### B.    USPS Increased Efforts in Support of November Election

In addition to USPS's longstanding practices in support of mail-in voting, USPS has increased its efforts to process and deliver Election Mail for the November Election. On August 18, 2020, Postmaster General DeJoy publicly committed that, starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election. *Id.* ¶ 29; Ex. 2 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1-2.  USPS has also expanded its Election Mail Task Force this year to include leaders of the postal unions and management associations, to ensure strong coordination throughout USPS and with state and local election officials, and to make sure any concerns can be raised and timely resolved at the highest levels of the organization. *Id.* ¶ 10. And USPS will use Ballot Monitors during the week preceding and through Election Day to ensure that all USPS personnel follow proper protocol for identifying and postmarking ballots. *Id.* ¶ 39.

## C.        Operational Instructions and Guidance in Support of the November Election

Since August, several cases have been filed challenging purported USPS policy changes. To date, four district courts have issued a total of seven preliminary injunctions imposing a patchwork of overlapping obligations on the Postal Service.  Preliminary injunctions addressing the same USPS activities Plaintiff addresses here have issued in the following related cases: *Washington v. Trump*, No. 20-cv-3127 (E.D. Wash.) (nationwide preliminary injunction entered on Sept. 17, 2020; clarifying order entered Oct. 2, 2020); *Jones v. U.S. Postal Service*, No. 20-cv-6516 (S.D.N.Y.) (nationwide preliminary injunction entered Sept. 25, 2020; clarifying order entered Sept. 29, 2020); *Pennsylvania v. DeJoy*, No. 20-cv-4096 (E.D. Pa.) (nationwide preliminary injunction entered Sept. 28, 2020; clarifying order entered Oct. 13, 2020); *New York v. Trump*, No. 20-cv-2340 (D.D.C.) (nationwide preliminary injunction entered Sept. 28, 2020); *Vote Forward v. DeJoy*, No. 20-cv-2405 (nationwide preliminary injunction entered on Sept. 28, 2020); *Richardson v. Trump*, No. 20-cv-2262 (D.D.C.) (nationwide preliminary injunction entered Oct. 8, 2020); and *NAACP v. U.S. Postal Service*, No. 20-cv-2295 (D.D.C.) (nationwide preliminary injunction entered Oct. 10, 2020).  *See* Ex. 3 (Prelim. Inj. Orders).

Many of the activities at issue in this and related litigation were never in fact USPS policies. And, as to those that were, almost all of the complained-of activities were longstanding practices of USPS. In any event, the Postal Service has successfully undertaken the overwhelming task of synthesizing these injunctions in order to interpret and execute them in a coherent fashion for its employees. Accordingly, USPS has recently issued several operational instructions and guidelines addressing all of the purported Election Mail policies at issue. Each is discussed below.

### 1.        September 21, 2020 Clarifying Operational Instructions

On September 21, 2020, USPS issued detailed operational guidance regarding how to comply with the *Washington* preliminary injunction (Clarifying Operational Instructions), Ex. 4, which was the first preliminary injunction to issue. The Clarifying Operational Instructions reiterate UPSP's longstanding policies and practices in support of mail-in voting for the November Election and make clear USPS's position with respect to certain related matters. On September 24, and October 16, 2020, USPS issued Stand-Up Talks reiterating these instructions to all employees. Ex. 5 (Mandatory Stand-Up Talk (Sep. 21, 2020)); Ex. 6 (Mandatory Stand-Up Talk (Oct. 16, 2020).  Among other things, the Clarifying Operational Instructions provide:

- **Decommissioning of Letter Sorting Machines and Removal of Mail Collection Boxes:** Mail processing equipment and blue mail collection boxes will not be removed until after the November 2020 elections (except where collection boxes are damaged or temporarily removed for public safety). *See* Ex. 4 ¶¶ 4, 6. *See also* Ex. 2. With respect to mail processing equipment, Headquarters has provided Regional Vice Presidents authority to reconnect machines where doing so is necessary to fulfil its Election Mail service committments.  Ex. 4 ¶ 6.

- **Overtime:** Postal Service Headquarters has not imposed, and will not impose, any nationwide changes of any kind that would ban or newly restrict overtime prior to Election Day.  Overtime use has not been banned, nor have any caps been placed on overtime hours. Ex. 4 ¶ 1. *See also* Declaration of Angela Curtis ("Curtis Dec.") ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4.

- **Late and Extra Trips:** USPS "has not banned the use of late or extra trips, when operationally required, extra or late trips are permitted," mail "should not" be left behind; and "transportation, in the form of late or extra trips that are reasonably necessary to compete timely mail delivery, is not to be unreasonably restricted or prohibited.  Managers are authorized to use their best business judgment to meet [USPS] service commitments."  Ex. 4 ¶ 5. *See also* Declaration of Robert Cintron ("Cintron Dec.") ¶ 22-27.

- **Alleged Reduction in Operating Hours:** Retail hours will not be adjusted prior to the Election, absent temporary changes due to unforeseen circumstances beyond the Postal Service's control, such as natural disasters.  Ex. 4 ¶ 3.

- **Election Mail:** USPS will prioritize Election Mail that is entered as Marketing Mail (a lower-cost mail class with a three to ten-day delivery standard), regardless of the paid class.  Ex. 4 ¶ 7; Glass Dec. ¶4.  This includes using standardized log sheets to track Election Mail through processing; conducting daily "all clears" to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly; advancing Election Mail entered as Marketing Mail ahead of all other Marketing Mail and processing it expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail delivery standards; expanding processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed the same day; and prioritizing Election Mail when loading trucks.  *Id.*

### 2.      September 25, 2020 Additional Resources Memorandum

On September 25, 2020, USPS issued a memorandum concerning additional resources for Election Mail beginning October 1, 2020 (Additional Resources Memorandum). Ex.7. By this memorandum, USPS made available additional resources to utilize "to support the timely and expeditious handling" of Election Mail. *Id.* at 1. Although not an exhaustive list, the memorandum provides for authorization of even more resources including: processing and advancing Election mail received after the Critical Entry Time as if it arrived prior thereto, unless doing so would disrupt on-time service for other Election Mail, and early collections the week before the Election and delivery of ballots found in collection on Election Day to the Boards of Election (BOEs) within states requiring ballots be returned by a designated time on Election Day. *Id.* at 1-2.

### 3.      October 13, 2020 Supplemental Guidance Memorandum

On October 13, 2020, USPS issued supplemental guidance (Supplemental Guidance Memorandum). Ex. 8. USPS intended the guidance to supplement the Clarifying Operational Instructions and Additional Resources Memorandum, reiterate earlier guidance, and assist in carrying out the specific directives required by the *Jones* preliminary injunction. The Supplemental Guidance Memorandum made clear that "many long-standing recommended practices about how to treat Election Mail are now policy requirements and must be followed." *Id.* at 1. In additional to the policies outlined in the preceding instructions, the Supplemental Guidance Memorandum provides, among other things, that: employees be made aware that balloting materials are handled differently than other unpaid or shortpaid mailpieces, and shall be delivered to an election office with or without sufficient postage; ballots may be manually separated and moved by air or according to Priority Mail Express delivery standards regardless of paid class; managers should explain all Election Mail-related guidance to their direct reports; and all concerns regarding compliance with Election Mail policies and practices should be reported as soon as possible so that they may be corrected promptly. *Id.* at 3-4.

### 4.      October 20, 2020 Extraordinary Measures Memorandum

Most recently, on October 20, 2020, USPS issued additional operational instructions to support the timely and efficient handling of Election Mail by implementing "extraordinary measures" (Extraordinary Measures Memorandum). *See* Ex. 9. The Extraordinary Measures Memorandum reiterated the common theme among all the foregoing memoranda concerning the handling of Election Mail for this Election, the "commitment to the proper handling and timely

6

delivery of Election Mail, which remains [USPS's] number one priority." *Id.* at 1. Specifically, the memorandum provides unequivocal authorization and encouragement of the use of "extraordinary measures beyond [USPS's] normal course of operations . . . to accelerate the delivery of ballots." *Id.* at 2. The specific operational measures outlined include, *inter alia*:

- Establishment of a Command Center by Retail and Delivery Operations, "with a cross-functional team dedicated to providing guidance and answering questions from the Field on Election Mail, ballot handling, or any election-related issue." *Id.* at 1. The Command Center has a dedicated telephone hotline to receive inquiries and submission of any questions or requests for further clarification is encouraged. *Id.*

- Authorization of and the expectation that Postal employees use extraordinary measures beyond USPS's "normal course of operations . . . to accelerate the delivery of ballots, when the Postal Service is able to identify the mailpiece as a ballot." *Id.* at 2. These measures include, but are not limited to, "expedited handling, extra deliveries, and special pickups as used in past elections, to connect blank ballots entered by election officials to voters, or completed ballots returned by voters entered close to or on Election Day to their intended destination . . . ." *Id.*

- Examples of Extraordinary Measures, including, but not limited to:
  - o Extending retail hours in designated sites through the November Election;
  - o Expanding retail services to facilitate receipt and postmarking of ballots;
  - o By-passing automation flow for processing ballots received by  local offices in close proximity to a BOE for immediate delivery;
  - o Requiring carriers to physically check every delivery point, regardless of whether they have mail, to check of outgoing mail; run early collections on November 2 and 3;
  - o Establishing a "hub-and-spoke" process for running and expediting ballots on November 2 and 3;
  - o Using special, pre-identified drivers and vehicles staged to run trips where reasonably possible to effectuate delivery by the cutoff time for ballot acceptance;
  - o Hand-pulling ballots on November 3 for delivery by designated supervisors to BOEs;
  - o Intercepting and delivering Election Mail with mailer misprints (wrong ZIP codes or addresses) to redirect to the correct BOE; and
  - o Postmaster coordination of after-hours handoffs with BOEs, sweeping collection boxes and making deliveries as necessary to facilitate ballot flow. *Id.* at 2-3.

- And a channel for submitting requests for additional extraordinary measures not included in the memorandum. *Id.* at 2.

## II. Florida Specific Efforts

Consistent with these instructions, Florida Election Mail District Coordinators, in combination with the postmasters within their jurisdictions, have reached out to all the Supervisors of Elections within their jurisdictions, and have spoken to all of them.  Declaration of Timothy Costello ("Costello Dec.") ¶ 22.  These coordinators and/or their postmasters, plan to coordinate pickups and drop-offs of ballots on Election Day with local officials.  *Id.* ¶ 23.

ARGUMENT

## I. Plaintiff's sought relief will hinder—rather than help—the expeditious delivery of Election Mail

Whether viewed under the irreparable harm or likelihood of success prong of the preliminary injunction analysis, Plaintiff's motion should be denied for the fact that it is more likely to hinder, than help, the delivery of Election Mail.  "[T]he use of extraordinary measures beyond [the Postal Service's] normal course of operations is authorized *and expected to be executed* by local management between October 26 and November 24, to accelerate the delivery of ballots."  Ex. 9 at 2 (emphasis added).  These include extra collection activities at retail locations, early postmarking, direct delivery of ballots to BOEs, extra and early collections, and specific transportation processes to run ballots to the BOEs before the ballot deadlines, recognizing that individual facilities may need to have individualized plans based on their size, staffing, and physical location.  *See id.* at 2-3.  Postmasters and managers are further directed to coordinate after-hours handoffs with local boards of elections and to coordinate with each other and with the local BOEs.  *Id.* at 3.  In authorizing these measures, the Postal Service recognized that some "will not be appropriate for many retail facilities," as some lack the staffing or the infrastructure to take such steps such as delivering ballots directly to a BOE that is geographically distant.  Costello Dec. ¶ 6.  "By authorizing and supporting these measures, while allowing for local discretion regarding which measures to implement, the Postal Service avoids the inefficiencies and confusion a one-size-fits-all approach would impose on an organization with tens of thousands of retail units with unique circumstances."  *Id.*; *see also id.* ¶ 7 (discussing similar process for delivery units).

Plaintiff's proposed order is affirmatively counterproductive for two reasons.  First, much of it overlaps, to some extent, with the Postal Service's recent guidance, and thus risks Postal

8

employee confusion caused by somewhat different directions at the worst possible time—right before an Election, *see Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("[C]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion . . . . As an election draws closer, that risk increases."). And second, many of the specific proposals Plaintiff seeks to impose ignore the basic nature of Postal operations, and would result in the Postal Service jettisoning its existing infrastructure to build—on the fly—an entirely new system of mail processing and transportation, without quality control or supervision. This would imperil, rather than promote, the expeditious delivery of ballots.

As to the first reason—the confusion created by multiple instructions to field employees—much of the specific relief Plaintiff seeks has already been provided. For example, Plaintiff seeks to require that USPS arrange with each Florida election supervisor to discuss how ballots will be transferred to their custody. *See* Proposed Order ¶¶ 1, 7. But the Postal Service's existing guidance makes clear that "Postmasters are to coordinate after-hours handoffs with BOE," and that "[l]ocal management will continue regular outreach with local BOEs." Ex. 9 at 3. This coordination is "mandatory," Costello Dec. ¶ 10, and, indeed, each of the three Florida Election Mail Coordinators, in conjunction with their postmasters, "have reached out to all Supervisors of Elections within their jurisdictions, and combined, they have spoken to all of them," *id.* ¶ 22. "All three report that either they or the postmasters within their jurisdictions reached out to election officials to discuss the most efficient way for election officials to pick up or receive ballots on election day." *Id.* Moreover, it is the Postmasters and Election Mail Coordinators (the individuals who already have been in contact with election officials) who should continue that contact, rather than requiring post offices and plants to coordinate with election officials directly, as Plaintiff seeks. *See* Proposed Order ¶ 7; Costello Dec. ¶ 20. Plaintiff should not dictate which specific USPS employees contact state election officials, particularly at this late date.

Plaintiff also seeks to require USPS to provide for delivery or pickup of ballots on the two weekends before Election Day. *See* Proposed Order ¶ 2. USPS is providing extra pickup services on Saturday, October 31, and all postal offices above a certain size will "run regular collections (Monday-Friday schedule) on Sunday, November 1." Ex. 9 at 2. For this coming weekend, the Postal Service is already collecting mail on Saturday in the normal course, and it is not necessary to collect mail on Sunday, October 25. Indeed, "[a]ttempting to implement additional collection on such short notice would risk confusing schedules." Costello Dec. ¶ 15. With respect to the

9

transportation of ballots, *see* Proposed Order ¶¶ 3-5, the Postal Service has authorized running early collections on November 2 and November 3, *see* Ex. 9 at 2, to establish "hub-and-spoke" processes to run ballots prior to the cut-off period, both for local and, where possible, non-local deliveries, *id.* at 3, to have carriers pull ballots from their collections directly on Election Day, and to use the Express Mail network in the days leading up to the election, *id.* These existing measures are sufficient—and attempting to alter or micromanage these extraordinary efforts, as Plaintiff seeks to do, at this late hour risks confusion over the steps that Postal employees should be taking; exactly the wrong result merely days before the Election. *See, e.g.*, Costello Dec. ¶¶ 6, 12, 15.

Other affirmative provisions that Plaintiff seeks would not merely invite confusion, but would in fact put Election Mail at risk by requiring the Postal Service to develop new mail processing and transportation procedures on the fly, in a way that would ignore the Postal Service's existing infrastructure, and ultimately, delay the mail. Plaintiff seeks to require, for example, that mail collected on October 31 "shall be processed by the Post Office most physically proximate to the destination election office." Proposed Order ¶ 3. This requirement ignores how the Postal system is structured, and "would be extremely disruptive and create a substantial risk of delaying ballots." Costello Dec. ¶ 16. "Many Post Offices have very few employees and are not equipped to sort mail manually; none have mail sorting equipment; and few have the necessary logistical support to transport mail as proposed by plaintiff." *Id.* Indeed, Plaintiff's plan ignores the fact that "[t]he Postal Service primarily utilizes high-speed mail processing machines located in processing and distribution centers, not manual sortation, to process Election Mail in a timely manner," *id.*, and the alternative would impede the delivery of the mail for no purpose. Stated simply, there is a reason that the Postal Service uses mail sorting machines to sort the many millions of pieces of mail posted in Florida each day. Plaintiff also seeks to require that each Post Office directly collect and transport their ballots on Monday, November 2, both to BOEs located within their geographic areas and beyond them. Proposed Order ¶¶ 4, 5. This is impractical for the same reason: processing plants are responsible for mail sortation and transportation; not individual post offices. To be clear, the Postal Service has stated that "[l]ocal offices which serve or are in close proximity to a BOE are authorized to postmark . . . and deliver ballots, rather than the ballots being placed into the automation flow [i.e., sent to a mail processing facility]." Ex. 9., at 2. "This allows large offices to undertake such efforts, without requiring the same of smaller offices, which would be incapable of doing so without substantial delays. The Postal Service is in the best position to

10

determine how to best sort and deliver the mail, and the local offices are in the best position to determine whether the efforts authorized by the Extraordinary Efforts memorandum would be helpful." Costello Dec. ¶ 17.

Plaintiff also seeks to require that on Election Day "all servicing plants in Florida will run an early sortation to retrieve any ballots in the mail stream." Proposed Order ¶ 6. But this is the wrong way to accomplish what all parties agree is their common goal: to transfer as many ballots on Election Day to the BOEs as possible. "Plants sort mail after it is brought to them from retail and delivery units. The sorting schedules are based on the time mail is expected to arrive at the plant. Running an early sortation before mail arrives at a plant would be wasteful and would not expedite ballots." Costello Dec. ¶ 18. Rather, USPS has already instructed processing windows to process ballots expeditiously, *id.*, and will "scour plants throughout election day looking for ballots and make every attempt to deliver them before the cutoff." *Id.* ¶ 19; *see also* Ex. 7 at 1. To be clear, early sortation is *authorized*, and may be helpful if plants have already made arrangements to receive mail deliveries early for the purpose of starting sortation early, Costello Decl. ¶¶ 18, 19, but categorically requiring early sortation, without considering existing transportation and collection processes, is counterproductive.

## II.    Plaintiff is unlikely to prevail on the merits of its claims.

### A.    The Court lacks subject-matter jurisdiction over Plaintiff's claims.

Plaintiff fails to establish that this Court has Article III standing. An entity can sue either on its own behalf (organizational standing) or on behalf of its members (associational standing). Plaintiff cannot demonstrate associational standing, because it needs to identify a specific member with a specific injury that is redressable by the Court. *See Summers v. Earth Island Institute*, 555 U.S. 488, 498-99 (2009). It fails to do so; the attached Ewart Declaration, ECF No. 28-3, does not identify a specific member whose injury is certainly impending. *See generally* Ewart Dec; *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). The only potential exception to this requirement is if "all the members of an organization are affected by the conduct," *see In re Equifax., Inc., Customer Data Sec. Breach Litig.*, 371 F. Supp. 3d 1150, 1165 (N.D. Ga. 2019) (citing *Summers*, 555 U.S. at 499), but this plainly is not true: Plaintiff fails to show that *all* its members must vote by mail in the last hours of the Election, such that they are certain to be injured absent relief uniquely targeted toward that time period.

11

Nor can Plaintiff show organizational standing.  It tries to articulate a theory of standing based on a diversion-of-resources theory, which is "when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response."  *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (citing *Havens Reality Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  But while Plaintiff notes that it has changed its voter education plan, it says it has done that "[a]s the result of Defendants' recent changes to Postal Service policies."  Ewart Dec. ¶ 25.  But those changes *have all been enjoined*, and will be enjoined through the Election, and Plaintiff cannot be currently injured by those not-in-effect policies.  Past injury is not sufficient to establish standing for injunctive relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983).  Nor has Plaintiff shown that the relief it seeks would remedy its injury; all its sought relief involves changes to postal operations in the last hours of the Election, yet Plaintiff does not claim that it would *stop* its outreach, or even alter it, if it received the relief it seeks.  *See* Ewart Dec. ¶ 26-27.

## B.   Plaintiff is unlikely to prevail on it claim that USPS had to observe the procedures in section 3661 prior to implementing the alleged policy changes.

### 1.   District courts lack subject-matter jurisdiction over complaints regarding 39 U.S.C. § 3661

As a threshold matter, this Court lacks subject-matter jurisdiction over Plaintiff's section 3661 claim because Congress has precluded district court jurisdiction over that claim. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). Specifically, in section 3662 of Title 39, Congress specified that any person "who believes the Postal Service is not operating in conformance with the requirements of various provisions, including "*this chapter* [*i.e.*, Chapter 36 of Title 39, which includes 39 U.S.C. § 3661] (or any regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission." 39 U.S.C. § 3662(a) (emphasis added). "If the Postal Regulatory Commission finds the complaint to be justified, it shall order that the Postal Service take such action as the Commission considers appropriate in order to achieve compliance with the applicable requirements and to remedy the effects of any noncompliance." *Id.* § 3662(c). If that person is dissatisfied with the PRC's ruling, she may petition for review in the D.C. Circuit. *Id.* § 3663.

Numerous courts of appeals have held that 39 U.S.C. §§ 3662 and 3663 constitute the exclusive jurisdictional remedy for complaints about postal services that fall within the statutory

provisions specifically identified in section 3662, which includes a claim that the Postal Service is not complying with section 3661. *See, e.g.*, *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013) (PRC has "exclusive jurisdiction . . . over claims enumerated in § 3662"); *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799-800 (8th Cir. 2006) ("In this case, Congress removed the district courts' jurisdiction over claims regarding postal rates and services. It did so by enacting 39 U.S.C. § 3662."); *Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir. 1995) (earlier version of 39 U.S.C. § 3662 "makes clear that a postal customer's remedy for unsatisfactory service [which was identified in section 3662] lies with the Postal Rate Commission. . . . Accordingly, the district court was without jurisdiction to review this claim."). These courts of appeals have been joined by "countless decisions" of lower courts. *Pep-Wku, LLC v. U.S. Postal Serv.*, No. 1:20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky. Apr. 30, 2020); *see, e.g.*, *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018); *Striley v. U.S. Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017).

This overwhelming line of precedent has developed for good reason. "Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems' those procedures 'are to be exclusive.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S.411, 420 (1995)). "It is well settled that even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomms Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984). This principle applies particularly in situations where there are multiple layers of review, *i.e.*, review first to an agency, and then to the federal courts of appeals. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008). Here, Congress has created just such a channeling scheme: complaints within the ambit of section 3662 go first to the Commission, an agency with deep expertise in postal matters, and then to the D.C. Circuit. *See* 39 U.S.C. §§ 3661, 3662. This court therefore lacks subject matter jurisdiction over this claim.

    **2.  Plaintiff is unlikely to prevail on its claim that USPS had to observe the procedures in section 3661 prior to implementing the alleged policy changes**

Even if the Court had subject-matter jurisdiction over Plaintiff's section 3661 claim (it does not), Plaintiff still cannot show a likelihood of success on the merits. Because the Postal Service "is exempt from review under the Administrative Procedure Act," *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014), Plaintiff's only potential avenue for relief is the *ultra vires* review doctrine. Review under this doctrine, however, "is quite narrow," *id.* 307, and "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds." *Nyunt v. Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). In order to justify relief under the *ultra vires* doctrine, a plaintiff must show, "*first* that the agency has acted in excess of its delegated powers and contrary to a specific prohibition, and, *second*, that barring review by the district court would wholly deprive the party of a meaningful and adequate means of vindicating its statutory rights." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006). Plaintiff cannot make either showing.

*First*, Plaintiff cannot show that USPS is acting "in excess of its delegated powers and contrary to a specific prohibition." *Id.* To satisfy this element, Plaintiff must show that USPS is violating a "clear and mandatory" statutory provision that "has only one unambiguous interpretation." *Nat'l Ass'n of Postal Supervisors v. USPS*, No. 18-cv-2236-RCL, 2020 WL 4039177, at *3 (D.D.C. July 17, 2020). Plaintiff relies on Section 3661(b), which states that the Postal Service must request an advisory opinion when it "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). "Congress intended 3661 to apply to only a specified class of decisions." *Buchanan v. USPS*, 508 F.2d 259, 262 (5th Cir. 1975). "Postal management was left with broad decision-making power, subject to 3661's requirements for specified decisions." *Id.* at 262. Accordingly, section 3661 comes into play only if (i) there is a change that has a "meaningful impact on service," (ii) the change is "in the nature of postal service," and (iii) the change affects service "on a nationwide or substantially nationwide basis." *Id.* at 262-63.

Plaintiff has not established any of these elements. As an initial matter, Plaintiff's motion does not identify with any specificity any change that it believes USPS continues to implement that should be enjoined because the change not presented to the PRC. *See* PI Mot. 4-6, 11-13. Nor does Plaintiff explain at all how any alleged change satisfies any of the three elements of *Buchanan—i.e.*, that it have a "meaningful impact on service," that it be "in the nature of a postal service," and that it affect service "on a nationwide or substantially nationwide basis." 508 F. 2d

14

at 262-63. Indeed, USPS's Office of Inspector General recently issued a report concluding that the Postal Service was *not* required to consult with the PRC before implementing the Postal Policy Changes.  *See* Ex. 10 (USPS OIG Audit Report No. 20-292-R21, "Operational Changes to Mail Delivery" (Oct. 19, 2020), at 3 ("Based on our review of the applicable legal requirements for consulting the PRC at the time the Postal Service was making its determination, the Postal Service was in compliance with policies and legal requirements."); *id.* at 18–19. At a minimum, this report shows that USPS has not violated a "clear and mandatory" statutory provision that has "only one unambiguous interpretation," *Nat'l Ass'n of Postal Supervisors*, No. 2020 WL 4039177, at *3.

Rather than identify any specific change that it seeks to enjoin, Plaintiff instead refers generally to undefined "major operational changes" that USPS allegedly made in July 2020. *See* Mot. 8-13. But, as discussed above, most of the alleged "changes" were either (i) never in fact made or (ii) were not "changes" but were instead longstanding USPS policies. For example, USPS never made changes to its overtime policy (including banning overtime) or to its retail operating hours, nor has it closed or consolidated any mail processing facilities. *See* Curtis Dec. ¶¶ 12, 22–23, 32–35; Colin Dec. ¶ 3. It did not ban late or extra trips. *See* Supp. Cintron Dec. ¶ 4. Nor did USPS make any "changes" with respect to its treatment and prioritization of Election Mail. Ballots returned by voters have *always* been First-Class Mail and will continue to be handled as such. *See* Glass Dec. ¶ 18. And for Election Mail sent to voters, election officials have *always* had the choice to determine the class of mail to use to send mailings to voters—nothing has changed. *Id.* ¶ 4.

Plaintiff relies heavily on injunctions entered by other courts, *see* PI Mot. 12–13, but, significantly, those courts enjoined changes based on findings that the complained of policies were *still in effect* at the time the plaintiffs in those cases sought injunctive relief. *See, e.g.*, *Commonwealth of Pennsylvania v. DeJoy*, No. CV 20-4096, 2020 WL 5763553, at *9 (E.D. Pa. Sept. 28, 2020) (finding that "[t]he contested policies remain in place"). As explained above, however, USPS has complied with each of the injunctions, which will remain in place through the election (at which point Plaintiff's claims will become moot). Thus, even assuming that there were once "changes" that could have previously given rise to a section 3661 claim, any such changes have been enjoined and thus cannot provide a basis for entering prospective injunctive relief against the Postal Service now. Indeed, not only have the changes been enjoined, but USPS has affirmatively agreed not to implement any of the changes until after the election. *See* Ex. 4 ¶ 8.

*Second*, even if Plaintiff could show that there are still "changes" in place that should have been presented to the PRC, Plaintiff's *ultra vires* claim also fails because Plaintiff cannot show that "barring review by the district court would wholly deprive [Plaintiff] of a meaningful and adequate means of vindicating its statutory rights." *Nat'l Air Traffic Controllers*, 437 F.3d at 1264. *Ultra vires* review is available *only* where there is no other potential remedy. But here, Plaintiff has a "meaningful and adequate means of vindicating [his] statutory rights," *Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) – Plaintiff can file a complaint to the Postal Regulatory Commission, with judicial review in the D.C. Circuit if Plaintiff remains unsatisfied. Plaintiff's failure to even attempt to pursue the remedy provided by Congress, despite having months of notice, is yet another reason why it cannot succeed on its section 3661 claim.

C.      **Plaintiff is unlikely to establish that the alleged USPS policy changes violated Plaintiff's members' right to vote.**

Plaintiff claims that the alleged USPS policy changes—which, again, have been undone pursuant to multiple Preliminary Injunctions—unconstitutionally burden the right to vote. Plaintiff's claim fails. As an initial note, Plaintiff is not clear on which policy changes it is actually claiming are unconstitutional: the purported changes from July, all of which have been enjoined, or the Postal Service's implementation of the Extraordinary Resources Memorandum (or, said differently, the Postal Service's failure to accede to Plaintiff's flawed and counterproductive proposed order).  Under any theory, however, there is no constitutional violation.

Plaintiff relies upon the *Anderson-Burdick* test, which does not apply to the alleged USPS policy changes at issue. *Anderson-Burdick* applies to challenges against *state election laws*; *e.g.*, laws which "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *see also id.* at 789 (test applies to "Constitutional challenges to specific provisions of *a State's election laws*.") *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (the test set forth in *Anderson* applies when "[a] court [is] considering a challenge to *a state election law*." (emphasis added)). Indeed, applying the *Anderson-Burdick* balancing test to *any* policy that has some impact on the electoral process could mean that *any* deficiency in USPS service could give rise to a constitutional claim.

Regardless, the challenged USPS policies survive *Anderson-Burdick* scrutiny. Under the *Anderson-Burdick* balancing framework, the Court must "first consider the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate." *Anderson*,

460 U.S. at 789. The "rigorousness of [the Court's] inquiry" depends "upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Defendant need only establish a compelling government interest if plaintiffs' "rights are subjected to 'severe' restrictions," *id.*, such as those that effectively "disenfranchise [a] class" of persons, *Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973). Otherwise, the defendant must establish only an "important regulatory interest." *Burdick*, 504 U.S. at 434.

Here, the alleged USPS policy changes at issue have not, and will not, impose a "severe" burden on voters. Assuming that Plaintiff challenges the July actions, these alleged changes have been suspended, either by independent action of the Postal Service, settlements with plaintiffs, or court orders, and USPS is committing additional resources to specifically facilitate the processing of Election Mail. *See supra.* Additionally, voters can ensure, with minimal burden, that these delays will not impact the voting process by promptly mailing in their ballots. If they wait until the eleventh hour to cast their ballots, and their votes are not counted due to some delay, then "if their plight can be characterized as disenfranchisement at all, it was not caused by" USPS but rather "their own failure to take [the] timely steps" necessary. *Rosario*, 410 U.S. at 758. Alternatively, the voter may deliver the ballot to an election drop box; something Plaintiff has made no serious effort to show is inadequate. *See, e.g.*, https://www.votemarion.gov/Election-Info/Mail-Ballot-Drop-Box-Locations;   https://www.leonvotes.gov/Vote-By-Mail/Mail-Ballot-Drop-Boxes.  And if Plaintiff challenges the Extraordinary Resources Memorandum, Defendants have already explained why that policy is sufficient – and why Plaintiff's proposals are improper.

The alleged USPS policy changes may therefore survive an *Anderson-Burdick* inquiry if justified by "general regulatory interests," which includes a desire to minimize "administrative costs." *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 77 (D.C. Cir. 2012). Here, any actions taken by the Postal Service were taken to increase efficiency, and minimize unnecessary costs, precisely the type of "general regulatory interest" sufficient to justify a minimal, indirect burden on voters.  Indeed, the Postal Service has gone far beyond mere administrative efficiency; putting in place numerous additional resources and commitments to expeditiously deliver Election Mail.  That Plaintiff may quibble with some of the details does not create a constitutional violation.

**D.    Plaintiff is unlikely to establish that USPS's failure to require all local postal units in Florida to adopt the same election mail protocols violates the equal protection component of the Fifth Amendment.**

Plaintiff claims that, under *Bush v. Gore*, the equal protection clause requires USPS to force all local postal facilities in Florida to adopt the same special election mail procedures, regardless of their unique circumstances. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). "[T]he question," however, is not "whether uniform procedures have been followed across a state regardless of" circumstances. *Wexler v. Anderson*, 452 F.3d 1226, 1231 (11th Cir. 2006). The relevant question is whether, due to a State's election laws, certain voters are "less likely to cast an effective vote than" other voters. *Id.* at 1231.

Plaintiff cannot establish a *Bush v. Gore* claim here. First, there is no indication that voters in counties outside of Broward and Palm Beach are necessarily "less likely to cast an effective vote" due to their local postal offices' judgment that no further special election mail protocols are necessary. As Plaintiff acknowledges, the two counties in which local post offices adopted special measures—Broward and Palm Beach—are the "most populous counties," PI Mot., at 15, and thus it makes sense that these counties may have a critical mass of Postal Service resources and staffing that would permit certain processes.   Rather, the Postal Service explicitly recognized that individual counties and facilities may have individual needs, based on their local conditions. *See* Costello Dec.   This is fatal to Plaintiff's claim, as an equal protection argument requires that persons be similarly situated, *see, e.g.*, *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007), and here, there is no such showing that the postal infrastructure in these counties is identical such that the same procedures need to be adopted in all circumstances.   If anything, these actions show that the Postal Service allows employees discretion to do what is necessary to promptly deliver Election Mail, rather providing an inference of nefarious contact at all other offices in Florida.   Indeed, Plaintiff provides no evidence suggesting that smaller counties need similar processes, or that the facilities within those counties are equipped to provide such resources, or that the measures they are taking are in fact insufficient.

Second, as explained above, the Postal Service is not precluding any person from casting an effective vote. Plaintiff cannot dispute that, even without further, special election mail protocols, if persons mail their ballots in a timely fashion, those ballots should reach their destination in time to be counted. And third, "if voters" in other Florida "counties are burdened at all, that burden is the mere *possibility* that" their "ballots will receive a different, and allegedly inferior, type of" treatment simply because their local post offices did not adopt *additional* election

18

mail protocols," and so "strict scrutiny" is not "appropriate." *Wexler*, 452 F.3d at 1232–33 (emphasis added). The Postal Service need only establish "important regulatory interests," *id.* at 1233, and as set forth above, there is an inherent interest in letting local facilities craft procedures based on their unique circumstances and abilities, *see supra.*

**III.   Plaintiff fails to establish irreparable harm.**

Plaintiff has also failed to show that it will suffer irreparable harm in the absence of a preliminary injunction. "As we have emphasized on many occasions, the asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal citation omitted).

While Plaintiff acknowledges that "five nationwide injunctions [have] already issued," PI Mot. at 19, conspicuously absent from Plaintiff's argument on this point is an explanation of how it will suffer irreparable harm if another preliminary injunction does not issue. As discussed previously, virtually every item of Plaintiff's requested relief is *either* addressed by an existing court order of nationwide application or by USPS instructions or guidance, *or* would represent a fundamental and massive change that would harm Plaintiff and, in any event, would be inappropriate (if even possible) on the eve of the Election.  Thus, because USPS has already mandated many of the actions that Plaintiff requests this Court order, Plaintiff cannot show that it will be irreparably harmed in the absence of yet another injunction.

Plaintiff complains that it has been injured by the alleged deprivation of their procedural rights under 39 U.S.C. § 3661, PI Mot. at 18, n.12, but the deprivation of a procedural right, standing alone, is not even sufficient to establish a case or controversy, let alone to justify the extraordinary remedy of a mandatory injunction. *See Summers*, 555 U.S. at 496. Likewise, Plaintiff cannot demonstrate harm associated with the exercise of their First Amendment and Equal Protection rights because, as discussed above, no such violation has occurred. *See Siegel*, 234 F.3d at 1177 ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however.") (citing cases).

Ultimately, Plaintiff's theory seems to be that because other courts have granted other plaintiffs' motions for preliminary injunctions, it should win, too.  *See* PI Mot. at 19.  But this makes no sense – those injunctions are in effect, and the policies that supposedly injured those plaintiffs are *enjoined*.  There is nothing left to injure Plaintiff and no basis for a mandatory injunction – particularly in light of the additional measure USPS has committed to undertake.

## IV.     The balance of equities counsel against Plaintiff's requested relief.

A preliminary injunction is also not appropriate because the balance of the equities and public interest weigh in Defendants' favor.  As explained above, *several* courts have already issued nationwide injunctions enjoining Defendants from implementing the purported changes, and USPS has issued instructions consistent with those injunctions.  Indeed, the Supreme Court has instructed that "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).  Here, Plaintiff plainly has not.

More fundamentally, however, Plaintiff seeks a mandatory injunction requiring significant changes to Postal operations on the eve of the Election.  "When a moving party is seeking a *mandatory* injunction," as here, "it faces a particularly heavy burden of persuasion."  *FHR TB, LLC v. TB Isle Resort, LP*, 865 F. Supp. 2d 1172 (S.D. Fla. 2011).  Furthermore, the Supreme Court has repeatedly expressed concern about cases affecting the voting process right at an election deadline.  *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *cf. New Georgia Proj. v. Raffensperger*, 2020 WL 5877588 at *3 (11th Cir. 2020) ("[W]e are not on the eve of the election – we are in the middle of it, with absentee ballots already printed and mailed.  An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules – especially at the last minute.").  Both of these principles make clear that significantly changing how the Postal Service processes ballots across the entire State of Florida, mere days before the Election concludes, is inadvisable and ultimately risks disruption that may have the effect of disenfranchising voters.  This Court should not issue such consequential and ill-advised relief.

### CONCLUSION

The Court should deny Plaintiff's Motion for a Preliminary Injunction.  In the alternative, if this Court grants Plaintiff's motion in whole or in part, it should stay its decision pending a determination by the Acting Solicitor General whether to file an appeal.[1]

---

[1] If the Court grants Plaintiff's motion, Defendants respect an opportunity to confer with the Plaintiff regarding the precise terms of the order.

Dated: October 21, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC WOMACK
Assistant Branch Director, Federal Programs Branch

*/s/ Joseph E. Borson*
JOSEPH E. BORSON
KUNTAL V. CHOLERA
ALEXIS ECHOLS
DENA ROTH
JOHN ROBINSON
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Joseph.Borson@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all users receiving ECF notices for this case.

<u>/s/ Joseph E. Borson</u>

Joseph E. Borson
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

Attorney for Defendants