FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 17, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WISCONSIN, | No. 1:20-CV-03127-SAB |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; LOUIS DEJOY, in his official capacity as Postmaster General; UNITED STATES POSTAL SERVICE, | |
| Defendants. | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 1

Before the Court is Plaintiffs' Motion for Preliminary Injunction, ECF No. 54. A hearing on the motion was held on September 17, 2020. Plaintiffs were represented by Kristen Beneski and Noah Purcell; Defendants were represented by Joseph Borson, who appeared by videoconference. The following attorneys also participated by telephone: Andrew Hughes (Washington); Cristina Sepe (Washington); Karl Smith (Washington); Emma Grunberg (Washington); Tera Heintz (Washington); Nathan Bays (Washington); Daniel DeCecco (Colorado); Danny Rheiner (Colorodo); Joshua Perry (Connecticut); Jeffrey Dunlap (Maryland); Angela Behrens (Minnesota); Nicholas Sydow (New Mexico); Elleanor Chin (Oregon); Carol Lewis (Virginia); and Colin Roth (Wisconsin). The Court also considered the briefs of amici curiae. ECF Nos. 57-1; 63-1; 66-1; and 78.

### Background Facts

The case is a result of Defendant Postmaster General Louis DeJoy's institution of "transformative" changes that caused "immediate, lasting, and impactful changes" in the operations and culture on the United States Postal Service ("Postal Service"). These changes were set forth in a "Mandatory Stand-up Talk: All Employees, July 10, 2020" document. Bullet points identified specific examples of "transformative" changes that were being implemented immediately:

- ✓ All operations must meet our 24-hour clock commitment
- ✓ All trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted
- ✓ Extra trips are no longer authorized or accepted
- ✓ There must be proper annotation in the scanner, if a Contractor Failure occurs
- ✓ All PVS/HCR drives must be notified that trips depart on time
- ✓ Function 3 must start on time and end on time and we must make scheduled DUT
- ✓ Carriers must begin on time, leave for the street on time, and return on time

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 2

    ✓ Carriers must make the final dispatch of value; no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch
    ✓ The right mail must go on the right truck – every time
    ✓ ALL EMPLOYEES have an essential role with trips departing on time

The document noted that "[o]ne aspect of these changes that may be difficult for employees is that–temporarily–we may see mail left behind or mail on the workroom floor or docks, (in P&DCs), which is not typical."

Other actions taken by DeJoy include: (1) eliminating overtime; (2) decommissioning sorting machines; (3) removing mailboxes; (4) reducing operating hours; and (5) changing how election mail is classified. Plaintiffs assert the Postal Service has indicated that it will no longer treat election mail as First Class mail regardless of the paid class of service and do so could delay the delivery of the ballots by 1-5 days.

Plaintiffs allege these changes were made for political reasons, a few months before a presidential election and in the middle of a global pandemic, with no analysis on how they would affect voters or people relying on delivery of time-critical items. Plaintiffs allege that while the removal of sorting machines is taking place across the county, the removals would particularly affect sorting capacity in states where recent presidential elections have been particularly close. Plaintiffs assert the removal of the sorting machines are diminishing and will continue to diminish the Postal Service's capacity to speedily process flat mail, such as ballots. If the states are required to pay the First Class rate, it will cost them tens of millions of dollars.

In their Complaint, Plaintiffs state that reports have confirmed that delivery has been delayed because of the new policy. "People have reported delay in receiving time-sensitive medications, businesses that rely on the mail have reported delays harming their finances, and state agencies have seen delays in delivery of

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 3**

important documents and benefits." ECF No. 1. Plaintiffs report that in Tennessee, trucks are leaving sorting facilities for cross-country trips completely empty as a result of the new policy not allowing a truck to remain even five minutes so it can be loaded with mail. They allege that postal workers report that the mail is piling up in their offices and that mail is backed up across the country. Plaintiffs assert the effects of the mail delays are widespread, with troubling impacts on vulnerable populations, small business, and political franchise. Medications and prescriptions provided by the Department of Veterans Affairs are taking weeks to be delivered, causing veterans to miss doses of their vital medications. Other Americans rely on the Postal Service for delivery of prescriptions, as well and the delays affect the delivery of their medications.

Plaintiffs assert the changes to the Postal Service operations threaten to disrupt the successful use of mail in balloting. States are reporting increased anxiety on the part of voters who have expressed concern that their mail-in ballots will not be delivered on time or at all. Officials in some states are concerned that voters may choose to vote in-person thereby increasing the risk of COVID-19 transmission at the voting centers.

On August 18, 2020, the day Plaintiffs filed their lawsuit, DeJoy announced the suspension of some operational changes to the Postal Service, including the nationwide removal of hundreds of mail processing and sorting machines, the removal of mail collection boxes, and the reduction in post office retail hours. The policy described above, referred to by Plaintiffs as the "Leave Mail Behind" policy, however, still remains in place. Moreover, it appears that the Postal Service will not treat election mail as First Class mail unless First Class postage is paid.

Plaintiffs assert that the delays in delivery and postmarking caused by the "Leave Mail Behind" policy and the Postal Service's decision to no longer treat Election Mail as First Class mail have already disenfranchised voters and will disenfranchise many more in November.

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 4**

**Plaintiffs' Complaint**

In their Complaint, Plaintiffs are bringing eight claims. First, they are seeking a writ of mandamus under 28 U.S.C. § 1361, directing Defendants to "submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion on the 'transformative' changes and enjoining Defendants from implementing these changes pending receipt of the requested advisory opinion."

Second, Plaintiffs also seek declaratory relief that declares Defendants' "transformative" changes unlawful and enjoined because they are *ultra vires.*

Third, Plaintiffs allege that Defendants' actions violate the States' right to prescribe "the Time, Places and Manner of holding Elections for Senators and Representatives" guaranteed by Article I, Section 4, Clause 1 of the United States Constitution.

Fourth, Plaintiffs assert Defendants' actions violate Article II, Section I of the United States Constitution and the Twelfth Amendment of the United States Constitution.

Fifth, Plaintiffs allege Defendants violated the Tenth Amendment to the U.S. Constitution because Defendants' actions—implemented well after the States established systems for voting using the Postal Service—interfere with the manner chosen by the States to elect state officers and deprive the States of their constitutional rights to regulate state elections and determine the manner in which state officers will be chosen.

Sixth, Plaintiffs assert Defendants' actions interfere with the ability of their residents to timely receive and return voter registration forms and ballots and have their vote counted, thereby burdening their residents' right to vote. Plaintiffs also maintain that Defendants' actions interfere with the States' constitutional interest in choosing the method of electing national officers that respects the constitutional right to vote.

Seventh, Plaintiffs allege Defendants' actions violate the Fifth Amendment

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 5**

1   to the United States Constitution, which guarantees qualified voters a substantive

2   right to participate equally with other qualified voters in the electoral process.

3   Plaintiffs assert Defendants' actions burden the right of qualified voters in the

4   States to cast their ballot effectively and these actions are not supported by any

5   interest that justifies the serious burden on the right of qualified voters the equal

6   protection secured by the Fifth Amendment.

7          Eighth, Plaintiffs allege Defendants' actions violate § 504 of the

8   Rehabilitation Act because Defendants' actions impermissibly interfere with the

9   rights of the States' residents with disabilities to be free from discrimination;

10  impermissibly interfere with the rights of the States' residents with disabilities to

11  receive the benefits of and participate meaningfully in the programs and services of

12  the Postal Service; and will have a disparate impact on individuals with disabilities,

13  severely imperiling their ability to receive critical, life-saving medications through

14  the mail, participate in elections, and conduct other important, time-sensitive

15  activities.

16                          **Jurisdiction**

17          Plaintiffs' Complaint is properly before this Court pursuant to 39 U.S.C. §

18  409, which provides that "[e]xcept as otherwise provided in this title, the United

19  States district courts shall have original but not exclusive jurisdiction over all

20  actions brought by or against the Postal Service." Thus, this Court has jurisdiction

21  to review Plaintiffs' claim that the Postal Service has violated § 3661(b).[1]

22       ————————————

23  [1] 39 U.S.C. § 3662 does not limit this Court's jurisdiction. By its terms, § 3662 is

24  discretionary, not mandatory. Section 3662 does not divest district courts of the

25  broad jurisdiction granted to them under 28 U.S.C. § 1339 over "any civil action

26  arising under any Act of Congress relating to the postal service," nor the grant of

27  "jurisdiction over all actions brought by or against the Postal Service" in 39 U.S.C.

28  § 409(a). Moreover, § 3662 encompasses claims that the Postal Service has failed

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 6**

Under 28 U.S.C. § 1361, this Court has "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

Under 28 U.S.C. 1331, this Court has original jurisdiction over all civil actions arising under the Constitution and laws of the United States.

**Motion Standard**

"A preliminary injunction is a matter of equitable discretion and is 'an extraordinary remedy that may only be awarded upon a clear showing that a plaintiff is entitled to such relief.'" *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quoting *Winter v. N.R.D.C.*, 555 U.S. 7, 22 (2008)). "A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (alteration in original) (quoting *Winter*, 555 U.S. at 20). The Ninth Circuit uses a "sliding scale" approach in which the elements are "balanced so that a stronger showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quotation omitted). When the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). This means that when the government is a party, the court considers the balance of equities and the public interest together. *Azar*, 911 F.3d at 575. "[B]alancing the equities is not an exact science." *Id.*

to adhere to its rate and service standards or that those standards are inadequate. That is not the case here. Instead, Plaintiffs are arguing the Postal Service's implementation of nationwide policy changes without oversight by the Postal Regulatory Commission or the public was unlawful. Such claims are properly brought under §§ 409 and 3661.

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION \* 7**

(quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring) ("Balancing the equities . . . is lawyers' jargon for choosing between conflicting public interests.")).

Likelihood of success on the merits is the most important factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors. *Disney*, 869 F.3d at 856 (citation omitted). A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. The analysis focuses on irreparability, "irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999). Economic harm is not normally considered irreparable. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

"'[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the Court." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This is particularly true where there is no class certification. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification."); *Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469, 1480 (9th Cir. 1994) (district court erred in enjoining the defendant from improperly applying a regulation to all military personnel (*citing Califano*, 442 U.S. at 702)).

That being said, there is no bar against nationwide relief in the district courts or courts of appeal, even if the case was not certified as a class action, if such broad relief is necessary to give prevailing parties the relief to which they are entitled. *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987).

//
//
//

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 8

**Analysis**

Here, Plaintiffs have established a likelihood of success on the merits of their claims that the United States Postal Service and the Postmaster General violated 39 U.S.C. § 3661(b) and infringed on the States' constitutional authority to regulate elections and the people's right to vote. Plaintiffs would suffer irreparable harm absent preliminary injunctive relief, and the balance of equities and the public interest weigh in favor of a preliminary injunction.

Although not necessarily apparent on the surface, at the heart of DeJoy's and the Postal Service's actions is voter disenfranchisement. This is evident in President Trump's highly partisan words and tweets, the actual impact of the changes on primary elections that resulted in uncounted ballots, and recent attempts and lawsuits by the Republican National Committee and President Trump's campaign to stop the States' efforts to bypass the Postal Service by utilizing ballot drop boxes, as well as the timing of the changes. It is easy to conclude that the recent Postal Services' changes is an intentional effort on the part the current Administration to disrupt and challenge the legitimacy of upcoming local, state, and federal elections, especially given that 72% of the decommissioned high speed mail sorting machines that were decommissioned were located in counties where Hillary Clinton receive the most votes in 2016.

Moreover, the fact that fourteen States, members of the United States House of Representatives, members of the United States Senate, and various local and tribal governments have asked this Court to intervene to prevent the Postal Service and others from disenfranchising citizens from participating in federal, state, and local elections suggest that the Postal Service's actions are not the result of any legitimate business concerns. DeJoy's actions fly in the face of Congress's intent to insulate the management of the Postal Service from partisan politics and political influence and acknowledgement that free and fair elections depend on a reliable mail service.

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 9**

In addition, these parties have demonstrated that the recent changes implemented by DeJoy and the Postal Service have the unintended but very serious consequences of interfering with other essential government functions such as collecting fees and taxes, sending pension payments, and enforcing local ordinances, as well as interfering with the provision of critical health care services such as prescription refills, contract tracing, sexually-transmitted infection testing and opioid overdose prevention.

Defendants take the remarkable position that nothing has changed in the Postal Service's approach to election mail from past years. This is simply not true. Statistics show there has been a drastic decrease in delivery rates. Most telling is the picture of the banner that was hung at an Oregon Postal Service facility in early September. *See* ECF No. 79. That banner includes the following phrases: "No Employee has Authorization to Hold Trucks," "ALL HCR & PVS TRIPS WILL DEPART ON TIME, NO EXCEPTIONS," "DO NOT HOLD A TRUCK * NO MORE HOLDING TRUCKS," "Make sure every single employee in our building understands * All Trips Depart on Time." *Id.* The banner reflects the "Leave Mail Behind" policy that was instituted in July 2020 and is a significant change from past practice. Moreover, the letters sent to the States regarding the Postal Service's decision to change the past practice of handling election mail sent as Marketing Mail indicate a significant change in policy and practice.

Here, Plaintiffs have made an extensive showing of irreparable harm that is caused and will be caused by the Postal Service's "Leave Mail Behind" policy and the Postal Service's refusal to ensure that election mail will be treated as First Class mail to ensure timely delivery. Indeed, the Postal Service sent out mailers to all voters that warned that voters should take extra steps to minimize delays that presumably the Postal Service anticipates, which supports Plaintiffs' arguments there would be harm in the future. Moreover, Plaintiffs have shown actual harm with respect to recent primary elections. In this case, this significant and

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 10

irreparable harm tips the balance of the scale in such a manner that Plaintiffs need not make a strong showing of substantial likelihood of success on the merits.

Even so, Plaintiffs have made a strong showing of substantial likelihood of success on the merits. The Postal Service is required under § 3661(b) to present such sweeping nationwide changes to the Postal Regulatory Commission prior to implementing such changes, and the failure to do so suggests that the Postal Service acted *ultra vires*. Plaintiffs have made a strong showing that the Postal Service's actions have infringed on the States' constitutional rights to appoint presidential electors and set the time, manner, and place of elections. Plaintiffs have made a strong showing that the recent changes are the result of an effort by the current Administration to use the Postal Service as a tool in partisan politics, which violates the spirit and purpose of the Postal Reorganization Act and the Postal Accountability and Enhancement Act.

Finally, Defendants' burden in complying with the Court's preliminary injunction is negligible.

The Court finds that a nationwide injunction is appropriate in this case. Indeed, if there ever were a mandate for the need of a nationwide injunction, it is this case. It is easy to envision situations where the mail needs to cross state lines, for example, residents who are residing out of state and want to send in an absentee ballot, medications being sent from other states, as well as small businesses who send their products to customers who live in other states. A nationwide injunction is necessary to give Plaintiffs the relief to which they are entitled.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiffs' Motion for Preliminary Injunction, ECF No. 54, is **GRANTED**.

2. The USPS Defendants, and all their respective officers, agents, servants, employees and attorneys, and persons in active concert or participation with them are hereby **ENJOINED** from the following until the Court resolves the

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 11

merits of this case:

    a.    continued implementation or enforcement of policy changes announced in July 2020 that have slowed mail delivery, including:

        i.    instructing mail carriers to leave mail behind for processing or delivery at a later date;

        ii.    requiring mail carriers or delivery trucks to leave at set times regardless of whether the mail is actually ready;

        iii.    prohibiting or unreasonably restricting return trips to distribution centers, if necessary, to complete timely mail delivery; and

        iv.    taking any actions to implement or enforce the operational changes outlined in the USPS's "Mandatory Stand-Up Talk: All Employees" dated July 10, 2020;

    b.    deviating from the USPS's long-standing policy of treating election mail in accordance with First Class Mail delivery standards, regardless of the paid class;

    c.    taking any actions in violation of the commitments made in the "Postmaster General Louis DeJoy Statement," dated August 18, 2020, such as removal or decommissioning of any mail sorting machines, reducing hours at post offices, or closing mail processing facilities; and

    d.    implementing or enforcing any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," absent a duly issued advisory opinion of the Postal Regulatory Commission, 39 U.S.C. § 3661(b).

    3.    If any post office, distribution center, or other postal facility will be unable to process election mail for the November 2020 election in accordance with First Class delivery standards because of the Postal Service's recent removal and decommissioning of equipment, such equipment will be replaced, reassembled, or reconnected to ensure that the Postal Service can comply with its prior policy of

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 12

delivering election mail in accordance with First Class delivery standards, and that if any post office or distribution center has requested, or in the future requests, to reconnect or replace any decommissioned or removed sorting machine(s), any such request must be presented to this Court within three days of this Order or within three days of the date of the request, whichever is later, unless the Postal Service has already approved the request. If the Postal Service has denied the request or has not responded, the Court will determine whether granting the request is likely necessary to ensure that election mail is processed according to First Class delivery standards or otherwise to protect the constitutional right to vote, and if the Court so finds, it shall order that the request be approved by the USPS Defendants.

4.     The USPS Defendants shall notify their officers, agents, representatives, servants, employees, attorneys, and all persons in active concert or participation with them of the requirements herein.

5.     The Court deems no security bond is required under Federal Rule of Civil Procedure 65(c).

6.     This injunction shall remain in effect until a final judgment is entered or until further order of the Court.

**IT IS SO ORDERED**. The Clerk of Court is directed to enter this Order and forward copies to counsel.

**DATED** this 17th day of September 2020.



Stanley A. Bastian
Chief United States District Judge

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 13

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 02, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WISCONSIN, | No. 1:20-CV-03127-SAB |
| Plaintiffs, | |
| v. | **ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY THE PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; LOUIS DEJOY, in his official capacity as Postmaster General; UNITED STATES POSTAL SERVICE, | |
| Defendants. | |

**ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY** * 1

Before the Court is Defendants' Motion to Clarify the Preliminary Injunction, ECF No. 83. The motion was heard without oral argument.

Defendants move to clarify the Court's preliminary injunction, asserting that some aspects of the Court's order could be interpreted to cause an overall degradation in service or create obligations that cannot be fulfilled. In response, Plaintiffs submitted a proposed Order on which the parties conferred. ECF No. 88-1. Plaintiffs indicate Defendants do not oppose the entry of Plaintiffs' proposed order. ECF No. 88. Good cause exists to grant Defendants' Motion to Clarify the Preliminary Injunction, incorporating the language set forth in Plaintiffs' proposed order.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants' Motion to Clarify the Preliminary Injunction, ECF No. 83, is **GRANTED** in part, and **DENIED**, in part as follows:

   a. Defendants' proposed clarification to Paragraph 2(a) of the Preliminary Injunction Order is **granted**, in part. Paragraph 2(a) is clarified to provide that the Postal Service is not required to delay a trip when the impact of the delay will be an overall degradation in service, *e.g.*, in order to prevent a small amount of mail from being delayed if doing so would cause a larger amount of mail to be delayed, but that the Postal Service shall use extra trips to minimize the effect of such delays and to meet service commitments, except when not feasible. "[E]xtra trips that are reasonably necessary to complete timely mail delivery [are] not to be unreasonably restricted or prohibited," as the Postal Service committed to in its September 21, 2020 memorandum to employees.

   b. Defendants' proposed clarification to Paragraph 2(b) of the Preliminary Injunction Order is **granted**, in part. Paragraph 2(b) is clarified to provide that the Postal Service is required to ensure that Election Mail "is generally delivered in line with First-Class Mail

**ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY** * 2

delivery standards," as the Postal Service committed to in its September 25, 2020 memorandum to employees, but the Court is not specifying that Election Mail entered as Marketing Mail be shipped by any particular means (such as by air). To facilitate this goal, the Postal Service will, as it has promised, take "extraordinary measures" "between October 26 and November 24, to accelerate the delivery of ballots, when the Postal Service is able to identify the mailpiece as a ballot. These extraordinary measures include, but are not limited to, expedited handling, extra deliveries, and special pickups as used in past elections, to connect blank ballots entered by election officials to voters or completed ballots returned by voters entered close to or on Election Day to their intended destination (e.g., Priority Mail Express, Sunday deliveries, special deliveries, running collected ballots to Boards of Elections on Election Day, etc.)."

  c.  Defendants' proposed clarification to Paragraph 3 of the Preliminary Injunction Order is **denied,** without prejudice, to the same arguments being raised again in the future.

  **IT IS SO ORDERED**. The Clerk of Court is directed to enter this Order and forward copies to counsel.

  **DATED** this 2nd day of October 2020.



Stanley A. Bastian
United States District Judge

**ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY** * 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
MONDAIRE JONES, et al.,              :
                                     :
                    Plaintiffs,      :   20 Civ. 6516 (VM)
                                     :
        - against -                  :        **ORDER**
                                     :
UNITED STATES POSTAL SERVICE, et al.,:
                                     :
                                     :
                    Defendants.      :
--------------------------------------X
**VICTOR MARRERO, United States District Judge.**

   By letter dated September 25, 2020, counsel for the Government
advised the Court that the parties had settled an order providing
Plaintiffs with relief consistent with this Court's decision and
order dated September 21, 2020. ("Preliminary Injunction
Decision," Dkt. No. 49.) The Court will issue an Order adopting
the parties' proposed relief. Pending the parties' further
submissions on overtime payments, the Preliminary Injunction
Decision is stayed.


**SO ORDERED.**

Dated:   New York, New York
         25 September 2020


                                        Victor Marrero
                                           U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
MONDAIRE JONES, et al.,                :
                                       :
                        Plaintiffs,    :    20 Civ. 6516 (VM)
                                       :
        - against -                    :    **ORDER**
                                       :
UNITED STATES POSTAL SERVICE, et al.,  :
                                       :
                                       :
                        Defendants.    :
-------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _9/25/2020_

**VICTOR MARRERO, United States District Judge.**

On September 25, 2020, Defendants in the above-captioned matter filed a joint letter in accordance with this Court's September 21, 2020 Decision and Order. (Dkt. No. 54 (citing Dkt. No. 49).) The letter indicated that the parties had agreed to all terms of a proposed order with the exception of one, concerning the appropriate relief with respect to overtime. The letter further indicated that Defendants expected to file a Motion for Clarification or Modification, or in the Alternative, for a Stay, addressing the parties' dispute with respect to this issue. Accordingly, it is hereby

**ORDERED** that the Defendants' motion shall be filed no later than September 26, 2020; and it is further

**ORDERED** that the Plaintiffs' opposition to that motion shall be filed by no later than September 27, 2020.

**SO ORDERED.**

Dated:      New York, New York
            25 September 2020

                                        Victor Marrero
                                        U.S.D.J.

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/25/2020

| | |
|---|---|
| MONDAIRE JONES, *et al.*, | **No. 20 Civ. 6516 (VM)** |
| Plaintiffs, | |
| - against - | ~~[PROPOSED]~~ **ORDER** |
| UNITED STATES POSTAL SERVICE, *et al.*, | |
| Defendants. | |

VICTOR MARRERO, United States District Judge:

WHEREAS, Plaintiffs brought this case challenging certain policies and practices of the

United States Postal Service ("USPS") under the First and Fifth Amendments to the United

States Constitution;

WHEREAS, on September 2, 2020, Plaintiffs moved the Court for a preliminary

injunction;

WHEREAS, on September 16, 2020, the Court conducted a hearing on Plaintiffs' motion,

during which the Court took testimony and heard oral argument;

WHEREAS, on September 21, 2020, the Court issued a Decision and Order (the "PI

Decision," ECF No. 49) granting Plaintiffs' motion in part, and directing the parties to make

efforts to settle and submit an Order providing Plaintiffs with relief consistent with the PI

Decision;

WHEREAS, on September 21, 2020, USPS issued a memorandum entitled "Clarifying

Operational Instructions" (the "September 21 USPS Instructions," attached hereto as Exhibit A)

to all Officers, Postal Career Executive Service (PCES) managers, and Pay Band (Management

and Technical Pay Band) employees, with instructions to share the memorandum with their

Executive and Administrative Schedule (EAS) employees, which, among other things, noted that "[f]urther guidance on use of additional resources [to facilitate the handling and timely delivery of Election Mail] will be provided separately";

WHEREAS, the parties have conferred and have reached agreements consistent with the PI Decision, as reflected herein;

WHEREAS, the parties propose that the Court so-order the agreements reflected herein;

WHEREAS, for purposes of this Order, the term "Election Mail" shall refer to any item mailed to or from authorized election officials that enables citizens to participate in the voting process, including voter registration materials, absentee or mail-in ballot applications, polling place notifications, blank ballots, and completed ballots;

NOW, THEREFORE, upon the parties' agreement, IT IS HEREBY ORDERED that:

1.       USPS shall, to the extent that excess capacity permits, treat all Election Mail as First-Class Mail or Priority Mail Express.

       a. Specifically, USPS shall prioritize identifiable Election Mail that is entered as Marketing Mail, regardless of the paid class, including advancing Election Mail entered as Marketing Mail ahead of other Marketing Mail and processing it expeditiously so that it is generally delivered in line with the First-Class Mail delivery standards; expanding processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day; and prioritizing Election Mail, including ballots entered with Green Tag 191, when loading trucks.

       b. This paragraph (Paragraph 1) shall not be construed to require USPS to change its policies that generally do not include the transportation of Election Mail entered

as Marketing Mail by air; or to extend other features of First-Class Mail, distinct from delivery speed, to Election Mail entered as Marketing Mail. However, USPS will employ special individualized measures to expedite handling of individual voter ballots mailed close to Election Day, regardless of paid class, which may include manually separating them and moving them by air or according to Priority Mail Express delivery speed standards, consistent with practices used in past elections.

2.      To the extent it has not already done so, no later than September 25, 2020, USPS shall provide to this Court and Plaintiffs a cost estimate for treating all Election Mail, as defined herein, as First-Class Mail beginning on October 15, 2020.

3.      USPS shall pre-approve all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020.

4.      No later than October 1, 2020, USPS shall submit to the Court a list of steps necessary to restore First-Class Mail and Marketing Mail on-time delivery scores to the highest score each respective class of mail has received in 2020, which are 93.88 percent for First-Class Mail and 93.69 percent for Marketing Mail, and shall thereafter make a good faith effort to fully implement the listed steps.

5.      To the extent it has not already done so, no later than September 25, 2020, USPS shall submit to the Court a list of all USPS recommended practices concerning the treatment of Election Mail that are not binding policies.

6.      USPS shall provide this Court and Plaintiffs with a weekly update, to be provided every Friday[1], that includes:

    a.   The same weekly update USPS is providing Congress, with respect to USPS's Market-Dominant products (First-Class Mail, Marketing Mail, and Periodicals);

    b.   Separate, unmerged 2-day and 3-5 day weekly service reports for both pre-sort and single-piece First-Class Mail, and variance reports;

    c.   A summary, not to exceed 10 pages in length, of any and all data and information collected by USPS Headquarters regarding USPS's handling of Election Mail at the Headquarters level and compliance with the USPS policies regarding Election Mail, USPS recommended practices regarding Election Mail, and the terms of this Order specifically pertaining to Election Mail.

7.      No later than September 29, 2020, USPS shall submit to the Court and Plaintiffs a proposed Supplemental Guidance Document, to be distributed to all USPS managerial staff.  The September 21 USPS Instructions, the forthcoming further guidance on the use of additional resources, and the proposed Supplemental Guidance Document shall together, in clear terms and with the aid of examples:

    a.   Identify and explain all USPS policy requirements concerning the treatment of Election Mail;

    b.   Identify and explain all USPS recommended practices concerning the treatment of Election Mail;

    c.   Reemphasize that late and extra trips are not banned, and clarify that pre-approval

---

[1] The parties agree that on Friday, September 25, 2020, USPS will provide the information described in Paragraphs 6(a) and 6(b), but not the variance reports described in Paragraph 6(b) or the information described in Paragraph 6(c), herein.

is not needed for late and extra trips and that authorizing late and extra trips
through November 6, 2020, will not result in disciplinary action;

d.   Reemphasize that USPS commits to, authorizes, and encourages the use of any
late and extra trips that would facilitate the timely delivery of Election Mail;

e.   Explain that USPS shall prioritize Election Mail as described in Paragraph 1 of
this Order;

f.   Explain that USPS has pre-approved all overtime that has been or will be
requested for the time period beginning October 26, 2020 and continuing through
November 6, 2020;

g.   Direct managers to explain to each of their direct reports the policies and practices
described in the Supplemental Guidance Document that are relevant to each direct
report, taking into account their individual responsibilities;

h.   Provide contact information for persons available to answer questions concerning
the Supplemental Guidance Document; and

i.   Provide contact information for persons responsible for tracking and responding to
reports of violations of USPS policies and recommended practices concerning the
treatment of Election Mail and direct personnel to contact this person in the event
of any such violation.

8.     No later than October 1, 2020, Plaintiffs shall submit any comments concerning
the Supplemental Guidance Document to this Court.  Plaintiffs shall attach a copy of
Defendants' proposed Supplemental Guidance Document containing any of Plaintiffs' suggested
edits in track changes.

9.     Within 7 days of the date of an Order of this Court approving the Supplemental
Guidance Document, USPS shall certify to this Court whether all USPS managerial staff

members have certified that they have read, reviewed, and understand the Supplemental

Guidance Document; to the extent any managerial staff member has not yet certified that they

have read, reviewed, and understand the Supplemental Guidance Document, USPS shall

describe each attempt it has made to contact the relevant managerial staff member.

      10.     Paragraphs 3 and 7(f) of this Order are hereby stayed pending an order of this

Court resolving Defendants' forthcoming Motion to Modify, Clarify, or, Alternatively, Stay this

Order.



SO ORDERED.

9/25/2020

DATE                    VICTOR MARRERO, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/29/2020

------------------------------------X

MONDAIRE JONES, et al.,               :
                                      :
                   Plaintiffs,        :      20 Civ. 6516 (VM)
                                      :
      - against -                     :      **DECISION AND ORDER**
                                      :
UNITED STATES POSTAL SERVICE, et al., :
                                      :
                                      :
                   Defendants.        :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman, and Rebecca Rieckhoff ("Plaintiffs") filed this action against defendants United States Postal Service ("USPS" or "Postal Service"); Louis DeJoy, as Postmaster General ("DeJoy"), and Donald J. Trump, as President of the United States ("President," and together with the Postal Service and DeJoy, "Defendants" or the "Government"). Plaintiffs seek declaratory relief and a preliminary injunction mandating that the Postal Service take certain actions to ensure the timely delivery of their mailed ballots in the upcoming national election. Now before the Court is Defendants' motion for clarification or modification, or, alternatively, a stay of certain terms of the preliminary

1

injunction that this Court entered on September 25, 2020 (the "Motion," Dkt. No. 59). For the reasons set forth below, the Court grants the Motion in part.

## I.   BACKGROUND

A.   FACTUAL AND PROCEDURAL BACKGROUND

On September 2, 2020, Plaintiffs moved the Court for a preliminary injunction. The Court held a hearing on September 16, 2020 and heard witness testimony and oral argument. On September 21, 2020, the Court issued a Decision and Order granting in part Plaintiffs' motion for a preliminary injunction and directing the parties to settle an order consistent with the Court's decision. See Jones v. U.S. Postal Serv., No. 20 Civ. 6516, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020). The September 21, 2020 Decision and Order provided certain default preliminary injunctive terms scheduled to take effect on September 25, 2020 in the event the parties were unable to settle an order. Consistent with the Court's directive, the parties submitted a joint proposed order on September 25, 2020. The parties were able to reach agreement on all but one issue: injunctive terms reflective of the relief to which Plaintiffs are entitled with respect to USPS's overtime policies and practices pursuant to the Court's September 21, 2020 Decision and Order. The parties accordingly agreed that the default provisions concerning

2

overtime set forth in the Court's September 21, 2020 Decision and Order would govern, although Defendants would move to clarify, modify, or, alternatively, stay those provisions. (See "Joint Letter Dated September 25, 2020," Dkt. No. 54.) Accordingly, on September 25, 2020, the Court entered an Order adopting the parties' proposed preliminary injunction, including the default provisions regarding overtime, but staying the effect of the default overtime provisions pending a decision on Defendants' then-forthcoming motion. (See "Preliminary Injunction," Dkt. No. 57.)

Specifically, with regard to overtime, Paragraph 3 of the Preliminary Injunction provides that "USPS shall pre-approve all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020." (Id. ¶ 3.) Paragraph 7(f) further requires USPS to explain that directive in a guidance memorandum to all staff. (Id. ¶ 7(f).)

Defendants filed the present Motion on September 26, 2020. In support of the Motion, Defendants submitted additional declarations. (See "Mills Decl.," Dkt. No. 61; "Kochevar Decl.," Dkt. No. 62.) Attached as exhibits to the Kochevar Declaration are recent guidance documents that USPS issued: a September 21, 2020 guidance memorandum sent to managerial staff titled "Clarifying Operational Instructions"

3

("September 21 USPS Instructions," Dkt. No. 62-1); a September 24, 2020 Stand Up Talk titled "Ready to Deliver Election Mail for the Nation" ("September 24 Stand Up Talk," Dkt. No. 62-2); and a September 25, 2020 guidance memorandum sent to managerial staff titled "Additional Resources for Election Mail Beginning October 1" ("September 25 Additional Resources Memorandum," Dkt No. 62-3). The two guidance memoranda were previously provided to the Court as part of the Defendants' September 25, 2020 weekly update.

Plaintiffs filed an Opposition to the Motion on September 27, 2020, along with additional declarations in support. (See "Green Decl.," Dkt. No. 63-1; "Jamison Decl.," Dkt. No. 63-4.)

## II.  THE PARTIES' ARGUMENTS

Defendants' primary objection to Paragraphs 3 and 7(f) of the Preliminary Injunction is that their terms could be read as requiring USPS to pre-approve any overtime requested as to any employee, even if the overtime relating to that employee would have no bearing on the delivery of Election Mail. Such a broad reading could, Defendants argue, lead to financial disaster and administrative and legal difficulties. Relying on the Mills Declaration, Defendants assert that USPS does not have an organization-wide request-based system for approving overtime. Rather, they contend that local

supervisors and managers decide, in real time, whether overtime is necessary and then assign it to employees consistent with mandatory collectively bargained processes.

Defendants submit that the Court did not intend Paragraphs 3 and 7(f) to be interpreted so broadly. According to Defendants' own interpretation, Paragraphs 3 and 7(f) are intended to confirm to USPS employees "that any overtime needed to facilitate the expeditious delivery of Election Mail may, and indeed should, be used and approved." ("Defendants' Memorandum," Dkt. No. 60, at 6.) Defendants maintain that, by asking the Court to confirm their understanding of Paragraphs 3 and 7(f), they are simply requesting a clarification of the scope and interpretation of those terms. They assert that the Court's authority to provide such a clarification is well-established.

Defendants claim that the September 21 USPS Instructions and September 25 Additional Resources Memorandum are consistent with the narrower interpretation of Paragraphs 3 and 7(f). The September 21 USPS Instructions purport to "address any misinformation and clear up any confusion about the status of the Postal Service's practices concerning Overtime" and various other issues. The memorandum begins by stating that "[t]he number one priority for Postmaster General DeJoy and the Postal Service between now and Election

5

Day is the secure and on-time delivery of the nation's
election mail." (September 21 USPS Instructions at 1.)
Regarding overtime, the memorandum states:

> Postal Service Headquarters has not imposed, and will
> not impose, any nationwide changes that ban or newly
> restrict overtime prior to Election Day. Overtime use
> has not been banned, nor have any caps been placed on
> overtime hours. Front-line supervisors and managers will
> continue to schedule employees' work hours and oversee
> employee overtime, including planning for any needed
> prescheduled overtime, directing unscheduled overtime,
> and approving employee requests for overtime work based
> on the workload. Supervisors will continue to set
> schedules with the goal of matching the expected earned
> work hours with the appropriate staffing. Management
> will continue to monitor the use of work hours and
> overtime so that it can identify and address problems
> that may be the cause of work not being performed within
> expected work hours or managed inefficiently.
>
> The Postal Service's consistent practice in the past is
> to use justified and approved overtime hours where
> needed to deliver the mail on time, and that practice
> will continue. Overtime has been, and will continue to
> be, utilized as necessary to fulfill our mission. As
> will be discussed in more detail in the forthcoming
> guidance regarding the use of additional resources
> starting on October 1, use of overtime necessary to
> expeditiously move Election Mail should be approved.

(Id.)

The September 25 Additional Resources Memorandum
similarly begins by stating that "the Postmaster General has
reiterated that [USPS's] number one priority is the proper
handling and timely delivery of all Election Mail, especially
ballots." (September 25 Additional Resources Memorandum at
1.) The memorandum provides information concerning

"additional resources" that "are being made available for District Managers, Postmasters, Division Directors, and Plant Managers to utilize, as they determine, to support the timely and expeditious handling of the increased volume of Election Mail." (Id.) It provides that personnel are "authorized and instructed to use these additional resources to ensure that all Election Mail is prioritized and delivered on time." (Id.) The memorandum authorizes additional processing resources (e.g., advancement of Election Mail entered as Marketing Mail and expanded processing windows on letter and flat sorting equipment), transportation resources (e.g., extra trips from all points of processing and delivery), and extra delivery and collection trips. (Id. at 1-2.) Regarding overtime, the Additional Resources Guidance instructs that "[o]vertime is authorized and instructed to be used to support these additional resources and the completion of the additional work, as needed." (Id. at 2.) The memorandum further provides that "consistent with our practices in past election cycles, the use of extraordinary measures beyond our normal course of operations" -- such as "expedited handling, extra deliveries, and special pickups" to deliver blank and completed ballots -- are "authorized and expected to be executed by local management between October 26 and November 24, to accelerate

the delivery of ballots, when the Postal Service is able to
identify the mailpiece as a ballot." (Id.)

To resolve the ambiguity surrounding the scope and
meaning of the Preliminary Injunction's overtime
requirements, Defendants propose that the Court clarify
Paragraph 3 of the Preliminary Injunction as providing that:

> Overtime is authorized and instructed to be used to
> facilitate the timely delivery of Election Mail,
> consistent with the September 21 USPS Instructions and
> the September 25 Additional Resources Memorandum.

(Defendants' Memorandum at 5-6.) Defendants similarly request
that the Court clarify that Paragraph 7(f) requires USPS to
"[e]xplain that overtime is authorized and instructed to be
used as described in Paragraph 3 of this Order." (Id. at 6.)

The Government further argues that, if the Court
construes its request as seeking something more than a
clarification, then Federal Rule of Civil Procedure 60(b)
("Rule 60(b)") applies and entitles the Government to a
modification. Defendants observe that Rule 60(b) authorizes
the Court to modify a preliminary injunction where
extraordinary circumstances exist or where the injunction
would cause an extreme and unwarranted hardship. The
Government contends that the upcoming election is an
extraordinary circumstance and that the financial,

administrative, and legal problems described above constitute an extreme and undue hardship.

In the event the Court declines to clarify or modify the Preliminary Injunction, Defendants ask the Court to stay those provisions until the Solicitor General determines whether to appeal. Defendants contend that an argument that Paragraphs 3 and 7(f) of the Preliminary Injunction are overbroad would likely succeed on appeal. In light of the financial, administrative, and legal issues described above, the Government additionally asserts that it can demonstrate irreparable harm. Further, according to Defendants, any stay would not substantially injure Plaintiffs. Finally, the Government argues that, by preventing administrative and legal confusion and difficulties, a stay would benefit the public interest.

In response, Plaintiffs assert that Defendants' motion should be denied in its entirety. Incorporating the September 21 USPS Instructions and the September 25 Additional Resources Memorandum into the terms of the Preliminary Injunction would be, in Plaintiffs' view, inconsistent with the Court's September 21, 2020 Decision and Order. Plaintiffs explain that the September 21 USPS Instructions and the September 25 Additional Resources Memorandum leave local managers with substantial discretion to determine when

overtime is necessary and, consequently, authorized. Plaintiffs argue that, in light of the organizational confusion the Court previously recognized and Defendants' admissions that certain local managers had exercised poor judgment, such an approach will not result in the uniform treatment of Election Mail that the Constitution requires.[1] Plaintiffs further contend that incorporating the September 21 USPS Instructions and the September 25 Additional Resources Memorandum into the terms of the Preliminary Injunction would introduce unmanageable standards and undefined terms into the Preliminary Injunction.

According to Plaintiffs, Paragraphs 3 and 7(f) of the Preliminary Injunction are not lacking in clarity. In their view, the Court has clearly directed that all overtime is approved for a 10-day period surrounding Election Day. Plaintiffs further contend that Defendants' objection to the language of Paragraph 3 is untimely because Plaintiffs proposed this language in their September 2, 2020 Notice of Motion for Injunctive Relief, giving Defendants the opportunity to raise specific objections concerning the

---

[1] Relatedly, Plaintiffs suggest that, by reaffirming USPS's commitment to certain cost-cutting efforts, the September 21 USPS Instructions and the September 25 Additional Resources Memorandum will discourage local managers from deeming overtime necessary to the timely delivery of Election Mail.

language prior to the issuance of the September 21, 2020 Decision and Order.

Plaintiffs argue that Defendants' motion, though couched as a motion for clarification or modification, is, in effect, a motion for reargument and should be assessed under the standards for such motions, including Local Rule 6.3, which prohibits the filing of affidavits unless directed by the Court and requires the movant to identify matters or controlling law the Court overlooked. Plaintiffs argue that Defendants do not meet this standard because their motion relies on newly introduced facts and arguments, rather than matters previously raised that the Court overlooked.

Plaintiffs also contend that the financial, administrative, and legal harms that Defendants claim they may suffer are purely speculative. Plaintiffs insist that Defendants' theory of harm rests on an unlikely series of events -- that employees will abusively request overtime over the 11-day period, that this will trigger automatic entitlement to overtime among other employees based on union contracts, and that the cost of this overtime will financially ruin USPS. Thus, because Defendants have not shown that they will likely suffer undue harm, Plaintiffs submit that they are not entitled to a modification under Rule 60(b) or a stay of the contested provisions of the Preliminary Injunction.

Plaintiffs offer additional reasons Defendants are not entitled to a stay. For one, Plaintiffs contend that, given the impending Election, any delay -- in particular, the delayed issuance of the Guidance Memorandum contemplated in the Preliminary Injunction, which is intended to cure non-uniformity among local practices -- would cause Plaintiffs to suffer prejudice. Next, Plaintiffs argue that Defendants cannot demonstrate a likelihood of success on appeal because their arguments regarding the language of Paragraph 3 were not raised in their Opposition to Plaintiffs' motion for a preliminary injunction and are not in the record. Additionally, Plaintiffs observe that the Government does not explain how the Court erred in making the findings of fact regarding USPS's non-uniform practices and mismanagement, which led the Court to issue an order that divested local managers of discretion.

Also of note, Plaintiffs introduce a slide from a presentation given at the July 10, 2020 teleconference with DeJoy that states, "NO EXTRA TRANSPORTATION" and "NO LATE TRANSPORTATION." ("Green Decl. Ex. 1," Dkt. No. 63-2, at 9.) Plaintiffs contend that this document undermines the testimony of witnesses at this Court's preliminary injunction hearing who testified that at the July 10 teleconference,

12

USPS headquarters had not communicated a ban on late and extra trips.

## III. DISCUSSION

The parties dispute whether the Court should deem Defendants' request a motion for clarification, modification, or reconsideration. For the reasons discussed below, the Court construes the motion as seeking a clarification and in part grants the requested relief.

A.   APPLICABLE LEGAL STANDARD

It is "undoubtedly" within the district court's power to "issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent unwitting contempt." IGT v. High 5 Games, LLC, No. 17 Civ. 9792, 2018 WL 2939032, at *3 (S.D.N.Y. Apr. 17, 2018) (quoting One11 Imports Inc. v. NuOp LLC, No. 16 Civ. 7197, 2016 WL 7338422, at *1 (S.D.N.Y. Dec. 19, 2016)) (internal quotation marks omitted) (issuing clarification order to resolve "differing interpretations" of the court's preliminary injunction); see also Regal Knitwear Co. v. NLRB, 324 U.S. 9, 15 (1945) (explaining defendants "may petition the court granting [an injunction] for a modification or construction of the order" and "such relief would be in the sound discretion of the court"). Clarifications of previously issued orders "add certainty to an implicated party's efforts

13

to comply with the order and provide fair warning as to what
future conduct may be found contemptuous," and "may be
obtained on motion or made sua sponte by the court." N.A.
Sales Co. v. Chapman Indus. Corp., 736 F.2d 854, 858 (2d Cir.
1984).

        In seeking relief on the basis that Paragraphs 3 and
7(f) could be construed as requiring USPS to approve requests
for overtime that have no bearing on the timely delivery of
Election Mail, Defendants essentially seek confirmation of
the scope and meaning of the Preliminary Injunction's terms.
Courts routinely treat requests of this type as motions for
clarification. For example, in A.V. by Versace, Inc. v. Gianni
Versace, S.p.A., the court construed a similar motion, though
brought as a motion for modification under Rule 60(a), as a
request for clarification. See 126 F. Supp. 2d 328, 334-35
(S.D.N.Y. 2001). There, plaintiff sought confirmation that a
provision in a preliminary injunction applied
extraterritorially, although the provision at issue included
the limiting phrase "in the United States of America". Id. at
332-34. Plaintiff argued that the inclusion of the phrase "in
the United States of America" in paragraph 8 was "a
typographical error" and moved for modification under Rule
60(a). Id. at 333-34. The court determined that defendant was
"essentially seeking clarification of the injunction's

extraterritorial scope," and, after considering the other
provisions of the preliminary injunction and comments the
court had made on the record that were indicative of the
injunction's purpose, the court clarified that the injunction
*did* apply extraterritorially. <u>Id.</u> at 335-36. In reaching this
conclusion, the court determined that this "appropriate
guidance" rendered a ruling pursuant to Rule 60(a)
"unnecessary." <u>Id.</u> at 334.

Likewise, in <u>Onell Imports</u>, the court issued a
clarification order where the "parties disagree[d] about the
scope of the Court's preliminary injunction." 2016 WL
7338422, at *1. Specifically, the plaintiff had been
instructing nonparties that they were subject to the
preliminary injunction, and the defendant sought confirmation
that the injunction did not actually bind nonparties. <u>Id.</u> at
*1-3. The defendant also sought the court's confirmation of
whether the injunction permitted it to continue using a
particular mark. <u>Id.</u> at *1. Under those circumstances, the
court applied the legal standard for clarification motions to
assess the defendants' requests. <u>Id.</u> The court ultimately
clarified that the injunction did not apply to nonparties,
enjoined the plaintiff from representing otherwise, and
confirmed that the defendant could not use a particular mark.
<u>Id.</u> at *3.

That the relief Defendants seek is appropriately characterized as a clarification is further confirmed by its similarity to relief courts have granted during the pendency of preliminary injunction appeals. In that context, a district court's power is limited to maintaining the status quo. See Broker Genius, Inc. v. Seat Scouts LLC, No. 17 Civ. 08627, 2019 WL 5203474, at *3 (S.D.N.Y. Sept. 23, 2019). Even with such limited authority, district courts often clarify the intended breadth of their injunctions. For instance, in Eli Lilly & Co. v. Arla Foods Inc., the district court agreed with the defendant that a preliminary injunction was overly broad. No. 17 Civ. 703, 2017 WL 5244681, at *2 (E.D. Wis. July 18, 2017), aff'd, 893 F.3d 375, 384 (7th Cir. 2018). The injunction's purpose was to restrain defendant from making false or misleading statements about a particular product. Id. However, the injunction effectively prohibited the defendant from "using all portions of the [] advertisements [attached to the complaint], including those that ha[d] nothing to do with its statements about [the product]." Id. Accordingly, despite the limitations on its jurisdiction, the district court "clarif[ied] the scope of the injunction." Id.

Although Plaintiffs argue that the Court cannot consider Defendants' new affidavits on a motion for reargument,

16

Plaintiffs do not explicitly argue that consideration of such materials is inappropriate on a motion to clarify a preliminary injunction. Cf., e.g., IGT, 2018 WL 2939032, at *1 (considering newly submitted materials in clarification order); Harris v. Fairweather, No. 11 Civ. 2152, 2011 WL 4538436, at *1 (S.D.N.Y. Sept. 29, 2011) (same). Nonetheless, the Court declines to consider the newly submitted evidence in this case, as it is not necessary to and would not alter the Court's ultimate decision to clarify its preliminary injunction.

B.    APPLICATION

Relying on the facts presented on the record of Plaintiffs' motion for preliminary injunction, and without reference to the newly introduced facts, the Court agrees with Defendants that the language of Paragraphs 3 and 7(f) warrants clarification. Federal Rule of Civil Procedure 65(d)(1) ("Rule 65(d)(1)") requires that "[e]very order granting an injunction and every restraining order must: . . . (B) state its terms specifically; and (C) describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." Rule 65(d)(1).

Plaintiffs' claims and the Court's September 21, 2020 Decision and Order focused not on the Postal Service's

policies and operations generally but on the extent to which USPS practices bear on its handling of Election Mail. Plaintiffs had asserted that USPS's practices infringed their First and Fifth Amendment rights to vote and have their votes counted equally. The Court found that multiple managerial failures yielded substantial delays and unwarranted disparities in local postal practices with respect to the processing and delivery of Election Mail. Based on those factual findings, the Court concluded that Plaintiffs demonstrated a clear and substantial likelihood of success on the merits of their First and Fifth Amendment claims. Nonetheless, the Court agreed with Defendants that many of the injunctive terms Plaintiffs proposed were overbroad. See Jones, 2020 WL 5627002, at *27.

Accordingly, the default terms that the Court provided in its September 21, 2020 Decision and Order were significantly narrower and more targeted than those Plaintiffs proposed in their September 2, 2020 Notice of Motion for Injunctive Relief. Even a cursory comparison of Plaintiffs' proposed terms with the default terms the Court prescribed makes clear that the Court devoted substantial effort to crafting default terms that precisely tracked the constitutional injuries at issue in this case -- terms designed to remedy defects in USPS's handling of Election

18

Mail, and not conditions relating to Postal Service operations more generally. In this context, the default overtime provision, which called for USPS to approve all overtime and not simply overtime that facilitated the delivery of Election Mail, stands out, prompting reasonable questions and ambiguities concerning what the Court's injunctive relief order requires for USPS compliance.

By providing that USPS shall pre-approve "all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020," the Order does not state its terms with sufficient specificity and detail to convey the Court's intent to narrow the scope of the injunctive relief. See Rule 65(d)(1). The Court agrees with the Government's argument that, as now written, this provision could be construed to require USPS to approve all overtime requests, regardless of whether the overtime would relate to ensuring the delivery of Election Mail. Consequently, such an interpretation would be at odds with the Court's express intent to craft default terms focused on improving USPS's handling of Election Mail, as distinct from all mail.

Accordingly, the Court clarifies that Paragraph 3 of the Preliminary Injunction provides that USPS shall authorize, and instruct, overtime to be used to ensure the timely

delivery of Election Mail. The Court further clarifies that Paragraph 7(f) requires USPS, in its forthcoming proposed guidance memorandum, to explain that overtime is authorized and instructed to be used as described in Paragraph 3 of the Preliminary Injunction as clarified herein.

Plaintiffs are correct that the Court's September 21, 2020 Decision and default terms focused on preventing injuries arising from problematic disparities in local practices, including by limiting the discretion of local management. The clarification provided herein calls for USPS to approve overtime that will ensure the timely delivery of Election Mail pursuant to uniform nationwide standards that minimize local discretion concerning whether to authorize overtime.

The Court cannot adopt the exact language of Defendants' proposed clarification, which would incorporate by reference into the Preliminary Injunction the September 21 USPS Instructions and September 25 Additional Resources Memorandum. Even assuming that these documents are perfectly clear and consistent with the Court's September 21, 2020 Decision and Order, incorporating them by reference into the Preliminary Injunction would violate Rule 65(d)(1). See Rule 65(d)(1) (requiring that "[e]very order granting an injunction and every restraining order must: . . . describe

in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required"); City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 146 (2d Cir. 2011) (relying on Rule 65(d)(1)(C) to vacate an injunction that "prohibit[ed] certain conduct by reference to [an] amended complaint"); Eyewonder, Inc. v. Abraham, 293 F. App'x 818, 820 (2d Cir. 2008) (rejecting the argument that incorporation of an external document was harmless because the referenced document was "clear" and "easily understood" and explaining that the court is not "flexible" about applying Rule 65(d)(1)).

Because the Court determines that the clarification standard applies and concludes, upon its application, that Paragraphs 3 and 7(f) of the Preliminary Injunction warrant clarification, the Court need not address Defendants' alternative requests for a modification or stay, or Plaintiffs' arguments regarding reconsideration.[2] See, A.V. by Versace, Inc., 126 F. Supp. 2d at 330 (dismissing Rule 60(a) motion for modification of a preliminary injunction order as "moot" where court instead clarified unclear and ambiguous language in the order).

---

[2] The Court is not persuaded that Defendants' request is nothing but a disguised motion for reconsideration. Notably, the cases Plaintiffs cite for this proposition do not concern preliminary injunctions. (See Plaintiffs' Opposition at 7-8.)

The Court notes, however, that construing Defendants'
request as a motion for modification would yield the same
result. As an initial matter, although Defendants seek
modification of this Court's order under Rule 60(b), the Court
would have to consider Defendants' motion pursuant to Federal
Rule of Civil Procedure 59(e) ("Rule 59(e)"). A preliminary
injunction is not a final judgment, and therefore, Rule 60(b)
is inapplicable; rather, a motion to modify a preliminary
injunction order is properly made pursuant to Rule 59(e),
which allows for alterations of appealable judgments. See Am.
ORT, Inc. v. ORT Israel, No. 07 Civ. 2332, 2009 WL 233950, at
*3 n.2 (S.D.N.Y. Jan. 22, 2009).

Under Rule 59(e), modification is appropriate in certain
situations, including when the movant has demonstrated "the
need to correct a clear error." Id. at *3 (internal quotation
marks and citation omitted) (alterations in original). Here,
had the Court focused more sharply on the unnecessary breadth
of the overtime provisions of its preliminary injunction, the
Court would undoubtedly have concluded that, for the reasons
provided above those provisions were not appropriately
tailored to remedy the harm shown. Accordingly, modification
would be warranted under Rule 59(e).

## IV.   ORDER

Accordingly, for the reasons stated above, it is hereby

      **ORDERED** that Defendants' motion (Dkt. No. 59) for clarification or modification, or, alternatively, a stay of certain terms of the Preliminary Injunction (Dkt. No. 57) is **GRANTED** in part; and it is further

      **ORDERED** that Paragraph 3 of the Preliminary Injunction is hereby clarified as requiring that USPS shall authorize, and instruct, overtime to be used for the time period beginning October 26, 2020 and continuing through November 6, 2020 to ensure the timely delivery of Election Mail; and it is further

      **ORDERED** that Paragraph 7(f) of the Preliminary Injunction is hereby clarified as requiring that USPS explain that overtime is authorized and instructed to be used as described in Paragraph 3 of the Preliminary Injunction and as clarified herein.

**SO ORDERED.**

Dated:    New York, New York
          29 September 2020

                          Victor Marrero
                          U.S.D.J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ET AL. | : | |
| | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 20-4096 |
| | : | |
| LOUIS DeJOY | : | |
| *IN HIS OFFICIAL CAPACITY AS* | : | |
| *UNITED STATES POSTMASTER GENERAL,* | : | |
| ET AL. | : | |

## MEMORANDUM

**Gerald Austin McHugh, J.**                                              **September 28, 2020**

This is an action brought by six states and the District of Columbia to enjoin certain changes made by the United States Postal Service in the leadup to the November 3, 2020 election. As an initial matter, it is useful to highlight that as a public agency, the Postal Service must abide by the procedures enacted by Congress when it created the modern Postal Service via the Postal Reorganization Act ("PRA") in 1970, and again when it amended the PRA by passing the Postal Enhancement and Accountability Act ("PAEA") in 2006. Congress required that the Postal Service seek an advisory opinion from the Postal Regulatory Commission (hereafter, "the Commission") and that a public hearing be held prior to making significant, nationwide changes. 39 U.S.C. § 3661. This structure formally balances the Postal Service's need to make "businesslike" decisions with its role as an agency that provides an indispensable service to the American public. *See* H.R. Rep. No. 109-66, at 42 (2005).

The Postal Service must also meet substantive requirements, including that it provide "adequate and efficient postal services," 39 U.S.C § 403(a), and that it "give the highest

consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

At issue in this case is whether the Postal Service violated the law and acted beyond its authority when it restricted extra and late trips by trucks and letter carriers and instituted overtime restrictions. Such changes could have profound consequences for the administration of state agencies in ordinary times. In a pandemic, states are even more reliant on the mail, especially when it comes to administering elections. This Court has been called upon to exercise jurisdiction and provide redress—namely, that the Postal Service reverse the changes it has made and abide by the statutorily-required process, which includes review and input from both the Commission and the public.

Plaintiffs and the Postal Service agree that the Postal Service undertook a major new initiative following Louis DeJoy's installation as Postmaster General. Both sides also agree that the Postal Service did not seek an advisory opinion and that no public hearing occurred before the Postal Service implemented these changes in July 2020. Against that background, Plaintiffs have produced compelling evidence from Defendants themselves, indicating that there has been a pronounced increase in mail delays across the country since the implementation of these changes. And the Postal Service insists that it is rolling back the changes and improving performance.

Nonetheless, the Postal Service raises several procedural arguments as to why this Court may not hear this case in the first place. It further contends that even if this Court has jurisdiction, the changes do not rise to a level that requires the input of the Commission or the public.

Having examined the facts, along with the text, structure, and legislative history of the PRA and the PAEA, and having also accorded some level of deference to the Postal Service's interpretation of the statute, I conclude that jurisdiction exists. Furthermore, as users of the mail

who rely on the Postal Service's historic commitment to a policy of "every piece, every day,"[1] Plaintiffs have been harmed in various and meaningful ways by these changes, as discussed below.

The Postal Service is a critical agency that preceded the birth of the nation itself, one of a few agencies that the Constitution explicitly authorized. U.S. Const. art. I, § 8. Congress has described it as "a basic and fundamental service provided to the people by the Government of the United States. . . ." 39 U.S.C. § 101(a). Its ability to fulfill its mission during a presidential election taking place in the midst of a public health crisis is vital. The record in this case strongly supports the conclusion that irreparable harm will result unless its ability to operate is assured. I will therefore grant injunctive relief.

## I.    The Relevant Factual Background and Procedural History

In response to the COVID-19 pandemic, states have sought to facilitate mail-in voting, and a record number of voters are expected to cast mail-in ballots. In twenty-eight states, plaintiffs may apply for and cast a mail-in ballot for any reason. *See* Compl. ¶ 6, ECF No. 1. Nine states will send mail-in ballots to all eligible voters. *Id.* Voters in six other states may also request a mail-in ballot for reasons related to COVID-19. *Id.* As a result of these efforts and voters' fears about contracting COVID-19 while voting in person, states are already seeing record numbers of requests for mail-in ballots.[2]

The ability of the Postal Service to deliver the Election Mail and other essential post in a timely fashion has recently been called into question. On June 15, 2020, Louis DeJoy began his tenure as the 75th Postmaster General and Chief Executive Officer. Compl. ¶ 155. Prior to his

---

[1] Mr. Robert Cintron, Vice President of Logistics for the Postal Service, acknowledged that for 35 years, he has heard the policy stated in various contexts: "It's about making sure that we get every piece delivered every day, every piece on the truck every day." Cintron Dep. Courtroom Exhibit 54 at 106: 12-16.  Plaintiffs introduced Supplemental Exhibits on September 24, 2020. These exhibits have not been filed electronically.

[2] In North Carolina, for instance, the elections authority has received over 10.8 times the number of absentee ballot requests than it had at the same time in 2016. Compl. ¶ 7.

3

term, DeJoy had no experience working at the Postal Service. *Id.* Before the COVID-19 pandemic began, the Postal Service met its service standards for First-Class Mail roughly 92 percent of the time. *See* Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit Ex. 54-16. In April, service performance declined to 90 percent, before climbing again in May to 92 percent. *Id.* Approximately one month after Postmaster DeJoy began his tenure, service dropped precipitously and fell to 85 percent on July 11, 2020. *Id.* By August 8, 2020 service performance fell to 81.47 percent, far lower than at any other time during the pandemic. *Id.*

## A. Procedural History

Prompted by fears of Postal Service delays and the administration of elections, the Commonwealth of Pennsylvania, the State of California, the State of Delaware, the District of Columbia, the State of Maine, the Commonwealth of Massachusetts, and the State of North Carolina filed a complaint for declaratory and injunctive relief on August 21, 2020 against Postmaster DeJoy, Robert Duncan, who serves as Chairman of the Postal Service Board of Governors,[3] and the United States Postal Service.

Plaintiffs claim that the Postal Service has unlawfully implemented policy changes regarding transportation schedules, letter carriers, and the use of overtime. Compl. ¶ 2. Specifically, they allege that the Postal Service has been "prohibiting late or extra trips by postal workers that are often necessary to keep the mail moving forward in the mail stream; requiring carriers to adhere rigidly to start and stop times regardless of whether all mail for their route has arrived or been delivered; and limiting the use of overtime." *Id.* at ¶ 3. Plaintiffs further argue

---

[3] Postmaster DeJoy and Chairman Duncan are named in their official capacities.

that these policy changes caused a significant drop in service and continue to contribute to delays.

The states have further claimed that Postal Service officials "also intend to change the Postal Service's longstanding practice of prioritizing Election Mail ahead of the November 2020 election." Pls. Mot. Prelim. Inj. ¶ 1, ECF No. 18.

Plaintiffs include four causes of action within their Complaint:

Count I:  The states contend that Defendants acted beyond their statutory authority, and in violation of section 3661 of the PRA, 39 U.S.C. § 3661, when they made national changes to postal services without submitting a proposal to the Postal Regulatory Commission. *See* Compl. ¶ 222-227. In Plaintiffs' Motion for a Preliminary Injunction, the states also allege that Defendants' "contemplated changes to the processing of Election Mail . . . are subject to section 3661's procedural requirements" and that the Postal Service must issue a proposal to the Commission before making these changes. Mem. Law. Supp. Pls. Mot. Prelim. Inj. 34-35, ECF No. 18-1.

Count II:  Plaintiffs also claim that Defendants' July 2020 policy changes and their intention to abandon the practice of giving Election Mail the highest priority exceed Defendants' authority under sections 101 and 403 of the PRA. Compl. ¶ 228-236. The Postal Service must "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C § 403(a). The Postal Service must also "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

Count III:  The states allege that the Defendants' changes have "abruptly and unlawfully impaired the operation of the postal services and have acted to cast doubt on the Postal Service's

5

ability to facilitate mail-in voting." Compl. ¶ 244. As a consequence, Defendants have violated

Plaintiffs' rights under the Elections Clause and the Electors Clause. *Id.* at ¶ 244-246.

Count IV:  Plaintiffs assert that Defendants' actions have disenfranchised voters based on

age, in violation of the 26th Amendment. *Id.* at ¶ 247-253.

On September 2, Plaintiffs filed a motion for a preliminary injunction. *See* P's Mot.

Prelim. Inj. ¶ 1.  On September 4, I ordered expedited discovery. *See* Order Granting Pls. Mot.

Expedite Disc., ECF No. 22. The Court was prepared to proceed with a hearing on September

22, the date proposed by the parties, but deferred the hearing to allow review of the documents

produced and the deposition of two Postal Service witnesses. Testimony from the Southern

District of New York was incorporated into the record here, and the parties agreed that the

pending motion could be decided without live testimony. *See* ECF No. 57. I held a hearing on

September 24, 2020, at which Plaintiffs introduced Supplemental Exhibits (Ex. 54–Ex. 75) and

the parties presented argument. During the hearing, Plaintiffs clarified that their motion for a

Preliminary Injunction is currently limited to Counts I and III.

**B.  Determinations of Fact**[4]

By way of initial summary, the record shows that the Postal Service has implemented

new initiatives to slash the number of extra and late truck trips and restrict work hours. It has

also required letter carriers to abide by rigid start and stop times. Defendants strive to frame

these changes as merely the further implementation of existing operating plans. *See Examining

the Finances and Operations of the United States Postal Service During COVID-19 and

Upcoming Elections Before the S. Committee on Homeland Security and Governmental Affairs*,

116th Cong. 10 (2020) (statement of Postmaster General and Chief Executive Office Louis

---

[4] "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

DeJoy), Courtroom Ex. 58. But the record makes clear that the agency's sudden and rigid pivot to operating goals in the areas of truck transportation, overtime, and start and stop times for letter carriers constituted a significant change in agency practice. The evidence further establishes that these policy changes resulted in mail being left behind – until that point a "cardinal sin" among the 600,000 employees of the Postal Service. *See* Chester Cassel Decl. Ex. 47 ¶ 9, ECF No. 47-1. The declines in service that resulted from the initiatives have not been fully remedied and pose a threat to the operation of the November 2020 elections.

### 1. Late/Extra Truck Trips and Carrier Start/Stop Times

New Postal Service policies that were set by leadership highly discourage late or extra truck trips to move the mail, even when those trips are needed to prevent delays in delivery. After weighing the evidence, I also conclude for the purposes of this motion that USPS has also changed its policies to require letter carriers to adhere to rigid stop and start times, with few exceptions. These changes appear to have occurred on a national basis and have caused delays in the mail service.

In an August 13, 2020 internal memo, Postmaster DeJoy summarized his view that the Postal Service "must make a number of significant changes," including "re-establish[ing] fundamental operating principles and then adher[ing] to them and run[ning] on time." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G, ECF No. 1-1. Postmaster DeJoy confirmed that he "began those efforts right away" and that, as a result, the Postal Service had an "ontime dispatch schedule" of "97.3 percent, up from 89.8 percent" and had "reduced extra trips by 71 percent." *Id.* These statements were corroborated in an August 6th letter drafted by Postal Service Chief Operating Officer David Williams, where Williams declared that the Postal Service had taken "immediate steps" focused on "improving our

transportation efficiency," including "working to eliminate extra and late trips." Letter to Members of Congress from Chief Operating Officer David Williams (Aug. 6, 2020) Ex. D., ECF No. 1-1.

The initiatives regarding trucks and letter carriers were planned during a series of conference calls between Headquarters and the Area Vice Presidents ("AVPs") who are charged with overseeing mail processing and delivery in their respective regions. With respect to the trucking initiative, Postmaster DeJoy was aware of efforts to "improve adherence to transportation schedules" and expressed support for them. *See* Cintron Dep. Courtroom Ex. 54, at 45-48.[5]

Headquarters repeatedly communicated rigid guidelines for letter carriers. On June 26, 2020, Chief Operating Officer David Williams, who reports directly to Postmaster DeJoy, presided over a conference call and PowerPoint presentation that included the AVPs. The PowerPoint declared that the Postal Service would be instituting actions to ensure that letter carriers adhere to start times and "leave on time." *See* PowerPoint – AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13. The Service estimated that the new "leave on time" requirement would save 7.1 million work hours. *Id.* On July 7, 2020, David Williams led another call with the AVPs that reiterated these messages. *See* PowerPoint – AVP Meeting (July 7, 2020), Courtroom Ex. 54-14.[6] There, presenters again stated that letter carriers should "leave on time" and that management should "set expectations for return times" for rural letter carriers. *Id.*

---

[5] On July 9, 2020, Otis Smith emailed Robert Cintron to notify him that Postmaster DeJoy "was requesting a draft of the business plan for review." Smith directed Cintron to provide preliminary financial estimates for "elimination of extra trips and change service standards to enable use of the most efficient transportation." Email from Robert Cintron to Otis Smith re: Preliminary Financial for Transportation Initiatives – PMG Draft report due Friday (July 20, 2020), Courtroom Ex. 54-8.

[6] This meeting was held on a monthly basis. *See* Cintron Dep. 121. Postmaster DeJoy was certainly aware of this initiative, as he attended the July 7, 2020 call to deliver "general remarks" for 15 minutes. *See* PowerPoint – AVP Meeting (July 7, 2020), Courtroom Ex. 54-14.

Achieving these goals would require "message saturation" and for employees to have "clarity on roles, responsibilities [and] expectations." *Id.*[7]

Williams also used the conference calls with the AVPs to push changes to trucking policies. During a July 10, 2020 conference call with the AVPs, the accompanying PowerPoint called for drastic changes to trucking transportation schedules. *See* PowerPoint – AVP Telepresence (July 10, 2020) Courtroom Ex. 54-9; Cintron Dep. 66 (establishing Williams participation). To meet "our first test," the PowerPoint declared, the Postal Service must shift to "no extra transportation" and "no late transportation." PowerPoint – AVP Telepresence (July 10, 2020) Courtroom Ex. 54-9. As of July 13, 2020, "all extra trips and Postal caused late trips are unauthorized contractual commitments." *Id.* For late trips and extra trips, Area Vice Presidents would serve as the "ratifying official" and must "ratify and submit to the COO." *Id.* If extra trips or late trips occurred the prior day, AVPs were to call the COO (Williams) "daily" to discuss next steps. *Id.* This PowerPoint would have been drafted by Williams or his staff. *See* Cintron Dep. 69.

Defendants claim that these messages represent a mere "aspiration for trying to achieve no unnecessary late trips and no unnecessary extra trips." Cintron Dep. 143. This framing of the evidence is unconvincing. Although the July 10, 2020 PowerPoint suggests that late trips and extra trips will be permitted in rare circumstances, the specificity of its content belies Defendants' assertions that the mandates are merely aspirational. Indeed, the PowerPoint encouraged AVPs to assume that extra trips and late trips are unauthorized absent action from the AVP as a ratifying official. The PowerPoint also suggested that AVPs who did authorize late

---

[7] This document, among others produced in discovery, was marked confidential. I will not post such documents on the docket absent further consultation with counsel but will cite to them as required because of the public interest in the transparency of judicial proceedings. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 784 (3d Cir. 1994). The Court's inherent power to do so is set forth in my published Guidelines for Counsel.

and extra trips would be held to account by the COO. The presentation appears authoritative, as it was drafted by the COO.

Given the specificity and intensity of the messages from Headquarters, it is unsurprising that some AVPs immediately undertook the rigid implementation of Headquarters' restrictions on letter carriers and truck transportation. One such effort was a July 10 "Mandatory Stand Up [sic] Talk" for "All Employees." Ex. A., ECF No. 1-1. The Stand-Up Talk ("SUT") was drafted by an AVP for the Southern Area. *See* Cintron Dep. 82.

The July 10 Stand-Up Talk was clearly influenced by the June 26, July 7, and July 10 presentations from Headquarters. The document offered "specific examples of transportation changes being implemented immediately (today)" and stated that "late trips are no longer authorized or accepted"; "all trips must depart on time"; "extra trips are no longer authorized or accepted"; "all PVS/HCR drivers must be notified that trips depart on time"; "carriers must begin on time, leave for the street on time, and return on time"; and "no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch." Stand-Up Talk, Ex A. The AVP also noted that "one aspect of these changes that may be difficult for employees is that – temporarily – we may see mail left behind . . . which is not typical." *Id.* Employees were directed to report any mail left behind. *Id.*

Similarly, a PowerPoint entitled "PMGs expectations and plan" offered some of "[DeJoy's] expectations [that] will be implemented in short order." Ex. B, ECF No. 1-1. The author noted that "[i]f the plants run late they will keep the mail for the next day. If you get mail late and your carriers are gone and you cannot get the mail out without OT it will remain for the next day." *Id.* This document was drafted by an official out of the Northern Ohio District. *See* Tr. Prelim. Inj. Teleconference at 73, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020).

Defendants hotly dispute the reach and authority of the SUT and the PMG Expectations PowerPoint, particularly with respect to the trucking changes. Robert Cintron declared initially, under penalty of perjury, that the Stand-Up Talk "was not prepared, reviewed, or approved by Headquarters and does not represent official Postal Service guidance or direction." Cintron Decl. 19 n. 1, ECF No. 37-1. Cintron also stated that "Headquarters did not ban all . . . extra or late trips." *Id.* In his deposition, Cintron reiterated that extra and late trips are not banned and that the Service runs "late trips every day in the network." Cintron Dep. 40. He maintains that the Stand-Up Talk statement that "[e]xtra trips are no longer authorized or accepted" is inaccurate. *Id.* at 83.

Angela Curtis, who serves as Vice President for Retail and Post Office Operations at Headquarters, also testified that the Stand-Up Talk and the PMGs Expectations PowerPoint were "not reviewed or approved by Headquarters" and were "distributed locally, not nationally." Curtis Decl. 37-38 n.1, ECF No. 37-1. Moreover, she claims that "contrary to some information in these documents, Headquarters did not ban . . . all extra or late trips and did not instruct local facilities to leave . . . mail." *Id.* at ¶ 8.

Defendants have since conceded that there is a clear connection between Headquarters and the Stand-Up Talk. In view of the involvement of Mr. Williams, the COO, it can hardly claim otherwise. In a supplemental declaration, Cintron admitted that the content of the July 10th Stand-Up Talk "draws from a July 10, 2020 teleconference, conducted with AVPs and members of Headquarters." Cintron Supp. Decl. ¶ 3, ECF No. 46-1.[8] It appears from the record that the

---

[8] Cintron adds that, "[d]uring that teleconference, members of Headquarters made statements reflected, in part, in the July 10, 2020 SUT." *Id.* Curtis, in another supplemental declaration, also noted that she participated in a July 10, 2020 teleconference where Headquarters members made statements that reflect the SUT in part. *See* Curtis Supp. Decl. ¶ 3, ECF No. 46-2.

11

Vice President for the Southern Area took Headquarters' demand for "message saturation" seriously and immediately set to work to educate employees under his purview about the changes. Furthermore, the AVP's belief that the July 10th PowerPoint's edict that "all extra trips and Postal caused late trips are unauthorized contractual commitments" meant a ban on late and extra trips is hardly unreasonable.

The messages contained within Stand-Up Talk and the PMGs Expectations PowerPoint were broadly disseminated.[9] On July 13, 2020, Thelma Griffin, the administrative assistant to Scott Tosch, the District Manager in Louisiana, forwarded an email that stressed the Stand-Up Talk should be shared with "all employees." Email from Thelma Griffin to Louisiana ACE Users re: SUT: Pivoting for Our Future (July 14, 2020), Courtroom Ex. 54-3. She urges all of the employees within the district to "[p]rint and post on all employee bulletin boards. Keep something on file in each office to indicate completion and compliance." *Id.* On July 14, 2020, Griffin emailed again to remind employees to "continue sharing the attached SUT, until it has been shared with all employees." *Id.* On July 13, an Arizona-based representative of the National Rural Letter Carriers' Association noted that she had received a copy of the Stand-Up Talk and had questions. *See* Email from Robert Cintron to Shaun Mossman re Pivoting (July 13, 2020), Courtroom Ex. 59.[10] It appears that these messages are still present in the field: on September 6, 2020, a journalist tweeted a sign that had "just went up" in a Portland, Oregon facility. *See* Tr. Prelim. Inj. Teleconference at 66, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020). The

---

[9] Vance Zimmerman, the Director of Industrial Relations for the American Postal Workers Union testified that, in his experience, "stand-up talks that are entitled "Mandatory Stand-up Talk" are from National Headquarters" and are "delivered to all employees nationwide." Vance Zimmerman Decl. Ex. 46 ¶¶ 7, 8, ECF No. 18-4.

[10] Management did not initially know where the Stand-Up Talk emanated from. Cintron emailed Shaun Mossman, who was revealed to have drafted the SUT to ask, "is this from the SA [Southern Area]." Email from Robert Cintron to Shaun Mossman re Pivoting (July 13, 2020), Courtroom Ex. 59.

sign stated that "All HCR and PBS trips will depart on time, no exception" and "Do not hold the truck. No more holding trucks." *Id.*

In addition to the impact of the Stand-Up Talk and the PowerPoint presentation, there is also guidance on Postal Service trucking policy preliminarily released by Robert Cintron on July 11, 2020 (hereinafter "Cintron Guidelines"). *See* Cintron Dep. 130. Cintron has claimed that he began work on the Guidelines on July 11, 2020 in order to clarify for the AVPs that there was no ban on late or extra trips. *Id.* at 65-66. The Cintron Guidelines do not explicitly ban late or extra trips but nonetheless mirror Headquarters' emphasis on sharply restricting approval for these trips. In the email distributing the Guidelines to the AVPs, Cintron wrote that "our focus is to eliminate unplanned extra transportation . . . we should not impact the customers we have been providing pick ups for." Email from Robert Cintron to Area Vice Presidents re: Extra Guidance (July 14, 2020) Courtroom Ex. 54-11. He reiterated that "trips must depart on time." *Id*. Notably, Cintron's analytics team did not model the impact of the guidelines on the service prior to releasing them. *See* Cintron Dep. 54. Nor did they estimate what the impact of the guidance could be on the November elections. *Id.* at 62.

The combination of the Cintron Guidelines, the SUT, and the PMGs Expectations PowerPoint sharply curbed the number of late and extra trips. As Postmaster DeJoy emphasized in an August internal memo, the Postal Service on-time rates are now "97.3 percent, up from 89.8 percent" and extra trips have been reduced by "71 percent." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G. In numerous instances, these efficiencies came at the cost of timely delivery of mail.[11]

---

[11] Union officials have attested to this effect. *See* John Gibson Decl. Ex. 26 ¶ 15, ECF No. 18-4 ("Rigidly requiring trucks to leave at their scheduled time means that trucks leave without all of their mail, which exacerbates delays because a piece of mail that may have been an hour late becomes a day late or more."); Joseph Cogan Decl. Ex. 48 ¶

Defendants' policy with respect to rigid stop and start times for individual letter carriers is less clear. In arguing that the Stand-Up Talk and the PMGs Expectations PowerPoint do not represent actual policy, Defendants have focused primarily on the limitations upon extra or late trips for trucks. However, the SUT and the PMGs Expectations presentation both mirror Headquarters' talking points that carriers must start on time and leave on time.

The existence of a policy constraining letter carriers is also supported by other evidence from the field. In Philadelphia, for example, "mail handlers and other postal employees were instructed that all trips, including trucks and carriers, were to leave as scheduled." Gibson Decl. ¶ 14. National officials have also testified that they have "received reports from current U.S. Postal Service employees that they are prohibited from making late trips and extra trips even if waiting just a few minutes would ensure timely delivery to entire communities." Coradi Decl. Ex. 49 ¶ 8, ECF No. 47-1. Postal workers have also "been instructed to leave behind mail that is ready for delivery. *Id.* Given this evidence, and no effective rebuttal from Defendants, I conclude for purposes of this motion that the Defendants at some point effectively implemented strict start and stop requirements for letter carriers.

### 2. Overtime Changes

The Postal Service has also set new work hour reduction targets and sought to aggressively reduce the use of overtime on a nationwide basis. Postal Service leadership has engaged in a coordinated national effort to reduce overtime usage. On August 7, 2020, Postmaster DeJoy stated that he was focused on taking "immediate steps to better adhere to our existing operating plans," which included "not incurring unnecessary overtime or other costs." Opening Remarks of Postmaster General Louis DeJoy at Bd. of Governor's Meeting (Aug. 7,

---

13, ECF No. 47-1 (testifying that as a result of the changes, "mail that was nearly done being processed may miss the truck entirely and could sit at the facility for at least another day").

2020) Ex. E, ECF No. 1-1. This message was also reflected in an August 6th letter to Congress,
where David Williams noted that, while the Postal Service has not eliminated overtime,
leadership is "reemphasizing that operational managers must ensure that overtime is earned as
the result of unexpected volume or other factors pursuant to our normal overtime analysis before
it is approved." Letter to Members of Congress from Chief Operating Officer David Williams
(Aug. 6, 2020) Ex. D.

Overtime was heavily discussed during the June 26, 2020 conference call between David
Williams and the AVPs. *See* PowerPoint – AVP Telepresence (June 26, 2020), Courtroom Ex.
54-13. At several points, the presentation focused on a "Work Hour Reduction Target, Do It
Now" initiative. *Id.* The new initiative applied to processing, delivery, and retail services. *Id.*
Letter carrier supervisors would be unable to exceed 8 hours a day or forty hours a week without
higher approval. *Id.* Carrier work hours would be further reduced by eliminating standby and
pre-tour overtime and enforcing rigid start times. *Id.* And with respect to mail processing,
leadership sought to "zero out penalty overtime"[12] and "minimize use of pre-tour OT" for
employees involved in mail processing of letters and flats. *Id.* Going forward, penalty overtime
would be "approved by Plant Manager only." *Id.* The presentation also reported that changes
with respect to penalty overtime would be implemented as of July 4, 2020. *Id.* Control of
overtime for mail processing supervisors would be implemented in the period from July 11, 2020
to July 17, 2020. *Id.*

---

[12] Penalty overtime is when the Postal Service compensates a worker at twice their base rate. Employees receive
time and a half for working 9 and 10 hours. After 10 hours, employees receive penalty overtime. *See* Cintron Dep.
86. The PMGs Expectations PowerPoint likely makes reference to penalty overtime when it declares that "POT will
be eliminated. This is not cost effective and it will be taken away." Ex. B, ECF No. 1-1.

These messages were repeated on the July 7, 2020 call that was also led by David Williams and included the AVPs. *See* PowerPoint – AVP Meeting (July 7, 2020), Courtroom Ex. 54-14. Leadership reiterated its call to slash work hours and included a topline message of "64 Million Work Hours" "T-86. Days" (October 1, 2020).[13] *Id.* The accompanying PowerPoint also included directives to limit work hours for carrier and mail processing supervisors, as well as non-supervisory letter carrier personnel. *Id.* Angela Curtis, who then served as Acting Vice President for Eastern Area Operations, presented on new, reduced overtime targets regarding the manual distribution of mail to carrier routes. *Id.* Curtis also noted that overtime would be limited with respect to retail and customer service. *Id.* The overtime utilization rate for clerks would be cut from 16 percent to 12 percent and pre-tour overtime would be eliminated. *Id.* The July 10, 2020 call with the AVPs and Williams also incorporated the "64M Work Hours" and "T-83 Days" message. *See* PowerPoint – AVP Telepresence (July 10, 2020) Courtroom Ex. 54-9.

Postal Service leadership strongly disputes the existence of a new national overtime policy. Angela Curtis has testified that the current policy allows management to utilize overtime hours as needed to deliver the mail on time. Curtis Decl. ¶¶ 13, 14. She insists that this practice has not changed since Postmaster DeJoy took office. *Id.* Supervision of overtime, she contends, is handled by front-line workers in the field who may freely approve or deny overtime requests. *Id*. at ¶ 14. Curtis also stresses that Headquarters has never issued an instruction that bans or formally caps overtime. *Id.* at ¶ 22; *see also* Colin Decl. ¶ 3, Ex. 37-2.

Curtis' assertion that there is no change on overtime policy conflicts with Plaintiffs' declarations. Union officials have testified that "overtime was significantly restricted at certain facilities" in Philadelphia that are represented by Local 308. Gibson Decl. ¶ 14. Although

---

[13] October 1, 2020 is the end of the fiscal year for USPS. *See* Cintron Dep. 105.

overtime allowances have increased in Philadelphia since the dramatic reductions in late July and early August, restrictions remain in place. *Id.* at ¶ 16. One Philadelphia branch manager further reported that the overtime restrictions came from the Postmaster General. *Id.* And in Pittsburgh, management instituted a blanket one-week ban on overtime. *See* Kelly Dickey Decl. Ex. 50 ¶ 22, ECF No. 47-1. Management has since lifted its ban but overtime continues to be limited at the facilities represented by Local 322 of the National Postal Mail Handlers Union. *Id.* at ¶ 23. Employees in San Antonio have also alleged that overtime restrictions are in place. *See* Tr. Prelim. Inj. Teleconference at 23, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020).

The PMGs Expectations PowerPoint, which came out of the Northern Ohio district[14] also discusses overtime restrictions. The document states that "[o]vertime will be eliminated . . . we are paying too much in OT and it is not cost effective and will soon be taken off the table." Ex. B, ECF No. 1-1. The presentation also declares that "[i]f . . . you cannot get the mail out without OT it will remain for the next day." *Id.* As with the transportation schedules, Postal Service leadership has denied that this PowerPoint represents agency policy. Cintron Decl. ¶ 25.

Ms. Curtis, in support of her claim that there are no overtime restrictions, notes that "prior to June 15, 2020, the Postal Service was incurring overtime at a rate of approximately 13 percent of total work hours nationwide, and since that time the rate has remained approximately 13 percent." Curtis Decl. ¶ 23 The Service has also claimed that the "[l]owest levels of availability were in July 11 due to localized COVID impact and increased usage of annual leave." Prokity Decl. ¶ 5, ECF No. 37-2. The testimony regarding the impacts of COVID-19 is supported by the reports of union officials in the field. *See* Dickey Decl ¶ 17 (noting that

---

[14] *See* Tr. Prelim. Inj. Teleconference at 73, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020).

COVID-19 has exacerbated the need for overtime); Gibson Decl. ¶ 16 (stating that more overtime has been needed for COVID).

There are some obvious inconsistencies in Defendants' account. It is clear that there have been repeated messages from Headquarters regarding its "Work Hour Reduction" initiative. The agency blames its decline in service on the large number of COVID-absences but acknowledges that the overtime rates have remained the same. Logically, however, one would expect overtime to increase with a greater number of absences because a smaller number of employees must perform more work.

The comments regarding overtime from Postmaster DeJoy and Mr. Williams, when viewed in combination with Headquarters' presentation of "Work Hour Reduction Targets" to AVPs and the actions at the facility level in Ohio (as represented by the PMGs Expectations document) and Pennsylvania, strongly suggest that however Defendants seek to characterize official policy, for practical purposes, leadership has encouraged restrictions on overtime in a way that has affected timely delivery of mail.

### 3. Status of the Transportation and Overtime Policies

The contested policies remain in place. Postmaster DeJoy's August 18, 2020 statement did not suspend transportation changes, and the Cintron Guidelines are still in effect. Cintron Dep. 144. DeJoy has stated that, "effective Oct. 1, we will engage standby resources in all areas of our operations, including transportation, to satisfy any unforeseen demand." Statement of Postmaster General Louis DeJoy (August 18, 2020) Ex. H, ECF No. 1-1. However, it is unclear if Postmaster DeJoy's statement on standby capacity rescinded the former policies. His statement may also apply solely to election mail.

18

The Postal Service has also not changed its overtime policy in response to public outcry over service; as Postmaster DeJoy reiterated on August 18, 2020, "overtime has, and will continue to be, approved as needed." *Id.* While this statement serves as additional evidence of the fact that a flat ban is not in place, it does not eliminate the possibility that the agency has instituted new work hours reductions targets and restrictions on overtime.

### 4. Changes in the Treatment of Election Mail Sent as Marketing Mail

The Postal Service has historically prioritized the processing of Election Mail, defined as "any mailpiece that an authorized election official creates for voters participating in the election process and includes ballots and voter registration materials." *Office of the Inspector General, Audit Report: Processing Readiness of Election and Political Mail During the 2020 General Elections* (Aug. 31, 2020) Ex. 19 at 1, ECF No. 18-5. Ballots returned by voters to election officials must be sent, at a minimum, as First-Class Mail. *Id.* Current Postal Service officials have reiterated this requirement. Glass Decl. ¶ 4, ECF No. 37-2.

The question in this case is whether the Postal Service is altering its treatment of Election Mail that is sent from election authorities to voters. States may send their election mail as either First-Class mail, which routinely takes 2-5 days to be delivered, or Marketing Mail, which takes 3-10 days to be delivered. *See Office of the Inspector General, Audit Report: Processing Readiness of Election and Political Mail During the 2020 General Elections (Aug. 31, 2020)* Ex. 19 at 1. At this stage, the record in this case does not suggest that the Postal Service intends to deviate from its customary procedures with respect to the processing of Election Mail sent as Marketing Mail.

The Service does not appear to have a formal policy of upgrading Election Mail sent as Marketing Mail to First-Class Mail. *See* Glass Decl. ¶ 18. This conclusion is supported by a 2016

19

letter sent to election officials which encourages Boards of Election to "use First-Class Mail postage rather than Standard or Non-Profit postage rates when paying for the delivery of outbound absentee or vote by mail ballots." Glass Decl. 55. The 2016 letter further emphasized that "[t]he Postal Service is committed to processing and delivering Official Election mail within our stated delivery standards. Most First-Class Mail deliveries are made within 2-5 days. Standard Mail deliveries are made within 3-10 days." *Id.* at 56.

Although Defendants do not have a formal policy of automatically upgrading this class of mail, the Postal Service custom of "advancing" means that Election Mail entered as Marketing Mail usually has a similar delivery speed to First-Class Mail. *See* Glass Decl. ¶ 21. "Advancing" means that when there is excess First-Class processing capacity at a plant, Election Mail entered as Marketing Mail will be processed before all other mail. *Id.*

The evidence regarding specific changes in the Postal Service's handling of election mail is inconclusive. What is not reasonably in dispute is that the delays that have occurred as a result of the initiatives described above clearly pose a threat to the delivery of Election Mail to and from the voters. As Robert Glass admitted in his deposition, "service performance of Election Mail decreased similar to the decreases we saw in other mail." Glass Dep. 65-66 Courtroom Ex. 55. And Judge Marrero of the Southern District of New York posed the question starkly to Mr. Cintron in the evidentiary hearing in *Jones v. United States Postal Service*: "Q: Is it possible that in the course of implementing this policy of loading trucks and having them go out on time, that some of the mail that does not get in the trucks and having them go out on time, that some of the mail that does not get in the truck and leave on time could include some election mail?  A: It's possible." *See* Tr. Prelim. Inj. Teleconference at 67, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020).

20

5.  **Impacts of Changes**

As an initial matter, it is somewhat concerning that the Postal Service has been inconsistent even as to the standard for First-Class Mail.  The official website for the Service describes First-Class Mail as being delivered in "1-3 business days." *First-Class Mail*, https://www.usps.com/ship/first-class-mail.htm (last visited Sept. 27, 2020).  In letters sent to election officials, the Postal Service represented that most first-class mail "is delivered [in] 2-5 days." Letters to Plaintiff States from General Counsel Thomas Marshall Ex. I, ECF No. 1-1. Approximately one month later, a letter was sent to Mail Service Providers stating that "First-Class Mail is delivered in 3 to 5 days." Letter from Steven W. Monteith Acting Chief Customer and Marketing Officer and Executive Vice President, USPS, to Mail Service Providers (Aug. 26, 2020) Ex. 15 at 8, ECF No. 18-4. In an August 31, 2020 audit report, the USPS Office of Inspector General made clear that one-day delivery is not being accomplished, as First-Class Mail service currently takes 2-3 days within the continental United States. *See Office of the Inspector General, Audit Report: Processing Readiness of Election and Political Mail During the 2020 General Elections (Aug. 31, 2020)* Ex. 19 at 9 n. 13.

As conceded by Postmaster DeJoy,[15] the initiative, which included changes to trucking, overtime, and letter carrier schedules, caused a decline in service. During the week of July 4, 2020 to July 11, 2020, there was a five-point decline in service standards. *See* Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit Ex. 54-16. Mr. Cintron issued his preliminary guidance on July 11, 2020 and performance declined further, to 82.22 percent. *Id.* The lowest point occurred on August 8, 2929, at 81.47 percent. *Id.* Mr. Cintron

---

[15] On August 13, Postmaster DeJoy touted "substantial improvements" but acknowledged that "this transformative initiative has had unintended consequences that impacted our overall service levels." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G.

maintains that the dip in service could have been attributed to other factors like COVID-19 and "other initiatives that were going on at the same time," which included "other operating plan initiatives." Cintron Dep. 146, 149. But at no other point during the pandemic has service fallen in the manner it did in July and August.

Furthermore, although Defendants have claimed that "service performance is rapidly returning to early July levels," Cintron Decl. ¶ 27, Congressional briefing materials indicate that meaningful delays were still present at the end of August. *See Congressional Briefing: Transportation and Service Performance Updates* (Aug. 31, 2020) Ex. 16, ECF No. 18-4. As of September 5, 2020, the latest data in the record, First-Class mail service was at 88.74 percent, which is still lower than pre-July levels. *See* Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit Ex. 54-16.

The affidavits of current and former Postal Service employees persuasively explain why heavy restrictions on late or extra trips would impact service. John Gibson, President of Local 303 of the National Postal Mail Handler's Union, details that "[r]gidly requiring trucks to leave at their scheduled time means that trucks leave without all of their mail, which exacerbates delays because a piece of mail that may have been an hour late because a day late or more." Gibson Decl. ¶ 15. Similarly, Chester Cassel, who worked for the Postal Service for 51 years, underscores that, in his experience as a transportation manager, "it was often necessary to hold trucks for a few minutes at the plant or at the station to make sure that all the day's mail was loaded on board." Cassel Decl. ¶ 26. These extra or late trips prevent the "cardinal sin" among Postal Service employees – leaving mail behind. *Id*. at ¶ 9. And the nationwide scope of the restrictions was conceded by the Postmaster in his testimony before the House of Representatives, in which he acknowledged that the changes were in place in "every state a truck

22

moves in." *See Protecting the Timely Delivery of Mail, Medicine, and Mail-In Ballots Before the H. Committee on Oversight and Reform*, 116th Cong. 228 (2020) (statement of Postmaster General and Chief Executive Office Louis DeJoy), ECF No. 37-4.

Admittedly, increased operating efficiencies at the Postal Service that result in cost savings are in the public interest. But, consistent with updated reporting from June 2020, testimony before the House of Representatives demonstrated that the Service will remain financially viable through August of 2021. *Id.* at 95. It is therefore curious, at a minimum, that a major initiative would be implemented, in the middle of a public health crisis, four months before a national election where mail-in voting is expected to increase dramatically. Depending on how one views the range of conclusions that can be drawn from the evidence, it might even be considered reckless. Regardless, for the reasons set forth below, it is unlawful.

Plaintiffs go further and argue that the changes are malign in their intent. They draw that inference based upon President Trump's continued public statements attacking the Postal Service and attacking mail-in voting, coupled with Postmaster DeJoy's substantial contributions both to the Republican Party and to President Trump. At this stage in the case and with minimal formal discovery, any such conclusion is premature. I do note, however, that I am troubled by, and draw negative inferences from, what appears to be a strategic effort by Defendants to limit the Court's understanding of the significant degree to which some top officials of the Postal Service were directly involved in the operational changes that went into effect in July. My concern on that score weighs strongly in favor of injunctive relief, to assure that the necessary steps are taken to cure these critical deficits.

## II.     The Controlling Procedural Standard

A plaintiff that seeks a preliminary injunction must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The first two factors are the most critical; the Third Circuit has stated that plaintiffs "must meet the threshold for the first two most critical factors... and if the gateway factors are met, a court then considers the remaining two factors, possibility of harm to others and the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). The Supreme Court has further emphasized that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Benisek v. Lamone*, 138 S.Ct. 1942, 1945 (2018) (citing *University of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)).

## III.     Subject-Matter Jurisdiction

Congress enacted the PRA in 1970. In doing so, it created the modern Postal Service, and defined its susceptibility to private suit. It gave the Postal Service the power to "sue and be sued in its official name." 39 U.S.C. § 401. Congress also conferred upon federal district courts the power to hear cases by or against the Postal Service, saying "[e]xcept as provided in this section, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409(a). Separately, 28 U.S.C. § 1339 states that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service."

The PRA's overarching policy concern is to provide "basic and fundamental service . . . to the people." 39 U.S.C. § 101(a). Pursuant to that end, the Postal Service is obligated to "develop

24

and promote adequate and efficient postal services." 39 U.S.C. § 3661(a). When deciding to make "change[s] in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," the Postal Service must first "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b). Users of the mail then have an opportunity to participate in a public hearing subject to Administrative Procedure Act ("APA") rules before the PRC issues an advisory opinion. 39 U.S.C. § 3661(c).

The Commission has an additional role with respect to 39 U.S.C. § 3661. For example, the PRA invests the Commission with original jurisdiction over "*Rate and Service Complaints*." Thus, while the PRA gave district courts broad jurisdiction over Postal Service matters, Congress did not give district courts exclusive jurisdiction over its disputes. 39 U.S.C. § 3662(a).

Section 3662(a), titled "*Rate and Service Complaints*," provides:

> Any interested person (including an officer of the Postal Regulatory Commission representing the interests of the general public) who believes the Postal Service is not operating in conformance with the requirements of the provisions of sections 101(d), 401(2), 403(c), 404a, or 601, or this chapter (or regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission in such form and manner as the Commission may prescribe.

The question before me is whether this Court may exercise jurisdiction, under 28 U.S.C. § 1339 and the PRA's general statutory grant of § 409(a), over Plaintiffs' claim that the Defendants acted unlawfully when they failed to consult with the Commission and participate in a public hearing before making "change[s] in the nature of postal services which will generally affect service on a nationwide . . . basis." 39 U.S.C. § 3661(b).

The Postal Service argues the Commission's authority is exclusive and that this Court lacks authority to review its action. Its position is not without some irony. It is accused of bypassing the Commission and thereby acting beyond its authority, and, in turn, defends itself by stating that it

25

is the Plaintiffs who must resort to the Commission in order to obtain relief. *See* Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 25-30, ECF No. 37. These circumstances arise partially because of the dual roles of the Commission with regard to Chapter 36 of the PRA. First, it hears "Rate and Service Complaints" from "interested part[ies]" per section 3662(b). Second, *before* the Postal Service may make "change[s] in the nature of postal services which will generally affect service on a nationwide . . . basis," 39 U.S.C. § 3661(b), it holds public hearings and issues advisory opinions. 39 U.S.C. § 3661(c). The issue is nuanced and complex, but in the final analysis I am persuaded that this Court has jurisdiction.

By way of initial summary, before proceeding through the analysis, it bears repeating that 28 U.S.C. § 1339 provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service."[16] More importantly, section 409(a) of the PRA constitutes an additional jurisdictional grant that explicitly states non-reviewability is the exception—not the rule. With regard to section 409(a), the Third Circuit has stated that "we cannot imagine how Congress could grant jurisdiction more plainly." *Licata v. U.S. Postal Serv.*, 33 F.3d 259, 261 (3d Cir. 1994).

Moreover, the Court has not found, nor have the Defendants cited, any case in which a court denied jurisdiction over a claim that the Postal Services acted outside of its authority with regard to the process required under section 3661(b). In contrast, the Third Circuit has addressed claims that the Postal Service acted outside its authority when it bypassed the Commission, where the PRA explicitly calls for Commission input. It exercised jurisdiction, even though according to

---

[16] It should be noted that the Supreme Court attaches less significance to grants of general jurisdiction such as 28 U.S.C. § 1331 when the governing statute provides for judicial review in a particular court, *see e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012), but the combination of three statutory sources—28 U.S.C. § 1331, 28 U.S.C. § 1339, and 39 U.S.C. § 409(a) carries some weight.

26

Defendants' rationale here, Plaintiffs would have been obligated to bring those claims exclusively to the Commission. *See United Parcel Serv., Inc. v. U.S. Postal Serv.*, 604 F.2d 1370, 1381 (3d Cir. 1979) *cert. denied*, 446 U.S. 957 (1980).[17] Similarly, the Sixth Circuit has exercised jurisdiction per 28 U.S.C. § 1339 and section 409(a) over *ultra vires* claims against the Postal Service with regard to the promulgation of regulations. *See Combined Commc'ns Corp. v. U.S. Postal Serv.*, 891 F.2d 1221, 1227-28 (6th Cir. 1989). Moreover, when confronted with the precise legal issue this court is called upon to decide—a claim relating to the failure of the Postal Service to undertake the process mandated under section 3661(b) in making nationwide changes to service—both the Fifth Circuit and a district court have exercised jurisdiction under section 409(a). *See Buchanan v. U.S. Postal Serv.*, 375 F. Supp. 1014, 1017 (N.D. Ala. 1974), *aff'd in part, vacated in part*, 508 F.2d 259 (5th Cir. 1975) (affirming district court order enjoining changes in service); *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, No. CIV.A.06 726 CKK, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007). My ultimate conclusion is that jurisdiction exists for the reasons set forth more fully below.

## A. Standard of Review

In this inquiry I am guided by a trio of Supreme Court cases. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010); *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012). They provide the framework to determine

---

[17] The Plaintiffs in *United Parcel Serv., Inc.* argued that the Postal Services acted outside its authority in bypassing the Commission when engaging in a temporary ratemaking experiment *vis a vis* former section 3622, which required that any change in a rate of postage be recommended by the Postal Rate Commission. 39 U.S.C. § 3622 (1970), *amended by* 39 U.S.C. § 3622 (1998); *United Parcel Serv., Inc.*, 604 F.2d at 1374. The previous version of section 3662 allowed "[i]nterested parties who believe the Postal Service is charging rates which do not conform to the policies set out in this title . . . to lodge a complaint with the Postal Rate Commission in such form and in such manner as it may prescribe." 39 U.S.C. § 3662 (1970), *amended by* 39 U.S.C. § 3622 (2006).The Commission, in its discretion, would hold hearings on such complaint and issue a recommended decision. *Id.* Then, "[a] decision of the Governors to approve, allow under protest, or modify the recommended decision of the Postal Rate Commission" could be appealed to any court of appeals of the United States. *Id.*

when judicial review is appropriate if a statute also provides for administrative review and the right to appeal the administrative decision to a circuit court. In the most recent case, *Elgin*, the Supreme Court instructs that where the circuit court is capable of providing meaningful review, the "appropriate inquiry is . . . whether it is 'fairly discernible' from the [statute] . . . that Congress intended [litigants] . . . to proceed exclusively through the statutory review scheme." 567 U.S. at 9-10 (alteration in original) (internal citations omitted). "To determine whether it is 'fairly discernible' that Congress precluded district court jurisdiction over petitioners' claims, we examine the . . . [statute's] text, structure, and purpose." 567 U.S. at 10 (alteration in original) (internal citations omitted).

The Third Circuit has recently utilized *Elgin's* approach in determining the appropriateness of judicial review of agency action. *See E.O.H.C. v. Sec'y U. S. Dep't of Homeland Sec.*, 950 F.3d 177, 188 (3d Cir. 2020); *see also Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 135 (3d Cir. 2019); *cf. Adorers of the Blood of Christ v. FERC*, 897 F.3d 187, 195 (3d Cir. 2018) (noting that it would utilize the approach outlined in *Thunder Basin* had it not already decided the jurisdictional question through the explicit language of the statutory text).

## B. Discussion

I begin with the analysis under the framework set forth in *Elgin*: where the circuit court is capable of providing meaningful review, the "appropriate inquiry is . . . whether it is 'fairly discernible' from the [statute] . . . that Congress intended [litigants] . . . to proceed exclusively through the statutory review scheme." 567 U.S. at 9-10 (alteration in original). Assuming the Plaintiffs' claims could at some later point ultimately be addressed by the D.C. Circuit under 39 U.S.C. § 3663[18] following administrative review by the Commission, I must determine whether

---

[18] 39 U.S.C. § 3663 provides: "A person, including the Postal Service, adversely affected or aggrieved by a final order or decision of the Postal Regulatory Commission may, within 30 days after such order or decision becomes

Congress' intent to preclude district court jurisdiction is "fairly discernible in the statutory scheme." *Id.* This requires an examination of the statute's text, structure, and purpose. *Id.*; *see E.O.H.C.*, 950 F.3d at 188; *see also Guerra*, 936 F.3d at 135.

If an intent to preclude judicial review is not discerned, the language of the statute authorizing review has force and effect. *See Buchanan v. U.S. Postal Serv.*, 375 F. Supp. 1014, 1017 (N.D. Ala. 1974), *aff'd in part, vacated in part*, 508 F.2d 259 (5th Cir. 1975) (affirming district court order enjoining changes in service); *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, No. CIV.A.06 726 CKK, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007) (exercising jurisdiction where USPS allegedly acted beyond its authority *vis a vis* section 3661(b)); *see also United Parcel Serv.*, 604 F.2d 1370, 1381 (3d Cir. 1979) (exercising jurisdiction where USPS allegedly acted beyond its authority in ratemaking context, despite the availability of resort to the Commission); *Commc'ns Corp.*, 891 F.2d 1221, 1228 (6th Cir. 1989) (exercising jurisdiction per section 409(a) over *ultra vires* claims against the Postal Service with regard to the promulgation of regulations.)

The most relevant sections for this analysis are sections 3661, 3662(a), and 409(a), along with 28 U.S.C. § 1339. Section 3661, titled "*Postal Services,*" provides:

(a) The Postal Service shall develop and promote adequate and efficient postal services

(b) When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such

---

final, institute proceedings for review thereof by filing a petition in the United States Court of Appeals for the District of Columbia." However I note that the Third Circuit recently held in the context of the INA that "claims that cannot be effectively handled by the administrative review process," such as "where review and relief may come too late" deprive the claimant of meaningful review. *E.O.H.C.*, 950 F.3d at 186 (internal citations omitted); *see also Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996)("It follows that . . . [plaintiff] has alleged a sufficiently serious irreparable injury to lead us to conclude that the administrative review process is insufficient to afford him full relief.) (alteration in original).

proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.

(c) The Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under sections 556 and 557 of title 5 has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title.

Next, section 3662(a), titled "*Rate and Service Complaints*," provides:

Any interested person (including an officer of the Postal Regulatory Commission representing the interests of the general public) who believes the Postal Service is not operating in conformance with the requirements of the provisions of sections 101(d), 401(2), 403(c), 404a, or 601, or this chapter (or regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission in such form and manner as the Commission may prescribe.

28 U.S.C. § 1339 states:

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service.

Finally, section 409(a) provides:

Except as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service.

In analyzing the text, given the Third Circuit's statement in *Licata,* 33 F.3d at 261, I start from the premise that section 409(a) consists of a general grant of jurisdiction over all actions brought against the Postal Service. Yet section 409(a) counsels that exceptions to that rule exist, given its opening phrase, "[e]xcept as otherwise provided in this title . . . ." 39 U.S.C. § 409(a).

In order to determine whether section 3662, as it relates to section 3661(b), constitutes the exception, thus divesting district courts' jurisdiction over claims relating to section 3661(b), I examine the text of section 3662. Section 3662 is entitled "*Rate and Service Complaints*." The explicit text of section 3662 provides that "any interested person . . . *may* lodge a complaint with

the Postal Regulatory Commission" (emphasis added) when that person believes the Postal Service is not operating in conformance with Chapter 36 and a number of other sections (which predominantly deal with rates and service).[19] Chapter 36 includes section 3661.

At the outset, the term "may" suggests that resort to the Commission is permissive. The principal case on which Defendants rely, *Lemay*, makes this very point: "[c]ertainly, as a general rule of statutory construction, 'may' is permissive, whereas 'shall' is mandatory. *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (citing *Anderson v. Yungkau,* 329 U.S. 482, 485 (1947)). In that regard, the Third Circuit has emphasized that courts should assume words mean what they appear to say: "[i]f the Act's meaning is plain from its text, our task is complete, unless the result falls into the narrow category of cases where the plain meaning of the statute is 'demonstrably at odds with the intentions of its drafters.'" *Air Courier Conference of Am./Int'l Comm. v. U.S. Postal Serv.*, 959 F.2d 1213, 1217–18 (3d Cir. 1992) (internal citations omitted). I note as well the Supreme Court's recent and forceful comment on extra-textual analysis: "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1737 (2020).

Yet, as numerous courts have observed, the legislative history of the PRA reveals a Congressional desire "to minimize external intrusions on the Postal Service's managerial independence." *LeMay*, 450 F.3d at 800 (citing *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262 (5th Cir.1975)). In crafting the PRA, "Congress intended to afford postal management the 'unfettered authority and freedom that has been denied for years to maintain and operate an

---

[19] These sections include: 39 U.S.C. § 101(d) (rates); 39 U.S.C. § 401(2) (rules and regulations) (services, rates, fees, and classifications); 39 U.S.C. § 404a (rules and regulations); 39 U.S.C.A. § 601(services).

efficient service.'" *Lemay,* 450 F.3d at 800 (citing Sen. Rep. No. 912, 91st Cong., 2d Sess. 2 (1970)).

Thus, despite the explicit presumption in favor of judicial review under both 28 U.S.C. § 1339 and section 409(a) of the PRA, as well as the general rule of statutory construction suggesting that "may" is permissive, some courts reviewing "claims regarding postal rates and services," *Lemay,* 450 F.3d at 799, have looked beyond the text and concluded that the legislative history reveals Congress intended to divest jurisdiction from the district courts.[20] Defendants point to a number of such cases. *Id.*; *see also Foster v. Pitney Bowes Corp.*, 549 F. App'x 982 (Fed. Cir. 2013); *Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir. 1995); *Pep-Wku, LLC v. USPS*, No. 20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky. Apr. 30, 2020); *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009), *aff'd sub nom. McDermott v. Donahue*, 408 F. App'x 51 (9th Cir. 2011); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018); *Striley v. United States Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017); *Murphy v. United States Postal Serv.*, No. C 14-02156 SI, 2014 WL 4437731, at *3 (N.D. Cal. Sept. 9, 2014); *Powell v. United States Postal Serv.*, No. CV 15-12913-FDS, 2016 WL 409672, at *1 –2 (D. Mass. Feb. 2, 2016).

But each of the cases cited by the Defendants involved run-of-the-mill allegations of unsatisfactory service or issues far afield from those contemplated in section 3661(b). *See, e.g.*, *Lemay*, 450 F.3d at 798 (complaint that Postal Service's heightened Priority Mail charges did not correspond with enhanced services); *Foster v. Pitney Bowes Corp.*, 549 F. App'x at 984 (complaint arising under PRA section 404(a) that the Postal Service stole plaintiff's ideas contained in patent application); *Bovard*, 47 F.3d at 1178 (complaint that USPS unreasonably discriminated against

---

[20] As discussed below, I find the legislative history discussed by *Lemay* and other courts as limited to garden variety claims about postal service.

Plaintiff by switching mail service from ordinary to afternoon delivery); *Pep-Wku, LLC*, 2020 WL 2090514, at *1 (W.D. Ky. Apr. 30, 2020) (complaint by owners of multi-unit apartment complexes that USPS failed to sort mail before delivering it to their apartment complexes, thereby forcing them to do the sorting themselves); *McDermott v. Potter*, 2009 WL 2971585, at *1 (W.D. Wash. Sept. 11, 2009), (complaint about closure of local postal facility); *Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *1 (W.D. Wash. July 30, 2018) (complaint about bad attitude of mail carrier); *Striley*, 2017 WL 513166, at *1 (N.D. Cal. Feb. 8, 2017) (complaint that USPS unlawfully increased the rates for Plaintiff's post office box, crammed Plaintiff's box full of advertising materials, and failed to deliver an article of mail), *Murphy*, 2014 WL 4437731, at *1 (N.D. Cal. Sept. 9, 2014) (complaint about denial of Plaintiff's postal services at a local United States post office); *Powell*, 2016 WL 409672, at *1 (D. Mass. Feb. 2, 2016) (complaint that local post office refused to deliver mail to the Plaintiff).[21]

Although these lawsuits were largely filed by *pro se* plaintiffs who were likely without the legal background to ground their claims in a specific statutory provision, the overwhelming majority of the claims at issue are precisely captured by section 3661(a), which requires the Postal Service to provide adequate and efficient service to the public. None involved a claim that the USPS circumvented the process required when making a "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). The nature of the dispute in *Lemay*—a "common dispute over . . . services"—controlled the Eighth Circuit's conclusion that the legislative history weighed against exercising jurisdiction.

---

[21] Other district court cases not cited by the parties are consistent. *Azzolina v. U.S. Postal Serv.*, 602 F. Supp. 859 (D.N.J.1985) (complaint challenged USPS selection of post office site in his township); *Tedesco v. U.S. Postal Serv.*, 553 F. Supp. 1387 (W.D.Pa.1983) (Plaintiffs sought to have post office established in their township and brought action against Postal Service based on allegations of breach of duty to provide prompt, reliable, and efficient service.) They fit the same mold.

450 F.3d at 801. Its opinion makes that clear in the following summary of its holding: "After correctly perceiving the matter was a common dispute over rates and services, the district court rightly determined Congress had placed authority over such matters in the Postal Rate Commission, at which point the district court was divested of its jurisdiction." *Id.*

Unlike the claims in the cases cited by Defendants, which dealt with the adequacy and efficiency of service under section 3661(a), Plaintiffs' core challenge is that the Postal Service acted outside of its authority in making changes without consulting first with the Commission in violation of section 3661(b), a wholly separate provision. *See* Pls. Reply Supp. Mot. Prelim. Inj. 7, ECF No. 47. They argue that while it may not be unreasonable to infer that Congress intended to foreclose judicial review of claims arising under section 3661(a), which can most properly be characterized as localized service-related disputes, *id.* at 7, Congress certainly did not have the same intention *vis a vis* claims relating to section 3661(b). That section focuses on the *process* to which the Postal Service must adhere before making a "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). Likewise, the Commission has emphasized that "the twin hallmarks of section 3661(b) are advance public disclosure of Postal Service plans that will affect service on a nationwide basis, in the form of a request for an advisory opinion from the Commission, and an opportunity for public comment on those plans." Commission Report Concerning Complaint on First-Class Mail Standards Service, Docket No. N2001-3, at 2 (April 17, 2006).

So I return again to the text, structure, and legislative history of the PRA with regard to section 3662 and its relation to section 3661(b) — the specific provisions that are before this court — bearing in mind that reviewability is embedded in the relevant statutes. 28 U.S.C. § 1339; 39 U.S.C. § 409(a). In reviewing the relevant text of sections 3662 and 3661, I note once more that

Congress elected to use the term "may" when it described the right of "any interested user" to file a complaint with the Commission. 39 U.S.C. § 3662(a). At the outset, this plain text suggests that resort to the Commission is permissive. *LeMay*, 450 F.3d at 799 (citing *Anderson,* 329 U.S. at 485 (1947)). To interpret it otherwise requires countervailing evidence from the overall structure and legislative history of the PRA. *Id*.; *see Bostock*, 140 S. Ct. at 1737.

Turning to the structure of the PRA and its legislative history, certainly Congress intended to reduce outside interference with several facets of Postal Service operations. As discussed above, other courts have not unreasonably concluded that "common disputes over . . . services" were meant exclusively for the Commission. *Lemay,* 450 F.3d at 801. But section 3661(b)—the provision Plaintiffs claim that Defendants have violated—clearly falls outside the scope of such common disputes. Indeed, Congress instituted section 3661(b) because it expected that these changes were uncommon and would require stakeholder input. *See Buchanan*, 508 F.2d at 262 (5th Cir. 1975) ("The language of the statute, the legislative history, and the existence of alternative remedies indicate that Congress intended 3661 to apply to only a specified class of decisions. Postal management was left with broad decision-making power, subject to 3661 requirements for specified decisions"). That section requires not only that the Postal Service consult with the Commission before making changes that fall within its purview, 39 U.S.C. § 3661(b), but also that a public hearing be held in accordance with APA procedures. 39 U.S.C. § 3661(c). I find this provision significant, as the Postal Service, for the most part, is not otherwise subject to APA review. 39 U.S.C. § 410; *Nat'l Easter Seal Soc. for Crippled Children & Adults v. U.S. Postal Serv.*, 656 F.2d 754, 767 (D.C. Cir. 1981) ("Congress provided that the procedural requirements of the APA apply in certain, limited circumstances for example, when major changes with a nationwide impact are contemplated . . .").

Moreover, the only court presented with section 3661(b) claims as they relate to section 3662 has emphasized the distinction between "common disputes over . . . services" on the one hand, *LeMay*, 450 F.3d at 801, and claims about nationwide changes relating to section 3661(b) on the other. *Buchanan,* 508 F.2d 259, 262 (5th Cir.1975) (exercising jurisdiction where the Postal Service allegedly acted beyond its authority *vis a vis* 3661(b)). In *Buchanan*, the Fifth Circuit found that the PRA offered a "harmonious scheme," whereby those seeking to challenge whether the Postal Service improperly bypassed the Commission could do so in federal district court, whereas those with service-related complaints akin to section 3661(a) could file complaints with the Commission. 508 F.2d at 264. In reaching this conclusion, the court found that "[t]here is much in the legislative history of the Act to indicate that Congress intended to increase the ability of the Postal Service management to make the decisions necessary to the efficient and effective operation of the postal system," but also evident is the "goal of providing to the American people a public service which is sensitive and responsive to their needs."[22] 508 F.2d at 262; *see Am. Postal Workers Union, AFL-CIO*, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007).

Nothing in the legislative history of subsequent amendments suggests an intention to legislatively overrule *Buchanan*. *See, e.g.*, S. Rep. No. 108-318, at 48 (2004); H.R. Rep. No. 109-66, at 52 (2005).  In describing section 3662, the House and Senate Committee reports are nearly identical. They focus almost entirely on the Commission's expanded enforcement powers to address rate and service issues promptly and effectively. The House Committee Report states that the changes to section 3662 "strengthen the authority of the Postal Regulatory Commission to act

---

[22] This reading is consistent with the opening section of Title 39 entitled "*Postal Policies*," which begins with the following provision: "The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people." 39 U.S.C. § 101(a).

on complaints," H.R. Rep. 109-66, at 52, and explains that it will be required to address complaints within 90 days of receipt. *Id.* It notes that the Commission can now levy fines against the Postal Service for certain violations. *Id.* Clearly the thrust of the report is on enforcement powers and not the scope of the Commission's authority or its preclusive impact on judicial remedies. Indeed, the House Committee cites only one way that the changes would enlarge the scope of the authority of the Commission. *Id.* With the revisions in place, the Commission could now order the Postal Service to adjust rates or suspend product rates or classification. *Id.*

Similarly, the Senate Committee Report in a section entitled "Rate and Service Complaints," summarily states that the new changes provide the Regulatory Commission with enhanced authority to respond to complaints of pricing, service, or other actions by the Postal Service in violation of law." S. Rep. No. 108-318 at 48. The Committee Report then notes a number of ways in which the Commission's enforcement powers had expanded under the revised language. First, the changes required prompt attention by the Committee within 90 days of receiving complaints. *Id.* Second, the Commission could now levy fines against the Postal Service. *Id.* Again, the Senate Report discusses one area in which the actual scope of the Commission's authority would be enlarged: under the new changes, the Commission could order the Postal Service to adjust rates if they are set below attributed costs, which was authority that the Rate Commission had lacked under the original version of the PRA. *Id.* Thus, although explaining changes in enforcement powers and the scope of the Commission's authority, neither the House nor the Senate Reports mentioned changes with regard to claims relating to section 3661(b), nor any intention to displace judicial review.[23]

---

[23] Neither party has brought anything to the court's attention to contradict this reading of the legislative history.

The Act's legislative history simply does not convince me that Congress intended courts to diverge from the plain meaning of the text. And, I must be mindful of the Third Circuit's admonition in *Air Courier*, which was analyzing PRA provisions regarding ratemaking, not "to use ambiguous legislative history to contradict a clear statute's text." *Air Courier Conference of Am./Int'l Comm.*, 959 F.2d at 1223. *See also Bostock*, 140 S. Ct. at 1737.

In fact, shortly after the current version of section 3662 was enacted, a district court explicitly *rejected* the argument that it lacked jurisdiction over a complaint regarding the USPS's alleged non-compliance with section 3661(b). *Am. Postal Workers Union, AFL-CIO*, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007). As the court explained, "[p]laintiff's Complaint seeks a declaration that it is unlawful for USPS to proceed with modification to its mail processing operations . . . because USPS failed to submit [the proposed modifications] to the PRC for an advisory opinion within a reasonable time prior to the implementation of . . . [the modifications]." *Id.* "Plaintiff's Complaint appears to be properly brought before this Court pursuant to 39 U.S.C. § 409, which provides that 'the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against [USPS]'." *Id.* Additionally with regard to section 3662, the D.C. Circuit has noted that the PRA's "scheme . . . is inherently claim-dependent, and the relevant statutory language even suggests an aim on the part of Congress to allow complainants a role in framing their claims (and choosing their forum)." *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 220 F. Supp. 3d 27, 34 (D.D.C. 2016).

Likewise, the Third Circuit has exercised jurisdiction in ratemaking cases involving allegations that the Postal Service improperly bypassed the Commission, where resort to the Commission was also available under section 3662. *United Parcel Serv.*, 604 F.2d at 1381 (holding that Postal Service acted outside its authority in bypassing the PRC before engaging in a temporary

38

ratemaking experiment). These rulings are not inconsistent with the reasoning of *Lemay*, which found that section 3662 constitutes "a *specific* grant of authority over a *defined* category of postal rate/postal service concerns." 450 F.3d at 800 (emphasis added). That the Third Circuit has exercised jurisdiction over claims otherwise susceptible of administrative review by the Commission per section 3662 supports a conclusion that section 3662 *does not* divest district courts of jurisdiction under 28 U.S.C. § 1339 and section 409(a), where plaintiffs claim that the Postal Service acted outside of its authority in bypassing the Commission. *United Parcel Serv., Inc.*, 604 F.2d at 1381.

      In light of the text, structure, and legislative history, and informed by decisions from the Third and Fifth Circuits, I do not find it "fairly discernible" that Congress intended to preclude district courts from hearing claims related to section 3661(b), which contemplates changes of national significance, simply because resort to the Commission is available.[24] I echo the Third Circuit in noting that, "as a policy matter, 'it would be passing strange for an ultra vires agency action to be . . . insulated from judicial review.'" *Advanced Disposal Servs. E., Inc. v. N.L.R.B.,* 820 F.3d 592, 600 (3d Cir. 2016) (quoting *Teamsters Local Union No. 455 v. N.L.R.B.*, 765 F.3d 1198, 1201 (10th Cir. 2014)).[25] Otherwise, as Plaintiffs suggest, "the Postal Service could, for example, choose to stop delivering mail received from select zip codes the week before an election . . . and the States could do nothing about it." *Pl. Resp.* at 16, ECF No. 47.

---

[24] If Congress had indeed intended to preclude review over such claims, it could have changed the language of section 3661(b) from the permissive "may" to "must" or "shall" when it adopted the PAEA in December 2006. Indeed, when the PAEA was adopted, Congress used the term "shall" in the very same section. 39 U.S.C. § 3661(c). This coupling further suggests that "may" in section 3662(a) means what it says.

[25] It should be further borne in mind that "[t]he law is settled that if a federal officer does or attempts to do acts which are in excess of his authority or under authority not validly conferred, equity has jurisdiction to restrain him." *Zirin v. McGinnes*, 282 F.2d 113, 115 (3d Cir. 1960) *citing State of Colorado v. Toll*, 268 U.S. 228 (1925); *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *and Harper v. Jones*, 195 F.2d 705 (10th Cir. 1952), *cert. denied,* 344 U.S. 821 (1952).

To further illustrate why judicial review is warranted here, it is useful to return to *Thunder Basin*. 510 U.S. 200. There, the Supreme Court considered the question of jurisdiction in the context of the Mine Act, wherein Congress did not provide explicit guidance on whether judicial review was precluded by the statute's administrative scheme, and a plaintiff was seeking injunctive relief in the court. *Id*. at 202-06. The nature of the mine operator's claim against the Mine Safety and Health Administration (MSHA) was that certain regulations the MSHA had promulgated violated its rights under the National Labor Relations Act. *Id.* at 205. The mine operator sought to enjoin penalties to which it was subject for failure to comply with those regulations, prior to enforcement by Secretary of the Department of Labor.[26] *Id.* It had filed the motion for a preliminary injunction in federal district court, despite the fact that the statutory scheme allowed mining operators thirty days to challenge citations via the Federal Mine Safety and Health Review Commission (MSHRC), whose determinations were reviewable by courts of appeals. *Id.* at 208.

To ascertain whether it was "fairly discernible" that Congress intended to preclude judicial review of such claims, the Court reviewed the text, structure, and legislative history of the Mine Act. *Id.* at 206-12. Ultimately it concluded that "the Mine Act's comprehensive enforcement structure, combined with the legislative history's clear concern with channeling and streamlining the enforcement process, establishes a 'fairly discernible' intent to preclude district court review . . . ." *Id.* at 216 (internal citations omitted). It thus held that the MSHRC had exclusive jurisdiction over such claims. *Id.*

---

[26] Section 814 of the Mining Act provides that the Secretary may issue a citation if he "believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter." 30 U.S.C. § 814.

The Court found it persuasive that the structure of the Mine Act expressly authorized district court jurisdiction in only two provisions, both of which empowered the Secretary of the Department of Labor to enjoin violations, and neither of which afforded mine operators a corresponding right. *Id.* at 209. Moreover "[t]he Act's comprehensive review process" did "not distinguish between preenforcement and postenforcement challenges . . . ." *Id.* at 208-09. And the Court stressed the "detailed structure for reviewing violations of 'any mandatory health or safety standard, rule, order, or regulation promulgated' under the Act." *Id.* at 207 (internal citations omitted).

The Court also found that the legislative history of the statute weighed against exercising jurisdiction over the claims of mine operators. *Id.* at 209-10. At the time of the Mining Act's passage, worker accidents were common, and Congress expressed concern that mine operators would be able to re-litigate civil-penalty assessments in federal district court once the administrative review process was complete, thereby "seriously hamper[ing] the collection of civil penalties." *Id.* at 210. Thus, Congress expressly eliminated mine operators' rights to challenge a final penalty assessment *de novo* in district court. *Id.*

The case before us differs meaningfully from *Thunder Basin* in several key respects. First and foremost, unlike the limited jurisdictional grants in the Mine Act, both 28 U.S.C. § 1339 and section 409(a) of the PRA explicitly grant jurisdiction in cases involving the Postal Service, with section 409(a) explicitly granting jurisdiction in cases *against* the Postal Service. *Licata*, 33 F.3d at 261-62. That explicit grant is subject only to exceptions within the statute.[27] 39 U.S.C. § 409(a). In contrast, the Mine Act *did not* include a grant of general jurisdiction to district courts in suits

---

[27] I reiterate that the combination of three statutory sources—28 U.S.C. § 1331, 28 U.S.C. § 1339, and 39 U.S.C. § 409(a) carries some weight.

against the MSHA or the Secretary of Labor. *Thunder Basin*, 510 U.S. at 209. To the contrary, the Mine Act authorized jurisdiction in only two distinct areas, both of which empowered the Secretary of Labor to utilize district courts to augment its enforcement powers against regulated entities. *Id*.

Second, the Mine Act's review process did not discuss pre-enforcement challenges; it told mine operators exactly when they had a right to weigh in on the process, and that was *after* the Secretary of Labor issued citations. *Id.* at 208-09. Here, the distinction in the PRA between pre-implementation and post-implementation of certain Postal Service actions is fundamental. Indeed, Plaintiffs' claims relate precisely to that distinction. Per sections 3661(b) and 3661(c), the PRA reserves for both the Commission and the public the right to provide input *before* the Postal Service makes nationwide changes affecting the nature of the postal services, a right which Plaintiffs allege was denied when USPS skirted the statutorily mandated process.[28]

Finally, an interpretation allowing judicial review in *Thunder Basin* would have thwarted the goals of the statute. *Id*. at 209-10. Congress's purpose in passing the Mine Act was to empower the Secretary of Labor to penalize mine operators violating health and safety standards accordingly, without being hampered at the collection stage. *Id.* at 210. *De novo* resort to a district court by mine operators would have complicated collection efforts, thus undermining the legislation's purpose. But the instant matter is different. Allowing the public to resort to federal district court when the Postal Service violates the *public's statutorily mandated right* to a hearing before nationwide changes are made under section 3661 only supports the PRA's overarching

---

[28] Again, the Commission has pointed out that "[t]he twin hallmarks of section 3661(b) are advance public disclosure of Postal Service plans that will affect service on a nationwide basis, in the form of a request for an advisory opinion from the Commission, and an opportunity for public comment on those plans." Commission Report Docket No. N2001-3, at 2.

42

policy, which is to provide a "basic and fundamental service . . . to the people." 39 U.S.C. § 101. The availability of judicial review in such limited instances only serves to support that policy.

Thus, applying the Supreme Court's test in the context of the PRA, it is entirely sensible to conclude that section 3662 precludes review of "common disputes over . . . services," *id.*, given that these complaints comprise the core language of, and guiding principle behind, section 3662. But as to claims relating to section 3661(b), the controlling test supports the availability of judicial review. *See Buchanan,* 508 F.2d at 262 (5th Cir. 1975); *United Parcel Serv.*, 604 F.2d at 1381 (holding that Postal Service acted outside its authority in bypassing the PRC before engaging in a temporary ratemaking experiment); *Am. Postal Workers Union, AFL-CIO*, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007) (explicitly *rejecting* the argument that it lacked jurisdiction under 409(a) regarding a complaint *vis a vis* USPS's alleged non-compliance with section 3661(b)); *see also Anatol Zukerman*, 220 F. Supp. 3d at 34 (the PRA's "scheme . . . is inherently claim-dependent, and the relevant statutory language even suggests an aim on the part of Congress to allow complainants a role in framing their claims (and choosing their forum)").

In summary, Congressional intent to preclude district courts from hearing claims relating to section 3661(b) is not fairly discernible from the text, structure, and legislative history of the PRA.[29] The Defendants have not overcome the statutory language authorizing judicial review per

---

[29] If I had been unpersuaded by Plaintiffs' argument that Congressional intent to preclude review is not fairly discernible in the text, structure, and legislative history of the PRA, I could also have considered "'three additional factors'" to override the presumption of the unavailability of judicial review. *Elgin*, 567 U.S. at 15 (citing *Free Enter. Fund*, 561 U.S. at 489). Under these additional exceptions, which are not applied according to any "strict mathematical formula," *Arch Coal v. Acosta*, 888 F3d 493, 500 (D.C. Cir. 2019), courts may find that Congress did not intend to limit jurisdiction where: 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.' *Elgin*, 567 U.S. at 15 (internal citations omitted).

Nevertheless, having been persuaded that Congressional intent to preclude review is not fairly discernible, I need not consider those factors under *Elgin*, which instructs that where the circuit court is capable of providing meaningful review, the "appropriate inquiry is . . . whether it is 'fairly discernible' from the [statute] . . . that Congress intended [litigants] . . . to proceed exclusively through the statutory review scheme." 567 U.S. at 9-10 (alteration in original) (internal citations omitted).

28 U.S.C. § 1339 and 39 U.S.C. § 409(a). I will exercise therefore exercise jurisdiction over Plaintiffs' Count I claims.

At argument, Defendants made clear that they were not arguing that the Plaintiffs had failed to exhaust administrative remedies, but rather that the availability of judicial review later in the process deprives this Court of jurisdiction. But some of the controlling principles of exhaustion have relevance here if only by way of analogy. If a nonjudicial remedy is "clearly shown to be inadequate to prevent irreparable injury" in extraordinary circumstances, the court may grant an exception under administrative exhaustion doctrine. *Republic Indus., Inc. v. Cent. Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 293–94 (3d Cir. 1982); *see Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002) ("[a] plaintiff is excused from exhausting administrative procedures under ERISA if it would be futile to do so.").

As will be discussed below, the Plaintiffs have demonstrated irreparable harm. Moreover, they have shown that—with regard to the demonstrable harms related to their status as users of the mail *vis a vis* the upcoming election—resort to the Commission even within days of the changes USPS made on or around July 10, 2020 would have been futile, given that the Commission has 90 days simply to respond as to whether it will hear a complaint. 39 U.S.C. § 3662(b)(1). If the Commission had decided to dismiss the case, it could have waited until mid-October to do so. *Id.* Defendants would have been left to appeal to the D.C. Circuit just days before the election. Similarly under section 3662(b)(1) the Commission could have simply waited until mid-October to decide to hear the case, at which time it would have been too late. There is no doubt the Plaintiffs have acted reasonably and in due diligence in seeking immediate judicial review.

---

As to Count II, subject matter jurisdiction exists under 28 U.S.C. § 1339 and 39 U.S.C. § 409(a), which provides that: "[e]xcept as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." The Third Circuit has held that section 409(a) provides an independent basis for subject matter jurisdiction. *See Licata*, 33 F.3d at 262; *see also Anselma Crossing, L.P. v. U.S. Postal Serv.*, 637 F.3d 238, 241 (3d Cir. 2011).[30]

As to Count III, subject matter jurisdiction exists under 28 U.S.C. § 1331 and Article III, Section 2 of the United States Constitution.

## IV.    Standing

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." The law of Article III standing, in turn, "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013). At its core, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "Standing has constitutional and prudential components, both of which must be satisfied before a litigant may seek redress in the federal courts." *UPS Worldwide Forwarding, Inc. v. U.S. Postal Serv.,* 66 F.3d 621, 625 (3d Cir. 1995).[31]

Constitutional standing to seek injunctive relief requires a plaintiff to show (1) "that he is under threat of suffering 'injury in fact' that is concrete and particularized; (2) the threat must be actual and imminent, not conjectural or hypothetical; (3) it must be fairly traceable to the

---

[30] Plaintiffs have not formally moved for preliminary relief under Count II. It should be noted, however, that none of the exceptions that Defendants assert deprive this Court of jurisdiction apply to the claims asserted under Count II. And as discussed below, the same evidence that provides a basis for relief under Count I would apply with equal force to the core elements of Count II.

[31] Because Defendants do not challenge Plaintiffs' prudential standing, I do not address it here.

challenged action of the defendant; and (4) it must be likely that a favorable judicial decision will prevent or redress the injury." *Free Speech Coalition, Inc. vs. Att'y Gen. of the U. S.*, 825 F.3d 149,165 (3d Cir. 2016) (internal punctuation omitted) (citing *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009)). Plaintiffs seeking injunctive relief must also demonstrate a likelihood of future harm. *See McNair v. Synapse Grp. Inc.,* 672 F.3d 213, 225 (3d Cir. 2012). Moreover, a plaintiff must also "demonstrate standing for each claim he seeks to press." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015).

Plaintiffs must make a "clear showing" that they have standing. Because standing requirements "are not pleading requirements, but are necessary elements of a plaintiff's case, mere allegations will not support standing at the preliminary injunction stage." *Doe v. National Bd. of Medical Examiners*, 199 F.3d 146, 152 (3d Cir. 1999). Moreover, as a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," these Plaintiffs must make a "clear showing" that they have standing. *See Winter*, 555 U.S. at 22; *see also Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (applying a "clear showing" standard in evaluating Article III standing at the preliminary injunction stage).

Moreover, as a general rule, in an injunctive case, courts need not address the standing of each plaintiff if it concludes that one plaintiff has standing. *See Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 481 n.14 (3d Cir. 2016) (citing *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 826 n.1 (2002)).

### A. Pennsylvania Has Standing to Challenge Procedural Violations of the PRA

Plaintiffs allege that, in early July, "the Postal Service abruptly instituted a 'transformative initiative' that changed how mail was processed, transported, and delivered." Mem. Law. Supp. Pls. Mot. Prelim. Inj. 33. These changes included restrictions on overtime, requirements that

46

carriers adhere rigidly to start and stop times regardless of whether all mail for their route has arrived or been delivered, and limits on late or extra trips by postal workers. *Id.* The Postal Service, Plaintiffs claim, was required to request an advisory opinion from the Postal Regulatory Commission prior to instituting the July changes. *Id.*

Plaintiffs further claim that the Postal Service has acted without the requisite procedural safeguards (the submission of the proposed changes to the Postal Regulatory Commission) and are suing to enforce their procedural rights. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 (1992) (describing the "procedural" requirements for a hearing prior to a license denial or the issuance of an environmental impact statement before the construction of a new government facility). To the extent that the Defendants believe that the Postal Service was not required to submit its proposed changes to the Commission, this is an issue of the merits rather than of standing.

Where plaintiffs seek to enforce procedural rights, they must first establish that the procedures "are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n.8; *Earth Island Inst.,* 555 U.S. at 496–497 (noting that an injury may arise when individuals are denied their right to comment due to "unlawful abridged procedures," so long as their concrete interests are threatened). Once a plaintiff establishes that his concrete interest is particularly threatened by the procedural violation, the "plaintiffs must 'demonstrate a causal relationship between the final agency action and the alleged injuries,'" which permits the court to "assume[ ] the causal relationship between the procedural defect and the final agency action." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see also Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 247 n.4 (3d Cir. 2011) (noting that plaintiffs had

standing where the agency implemented a policy, in violation of plaintiffs' notice and comment rights, that could delay issuance of notices to proceed to plaintiffs.

### 1. Defendants' Alleged Procedural Violations Threaten Pennsylvania's Concrete Interests

Pennsylvania has experienced a particularized, concrete harm to its interest in timely service as a user of the mail.[32] "A concrete injury must be *de facto;* that is, it must actually exist." *Spokeo, Inc.* v. *Robins*, 136 S.Ct. 1540, 1548 (2016) (internal punctuation omitted). Plaintiffs must set forth facts that show a risk of harm particular to them. *See Kamal v. J. Crew Group, Inc.*, 918 F.3d 102, 116 (3d Cir. 2019). The Commonwealth's Department of General Services has provided a list of instances where delays have interrupted the processing of incoming revenue, travel reimbursements, and other agency priorities. *See* Beverly Hudson Decl. Ex. 28 3–4, ECF No. 18-4. The Office of the General Counsel in the Pennsylvania Criminal Unit has also experienced mail delays that have made it more difficult to carry out their duty to issue warrants. *See* Carissa M. Mager Decl. Ex. 34 ¶¶ 8, 9, ECF No. 18-4. Recent USPS delays have also hindered the Department of Labor's efforts to schedule hearings and adjudicate benefits. *See* Robert V. O'Brien Decl. Ex. 39 ¶ 19–29, ECF No. 18-4.

This evidence underscores that Pennsylvania is not asserting a procedural right "*in vacuo.*" *Earth Island Inst.*, 555 U.S. at 496. Had the Commonwealth been able to participate in the commenting process prescribed under section 3661, it would have the opportunity to assert its

---

[32] Because only one plaintiff must have standing in equitable relief cases, I do not address the standing of the other state Plaintiffs in detail, although California, Delaware, and North Carolina have also offered evidence of harms to their state agencies. Mail delays have also impaired the ability of the California Department of Consumer Affairs to process licenses, which has forced the agency to deploy additional staff resources. *See* Kimberly Kirchmeyer Decl. Ex. 32 ¶ 16-20, ECF No. 18-4. In addition, Delaware has listed instances, beginning in July, where state residents did not receive essential items provided by the Delaware Department of Health and Social Services, on account of mail delays. *See* Gabriela Kejner Decl. Ex. 31 ¶ 14, ECF No. 18-4. And finally, North Carolina's Division of Motor Vehicles has received hundreds of complaints about mail delays around driver's license suspensions and hearing deadlines. D. Jordan Whichard IV Decl. Ex. 45 ¶ 8, ECF No. 18-4.

agencies' need for timely service. Pennsylvania, accordingly, has a concrete and particularized

interest in the resolution of this controversy.[33]

### 2. The Delays Harming Pennsylvania Are Traceable to Defendants' Alleged Violations

Plaintiffs must also demonstrate that the injuries to their interests are "fairly traceable" to

the agency action that was instituted with insufficient procedures. This requirement preserves

concreteness and particularity in procedural standing cases; as the D.C. Circuit has persuasively

explained, it ensures that courts do not "foster a procedural right in the air or a right that is distinct

from any concrete injury." *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996)

(internal citations omitted). In this matter, Pennsylvania has made a clear showing that the mail

delays are "fairly traceable" to the Postal Service's transportation and overtime changes.

On August 13, Postmaster DeJoy touted improvements in the on-time dispatch schedule,

which resulted on-time rates of "97.3 percent, up from 89.9 percent." Internal Memorandum from

Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G. At the same time, DeJoy also noted that

the Postal Service had "reduced extra trips by 71 percent — a tremendous achievement." *Id.* But

DeJoy conceded that "this transformative initiative has had unintended consequences that

impacted our overall service levels." *Id.* DeJoy's conclusion that the transportation changes

impacted service is also supported by statistical evidence and employee testimony. Service

precipitously declined in July, when the changes were implemented, *see* USPS Serv. Performance

Measurement Ex. 11, ECF No. 18-3, and delays impacted services in the Eastern Area (which

includes Pennsylvania), *see* Eastern Area AIM Meeting – Service Update Ex. 6, ECF No. 18-3,

and the Pacific Area (which includes California). *See* Pacific Area AIM Meeting Presentation Ex.

---

[33] The fact that the delays are "widely shared" does not minimize Pennsylvania's interest in the litigation. *See Massachusetts v. EPA*, 549 U.S. 497, 522 (2007).

49

12, ECF No. 18-3. Post office employees in the Pacific and Eastern areas have also alleged that the change to transportation mail has delayed processing in their respective regions. *See* Cogan Decl. Ex. 48 ¶ 13 (Oregon); Kelly Dickey Decl. Ex. 50 ¶ 25 (Pittsburgh); John Gibson Decl. Ex. 26 ¶ 15 (Philadelphia).

The delays in Pennsylvania are also linked to the changes in overtime policy. As described previously, the record strongly suggests that USPS leadership has undertaken a national policy to alter overtime policies. *See* PowerPoint – AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13 (describing a national "Work Hour Reduction Target, Do It Now" initiative). Pennsylvania has not been spared the impact of this decision. Union officials have testified that "overtime was significantly restricted at certain facilities" in Philadelphia that are represented by Local 308 of the National Postal Mail Handler's Union. Gibson Decl. ¶ 14. Although overtime allowances have increased in Philadelphia since the dramatic reductions in late July and early August, restrictions remain in place. *Id.* at ¶ 16. One Philadelphia branch manager further reported that the overtime restrictions came from the Postmaster General. *Id.* And in Pittsburgh, management instituted a one-week ban on overtime. Dickey Decl. ¶ 22. Management has since lifted its ban but overtime continues to be limited at the facilities represented by Local 322 of the National Postal Mail Handlers Union. *Id.* at ¶ 23.

Defendants have argued that the Plaintiffs must also show that that the prior delays were "primarily caused by the USPS policy changes, rather than COVID-related circumstances (e.g., staffing shortages)." Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 32. But this view misstates the law on causation.[34] In *Massachusetts v. EPA*, the agency maintained that its alleged procedural

---

[34] Even if Defendants were correct, Plaintiffs could still make a strong showing that the delays were primarily caused by USPS policy changes. In a September 16, 2020 hearing, Robert Cintron observed that the COVID-related impacts started to occur in February/March. *See* Tr. Prelim. Inj. Teleconference at 59, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020). However, as of the week of August 29th, first-class mail service was at 88%, which was

violation – a refusal to undertake rulemaking to address greenhouse gas emissions – contributed so "insignificantly to petitioners' injuries that the Agency cannot be haled into federal court to answer for them." 549 U.S. 497, 523 (2007). The Court disagreed; Massachusetts had standing because the agency's refusal to regulate such omissions *contributed* to the state's injury, even though the actions of third parties also had a large impact. *Id.* at 523-24. As in *Massachusetts*, halting the Defendants' policies would meaningfully contribute to addressing Pennsylvania's injuries.

### 3. Pennsylvania Will Experience Ongoing Injuries

The Commonwealth of Pennsylvania has also met its burden with respect to the "actual and imminent" standard. In equitable relief cases, the Third Circuit has required plaintiffs to show that they are "likely to suffer future injury" from the defendant's conduct." *McNair*, 672 F.3d at 223. Defendants argue that Plaintiffs cannot make such a demonstration, as "service performance is rapidly returning to early July levels."[35] Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 32. This statement was contradicted by Robert Cintron's testimony during the September 16, 2020 *Jones v. USPS* hearing. Robert Cintron first admitted, on cross-examination, that service performance of First-Class mail had improved by only .28 percent in the most recent data. *See* Tr. Prelim. Inj. Teleconference at 62, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020). Cintron also agreed that "[c]urrently, first-class mail products are somewhere between five and six percent below

---

the lowest performance yet within the COVID-19 pandemic. *Id.* at 59-60. The Postal Service has stated that the lowest rates of availability due to COVID-19 and vacation absences occurred in mid-July. *See* Prokity Decl.¶ 5. The ongoing nature of the delays strongly suggests that another causal factor besides COVID-19 is at work.

[35] This factor is less critical in our standing analysis because Pennsylvania is asserting a procedural injury. As the Supreme Court made clear in *Lujan v. Defenders of Wildlife*, "the normal standards for redressability and immediacy" are lessened in cases where the plaintiff has been "accorded a procedural right to protect his concrete interests." 504 U.S. at 572 n.7. Pennsylvania's interest against mail disruption will remain concrete throughout; *compare Earth Island Inst.*, 555 U.S. at 497 (Plaintiffs asserted a procedural right *in vacuo* with respect to a building project that was already the subject of litigation and settlement).

established service standards." *Id.* at 53. At 88.74% for First-Class Mail, *see* Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit Ex. 54-16, service has not yet rebounded to the lowest point in the COVID-19 era. *Id.*

Pennsylvania's claim that they are likely to suffer future injury is further bolstered by evidence that the contested policies have persisted and will continue delays across the state. The August 18, 2020 DeJoy statement notably did not mention a suspension of changes to the transportation policy and stated only that overtime would be "approved as needed." Statement of Postmaster General Louis DeJoy (August 18, 2020) Ex. H, ECF No. 1-1. But among the Pennsylvania facilities represented by Local 322, overtime was terminated for one week and continues to be limited. *See* Dickey Decl. ¶¶ 22, 23. Management at these facilities continues to order that trucks adhere to a strict transportation standard, even if it means that some mail will be left behind. *Id.* at ¶ 24. Representatives of Pennsylvania-based Local 303 have also claimed that the rigid transportation requirements and overtime restrictions have persisted, although overtime usage has increased. *See* Gibson Decl. ¶¶ 15, 16. The record strongly shows that the injuries sustained by Pennsylvania will persist into the future, as the state will continue to be denied their right to comment on the policy changes that threaten their concrete interests as users of the mail.

### 4. Pennsylvania's Injuries Can Be Redressed by Injunctive Relief

Plaintiffs are also able to meet the light burden of redressability that arises in procedural rights standing cases. The Supreme Court has maintained that "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Earth Island Inst.,* 555 U.S. at 496 (noting that procedural rights claims "can loosen the strictures of the redressability prong of our standing inquiry"). Here, a favorable judicial ruling would resolve plaintiffs' procedural injury, as the

52

plaintiffs would be able to comment on the proposed changes prior to their implementation. Plaintiffs do not need to show that a resolution in the procedural injury would ultimately result in USPS adopting a different policy. *See Defenders of Wildlife*, 504 U.S. at 572 n. 7.

**B. California Has Standing to Challenge USPS' Alleged Constitutional Violations**

Standing involves an examination of whether a "particular plaintiff is entitled to an adjudication of the particular claim*s* asserted." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

In *Oregon v. Mitchell*, the Supreme Court reiterated that states retain power to "regulate elections" under the Elections Clause in the absence of a Congressional enactment or Constitutional limit. 400 U.S. 112, 121 (1970). There, the Court entertained an action by the State of Oregon to enforce its interests under the Elections Clause against Congressional aggrandizement. The Court ultimately held that Congress had "invaded an area preserved to the states" when it attempted to lower the voting age in state and local elections. *Id.* at 130.[36] Similarly, in *South Carolina v. Katzenbach*, the Court permitted South Carolina and the states to pursue claims that the Voting Rights Act "encroach[ed] on an area reserved to the States by the Constitution." 383 U.S. 301, 323 (1966).

Plaintiffs in this action similarly seek to halt federal encroachment on their constitutional power to determine the "Times, Places, and Manner" of federal elections and appoint electors. *See* U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II § 1, cl. 2. The states allege that USPS interference,

---

[36] The Court also noted that "no question has been raised concerning the standing of the parties or the jurisdiction of this Court." *Oregon v. Mitchell*, 400 U.S. 112, 117 n. 1 (1970).

in the form of delays and incorrect mailers to voters, have "jeopardize[d] the manner in which the States have chosen to let voters vote" under the Elections Clause. Mem. Law. Supp. Pls. Mot. Prelim. Inj. 47.

California[37] has offered sufficient evidence to show that its claimed injury – the Postal Service's interference with the state's constitutional power to conduct elections and set rules for mail-in ballots – is concrete, particularized, and fairly tracible to Defendants. The agency's intrusions have taken two forms: delays[38] that call into the efficacy of California's mail voting system into question and incorrect mailers to California voters.

USPS data from the Pacific region (the latest available in the record) establishes that services for First-Class mail declined precipitously in July and remained below usual standards at the start of August. *See* Pacific Area AIM Meeting Presentation Ex. 12. Declines have persisted nationally and have impacted Election Mail. *See* Tr. Prelim. Inj. Teleconference at 53, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020) ("[c]urrently, first-class mail products are somewhere between five and six percent below established service standards."); Robert Glass Dep. 65, Courtroom Exhibit 55 (observing that delays have already occurred with respect to Election Mail). Declarations from California officials have established that service delays have occurred in California and are persistent. *See, e.g.*, Kirchmeyer Decl. ¶ 18. And California's Secretary of State has testified that USPS sent out incorrect mailers about how voters can vote by mail in California's elections. *See* Alex Padilla Supp. Decl. Ex. 53 ¶ 6, ECF No. 47-1. As a result of USPS delays and policy changes, California's Secretary of State experienced a "drastic spike in inquiries" that

---

[37] Again, I analyze standing for California because only one plaintiff is required to have standing in equitable relief cases. Declarations from officials in Maine and Washington, D.C. also describe financial expenditures by the states to protect their residents' ability to vote by mail, in light of persistent USPS delays. *See* Matthew Dunlap Decl. Ex. 23 ¶19, ECF No. 18-4 (ME); Alice P. Miller Decl. Ex. 37 ¶13, ECF No. 18-4 (D.C.).

[38] Because I have established that the delays are tracible to USPS policy changes, I do not repeat this analysis here.

required them to divert resources. Alex Padilla Dec. Ex. 40 ¶¶ 27, 28, ECF No. 18-4. California also received a surge of questions regarding the incorrect mailers. *See* Alex Padilla Supp. Decl. ¶ 4.

Taken together, this evidence establishes that USPS' actions have shaken voters' confidence in California's mail-in voting system and continue to pose a credible threat to the state's ability to administer its election. Whether the harm is cognizable under the Electors Clause or the Elections Clause is a different inquiry.

California can also meet standards for redressability. As established previously, an injunction would remedy the delays that are the result of the July 2020 policies. Moreover, this Court is empowered to enjoin USPS from mailing false postcards. These remedies would resolve California's constitutional injury.

## V. Likelihood of Success on the Merits

With respect to this requirement, a movant for a preliminary injunction "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not"). *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018), *cert. denied,* 139 S. Ct. 440, 202 L. Ed. 2d 319 (2018) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017); *see also Singer Management Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (stating that a "likelihood" of success "does not mean more likely than not").

The Plaintiffs allege that the Postal Service was required by 39 U.S.C. § 3661(b) to ask the Postal Commission for an advisory opinion regarding their changes to policies for late and extra trips ("Transportation Policy") and for overtime work ("Overtime Policy"). Compl. ¶ 224-226. Section 3661(b) of the Postal Reorganization Act (PRA) states:

When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially

nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.

39 U.S.C. § 3661(b).

Plaintiffs further claim that by not submitting a proposal to the Commission before the changes in the Transportation Policy and Overtime Policy took effect, Defendants acted beyond their statutory authority and the changes are *ultra vires*. Compl. ¶ 227. Defendants argue that they were not required to seek an advisory opinion under section 3661(b) because the changes implemented do not constitute changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis. Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 32.

Both Defendants and Plaintiffs agree that the question of whether the Postal Service needs to go to the Commission for an advisory opinion is properly addressed under the framework of *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1974). In *Buchanan*, a proposed class of postal users sought to enjoin changes being implemented by the Postal Service, alleging that the Service was required to go through the section 3661 process beforehand. *Buchanan*, 508 F.2d at 261. The court enjoined implementation of two of the three changes involved and ordered the Postal Service to seek an advisory opinion from the Commission. *Id.* at 267. The PRA had been enacted just four years prior, and the circuit court (as had the district court below) thoroughly examined the legislative history and purposes of § 3661. *Id.* at 263-64; *Buchanan v. U.S. Postal Serv.*, 375 F. Supp. 1014, 1017-18 (N.D. Ala. 1974).

The court wrote that there are "two basic policies" at the core of the PRA that "pull in different directions": "the goal of vesting in management the freedom to make decisions without external constrains" and "the goal of providing to the American people a public service which is

56

sensitive and responsive to their needs." *Buchanan*, 508 F.2d at 262. The court found that these policies could be harmonized by reading section 3661 such that "management is given the freedom to manage without unnecessary limitations and the public is given an opportunity to present their views on decisions of the Postal Service which affect them." *Id.* at 262; *see also Buchanan*, 375 F. Supp. at 1017-18 (noting that although "it is clear that Congress intended generally to give the Postal Service broad powers and wide discretion in its operations" it is "equally as clear . . . Congress intended to retain for the public a right to be heard so that the Postal Service would be responsive to the public and the public would have assurance that any major changes in postal service. . . would conform to the basic policies established in the [PRA].)"[39] When the Postal Service implements "change[s] in the nature of postal service which will generally affect service on a nationwide or substantially nationwide basis" without going through the procedures prescribed by section 3661, the general public is "denied a very fundamental right -- the opportunity for a hearing on the proposed change." *Buchanan*, 375 F. Supp. at 1019.

Under *Buchanan*, there are three factors that must exist before a proposed change is required to go through the Commission in compliance with section 3661:

> First, there must be a "change." This implies that a quantitative determination is necessary. There must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within § 3661. Second, the change must be "in the nature of postal services." This involves a qualitative examination of the manner in which postal services available to the user will be altered. Third, the change must affect service "on a nationwide or substantially nationwide basis." A broad geographical area must be involved.

*Buchanan*, 508 F.2d at 262-63.

As discussed in Section III, I have found that subject matter jurisdiction exists under 39 U.S.C. § 409, as buttressed by 28 U.S.C. § 1339 and 28 U.S.C. § 1331 to consider this claim.

---

[39] The text of section 3661(b) examined in *Buchanan* remains unchanged today. See *Buchanan*, 375 F. Supp. at 1018; 39 U.S.C. § 3661(b).

Because the Administrative Procedure Act does not apply to the Postal Service for claims like this one, *see Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014), I analyze this claim under a theory of nonstatutory review.

"Nonstatutory review" enables a federal court to use its equity powers to enjoin violations of law by governmental officials. This form of review is primarily used if a plaintiff "is unable to bring his case predicated on either a specific or a general statutory review provision." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *see also Zirin v. McGinnes*, 282 F.2d 113, 115 (3d Cir. 1960); *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 600 (3d Cir. 2016) (ruling that party did not forfeit claim of ultra vires agency action because such claims should not be insulated from judicial review); *Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 916 (3d Cir. 1981). Where nonstatutory review is available, it is quite narrow. *Mittleman,* 757 F.3d at 25. It is available only to determine whether the agency has acted "*ultra vires*"—that is, whether it has "exceeded its statutory authority." *Id.*

*Ultra vires* review has been utilized by various courts to analyze actions of the Postal Service. In *Aid Ass'n for Lutherans*, the D.C. Circuit reviewed a District Court decision, holding that the Postal Service had acted *ultra vires* in promulgating certain regulations. 321 F.3d 1166, 1174 (D.C. Cir. 2004). The court found that the agency acted *ultra vires* because it "lacked authority under the statute effectively to regulate out of the market nonprofits' use of the reduced postage rates for insurance-related purpose." *Id.* at 1178; *see also id.* at 1172 ("Judicial review is favored when an agency is charged with acting beyond its authority.") Similarly, in *Combined Commc'ns Corp.*, the Sixth Circuit upheld a district court's decision that the Postal Service had acted *ultra vires* in promulgating certain regulations, after finding jurisdiction under 28 U.S.C. § 1339 and 39 U.S.C. § 409. 891 F.2d at 1227-28. The Third Circuit has likewise analyzed ultra vires claims against the

Postal Service where plaintiffs alleged that the Service exceeded its authority by implementing certain policies without following the procedure prescribed by the PRA. *See Air Courier Conf. of America/ Int'l Comm.*, 959 F.2d at 1215; *United Parcel Serv., Inc.*, 604 F.2d at 1372.[40]

## A. Scope of Review

Before analyzing the *Buchanan* factors, I am mindful of the deference owed to agency interpretations of its governing statute.

At the outset, I must identify exactly what the interpretation is that was offered by the agency, as that will guide the analysis as to the deference owed that interpretation. *See United States v. Mead Corp*, 533 U.S. 218, 227-28 (2001). I may only consider the interpretation offered at the time of the agency action, and not *post hoc* justification offered during litigation. *See Dep't of Homeland Security v. Regents of the Univ. of Calif*, 140 S. Ct. 1891, 1909 (2020) (holding that courts must rely only on "contemporaneous explanations for agency action" and that "[p]ermitting agencies to invoke belated justifications, on the other hand, can upset 'the orderly functioning of the process of review.'") (quoting *SEC v. Chenery Corp*., 318 U. S. 80, 94 (1943)); *see also Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 151 (3d Cir. 2004) ("[W]e may affirm the agency's decision only on grounds on which the agency actually relied, and not on the basis of alternative rationales or justifications put forward by counsel on appeal.") (quoting *Chenery*).

As discussed in Section I.B, there were changes to the Postal Service's transportation policies in July 2020. Mr. Cintron states that he has been leading an "initiative" regarding extra

---

[40] Defendants have suggested that this Court's nonstatutory review must proceed under *Leedom v. Kyne*, 358 U.S. 184 (1958). In interpreting *Leedom*, the D.C. Circuit has looked to whether the agency's error is "patently a misconstruction of the Act," or "when the agency has disregarded a specific and unambiguous statutory directive," or "when the agency has violated some specific command of the statute." *Griffith v. Federal Labor Relations Authority*, 842 F.2d 487, 497 (D.C. Cir. 1988). However, I do not rely on the more restrictive language of *Leedom* because I do not find that Congress has generally precluded review on this class of claims where jurisdiction already exists within the statute itself. *See Air Courier*, 959 F.2d 1213, 1215 (3d Cir. 1992); *United Parcel Serv., Inc.*, 604 F.2d 1370, 1372 (3d Cir. 1979); *see also Combined*, 891 F.2d at 1227-28.

59

and late truck trips, which began in name two years ago, but received "renewed focus" this July. Changes in overtime policy also began in July 2020.

The Postal Service has not presented documents issued at the beginning of Mr. Cintron's "initiative" from two years ago. And as to documents published contemporaneously with the changes in July of this year, the Postal Service disputes that either the Stand-Up Talk or the PMG Expectations PowerPoint represent agency policy. That question is not dispositive for this analysis, however, since neither document references section 3661. The policy guidelines issued by Mr. Cintron in July 2020 likewise do not reference section 3661 and do not discuss why the new policy would or would not be covered by the procedural safeguards of that section. The only contemporaneous document in the record seems to be the letter from the Postal Service's General Counsel, Thomas Marshall, to members of Congress on July 22, 2020. *See* Marshall Letter, Ex C at 13-15, ECF No. 1-1. In this letter, Mr. Marshall writes that "we are aware of our legal obligations to request an advisory opinion before implementing 'a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis' under 39 U.S.C. § 3661(b)" but that "[n]one of the operational efforts discussed here constitute such a change." *Id.* at 15.

## 1. The Marshall Letter Is Not Owed *Chevron* Deference.

I now turn to the level of deference owed to Mr. Marshall's determination that the operational changes do not constitute a change within the ambit of section 3661(b). As I must at the beginning of any deference inquiry, I begin by asking whether Congress "has directly spoken to the precise question at issue" through unambiguous statutory language. *See Hagans v. Commissioner of Social Sec.*, 694 F.3d 287, 294 (3d Cir. 2012) (citing *Chevron U.S.A., Inc. v.*

*Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). If so, then no further inquiry is needed. *Id.*

Here, the statute mandates procedure through the Commission when a change affects "the nature of postal services" and that change "will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). These terms are ambiguous and are susceptible to multiple interpretations, as the Commission itself has acknowledged. *See, e.g.* Order No. 1307, Order Partially Denying Motion of [USPS] to Dismiss Complaint and Notice of Formal Proceedings, Docket No. C2001-1, at 13 n. 12 (Mar. 20, 2001) ("There is no bright line for determining when a reduction in collection and mail processing service is a change in the nature of a postal service."). I therefore proceed to step two of *Chevron*. *See Chevron*, 467 U.S. at 843.

*Chevron* review of an agency's interpretation of ambiguous statutory language is appropriate where "Congress delegated authority to the agency generally to make rules carrying the force of law and the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead Corp.*, 553 U.S. at 226-27. Congress has delegated authority to the Postal Service to make rules carrying the force of law. *See* 39 U.S.C. § 401(2) (authorizing the Postal Service "to adopt, amend, and repeal . . . rules and regulations . . . as may be necessary in the execution of its functions…") Interpretations by the Postal Service promulgated in the exercise of this rulemaking authority can thus be entitled to *Chevron* deference. *See, e.g., Aid Ass'n for Lutherans,* 321 F.3d at 1174 (holding that *Chevron* review was appropriate where USPS had promulgated regulations pursuant to notice and comment rulemaking). In *Air Courier*, the Third Circuit granted *Chevron* deference to the Postal Service's international rate-setting. *Air Courier,* 959 F.2d at 1215. The PRA delegated to the Postal Service the authority to set rates carrying the force of law, and the rate-setting in this context was an exercise of that authority. *Id.* at 1225.

61

The internal policies addressed by Mr. Cintron's initiative (or its "renewed focus"), and the concurrent interpretation of section 3661 provided by Mr. Marshall were not exercises of the Postal Service's delegation and do not carry the force of law. The summary explanation provided in the letter is not owed *Chevron* deference. The Third Circuit has consistently held that "interpretations such as those in opinion letters— like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law- do not warrant *Chevron*-style deference." *Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 252 (3d Cir. 2005) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)); *see also Hayes v. Harvey*, 903 F.3d 32, 45-46 (3rd Cir. 2018) (en banc) (noting in dicta that HUD guidance documents do not warrant deference under *Chevron* because they lack the force of law); *Mercy Catholic Medical Center v. Thompson*, 380 F. 3d 142, 145-55 (3rd Circ. 2004) (holding that agency interpretive guidelines are not entitled to *Chevron* deference and noting that "[t]o grant Chevron deference to informal agency interpretations would unduly validate the results of an informal process.") (quoting *Madison v. Res. For Human Dev., Inc.*, 233 F.3d 175, 186 (3d Cir. 2000)).

Where agency interpretations are cursory and lack detailed explanation, as is the case here, the Third Circuit has also held that these interpretations are not entitled to *Chevron* deference. *See Packard*, 418 F.3d at 251-52 (holding that "the informal and cursory" reasoning of the agency derived from one paragraph in an interagency letter was not entitled to *Chevron* deference); *Hagans*, 694 F.3d at 302 (noting that "[t]he SSA devotes only one paragraph to its interpretation of the statute and does not explain how or why it reached its interpretation, a factor which weighs against deference.").[41]

---

[41] Although many Third Circuit decisions focus on whether an agency interpretation has the "force of law," *see, e.g. Hayes*, 903 F.3d at 45-46, some agency interpretations that do not have the force of law may at times still be entitled to *Chevron* deference. *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (holding that the agency's longstanding interpretation is not "automatically deprive[d]. . . of the judicial deference otherwise its due" solely because the "the

## 2. The Marshall Letter should be examined under the *Skidmore* framework

Instead, the agency's interpretation of the PRA should be reviewed pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Hagans*, 694 F.3d at 294-95. Under *Skidmore* review, a court considers an agency judgment "based on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" 323 U.S. at 140.

The Third Circuit has "adopted *Mead*'s conceptualization of the *Skidmore* framework as a 'sliding-scale' test in which the level of weight afforded to an interpretation varies depending on [the] analysis of the enumerated factors." *Sec'y U.S. Dep't of Labor v. American Future Systems Inc.,* 873 F.3d 420, 428 (3d Cir. 2017) (citing *Hagans*, 694 F. Supp. at 304, citing *Mead*, 553 U.S. at 228). Those factors include whether the interpretation was: "(1) [i]ssued contemporaneously with the statute; (2) [c]onsistent with other agency pronouncements; (3) [r]easonable given the language and purposes of the statute; (4) [w]ithin the expertise of the relevant agency; (5) [p]art of a longstanding and unchanging policy." *Id.* "[M]any of the same circumstances. . . relevant for determining whether to apply *Chevron* deference are also useful for deciding the level of deference due under *Skidmore*." *Hagans*, 694 F.3d at 304-05.

---

Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking.") (citing *Chevron*, 467 U.S. at 843). Rather, depending on "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time," *Chevron* may still "provide[] the appropriate lens through which to view the legality of the Agency interpretation." *Id.* at 222. Nevertheless, like the informal ruling at issue in *Hagans*, the two sentences of the Marshall letter still would not be entitled to *Chevron* deference even without an exclusive focus on whether the letter had the force of law. *See Hagans*, 694 F.3d at 303 ("It is not entirely clear form the Supreme Court's precedent whether the lack of the 'force of law' is always fatal to the application of *Chevron*, but in any event, the lack of legal effect of this ruling, combined with the absence of formal notice-and-comment rulemaking and the failure of the [agency] to describe its reasoning, cannot be counterbalanced by the [agency]'s institutional desire for uniformity and ease of administration.")

Applying these factors, I find that a relatively low level of deference is warranted. Under the first factor, Mr. Marshall's interpretation was not issued contemporaneously with the statute. Under the second factor, Mr. Marshall's interpretation is not consistent with other contemporaneous agency pronouncements. Postmaster DeJoy referred to the policies instituted in July as "significant changes," and as a "transformative initiative." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G. And with respect to late and extra trips, Mr. DeJoy further stated that the Postal Service had "reduced extra trips by 71 percent" and that the change had affected on-time rates by eight percent. *Id.* Postmaster DeJoy also noted that "this transformative initiative has had unintended consequences that impacted our overall service levels." *Id.* Postal Service briefing documents provided to Congress likewise refer to the transportation policy as an "initiative." *Congressional Briefing: Transportation and Service Performance Updates* (Aug. 31, 2020) Ex. 16. Overall, Mr. Marshall's interpretation is not consistent with other agency pronouncements.

The third factor is whether Mr. Marshall's interpretation is reasonable given the language of the statute. To trigger the Commission process under section 3661(b), there must be a "change in the nature of postal services." 39 U.S.C. § 3661(b). The PRA defines "postal services" to be "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 101(5). Postal service standards must "preserve regular and effective access to postal services in all communities, including those in rural areas or where post offices are not self-sustaining" and must "reasonably assure Postal Service customers [of] delivery reliability, speed and frequency consistent with reasonable rates and best business practices." 39 U.S.C. § 3691(b)(1)(B), (C); *see also* Goldway

Decl. Ex. 52 ¶ 12, ECF No. 47-1 (describing "service standards" as "the official timeliness goal for delivering mail after receiving it from the customer.")

Defendants urge me to give broad deference to the past interpretations of section 3661(b) offered by the Commission, and I do so. *See* Section V.B.3, *infra*. The Commission's description of the language of the statute is thus useful in analyzing this third factor. In one of the first advisory opinions issued by the Postal Regulatory Commission (then called the Postal Rate Commission), the PRC details the history of section 3661(b), and the competing interests of allowing the USPS managerial freedom while still trying to ensure public accountability. *See* Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, Docket No. N75-1, at 15-17 (Apr. 22, 1976). The Commission wrote that "[t]he procedural requirements of § 3661 obviously impinge upon the managerial decision-making processes of the Postal Service" but that "the imperative that adequate and efficient postal services to be provided to the public dictates a significant and viable scope of operation for § 3661." *Id.* at 16. Ultimately, the Commission held that section 3661 encompasses changes in the "type, quality, terms, or conditions" of service, and that a change falls within the ambit of section 3661 if "it has as a reasonably foreseeable consequence a significant change in the availability of basic postal services to the representative postal consumer." *Id.* at 9*; see also id.* at 21 ("It is the experience of the individual postal consumer, the recipient of the complex of services provided by the Postal Service and the intended beneficiary of the policies incorporated by § 3661, that must be assayed in determining whether an action or program involves a change in the nature of postal services.").

Here, Plaintiffs have put forward substantial evidence to show that postal customers experienced significant changes in the availability of basic postal services. *See* Section IV.A.2, *supra*; Section V.B, *infra*. They have also proffered evidence showing that these service impacts

65

were a reasonably foreseeable consequence of the changes. *See* Stand-Up Talk (stating that "we may see mail left behind" as a result of the changes); Gibson Decl. ¶ 15 (" Rigidly requiring trucks to leave at their scheduled time means that trucks leave without all of their mail, which exacerbates delays because a piece of mail that may have been an hour late becomes a day late or more."); Cogan Decl. ¶ 13 (testifying that as a result of the changes, "mail that was nearly done being processed may miss the truck entirely and could sit at the facility for at least another day."); Coradi Decl. ¶ 8 (testifying that as a result of the transportation policy, employees "are prohibited from making late trips and extra trips even if waiting just a few minutes would ensure timely delivery to entire communities.").

Plaintiffs also submitted a declaration from Ruth Goldway, who served on the Commission for seventeen years and was Chairwoman for six years. Goldway Decl. ¶ 1-2. Ms. Goldway represents that "[i]t is my opinion, based on my two decades of experience reviewing Postal Service operations, that eliminating local flexibility and requiring rigid adherence to transportation schedules would negatively impact service performance." *Id.* at ¶ 31. She further represents that "[e]ven if the Postal Service did not know that its changes were likely to impact service standards, it should still have reported to the Commission once it became clear that the changes were preventing the Postal Service from meeting its existing service standards." *Id.* at ¶ 36. Given the language of the statute, as interpreted by the Commission, it is unreasonable to argue that the policy changes contemplated and implemented could not have significant changes as a reasonably foreseeable consequence.

The fourth factor is whether the interpretation is within the expertise of the relevant agency. The Postal Service clearly does have some expertise in evaluating programs under § 3661. But this expertise is shared with the Postal Commission. *See, e.g., Air Courier*, 959 F.2d at 1223 ("Our

holding. . . in favor of the Postal Service is strengthened by the long-standing interpretation both the Postal Service and the Commission have given the statute. ") The Postal Service has previously sought out the expertise of the Commission as to exactly this question—whether a proposed change affects the nature of postal service on a substantially nationwide basis and triggers the procedures of the subsection. *See* Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1, at 1 (Mar. 24 2011) ("[T]he public proceeding that supports the Commission's conclusions is an example of how the Postal Service and the Commission can cooperatively use their complementary authority to develop policy and improve the process in an open and transparent manner."); s*ee also* Advisory Opinion on Service Changes Associated with Standard Mail Load Leveling, Docket No. N2014-1 (Mar. 26, 2014) at 8 (noting that "[w]ith an advisory opinion, the Commission. . . provides an opinion based on its expertise."); Goldway Decl. ¶ 23 ("The Commission also provides the Postal Service with valuable analysis and guidance on how to best accomplish its goals of increased efficiency and cost-savings without impeding mail service and public access").

Because interpretations of section 3661(b) are shared between the Postal Service and the Commission, and because these interpretations often conflict, *see* section V.A.3, *infra*, this factor likewise does not warrant deference to the Postal Service's interpretation alone in this instance. *Compare National Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 825-26 (1983) (deferring to the Commission's interpretation of a statute instead of the Postal Service's interpretation), *with Air Courier*, 959 F.2d at 1224 (noting that "the Commission agrees with the Postal Service" as to the interpretation in question and deferring to that interpretation).

Finally, under the fifth factor, this interpretation is not part of a long and unchanging policy. *See, e.g.,* Gibson Decl. ¶ 14 (testifying to implementation of changes in July 2020 that differed

from previous policy and practice); Cogan Decl. ¶ 7 (same); Coradi Decl. ¶¶ 5-9 (same); Dickey Decl. ¶¶ 19-26 (same). Under Third Circuit precedent, the agency's summary interpretation, devoid of reasoning, is owed very low deference under *Skidmore*. *See Packard*, 418 F.3d at 253 (holding in the context of an "informal and cursory" letter that "*Skidmore* deference is available only based on an agency interpretation's power to persuade . . . [t]he materials at issue here simply provide no reasoning or analysis that a court could properly find persuasive.") After analyzing the five factors above, I conclude that the agency's interpretation through the Marshall letter is owed a low level of deference. *Mead*, 553 U.S. at 228.

### 3. Past Practice of the Commission

The Defendants also argue that past practice of the Commission and the Postal Service "should be given the deference ordinarily accorded any interpretation of a statute by the agency." Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 33 (citing *United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102,107 n.11 (D.D.C. 2002)). According to Defendants, the Commission's past practice makes clear that the changes in this case do not rise to the level of changes affecting the nature of postal service on a substantially nationwide basis. *Id.* at 33-34.

I agree that the past practice of the Commission and the Postal Service is critical, and that statutory interpretations of the Commission are owed the highest degree of deference. *Cf. U.S. Postal Serv. v. Postal Regul. Comm'n,* 640 F.3d 1263, 1266 (D.C. Cir. 2011) (holding that the Commission's interpretation of 39 U.S.C. § 3622 is entitled to *Chevron* deference); *U.S. Postal Serv. v. Postal Regul. Comm'n*, 599 F.3d 705, 710 (D.C. Cir. 2010) (deferring to Commission's interpretation of 39 U.S.C. § 404(e)(3)).

The past practice of the Commission, however, does not accord with Defendants' description of how the Commission has interpreted section 3661(b). To the contrary, the

68

Commission's interpretation of section 3661(b) and the types of changes it has held to fall within that section's ambit would seem to reach the changes contemplated by this action.

True, some advisory opinions concern "general changes to postal facility hours or service standards for mail delivery." Advisory Opinion Docket No. N2014-1 at 1, 10 (involving a proposal to change the service standard from 3 days to 4 days); Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1, at 1 (Sept. 28, 2012) (involving changes to service standard that "would ultimately eliminate all overnight delivery service for single-piece First-Class Mail, and delay much of current First-Class Mail 2-day delivery to 3-day delivery.").

But the Commission has also issued advisory opinions on smaller matters and has interpreted section 3661(b) to encompass a larger variety of changes than Defendants imply. In 2006, for example, the Commission issued an opinion on the Postal Service's proposal "to enhance efficiency in the postal system's network of mail processing facilities through the use of modern computerized simulation and optimization models." Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, Docket No. N2006-1, at 15 (Dec. 12, 2006). Notably, the Commission found that the proposal triggered section 3661(b) because "implementation of [the] proposal is likely to cause at least a small degradation in the current level of service provided to First-Class Mail on a nationwide basis." *Id.* at 9. In that same case, the Postal Service estimated that "[i]n terms of volume, the net reduction in overnight [First Class Single-Piece Letters] would be 1.55 percent." *Id.* at 74. The Commission found that the proposed change qualified as a "change to the nature of postal services" under section 3661(b). *Id.* at 9. The Commission issued an opinion under section 3661, even though the proposed change's "overall effects on the postal service [could not] be known in advance" and even though the Postal Service "explicitly disclaim[ed] any

69

intention to change currently-established service standards as part of its proposal." *Id.* at 13; 15. In one of its first advisory opinions, the Commission likewise wrote that "[T]he effect of a contemplated program, rather than the Service's specific intent in adopting it, controls in establishing whether that program accomplishes a change in the nature of postal services." Advisory Opinion Docket No. N75-1, at 20.

The Commission has also issued advisory opinions under section 3661(b) even where the Postal Service has not made the "threshold" determination that a proposed change affects the nature of postal service, and where the Postal Service has thus contested the Commission's jurisdiction. *See* Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1, at 11 (3/10/10) (rejecting the Postal Service's jurisdictional challenge, analyzing the proposed changes under the *Buchanan* framework, and finding that "the Postal Service's Initiative falls under the ambit of 39 U.S.C. § 3661."). The Commission has described section 3661(b) in expansive terms, noting the importance of its safeguards for protecting the public and in ensuring that the Postal Service fulfills its statutory obligations. The Commission has noted that section 3661(b) is a "statutory tool provided by Congress for gathering. . . public input" and that:

> Obtaining the views of Postal Service customers is vitally important where the Postal Service's monopoly First-Class Mail product is concerned. The privilege of a governmentally established monopoly status includes the responsibility to hear and consider the needs of the constituency that must function under the constraints of that monopoly. Actions that are, or are perceived to be unilateral in nature may disenfranchise users to the ultimate detriment of the monopoly product.

Commission Report: Complaint on Sunday and Holiday Collections, Docket No. C2001-1 at 2 (Nov 5, 2002).

It is precisely because the Postal Service cannot always properly independently make the threshold determination of section 3661(b) that the Commission has maintained it is important for the Postal Service to seek out the expertise of the Commission. *See, e.g.,* Goldway Decl. ¶ 21 (describing how in reviewing a certain proposal, the Commission found "that the cost savings [stated by the Postal Service] were overstated by more than $1 billion, would cause up to $0.6 billion in net revenue losses, and would cause almost 25 percent of all First-Class and Priority mail to be delayed for two days" and that "the Postal Service had failed to assess the impact its proposal would have on people living and working in rural or remote locations.").

In sum, the past practice of the Commission, which is owed a high degree of deference, shows that the Commission interprets section 3661(b) more expansively than suggested by the Defendants. And, as set forth below, this ultimately weighs strongly against Defendants in an assessment of the merits.

### B. Analysis of *Buchanan* Requirements

I now return to the *Buchanan* requirements, giving a low level of deference to Mr. Marshall's statement in the July 22 letter, and a very high degree of deference to the Commission's past practice in interpreting section 3661 and these factors. In order for changes to fall within the ambit of section 3661(b), three requirements must be met. *Buchanan*, 508 F.2d at 262-63. Importantly, in the context of a preliminary injunction, "it is not necessary [for a court] to decide that the challenged changes are in fact embraced in Section 3661." *Buchanan*, 375 F. Supp. at 1022. Rather, a court must find "that most likely they are and therefore that there is substantial likelihood that plaintiffs will prevail on the merits." *Id.*

The first requirement under *Buchanan* is that "there must be a 'change.' This implies that a quantitative determination is necessary. There must be some meaningful impact on service.

Minor alterations which have a minimal effect on the general class of postal users do not fall within § 3661." *Buchanan,* 508 F.2d at 262. Defendants argue that the July operational changes are not changes within the ambit of section 3661 because they do not represent new policy, but rather a "renewed focus" to comply with existing policies. Plaintiffs counter that the evidence thus far, including declarations from Mr. Cintron and public statements from Postmaster DeJoy and Chief Operating Officer David Williams, show evidence of a change and a meaningful impact on service.

The agency's description of its own change is not determinative; rather, courts may look at facts in the record to determine whether there has been a "meaningful impact on service." *See id.* at 265 (noting that "the Postal Service says[] there is no change in the nature of postal services since [the program] changes nothing and only provides information" but that "[t]estimony indicating the existence of two programs supports plaintiffs' position."). The Commission has likewise held that "the effect of a contemplated program, rather than the Service's specific intent in adopting it, controls" as to whether there has been a "change." Advisory Opinion Docket No. N75-1, at 20. "Therefore, the Service's claim that [a program] is designed to maintain existing overall levels of postal service, and will produce no aggregate change in the service it provided, is not controlling." *Id.* And even proposals described by the Postal Service as a "renewed focus" of "longstanding policy" have previously merited review by the Commission under section 3661. *See* Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1, at 8 (Mar. 10, 2010) (noting that the Postal Service sought an advisory opinion before implementing changes "that may result from a focused, systemwide application of its longstanding discontinuance review process.").

As discussed above, Defendants' attempt to characterize the initiative as a simple continuance of existing policies, rather than a change, is belied by the agency's own pronouncements and substantial evidence in the record. Postmaster DeJoy stated that the Postal Service "must make a number of significant changes," and that he "began those efforts right away." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G. The Stand-Up Talk referred to "transportation changes being implemented immediately (today)." *See* Stand-Up Talk Ex A. A banner put up recently in Oregon read "Do not hold the truck. No more holding trucks" and "All HCR and PBS trips will depart on time, no exception." *See* Tr. Prelim. Inj. Teleconference at 66, Jones v. USPS, No. 20-6516 (S.D.N.Y. Sept. 16, 2020). Guidance by Mr. Cintron effectively sets national transportation policy and narrows the criteria for approving late or extra trips. *See* Email from Robert Cintron to Area Vice Presidents re: Extra Guidance (July 14, 2020) Courtroom Ex. 54-11 (stating that "our focus is to eliminate unplanned extra transportation" and that "trips must depart on time."). The Cintron Guidance was distributed to area executives. *Id.*; Cintron Decl. ¶245. Ruth Goldway, the former Chairwoman of the Commission, noted that, in her opinion, the changes in transportation and overtime policies should have been submitted to the Commission. Goldway Decl. ¶ 35. Ms. Goldway also wrote that "[e]ven if the Postal Service did not know that its changes were likely to impact service standards, it should still have reported to the Commission once it became clear that the changes were preventing the Postal Service from meeting its existing service standards." *Id.* ¶ 36.

The "quantitative determination" demanded by *Buchanan* is also evidenced in the agency's own documents. Mr. DeJoy stated that the Postal Service now had an "ontime dispatch schedule" of "97.3 percent, up from 89.8 percent" and had "reduced extra trips by 71 percent." Internal Memorandum (Aug. 13, 2020) Ex. G. Mr. DeJoy also stated that "[u]nfortunately, this

transformative initiative has had unintended consequences that impacted our overall service levels." *Id.* Evidence shows sharp decreases in mail service across the country beginning in mid-July, after the issuance of the Stand Up Talk and Mr. Cintron's policy guidance. *See* Eastern Area AIM Meeting- Service Update (Aug. 4, 2020) Ex. 6; Service Performance Measurement, PMG Briefing Ex. 11; Pacific Area Performance Briefing; Congressional Briefing (Aug. 31, 2020) Ex. 12; Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit 54-17.

The second *Buchanan* requirement is that "the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered." 508 F.2d at 262-63. Defendants argue that if the new initiatives qualify as a change, then any managerial initiative would have to go through the process. Plaintiffs respond that not all managerial decisions would be implicated by their reading of section 3661(b), but only those that affect the nature of postal services.

The Commission has stated  that in determining whether an initiative involves a change in the nature of postal services "[i]t is the *experience of the individual postal consumer*, the recipient of the complex of services provided by the Postal Service and *the intended beneficiary of the policies* incorporated by § 3661, that must be assayed." Advisory Opinion Docket No. N75-1, at 21. (Emphasis added).

Plaintiffs have shown that individual postal customers have experienced an alteration in the availability of postal services as a result of the changes. *See, e.g.,* Jeffrey Erlbaum Decl. Ex. 24, ECF No. 18-4 (testifying to impact of delays on his business); Clayton Haas Decl. Ex. 27, ECF No. 18-4 (describing how delays have harmed the California Department of Conservation); Beverly Hudson Decl. Ex. 28 (testifying to problems caused by delays for the Pennsylvania Department of General Service and providing a chart of these delays); Linda Jara Decl. Ex. 29,

74

ECF No. 18-4 (describing how delays have impacted her access to medication); Jennifer Jones Decl. Ex. 30, ECF No. 18-4 (describing how USPS delays killed the chickens she ordered through the mail); Gabriella Kejner Decl. Ex. 31 (detailing instances where Delaware residents did not receive essential items provided by the Delaware Department of Health and Social Services in a timely fashion due to postal delays); Kimberly Kirchmeyer Decl. Ex 32 (describing how mail delays have impaired the California Department of Consumer Affair's ability to carry out its mission and have impaired the ability of the agency to process licenses); Steward Knox Decl. Ex. 33, ECF No. 18-4 (describing how delays have impacted receipt of notices that the California Labor and Workforce Development Agency has sent); Clarissa Mager Decl. Ex 34 (describing the public safety risks caused by mailing delays related to the Pennsylvania Criminal Unit of the Office of the General Counsel); Naomi Mayer Decl. Ex. 36, ECF No. 18-4 (testifying that she has been personally impacted by Postal Service delays); Christina Ann Naccarato-OToole Decl. Ex 38 (testifying that she and her family have been harmed by USPS delays); Robert O'Brien Decl. Ex. 39 (describing how recent USPS delays have impaired the ability of the Pennsylvania Department of Labor to timely adjudicate and pay benefits, schedule and hold hearings, and respond to matters in litigation); Jean Pallares Decl. Ex. 41, ECF No. 18-4 (describing how patients who receive prescriptions through the mailing program from the Los Angeles County Department of Health Services have been impacted by delays); Melinda Utal Decl. Ex. 43, ECF No. 18-4 (describing how her business has been impacted by delays); Jill Weber Decl. Ex 44, ECF No. 18-4 (describing changes in her mail delivery); *see also* Sections IV.A.2 and IV.A.3, *supra*.

The third requirement to invoke section 3661(b) is that "the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved." *Buchanan*, 508 F.2d at 263.

In analyzing this requirement, the Commission previously upheld a decision by an ALJ that the change had a nationwide impact "because the breadth of its impact" was "evidenced by its hierarchical dissemination from Postal Service headquarters and its implementation at multiple locations in different areas throughout the country." Advisory Opinion Docket No. N75-1, at 26. The Commission further noted that "[i]f a significant number of postal customers experience the requisite change in service in their local areas, and these local areas cover a 'broad geographical area" then the change is substantially nationwide "regardless of whether the local changes produce an aggregate change in the level of postal services provided by the Postal service." *Id.* at 29. The Commission cautioned that this reasoning "should not be read to imply that this Commission will assert jurisdiction over 'scattered local changes' in postal services which are not the products of an identifiable decision or program of the Postal Service." *Id.* Rather, jurisdiction under section 3661(b) "is predicated upon the assumption that change in the nature of postal services, however widespread or significant, must be the results of a 'determination' of the Postal Services in the form of a discrete managerial decision or program." *Id.* at 29-30.

Where courts have denied relief, it has been on the basis that the postal service changes challenged were limited in geographical area and thus not covered by section 3661(b). *See, e.g., Bradley v. U.S. Postal Serv.*, 554 F.2d 186, 187-88 (5th Cir. 1977) (per curiam) (holding that a change did not "invoke the safeguards of section 3661" because it only affected residents of one county and thus was not "a nationwide change."); *Ludewig v. Wolff*, 492 F. Supp. 1048, 1059 (S.D. Tx. 1980) (holding that "the renumbering of mailboxes in one rural route in Three Rivers, Texas" did not invoke the section 3661 procedures under the "nationwide impact" requirement of the subsection); *Wilson v. U.S. Postal Serv.*, 441 F. Supp. 803, 808 (C.D. Cal. 1977) ("In this instance, the transfer of mail processing functions merely affects the western region of Los Angeles County.

76

That is a far cry from affecting postal services on even a substantially nationwide basis."); *NAACP v. U.S. Postal Serv.*, 398 F. Supp. 562, 564 (N.D. Ga. 1975) (holding that the relocation of the main branch of the Atlanta Postal Service "does not involve a broad geographic region.")

Defendants seem to concede that these changes are occurring at a nationwide level; indeed, they could not plausibly argue otherwise. The changes in this case come from headquarters. *See* Cintron Decl ¶ 245; PowerPoint – AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13; PowerPoint – AVP Meeting (July 7, 2020), Courtroom Ex. 54-14; PowerPoint – AVP Telepresence (July 10, 2020) Courtroom Ex. 54-9; Cintron Dep. 66. The changes have been implemented at postal offices around the country, as shown by declarations from union leaders, *see* Gibson Decl. Ex. 26; Dickey Decl. Ex. 50; Coradi Decl. Ex. 49; Cogan Decl. Ex. 48, led to a Stand Up Talk being distributed around the country from the Southern Area, to a banner being hung in Oregon, and to a PowerPoint apparently being crafted in Northern Ohio and widely distributed. The effects of the centralized changes have been felt by customers in, at least six states and the District of Columbia, as described above and in Section IV, *supra*.

In order to grant a preliminary injunction, the Plaintiffs must show a "reasonable probability" of success on the merits that Defendants were required to seek an advisory opinion from the Commission under section 3661(b) and acted ultra vires by failing to do so. *Reilly*, 858 F.3d at 176; *see also Buchanan*, 375 F. Supp. at 1022 (holding that a court need only find that "most likely" the changes in question are embraced by section 3661(b)). Under any standard of deference, I conclude that the Plaintiffs have made this showing.[42]

---

[42] See Section VIII, *infra*, for a brief discussion on the merits of Count III.

## VI.    Irreparable Harm

To show irreparable harm, "a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Ramsay v. National Board of Medical Examiners*, 968 F.3d 251, 262 (3d Cir. 2020) (citing *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)). Economic loss does not constitute irreparable harm. *Acierno*, 40 F.3d at 653. Moreover, "the injury created by a failure to issue the requested injunction must 'be of a peculiar nature, so that compensation in money cannot atone for it.'" *Id.* Irreparable harm is evaluated according to a "more likely than not" standard. *Reilly*, 858 F.3d at 180.

Here, Plaintiffs have shown previous and ongoing harm being suffered by agencies and individuals as a result of these allegedly illegal changes. *See* Sections IV.A.2 and IV.A.3, *supra*. The harms highlighted are more than economic, and are "of a peculiar nature, so that compensation in money cannot atone" for them. For example, the Deputy Secretary for Administration at the Department of General Services in Pennsylvania attested that the agency has received a number of complaints from suppliers concerning payments that have been mailed and were never received. *See* Hudson Decl. Ex. 28 at 4-5. The Postal Service's delays have inflicted a reputational injury, a fact that operates in favor of a preliminary injunction. *See Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 211 (3d Cir. 2014), *holding modified* by *Reilly*, 858 F.3d at 173 ("Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.") (citing to *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990)); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 378 (3d Cir.1992) (noting that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.").

Plaintiffs must show that it is likely that they will suffer irreparable harm. *See Winter,* 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."). Plaintiffs have made that showing. Multiple agencies have shown that postal delays interfered with their basic ability to administer their programs. *See, e.g.*, Haas Decl. Ex. 27 (testifying to how delays in equipment delivery and delays in hearing notices have harmed the California Department of Conservation); Kejner Decl. Ex. 31 (testifying to how the delays in mail have prevented proper administration of programs by multiple agencies within the Delaware Department of Health and Social Services); Kirchmeyer Decl., Ex. 32 (testifying to how mail delays have harmed the basic functioning and processing of the California Department of Consumer Affairs); Knox Decl. Ex. 33 (testifying to how delays have affected the ability to issue decisions and delays in hearings for agencies within the California Labor and Workforce Development Agency); Mager Decl. Ex. 34 (testifying to public safety risks caused by delays in mailings to and from the Office of the General Counsel in Pennsylvania); O'Brien Decl. Ex. 39 (testifying to how mailing delays for hearing notices and decisions have harmed the Pennsylvania Department of Labor and Industry); Pallares Decl. Ex. 41 (testifying to how the Los Angeles County Department of Health Services has been harmed in its ability administer its prescription mailing program due to mailing delays); Whichard Decl. Ex. 45 (testifying to how mailing delays have harmed the ability of the Office of the Governor for North Carolina to administer various programs).

Given the ongoing reductions in service standards, even after Postmaster DeJoy announced a halt of various changes, *see* Courtroom Exhibit 54-16, Plaintiffs have shown it is more likely than not that they will continue to suffer these harms without a preliminary injunction. *See also* Section IV.A.3, *supra*. This resonates with particular concern as to Election

Mail, because the defendants have testified that Election Mail was delayed during primaries in July and August could be impacted in the future by the operational changes. *See* Glass Dep. 50-51, 65-66, Courtroom Ex 55 (stating that "[t]here was a reduction in our service level. It did take longer for pieces to go from sender to receiver" that included election mail in primary elections conducted in July and August 2020); *see* Tr. Prelim. Inj. Teleconference at 66, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020) (conceding that election mail could be left behind as a result of changes in the transportation policy).

### VII. Balance of Equities and Public Interest.

Having established likelihood of success on the merits and irreparable harm, which the Third Circuit has stated are the most critical, I now turn to the Balance of Equities and the Public Interest. *See Reilly*, 858 F.3d at 179 (describing the first two factors as "critical" and as "gateway factors.") Plaintiffs must show that "the balance of the equities tips in [their] favor, and an injunction is in the public interest." *Winter*, 555 U.S. at 20. Where the Government is a party, the last two factors in the preliminary injunction analysis merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

When assessing the balance of equities, the Third Circuit will consider how the district court "balanc[ed] the parties' relative harms; that is, the potential injury to the plaintiff[ ] without this injunction versus the potential injury to the defendant with it in place." *Ramsay v. National Board of Medical Examiners*, 968 F.3d 251, 263 (3d Cir. 2020). In this matter, the balance of the equities tilts in Plaintiffs' favor. Although the USPS has an interest in efficiency, as discussed above, this interest does not outweigh its responsibility to adhere to the PRA and its responsibilities to the public. The agency has already pledged to halt a number of different policy initiatives until the election, effectively conceding that the public interest requires such action. *See* Statement of

Postmaster General Louis DeJoy (August 18, 2020) Ex. H. Moreover, the purpose of a preliminary injunction is to preserve the relative positions of the parties. *Benisek*, 128 S. Ct. at 1945. Enjoining the enforcement of the July 2020 policies puts the Postal Service in the same posture that it has been in for its recent history. I find that enjoining the imposition of USPS policies would halt disruption in the mail service and preserves the status quo that existed before the policies were implemented. I find that the interest of the public and particularly the risk of irreparable harm tilts the equities in the plaintiffs' favor in this instance. Finally, to the extent that Defendants contend that they are already taking steps to remedy the admitted deficits in the timely delivery of mail, they can hardly be burdened by a court order requiring them to address those deficits.

For the foregoing reasons, I find that Plaintiffs have met their burden and that a preliminary injunction should be entered as to Count I.[43]

## VIII.   Disposition of Count III

Because Plaintiffs' motion for a preliminary injunction with respect to their procedural claims under the PRA will be granted, there is no need to reach Plaintiffs' claims under the Elections Clause and the Electors Clause. I decline to do so under the reasoning articulated by Justice Brandeis in his famed *Ashwander* concurrence:

> The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.

---

[43] Plaintiffs have not moved for relief under Count II, which alleges that the changes implemented by the Postal Service violate sections 101(e), 403(a) and 403(b) of the PRA. Pl. Compl. at ¶ 228-236. As noted in note 29 *supra*, there is a separate jurisdictional basis for these claims. Section 101(e) of the PRA requires that in determining all policies for postal services, the Postal Service "shall give the highest consideration to the requirement for the most expeditious. . . delivery of important letter mail." 39 U.S.C. § 101(e). Section 403(a)  requires  the Postal Service to "develop, plan, promote, and provide adequate and efficient postal services." 39 U.S.C. § 403(a). Section 403(b) requires  the Postal Service to  "maintain an efficient system of collection, sorting, and delivery of the mail nationwide." 39 U.S.C. § 403(b). Much of the same evidence advanced in support of Count I would appear to establish a probability of success on the merits as to Count II.

*Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). *See also Harmon v. Brucker,* 355 U.S. 579, 581 (1958).

Justice Brandeis' principle has been endorsed by the Third Circuit. *See Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 249 n.13 (3d Cir. 2005); *New Jersey Payphone Ass'n, Inc. v. Town of West New York*, 299 F.3d 235, 249 (3d Cir. 2002) (Alito, J., concurring).

Plaintiffs bring claims under the Elections Clause and the Electors Clause seeking to halt what they view as unprecedented executive interference in their election administration. The states fear that the persistent declines in USPS service under Postmaster DeJoy will delay Election Mail, thereby impairing voters' ability to safely participate in a critical election contest. I share Plaintiffs' concern, as USPS service has not rebounded to pre-July levels. But, as Plaintiffs admit, their constitutional arguments are novel and would require me to craft a new constitutional standard in deciding the merits of their claims.

Because equitable relief under Count I also addresses the delays that threaten states' mail-in voting systems, under the prevailing guidance from the Court of Appeals, I will dispose of Plaintiffs' motion for a preliminary injunction on the narrowest possible ground – the procedural violation of the PRA.

## IX. Remedy

The nature of this action necessarily requires a nationwide injunction, for which there is well-settled authority. *See Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932) (holding district court's order "binding upon the respondent, not simply within the District of Massachusetts, but throughout the United States"); *McLendon v. Cont'l Can Co.*, 908 F.2d 1171, 1182 (3d Cir. 1990) (holding "[f]ull relief required a nationwide injunction"). Thus, ordinarily, when a court finds agency regulations to be unlawful under the APA, it vacates those

rules entirely—the scope of the remedy fits the violation. *See, e.g.*, *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 834 (E.D. Pa. 2019), *aff'd sub nom. Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019), *as amended* (July 18, 2019), *cert. granted sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 918, (2020), and *cert. granted sub nom. Trump v. Pennsylvania*, 140 S. Ct. 918 (2020), and *rev'd and remanded sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).[44]

Yet "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). In that exercise, courts must give appropriate consideration to the imperative "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Therefore, in certain circumstances—even in cases involving APA procedures with nationwide effect—it is possible to craft an injunction more limited in scope. *See Baeder v. Heckler*, 768 F.2d 547, 553 (3d Cir. 1985) (holding regulation invalid, but determining district court did not have "the authority to issue an injunction aimed at controlling [Agency's] behavior in every . . . case in the country").

Although the APA is not at issue here, for the purposes of providing complete relief to the Plaintiffs, I find the instant case highly analogous to that in which a federal agency violates procedures mandated by the APA in issuing regulations. As discussed *supra*, the Plaintiffs have suffered a procedural injury by nature of the deprivation of the right to a public hearing per section

---

[44] Although the holding of *Pennsylvania v. Trump* was ultimately reversed on the merits, the district court's decision to issue a nationwide injunction was both affirmed by the Third Circuit in *Pennsylvania v. President United States*, 930 F.3d 543, 575-76 (3d Cir. 2019), and approved in dicta by the Supreme Court in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2412 n.5 (2020). Thus I find it illustrative for this purpose.

3661 of the PRA. This has resulted in numerous concrete harms to the States themselves, including but not limited to the impaired functioning of critical state agencies. There are any number of examples of how continued mail delays outside of Plaintiff states would continue to subject Plaintiff states to those same harms.

Plaintiffs have demonstrated that mail delays both disrupt their ability to administer programs that impact the health and safety of their citizens, and subject them to reputational harms involving contractual partners. For example, Pennsylvania state agencies involved in ongoing business relationships have sent checks to suppliers that are late or never received; meanwhile incoming checks have arrived weeks late.[45] Hudson Decl. at 2, 4. Where contractual partners are out of state, it is difficult to imagine that the proper functioning of state agencies, which rely heavily on the effectiveness of the Postal Service, could be fully restored without nationwide relief. It is similarly challenging to conceive of a way to address ongoing reputational harms that result from out-of-state contractual partners receiving checks late without affording the Plaintiffs nationwide relief.

Plaintiffs' administrative agencies have been disrupted in other meaningful ways, including their ability to ensure the safety of their citizens.[46] An Administrative Officer in the Office of General Counsel in the Criminal Unit in Pennsylvania ("OCG Criminal Unit"), who receives and processes extradition requests from other states, reports mail delays and notes the related safety concerns. Mager Decl. Ex. 34, at ¶ 4-9, ECF 18. She explains that "[i]n most states

---

[45] Beverly Hudson, Deputy Secretary for Administration at Department of General Services ("DGS") explains how delays regarding incoming and outgoing mail are impacting her office, which oversees "processing of in-bound and outgoing mail on behalf of the Commonwealth." Hudson Decl. at ¶ 4.

[46] See, e.g., Penn. Const., art. I, § 2 titled "Political Powers": "All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness."

there is a 90-day deadline for a Governor's Warrant to be issued in an asylum state . . . If the Governor's Warrant is not issued by the 90-day deadline a fugitive can be released from jail regardless of the crimes with which they have been charged."[47] *Id.* at ¶ 6. Thus, if I issue an injunction with regard only to Plaintiff states, the Commonwealth remains exposed to high-level risks because of mail delays beyond its borders.

Moreover, Plaintiffs' administration of the upcoming election has been and will continue to be frustrated as a result of mail delays. For example, Maine's Secretary of State, which is responsible for administering state and federal elections, has had to respond to reports of delays in a host of ways: "encouraging voters to return absentee ballots as soon as possible after they are received," answering "from voters who say that they do not trust the USPS to deliver their mail in absentee ballots on time," working with "municipal officials to secure funding to partially offset the cost of the installation of secure drop boxes," and activating an on-line website "where voters will be able to track their absentee ballot." Dunlop Decl. at ¶¶ 2, 17-20.

By Defendants' own admission, it is reasonable to conclude that Plaintiff states will have to continue to devote time and resources to addressing these problems even if mail delays in their own states are corrected. According to Robert Justin Glass, Director of the Postal Service's Election Mail Operations:

> [T]he Postal Service has to also be aware that we reach a general national audience, especially one where you're gonna have voters that are currently receiving mail in a state that is not the state in which they're gonna be voting. So you have to take into account that somebody could be living or currently be receiving mail in Pennsylvania, but voting for an election, you know, based in the State of Florida, and there could be completely different sets of laws.

---

[47] See Pa.C.S.A. § 9136; 42 Pa. C.S.A. § 9138; *Com. ex re. Knowles v. Lester*, 321 A.2d 637 (Pa. 1974) (affirming grant of writ of habeas corpus on ground that petitioner had been detained for more than 90 days following his arrest without being presented before court as required by Pennsylvania's Uniform Criminal Extradition Act). The Court explained that the 90-day timeline was meant to allow the governor of the state demanding the fugitive's presence to "forward a requisition to the asylum state." *Lester*, 321 A.2d at 639.

Glass Dep. 118:18-24, 119:1-5.

Ultimately it would be highly impractical to craft a remedy specific to the Plaintiff states based on the Postal Service's operating structure. First, the Postal Service's retail and delivery operations are separated into four geographical areas (Atlantic, Southern, Central, and Western Pacific); mail processing operations are divided into two additional areas (Eastern and Western). Powerpoint AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13.[48] That the Postal Service, by its own admission, cannot account for the way communications around late and extra trips have been interpreted in the field and around the country supports the conclusion that the Postal Service's internal operating structure would be a barrier to ensuring that anything but a nationwide injunction could be effectively implemented. Tr. Prelim. Inj. Teleconference at 64-77, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020)..

Three other district courts have issued national injunctions within the past ten days. *Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557 (E.D. Wa. Sep. 17, 2020); *Jones v. U. S. Postal Serv*., No. 20 Civ. 6516 (VM), 2020 WL 5627002 (S.D.N.Y. Sep. 21, 2020); *State of New York v. Trump* (ECF 20-cv-2340) (D.D.C. Sep. 27, 2020). It is therefore particularly important "to ensure that nationwide relief . . . would not improperly interfere with the litigation of similar issues in other judicial districts." *Califano*, 442 U.S. at 702 (1979). Under the comity doctrine, I have attempted to ensure that the remedy here does not directly conflict. Indeed, this preliminary injunction explicitly incorporates the Order entered by agreement of the parties in *Jones. See California v. U.S. Dep't Health & Human Serv.*, 941 F.3d 410, 421 (9th Cir. 2019) ("to our knowledge, no court has adopted the view that an injunction imposed by one district court against a defendant deprives every other federal court of subject matter jurisdiction over a dispute

---

[48] This document was labeled as "confidential."

86

in which a plaintiff seeks similar equitable relief against the same defendant."). Although the issue of election mail was not presented here as fully as it was in *Jones v. U. S. Postal Serv*, a case brought largely by voters, I am fully incorporating Judge Marrero's Order because the problems created by Defendants' changes in operating procedures affect election mail at every stage of the process, both mailings to voters by states and ballots returned to states. It is necessary to include those aspects of Judge Marrero's Order in order to afford complete relief here.

Again, when "agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n*, 145 F.3d at 1409. In considering the alternatives, it is clear that the "ordinary result" must apply under these circumstances. *Id.*; *see Pennsylvania v. President United States*, 930 F.3d at 575 (affirming district court's decision to apply nationwide injunction). In order to afford the Plaintiffs "complete relief," *Califano*, 442 U.S. at 702, a nationwide injunction is needed.

An appropriate Order follows.

           /s/ Gerald Austin McHugh
           United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ET AL. | : |
| | : |
| | : |
| v. | :      CIVIL ACTION NO. 20-4096 |
| | : |
| LOUIS DeJOY | : |
| *IN HIS OFFICIAL CAPACITY AS* | : |
| *UNITED STATES POSTMASTER GENERAL,* | : |
| ET AL. | : |

## ORDER

This 28th day of September, 2020, for the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (ECF No. 18) is **GRANTED IN PART,** as follows:

1. This Court adopts the order entered by the United States District Court for the Southern District of New York in *Jones v. United States Postal Service*, No. 20 Civ. 6516 (S.D.N.Y. Sept. 25, 2020) (Marerro, J.) and makes it an Order of this Court.

2. To the extent that Judge Marerro's Order imposed reporting requirements, in complying with the Order, Defendants shall simultaneously file the same reports with this Court.

3. Defendants shall comply with the "Clarifying Operational Instructions" issued September 21, 2020, Courtroom Exhibit 57, adopted in response to the Order entered by *Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557 (E.D. Wa. Sep. 17, 2020) (Bastian, J.), and not deviate from those instructions except as authorized by Judge Bastian.

4. Additionally, Defendants, and all their respective officers, agents, servants, employees and attorneys, and persons in active concert or participation with them are hereby **ENJOINED** from the following:

   a. continued implementation or enforcement of operational changes announced in July 2020 reflected in the July 10, 2020 "Mandatory Stand-Up Talk: All Employees," and the "PMGs Expectations" PowerPoint unless and until the Postal Service presents such changes to the Postal Regulatory Commission and obtains an advisory opinion after a public hearing is held pursuant to 39 U.S.C. 3661(b) and 39 U.S.C. 3661(c).

   b. continued implementation or enforcement of the Guidelines regarding transportation sent by Robert Cintron to Area Vice Presidents and other agency representatives on

July 11, 2020 and July 14, 2020, unless and until the Postal Service presents such changes to the Postal Regulatory Commission and obtains an advisory opinion after a public hearing is held pursuant to 39 U.S.C. 3661(b) and 39 U.S.C. 3661(c).

c.  continued implementation or enforcement of any and all organizational efforts, initiatives, "operational pivots," new efforts to "better adhere to existing operating plans" or priority shifts with regard to changes in late and extra truck trips and carrier start and stop times that began during the time period of June 15, 2020 until September 16, 2020, unless and until the Postal Service presents such changes to the Postal Regulatory Commission and obtains an advisory opinion after a public hearing is held pursuant to 39 U.S.C. 3661(b) and 39 U.S.C. 3661(c);

d.  continued implementation or enforcement of any and all organizational efforts, initiatives, "operational pivots," or priority shifts with regard to work hours reduction targets, penalty overtime, pre-tour overtime, new manager approval requirements for work hours and overtime, and other overtime requests and approvals that began during the time period of June 15, 2020 until September 16, 2020, unless and until the Postal Service presents such changes to the Postal Regulatory Commission and obtains an advisory opinion after a public hearing is held pursuant to 39 U.S.C. 3661(b) and 39 U.S.C. 3661(c);

5. On October 9, October 16, October 23, and October 30, the Postal Service shall make timely submissions to this Court regarding:

a.  The rate that the Postal Service incurred overtime, starting October 2, 2020, as a percentage of total work hours nationwide and as a percentage of total work hours within the two regional processing operations areas and four retail and delivery operations areas;

b.  The number of late and extra trips taken by Network & Local PVS & HCR, starting October 2, 2020.

                                                          /s/ Gerald Austin McHugh
                                            United States District Judge

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ET AL. | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 20-4096 |
| | : | |
| LOUIS DeJOY *IN HIS OFFICIAL CAPACITY AS UNITED STATES POSTMASTER GENERAL,* ET AL. | : | |

### MEMORANDUM

**McHUGH, J.**                                                              **October 9, 2020**

Defendants have moved for Clarification and/or Reconsideration (ECF 66) of this Court's Order of September 28, 2020, granting in part Plaintiffs' Motion for a Preliminary Injunction (ECF 63). Specifically, Defendants contend that some aspects of the Court's order, notably ¶ 1, ¶ 4b, ¶ 4c, and ¶ 4d, might be interpreted in a way that could spur confusion and lead to an overall degradation in service. *See* Defs. Mot. for Clarification and/or Recons. at 2.

As Defendants requested, a telephonic hearing took place on October 6, 2020, followed by a number of hearings on October 8, 2020 and October 9, 2020, in an attempt to guide and facilitate further discussion by the parties. The parties conferred and were able to reach agreement on some, but not all, issues.

"[S]o long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so." *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973). Moreover, under Federal Rule of Civil Procedure 54(b), "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of

judgment adjudicating all the claims and all the parties' rights and liabilities." Given the fast-approaching November 3, 2020 election and the Postal Service's concern that the immediate implementation of certain provisions of this Court's September 28, 2020 Order might cause unnecessary confusion around Postal Service operations, good cause exists to clarify the way in which those provisions shall be implemented in the immediate future. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (noting that courts "should pay particular regard to the public consequences in employing the extraordinary remedy of the injunction.").

As an initial matter, I note that I have taken care to co-ordinate my orders with the orders entered by other judges. To that end, I have now specifically incorporated two subsequent orders from the Southern District of New York. Conversely, because I have now approved specific instructions for implementation of my order, in order to avoid potential ambiguity or confusion, I am vacating the previous reference to the Eastern District of Washington in paragraph 3 of the September 28, 2020 Order.

The Order of Clarification issued today incorporates most of the language on which the parties have mutually agreed, together with additional language I am persuaded is warranted both to meet Defendants' operational needs and provide specific guidance with respect to compliance with my order.

/s/Gerald Austin McHugh
United States District Judge

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ET AL. | : | |
| | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 20-4096 |
| | : | |
| LOUIS DeJOY | : | |
| *IN HIS OFFICIAL CAPACITY AS* | : | |
| *UNITED STATES POSTMASTER GENERAL,* | : | |
| ET AL. | : | |

### ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY

This 9th day of October, 2020, it is hereby **ORDERED** that Defendants' Motion for

Clarification/Reconsideration, (ECF No. 66) is **GRANTED IN PART,** as follows:

1. The supplemental orders of September 25, 2020 and September 29, 2020, entered by the United States District Court for the Southern District of New York in *Jones v. United States Postal Service*, No. 20 Civ. 6516 (S.D.N.Y. Sept. 29, 2020) are adopted and deemed incorporated within this Court's orders.

2. Paragraph 3 of this Court's Order of September 28, 2020 (ECF No. 63), making reference to the action pending in the Eastern District of Washington is hereby **VACATED** and superseded by the specific provisions of this Order.

3. Paragraph 4 of this Court's order of September 28, 2020 (ECF No. 63) is hereby **CLARIFIED** as follows:

   For the purposes of paragraphs 4b and 4c of this Court's Order, Defendants shall be deemed in compliance if they commit to and enforce the following:

   • Transportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets. While the Postal Service is not required to delay a trip when that delay will cause an overall degradation in service (e.g., a truck should not be delayed to ensure timely delivery of a small amount of mail when doing so would cause a larger amount of mail to be delayed) the Postal Service shall use extra trips to minimize the effect of such delays and to meet service commitments, except when not feasible. Managers shall use their best business judgment to meet service commitments and to not leave mail behind.

- Extra transportation resources are authorized and shall be used to ensure that Election Mail reaches its intended destination in a timely manner. This includes, but is not limited to, extra trips from all points of processing and delivery (e.g., retail units and plants), as necessary to connect Election Mail to its intended destination or the next stage in Postal Service processing. Late and extra trips that would facilitate the on-time delivery of Election Mail are authorized and encouraged—the Postal Service is committed to using such trips to deliver Election Mail on time.

- Extra delivery and collection trips are authorized and shall be used to ensure, to the best of the Postal Service's ability, that completed ballots entered on Election Day reach the appropriate election official by the state's designated deadline. This includes, but is not limited to, early collections the week before Election Day to ensure all collected ballots are processed timely, and delivery of ballots found in collections on Election Day to election boards within states requiring ballots to be returned by a designated time on Election Day.

- The Postal Service shall make all reasonable efforts to ensure that all mail, including Election Mail, committed for a particular day is delivered that day. All requirements regarding carrier start and stop times should be consistent with the Postal Service's handbooks and manuals, all of which predate June 15, 2020.

Defendants will ensure that all USPS employees, via their supervisors and managers, are notified of the provisions of this Order and the Postal Service's commitment to and enforcement of them. To the extent that they conflict, the provisions of this Order shall supersede any prior guidance, including Guidelines regarding transportation sent by Robert Cintron to Area Vice Presidents and other agency representatives on July 11, 2020 and July 14, 2020.

For the purposes of paragraph 4.d., Defendants shall be deemed in compliance with the Order (ECF No. 63) if they commit to and enforce the following:

- The Postal Service will approve overtime, including penalty overtime, for the purpose of meeting service standards and service performance targets.

- Overtime, including penalty overtime, is authorized and shall be used to support all additional resources necessary to ensure that Election Mail is prioritized and delivered on time.

Defendants will ensure that all USPS employees, via their supervisors and managers, are notified of these provisions and the Postal Service's commitment to and enforcement of them. These provisions shall supersede any prior guidance, to the extent they conflict.

4. By October 16, 2020, Defendants shall provide Plaintiffs and this Court with an affidavit detailing their efforts to notify all USPS employees, via their supervisors and managers, of these provisions and the Postal Service's commitment to and enforcement of them.

5. The Court hereby schedules a telephonic status hearing for **December 3, 2020**, at 1:30 p.m. to review the operational effect of Defendants' ongoing implementation of the Court's Order of September 28, 2020 (ECF No. 63).

/s/Gerald Austin McHugh
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW YORK, *et al.*,

            Plaintiffs,

v.

DONALD J. TRUMP, *in his*
*official capacity as President*
*of the United States*, *et al.*,

            Defendants.

No. 20-cv-2340(EGS)

<u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** the Plaintiffs' Motion for Preliminary Injunction is **GRANTED**; and it is further

**ORDERED** that a Preliminary Injunction is hereby entered against Defendants; and it is further

**ORDERED** that pursuant to the Order, Defendants are **HEREBY ENJOINED** from enforcing the Postal Policy Changes; and it is further

**ORDERED** that any request to stay this Order pending appeal will be denied for the reasons stated in the accompanying Memorandum Opinion.

1

```
SO ORDERED.

Signed:    Emmet G. Sullivan
           United States District Judge
           September 27, 2020
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| Plaintiffs, | |
| v. | No. 20-cv-2340(EGS) |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*, | |
| Defendants. | |

MEMORANDUM OPINION

I. Introduction

Plaintiffs, the States of New York, Hawaii, and New Jersey; the City of New York; and the City and County of San Francisco filed this lawsuit against Defendants Donald J. Trump, in his official capacity as President of the United States; Louis DeJoy ("Mr. DeJoy"), in his official capacity as Postmaster General of the United States; and the United States Postal Service ("USPS" or ("Postal Service")) alleging the following claims: (1) *Ultra Vires* Agency Action—Postal Accountability and Enhancement Act; (2) *Ultra Vires* Agency Action—Postal Reorganization Act; and (3) violation of the Elections Clause of the United States Constitution. Plaintiffs seek a preliminary injunction with regard to their Postal Accountability and Enhancement Act claim. Upon consideration of the Plaintiffs' motion, the response, and

1

reply thereto, the applicable law, and the entire record, the Court **GRANTS** Plaintiffs' motion.

## II. Background

### A. Statutory and Regulatory Framework

In the Postal Reorganization Act ("PRA"), Public Law 91-375, 84 Stat. 719 (Aug. 12, 1970), Congress replaced the Post Office Department with the United States Postal Service as "an independent establishment of the executive branch of the Government of the United States, under the direction of a Board of Governors, with the Postmaster General as its chief executive officer." 39 C.F.R. § 1.1. The PRA also created an independent oversight body for the USPS, the Postal Rate Commission. 39 U.S.C. § 501. Congress passed the PRA to "[i]nsulate" the management of the USPS "from partisan politics . . . by having the Postmaster General responsible to the [Postal Rate] Commission, which represents the public interest only, for his conduct of the affairs of the Postal Service." H.R. Rep. No. 91-1104, 3660-61 (1970).

In the Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 et seq.), Congress replaced the Postal Rate Commission with the Postal Regulatory Commission ("PRC" or "Commission") and "strengthened its role." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 340 (D.C. Cir. 2019).

The USPS is responsible for "develop[ing] and promot[ing] adequate and efficient postal services." 39 U.S.C. § 3661(a). "When the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id*. § 3661(b). This provision was enacted in the PRA, and the only change made in the PAEA was to replace the original "Postal Rate Commission" with the "Postal Regulatory Commission."

Following the submission of a proposal, "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." 39 U.S.C. § 3661(c).

3

B. **Factual Background**

1. **The COVID-19 Pandemic**

Plaintiffs assert that the COVID-19 pandemic has increased reliance on mail delivered by the USPS. *See* Mem. Supp. Mot. Prelim. Inj. ("Mot."), ECF No. 12-1 at 8.[1] According to Plaintiffs, '"[b]ecause COVID-19 is 'primarily spread through person-to-person contact,' Ku[2] Decl.[, ECF No. 12-13] ¶ 13, state and local governments, including Plaintiffs here, have undertaken serious efforts to minimize in-person gatherings." *Id.* Plaintiffs further state that "some . . . have transformed their plans for the November 2020 election to facilitate voting by mail." *Id.* (citing Adinaro[3] Decl., ECF No. 12-4 ¶ 9; Kellner[4] Decl., ECF No. 12-12 ¶¶ 16–17; Ku Decl., ECF No. 12-13 ¶¶ 8–10; P.L. 2020, ch.72 (N.J. August 28, 2020) (providing that New Jersey's November General Election is to be conducted primarily by vote-by-mail in part to reduce the risk of community spread of COVID-19 at polling locations)). Those Plaintiffs that have

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

[2] Leighton Ku is a Professor of Public Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University.

[3] David Adinaro is the Deputy Commissioner for Public Health Services for the New Jersey Department of Health.

[4] Douglas Kellner is the Co-Chair of the New York State Board of Elections.

"mail-based election systems" in place "seek to preserve [them] during a pandemic." *Id.* (citing Henricks[5] Decl. ¶ 3, ECF No. 12-9; Kaohu[6] Decl., ECF No. 12-11 ¶ 3; Takahashi[7] Decl., ECF No. 12-19 ¶ 3.) Plaintiffs state they "have also expended time, money, and resources to educate the public about social distancing, *see* Adinaro Decl., ECF No. 12-4 ¶ 8, and to continue to meet their legal obligations to their residents and to administer public benefits programs by increased reliance on U.S. mail, Banks[8] Decl., ECF No. 12-5 ¶¶ 4-7, 11, 14; Newton[9] Decl., ECF No. 12-15 ¶ 9." *Id.*

### 2. USPS Postal Policy Changes

In June and July 2020, the USPS announced and implemented four changes (collectively, "Postal Policy Changes") to how it collects, processes and delivers mail. First, on June 17, 2020, the USPS announced that it would be removing 671 high-speed sorting machines nationwide "over the next several months." Pls.' Ex. 17, ECF No. 12-20 at 2-4.

Second, on July 10, 2020, the USPS announced an "operational pivot" to make "immediate, lasting, and impactful

---

[5] Jon Henricks is the County Clerk for the County of Hawaii.
[6] Kathy Kaohu is the County Clerk for the County of Maui.
[7] Glen Takahashi is the City Clerk for the City and County of Honolulu.
[8] Steven Banks is the Commissioner of the New York City Department of Social Services.
[9] Jack Newton is the Director of the Public Benefits Unit as Bronx Legal Services.

changes in our operations and culture." Pls.' Ex. 21, ECF No. 12-24 at 2. These changes included prohibiting "late trips" and "extra trips." *Id.* "[I]t has long been typical for postal drivers to depart for post offices or delivery points a short period *after* the prescribed time if needed to ensure that all the mail for that truck would be loaded before departure." Coradi[10] Decl., ECF No. 12-34 ¶ 13. "Extra" trips are non-scheduled delivery trips, which ensure that the agency can maintain the necessary flexibility to timely deliver mail to 160 million addresses for six days a week, *id.* ¶¶ 5, 14; and have long allowed the agency to account for daily fluctuations in mail volume, processing malfunctions or errors, and other disruptions, *id.* ¶¶ 13-4. Late trips and extra trips "are needed adjustments to adequately administer a system responsible for delivering over 470 million pieces of mail per day. They are features of the postal system, not bugs." *Id.* ¶ 14.

The USPS knew that prohibiting these trips would result in delayed mail delivery: "One aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or mail on the workroom floor or docks (in P&DCs), which

---

[10] Peter Coradi has been the National Business Agent "A" for the Clerk Division, New York Region of the American Postal Workers Union since November 2001. Clerks in the Clerk Division are responsible for, among other things, mail processing, bulk mail entry, retail windows, and call centers.

is not typical." Pls.' Ex. 21, ECF No. 12-24 at 2. By August 13, 2020, the USPS had reduced the number of late trips by 71 percent. Pls.' Ex. 19, ECF No. 12-22 at 2. Defendants have clarified that late or extra trips are not "banned"; however, they acknowledge that they continue "at a reduced level." Suppl. Cintron Decl., ECF No. 39-1 ¶ 4. On September 21, 2020, USPS also issued "Operational Instructions" providing that "transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments." *See* Ex. 1 to Notice Suppl. Material, ECF No. 50-1 at 4.

Third, the USPS announced another "initiative" that prohibited mail carriers in certain cities from spending time in the morning sorting mail so they could "leave for the street earlier." Pls.' Ex. 22, ECF No. 12-25 at 2. This meant that carriers were being ordered to not deliver mail that had arrived overnight, but rather sort it in the afternoon, meaning that it would not be delivered until the next day. *Id*. On August 24, 2020, Mr. DeJoy testified that he stopped this pilot project. *See* House Oversight and Reform Committee Hearing Tr. ("House Committee Hearing"), Aug. 24, 2020, Defs.' Ex. 14, ECF No. 30-3 at 449.

Fourth, on or around July 29, 2020, the USPS General Counsel informed 46 states and the District of Columbia that if the states did not pay First Class postage on ballots sent to voters, there would be a risk that voters would not receive their ballots in time to return them by mail. *See* U.S. Postal Service letters to states, Wash. Post (Aug. 17, 2020), https://context-cdn.washingtonpost.com/notes/prod/default/documents/d1b752f9-f8c9-4c18-b548-4eb9668c672a/note/36253644-7029-4dd3-bd1c-f824054400c2.[11] This was a change to the USPS policy of treating election mail and political mail mailed as marketing mail on an expedited First-Class basis. Pls.' Ex. 30, 12-33 at 12.

It is undisputed that the USPS did not seek an advisory opinion pursuant to Section 3661(b) from the PRC prior to implementing these changes.

### 3. USPS Postal Policy Changes Have Led to Nationwide Delays and Continue to Have a Nationwide Impact

USPS records indicate that nationally, on-time delivery of First-Class Mail began to decline in late June 2020, going from roughly 90 to 94 percent prior to the implementation of the Postal Policy changes to 82 percent in early August. Pls.' Ex. 28, ECF No. 12-31 at 11. In the August 13, 2020 email to all

---

[11] The Court takes judicial notice of the letters from the USPS to 46 states and the District of Columbia. Fed. R. Evid. 201(b)(2).

USPS employees, Mr. DeJoy acknowledged that "this transformative initiative has had unintended consequences that impacted our overall service levels." Pls.' Ex. 19, ECF No. 12-22 at 2; *see also* House Committee Hearing, Defs.' Ex. 14, ECF No. 30-3 at 455 (Mr. DeJoy testifying that mitigating late trips and extra trips "was not expected to have the impact it had for the duration of the period that it had").

On August 18, 2020, Mr. DeJoy issued a statement that the USPS would be suspending "some longstanding operational initiatives—efforts that predate my arrival at the Postal Service—that have been raised as areas of concern as the nation prepares to hold an election in the midst of a devastating pandemic." Pls.' Ex. 20, ECF No. 12-23 at 2. Specifically, Mr. DeJoy stated that: (1) "[r]etail hours at Post Offices will not change"; (2) "[m]ail processing equipment and blue collection boxes will remain where they are"; (3) "[n]o mail processing facilities will be closed"; (4) "overtime has, and will continue to be, approved as needed." *Id*.; *see also* House Committee Hearing, ECF No. 30-3 at 484 (Mr. DeJoy testifying that he halted the pilot program, the removal of collection boxes, reducing hours at postal retail centers, and the removal of flat and mail sorting machines).

Except for "mail processing equipment," the suspension did not apply to the rest of the Postal Policy Changes at issue

9

here. *See also* Senate Homeland Security and Government Affairs Committee Hearing ("Senate Committee Hearing"), Aug. 21, 2020, Defs.' Ex. 5, ECF No. 30-2 at 107 (Mr. DeJoy stating that the policy of mitigating extra trips would not be suspended); *id.* at 108 (Mr. DeJoy stating that none of the mail processors that had been removed would be brought back).

With regard to election mail, Mr. DeJoy testified before the Senate Committee that states would not have to use First-Class Mail for election mail. *Id.* at 110. However, in his testimony before the House Committee, he testified that states and election boards should follow the recommendation in letters from the USPS General Counsel to the states and the District of Columbia that election officials use First-Class Mail to mail ballots to voters. House Committee Hearing, Defs.' Ex. 14, ECF No. 30-3 at 433; see also *id.* at 394 (Mr. DeJoy testifying that the USPS "will try to fulfill" "objectives" for "normal processing procedures plus enhanced procedures" to ensure the ballots get delivered in time).

USPS records indicate that nationally, on-time delivery of First-Class Mail as of August 22, 2020 was slightly above 85 percent. Pls.' Ex. 28, ECF No. 12-31 at 11.

**B.  Procedural Background**

Plaintiffs filed this lawsuit on August 25, 2020. On September 2, 2020, they filed a motion for a preliminary

10

injunction, which requests that the Court enjoin the defendants from enforcing the Postal Policy Changes. *See* Mot., ECF No. 12-1. The defendants filed their opposition on September 11, 2020. *See* Defs.' Opp'n Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 30. The Plaintiffs filed their reply brief on September 16, 2020. *See* Pls.' Reply ("Reply"), ECF No. 40. The motion is ripe for the Court's consideration.

## III. Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,*

11

451 U.S. 390, 395 (1981). In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council,* 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC,* 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley,* 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.") (quotation marks omitted). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz,* 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

**IV.  Analysis**

Plaintiffs argue that they are likely to succeed on the merits of their Section 3661 claim because the USPS "failed to submit the Postal Policy Changes to the Postal Regulatory Commission in advance for an advisory opinion as required under

12

39 U.S.C. § 3661(b) (and the Commission's rules), despite their significant effect on postal service nationwide," Mot., ECF No. 12-1 at 16; and that this Court has the authority to review the Postal Policy changes as *ultra vires* agency action, *id*.

Defendants respond that Plaintiffs lack Article III standing, that district courts lack subject matter jurisdiction over Section 3661 claims, and that Plaintiffs' claim does not satisfy the requirements for *ultra vires* review. Defs.' Opp'n, ECF No. 30 at 32, 35, 39.

### A. Plaintiffs Are Likely To Succeed On The Merits Of Their 39 U.S.C. § 3661(b) Claim

#### 1. Plaintiffs Likely Have Standing To Bring This Challenge

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "Standing to seek . . . forward-looking injunctive relief requires [Plaintiff] to show [that it] is suffering an ongoing injury or faces immediate injury. For a future injury, that means submitting evidence showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Preservation Office v. FERC*, 949 F.3d 8,

13

13 (D.C. Cir. 2020) (internal quotation marks, citations, and alterations in original omitted).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

Defendants contend that Plaintiffs lack standing for two reasons.[12] First, they cannot show a causal connection because they have "produce[d] no evidence that any delay in mail delivery will come from the reduction in capacity of mail processing machines," noting that the "mail processing machines are still only being utilized at a sixty-five percent rate . . . which means that there is ample extra capacity." Defs.' Opp'n, ECF No. 30 at 33. However, Plaintiffs have provided evidence that the elimination of the machines has and will continue to

---

[12] Defendants also argue that plaintiffs lack standing because they allege an injury by the "expedited to Street/Afternoon Sortation" initiative, which has been suspended. Defs. Opp'n, ECF No. 30 at 26. Plaintiffs respond—and the Court agrees—that defendants "may not defeat [p]laintiffs' standing by voluntarily suspending just one of several offending policies, especially where there is no prohibition on that policy's resumption." Reply, ECF No. 40 at 13.

14

cause delayed mail. *See* Coradi Decl., ECF No. 12-31 ¶ 9
("[E]mployees report astonishing amounts of delayed mail in
facilities that I have visited multiple times . . . I have never
heard anything like it in my 36 years serving the U.S. Postal
Service and its employees."); *id.* ¶ 16 ("With fewer sorting
machines for letter mail and flat mail, Postal employees must
adapt the remaining machines to accommodate more volume or sort
letter and flat mail manually.").

Second, Defendants concede that the policy change regarding
extra and late trips resulted in delayed mail in the past, but
argue that "Plaintiffs cannot show that USPS's activities are
harming Plaintiffs *now and in the future*," stating that "while
there 'was a temporary decline in meeting service standards' in
mid-July" that decline was addressed and "'service performance
is rapidly returning to early July levels.'" Defs.' Opp'n, ECF
No. 30 at 33. Defendants also argue that Plaintiffs' complaint
about election mail delays are entirely speculative, noting "the
enormous efforts that USPS has put into place (and will continue
or supplement through the Election) to ensure that ballots are
timely delivered." *Id.* at 34. Defendants also argue that
Plaintiffs have not established that the decline was due to
reducing unnecessary trips rather than staffing shortages due to
COVID-19. *Id.* at 34.

15

However, Plaintiffs have provided evidence that reducing extra or late trips will necessarily cause delays in the delivery of mail. *See* Grimmer[13] Decl., ECF No. 40-3 ¶ 10 (decrease in the number of extra or late trips will delay the delivery of letters); Goldway[14] Decl., ECF No. 40-5 ¶ 31 ("It is my opinion, based on my two decades of experience reviewing Postal Service operations, that eliminating local flexibility and requiring rigid adherence to transportation scheduled would negatively impact service performance."). Moreover, Plaintiffs have provided proof that delays, both locally and nationally, have continued. *See* Failure to Deliver, U.S. Senate Committee on Homeland Security and Governmental Affairs, Minority Staff Report, ECF No. 40-9 at 3 (finding that nationwide during the second week of August, "85 million more deliveries were late in a single week compared to what the late deliveries would have been that week under on-time delivery rates before the changes"); *id.* (finding that "[s]ome parts of the country saw on-time delivery drop by 15-20 percentage points in the weeks following Mr. DeJoy's July 2020 changes"). USPS's own data shows

---

[13] Justin Grimmer, a Professor of Political Science at Stanford University, made a preliminary assessment of the impact of the policy change limiting the number of extra and late trips based on the USPS August 31, 2020 powerpoint.
[14] Ruth Goldway served on the U.S. Postal Regulatory Commission from 1998 to 2015, having been appointed and reappointed by Presidents Clinton, George W. Bush, and Obama.

declines in on-time delivery of First-Class Mail continuing into August. Ex. 37, ECF No. 40-8. Moreover, in an August 13, 2020 email to all USPS employees, Mr. DeJoy acknowledged that "this transformative initiative has had unintended consequences that impacted our overall service levels." Pls.' Ex. 19, ECF No. 12-22 at 2. Finally, Plaintiffs have rebutted Defendants' argument that the decline was due to reducing unnecessary trips rather than staffing shortages due to COVID-19 by pointing out that the sharp decline in on-time deliveries occurred in July and August 2020, months after COVID-19 infections began to spike in the United States in March 2020. Reply, ECF No. 40 at 11.

Accordingly, Plaintiffs have shown that there is a substantial likelihood that the on-going non-speculative harms they allege caused by mail delays are "fairly traceable" to the Postal Policy Changes. *Lujan*, 504 U.S. at 560.

### 2. This Court Likely Has Subject Matter Jurisdiction Over The Section 3661 Claim

Defendants contend that this Court lacks subject matter jurisdiction over "complaints regarding" Section 3661 because such complaints must first be made to the PRC and then appealed to the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"). Defs.' Opp'n, ECF No. 30 at 35. The statutory scheme provides as follows. 39 U.S.C. § 409(a) provides that "[e]xcept as otherwise provided in this title, the

17

United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." One of the exceptions to this original jurisdiction is 39 U.S.C. § 3662, which provides that "[a]ny interested person . . . who believe[s] the Postal Service is not operating in conformance with the requirements of a provision of . . . this chapter (or regulations promulgated under any of these provisions) may lodge a complaint with the Postal Regulatory Commission . . . ." Section 3662(b) requires the PRC to respond to the complaint within 90 days and that if a complaint is not timely responded to, a petition for review may be filed with the D.C. Circuit, which also has jurisdiction to review final orders or decisions of the PRC.

Plaintiffs' complaint alleges a procedural violation—that USPS failed to comply with the requirement that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory commission requesting an advisory opinion on the change." 39 U.S.C. § 3661. Section 3661(c) requires that the opinion shall not be issued until there is opportunity for notice and comment under applicable provisions of the Administrative Procedure Act.

18

Defendants contend that "[c]ourts have repeatedly held that
19 U.S.C. §§ 3662 and 3663 constitute the exclusive
jurisdictional remedy for complaints about postal services that
fall within the statutory provisions specifically identified in
section 3662." Defs.' Opp'n, ECF No. 30 at 36. However,
Defendants have provided no mandatory authority to support their
assertion that Sections 3662 and 3663 constitute the exclusive
jurisdictional remedy for a claim that the USPS has failed to
comply with the procedural requirements of Section 3661.

"Whether a statute is intended to preclude initial judicial
review is determined by the statute's language, structure, and
purpose, its legislative history, and whether the claims can be
afforded meaningful review." *Thunder Basin Coal Co. v. Reich*,
510 U.S. 200, 307 (1994) (internal citation omitted). The
language of the statute is broad:  "[a]ny interested person . .
. who believe[s] the Postal Service is not operating in
conformance with the requirements of a provision of  . . . this
chapter (or regulations promulgated under any of these
provisions) may lodge a complaint with the Postal Regulatory
Commission . . . ." 39 U.S.C. § 3662. This could certainly be
read to mean that the failure of the USPS to comply with the
procedural requirement set for in Section 3661 would be
encompassed by Section 3662. Plaintiff argues that the use of
the permissive "may" in Section 3662 coupled with the mandatory

19

phrasing "shall" in Section 3662(c) shows Congress did not intend to limit jurisdiction over Section 3661 claims. Reply, ECF No. 40 at 14. The statute consistently uses the word "may" when setting forth the procedure for filing complaints and for seeking appellate review of the PRC's determination (or failure to make a determination): any interested person "may" lodge a complaint with the PRC, and if the interested person is unsatisfied with the response or does not receive a timely response, they "may" file a petition with the D.C. Circuit. 39 U.S.C. §§ 3662(a), 3663. The use of the permissive "may" coupled with the use of the mandatory "shall" suggests that Sections 3662(a) and 3663 were not intended to be the exclusive avenue for bringing a procedural challenge to the USPS's failure to comply with Section 3661. *See Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1828 (D.C. Cir. 1973) ("[T]he permissive interpretation is conclusively proven to be correct [together with the particular legislative history] by the fact that when in the same statute Congress intended a mandatory direction it used the auxiliary 'shall' not 'may'-a contrast which is generally significant . . . ."). This interpretation is strengthened because the statute expressly provides that this Court has original jurisdiction "over all actions brought by or against the Postal Service" unless "otherwise provided in [title 39]." 39 U.S.C. § 409(a).

20

The availability of judicial review for the USPS's failure to comply with the procedural requirements in Section 3661 is consistent with the legislative history of the PRA. In the discussion of the section of the PRA that established the "procedures for changes in postal service," the House Committee Report states the "[t]he postal service is—first, last, and always—a public service" and that the PRA "require[s] [Postal Services management] to seek out the needs and desires of its present and potential customers—the American public." H.R. Rep. No. 91-1104 at 3668. The Committee Report describes provisions in the act that "contain[] specific provisions requiring justification and review of changes in service." *Id.; see also Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 263 n.6 (5th Cir. 1975) ("[T]he procedures mandated by [Section] 3661 are sufficiently elaborate to amount to a significant impediment in the path of the decision-making process of the Postal Service.").

The Court must also consider whether the claim may be reviewed because there is no other meaningful or adequate avenue for judicial review. *See Thunder Basin Coal Co.*, 510 U.S. at 307. District court jurisdiction may not be implicitly precluded based on consideration of the following factors: (1) if "'a finding of preclusion could foreclose all meaningful judicial review'"; (2) if the claim is "'wholly collateral to a statute's

21

review provisions'"; and (3) if the claims are "'outside the
agency's expertise'" to discern "whether the particular claims
at issue fall outside an overarching congressional design."[15]
*Jaresky v. SEC*, 803 F.3d 9, 17 (D.D.C. 2015) (quoting *Free
Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489-
90 (2010). Mindful of the fact that the 90-day window for the
PRC to respond to a complaint brought pursuant to Section 3661,
Defendants contend that it does not matter that the PRC cannot
provide immediate relief because eventual relief is sufficient
as a matter of law. Defs.' Opp'n, ECF No. 30 at 39 n.11.
However, the authority upon which Defendants rely, *American
Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d
748 (D.D.C. 2019), is inapposite. There, the court held that
meaningful judicial review was not foreclosed because Plaintiffs
were unable to obtain "'pre-implementation' review of executive
orders or immediate relief barring all agencies from
implementing the executive orders,'" *id*. at 755-56, because
there the parties agreed to consolidate their preliminary
injunction requests with the merits, *see* Scheduling Order, Civil
Action No. 18-1261, ECF No. 16 at 1.

With regard to the first consideration—whether Plaintiffs
would be denied meaningful review—it is clear that they would.

---

[15] Defendants' assertion that the three factors must be met is
incorrect. *See* Jaresky v. SEC, 803 F.3d at 17.

Plaintiffs have shown that the USPS implemented dramatic
operational changes that have resulted in delayed mail that
"have negatively affected and will continue to negatively affect
Plaintiffs' ability not only to provide necessary services to
residents in need and administer their own laws and regulations,
but also to protect public health by providing safe and
effective means to vote by mail in the upcoming general
election." Reply, ECF No. 40 at 16. Accordingly, even if there
was a "fairly discernible" intent in the statutory scheme to
preclude district court jurisdiction, requiring Plaintiffs to go
through the PRC process would deny them meaningful review. *See
Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th
Cir. 2018) (noting that "plaintiffs are denied meaningful review
when they are subject to some additional and irremediable harm
beyond the burdens associated with the dispute resolution
process") (internal quotation marks and citations omitted));
*Krescholleck v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir.
1996) (noting that the plaintiff had "alleged a sufficiently
serious irreparable injury to lead us to conclude that the
administrative review process is insufficient to afford him full
relief"). And persuasive authority holds that this factor is the
"most important." *Berkley*, 896 F.3d at 630. Accordingly, this
first factor weighs in favor of finding Congress intended
district courts to have jurisdiction over claims such as this

23

one brought by Plaintiffs. The second consideration—whether the claim is wholly collateral to the statutory scheme—is "'related' to whether 'meaningful judicial review' is available, and the two considerations are analyzed together." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 758 (D.C. Cir. 2019) (quoting *Jarskey*, 803 F.3d at 22). The question to ask is "whether the plaintiffs 'aimed to obtain the same relief they could seek in the agency proceeding.'" *Id.* at 758-60 (quoting *Jarskey*, 803 F.3d at 23). Here, the relief Plaintiffs seek cannot be meaningfully redressed through filing a Section 3662 complaint.

The third consideration is whether the claim is "beyond the expertise" of the PRC. Plaintiffs' procedural claim does not require the "agency expertise" the statutory procedures contemplate. *Berkley*, 896 F.3d at 630. Accordingly, precluding district court jurisdiction here would completely deny plaintiff meaningful review given the timing of the implementation of the Postal Policy Changes.

### 3. Plaintiffs' Section 3661(b) Claim Is Likely Reviewable Pursuant To The *Ultra Vires* Doctrine

While as a general matter "the Postal Service is exempt from review under the Administrative Procedure Act, . . . its actions are reviewable to determine whether it has acted in excess of its statutory authority." *N. Air Cargo v. U.S. Postal*

24

*Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012). "The scope of Non-APA review is narrow . . . [and] is available only to determine whether the agency has acted *ultra vires*—that is whether it has exceeded its statutory authority." *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016) (quotation marks and citations omitted).

Defendants contend that *ultra vires* review is unavailable because: (1) Plaintiffs cannot show that USPS acted "in excess of its delegated powers and contrary to a specific prohibition" because they cannot show that USPS violated Section 3661(b); and (2) Plaintiffs have a "meaningful and adequate means of vindicating [their] statutory rights" because they can file a complaint with the PRC pursuant to Section 3662. Defs.' Opp'n, ECF No. 30 at 40 (citing *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1258 (D.C. Cir. 2006) (internal quotation marks and citations omitted)).

The Court is persuaded that Plaintiffs claim is reviewable:

> "Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction." *Griffith v. FLRA,* 842 F.2d 487, 492 (D.C. Cir. 1988) (citing the leading case, *Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 183-84, 3 L.Ed.2d 210 (1958) (finding judicial review proper despite statutory preclusion of judicial review, where the NLRB acted "in excess of its delegated

25

powers and contrary to a specific prohibition"
in the NLRA)).

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 116,
1172-73 (D.C. Cir. 2003). Plaintiffs claim here is that the USPS
failed to comply with the requirement Congress set forth in
Section 3661. Accordingly, Plaintiffs' claims "clearly admit of
judicial review." *Id*. at 1173.

### 4. USPS Likely Failed To Comply With Section 3661(b)

The scope of non-APA review includes, among other things,
"a straightforward question of statutory interpretation." *Nat'l
Ass'n of Postal Sup'rs v. U.S. Postal Serv.*, 602 F.2d 420, 432
(D.C. Cir. 1979). In conducting this review, "[t]he judicial
role is to determine the extent of the agency's delegated
authority and then determine whether the agency has acted within
that authority. In this as in other settings, courts owe a
measure of deference to the agency's own construction of its
organic statute, but the ultimate responsibility for determining
the bounds of administrative discretion is judicial." *Id*. at
432-33 (internal citations omitted).

Section 3661(b) provides that "[w]hen the Postal Service
determines that there should be a change in the nature of postal
services which will generally affect service on a nationwide or
substantially nationwide basis, it shall submit a proposal,
within a reasonable time prior to the effective date of such

proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."

Persuasive authority has construed Section 3661(b) as follows:

> The language of the statute . . . indicates that three factors must coexist before 3661 applies. First, there must be a 'change.' This implies that a quantitative determination is necessary. There must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661. Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered. Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved. These three factors combine to demonstrate that Congress intended the safeguards of 3661 to apply only when changes of significance were contemplated.

*Buchanan*, 508 F.2d at 263.

There is no dispute that the USPS did not comply with Section 3661(b) prior to implementing the Postal Policy Changes at issue in this case. Defendants argue that the Postal Policy Changes do not implicate Section 3661(b) because: (1) there has been no "meaningful impact on service;" (2) postal services available to the user have not been altered; and (3) the changes have not affected service in a broad geographical area. Defs.' Opp'n, ECF No. 30 at 42 (quoting and citing *Buchanan* 508 F.2d at 263). In support, Defendants argue that sorting machines are

27

being removed pursuant to a long-existing policy; not a change,
noting that the USPS is in Phase 6 of this initiative. *Id*.
Second, there is no change with regard to election mail because
it is being treated the same as it has in the past. *Id*. at 43.
Third, the ESAS pilot program, which has been suspended, was not
national in scope. *Id*. Fourth, USPS has not prohibited extra or
late trips, but rather has "renewed its emphasis on adhering to
its published schedule." *Id*. Defendants conclude that this
latter change is "precisely the type of management direction to
which [S]ection 3661 does not apply." *Id*. Finally, Defendants
contend that pursuant to past practice, the types of "nationwide
changes that trigger [Section] 3661's review are general changes
to postal facility hours or service standards for mail
delivery." *Id*. at 44.

The Court is persuaded that Plaintiffs are likely to
succeed on their claim that Defendants violated Section 3661(b)
by failing to submit the new transportation policy to the PRC.
First, the new transportation policy was a "change" because it
has had a "meaningful impact on service." *Buchanan*, 508 F.2d at
263. Plaintiffs have provided evidence showing that the
reduction in extra and late trips has had a meaningful impact on
service because it has resulted in nationwide delays. *See supra*
at 7-8. Second, Plaintiffs have demonstrated that the reduction
in sorting machines was dramatically accelerated beginning in

28

January 2020 as compared with the prior fiscal year. DeChambeau[16] Decl., ECF No. 30-2 ¶ 21. Specifically, while 101 machines were removed in FY 2019, 711 machines were removed in FY 2020 as of August 18, 2020, resulting in a nearly 15 percent reduction in capacity. *Id.* Defendants have provided no explanation for the sudden acceleration of the removal of the sorting machines.

Plaintiffs have also demonstrated that the combination of the reduction of late trips, extra trips and reduced sorting capacity puts the timely delivery of election mail at risk. Coradi Decl., ECF No. 12-34 ¶ 17 ("If postal employees are not able to make the necessary daily adjustments via late trips, extra trips, and the full fleet of sorting machines for the 2020 election season, I am deeply concerned about whether the U.S. Postal Service will be able to deliver election mail as quickly as it has in the past. Since I began as a letter carrier in 1984, it has been standard practice to treat election mail as First Class mail with delivery times of one to three days—or better—regardless of whether it was marked as Marketing Mail, which has a delivery time of three to 10 days."); *id.* ¶ 18 ("Given the recent U.S. Postal Service policy changes which have reduced sorting capacity and limitations on late trips and extra trips, I fear that the dedicated employees of the U.S. Postal

---

[16] Jason Chambeau is the Headquarter Director of Processing Operations for the United States Postal Service.

29

Service will be prevented from making the necessary adjustment to accommodate potential influxes of election mail. Election mail includes ballots, voter registration cards, absentee voting applications, and poling place notifications. If delivery is being significantly delated in August, which, in my experience is when mail volume it typically lower, the risk of even more dramatic delays beginning in the fall is high.").

Plaintiffs have also demonstrated that Defendants' position in this litigation that the Postal Policy Changes are not "changes" is not supported based on USPS's own statements. *See* Email from Mr. DeJoy to All Employees, August 13, 2020, ECF No. 12-22 at 2 ("In order to transform . . . we must make a significant number of changes that will not be easy . . . ."); *id*. ("Unfortunately, this transformative initiative has had unintended consequences that impacted our overall service levels. However, recent changes are not the only contributing factors."); *id*. at 3 ("I ask that you bear with me while we work through these changes to transform for the better . . . .").

Second, the change was "in the nature of postal services," 39 U.S.C. § 3661(b), because it qualitatively altered "the manner in which postal services [are] available to the user," *Buchanan*, 508 F.2d at 263. As stated above, Plaintiffs point to evidence showing that the reduction in extra and late trips

30

combined with the reduction in sorting machines resulted in nationwide delays.

Third, the change affected service "on a nationwide or substantially nationwide basis," 39 U.S.C. § 3661(b), because "[a] broad geographical area [was] involved," *Buchanan*, 508 F.2d at 263. Plaintiffs have submitted evidence that the Postal Policy Changes have resulted in delays on a nationwide basis. *See supra* at 16-17.

While it is clear that Congress did not intend for the courts to micromanage the operations of the USPS, requiring the USPS to comply with the statutory requirement that it obtain an advisory opinion from the PRC and provide for notice and comment prior to implementing "a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" is not micro-managing; it is requiring the USPS to act within its statutory authority. Furthermore, Congress clearly intended Section 3661 to require an opportunity for public participation and for independent review before the USPS implements service changes that will have a broad effect. The broad scope of the Postal Policy Changes demonstrates on its face that it is precisely the kind of change that is to be the subject of the public-participation and independent review safeguards provided by Section 3661.

Finally, defendants argue that because Plaintiffs have a "meaningful and adequate means of vindicating their statutory rights" by filing a complaint with the PRC and then seek judicial review in the D.C. Circuit if unsatisfied, they cannot establish *ultra vires* jurisdiction. Defs.' Opp'n, ECF No. 30 at 41. Plaintiffs respond—and the Court agrees as explained above—that they lack a "meaningful and adequate means of vindicating their statutory rights" since "section 3662 would not afford [them] judicial review of an adverse PRC ruling within a timeframe that would allow for the meaningful vindication of their right to notice and opportunity to participate as required under 39 U.S.C. § 3661(b)." Reply, ECF No. 40 at 19.

**B. Plaintiffs Face Irreparable Harm**

"In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted).

32

Plaintiffs argue that the Postal Policy Changes impede their ability to combat the spread of COVID-19 because the failure to timely deliver mail and other reductions in service standards results in more in-person interactions with government officials and adversely affects their "ability to provide safe alternatives to in person voting." Mot., ECF No. 12-1 at 21-22. Defendants counter that Plaintiffs have failed to meet their burden of establishing "that mail delays were necessarily the result of the challenged policies, or that future delays, if there are any, would be the result of" the Postal Policy Changes. Defs.' Opp'n, ECF No. 30 at 46-47. However, the Court has already determined that Plaintiffs have shown that there is a substantial likelihood that the on-going non-speculative harms they allege caused by mail delays are "fairly traceable" to the Postal Policy Changes. *See supra* at 14-17.

Defendants further counter that this alleged harm is to the citizens of the states and that States cannot bring *parens patriae* claims against the federal government, and that even if they could, Plaintiffs' injury is entirely speculative. Defs.' Opp'n, ECF No. 30 at 48-49. However, Plaintiffs have provided evidence that the efforts to mitigate the spread of COVID-19 is aimed at protecting the public health of their respective jurisdictions as a whole. *See* Adinaro Decl. ECF No. 12-4 ¶¶ 7-8 (describing the efforts of the New Jersey Department of Health

33

to mitigate the spread of COVID-19); Ku Decl. (describing the
efforts of New York, New Jersey, and Hawaii to institute
absentee or mail voting to mitigate the spread of COVID-19).
Impeding these mitigation efforts results in harm to government
Plaintiffs as well as the residents of the states. *New York v.
U.S. Dep't of Homeland Sec.*, No. 19 Civ. 7777, 2020 WL 4347264,
at *10 (S.D.N.Y. July 29, 2020) (finding that the state
plaintiffs adequately demonstrated irreparable harm where the
Governmental "Plaintiffs provide[d] ample evidence that the
[challenged conduct] deters immigrants from seeking testing and
treatment for COVID-19, which in turn impedes public efforts in
the Governmental Plaintiffs jurisdictions to stem the spread of
the disease."), *stayed on other grounds*, No. 20-2537, 2020 WL
5495530 (2d Cir. Sept. 11, 2020).

Defendants also argue that Plaintiffs' argument that their
efforts to curb the spread of COVID-19 will be undermined by
mail delays because more residents will opt to vote in person as
speculative. Defs.' Opp'n, ECF No. 30 at 25. At this juncture,
Plaintiffs need only demonstrate the likelihood of an increased
risk of injury. *Winter*, 555 U.S. at 22 ("Our frequently
reiterated standard requires plaintiffs seeking preliminary
relief to demonstrate that irreparable injury is likely in the
absence of an injunction."). Plaintiffs have provided ample
evidence that mail delays are likely to cause more residents to

vote in person which in turn is likely to impede the spread of the virus. *See* Kellner Decl., ECF No. 12-12 ¶ 14 ("Due to [voters not receiving their ballots on time], additional voters went to polling places who would not have otherwise needed to, adding to significant crowds and delays at certain polling sites for in-person voting. Longer wait times at polling sites is of particular concern to election officials as this increases the risk of exposure to COVID-19, thereby threatening the health and safety of voters, voting officials, and the larger community."); Ku Decl., ECF No. 12-13 ¶¶ 17-18 (describing empirical evidence demonstrating that "voting in crowded polling places increases the risk of infection"); *id.* ¶ 12 (describing polls indicating fewer people intend to vote by mail due to concerns about mail delays).

Finally, Defendants argue that all residents need to do is "mail their ballots a reasonable time before the election (which is approximately two months away)." Defs.' Opp'n, ECF No. 30 at 39. However, as Plaintiffs point out, the ability of the residents of New York, Hawaii, and New Jersey to mail their ballots is not entirely within the residents' control since ballots are not mailed to the residents two months before the election.

Plaintiffs' harm is "both certain and great . . . actual and not theoretical" because mail delays are impeding

Plaintiffs' ability to combat the spread of a highly contagious and deadly disease and are impeding their ability to provide safe alternatives to in-person voting. As of September 27, 2020, 204,607 Americans have died from the disease and over seven million people have been infected with it. *See* Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html. Plaintiffs' harm is also "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm" because Election Day is November 3, 2020.

Because Plaintiffs have demonstrated that absent an injunction they will suffer immediate and irreparable harm to their ability to combat the spread of COVID-19 and to provide safe alternatives to in-person voting, the Court need not reach whether Plaintiffs have also demonstrated the Postal Policy Changes have resulted in direct, unrecoverable financial harms nor whether Plaintiffs have demonstrated that the Postal Policy changes disrupt Plaintiffs' administration of federal, state, and local laws and impose additional, unnecessary administrative burdens.

### C. The Balance Of Equities And Public Interest Favor An Injunction

The balance-of-equities factor directs the Court to "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the

36

requested relief.'" *ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.; see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast, the balance of equities may favor a preliminary injunction that serves only "'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Rufer v. FEC*, 64 F. Supp. 3d 195, 205 (D.D.C. 2014) (quoting *Camenisch*, 451 U.S. at 395). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, *University of Tex. V. Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest,' *Winter*, 555 U.S. at 26." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).

Defendants fail to identify any equities in their favor and do not contest the equities in the Plaintiffs' favor. Defendants' only arguments are that they are "undertaking extensive efforts to facilitate the timely delivery of Election Mail," that the two of the four postal policies are not changes— "one has been stopped, and the fourth has been mischaracterized"—and that ensuring compliance with the

37

injunction "could require the Court to act as an overseer of the agency's day-to-day activities." Defs.' Opp'n, ECF No. 30 at 50.

Here, the balance of the equities and the public interest favor an injunction. It is clearly in the public interest to mitigate the spread of COVID-19, to ensure safe alternatives to in-person voting, and to require that the USPS comply with the law. The equities balance in favor of Plaintiffs because the relief sought is a targeted preliminary injunction that prohibits Defendants from continuing to implement the Postal Service Policies with respect to which an advisory opinion from the PRC should have been obtained prior to implementation. Furthermore, the proposed injunction does not contemplate the Court becoming involved in overseeing the day-to-day operations of the USPS.

## V. Conclusion

For the foregoing reasons, the Court **GRANTS** the Plaintiffs' motion for a preliminary injunction. Any request to stay this decision pending appeal will be denied for substantially the same reasons as those articulated in this Opinion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**September 27, 2020**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VOTE FORWARD, et al., | |
|        Plaintiffs, | |
| v. | No. 20-cv-2405(EGS) |
| LOUIS DEJOY, *in his official capacity as the Postmaster General*, et al., | |
|        Defendants. | |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** the Plaintiffs' Motion for Preliminary Injunction is **GRANTED**; and it is further

**ORDERED** that a Preliminary Injunction is hereby entered against Defendants; and it is further

**ORDERED** that pursuant to the Order, Defendants are **HEREBY ENJOINED** from enforcing the Late/Extra Trips Policy; and it is further

**ORDERED** that any request to stay this Order pending appeal will be denied for the reasons stated in the accompanying Memorandum Opinion.

SO ORDERED.

Signed:    Emmet G. Sullivan
           United States District Judge
           September 28, 2020

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VOTE FORWARD; AMY BOLAN; AARON
CARREL; DANTE FLORES-DEMARCHI;
PAUL HUNTER; SEBASTIAN IMMONEN;
KATHRYN    MONTGOMERY;    SEAN
MORRISON; INDERBIR SINGH DATTA;
MARTHA       THOMPSON;      LINDA
ROBERSON;  GARY  YOUNG;  VOCES
UNIDAS     DE    LAS    MONTAÑAS;
COLORADO    ORGANIZATION    FOR
LATINA     OPPORTUNITY      AND
REPRODUCTIVE RIGHTS; PADRES &
JÓVENES UNIDOS;

              Plaintiffs,

v.

LOUIS DEJOY, in his official
capacity   as   the   Postmaster
General; and the UNITED STATES
POSTAL SERVICE,

             Defendants.

Civ. Action No. 20-2405 (EGS)

## MEMORANDUM OPINION

Plaintiffs—eleven voter-eligible individuals and four
organizations dedicated to seeking greater civic engagement in
the November 2020 election—bring this lawsuit against Defendants
Louis DeJoy ("Mr. DeJoy"), in his official capacity as
Postmaster General of the United States, and the United States
Postal Service ("USPS), alleging that a new USPS policy
implemented in July 2020 violates Plaintiffs' constitutional
right to vote and constitutes *ultra vires* agency action. *See*

Pls.' Am. Compl., ECF No. 15.[1] Plaintiffs seek a preliminary injunction with regard to their constitutional claim.

Upon consideration of the Plaintiffs' motion, the response, the reply thereto, the applicable law, and the entire record, the Court **GRANTS** Plaintiffs' motion.

## I. Background

### A. Factual Background

#### 1. The COVID-19 Pandemic

Plaintiffs assert that the COVID-19 pandemic has increased reliance on mail delivered by the USPS. Pls.' Mem. Law Supp. Mot. Prelim. Inj. ("Pls.' Mot."), ECF No. 16-1 at 7. According to Plaintiffs, several states have adjusted their election procedures to allow for all eligible voters to vote by mail-in ballot in the November 2020 election:  43 states and the District of Columbia will permit all eligible voters to vote by mail, and 28 states will require that the ballots be received, rather than postmarked, by Election Day. *Id.* at 7-8 (citing news reports). In total, the adjustments made by many states in response to the COVID-19 pandemic will result in approximately 83% of all eligible voters having the opportunity to vote in this method. *Id.* (citing news reports). It is anticipated that

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

at least 80 million mail-in ballots will be submitted for the
November election. *See* Hersh Decl., ECF No. 16-15 ¶ 14.

### 2. USPS Policy Changes

On July 10, 2020, USPS announced an "operational pivot" to
make "immediate, lasting, and impactful changes in our
operations and culture." Ex. 4 to Pls.' Mot., ECF No. 16-6 at 2.
As most relevant here, the document stated that (1) "[a]ll trips
will depart on time (Network, Plant and Delivery); late trips
are no longer authorized or accepted"; (2) "[e]xtra trips are no
longer authorized or accepted"; (3) "[c]arriers must begin on
time, leave for the street on time, and return on time"; and (4)
"no additional transportation will be authorized to dispatch
mail to the Plant after the intended dispatch" (collectively,
the "Late/Extra Trips Policy"). *Id*. The USPS knew that
prohibiting these trips would result in delayed mail delivery:
"One aspect of these changes that may be difficult for employees
is that—temporarily—we may see mail left behind or mail in the
workroom floor or docks . . . , which is not typical." *Id*.
However, the document noted expectations that "operations will
begin to run more efficiently and that delayed mail volumes will
soon shrink significantly." *Id*. at 3. These changes were also
confirmed in a USPS PowerPoint presentation, which explained
that if "the [USPS processing] plants run late they will keep
the mail for the next day. If [delivery units] get mail late and

3

your carriers are gone and you cannot get the mail out without
[overtime] it will remain for the next day." Ex. 5, ECF No. 16-7
at 5-6. Since the USPS policy took effect, USPS has eliminated
an average of 32,900 extra or late trips per week, Grimmer
Decl., ECF No. 16-11 ¶¶ 10-11, or a 75% drop in the number of
both types of trips, Pls.' Reply, ECF No. 24 at 11.

Due to the policy changes expressly prohibiting late trips
and extra trips, the ability to deliver mail in an efficient
manner can be inhibited at three different points in the
delivery chain. First, mail handlers deliver mail from the local
post office to a USPS processing plant; if the mail arrives at
the post office after the handler has already left for the
processing plant, the mail may wait at the post office until the
next day. Pls.' Mot., ECF No. 16-1 at 12-13. Second, once the
mail arrives at the processing plant, if it is not processed
prior to the mail handler's scheduled departure time from the
plant to the relevant delivery unit, it again may remain at the
plant until the next day. *Id.* at 13. Third, once the letter has
made it to the delivery unit, it still must arrive prior to the
mail carrier's trip to the final intended destination; if it
arrives after the mail carrier has left for her delivery route,
the letter may be delayed one day. *Id.* at 13. Thus, the USPS
policy changes may potentially delay certain mail items for up
to three days more than typical prior to the policy changes.

4

The USPS policy changes stand in contrast with prior practices that allowed postal workers to conduct late trips or extra trips "to delay or supplement their scheduled deliveries to ensure that they have collected and transported all outstanding mail at any given facility." Pls.' Mot., ECF No. 16-1 at 10 (citing Ex. 3 to Pls.' Mot., ECF No. 16-5).

Defendants have clarified that late or extra trips are not "banned"; however, they acknowledge that they continue "at a reduced level." Suppl. Cintron Decl., ECF No. 21-3 ¶ 4. On September 21, 2020, USPS also issued "Operational Instructions" providing that "transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments." *See* Ex. 1 to Notice Suppl. Material, ECF No. 30-1 at 4.

### 3. USPS Postal Policy Changes Have Led To Nationwide Delays And Continue To Have A Nationwide Impact

USPS records indicate that nationally, on-time delivery of First-Class Mail began to decline following implementation of the USPS policy changes. On-time services scores are the "measure of the frequency with which USPS is able to deliver mail in the timeframe defined by its service standards." Pls.' Reply, ECF No. 24 at 11; *see also* Suppl. Grimmer Decl., ECF No.

24-2 ¶¶ 5, 7. During the pre-policy period, from January 4, 2020 to July 4, 2020, the average USPS service score was 91.6% nationally; however, the August 29, 2020 service score was 3.56 percentage points lower than the pre-policy average. Suppl. Grimmer Decl., ECF No. 24-2 ¶ 5; *see also id.* (noting that the August 29 service score was 2.96 percentage points lower than the three-week period prior to the USPS policy implementation). The overall decline in service scores is consistent across all but one region in the United States, though the service scores vary. For example, while the USPS "Capital Metro" area has a service score that has declined 6.3 percentage points since implementation of the USPS policy, the service score in the "Southern" area has declined by only approximately two percentage points. *See id.* ¶ 7. Moreover, services scores in 91% of USPS districts around the United States are lower as compared to the pre-policy average from January 4, 2020 to July 4, 2020. *Id.* ¶¶ 8-9.

Defendant Mr. DeJoy has recognized that USPS made only "one change" in early July 2020, and that change regarded his request that "the team . . . run the transportation on time and mitigate extra trips." Ex. 6 to Pls.' Mot., ECF No. 16-8 at 4. In the August 13, 2020 letter to all USPS employees, Mr. DeJoy also acknowledged delivery delays were "unintended consequences" of the USPS policy changes. *See* Pls.' Mot., ECF No. 16-1 at 16

6

(citing USPS, *Path Forward: PMG Addresses Restructuring* (Aug. 13, 2020), https://rb.gy/y6tbre). Furthermore, in testimony before the House Committee on Oversight and Reform on August 24, 2020, Mr. DeJoy again recognized that the USPS policy changes were causing delivery delays and that it "expose[d] a need to realign some of [USPS's] processing and scheduling that caused mail to miss the scheduled transportation." *See* Ex. 8 to Pls.' Mot., ECF No. 16-10 at 10. Mr. DeJoy stated that because "production schedules within the plants were not aligned with the transportation schedules going out," "about 10% of the mail was not aligned." *See* Ex. 6 to Pls.' Mot., ECF No. 16-8 at 7.

## B. Procedural History

Plaintiffs filed this lawsuit on August 28, 2020. *See* Compl., ECF No. 1. On September 8, 2020, Plaintiffs filed an amended complaint against Defendants, *see* Am. Compl., ECF No. 15, and subsequently filed a motion for preliminary injunction requesting that the Court enjoin Defendants and their agents from implementing the USPS policy changes, *see* Pls.' Mot. Prelim. Inj., ECF No. 16. Defendants filed their opposition on September 15, 2020. *See* Defs.' Resp. Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 21. Plaintiffs filed their reply brief on September 20, 2020. *See* Pls.' Reply Supp. Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 24. The motion is ripe for the Court's consideration.

## II. Legal Standard

"A plaintiff seeking a preliminary injunction must
establish [1] that he is likely to succeed on the merits, [2]
that he is likely to suffer irreparable harm in the absence of
preliminary relief, [3] that the balance of equities tips in his
favor, and [4] that an injunction is in the public interest.'"
*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration
in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392
(D.C. Cir. 2011)). Where the federal government is the opposing
party, the balance of equities and public interest factors
merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A
preliminary injunction is an "extraordinary remedy that may only
be awarded upon a clear showing that the plaintiff is entitled
to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555
U.S. 7, 22 (2008) (citation omitted). "The purpose of a
preliminary injunction is merely to preserve the relative
positions of the parties until a trial on the merits can be
held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In
this Circuit, the four factors have typically been evaluated on
a "sliding scale," such that if "the movant makes an unusually
strong showing on one of the factors, then it does not
necessarily have to make as strong a showing on another factor."
*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92
(D.C. Cir. 2009).

8

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC*, 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley*, 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (citation and quotation marks omitted)). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

**III. Analysis**

> **A. Plaintiffs Are Likely To Succeed On The Merits Of Their Constitutional Claim**
>
> > **1. Plaintiffs Likely Have Standing To Bring This Challenge**

As a threshold matter, Defendants argue that Plaintiffs cannot establish that they are likely to succeed on the merits because Plaintiffs lack standing in this case. Defs.' Mot., ECF No. 21 at 31.

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a

9

'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "These requirements apply whether an organization asserts standing to sue, either on its own behalf, or on behalf of its members." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). "Standing to seek . . . forward-looking injunctive relief requires [Plaintiff] to show that it is suffering an ongoing injury or faces an immediate threat of injury. For a future injury, that means submitting evidence showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (internal quotation marks, citations, and alterations in original omitted). However, only one plaintiff needs standing in order for a claim to go forward. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) (citing *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)).

Defendants argue that neither the "Organization Plaintiffs"—Vote Forward, Voces Unidas de las Montañas, COLOR, and Padres & Jóvenes Unidos—nor the individual Plaintiffs can establish that they have suffered an injury-in-fact. Defs.' Mot., ECF No. 21 at 31. Defendants do not allege that Plaintiffs

have not established causation or redressability for the
purposes of standing.

First, regarding organizational standing, the D.C. Circuit
recently articulated the test for determining whether an
organization satisfies the "irreparable harm" prong:

> An organization is harmed if the "actions
> taken by [the defendant] have 'perceptibly
> impaired' the [organization's] programs."
> *Fair Emp't Council of Greater Wash., Inc. v.
> BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir.
> 1994) (quoting *Havens Realty Corp. v. Coleman*,
> 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L.Ed.2d
> 214 (1982)); *see also Nat'l Treasury Emps.
> Union v. United States*, 101 F.3d 1423, 1430
> (D.C. Cir. 1996) (explaining that the initial
> question is whether "a defendant's conduct has
> made the organization's *activities* more
> difficult"). If so, the organization must then
> also show that the defendant's actions
> "directly conflict with the organization's
> mission." *Nat'l Treasury Emps. Union*, 101 F.3d
> at 1430. The second step is required to ensure
> that organizations cannot engage in activities
> simply to create an injury. *Id.*

*League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016).

Citing Plaintiff Vote Forward as an example, Plaintiffs
argue that Defendants' policy changes have impaired Vote
Forward's programs by causing it to "redirect [its] limited
resources, which includes both [its] labor and [its] funds, to
address challenges caused by Defendants' Policy that were
unforeseen." Pls.' Mot., ECF No. 16-1 at 41. According to
Plaintiffs, as part of Vote Forward's mission to "empower
grassroots volunteers to help register voters from traditionally

11

underrepresented communities and encourage them to vote," *see* Forman Decl., ECF No. 16-24 ¶ 2, Vote Forward "has built an online platform through which volunteers throughout the country are connected with and encouraged to mail hand-written letters to fellow citizens imploring them to vote," Pls.' Reply, ECF No. 24 at 26 (citing Forman Decl., ECF No. 16-24 ¶¶ 4-5). While Vote Forward had previously planned to mail the get-out-the-vote letters on October 27, in line with its "data" suggesting that letters mailed closer to Election Day are more successful, Vote Forward has had to move up its mailing date as a direct result of the USPS policy changes, threatening to "diminish the success of the campaign." Pls.' Reply, ECF No. 24 at 26 (citing Forman Decl., ECF No. 16-24 ¶¶ 6, 8). As a result, Plaintiffs allege that Vote Forward has had to divert resources "to respond to an influx of inquiries [from] volunteers regarding USPS's mailing delays and to assess whether sending out [get-out-the-vote] letters earlier than planned would negatively impact the effectiveness of Vote Forward's letter-writing campaign." Pls.' Mot., ECF No. 16-1 at 42. In addition, Vote Forward has had to "expend[] multiple weeks of effort" to launch two new programs as a result of the USPS policy changes:  one that "aims to quantify the mailing delays associated with Defendant's policies," and another that "seeks to ascertain the differential impact on voter turnout if [get-out-the-vote] letters are sent

one week versus three weeks prior to an election," "at a total cost of approximately $50,000." *Id.*; Forman Decl., ECF No. 16-24 ¶¶ 9-11. Thus, Defendants' actions have "made the organization's activities more difficult," *Newby*, 838 F.3d at 8 (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430), as a result of the "direct conflict between the defendant's conduct and the organization's mission," *Abigail All. v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (citation omitted).

Contrary to Defendants' assertion, Plaintiffs' decision to "use[] its resources to counteract" such injury is not self-inflicted solely because it is voluntary. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)); *see also Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1139 (D.C. Cir. 2011) (explaining that an injury is not a "self-inflicted . . . budgetary choice[]" merely by having been made willfully or voluntarily (quoting *Fair Emp't Council of Greater Wash., Inc.*, 28 F.3d at 1276). Rather, as long as the organization expends resources "to counteract the effects of the defendant['s]" challenged conduct, that diversion can suffice for Article III purposes. *Id.* at 1140. As stated above, Plaintiff Vote Forward has demonstrated that its expenditures—"such as the time and monetary expenses associated with Vote Forward's new programs to test the time it will take to deliver letters and to gauge the

13

effectiveness of a get-out-the-vote campaign weeks, rather than mere days, before Election Day"—were undertaken to directly counteract the harms caused by Defendants' actions. Pls.' Reply, ECF No. 24 at 28. In addition, although Defendants argue that Plaintiffs such as Vote Forward could not suffer an injury because they "educate and assist potential voters as part of their standard activities," Defs.' Opp'n, ECF No. 21 at 32, the fact that Defendants' actions undermined Vote Forward's ability to conduct its usual activities is sufficient to constitute a "drain on the organization's resources," not "simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)); *see also Havens*, 455 U.S. at 379 (finding sufficient for organizational standing purposes that plaintiff alleged it had "been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and "had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices" (alteration in original)).

The Court also concludes that Plaintiffs have shown traceability and redressability. Regarding traceability, Plaintiffs have demonstrated that the implementation of the USPS

14

policy changes in July coincided with a significant decline in USPS on-time service scores, and Defendants have acknowledged that the only change USPS made in early July was in regard to the policy regarding transportation and extra trips. Pls.' Reply, ECF No. 24 at 12 (citing Ex. 6, ECF No. 16-8). Defendants, however, argue that Plaintiffs cannot establish that their injuries are solely the result of the USPS policy changes because of the "simultaneous impact" of the COVID-19 pandemic. Defs.' Mot., ECF No. 21 at 43-44. Defendants suggest instead that staffing shortages due to the pandemic caused the decline in USPS on-time service scores. *Id.* The Court is not persuaded. As Plaintiffs point out, USPS data "show no relationship between declines in on-time service scores and the time periods in which USPS allegedly experienced staffing shortages." Pls.' Reply, ECF No. 24 at 13. In fact, in comparison with prior months, the average service scores actually increased in March at the moment when Defendants allege staffing shortages were worsening. *Id.* (citing Grimmer Decl., ECF No. 24-2 ¶ 13; Prokity Decl., ECF No. 21-2 ¶ 5). Furthermore, "declines in service scores continued *after* the claimed staffing problems had abated." *Id.* (citing Prokity Decl., ECF No. 21-2 ¶ 10). Based on the data figures, the Court finds that Plaintiffs' claimed injuries are likely the result of the USPS policy changes and may be remedied by declaratory or injunctive relief.

15

Accordingly, Plaintiff Vote Forward has established a substantial likelihood of standing. Because the Court is satisfied that Vote Forward has standing, the Court need not address whether the other Plaintiffs also have standing in order to proceed.

## 2. The Applicable Legal Standard

Prior to considering the merits, the parties disagree as to which legal standard should govern Plaintiffs' claim that the USPS policy changes impose an unconstitutional burden on the right to vote under the First and Fifth Amendments. Plaintiffs argue that the Court should apply the *Anderson-Burdick* framework, derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), in this matter. Pls.' Mot., ECF No. 16-1 at 26. Under *Anderson*, *Burdick*, and their progeny, the United States Supreme Court has recognized that "'[e]lection laws will invariably impose some burden upon individual voters,' and that not all laws burdening the right to vote are subject to strict scrutiny." *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 73-74 (D.C. Cir. 2012) (alteration in original) (quoting *Burdick*, 504 U.S. at 433-34). Instead, courts "must first consider the character and magnitude of the asserted injury" to the plaintiffs' right to vote against "the precise interests put forward by the [government] as justifications for the burden

16

imposed[,]" including "the legitimacy and strength of each of those interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. The level of scrutiny a court should apply depends on the burden. When a voter's rights are "subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). But when a voter's rights are subjected only to "reasonable, nondiscriminatory restrictions," "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotation marks omitted). If the restriction falls somewhere between those two poles, then the court uses a flexible analysis, "where the more severe the burden, the more compelling the [government's] interest must be." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018).

Defendants, for their part, argue that the *Anderson-Burdick* framework does not apply here because that standard only concerns the constitutionality of state election laws—not "a non-election law that may have an attenuated, indirect effect on the electoral process" or the "everyday actions" of federal agencies. Defs.' Opp'n, ECF No. 21 at 36-37. In Defendants' view, "[a]pplying the *Anderson-Burdick* balancing test to any policy that has some impact on the electoral process would

17

produce odd results," including "that any deficiency in USPS service could give rise to a constitutional voting rights claim." *Id.* at 37. Defendants argue that because the *Anderson-Burdick* framework does not apply, Plaintiffs' claim must fail because Plaintiffs have not alleged stand-alone claims under either the First or Fifth Amendments, which encompass distinct requirements as compared to a claim alleged under *Anderson-Burdick*. *Id.* at 38.

Defendants further argue that even if the Court considers the USPS policy to constitute an "election law," the *Anderson-Burdick* framework still would not apply. *Id.* Rather, the Court would apply the rational basis test under *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969). In *McDonald*, the Supreme Court held that an Illinois statute that denied certain inmates mail-in ballots did not impose an unconstitutional burden on their right to vote. *Id.* at 807. Rather, the statute only restricted their asserted right to receive an absentee ballot, and they were therefore not "absolutely prohibited from voting by the State." *Id.* at 808 & n.7. The Supreme Court noted that "the record is barren of any indication that the State might not, for instance, possibly furnish the jails with special polling booths . . . or provide guarded transportation to the polls." *Id.* at 808 n.6. The Court further noted that a more rigid standard is proper only when the

18

policy or practice at issue categorically "den[ies] [plaintiffs] the exercise of the franchise . . . preclud[ing] [them] from voting." *Id.* at 807-08. Accordingly, the Supreme Court upheld the statute under rational basis review. *Id.* at 811. Defendants argue that *McDonald* is controlling because "Plaintiffs are claiming that USPS policies may deprive them of the ability to cast votes through mail-in ballots" and Plaintiffs' "position is not materially different from the county jail inmates . . . who were physically restricted from the polls." Defs.' Opp'n, ECF No. 21 at 39.

The Court finds that *McDonald* is inapposite. First, Defendants mischaracterize Plaintiffs' claim in this case. Plaintiffs do not broadly challenge the USPS policy changes as denying them the right to receive mail-in ballots, as was at issue in *McDonald*. Rather, Plaintiffs allege that Defendants' policy changes undermine the integrity of the November 2020 election by causing delays in the delivery of mail-in ballots, resulting in the risk that hundreds of thousands of voters will be disenfranchised. Second, "[t]he Supreme Court has expressly restricted [*McDonald*'s] applicability to cases in which there is no evidence showing that the challenged restriction will prohibit the plaintiff from voting." *Jones v. U.S. Postal Serv.*, No. 20-cv-6516 (VM), 2020 WL 5627002, at *15 (S.D.N.Y. Sept. 21, 2020). For example, in *Hill v. Stone*, the Supreme Court

19

explained that, in *McDonald*, "there was nothing in the record to indicate that the challenged Illinois statute had any impact" on the right to vote, but that the case had acknowledged that "[a]ny classification actually restraining the fundamental right to vote . . . would be subject to close scrutiny." *Hill v. Stone*, 421 U.S. 289, 300 n.9 (1974) (citing *McDonald*, 394 U.S. at 807-09). In other words, "[e]ssentially the Court's disposition of the claims in *McDonald* rested on failure of proof." *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974). Because Plaintiffs have provided evidence that the USPS policy will inhibit many voters' ballots from being counted in the November 2020 election, *McDonald*'s rational basis test is inappropriate.

Whether the Court should consider Plaintiffs' claim under the *Anderson-Burdick* framework is not so straightforwardly dismissed, however. The Court first notes that Defendants' claim that the policy changes implemented by USPS only inadvertently or indirectly affect voting rights is unpersuasive, particularly in a year in which the global COVID-19 pandemic has forced many individuals to decide either to vote by mail-in-ballot or to not vote at all. *See Jones*, 2020 WL 5627002, at *14 ("The Court . . . disagrees with the Government that this case does not implicate 'the counting of votes.' To hold otherwise would be to ignore the facts at hand: a large number of voters will be exercising their right to vote in the November 2020 election by

placing their ballots in the mail. There is simply no reason for the Court to ignore the severe reality that the country is in the middle of a deadly pandemic . . . .").  For the November 2020 election, 43 states and the District of Columbia will permit all eligible voters to vote by mail-in ballot, and 28 of those states will require that the ballots be received by Election Day. Pls.' Mot., ECF No. 16-1 at 7-8 (citing news reports). Furthermore, a "conservative" estimate predicts that 80 million ballots will be submitted by mail. *See* Hersh Decl., ECF No. 16-15 ¶ 14. In other words, for tens of millions of voters this year, the postal service "is literally the method by which the election is conducted." Pls.' Reply, ECF No. 24 at 16. The USPS policy thus directly impacts and controls the ability of millions of citizens to have their vote counted. Defendants themselves do not dispute their unique role within the electoral process and their "longstanding commitment to the timely delivery of Election Mail." Defs.' Opp'n, ECF No. 21 at 13. Even beyond delivering mail-in ballots, USPS conducts "extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots"; gives an "Election Mail Kit" to "approximately 11,500 state and local election officials"; and has established a separate "bipartisan Election Mail Committee to actively oversee USPS's support of Election Mail for the

21

Election." *Id.* at 12-13. This relationship between the USPS and
the electoral process suggests a strong connection with the
protection of voters' rights.

And although the Court acknowledges that the majority of
cases apply the *Anderson-Burdick* test within the confines of a
state election law, this aligns with the fact that "our country
has a highly decentralized system of election administration, in
which states and localities are primarily responsible for
regulating and managing elections." *Jones*, 2020 WL 5627002, at
*14 (citations omitted). Defendants correctly note, for example,
that both *Anderson* and *Burdick* themselves concerned the
constitutionality of state-level election laws and indicated
that the balancing test applies when a court is considering a
challenge to such laws. However, the Court is not persuaded that
either case, or the cases that have followed, have so restricted
application of the balancing framework to only that specific
context. For example, courts within this Circuit have relied
upon the *Anderson-Burdick* framework in analyzing "state"
practices that allegedly burden parties' ability to cast their
votes effectively under both the Fifth Amendment and the
Fourteenth Amendment. *See, e.g.*, *Libertarian Party*, 682 F.3d at
74 (analyzing under *Burdick* plaintiffs' First and Fifth
Amendment claims that the District "consistent with its
regulations, never reported which individuals were penciled in

22

by voters choosing the write-in option or how many votes any such individual accrued"); *Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25, 30, 33 (D.D.C. 1999) (RWR) (analyzing the constitutionality of Congress's 1998 District of Columbia Appropriations Act under *Burdick*, among other standards, where the Act barred the D.C. Board of Elections and Ethics from counting, releasing, and certifying the results of a referendum). *But see LaRouche v. Fowler*, 152 F.3d 974, 994 (D.C. Cir. 1998) (finding that the *Burdick* test was inappropriate in a challenge against the Democratic National Committee's internal rules because the test "was not designed for a case in which the First Amendment weighs on both sides of the balance"). Courts have also applied the *Anderson-Burdick* balancing test in the context of non-election laws. For example, in *Monserrate v. New York State Senate*, 599 F.3d 148 (2d Cir. 2010), the United States Court of Appeals for the Second Circuit addressed a First Amendment challenge to the New York Senate's decision to expel a senator who had been accused of domestic violence. *Id.* at 152-53. The Second Circuit found that the *Anderson-Burdick* line of cases was not limited to the pre-vote election law context, stating that the Supreme Court had "minimized the extent to which voting rights are distinguishable from ballot access cases" because "the rights of voters and the rights of candidates do not lend themselves to neat separation." *Id.* at

155 (internal citations and quotation marks omitted).
Accordingly, the Second Circuit applied the *Anderson-Burdick*
test in analyzing whether the senator's expulsion burdened
constitutional rights related to voting and political
association. *Id.; see also Peeper v. Callaway Cnty. Ambulance
Dist.*, 122 F.3d 619, 622-23 (8th Cir. 1997) (analyzing a board
resolution prohibiting a newly elected ambulance board member
from voting on certain matters because her husband worked for
the ambulance district under the *Anderson-Burdick* framework);
*Hussey v. City of Portland*, 64 F.3d 1260, 1262, 1264 (9th Cir.
1995) (applying the *Anderson-Burdick* framework in evaluating the
constitutionality of an "ordinance requiring non-residents to
consent to annexation as a condition of receiving a subsidy, or
reduction in hook-up costs, for mandated sewer connections,"
finding that consents were the "constitutional equivalent" of
voting).

Here, regardless of the intent behind the changes, the USPS
policy "will invariably impose some burden upon individual
voters" and their constitutional rights in an election year.
*Libertarian Party*, 682 F.3d at 73-74. The USPS directly affects
how Election Mail is handled and the speed with which Election
Mail arrives at its intended destination. While the USPS serves
many other functions, its role in handling ballots compels the
conclusion that USPS plays an active role in ensuring that

24

elections are conducted in a "fair and honest" manner, "rather than chaos." *Burdick*, 504 U.S. at 433 (citation omitted). Furthermore, the Court is not convinced that the *Anderson-Burdick* framework is limited to only state government and not federal government actions. To so find would effectively exclude, for example, any federal legislation impacting elections in the District of Columbia pursuant to Congress's plenary power over the District. *See* U.S. Const. art. I § 8; *Palmore v. United States*, 411 U.S. 389, 397 (1973). In addition, this case does not present the same concerns as the D.C. Circuit noted in *LaRouche v. Fowler*, 152 F.3d 974 (D.C. Cir. 1998), where the court noted that applying *Anderson-Burdick* to the rules of a non-state political party was inappropriate because "the presence of First Amendment interests on both sides of the equation makes inapplicable the test applied to electoral restrictions where the First Amendment weighs on only one side." *Id.* at 995.

Accordingly, the Court finds that Plaintiffs have established that the *Anderson-Burdick* framework likely applies to Plaintiffs' claim.

### 3. Plaintiffs Have Shown That They Are Likely To Succeed On The Merits Of Their Constitutional Claim

Plaintiffs argue that the USPS policy changes "impose[] undue burdens on Plaintiffs' and other voters' rights to vote in

violation of the First and Fifth Amendments." Pls.' Mot., ECF
No. 16-1 at 10. The Court agrees that, under the *Anderson-
Burdick* framework, Plaintiffs have shown that they are likely to
succeed on the merits of their claim.

As explained above, under the *Anderson-Burdick* framework,
the Court must determine whether "the character and magnitude of
the asserted injury to the rights protected by the First and
[Fifth] Amendments that the plaintiff seeks to vindicate"
outweighs "the precise interests put forward by the State as
justifications for the burden imposed by its rule," taking into
account "the extent to which those interests make it necessary
to burden the plaintiff's rights." *Burdick*, 504 U.S. at 433-34.
Next, the court evaluates how much deference to afford to the
government's interests. If voting rights are "subjected to
severe restrictions, the regulation must be narrowly drawn to
advance a state interest of compelling importance." *Burdick*, 504
U.S. at 434 (internal quotation marks omitted). But when a
voter's rights are subjected only to "reasonable,
nondiscriminatory restrictions," then courts apply a rational
basis review. *Id.* (internal quotation marks omitted).

"It is beyond cavil that 'voting is of the most fundamental
significance under our constitutional structure.'" *Burdick*, 504
U.S. at 433 (quoting *Ill. Bd. of Elections v. Socialist Workers
Party*, 440 U.S. 173, 184 (1979)). "Obviously included within the

26

right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots *and have them counted . . . .*" *United States v. Classic*, 313 U.S. 299, 315 (1941) (emphasis added). Thus, where a policy creates a situation where "[a] large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control," the "burden [on the right to vote] is exceptionally severe." *Gallagher v. N.Y. State Bd. of Elections*, No. 20-cv-5504, 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020); *see also Doe v. Walker*, 746 F. Supp. 2d 667, 679-80 (D. Md. 2010) ("By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote.").

Here, the Court finds that the "character and magnitude" of Plaintiffs' asserted injury to the right to vote is significant. Plaintiffs have provided sufficient evidence suggesting that Defendants' policy has caused and will continue to cause inconsistency and delays in the delivery of mail across the United States, placing at particular risk voters residing in one of the 28 states that require mail ballots to be received, not just post-marked, by Election Day. For example, Plaintiffs

27

explain that if a voter residing in one of those 28 states mails in her ballot on the Saturday before Election Day, a one-day delay "significant[ly] increases the risk of the ballot being rejected as untimely," and a two-day delay "would make disenfranchisement a certainty." Pls.' Mot., ECF No. 16-1 at 30. Furthermore, Plaintiffs simply cannot predict when their ballots will arrive at their intended destination. When they will arrive, and whether they will arrive in time to be counted, instead depends upon "arbitrary factors, such as the particular USPS branch that handles their ballots." *Jones*, 2020 WL 5627002, at *16; *see also* Supp. Grimmer Decl., ECF No 24-2 ¶¶ 5, 7 (listing "on-time" service scores varying across USPS areas in the United States). Indeed, USPS itself has acknowledged the threat of voter disenfranchisement that may result from delivery delays caused by Defendants' policy, warning in a July 29, 2020 letter to 46 states and the District of Columbia that USPS "cannot guarantee all ballots cast by mail for the November election will arrive in time to be counted." *See* Pls.' Mot., ECF No. 16-1 at 15. Thus, in a year in which it is estimated that 80 million citizens are anticipated to submit their votes via USPS, and between 3.7% and 9.3% of those are estimated to mail ballots on the Saturday before Election Day, the potential for voter disenfranchisement is immense. *See* Hersh Decl., ECF No. 16-15 ¶¶ 14, 21-23; *see also* Pls.' Mot., ECF No. 16-1 at 7 (citing

28

Juliette Love, Matt Stevens, & Lazaro Gamio, *Where Americans Can Vote by Mail in the 2020 Election*, N.Y. Times (last updated Aug. 14, 2020), https://rb.gy/fwss8l)).

Furthermore, while content neutral, Defendants' policy changes place an especially severe burden on those who have no other reasonable choice than to vote by mail, such as those who may be at a high risk of developing a severe case of COVID-19 should they become exposed to the virus at the polling place, and those who are not physically able to travel to the polls due to disability. *See* Pls.' Mot., ECF No. 16-1 at 31. For these individuals, mail-in voting is either the only choice or the only safe choice they have. Defendants, however, suggest that these individuals and others can avoid such injuries if they only choose to vote earlier. Defendants argue that there is no severe burden on Plaintiffs because any disenfranchisement would be due to "'their own failure to take [the] timely steps' necessary." Defs.' Opp'n, ECF No. 21 at 40 (alteration in original) (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)). In Defendants' view, USPS "cannot be required by the Constitution to ensure that a voter's ballot arrive in the timeframe set by her state if that voter mails the ballot the day before the state's deadline." *Id.* This argument fails. In suggesting that voters should cast their ballots earlier than required, Defendants ignore Plaintiffs' "essential" interest in

29

making "informed choices among candidates for office." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). As the Supreme Court has recognized, "[i]n election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time." *Anderson*, 460 U.S. at 790. Many individuals, including Plaintiffs in this case, rely on the efficient delivery of their mail-in ballots so that they make take the time available to consider the issues and candidates in an election. *See, e.g.*, Datta Decl., ECF No. 16-23 ¶¶ 3-5. Accordingly, any argument that Plaintiffs inflict injury on themselves by not voting earlier does not significantly lessen their harms in this situation. In any event, Plaintiffs' arguments are in regard to voters who decide to send in their ballots three days in advance of Election Day, not one day.

Defendants also argue that the Plaintiffs' claim must fail because there is no constitutional right to vote by mail and states are not required to offer mail-in voting. Defs.' Opp'n, ECF No. 21 at 35. Defendants contend that "[i]f a State can prohibit mail-in voting . . . then USPS policies which may indirectly limit *when* a ballot must be mailed cannot be constitutionally suspect." *Id.* However, Defendants miss the point. Plaintiffs here are not alleging that Defendants are denying them a right to vote by mail. Rather, Plaintiffs are

alleging that the Defendants' policy changes undermine the integrity of the November 2020 election by causing delays in the delivery of mail-in ballots, resulting in thousands of votes not being counted. As the Supreme Court has explained, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (quoting *Harper*, 383 U.S. at 665). And that is precisely the issue. For example, if one of the individual Plaintiffs submits her ballot, but it does not make it to her local election office in time because of delays caused by the USPS policy, "her 'right to full and effective participation in the political processes of h[er] [Nation]'s legislative bodies' is impaired relative to that of both in-state and out-of-state voters with access to USPS branches functioning effectively." *Jones*, 2020 WL 5627002, at *21 (alteration in original) (quoting *Reynolds v. Sims*, 377 U.S. 506, 565 (1964)).

Defendants contend that the USPS policy changes do not impose a "severe" burden on voters because "USPS has not instituted a ban on late trips or extra trips," only a call for a "renewed focus on schedules." Defs.' Opp'n, ECF No. 21 at 40. Defendants argue that there is "little indication" that policy changes will cause delays in view of the "resources USPS is committing to Election Mail, and USPS's assurance that it has

31

the capacity to process the expected volume of Election Mail."
*Id.* However, even if Defendants did not institute a full "ban"
on late or extra trips, Defendants have not rebutted the
statistics that Plaintiffs have put forward indicating that the
nearly 75% drop in the number of late and extra trips has
resulted in "a material cut in USPS's capacity to timely deliver
mail." *See* Cintron Decl., ECF No. 21-1 ¶¶ 23-25; Pls.' Reply,
ECF No. 24 at 11; *see also* Grimmer Decl., ECF No. 16-11 ¶ 9
(stating that USPS cuts amounted to an average of 32,900 fewer
trips per week). Although Defendants suggest that the drop in
USPS's "on-time" deliveries were partly caused by staffing
shortages from COVID-19, the Court is persuaded by Plaintiffs'
analysis of USPS data showing "no relationship between declines
in on-time service scores and the time periods in which USPS
allegedly experienced staffing shortages." Pls.' Reply, ECF No.
24 at 13. Furthermore, as USPS has "itself forecast[ed] the
injuries" previously, it is "disingenuous" for USPS to claim
that there is "little indication" of delays in delivery of mail-
in ballots. *See Jones*, 2020 WL 5627002, at *12 (citation
omitted). The Court finds that such burdens on voters' right to
have their ballots counted suggests that a high level of
scrutiny is required.

Against such injuries, Defendants assert that the policy
changes are "intended to increase efficiency" and "minimize

32

unnecessary costs." Defs.' Opp'n, ECF No. 21 at 41. Defendants contend that these "general regulatory interests" survive the *Anderson-Burdick* inquiry under a rational basis review. *Id.* (quoting *Libertarian Party*, 682 F.3d at 77). In Defendant's view, the fact that the USPS policy changes were actually inefficient in the short term or that cost savings may be minimal does not mean that they were any less legitimate. *Id.* Defendants argue that "the proffered justifications for the USPS policy at issue are sufficient to justify the indirect, minimal burden it may impose on voters." *Id.* Plaintiffs dispute that Defendants' justifications are sufficient to justify the burden imposed on voters. Plaintiffs argue that the USPS policy changes were in fact *inefficient* and that the mail delivery slow-downs were expected because the policy's purpose was to "undermine the ability of the Postal Service to fulfill its statutory duty to provide 'prompt, reliable, and efficient services to patrons in all areas.'" Pls.' Mot., ECF No. 16-1 at 32–33 (quoting 39 U.S.C. § 101(a)). Plaintiffs also contend that Defendants' cost savings rationale is insufficient because (1) case precedent establishes that the government may not burden fundamental rights in its quest to save costs; (2) the cost savings are minimal over the period leading up to Election Day; and (3) Defendant Mr. DeJoy has confirmed that the USPS's financial position is sound. *Id.* at 33–35.

33

Defendants are correct that the government generally need not justify itself with "elaborate, empirical verification" of its interests in a rational basis review. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997). However, the Court finds that the bar is higher here. Given the severity of Plaintiffs' harms, the Court must instead determine whether Plaintiffs' injuries are outweighed by Defendants' justifications under at least an intermediate level of scrutiny, if not strict scrutiny. The Court finds that Defendants do not meet either.

The Court respects that the federal government, and USPS in particular, have legitimate interests in maintaining efficient programs and in saving money; however, these interests do not justify the resulting harms Plaintiffs face. As stated above, the burden the USPS policy changes place on Plaintiffs' constitutional right to vote and have their vote counted is significant. At risk is disenfranchisement in the November election of potentially hundreds of thousands of individuals. These harms justify a high level of scrutiny, yet Defendants only generally assert that "compliance with pre-set schedules is intended to increase efficiency" and minimize "administrative costs." Defs.' Opp'n, ECF No. 21 at 41 (quoting *Libertarian Party*, 682 F.3d at 77). Defendants' reasons for administrative cost savings are insufficient: as the Supreme Court has

34

explained, the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963). Furthermore, Defendants have failed to provide any reasons regarding why implementation of the USPS policy changes were necessary during a nationwide election season in the middle of a pandemic, particularly in view of Defendants' express acknowledgement that they anticipated "mail left behind or mail on the workroom floor or docks." Ex. 4, ECF No. 16-6 at 2. And despite Defendants' assertions to the contrary, as of the end of August, USPS service scores remain lower that the pre-policy average. *See* Suppl. Grimmer Decl., ECF No. 24-3 ¶ 5.

Accordingly, the Court finds that Plaintiffs are likely to succeed on their constitutional claim.

### B. Plaintiffs Face Irreparable Harm

"The failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (RBW) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting

35

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted). Furthermore, similar to the test for organizational standing, an organization faced irreparable harm where (1) the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs," *League of Women Voters*, 838 F.3d at 8 (alteration in original) (quoting *Fair Emp't Council of Greater Wash.*, 28 F.3d at 1276), and (2) "the defendant's actions 'directly conflict with the organization's mission," *id.* (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430).

The Court finds that both the individual Plaintiffs and the Organization Plaintiffs face irreparable harm absent a preliminary injunction.

### 1. The Individual Plaintiffs Face Irreparable Harm

The individual Plaintiffs argue that the USPS policies puts their vote at risk of not being counted if they choose to send in their ballot on a day that is close to Election Day. Prior to the implementation of the USPS policy, the individual Plaintiffs would have been able to reasonably expect that a ballot placed

in the mail on October 31, the Saturday prior to Election Day, would have arrived at its intended destination by November 3, based on the 1 to 3 day First Class Mail delivery standard. Pls.' Mot., ECF No. 16-1 at 37. Now, however, even with just a one-day delivery delay caused by the USPS policy changes, there is a significant risk that a voter's ballot will not be counted. *Id.*

In response, Defendants argue that the individual Plaintiffs' preference to wait to send in their ballots until closer to Election Day because they want to avoid regretting their decision or because they want to "wait until they have all the information they need" is insufficient and too speculative to establish an irreparable harm. Defs.' Opp'n, ECF No. 21 at 42 (alterations omitted). In other words, "'if their plight can be characterized as disenfranchisement at all, it was not caused by' USPS but rather 'their own failure to take [the] timely steps' necessary." *Id.* (alteration in original) (quoting *Rosario*, 410 U.S. at 758). Furthermore, Defendants assert that "in light of service improvements and ongoing efforts to timely delivery [sic] Election Mail," Plaintiffs cannot show that their ballots would not be received in time. *Id.* at 42-43.

The Court finds that the individual Plaintiffs have sufficiently shown they will likely suffer irreparable harm absent a preliminary injunction. As described above, Plaintiffs

37

have provided ample evidence showing that, due to delays in the
delivery of mail, there is a substantial risk that Plaintiffs
will suffer an undue burden on their constitutional right to
vote. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.
2012) ("A restriction on the fundamental right to vote . . .
constitutes irreparable injury."); *Cardona v. Oakland Unified
Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992)
(explaining abridgement "or dilution of a right so fundamental
as the right to vote constitutes irreparable injury"). There is
"no do-over and no redress" once the election has passed. *League
of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247
(4th Cir. 2014). Defendants' suggestion that Plaintiffs need
only vote earlier than planned also does not remedy the harms
Plaintiffs would face in being forced to make a decision on how
to vote before they have all of the information they require.
*Cf. McIntyre*, 514 U.S. at 346–47 ("In a republic where the
people are sovereign, the ability of the citizenry to make
informed choices among candidates for office is essential, for
the identities of those who are elected will inevitably shape
the course that we follow as a nation."). Finally, regarding
Defendants' assertion that Plaintiffs have failed to show the
likelihood of delivery delays, as Plaintiffs have pointed out,
Defendants' own data suggests that USPS's service scores have
not bounced back since the implementation of the policy changes,

38

and Defendants have provided no other information suggesting that that will change prior to Election Day. *See* Pls.' Reply, ECF No. 24 at 10-13; *see also* Grimmer Decl., ECF No. 16-11; Suppl. Grimmer Decl., ECF No. 24-2.

The individual Plaintiffs have thus asserted irreparable harm.

### 2. The Organization Plaintiffs Face Irreparable Harm

The Organization Plaintiffs argue that they have also demonstrated that irreparable harm is clear and immediate because the USPS policy has "caused Plaintiffs to redirect their limited resources, which includes both their labor and their funds, to address challenges caused by Defendants' Policy that were unforeseen." Pls.' Mot., ECF No. 16-1 at 41. In response, Defendants argue that any claimed injury to the Organization Plaintiffs' resources are insufficient because they have not established that mail delays were solely a result of the USPS policy as opposed to COVID-19. Defs.' Opp'n, ECF No. 21 at 43. Defendants assert that COVID-19 caused significant staffing shortages beginning in March 2020, and, although the shortages began to recover in June, "the availability for July again began to decrease, with availability falling to its lowest levels in the week of July 11, 2020." *Id.* (citing Prokity Decl., ECF No. 21-2 ¶¶ 4-5). Thus, given these "simultaneous" impacts, Plaintiffs cannot claim that the USPS policy was the sole cause

39

of their injury. *Id.* at 43-44. Defendants also contend that any
future harms are not "certain and great." *Id.* at 44 (quoting
*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human
Servs.*, No. 20-cv-1630 (JEB), 2020 WL 5232076, at *38 (D.D.C.
Sept. 2, 2020)).

Here, the Organization Plaintiffs have shown a likelihood
of suffering irreparable harm. "As the D.C. Circuit has
confirmed, '[o]bstacles' that 'unquestionably make it more
difficult for [an organization] to accomplish [its] primary
mission . . . provide injury for purposes both of standing and
irreparable harm.'" *Whitman-Walker Clinic, Inc.*, 2020 WL
5232076, at *38 (alterations in original) (quoting *League of
Women Voters*, 838 F.3d at 9). As described, the USPS policy
changes have likely impaired and will likely continue to impair
Plaintiff Vote Forward's ability to provide its services,
undermining its mission. Plaintiff Voces Unidas has asserted
similar harms to its programs: to counteract the harms caused by
the USPS policy changes, Voces Unidas—an organization "dedicated
to increasing civic engagement of the Latino population in three
rural Colorado counties" through get-out-the-vote campaigns—
estimates it will need to spend between $50,000 to $80,000
beyond its original budget through hiring "additional canvassers
to intensify the campaign earlier than previously anticipated
and to pay for additional advertising and dissemination of

40

information to the communities it serves." Pls.' Mot., ECF No.
16-1 at 42-43 (citing Voces Unidas Decl, ECF No. 16-25); *cf.
Food & Water Watch, Inc.*, 808 F.3d at 920 (explaining that an
organization suffers an injury where it "expend[s] resources to
educate its members and others" and those "operational costs
[go] beyond those normally expended"). Furthermore, the Court
has already determined that Plaintiffs' harms were the result of
the implementation of the USPS policy changes, not staffing
shortages, and, as stated above, "that harm is irreparable"
because after the November election passes, "there can be no do
over and no redress." *League of Women Voters*, 838 F.3d at 9
(quoting *League of Women Voters of N.C.*, 769 F.3d at 247).

### C. The Balance of Equities and Public Interest Favor an Injunction

The balance-of-equities factor directs the Court to "balance
the competing claims of injury and . . . consider the effect on
each party of the granting or withholding of the requested relief."
*ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24).
"When the issuance of a preliminary injunction, while preventing
harm to one party, causes injury to the other, this factor does not
weigh in favor of granting preliminary injunctive relief." *Id.; see
also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir.
1998). By contrast, the balance of equities may favor a preliminary
injunction that serves only "to preserve the relative positions of
the parties until a trial on the merits can be held." *Rufer v. FEC*,

41

64 F. Supp. 3d 195, 206 (D.D.C. 2014) (CRC) (quoting *Camenisch*, 451 U.S. at 395). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest,' *Winter*, [555 U.S.] at 26." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (second alteration in original).

Plaintiffs contend that the balance of the equities and the public interest favor a preliminary injunction because it is in the public interest to prevent constitutional violations and to allow eligible citizens to vote. Pls.' Mot., ECF No. 16-1 at 43-44. Defendants do not contest the equities in Plaintiffs' favor. Rather, Defendants argue that the public interest and the balance of the equities disfavor granting relief because (1) "USPS is currently undertaking extensive efforts to facilitate the timely delivery of Election Mail"; (2) "the Individual Plaintiffs have an opportunity to avoid any harm by mailing in their ballots without delay"; (3) the July 10 "Stand-Up Talk" "does not represent official USPS policy"; and (4) granting relief "could require the Court to act as an overseer of the agency's day-to-day activities. Defs.' Opp'n, ECF No. 21 at 44-45.

Here, the balance of the equities and the public interest
favor an injunction. "By definition, '[t]he public interest . .
. favors permitting as many qualified voters to vote as
possible." *League of Women Voters of N.C.*, 769 F.3d at 247-48
(quoting *Husted*, 697 F.3d at 437). It is also clearly in the
public interest to require that USPS implement policies that do
not infringe upon constitutional rights. *League of Women Voters*,
838 F.3d at 12 ("There is generally no public interest in the
perpetuation of unlawful agency action."). Nor does the proposed
injunction contemplate that the Court would become involved in
overseeing the day-to-day operations of the USPS. And while it
may be true that the "Stand-Up Talk" itself may not be an
official policy, Defendants do not contest that they have
implemented changes regarding transportation and extra trips,
and the Court has the authority to adjust the requested relief
as appropriate. *See Richmond Tenants Org. v. Kemp*, 956 F.2d
1300, 1308 (4th Cir. 1992) ("It is well established . . . that a
federal district court has wide discretion to fashion
appropriate injunctive relief . . . .").

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the Plaintiffs'
motion for a preliminary injunction. Any request to stay this
decision pending appeal will be denied for substantially the

same reasons as those articulated in this Opinion. An

appropriate Order accompanies this Memorandum Opinion.

      **SO ORDERED.**

**Signed:**     **Emmet G. Sullivan**
                 **United States District Judge**
                 **September 28, 2020**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TERESA RICHARDSON, *et al.*,

        Plaintiffs,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,

        Defendants.

No. 20-cv-2262(EGS)

<u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** the Plaintiffs' Motion for Preliminary Injunction is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED** that a Preliminary Injunction is hereby entered against Defendants; and it is further

**ORDERED** that pursuant to the Order, Defendants are **HEREBY ENJOINED** from enforcing the Late/Extra Trips Policy; and it is further

**ORDERED** that pursuant to the Order, Defendants **SHALL** authorize all overtime necessary to ensure the timely delivery of Election Mail; and it is further

**ORDERED** that any request to stay this Order pending appeal will be denied for the reasons stated in the accompanying Memorandum Opinion.

**SO ORDERED.**

**Signed:**     **Emmet G. Sullivan**
          **United States District Judge**
          **October 8, 2020**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TERESA RICHARDSON; CHRISTOPHER CARROLL; GINA ARFI; and AIDA ZYGAS, | |
| Plaintiffs, | |
| v. | Civ. Action No. 20-2262 (EGS) |
| DONALD J. TRUMP, in his official capacity as President of the United States; LOUIS DEJOY, in his official capacity as Postmaster General of the United States; and UNITED STATES POSTAL SERVICE, | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs—four voter-eligible individuals from Texas, Pennsylvania, New York, and Wisconsin—bring this lawsuit against Defendants President Donald J. Trump ("President Trump"), in his official capacity as President of the United States; Louis DeJoy ("Mr. DeJoy"), in his official capacity as Postmaster General of the United States; and the United States Postal Service ("USPS") alleging (1) violation of the constitutional right to vote; (2) civil conspiracy to violate the right to vote; and (3) *ultra*

*vires* agency action. Am. Compl., ECF No. 49.[1] Plaintiffs seek a preliminary injunction with regard to each of their claims.

Upon consideration of the Plaintiffs' motion, the response, and reply thereto, the applicable law, and the entire record, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion.

**I. Background**

    **A. Factual Background**

        **1. The COVID-19 Pandemic**

The COVID-19 pandemic has increased reliance on mail delivered by the USPS. *See* Hersh Decl., ECF No. 57-6 ¶ 10. Several states have adjusted their election procedures to allow for all eligible voters to vote by mail-in ballot in the November 2020 election. For example, nine states and the District of Columbia will automatically send voters ballots this year, and another nine states will automatically send voters an application to request an absentee ballot. *Id.* ¶ 12. In addition, "some 77% of Americans live in jurisdictions in which anyone can request a mail ballot (without an excuse) or are mailed applications to vote by mail or are mailed actual ballots to cast votes by mail." *Id.* ¶ 14. In total, the adjustments made by many states in response to the COVID-19 pandemic will result

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

in approximately 80 million mail-in ballots being submitted for the November election. *See id.*

### 2. USPS Postal Policy Changes

In June and July 2020, the USPS announced and implemented a series of changes (collectively, "Postal Policy Changes") to how it collects, processes, and delivers mail.

First, in a "leaked PowerPoint" titled "PMGs expectations and plan," USPS announced that penalty overtime "will be eliminated" and "[o]vertime will be eliminated" because "we are paying too much in [overtime] and it is not cost effective" ("Overtime Policy"). Am. Compl., ECF No. 49 ¶ 48 (citing *Leaked USPS PowerPoint Indicates PMG DeJoy Focus on Getting Operating Costs Under Control*, Alliance of Nonprofit Mailers (July 14, 2020), nonprofitmailers.org/leaked-usps-powerpoint-indicates-pmg-dejoy-focus-on-getting-operating-costs-under-control/ [hereinafter "USPS PowerPoint"][2]). In testimony before the House Oversight and Reform Committee on August 24, 2020, Mr. DeJoy stated that he "did not direct the elimination or any cutback in overtime." *See* Ex. 14 to Defs.' Response Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 55-4 at 305.

---

[2] Because the USPS PowerPoint is cited and quoted within the Amended Complaint, ECF No. 49, the Court deems the document incorporated by reference in the complaint. *See Boster v. Reliance Standard Life Ins.*, 959 F. Supp. 2d 9, 29 (D.D.C. 2013) (ABJ).

Second, on June 17, 2020, the USPS announced that it would be removing high-speed sorting machines nationwide over the course of several months. Am. Compl., ECF No. 49 ¶¶ 50–51 (citing Letter from Rickey R. Dean, Manager of Contract Admin., Am. Postal Workers Union, to Mark Diamondstein, Pres., Am. Postal Workers Union (June 17, 2020), https://www.21cpw.com/wp-content/uploads/2020/06/mail-processing-equipment-reduction_6-17-2020.pdf[3]); *see also* Ex. A to Reply Further Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 57-2. Defendants state that the further removal of equipment has been suspended until after the November 2020 election. Defs.' Opp'n, ECF No. 55 at 23–24.

Third, on July 10, 2020, the USPS announced several "transportation changes," including changes prohibiting "late trips" and "extra trips" ("Late/Extra Trips Policy"). Am. Compl., ECF No. 49 ¶ 52 (citing Jory Heckman, *USPS Warns Staff of Temporary Mail Delays As It Cuts 'Soaring' Delivery Costs*, Fed. News Network (July 15, 2020), https://federalnewsnetwork.com/management/2020/07/usps-warns-staff-of-temporarymail-delays-as-it-cuts-soaring-delivery-costs[4]). The USPS knew that prohibiting these trips would result

---

[3] The Court considers this document as incorporated by reference in the Amended Complaint. *See supra* n.2.
[4] The Court takes judicial notice of the existence of the news article. *See Washington Post v. Robinson*, 935 F.2d 282, 291

in delayed mail delivery: "[One] aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or mail on the workroom floor or docks (in P&DCs) . . . ." *Id.* ¶ 53. By August 13, 2020, the USPS had reduced the number of extra trips by 71 percent. Pls.' Reply, ECF No. 57 at 8 (citing *Path Forward: PMG Addresses Restructuring*, USPS LINK (Aug. 13, 2020), https://link.usps.com/2020/08/13/path-forward-2[5]). Defendants have clarified that late or extra trips are not "banned"; however, they acknowledge that they continue "at a reduced level." Cintron Decl., ECF No. 55-3 ¶ 4. On September 21, 2020, USPS also issued "Operational Instructions" providing that "transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments." *See* Ex. A to Notice Suppl. Material, ECF No. 62-1 at 4.

_____

(D.C. Cir. 1991) ("[A] court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts); *Agee v. Muskie*, 629 F.2d 80, 81 n.1, 90 (D.C. Cir. 1980) (taking judicial notice of facts generally known as a result of newspaper articles).
[5] The Court takes judicial notice of this document. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on the District of Columbia's Retirement Board website).

Fourth, on July 16, 2020, the USPS announced another "initiative" that prohibited mail carriers in certain cities from spending time in the morning sorting mail so they could "leave for the street earlier." Mem. Points Authorities Supp. Pls.' Appl. Prelim. Inj. ("Pls.' Mot."), ECF No. 15 at 22. The National Association of Letter Carriers thereafter expressed concern that "USPS chose to test [the initiative] unilaterally" without their participation and because it did not seem to "conform" with specific USPS handbook provisions regarding certain types of mail. *See* Am. Compl., ECF No. 49 ¶¶ 54-55 (citing *USPS Announces New ESAS Delivery Initiative Test*, Nat'l Ass'n of Letter Carriers (July 21, 2020), https://www.nalc.org/news/nalc-updates/usps-announces-new-esas-delivery-initiative-test[6]). A subsequent USPS internal memo clarified that the initiative meant that "[c]ity carriers will not sort any mail during the morning operation," but will instead sort delivery in the afternoon "[u]pon return from street delivery." *Id.* ¶ 56 (citing Memorandum from USPS (July 2020), http://www.nalc3825.com/SUT.ESAS.July.2020.pdf[7]). Defendants state that this program has been "suspended at the Postmaster General's Direction." Defs.' Opp'n, ECF No. 55 at 28.

---

[6] The Court considers this document as incorporated by reference in the Amended Complaint. *See supra* n.2.
[7] The Court considers this document as incorporated by reference in the Amended Complaint. *See supra* n.2.

Fifth, on August 7, 2020, Mr. DeJoy "released a reorganization memo reflecting that twenty-three postal executives, including several with decades of experience, were reassigned or displaced." Am. Compl., ECF No. 49 ¶ 59 (citing Jacob Bogage, *Postal Service Overhauls Leadership as Democrats Press for Investigation of Mail Delays*, Wash. Post (Aug. 7, 2020), https://www.washingtonpost.com/business/2020/08/07/postal-service-investigationdejoy[8]). In addition, USPS announced it had implemented a "management hiring freeze and will be requesting future Voluntary Early Retirement Authority from the Office of Personnel Management for employees not represented by a collective bargaining agreement." *Id.* ¶ 60 (citing Press Release, *Postmaster General Louis DeJoy Modifies Organizational Structure to Support USPS Mission* (Aug. 7, 2020), https://about.usps.com/newsroom/national-releases/2020/0807-pmg-modifiesorganizational-structure.htm[9]). Defendants have stated that "[f]or a period of time beginning in August 2020, there has been a management hiring freeze for all non-bargaining unit

---

[8] The Court takes judicial notice of the existence of the news article. *See supra* n.4.
[9] The Court takes judicial notice of the USPS press release because it is a federal agency document available from a reliable source. *See Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 68 n.4 (D.D.C. 2019) (CKK).

7

employees. However, that hiring freeze has had no impact on craft employees. Indeed, [USPS] has hired thousands of new employees to help address staff shortages caused by the pandemic." Curtis. Decl., ECF No. 55-1 ¶ 25.

Sixth, in August 2020, USPS also began removing mailboxes in New York, Pennsylvania, Oregon, and Montana. Pls.' Mot., ECF No. 15 at 22. Defendants state that the removal of mailboxes has been suspended until after the November 2020 election. Defs.' Opp'n, ECF No. 55 at 23-24.

Seventh, on or around July 29, 2020, the USPS General Counsel informed 46 states and the District of Columbia that if the states did not pay First Class postage on ballots sent to voters, there would be a risk that voters would not receive their ballots in time to return them by mail. *See* Pls.' Reply, ECF No. 57 at 12; *see also* Goldway Decl., ECF No. 57-7 ¶¶ 4-6. This was a change to the USPS practice of treating "Election Mail"[10] and political mail mailed as marketing mail on an expedited First-Class basis. Pls.' Reply, ECF No. 57 at 12; *see also* Goldway Decl., ECF No. 57-7 ¶¶ 5-7.

---

[10] USPS defines "Election Mail" as "any item mailed to or from authorized election officials that enables citizens to participate in the voting process. This includes ballots, voter registration forms, ballot applications, polling place notifications, and similar materials. This mail qualifies as Election Mail both when it is sent to voters from election officials at the state and local levels and when it is returned by voters to those officials." Glass Decl., ECF No. 55-2 ¶ 3.

### 3. USPS Postal Policy Changes Have Led To Nationwide Delays And Continue To Have A Nationwide Impact

"[O]n-time mail delivery fell abruptly following . . . [Mr.] DeJoy's July 2020 directives ordering operational changes in mail service and delivery. By the second week of August 2020, on-time delivery of First-Class Mail nationwide had fallen nearly 10 percentage points compared to the week preceding the change." Pls.' Reply, ECF No. 57 at 9-10 (quoting Senator Gary Peters, U.S. Senate Comm. on Homeland Sec. & Gov't Affairs, *Failure to Deliver: Harm Caused by U.S. Postmaster General DeJoy's Changes to Postal Service Mail Delivery* 3 (Sept. 16, 2020), https://www.hsgac.senate.gov/imo/media/doc/200916_FullReport _PetersPostalInvestigation.pdf [hereinafter "Senate Report"][11]); *see also* Senate Report at 1 ("[T]hese changes significantly slowed mail delivery across the entire country and, as Senator Peters wrote to Postmaster General DeJoy and detailed in an interim report, 'compromised service for veterans, small businesses, rural communities, seniors, and millions of Americans who rely on the mail for medicines, essential goods, voting, correspondence, and for their livelihoods.'"). In an August 13, 2020 email to all USPS employees, Mr. DeJoy

---

[11] The Court takes judicial notice of the Senate report. *See Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 313 n.30 (D.D.C. 2018) (RC).

acknowledged that "this transformative initiative has had unintended consequences that impacted our overall service levels." *Path Forward: PMG Addresses Restructuring*, USPS LINK (Aug. 13, 2020), https://link.usps.com/2020/08/13/path-forward-2.

On August 18, 2020, Mr. DeJoy issued a statement that the USPS would be suspending "some longstanding operational initiatives—efforts that predate my arrival at the Postal Service—that have been raised as areas of concern as the nation prepares to hold an election in the midst of a devastating pandemic." Am. Compl., ECF No. 49 ¶ 63 (quoting Press Release, USPS, Postmaster General Louis DeJoy Statement (Aug. 18, 2020), https://about.usps.com/newsroom/national-releases/2020/0818-postmaster-general-louis-dejoy-statement.htm[12]). Specifically, Mr. DeJoy stated that: (1) "[r]etail hours at Post Offices will not change"; (2) "[m]ail processing equipment and blue collection boxes will remain where they are"; (3) "[n]o mail processing facilities will be closed"; (4) "overtime has, and will continue to be, approved as needed." Press Release, USPS, Postmaster General Louis DeJoy Statement (Aug. 18, 2020), https://about.usps.com

---

[12] The Court takes judicial notice of the USPS press release because it is a federal agency document available from a reliable source. *See supra* n.9.

/newsroom/national-releases/2020/0818-postmaster-general-louis-
dejoy-statement.htm.

Defendants state that "[t]he only exception to [Mr.
DeJoy's] directive to maintain the status quo through Election
Day pertains to the ongoing effort to improve compliance with
existing schedules throughout USPS's transportation and
processing networks." Defs.' Opp'n, ECF No. 55 at 22. However,
USPS has announced that employees "are not to
reconnect/reinstall machines that have been previously
disconnected without prior approval from HQ Maintenance." Am.
Compl., ECF No. 49 ¶ 64 (quoting Aaron Gordon, *USPS Headquarters
Tells Managers Not to Reconnect Mail Sorting Machines, Emails
Show*, Vice News (Aug. 20, 2020),
https://www.vice.com/en_us/article/xg8k4d/usps-emails-tell-
managers-not-toreinstall-mail-sorting-machines-postmaster-
general-dejoy[13]); *see also id.* ¶¶ 96, 111-12. In addition, USPS
announced it does not plan to reinstall the mailboxes removed
after June 16, 2020. Am. Compl., ECF No. 49 ¶ 119.

### 4.  Plaintiffs' Factual Allegations

Plaintiffs seek "injunctive relief to protect [their] right
to vote by ensuring that the United States Postal Service
delivers absentee and mail-in ballots in a timely fashion to

---

[13] The Court takes judicial notice of the existence of the news
article. *See supra n.4.*

them and then, delivers their executed ballots to election officials in time to be counted." *See* Am. Compl., ECF No. 49 ¶ 10. Each of the Plaintiffs allege that they applied for, but never received, an absentee or mail-in ballot during the 2020 primary elections due to the "several steps calculated to slow down – and to undermine – the [USPS's] ability to deliver the mail, all in the name of cost-cutting but at the expense of the right of citizens to vote." Am. Compl., ECF No. 49 ¶¶ 10-11, 16. Plaintiffs allege that these delays will continue into November, leaving them "with the choice of compromising their right to vote by not voting at all or risking their health." *Id.* ¶¶ 19, 176.

Because they never received their ballots through the mail, each Plaintiff was forced to either vote in-person, risking contracting COVID-19 or infecting at-risk individuals with whom they live, or not vote at all. *Id.* ¶¶ 11-12. For example, Plaintiff Teresa Richardson resides in Texas and applied for an absentee ballot, based on "disability," for the July primary election in her state. Ms. Richardson suffers from "debilitating arthritis that has resulted in two hip replacements, a shoulder replacement, and an expected knee replacement" and is a "high risk for COVID-19" because she is currently undergoing "prophylactic treatment resulting from a breast cancer diagnosis." Richardson Decl., ECF No. 15-2 ¶¶ 4-7. Ms.

12

Richardson applied for an absentee ballot on or around April 24,
2020, but she never received the ballot. *Id.* ¶¶ 10-12. She
decided to vote in person on July 14, 2020. *Id.* In Texas,
applications to vote by mail must be received 11 days before
Election Day; all ballots submitted by mail must be postmarked
by Election Day and be received by the day after Election Day.
*See FAQ*, Off. of the Tex. Sec'y of State (last visited Oct. 8,
2020), https://www.votetexas.gov/faq/index.html.

Plaintiff Christopher Carroll is a registered voter in
Pennsylvania and requested a ballot for the June 2020 primary
election in his state. Carroll Decl., ECF No. 15-3 ¶¶ 1, 3-5. He
never received his ballot, so he was unable to vote because he
was out of the state on the date of the election. *Id.* ¶ 5. In
Pennsylvania, applications to vote by mail must be received 7
days before Election Day; all ballots submitted by mail must be
postmarked by Election Day and be received within 3 days after
Election Day. *See Voting by Mail-in or Absentee Ballot*,
Commonwealth of Pa. (last visited Oct. 8, 2020),
https://www.votespa.com/Voting-in-PA/Pages/Mail-and-Absentee-
Ballot.aspx.

Plaintiff Gina Arfi is a registered voter in New York and
requested an absentee ballot for the primary election "based on
temporary illness or physical disability." Arfi Decl., ECF No.
15-4 ¶¶ 1, 3. Ms. Arfi never received her ballot; she decided

13

not to vote because, as she lives with her 85-year-old grandmother, she was concerned about exposing herself and her grandmother to COVID-19. *Id.* ¶ 5. In New York, applications to vote by mail must be received 7 days before Election Day; all ballots submitted by mail must be postmarked by Election Day and be received within 7 days after Election Day. *See Absentee Voting*, N.Y. State Bd. of Elections (last visited Oct. 8, 2020), https://www.elections.ny.gov/votingabsentee.html.

Finally, Plaintiff Aida Zygas is registered to vote in Wisconsin and requested an absentee ballot for the August 2020 elections in her state because she did not think she would be in the state on the day of the election. Zygas Decl., ECF No. 15-5 ¶¶ 1, 3. She did not receive a ballot; however, she returned to Wisconsin in time for the election and decided to vote in person. *Id.* ¶ 4. In Wisconsin, applications to vote by mail must be received 5 days before Election Day. All ballots submitted by mail must be postmarked by Election Day and be received within 6 days after Election Day. *See Overview of Absentee Voting Rules*, Wis. Elections Comm'n (last visited Oct. 8, 2020), https://elections.wi.gov/sites/default/files/publication/137/abs entee_overview_1_27_16_pdf_14821.pdf.

**B. Procedural History**

Plaintiffs filed this lawsuit on August 17, 2020. *See generally* Compl., ECF No. 1. On August 20, 2020, Plaintiffs

filed a motion for preliminary injunction requesting that the

Court direct Defendants to:

> (1) return postal operations and restore
> postal service to that in place on January 1,
> 2020; (2) replace or restore the removed the
> high-speed sorting machines and mailboxes that
> have been taken out of service and put them
> back into operation; (3) restore overtime pay
> and lift the hiring freeze so that USPS can
> hire additional employees when and where
> necessary to ensure the timely processing and
> delivery of mail-in ballots; (4) make all late
> mail deliveries instead of letting mail be
> delayed or go undelivered; (5) restore
> seasoned employees to their former positions,
> including the employees who were reassigned or
> displaced in the recent USPS reorganization;
> and (6) refrain from any and all other conduct
> that is intended to interfere and/or
> interferes with Plaintiffs' fundamental right
> to vote in United States elections, including
> but not limited to the 2020 presidential
> election.

Pls.' Appl. Prelim. Inj., ECF No. 14. Plaintiffs also request

that the Court appoint a special master to oversee Defendants'

compliance with any injunction. Pls.' Mot., ECF No. 15 at 28. On

September 11, 2020, Plaintiffs filed an amended complaint

against Defendants, replacing its claim that Defendants' conduct

violated the Administrative Procedure Act with a claim that the

USPS policy changes represent *ultra vires* agency action.[14] Am.

---

[14] Although Plaintiffs filed their amended complaint after filing
their motion for preliminary injunction and before Defendants
filed their opposition, the Court finds it appropriate to refer
to the factual allegations in the amended complaint. *See
Takiguchi v. MRI Int'l, Inc.*, 611 F. App'x 919, 921 (9th Cir.
2015) (dismissing the argument that the "district court

15

Compl., ECF No. 49. Defendants filed their opposition to
Plaintiffs' motion for preliminary injunction on September 15,
2020. Defs.' Opp'n, ECF No. 55. Plaintiffs filed their reply
brief on September 20, 2020. Pls.' Reply, ECF No. 57. The motion
is ripe for the Court's consideration.

## II. Legal Standard

"A plaintiff seeking a preliminary injunction must
establish [1] that he is likely to succeed on the merits, [2]
that he is likely to suffer irreparable harm in the absence of
preliminary relief, [3] that the balance of equities tips in his
favor, and [4] that an injunction is in the public interest."
*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration
in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392
(D.C. Cir. 2011)). Where the federal government is the opposing
party, the balance of equities and public interest factors

---

improperly considered evidence that the plaintiffs submitted
with their preliminary injunction reply brief and allegations
pleaded for the first time in the Third Amended Complaint, which
was filed after all of the preliminary injunction briefing,"
because "even if it were error to do so, it would be harmless,
*see United States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th
Cir. 1992), because the mere allegations of a complaint will
never suffice to establish the prerequisites for obtaining a
preliminary injunction, *see Winter v. NRDC, Inc.*, 555 U.S. 7,
20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)"); *Vantage Mobility
Int'l LLC v. Kersey Mobility LLC*, No. 19-cv-04684, 2020 WL
411188, at *1 (D. Ariz. Jan. 24, 2020) ("Although VMI filed the
First Amended Complaint ('FAC') after the Preliminary
Injunction Application, the Court will resolve the Application
by considering the FAC as the operative pleading . . . .").

merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A
preliminary injunction is an "extraordinary remedy that may only
be awarded upon a clear showing that the plaintiff is entitled
to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555
U.S. 7, 22 (2008) (citation omitted). "The purpose of a
preliminary injunction is merely to preserve the relative
positions of the parties until a trial on the merits can be
held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In
this Circuit, the four factors have typically been evaluated on
a "sliding scale," such that if "the movant makes an unusually
strong showing on one of the factors, then it does not
necessarily have to make as strong a showing on another factor."
*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92
(D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v.
Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C.
Circuit has suggested that a positive showing on all four
preliminary injunction factors may be required." *Holmes v. FEC*,
71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley*, 644
F.3d at 393 ("[W]e read *Winter* at least to suggest if not to
hold that a likelihood of success is an independent, free-
standing requirement for a preliminary injunction." (citation
and quotation marks omitted)). Nonetheless, "the Circuit has had
no occasion to decide this question because it has not yet

17

encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

## III. Analysis

### A. Plaintiffs Are Likely To Succeed On The Merits Of Their Claim

Plaintiffs claim that they have shown a likelihood of success on the merits of all three of their claims: (1) violation of the right to vote and the right to equal protection;[15] (2) civil conspiracy; and (3) *ultra vires* agency action. Because the Court finds that Plaintiffs have shown they will likely succeed on their claim that Defendants' policy changes violated their fundamental right to vote, the Court need not evaluate Plaintiffs' two other claims at this time.

#### 1. Plaintiffs Likely Have Standing

As a threshold matter, Defendants argue that Plaintiffs have failed to establish that they have standing to bring their claim. Defs.' Opp'n, ECF No. 55 at 30.

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between

---

[15] Plaintiffs bring their equal protection claim under the Fourteenth Amendment. Am. Compl., ECF No. 49 at 49. Because Defendants are subject to the Fifth Amendment to the United States Constitution but not to the Fourteenth, the Court construes the complaint as one bringing a claim under the Fifth Amendment.

the injury and the conduct complained of,' and (3) a
'likel[ihood]' that the injury 'will be redressed by a favorable
decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334,
2341 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555,
560-61 (1992)). "Standing to seek . . . forward-looking
injunctive relief requires [Plaintiff] to show that it is
suffering an ongoing injury or faces an immediate threat of
injury. For a future injury, that means submitting evidence
showing that there is a substantial risk that the harm will
recur." *Narragansett Indian Tribal Historic Pres. Off. v. FERC*,
949 F.3d 8, 13 (D.C. Cir. 2020) (internal quotation marks,
citations, and alterations in original omitted).

   "The party invoking federal jurisdiction bears the burden
of establishing these elements." *Lujan*, 504 U.S. at 561
(citations omitted). "Since they are not mere pleading
requirements but rather an indispensable part of the plaintiff's
case, each element must be supported in the same way as any
other matter on which the plaintiff bears the burden of proof,
*i.e.,* with the manner and degree of evidence required at the
successive stages of the litigation." *Id*.

   Defendants contend that Plaintiffs have not established
that any future injury is "certainly impending," Defs.' Opp'n,
ECF No. 55 at 31 (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C.
Cir. 2015)), arguing that the fact "[t]hat Plaintiffs may have

failed to receive their absentee ballots for the primary elections does nothing to establish a real and immediate threat that they will again fail to receive their absentee ballots for the November 2020 general election," *id.* (alterations and quotation marks omitted) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). Defendants contend that "Plaintiffs have put forth no evidence (or allegation) supporting Plaintiffs' inference that they failed to receive their absentee ballots for the primary elections due to any purported recent changes to USPS policies." Defs.' Opp'n, ECF No. 55 at 31. Because Plaintiffs cannot rule out "several alternative explanations" for why Plaintiffs never received their absentee ballots in time for the primary elections, Defendants argue that this "undermines" Plaintiffs' future injury allegation and theory of redressability. *Id.*

The Court disagrees. Plaintiffs exclusively seek prospective injunctive relief. Am. Compl., ECF No. 49 ¶ 10 ("This is a suit for injunctive relief to protect the Plaintiffs' right to vote by ensuring that the United States Postal Service delivers absentee and mail-in ballots in a timely fashion to them and then, delivers their executed ballots to election officials in time to be counted."). Under D.C. Circuit precedent, "the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm," which in this

20

case would be disenfranchisement in the November 2020 election,
"as the concrete and particularized injury and then to determine
whether the increased risk of such harm makes injury to an
individual citizen sufficiently 'imminent' for standing
purposes." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C.
Cir. 2017) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808
F.3d 905, 913 (D.C. Cir. 2015)). Here, Plaintiffs provided
evidence that changes in USPS policy caused and will continue to
cause delays in the delivery of mail. *See* Grimmer Decl., ECF No.
57-4 ¶ 10 (decrease in the number of extra or late trips will
delay the delivery of letters); Tr., *Jones v. U.S. Postal Serv.*,
No. 20-cv-6516 (S.D.N.Y. Sept. 16, 2020), Ex. D to Pls.' Reply,
ECF No. 57-5 at 24-25 (mail processing clerk at the San Antonio
Main Post Office testified under oath that the plant was
experiencing a "two to three day[]" delay and expected the delay
to continue into November because (1) "they're shifting people
around into positions of no expertise"; (2) "they're hiring
brand new employees with no official training to know how to
expedite the mail properly and running the right sort programs";
and (3) "they're cutting back on overtime").

Plaintiffs have cited evidence that delays in mail service,
both locally and nationally, correlate with the timing of the
USPS policy changes in July and have continued at least into the
month of August. *See* Pls.' Reply, ECF No. 57 at 9-10 ("By the

second week of August 2020, on-time delivery of First-Class Mail nationwide had fallen nearly 10 percentage points compared to the week preceding the changes." (quoting Senate Report at 3)); Senate Report at 3 (finding that "[s]ome parts of the country saw on-time delivery drop by 15-20 percentage points in the weeks following Mr. DeJoy's July 2020 changes"). In addition, USPS's own data shows declines in on-time delivery of First-Class Mail continuing into August. Grimmer Decl., ECF No. 57-4 at 24-25. The Court thus finds that Plaintiffs have shown they face a "'substantial risk' of future injury," *Attias*, 865 F.3d at 627, that is "fairly traceable" to the USPS policy changes, *Lujan*, 504 U.S. at 560.

Defendants also claim that even if the USPS policy changes did cause the primary ballots to never arrive, that still does "not support an inference that these delays will affect Plaintiffs in particular again" because Plaintiffs have not alleged that the mail delays "affect all voters across-the-board . . . [or that they] are uniquely susceptible to these delays." Defs.' Opp'n, ECF No. 55 at 32. Defendants argue that "Plaintiffs' allegations also fail to account for the fact that the delays that affected USPS in July are being remedied, . . . or the tremendous amount of resources that USPS has pledged to support the upcoming election." *Id.* However, as stated above, there is sufficient evidence to show that Defendants' policy

22

changes continue to have nationwide effects on the timely delivery of mail. *See* Senate Report at 3 (finding that nationwide during the second week of August, "85 million more deliveries were late in a single week compared to what the late deliveries would have been that week under on-time delivery rates before the changes"); Grimmer Decl., ECF No. 57-4 at 24-25.

For all of these reasons, the Court finds that Plaintiffs' have standing.

### 2. The Applicable Legal Standard

Prior to considering the likelihood of success on the merits, the parties disagree on which legal standard should govern Plaintiffs' claim that the USPS policy changes infringe upon their constitutional right to vote.

Plaintiffs argue that "[d]elaying mail-in ballots places an unconstitutional burden on Plaintiffs' right to vote and merits strict scrutiny." Pls.' Reply, ECF No. 57 at 22. In Plaintiffs' view, "[l]aws that govern the handling of ballots are reasonably understood as directly regulating the election, whether the ballot is handled by a poll worker or a mail handler or letter carrier." *Id.* at 21. Defendants, on the other hand, argue that because the USPS policy changes only indirectly affect Plaintiffs, the rational basis test should apply. Defs.' Mot., ECF No. 55 at 33. Defendants contend that the cases Plaintiffs

23

cite in favor of applying strict scrutiny are inapplicable because the cases are factually distinguishable or only concern state election laws that directly regulate the electoral process. *Id.* But even if the Court considers this case analogous to the line of cases involving "election laws," Defendants contend that the Court would still apply the rational basis test under *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969).

In *McDonald*, the Supreme Court held that an Illinois statute that denied certain inmates mail-in ballots did not impose an unconstitutional burden on their right to vote. *Id.* at 807. Rather, the statute only restricted their asserted right to receive an absentee ballot, and they were therefore not "absolutely prohibited from voting by the State." *Id.* at 808 & n.7. The Supreme Court noted that "the record is barren of any indication that the State might not, for instance, possibly furnish the jails with special polling booths . . . or provide guarded transportation to the polls." *Id.* at 808 n.6. The Court further noted that a more rigid standard is proper only when the policy or practice at issue categorically "den[ies] [plaintiffs] the exercise of the franchise . . . preclud[ing] [them] from voting." *Id.* at 807-08. Accordingly, the Supreme Court upheld the statute under rational basis review. *Id.* at 811. Defendants argue that McDonald is controlling because "Plaintiffs are

24

claiming that USPS policies may deprive them of the ability to cast votes through mail-in ballots" and Plaintiffs' "position is not materially different from the county jail inmates in *McDonald* who were physically restricted from the polls." Defs.' Opp'n, ECF No. 55 at 34-35.

Although Plaintiffs concede that they are not wholly prohibited from voting, as they may choose to vote in person if they do not receive a mail-in ballot in time, the Court finds that *McDonald* is inapplicable here. First, Defendants mischaracterize Plaintiffs' claim in this case. Plaintiffs do not broadly challenge the USPS policy changes as denying them the right to receive mail-in ballots, as was at issue in *McDonald*. There is no dispute that Plaintiffs are eligible to vote by mail under their respective state laws. Rather, the question here is whether USPS may implement a policy that may arbitrarily prevent a large swath of voters, eligible to receive a mail-in ballot, from receiving their ballots in the first place. Second, as the Supreme Court noted in a concurring opinion, *McDonald* involved a "relatively trivial inconvenience encountered by a voter unable to vote by absentee ballot when other means of exercising the right to vote [were] available." *O'Brien v. Skinner*, 414 U.S. 524, 532 (1974) (Marshall, J., concurring) (noting that the record in *McDonald* was "barren of any indication" that the State would not provide alternative

25

avenues to vote). Here, however, the Court concludes that in-person voting in the midst of the ongoing COVID-19 pandemic is more than a mere "trivial inconvenience." Because COVID-19 spreads mainly from person-to-person, *see Frequently Asked Questions*, Centers for Disease Control and Prevention (last updated Sept. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html, all voters, including Plaintiffs, place themselves at risk of contracting a potentially terminal infection should they choose to vote in person as a result of failing to receive their mail-in ballots in time. In such circumstances, which were absent in *McDonald*, the Court finds there is a burden on individuals' ability to effectuate their right to vote. Accordingly, *McDonald*'s rational basis test is inappropriate.

The Court also declines to apply strict scrutiny to the claim automatically, as Plaintiffs suggest. Rather, the Court finds that the *Anderson-Burdick* framework, derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), likely applies here. Under the *Anderson-Burdick* line of cases, courts have recognized that "'[e]lection laws will invariably impose some burden upon individual voters,' and that not all laws burdening the right to vote are subject to strict scrutiny." *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 73-74 (D.C. Cir. 2012) (alteration in

26

original) (quoting Burdick, 504 U.S. at 433-34). Instead, courts "must first consider the character and magnitude of the asserted injury" to the plaintiffs' right to vote against "the precise interests put forward by the [government] as justifications for the burden imposed[,]" including "the legitimacy and strength of each of those interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. The level of scrutiny a court should apply depends on the burden. When a voter's rights are "subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). But when a voter's rights are subjected only to "reasonable, nondiscriminatory restrictions," "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotation marks omitted). If the restriction falls somewhere between those two poles, then the court uses a flexible analysis, "where the more severe the burden, the more compelling the [government's] interest must be." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018).

Courts have applied this framework in the context of non-election laws that have an effect on voters' rights or political candidates' rights. For example, in *Monserrate v. New York State*

27

*Senate*, 599 F.3d 148 (2d Cir. 2010), the United States Court of Appeals for the Second Circuit addressed a First Amendment challenge to the New York Senate's decision to expel a senator who had been accused of domestic violence. *Id.* at 152-53. The Second Circuit found that the *Anderson-Burdick* line of cases was not limited to the pre-vote election law context, stating that the Supreme Court had "minimized the extent to which voting rights are distinguishable from ballot access cases" because "the rights of voters and the rights of candidates do not lend themselves to neat separation." *Id.* at 155 (internal citations and quotation marks omitted). Accordingly, the Second Circuit applied the *Anderson-Burdick* test in analyzing whether the senator's expulsion burdened constitutional rights related to voting and political association. *Id.; see also Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619, 622-23 (8th Cir. 1997) (analyzing a board resolution prohibiting a newly elected ambulance board member from voting on certain matters because her husband worked for the ambulance district under the *Anderson-Burdick* framework); *Hussey v. City of Portland*, 64 F.3d 1260, 1262, 1264 (9th Cir. 1995) (applying the *Anderson-Burdick* framework in evaluating the constitutionality of an "ordinance requiring non-residents to consent to annexation as a condition of receiving a subsidy, or reduction in hook-up costs, for mandated sewer connections," finding that consents were the

28

"constitutional equivalent" of voting). In addition, courts within this Circuit have relied upon the *Anderson-Burdick* framework in analyzing "state" practices that allegedly burden parties' ability to cast their votes effectively under both the Fifth Amendment and the Fourteenth Amendment. *See, e.g.*, *Libertarian Party*, 682 F.3d at 74 (analyzing under *Burdick* plaintiffs' First and Fifth Amendment claims that the District, "consistent with its regulations, never reported which individuals were penciled in by voters choosing the write-in option or how many votes any such individual accrued"); *Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25, 30, 33 (D.D.C. 1999) (RWR) (analyzing the constitutionality of Congress's 1998 District of Columbia Appropriations Act under *Burdick*, among other standards, where the Act barred the D.C. Board of Elections and Ethics from counting, releasing, and certifying the results of a referendum). *But see LaRouche v. Fowler*, 152 F.3d 974, 994 (D.C. Cir. 1998) (finding that the *Burdick* test was inappropriate in a challenge against the Democratic National Committee's internal rules because the test "was not designed for a case in which the First Amendment weighs on both sides of the balance").

Here, regardless of the intent behind the changes, the USPS policy "will invariably impose some burden upon individual voters" and their constitutional rights in an election year.

29

*Libertarian Party*, 682 F.3d at 73-74. The USPS directly affects how Election Mail is handled and the speed with which Election Mail arrives at its intended destination. While the USPS serves many other functions, its role in handling ballots compels the conclusion that USPS plays an active role in ensuring that elections are conducted in a "fair and honest" manner, "rather than chaos." *Burdick*, 504 U.S. at 433 (citation omitted). Furthermore, the Court is not convinced that the *Anderson-Burdick* framework is limited to only state government and not federal government actions. To so find would effectively exclude, for example, any federal legislation impacting elections in the District of Columbia pursuant to Congress's plenary power over the District. *See* U.S. Const. art. I § 8; *Palmore v. United States*, 411 U.S. 389, 397 (1973). In addition, this case does not present the same concerns as the D.C. Circuit noted in *LaRouche v. Fowler*, 152 F.3d 974 (D.C. Cir. 1998), where the court noted that applying *Anderson-Burdick* to the rules of a non-state political party was inappropriate because "the presence of First Amendment interests on both sides of the equation makes inapplicable the test applied to electoral restrictions where the First Amendment weighs on only one side." *Id.* at 995.

Although Defendants argue that failing to apply the rational basis test to "non-election policies that may have some

30

indirect impact on the electoral process would produce odd results," including that "any deficiency in USPS service could give rise to a constitutional voting rights claim," Defs.' Opp'n, ECF No. 55 at 33-34, the Court disagrees. The Court first notes that Defendants' claim that the policy changes implemented by USPS only inadvertently or indirectly affect voting rights is unpersuasive, particularly in a year in which the global COVID-19 pandemic has forced many individuals to decide either to vote by mail-in ballot or to not vote at all. *See Jones v. U.S. Postal Serv.*, No. 20-cv-6516, 2020 WL 5627002, at *14 (S.D.N.Y. Sept. 21, 2020) ("The Court . . . disagrees with the Government that this case does not implicate 'the counting of votes.' To hold otherwise would be to ignore the facts at hand: a large number of voters will be exercising their right to vote in the November 2020 election by placing their ballots in the mail. There is simply no reason for the Court to ignore the severe reality that the country is in the middle of a deadly pandemic . . . ."). For the upcoming election in November, it is estimated that 80 million ballots will be submitted by mail. *See* Hersh Decl., ECF No. 57-6 ¶ 14. The USPS policy thus directly impacts and controls the ability of millions of citizens to have their vote counted. Defendants themselves do not dispute their unique role within the electoral process and their "longstanding commitment to the timely delivery of Election Mail." Defs.'

Opp'n, ECF No. 55 at 13. Even beyond delivering mail-in ballots,
USPS conducts "extensive outreach to state and local election
officials to support effective use of postal services to
facilitate the distribution and return of ballots"; gives an
"Election Mail Kit" to "approximately 11,500 state and local
election officials"; and has established a separate "bipartisan
Election Mail Committee to actively oversee USPS's support of
Election Mail for the Election." *Id.* at 12-13. This relationship
between the USPS and the electoral process suggests a strong
connection with the protection of voters' rights. In addition, a
finding that the *Anderson-Burdick* framework applies does not
necessarily mean that "any deficiency in USPS service could give
rise to a constitutional voting rights claim." *Id.* at 33. This
case does not allege that inadvertent, run-of-the-mill delays in
the postal service will infringe on their right to vote in the
November 2020 election. Instead, Plaintiffs are alleging that a
series of deliberate nationwide changes in postal service
procedures has caused a widespread slow-down in mail delivery
times, that the changes directly affect their ability to vote,
and that Defendants are aware that the policy changes affect the
timely delivery of mail, including Election Mail. *See* Pls.'
Reply, ECF No. 57 at 7-10.

Accordingly, the Court finds that the *Anderson-Burdick*
framework likely applies to Plaintiffs' claim.

### 3. Plaintiffs Have Shown That They Are Likely To Succeed On The Merits Of Their Constitutional Claim

Plaintiffs argue that the USPS policy changes infringe upon their constitutional right to vote and violate the Equal Protection Clause. The Court agrees that, under the *Anderson-Burdick* framework, Plaintiffs have shown that they are likely to succeed on the merits of their claim.

As explained above, under the *Anderson-Burdick* framework, the Court must determine whether "the character and magnitude of the asserted injury to the rights protected by the First and [Fifth] Amendments that the plaintiff seeks to vindicate" outweighs "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into account "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 433-34. Next, the court evaluates how much deference to afford to the government's interests. If voting rights are "subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* at 434 (internal quotation marks omitted). But when a voter's rights are subjected only to "reasonable, nondiscriminatory restrictions," then courts apply a rational basis review. *Id.* (internal quotation marks omitted).

"It is beyond cavil that 'voting is of the most fundamental

33

significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)); *see also Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . . ." *United States v. Classic*, 313 U.S. 299, 315 (1941). The right to vote "includes the right to have one's vote counted on equal terms with others," *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008), and applies to the "initial allocation of the franchise" as well as to "the manner of its exercise," *id.* at 477 (quoting *Bush v. Gore*, 531 U.S. 98, 104-05 (2000)). Thus, where a policy creates a situation where "[a] large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control," the "burden [on the right to vote] is exceptionally severe." *Gallagher v. N.Y. State Bd. of Elections*, No. 20-cv-5504, 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020); *see also Doe v. Walker*, 746 F. Supp. 2d 667, 679-80 (D. Md. 2010) ("By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a

34

severe burden on absent uniformed services and overseas voters' fundamental right to vote.").

Here, the Court finds that the "character and magnitude" of Plaintiffs' asserted injury to the right to vote is significant. Although Defendants call Plaintiffs' harm "speculative," Defs.' Opp'n, ECF No. 55 at 35, Plaintiffs have provided sufficient evidence suggesting that Defendants' policy regarding extra and late trips has caused and will continue to cause inconsistency and arbitrary delays in the delivery of mail across the United States, placing at risk Plaintiffs' ability to receive their mail-in ballots in time or have them arrive at their local election office in time. *See* Senate Report at 3 (stating that "[b]y the second week of August 2020, on-time delivery of First-Class Mail nationwide had fallen nearly 10 percentage points compared to the week preceding the [USPS policy changes]"); Grimmer Decl., ECF No. 57-4 at 24-25 (indicating that USPS data shows that on-time delivery of First-Class Mail had not bounced back to the average experienced prior to July). For example, Plaintiffs explain that "[e]ven in states where ballots need only be postmarked by Election Day, delays of two to three days are likely to disenfranchise a large portion of the electorate," Pls.' Reply, ECF No. 57 at 11, because those ballots still have to arrive at the election office in time to be counted, *see, e.g.*, *Voting by Mail-in or Absentee Ballot*, Commonwealth of Pa.

35

(last visited Oct. 8, 2020), https://www.votespa.com/Voting-in-PA/Pages/Mail-and-Absentee-Ballot.aspx (explaining that, in Pennsylvania, ballots postmarked by Election Day must be received within three days after Election Day). Furthermore, Plaintiffs simply cannot predict when their ballots will arrive at their intended destination. When they will arrive, and whether they will arrive in time to be counted, instead depends upon "arbitrary factors, such as the particular USPS branch that handles their ballots." *Jones*, 2020 WL 5627002, at *16. Indeed, USPS itself has acknowledged the threat of voter disenfranchisement, warning in a July 29, 2020 letter to 46 states and the District of Columbia that USPS "cannot guarantee that all ballots cast by mail for the 2020 presidential election will arrive in time to be counted." Am. Compl., ECF No. 49 ¶ 181; *see also* Pls.' Reply, ECF No. 57 at 10 (citing a July 29, 2020 letter from the USPS General Counsel). Thus, in a year in which it is estimated that 80 million citizens are anticipated to submit their votes via USPS, and between 3.7% and 9.3% of those are estimated to mail ballots on the Saturday before Election Day, the potential for voter disenfranchisement is immense. *See* Hersh Decl., ECF No. 57-6 ¶¶ 14, 21-23.

Furthermore, Defendants' policy changes place an especially severe burden on the Plaintiffs who have no other reasonable choice than to vote by mail, such as those who may be

at a high risk of developing a severe case of COVID-19 should they become exposed to the virus at the polling place, who live with individuals at a high risk of severe COVID-19 symptoms, and who are not physically able to travel to the polls because they are out of the state. *See* Pls.' Mot., ECF No. 15 at 11-13. For these individuals, mail-in voting is either the only choice or the only safe choice they have for themselves and their loved ones. Although Defendants point out that Plaintiffs may still vote in person, the Court nonetheless finds that when nationwide policy changes prevent an eligible voter from receiving the mail-in ballot to which she is entitled, and as a result she must choose between either disenfranchisement or risking contracting a potentially terminal disease herself and infecting at-risk persons with whom she lives, the right to vote is heavily burdened.

Defendants argue that the Plaintiffs' claim must fail because there is no constitutional right to vote by mail and states are not required to offer mail-in voting. Defs.' Opp'n, ECF No. 55 at 32-33. Defendants contend that "[i]f a State can prohibit mail-in voting . . . then USPS policies which may indirectly limit when a ballot must be mailed cannot be constitutionally suspect." *Id.* Defendants miss the point. Plaintiffs here are not alleging that Defendants are denying them a right to vote by mail. Rather, Plaintiffs are alleging

37

that the Defendants' policy changes undermine the integrity of
the November 2020 election by causing delays in the delivery of
election mail, risking disenfranchisement of thousands of
voters. Defendants, however, claim that the arbitrariness of the
delays actually cuts in their favor. *Id.* at 35-36. Defendants
point out that the USPS policy changes "do not expressly (or
necessarily) deny anyone a mail-in ballot" and that "[t]o the
extent there are mail delays, or certain mail goes undelivered,
there is no allegation that USPS has determined in advance the
class of persons to be affected." *Id.* But whether there is
purposeful or intentional discrimination is irrelevant to the
Court's analysis here. *See Bush*, 531 U.S. at 104-05 (finding an
Equal Protection Clause violation without making a finding of
discriminatory intent). "Having once granted the right to vote
on equal terms, the State may not, by later arbitrary and
disparate treatment, value one person's vote over that of
another." *Id.; see also Reynolds v. Sims*, 377 U.S. 533, 557
(1964) (noting that "arbitrary and capricious action" can
violate the Fourteenth Amendment (quoting *Baker v. Carr*, 369
U.S. 186, 226 (1962)). For example, if one of the Plaintiffs
submits her ballot, but it does not make it to her local
election office in time because of delays caused by the USPS
policy, "her 'right to full and effective participation in the
political processes of h[er] [Nation]'s legislative bodies' is

38

impaired relative to that of both in-state and out-of-state voters with access to USPS branches functioning effectively." *Jones*, 2020 WL 5627002, at *21 (alteration in original) (quoting *Reynolds*, 377 U.S. at 565); *see also Brunner*, 548 F.3d at 478 (stating that the allegation, among others, that "[p]rovisional ballots were not distributed to appropriate voters, causing voters to be denied the right to vote . . . . if true, could support a troubling picture of a system so devoid of standards and procedures as to violate" the Constitution).

Against such injuries, Defendants assert that the policy changes are intended "to increase efficiency" and "minimize unnecessary costs." Defs.' Opp'n, ECF No. 55 at 36. Defendants contend that these general "regulatory" interests survive rational basis review, *id.* (quoting *Libertarian Party*, 682 F.3d at 77), and that the Court may not find such interests are irrational because it "disagrees with the policy choice," *id.* (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993). Plaintiffs, on the other hand, dispute that Defendants' justifications are sufficient to justify the burden imposed on voters. Plaintiffs argue that the USPS policy changes were in fact inefficient and increased unnecessary costs. Pls.' Reply, ECF No. 57 at 22-23. Furthermore, Plaintiffs contend that "USPS has no constitutional mandate to cut costs" and that "[v]iolating an important constitutional right in order to

39

achieve a goal not within its mandate . . . is obviously not legitimate or rational prioritization." *Id.* at 23.

Defendants are correct that "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns, Inc.*, 508 U.S. at 313. However, the Court finds that the bar is higher here. Given the severity of Plaintiffs' harms, the Court must instead determine whether Plaintiffs' injuries are outweighed by Defendants' justifications under at least an intermediate level of scrutiny, if not strict scrutiny. The Court finds that Defendants do not meet either.

The Court respects that the federal government, and USPS in particular, have legitimate interests in maintaining efficient programs and in saving money; however, these interests do not justify the resulting harms Plaintiffs face. As stated above, the burden the USPS policy changes place on Plaintiffs' constitutional right to vote and have their vote counted is significant. At risk is disenfranchisement in the November election of potentially hundreds of thousands of individuals. These harms justify a high level of scrutiny, yet Defendants only generally assert that "USPS did renew its focus on

40

compliance with pre-set schedules in order to increase efficiency, and minimize unnecessary costs." Defs.' Opp'n, ECF No. 55 at 36. Defendants' reasons for administrative cost savings are insufficient: as the Supreme Court has explained, the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963). Furthermore, Defendants have failed to provide any reasons regarding why implementation of the USPS policy changes were necessary during a nationwide election season in the middle of a pandemic, particularly in view of Defendants' express acknowledgement that they anticipated "mail left behind or mail on the workroom floor or docks." Mandatory Stand-Up Talk: All Employees (July 10, 2020), https://federalnewsnetwork.com/wp-content/uploads/2020/07/071020-stand-up-talk.pdf.[16] And despite Defendants' assertions to the contrary, as of the end of August, USPS service scores remained lower that the pre-policy average. *See* Grimmer Decl., ECF No. 57-4 at 24-25; Pls.' Reply, ECF No. 57 at 9-10 ("By the second week of August 2020, on-time delivery of First-Class Mail nationwide had fallen nearly 10 percentage points compared to the week preceding the changes." (quoting Senate Report at 3)).

---

[16] The Court takes judicial notice of the USPS document regarding transportation changes. Fed. R. Evid. 201(b)(2).

Accordingly, the Court finds that Plaintiffs are likely to succeed on their constitutional claim.

## B. Plaintiffs Face Irreparable Harm

"In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted).

Plaintiffs argue that, because the USPS policy changes infringe upon Plaintiffs' constitutional right to vote, including in the November 2020 election, that alone is sufficient to show irreparable injury for the purposes of seeking equitable relief. Pls.' Mot., ECF No. 15 at 25. Plaintiffs further argue that President Trump has "incentivized" voters to "remain away from the polls" in the November 2020 election by "making statements suggesting that mail-in voting is rife with fraud." *Id.* at 25-26 (quoting *Raysor v. DeSantis*, No. 19A1071, 2020 WL 4006868, at *3 (U.S. July 16, 2020) (Sotomayor, J., dissenting)). Defendants, in opposition, contend that

42

Plaintiffs' contention that USPS policies have denied them the right to vote is "insufficient and too speculative" to establish an irreparable injury. Defs.' Opp'n, ECF No. 55 at 40. Moreover, Defendants argue that Plaintiffs have not identified any actions that may "incentivize" them not to vote. *Id.* Nor have Plaintiffs established than any future harms are likely to recur given that "USPS has taken a number of steps that have resulted in service performance improving." *Id.* at 41.

The Court finds that Plaintiffs have sufficiently shown they will likely suffer irreparable harm absent a preliminary injunction. At this juncture, Plaintiffs need only demonstrate the likelihood of an increased risk of injury. *Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."). And, as described above, Plaintiffs have provided evidence showing that, due to delays in the delivery of mail, there is a substantial risk that Plaintiffs will suffer an undue burden on their constitutional right to vote. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) (explaining abridgement "or dilution of a right so fundamental as the right to vote constitutes irreparable

43

injury"). There is "no do-over and no redress" once the election has passed. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). The Court further finds Plaintiffs would face irreparable harm in being forced to make a decision on how to vote before they have all of the information they require. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995) ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."). Finally, regarding Defendants' assertion that Plaintiffs have failed to show the likelihood of delivery delays, USPS data suggests that on-time delivery for First Class Mail has not bounced back since the implementation of the policy changes, and Defendants have provided no other information suggesting that that will change prior to Election Day. *See* Grimmer Decl., ECF No. 57-4 at 24-25; Pls.' Reply, ECF No. 57 at 9-10.

The Court finds that the Plaintiffs have sufficiently shown they will likely suffer irreparable harm absent a preliminary injunction due to the restriction on the fundamental right to vote.

**C. The Balance of Equities and Public Interest Favor an Injunction**

The balance-of-equities factor directs the Court to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.; see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast, the balance of equities may favor a preliminary injunction that serves only "to preserve the relative positions of the parties until a trial on the merits can be held." *Rufer v. FEC*, 64 F. Supp. 3d 195, 206 (D.D.C. 2014) (CRC) (quoting *Camenisch*, 451 U.S. at 395). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest,' *Winter*, [555 U.S.] at 26." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (second alteration in original).

Plaintiffs contend that the balance of the equities and the

public interest favor a preliminary injunction because it is in the public interest to prevent constitutional violations and to allow eligible citizens the ability to exercise their right to vote. Pls.' Mot., ECF No. 15 at 26-27. Defendants do not contest the equities in Plaintiffs' favor. Rather, Defendants argue that the public interest and the balance of the equities disfavor granting relief because (1) "USPS is currently undertaking extensive efforts to facilitate the timely delivery of Election Mail"; (2) "[t]here is no dispute that USPS has the capacity . . . to handle the anticipated surge in Election Mail"; (3) "Plaintiffs have an opportunity to avoid any harm by mailing in their ballots without delay"; and (4) granting relief "could require the Court to act as an overseer of the agency's day-to-day activities." Defs.' Opp'n, ECF No. 55 at 41-42.

Here, the balance of the equities and the public interest favor an injunction. "By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C.*, 769 F.3d at 247-48 (quoting *Husted*, 697 F.3d at 437). It is also clearly in the public interest to require that USPS implement policies that do not infringe upon constitutional rights. *Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

46

**D. Request For Preliminary Injunction**

Plaintiffs' motion for preliminary injunction requests the following relief:

> (1) return postal operations and restore postal service to that in place on January 1, 2020; (2) replace or restore the removed the high-speed sorting machines and mailboxes that have been taken out of service and put them back into operation; (3) restore overtime pay and lift the hiring freeze so that USPS can hire additional employees when and where necessary to ensure the timely processing and delivery of mail-in ballots; (4) make all late mail deliveries instead of letting mail be delayed or go undelivered; (5) restore seasoned employees to their former positions, including the employees who were reassigned or displaced in the recent USPS reorganization; and (6) refrain from any and all other conduct that is intended to interfere and/or interferes with Plaintiffs' fundamental right to vote in United States elections, including but not limited to the 2020 presidential election.

Pls.' Appl. Prelim. Inj., ECF No. 14. To the extent the Court deems that certain aspects of the proposed preliminary injunction are inappropriate, the Court has the authority to adjust the requested relief as it deems fit. *See Richmond Tenants Org. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992) ("It is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief . . . ."). Although Plaintiffs have alleged that they are at risk of potential disenfranchisement in the November election due to the entirety of the June and July USPS Postal Policy Changes, the

47

Court finds that Plaintiffs have provided supporting evidence regarding only some of those policy changes.

The Court shall grant Plaintiffs' request to "restore overtime pay" and to "make all late mail deliveries instead of letting mail be delayed or go undelivered." As described above, the Court finds that Plaintiffs have established that, without a preliminary injunction, Plaintiffs are likely to suffer harms based upon this specific conduct.

However, the Court declines to issue a preliminary injunction to "return postal service to that in place on January 1, 2020." Plaintiffs have alleged that USPS policy changes implemented in June and July 2020 have led to significant delays in the on-time delivery of mail, and the Court therefore sees no reason to order USPS to return its operations to the status quo a full six months prior to those changes. In addition, the Court finds that Plaintiffs have submitted little to no evidence connecting the removal of high-speed sorting machines and mailboxes to any resulting delays in mail service. Plaintiffs also have not provided sufficient evidence to warrant a Court order regarding their request to "restore seasoned employees to their former positions" and "lift the hiring freeze." Finally, the Court denies Plaintiffs' request with regard to Defendants "refrain[ing] from any and all other conduct that is intended to interfere and/or interferes with Plaintiffs' fundamental right

48

to vote in United States elections, including but not limited to the 2020 presidential election" as overly broad and lacking the specificity required by Federal Rule of Civil Procedure 65. *See* Fed. R. Civ. P. 65(d) (providing that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail . . . the act or acts restrained or required").

The Court also finds it inappropriate to appoint a special master to supervise implementation of this Court's Order. While Plaintiffs cite to *National Organization for Reform of Marijuana Laws v. Mullen*, 112 F.R.D. 120 (N.D. Cal. 1996) [hereinafter "*NORML*"], in support of their position, the case is readily distinguishable. In *NORML*, the court had already issued a preliminary injunction, and the plaintiffs had subsequently alleged "numerous instances of violations" of that injunction. 112 F.R.D. at 121. The court found that because "[s]uch evidence of noncompliance with an injunction that first issued nearly a year earlier portends continuing violations, especially when viewed in light of the fast-paced and wide-ranging character of CAMP surveillance and raid activities, the difficult legal issues involved, and the numerous affirmative measures that the Court has ordered defendants to undertake" the "circumstances constitute an 'exceptional condition' and call for the appointment of a Special Master." *Id.* Here, in contrast, there

49

is no history of Defendants failing to comply with Court orders, no difficult legal issues involved, and relatively few measures for Defendants to take. Because reference to a master shall be the exception and not the rule, Fed. R. Civ. P. 53(a), the Court finds that implementation of its Order is not so complex as to constitute such exceptional circumstances.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Plaintiffs' motion for a preliminary injunction. Any request to stay this decision pending appeal will be denied for substantially the same reasons as those articulated in this Opinion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **October 8, 2020**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,

         Plaintiff,

v.

UNITED STATES POSTAL SERVICE,
*et al.*,

         Defendants.

No. 20-cv-2295(EGS)

---

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiff's Motion for Preliminary Injunction is **GRANTED**; and it is further

**ORDERED** that a Preliminary Injunction is hereby entered against Defendants; and it is further

**ORDERED** that pursuant to the Order, Defendants are **HEREBY ENJOINED** from enforcing the Transportation Policy Changes; and it is further

**ORDERED** that any request to stay this Order pending appeal will be denied for the reasons stated in the accompanying Memorandum Opinion.

```
SO ORDERED.

Signed:    Emmet G. Sullivan
           United States District Judge
           October 10, 2020
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,

                    Plaintiff,

        v.                                    No. 20-cv-2295(EGS)

UNITED STATES POSTAL SERVICE,
*et al.*,

                    Defendants.

MEMORANDUM OPINION

## I.    Introduction

Plaintiff, the National Association for the Advancement of Colored People ("NAACP") filed this lawsuit against Defendants the United States Postal Service ("USPS" or "Postal Service") and Louis DeJoy ("Mr. DeJoy"), in his official capacity as Postmaster General of the United States, alleging the following claims: (1) Non-statutory review of unlawful agency action for failure to follow the procedures required by 39 U.S.C. § 3661; (2) Non-statutory review of unlawful agency action that is arbitrary, capricious, and not in accordance with 39 U.S.C. § 101(e); (3) Mandamus to enforce 29 U.S.C. § 3991; and (4) Mandamus to enforce 39 U.S.C. § 101(e). Plaintiff seeks a preliminary injunction with regard to their first and second claims. Upon consideration of Plaintiff's motion, the response,

1

and reply thereto, the applicable law, and the entire record, the Court **GRANTS** Plaintiff's motion.

## II.  Background

### A.  Statutory and Regulatory Framework

In the Postal Reorganization Act ("PRA"), Public Law 91-375, 84 Stat. 719 (Aug. 12, 1970), Congress replaced the Post Office Department with the Postal Service as "an independent establishment of the executive branch of the Government of the United States, under the direction of a Board of Governors, with the Postmaster General as its chief executive officer." 39 C.F.R. § 1.1. The PRA establishes that the policy of the USPS includes the mandate to "provide prompt, reliable, and efficient services to patrons in all areas and . . . render postal services to all communities." 39 U.S.C. § 101. The PRA also created an independent oversight body for the USPS, the Postal Rate Commission. 39 U.S.C. § 501. Congress passed the PRA to "[i]nsulate" the management of the USPS "from partisan politics  . . . by having the Postmaster General responsible to the [Postal Rate] Commission, which represents the public interest only, for his conduct of the affairs of the Postal Service." H.R. Rep. No. 91-1104, 3660-61 (1970).

In the Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 et seq.), Congress replaced the Postal Rate

2

Commission with the Postal Regulatory Commission ("PRC" or "Commission") and "strengthened its role." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 340 (D.C. Cir. 2019).

The USPS is responsible for "develop[ing] and promot[ing] adequate and efficient postal services." 39 U.S.C. § 3661(a). "When the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* § 3661(b).

Following the submission of a proposal, "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." 39 U.S.C. § 3661(c).

## B.    Factual Background

### 1.    The COVID-19 Pandemic and Its Impact on Voting in the 2020 Election.[1]

On March 11, 2020, the World Health Organization ("WHO") declared a global pandemic as a result of the spread of COVID-19. *See* Dr. Tedros Adhanom, *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020. On March 13, 2020, President Donald J. Trump declared a national emergency as a result of the outbreak. Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020).

The virus that causes COVID-19 is highly contagious, is believed to spread mostly from person-to-person when people are in within six feet of each other, and may be spread by people who are not showing symptoms of the virus. *See* Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others* (last updated Sep. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-

---

[1] The Court takes judicial notice of documents and information on official government websites. Fed. R. Evid. 201(b)(2); *see also Western Watershed Project v. Bernhardt*, 2020 WL 3402379, * 3 n.4 (D.D.C. June 19, 2020). The Court takes judicial notice of certain information at the World Health Organization website, the Johns Hopkins University website, and the Mayo Clinic website which is "not subject to reasonable dispute" because they are "sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2).

sick/prevention.html. Symptoms range from mild to severe. *See* Mayo Clinic, *Coronavirus Disease 2019 (COVID-19), Symptoms and Causes* (updated Sep. 11, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963. Older people and people with existing chronic medical conditions have a higher risk of serious illness from COVID-19. *Id*. Such chronic medical conditions include "serious heart disease . . . , cancer, chronic obstructive pulmonary disease, type 2 diabetes, severe obesity, chronic kidney disease, sickle cell disease, and weakened immune system from solid organ transplants." *Id*. COVID-19 can result in severe medical complications including "pneumonia and trouble breathing, organ failure in more than one organ, heart problems, acute respiratory distress syndrome, blood clots, acute kidney injury, and additional viral and bacterial infections." *Id*. A disproportionate number of black people have been infected and killed by the disease. The COVID Tracking Project, *The COVID Racial Data Tracker*, https://covidtracking.com/race.

As of October 10, 2020, just over one million people worldwide, and 214,004 Americans have died from COVID-19. *See* Johns Hopkins University, Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html. Also as of October 6, 2020, over 37 million people worldwide have been infected, with

5

the United States having more infections than any other country, with just over seven and a half million infections. *Id*.

In light of the COVID-19 pandemic, the Centers for Disease Control and Prevention ("CDC") has provided guidance to voters and election polling locations to prevent the spread of the disease, including recommending "a wide variety of voting options . . . such as alternative voting options that minimize contact." *See* CDC, *Coronavirus Disease 2019 (COVID-19): Considerations for Election Polling Locations and Voters, Interim Guidance to Prevent Spread of Coronavirus Disease 2019 (COVID-19)* (last updated June 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html. Consistent with this guidance, states have enacted temporary changes for the 2020 election including expanding the ability to vote by mail. Nat'l Conference of State Legislatures, COVID-19 and Elections, (last updated Oct. 2, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-mail-voting-policies-in-effect-for-the-2020-election.aspx.

## 2. USPS Implements Changes that Lead to Nationwide Mail Delays

The key changes that Plaintiff challenges are the prohibition on "late trips" and "extra trips" (collectively

6

"Transportation Policy Changes")[2] announced on July 10, 2020.[3]
Reply, ECF No. 25 at 9.[4] Defendants have since clarified that
late or extra trips are not "banned"; however, they acknowledge
that they continue "at a reduced level" that began in July 2020.
Suppl. Cintron Decl., ECF No. 24-3 ¶ 4. By August 13, 2020, the
USPS had reduced the number of late trips by 71 percent. Email
from Mr. DeJoy to All Employees ("August 13, 2020 Email"), Aug.
13, 2020, ECF No. 25-1. Mr. DeJoy acknowledged that the
"transformative initiative has had unintended consequences that
impacted our overall service levels." *Id.* at 2. On September 21,
2020, USPS issued "Operational Instructions" providing that
"transportation, in the form of late or extra trips that are
reasonably necessary to complete timely mail delivery, is not to
be unreasonably restricted or prohibited. Managers are
authorized to use their best business judgment to meet our
service commitments." Ex. 1 to Notice Suppl. Material, ECF No.
29-1 at 4.

---

[2] "Late trips" and "extra trips" have been employed by the USPS
to "complete timely mail delivery." Ex. 1 to Notice Suppl.
Material, ECF No. 29-1 at 4.
[3] Plaintiff originally challenged changes in addition to the
Transportation Policy Changes, *see* Mem. in Supp. of Mot. for
Prelim. Inj. ("Mot."), ECF No. 8-1 at 22-23; but clarified that
they challenge the Transportation Policy Changes, *see* Reply, ECF
No. 25 at 9.
[4] When citing electronic filings throughout this Opinion, the
Court cites to the ECF page number, not the page number of the
filed document.

It is undisputed that the USPS did not seek an advisory opinion pursuant to 39 U.S.C. § 3661(b) from the PRC prior to implementing these changes.

### C. Procedural Background

Plaintiff filed this lawsuit on August 20, 2020. On September 1, 2020, Plaintiff filed a motion for a preliminary injunction, which requests that the Court enjoin Defendants from enforcing certain USPS policies and practices. *See* Mem. in Supp. of Mot. for Prelim. Inj. ("Mot."), ECF No. 8-1. Defendants filed their opposition on September 11, 2020. *See* Defs.' Opp'n Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 21. Plaintiff filed its reply brief on September 16, 2020. *See* Pls.' Reply ("Reply"), ECF No. 25. The motion is ripe for the Court's consideration.

## III. Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A

8

preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council,* 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC,* 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley,* 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.") (quotation marks omitted). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the

less rigorous sliding-scale analysis." *ConverDyn v. Moniz,* 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

**IV.  Analysis**

Plaintiff argues that it is likely to succeed on the merits of its Section 3661(b) claim because "Congress has mandated that before implementing changes that have a nationwide impact on mail delivery, the Postal Service must provide an opportunity for public comment and seek an advisory opinion from the [PRC]." Mot., ECF No. 8-1 at 13. Plaintiff further argues that in rushing to make the Transportation Policy Changes, "Defendants failed to consider key statutory objectives about reliable mail service and the need to give the highest consideration to delivery [of] important mail, including ballots and checks . . . and failed to consider the adverse impact on timely delivery of medications" which they contend is inconsistent with the mandate set forth in Section 101. *Id.*

Defendants respond that Plaintiff lacks Article III standing, that district courts lack subject matter jurisdiction over Section 3661 claims, that the *ultra vires* doctrine does not provide for judicial review here, and that Plaintiff's claim that defendants' failure to comply with Section 101(e) was arbitrary and capricious cannot be brought. Defs.' Opp'n, ECF No. 21 at 33-38, 39-43, 43-49, 49-51.

10

A.   **Plaintiff Is Likely To Succeed On The Merits Of Its 39
U.S.C. § 3661(b) Claim**

1.   **Plaintiff Likely Has Standing to Bring this
Challenge**

To establish standing, "a plaintiff must show (1) an
'injury in fact,' (2) a sufficient 'causal connection between
the injury and the conduct complained of,' and (3) a
'likel[ihood]' that the injury 'will be redressed by a favorable
decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334,
2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S.
555, 560-61 (1992)). "These requirements apply whether an
organization asserts standing to sue, either on its own behalf,
or on behalf of its members." *Nat'l Treasury Emps. Union v.
United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing
*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).
"Standing to seek . . . forward-looking injunctive relief
requires [Plaintiff] to show [that it] is suffering an ongoing
injury or faces immediate injury. For a future injury, that
means submitting evidence showing that there is a substantial
risk that the harm will recur." *Narragansett Indian Tribal
Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020)
(internal quotation marks, citations, and alterations in
original omitted).

"The party invoking federal jurisdiction bears the burden
of establishing these elements." *Lujan*, 504 U.S. at 561

11

(citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id*.

Defendants argue that Plaintiff fails to demonstrate injury to its members or to itself as an organization. "First, the fact that one of the Plaintiff's members [Mr. Earl Graham, a disabled veteran] allegedly has been harmed by delayed mail in the past does not entitle Plaintiff to standing now, at least when it is seeking forward-looking injunctive relief" because Defendants have provided "evidence that mail delays have been mitigated" and so "there is no basis to conclude that this purported injury is likely to recur." Defs.' Opp'n, ECF No. 21 at 34-35 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 107-108, 1983). However, Mr. Graham has described persisting mail delays. Decl. of Earl Graham,[5] ECF No. 8-3 ¶ 6 ("Before this summer, my mail-order medications would arrive generally a few days after my doctor approved any prescription. Since mid-July, however, my medications have taken much longer to arrive, including sometimes arriving one week or longer after my doctor has

---

[5] Earl Graham is a member of the NAACP.

12

approved prescriptions."); Second Decl. of Earl Graham, ECF No. 25-2 ¶ 2 ("The delays I discussed have continued since I submitted by August 28, 2020 declaration.); ¶ 3 ("A week [after an August 25, 2020 teleconference appointment with a Veterans Affairs doctor] the medicine approved by my doctor during my August 25, 2020, teleconference appointment still had not arrived. Without the medication, I began experiencing serious pain."); ¶¶ 5-6 (explaining that he was eligible to be sent medication through express mail due to the seriousness of the pain he was experiencing and that he received the medication sent via express mail within two days); ¶ 6 ("By the time the delayed medication arrived, it had been almost two weeks since my August 25, 2020 teleconference appointment."). As Plaintiff has provided evidence of continuing mail delays, Defendants' reliance on *City of L.A.* for the proposition that the alleged injury is unlikely to recur is misplaced. In that case, the Supreme Court observed that "five months had elapsed between [the traffic stop resulting in a chokehold] and the filing of the complaint, yet there was no allegation of further unfortunate encounters between [Mr.] Lyons and the police." *City of Los Angeles*, 461 U.S. at 108. Here, Plaintiff has provided evidence demonstrating that mail delays persist.

As part of this argument, Defendants contend that the Complaint does not allege what exactly caused the mail delays.

13

Defs.' Opp'n, ECF No. 21 at 34-35. However, Defendants' own evidence demonstrates that Mr. DeJoy has acknowledged that the Transportation Policy Changes caused mail delays. *See* Ex. 5, Tr. of Senate Homeland Security and Governmental Affairs Comm. Hr'g on USPS Operations During COVID-19 and the Elections, Aug. 21, 2020, ECF No. 21-1 at 104 (Mr. DeJoy stating that the reduction in late trips resulted in mail delays); *Id.* at 309, (Mr. DeJoy stating that "[w]e are very concerned with the deterioration and service and are working very diligently."); *Id.* at 323 (Mr. DeJoy stating that "[o]ur recovery process is taking too long. This should have been resolved in a couple of—in a few days and it's-it's not."); *Id.* at 350 (Mr. DeJoy stating that "I think there is a lot of different issues going on within the country that are—impact mail delay, including the actions that we took with regard to transportation."); August 13, 2020 Email, ECF No. 25-1 at 4 ("Unfortunately, this transformative initiative has had unintended consequences that impacted our overall service levels.")

Second, Defendants argue that Plaintiff's members' concerns about future mail delays impacting their ability to vote fails to establish standing because future injury must be "certainly impending." Defs.' Opp'n, ECF No. 21 at 35 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2010)). Defendants contend that "the Postal Service has numerous policies and practices

14

designed to ensure that ballots will be timely delivered before the election," that it is within Plaintiff's members' control to timely mail their ballots, and so their injury is speculative. *Id.* However, Defendants are incorrect to assert that standing to obtain injunctive relief requires the injury to be "certainly impending." Rather, "[s]tanding to seek . . . forward-looking injunctive relief requires [Plaintiff] to show [that it] is suffering an ongoing injury or faces immediate injury. For a future injury, that means submitting evidence showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Pres. Office*, 949 F.3d at 13 (internal quotation marks, citations, and alterations in original omitted). Accordingly, as explained above, Plaintiff has demonstrated that its members face a "substantial risk that the harm will recur" and has demonstrated injury to its members.

Third, Defendants contend that Plaintiff alleges issue advocacy harm, which is insufficient to establish organizational standing. Defs.' Opp'n, ECF No. 21 at 35-37. Plaintiff responds that it has provided evidence demonstrating that because of the impact of the mail delays, it is "diverting resources away from its ordinary voter registration activities, voter protection activities, and education activities designed to promote voter turnout" which pursuant to *League of Women Voters v. Newby*, 838

15

F.3d 1 (D.C. Cir. 2016), constitutes irreparable injury. Reply, ECF No. 25 at 30.

The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") recently articulated the test for determining whether an organization satisfies the "irreparable harm" prong:

> An organization is harmed if the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (explaining that the initial question is whether "a defendant's conduct has made the organization's *activities* more difficult"). If so, the organization must then also show that the defendant's actions "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430. The second step is required to ensure that organizations cannot engage in activities simply to create an injury. *Id.*

*League of Women Voters*, 838 F.3d at 8. "Irreparable harm" is a higher burden than that necessary to establish Article III standing. *Nat. Res. Def. Council, Inc. v. EPA*, 383 F. Supp. 3d 1, 11 (D.D.C. 2019) ("'an identifiable trifle is enough for standing'") (quoting *United States v. Students Challenging Reg'y Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)).

Plaintiff has provided evidence demonstrating that it "has established a civic engagement program, which is designed to encourage citizens to be fully engaged in the democratic

16

process, and to raise awareness for political, educational, social and economic equality for communities of color in the electoral and legislative process. . . [T]he program seeks to increase turnout among Black voters in federal, state, and local elections." Decl. of Carmen Watkins,[6] ECF No. 8-2 ¶¶ 2, 6. Plaintiff has also demonstrated that Defendants' actions have "made the organization's activities more difficult," *League of Women Voters*, 838 F.3d at 8 (citation omitted); because Plaintiff has explained that needing to address the impact of the mail delays is causing it to "divert[] resources from the regular activities of the NAACP's civil engagement program," which includes "registering voters, contacting registered voters to ensure that they have accurate voting information and encouraging them to vote, organizing events to get out the vote, and conducting voter protection activities during early voting." *Id*. ¶ 11.

Next, Plaintiff must show that "the defendant's actions 'directly conflict with the organization's mission'" in order "to ensure that organizations cannot engage in activities simply to create an injury." *League of Women Voters*, 838 F.3d at 8. Plaintiff's civic engagement program is clearly part of its mission "to ensure the political, educational, social, and

---

[6] Carmen Watkins is the Interim Vice President of Field Operations for the NAACP.

17

economic equality of all persons and to eliminate race-based discrimination." Watkins Decl., ECF No. 8-2 ¶ 2. And as stated above, the civic engagement program includes "registering voters, contacting registered voters to ensure that they have accurate voting information and encouraging them to vote, organizing events to get out the vote, and conducting voter protection activities during early voting." *Id.* ¶ 11. Accordingly, Plaintiff has provided evidence demonstrating that to Defendants' actions "directly conflict with [its] mission" because it has needed to divert resources from the civic engagement program to instead "organize transportation for voters to drop off their absentee ballots" in various states. *Id.* ¶¶ 8, 9, 10, 12.

Defendants fail to distinguish *League of Women Voters* in their opposition brief and the authorities they point to support Plaintiff's ability to satisfy "irreparable harm," a higher burden than that necessary to establish Article III standing. Plaintiff has provided evidence that due to mail delays caused by Defendants' action, they have needed in the past and will need in the future to divert resources from their civic engagement program to organize transportation to ensure that votes are counted. This constitutes a "drain on the organization's resources"; not simply a "setback to the organization's abstract social interests." *Nat'l Ass'n of Home*

18

*Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). Similarly, Plaintiff's provision of services through its civic engagement program demonstrates that it does not engage solely in "pure issue-advocacy." *Ctr. for Law & Educ v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005). Rather, Plaintiff's activities are more akin to those of Housing Opportunities Made Equal ("HOME"), which the Supreme Court held had standing in *Havens Realty Corp. v. Coleman*. In so holding, the Supreme Court stated:

> If, as broadly alleged, petitioner's steering practices have perceptibly impaired HOME's ability to providing counseling and referral services for low-and moderate-income home seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities–with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

455 U.S. at 379. Similarly, here Plaintiff has provided evidence demonstrating how mail delays are causing it to divert resources from its usual civic engagement activities, which is distinguishable from the situation in *Int'l Acad. Of Oral Medicine & Toxicology v. FDA*, 195 F. Supp. 3d 243 (D.D.C. 2016), where the Plaintiff failed to explain how the agency action "forced it to divert or modify its activities in any meaningful way from its standard programmatic efforts." *Id*. at 259.

19

For all of these reasons, Plaintiff has provided evidence "showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Pres. Office*, 949 F.3d at 13.

Finally, Defendants argue that "Plaintiff cannot establish causation or redressability because it seeks to enjoin changes that have not occurred." Defs.' Opp'n, ECF No. 38. Specifically, Defendants argue that "the only specific change that was actually implemented was additional guidance on complying with long-established transportation schedules by departing on time and thus mitigating extra trips." *Id*. This, however, is precisely what Plaintiff challenges. Reply, ECF No. 25 at 9, 19-21.

For all of these reasons, Plaintiff has demonstrated that it likely has standing to bring its claims on behalf of its members and itself as an organization.

### 2. This Court Likely Has Subject Matter Jurisdiction Over The Section 3661 Claim

Defendants contend that this court lacks subject matter jurisdiction over "complaints regarding" Section 3661 because such complaints must first be made to the PRC and then to the D.C. Circuit. Defs.' Opp'n, ECF No. 21 at 39. The statutory scheme provides as follows. 39 U.S.C. § 409(a) provides that "[e]xcept as otherwise provided in this title, the United States

20

district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." One of the exceptions to this original jurisdiction is set forth in 39 U.S.C. § 3662, which provides that "[a]ny interested person . . . who believe[s] the Postal Service is not operating in conformance with the requirements of a provision of . . . this chapter (or regulations promulgated under any of these provisions) may lodge a complaint with the [PRC] . . ." Section 3662(b) requires the PRC to respond to the complaint within 90 days and provides that if a complaint is not timely responded to, a petition for review may be filed with the D.C. Circuit, which also has jurisdiction to review final orders or decisions of the PRC.

Plaintiff's complaint alleges a procedural violation—that the USPS failed to comply with the requirement that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory commission requesting an advisory opinion on the change." 39 U.S.C. § 3661.

Defendants contend that "[c]ourts have repeatedly held that 39 U.S.C. §§ 3662 and 3663 constitute the exclusive jurisdictional remedy for complaints about postal services that

21

fall within the statutory provisions specifically identified in [S]ection 3662." Defs.' Opp'n, ECF No. 21 at 40. However, defendants have provided no mandatory authority to support their assertion that Sections 3662 and 3663 constitute the exclusive jurisdictional remedy for a claim that the USPS has failed to comply with the procedural requirements set forth in Section 3661. Indeed, Plaintiff points out that none of the cases cited by defendants "concerns a failure to follow the procedural requirements of [S]ection 3661" but rather "considered a complaint about Postal Service prices and the manner in which the Postal Service provides delivery services." Reply, ECF No. 25 at 12.

"Whether a statute is intended to preclude initial judicial review is determined by the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 307 (1994) (internal citation omitted). The language of the statute is broad: "[a]ny interested person . . . who believe[s] the Postal Service is not operating in conformance with the requirements of a provision of . . . this chapter (or regulations promulgated under any of these provisions) may lodge a complaint with the Postal Regulatory Commission . . . ." 39 U.S.C. § 3662. This could certainly be read to mean that the failure of the USPS to comply with the

22

procedural requirement set forth in Section 3661 would be encompassed by Section 3662. Plaintiff argues that the use of the permissive "may" in Section 3662 coupled with the mandatory phrasing "shall" in Section 3662(c) shows Congress did not intend to limit jurisdiction over Section 3661 claims. *See* Reply, ECF No. 25 at 10. The statute consistently uses the word "may" when setting forth the procedure for filing complaints and for seeking appellate review of the PRC's determination (or failure to make a determination): any interested person "may" lodge a complaint with the PRC, and if the interested person is unsatisfied with the response or does not receive a timely response, they "may" file a petition with the D.C. Circuit. 39 U.S.C. §§ 3662(a), 3663. The use of the permissive "may" coupled with the use of the mandatory "shall" suggests that Sections 3662(a) and 3663 were not intended to be the exclusive avenue for bringing a procedural challenge to the USPS's failure to comply with Section 3661. *See Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1828 (D.C. Cir. 1973) ("[T]he permissive interpretation is conclusively proven to be correct [together with the particular legislative history] by the fact that when in the same statute Congress intended a mandatory direction it used the auxiliary 'shall' not 'may'—a contrast which is generally significant . . . ."). This interpretation is strengthened because the statute expressly provides that this

23

Court has original jurisdiction "over all actions brought by or against the Postal Service" unless "otherwise provided in [title 39]." 39 U.S.C. § 409(a).

The availability of judicial review for the USPS's failure to comply with Section 3661 is consistent with the legislative history of the PRA. In the discussion of the section of the PRA that established the "procedures for changes in postal service," the House Committee Report states that "[t]he postal service is—first, last, and always—a public service" and that the PRA "require[s] [Postal Services management] to seek out the needs and desires of its present and potential customers—the American public." H.R. Rep. No. 91-1104 at 3668. The Committee Report describes provisions in the act that "contain[] specific provisions requiring justification and review of changes in service." *Id.; see Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 263 n.6 (5th Cir. 1975) ("[T]he procedures mandated by 3661 are sufficiently elaborate to amount to a significant impediment in the path of the decision-making process of the Postal Service.").

The Court must also consider whether the claim may be reviewed because there is no other meaningful or adequate avenue for judicial review. *See Thunder Basin Coal Co.*, 510 U.S. at 307. District court jurisdiction may not be implicitly precluded based on consideration of the following factors: (1) if "'a

24

finding of preclusion could foreclose all meaningful judicial
review'"; (2) if the claim is "'wholly collateral to a statute's
review provisions'"; and (3) if the claims are "'outside the
agency's expertise'" to discern "whether the particular claims
at issue fall outside an overarching congressional design."[7]
*Jaresky v. SEC*, 803 F.3d 9, 17 (D.D.C. 2015) (quoting *Free
Enter. Fund v. Pub. Company Acct. Oversight Board*, 561 U.S. 477,
489-90 (2010). Mindful of the fact that there is a 90-day window
for the PRC to respond to a complaint brought pursuant to
Section 3661, Defendants contend that it does not matter that
the PRC cannot provide immediate relief because eventual relief
is sufficient as a matter of law. Defs.' Opp'n, ECF No. 21 at 43
n.11. However, the authority upon which Defendants rely is
inapposite. In *American Federation of Government Employees, AFL-
CIO v. Trump*, 929 F.3d 748 (D.D.C. 2019), the court held that
meaningful judicial review was not foreclosed because Plaintiffs
were unable to obtain "pre-implementation review of executive
orders or immediate relief barring all agencies from
implementing the executive orders," *Id*. at 755 (internal
quotation marks omitted); because there the parties agreed to
consolidate their preliminary injunction requests with the

---

[7] Defendants' assertion that the three factors must be met is
incorrect. *See Jaresky v. SEC*, 803 F.3d 9, 17 (D.D.C. 2015).

merits, *see* Scheduling Order, Civil Action No. 18-1261, ECF No. 16 at 1.

With regard to the first consideration—whether Plaintiff would be denied meaningful review—it is clear that it would. There is no dispute that the USPS did not comply with Section 3661 in implementing the Transportation Policy Changes, and Plaintiff has provided evidence demonstrating that the changes have resulted in mail delays which cause Plaintiff's members and Plaintiff as an organization harm. *See supra* IV.A.1. Accordingly, even if there was a "fairly discernible" intent in the statutory scheme to preclude district court jurisdiction, requiring Plaintiff to go through the PRC process would deny it meaningful review. *See Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th Cir. 2018) (noting that "plaintiffs are denied meaningful review when they are subject to some additional and irremediable harm beyond the burdens associated with the dispute resolution process" (internal quotation marks and citations omitted)); *Krescholleck v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996) (noting that the plaintiff had "alleged a sufficiently serious irreparable injury to lead us to conclude that the administrative review process is insufficient to afford him full relief"). And persuasive authority holds that this factor is the "most important." *Berkley*, 896 F.3d at 630. Accordingly, this first factor weighs in favor of finding

26

Congress intended district courts to have jurisdiction over claims such as the one brought by Plaintiff. The second consideration–whether the claim is wholly collateral to the statutory scheme—is "'related' to whether 'meaningful judicial review' is available, and the two considerations are analyzed together." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 758 (D.C. Cir. 2019) (quoting *Jarskey*, 803 F.3d at 22.) The question to ask is "whether the plaintiffs 'aimed to obtain the same relief they could seek in the agency proceeding.'" *Id.* at 758-60 (quoting *Jarskey*, 803 F.3d at 23). Here, the relief Plaintiff seeks cannot be meaningfully redressed through filing a Section 3662 complaint.

The third consideration is whether the claim is "beyond the expertise" of the PRC. Plaintiff's claim is that the USPS failed to comply with the procedural requirement set forth in Section 3661. This procedural claim does not require the "agency expertise" the statutory procedures contemplate. *Berkley*, 896 F.3d at 630. Accordingly, precluding district court jurisdiction here would completely deny Plaintiff meaningful review given the timing of the implementation of the Transportation Policy Changes.

For all these reasons, the Court likely has subject matter jurisdiction over Plaintiff's Section 3661(b) claim. *See Commonwealth of Pennsylvania v. DeJoy,* Civil Action No. 20-4096,

2020 WL 5763553, *22 (E.D. Pa. Sept. 29, 2020) (stating that "Congressional intent to preclude district courts from hearing claims relating to [S]ection 3661(b) is not fairly discernible from the text, structure, and legislative history of the PRA.").

### 3. Plaintiff's Section 3661(b) Claim Is Likely Reviewable Pursuant To The *Ultra Vires* Doctrine

While as a general matter "the Postal Service is exempt from review under the Administrative Procedure Act, . . . its actions are reviewable to determine whether it has acted in excess of its statutory authority." *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012). "The scope of Non-APA review is narrow . . . [and] is available only to determine whether the agency has acted *ultra vires*—that is whether it has exceeded its statutory authority." *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016) (quotation marks and citations omitted).

Defendants contend that *ultra vires* review is unavailable because: (1) Plaintiff cannot show that USPS acted "in excess of its delegated powers and contrary to a specific prohibition" because they cannot show that USPS violated Section 3661(b); and (2) Plaintiff has a "meaningful and adequate means of vindicating [their] statutory rights" because they can file a complaint with the PRC pursuant to Section 3662. Defs.' Opp'n, ECF No. 21 at 44 (citing *Nat'l Air Traffic Controllers Ass'n*

28

*AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1258 (D.C. Cir. 2006) (internal quotation marks and citations omitted)).

The Court is persuaded that Plaintiff's claim is reviewable:

> "Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction." *Griffith v. FLRA,* 842 F.2d 487, 492 (D.C. Cir. 1988) (citing the leading case, *Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 183-84, 3 L. Ed. 2d 210 (1958) (finding judicial review proper despite statutory preclusion of judicial review, where the NLRB acted "in excess of its delegated powers and contrary to a specific prohibition" in the NLRA)).

*Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d 116, 1172-73 (D.C. Cir. 2003). Plaintiff's claim here is that the USPS failed to comply with the requirement Congress set forth in Section 3661. Accordingly, Plaintiff's claim "clearly admit[s] of judicial review." *Id.* at 1173.

### 4. USPS Likely Failed to Comply with Section 3661(b)

The scope of non-APA review includes, among other things, "a straightforward question of statutory interpretation." *Nat'l Ass'n of Postal Sup'rs v. U.S. Postal Serv.*, 602 F.2d 420, 432 (D.C. Cir. 1979). In conducting this review, "[t]he judicial role is to determine the extent of the agency's delegated authority and then determine whether the agency has acted within

29

that authority. In this as in other settings, courts owe a measure of deference to the agency's own construction of its organic statute, but the ultimate responsibility for determining the bounds of administrative discretion is judicial." *Id.* at 432-33 (internal citations omitted).

Section 3661(b) provides that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."

Persuasive authority has construed Section 3661(b) as follows:

> The language of the statute . . . indicates that three factors must coexist before 3661 applies. First, there must be a 'change.' This implies that a quantitative determination is necessary. There must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661. Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered. Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved. These three factors combine to demonstrate that Congress intended the safeguards of 3661 to apply only when changes of significance were contemplated.

*Buchanan v. U.S. Postal Service*, 508 F.2d 259, 263 (5th Cir. 1975).

There is no dispute that the USPS did not comply with Section 3661(b) prior to implementing the Transportation Policy Changes. Defendants argue that the Transportation Policy Changes do not implicate Section 3661(b) because: (1) there has been no "meaningful impact on service;" (2) postal services available to the user have not been altered; and (3) the changes have not affected service in a broad geographical area. Defs.' Opp'n, ECF No. 21 at 46 (quoting and citing *Buchanan* 508 F.2d at 263). In support, Defendants argue that "[t]he only notable change USPS has made has been to renew its emphasis on adhering to its published schedule, including developing written guidance clarifying the circumstances under which extra truck trips were acceptable, in order to mitigate the number of unplanned and unnecessary trips" which is not a "change" that is contemplated in Section 3661. *Id*. at 46-47. Defendants contend that this "is not a new policy but rather has a renewed focus on ensuring the Postal Service complies with its *existing policies*, and that it operates as efficiently as possible." *Id*. Defendants conclude that this is "precisely the type of management direction to which [S]ection 3661 does not apply." *Id*. at 47.

31

The Court is persuaded that Plaintiff is likely to succeed on its claim that Defendants violated Section 3661(b) by failing to submit the Transportation Policy Changes to the PRC. First, it was a "change" because it has had a "meaningful impact on service." *Buchanan*, 508 F.2d at 263. Plaintiff points to evidence showing that the reduction in extra and late trips has resulted in changes to service standards nationwide because it has resulted in nationwide delays. *See supra* at 6-7, 13-14; *see also* August 13, 2020 Email, ECF No. 25-1 at 4 ("We have also reduced extra trips by 71 percent – a tremendous achievement.") Furthermore, Plaintiff has demonstrated that Defendants' position that the Transportation Policy Changes do not constitute a "change" is not supported by the USPS's own statements. *See id.* at 3-4 ("In order to transform . . . we must make a significant number of changes that will not be easy . . . ); *Id.* at 4 ("Unfortunately, this transformative initiative has had unintended consequences that impacted out overall service levels. However, recent changes are not the only contributing factors."); *Id.* ("I ask that you bear with me while we work through these changes to transform for the better . . .").

Second, the changes were "in the nature of postal services," 39 U.S.C. § 3661(b) because they qualitatively altered "the manner in which postal services [are] available to the user," *Buchanan*, 508 F.2d at 263. As stated above, Plaintiff

32

points to evidence showing that the reduction in extra and late trips resulted in nationwide delays.

Third, the changes affected service "on a nationwide or substantially nationwide basis," 39 U.S.C. § 3661(b) because "[a] broad geographical area [was] involved," *Buchanan*, 508 F.2d at 263. Defendants' own evidence demonstrates that service was affected on a nation-wide basis. *See* Defs.' Ex. 14, ECF No. 21-1 at 452-53 (Mr. DeJoy stating that the reduction in late and extra trips occurred in "[e]very state a truck moves in").

Defendants contend that pursuant to past practice, the types of "nationwide changes that trigger 3661's review are general changes to postal facility hours or service standards for mail delivery"; and not the type of operational change at issue here. *Id*. at 47-49. However, based on the analysis above, the significant reduction in late and extra trips has resulted in a change to service standards.

While it is clear that Congress did not intend for the courts to micromanage the operations of the USPS, requiring the USPS to comply with the statutory requirement that it obtain an advisory opinion from the PRC and provide for notice and comment prior to implementing "a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" is not micro-managing; it is requiring the USPS to act within its statutory authority.

33

Furthermore, Congress clearly intended Section 3661 to require an opportunity for public participation and for independent review before the USPS implements service changes that will have a broad effect. The broad scope of the Transportation Policy Changes demonstrates on its face that it is precisely the kind of change that is to be the subject of the public-participation and independent review safeguards provided by Section 3661.

Finally, Defendants argue that because Plaintiff has a "meaningful and adequate means of vindicating their statutory rights" by filing a complaint with the PRC and then seek judicial review in the D.C. Circuit if unsatisfied, they cannot establish *ultra vires* jurisdiction. Defs.' Opp'n, ECF No. 21 at 44. Plaintiff responds—and the Court agrees—that the PRC complaint process, even if it is available for their procedural challenge, would not redress its injury due to the timeframes involved. Reply, ECF No. 25 at 18. Because the Court finds that Plaintiff has shown it will likely succeed on its claim that Defendants' Transportation Policy Changes likely violated 39 U.S.C. § 3661(b), the Court need not evaluate Plaintiff's claim that Defendants acted arbitrarily, capriciously, and contrary to the mandate of Section 101(e) at this time.

## C.    Plaintiff Faces Irreparable Harm

"In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted). Furthermore, an organization faces irreparable harm where (1) the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs," *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quoting *Fair Emp't Council of Greater Wash.*, 28 F.3d at 1276), and (2) "the defendant's actions 'directly conflict with the organization's mission," *id.* (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

With regard to the irreparable harm to its members, Plaintiff argues and submits evidence demonstrating that the "changes that USPS implemented without following the required [S]ection 3661 process have caused delays that harm, and will continue to harm, NAACP members." Mot., ECF No. 8-1 at 38. Defendants counter first, that there is no procedural injury

35

because "Plaintiff cannot state a claim under [S]ection 3661 and thus cannot have suffered any procedural injury as a result of any violation of that statute." Defs.' Opp'n, ECF No. 21 at 52. However, the Court has determined that Defendants likely violated Section 3661(b). *See supra* Section IV.A.4. And a failure to comply with Section 3661(b) is sufficient to show irreparable harm. *See Buchanan*, 375 F. Supp. 1014, 1022 (N.D. Ga. 1974) ("The denial of . . . a [Section 3661] hearing, should one be required, is sufficient irreparable injury to support interlocutory injunctive relief, for it is clear that no hearing will be conducted and that the changes will continue unless enjoined.") *aff'd in relevant part*, 508 F.2d at 266 (stating that the district court "was correct in its determinations that plaintiffs had properly established that there was a substantial threat of irreparable injury"). Second, Defendants counter that "Plaintiff has not identified that its members are likely to suffer any injuries in terms of the potential future delay of their ballots" in light of the USPS's service improvements, noting that all Mr. Graham has to do is "mail[] his ballot a reasonable time before the election (which is approximately two months away)." Defs.' Opp'n, ECF No. 21 at 52. However, Mr. Graham's ability to return his ballot on time is not wholly within his control as the mailing of ballots is a matter of state law. *See supra* Section II.B.1 Furthermore, Plaintiff has

36

demonstrated that mail delays have persisted. *See generally*
Second Decl. of Earl Graham, ECF No. 25-2.

    With regard to irreparable harm to Plaintiff as an
organization, Plaintiff argues and submits evidence
demonstrating that "the delays caused by the Postal Service's
changes have harmed, and continue to harm, the NAACP itself by
frustrating its mission and requiring it to divert resources to
counteract the effect of USPS's action." Mot., ECF No. 8-1 at
39-40. Defendants counter that Plaintiff's claimed injury to its
resources fails because "Plaintiff has not established that mail
delays were necessarily the result of the challenged policies,
or that future delays, if there are any, would be the result of
these Postal Service operational changes," Defs.' Opp'n, ECF No.
21; and that in view of the steps USPS has taken to improve
service performance, Plaintiff cannot show that "future harm is
imminent or likely to recur," *id*. at 53. However, the Court has
already determined that Plaintiff as an organization has
demonstrated irreparable harm. *See* supra at 15-20.

    Accordingly, both Plaintiff's members and Plaintiff as an
organization face irreparable harm absent a preliminary
injunction.

**D.    The Balance Of Equities And Public Interest Favor An Injunction**

The balance-of-equities factor directs the Court to "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'" *ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.; see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast, the balance of equities may favor a preliminary injunction that serves only "'to preserve the relative positions of the parties until a trial on the merits can be held.'" 64 F. Supp. 3d 195, 205 (D.D.C. 2014) (quoting *Camenisch*, 451 U.S. at 395). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest,' *Winter*, 555 U.S. at 26." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).

Plaintiff argues that, as it explained in its argument that it has standing to bring its claims, without an injunction, "the NAACP and its members will suffer serious and immediate harms that could not be sufficiently remedied later . . . [and that] the Postal Service would not be harmed by an order requiring it to follow the law, and the public interest is served when administrative agencies comply with their statutory obligations," noting that "[t]his point applies fully to procedural obligations imposed by statute." Mot., ECF No. 8-1 at 41-42. Plaintiff also notes that "the public would not be harmed (to the contrary) by the restoration of reliable postal service, providing the timely delivery of medicines and checks and other important mail." *Id.* at 42.

Defendants fail to respond to Plaintiff's arguments, responding only that they are "undertaking extensive efforts to facilitate the timely delivery of Election Mail" and that "Plaintiff's member voters have an opportunity to avoid any harm by mailing in their ballots without delay." Defs.' Opp'n, ECF No. 21 at 54. Defendants also contend that ensuring "full compliance could [inappropriately] require the Court to act as an overseer of the agency's day-to-day activities." *Id*.

The balance of the equities and the public interest favor an injunction. First, Defendants identify no harms to themselves whereas Plaintiff has demonstrated serious, immediate, and

recurring harms to its members and to itself as an organization. Defendants' suggestion that an injunction could require the Court to oversee the USPS's "day-to-day activities" is without merit given that the Court will issue a targeted preliminary injunction enjoining the USPS from implementing the Transportation Policy Changes. Second, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion for a preliminary injunction. Any request to stay this decision pending appeal will be denied for substantially the same reasons as those articulated in this Opinion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **October 10, 2020**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELVIN JOHNAKIN, individually and on behalf of all others similarly situated | : | |
| | : | |
| Plaintiff, | : | Case No. 2:20-CV-04055 |
| | : | |
| vs. | : | |
| | : | |
| UNITED STATES POSTAL SERVICE, LOUIS DEJOY, in his official capacity as Postmaster General of the United States Postal Service, DONALD J. TRUMP, in his official Capacity as President of the United States of America | : | |
| | : | |
| Defendants. | : | |

## JOINT STIPULATION TO STAY CASE IN LIGHT OF SETTLEMENT AGREEMENT

AND NOW, this 8th day of October, 2020, the Parties hereto, by and through their undersigned counsel, hereby stipulate and agree to stay this case in light of the agreement between the parties to settle this case. *See* attached Settlement Agreement. The Parties further move that this Court stay all deadlines in this proceeding pending further motion of the parties and/or the entry of a stipulation of dismissal. As provided in the attached Settlement Agreement, this Court retains jurisdiction to enforce the terms of this agreement until the dismissal of this case in accordance with the Parties' agreement.

Respectfully submitted,

VAN DER VEEN, O'NEILL, HARTSHORN & LEVIN

DATE: October 8, 2020

BY: /s/ Michael T. van der Veen_____
Michael T. van der Veen
Attorney for Plaintiff
Attorney ID No. 75616
1219 Spruce Street
Philadelphia, PA 19107
P: 215-546-1000
F: 215-546-8529
E: mtv@mtvlaw.com

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

WILLIAM M. McSWAIN
U.S. Attorney for the Eastern District of Pennsylvania

ERIC WOMACK
Assistant Branch Director, Federal Programs Branch

*/s/ Joseph E. Borson*
JOSEPH E. BORSON
KUNTAL V. CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 514-1944
Joseph.Borson@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELVIN JOHNAKIN, individually and on behalf of all others similarly situated | : | |
| | : | |
| Plaintiff, | : | Case No. 2:20-CV-04055 |
| | : | |
| vs. | : | |
| | : | |
| UNITED STATES POSTAL SERVICE, LOUIS DEJOY, in his official capacity as Postmaster General of the United States Postal Service, DONALD J. TRUMP, in his official Capacity as President of the United States of America | : | |
| | : | |
| Defendants. | : | |

## [PROPOSED] ORDER

Pursuant to the parties' stipulation, IT IS HEREBY ORDERED that all deadlines in this action are STAYED pending further Order of the Court or the dismissal of this action.

_____

Honorable Gerald Austin McHugh

United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELVIN JOHNAKIN, individually and on behalf of all others similarly situated | : | |
| | : | |
| Plaintiff, | : | Case No. 2:20-CV-04055 |
| | : | |
| vs. | : | |
| | : | |
| UNITED STATES POSTAL SERVICE, LOUIS DEJOY, in his official capacity as Postmaster General of the United States Postal Service, DONALD J. TRUMP, in his official Capacity as President of the United States of America | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## <u>AGREEMENT</u>

AND NOW, this 8th day of October, 2020, Plaintiff and Defendants hereby agree as set forth herein.

WHEREAS Plaintiff has brought this suit seeking to enjoin certain operational changes allegedly implemented by the United States Postal Service ("USPS"), so that such changes would not affect the 2020 November Election.

WHEREAS Defendants have implemented Operating Instructions and Supplemental Guidance making clear that the operational changes of which Plaintiff complains have been and will be resolved until after the 2020 November Election.

WHEREAS the Parties have reached agreement on a means to resolve this lawsuit without the cost and burden of additional litigation.

The Parties therefore enter into the following agreement:

1. Defendants shall comply with the "Clarifying Operational Instructions" issued on September 21, 2020, and as required by the Order entered by this Court on September 28, 2020 (ECF No. 63) in *Commonwealth of Pennsylvania v. DeJoy et al.*; No. 2:20-CV-04096 (E.D. Pa.

Sept. 28, 2020) (McHugh, J.), attached hereto as Exhibit "A." These include, but are not limited to, restrictions on the reductions of retail hours, the removal of collection boxes, the closure or consolidation of mail processing facilities, the removal of mail sorting machines, the policy establishing that "late or extra trips that are reasonably necessary to complete timely mail delivery [are] not to be unreasonably restricted or prohibited," and that overtime is not banned or newly restricted, and that hiring is permitted for Craft positions pursuant to the applicable collective bargaining agreement, subject to the time limitations provided in Paragraph 7.

2. Defendants shall comply with the "Additional Resources for Election Mail Beginning October 1" issued on September 25, 2020, attached hereto as Exhibit "B", and shall not deviate from the same except as authorized by this Court, subject to the time limitations provided in Paragraph 7.

3. Defendants shall prioritize the delivery of Election Mail[1] in a timely manner consistent with the long-standing practices of the United States Postal Service.

4. Defendants shall simultaneously provide Plaintiff with copies of any submissions made to this Court as required by the Order entered by this Court on September 28, 2020 (ECF No. 63) in *Commonwealth of Pennsylvania v. DeJoy et al.*; No. 2:20-CV-04096 (E.D. Pa. Sept. 28, 2020) (McHugh, J.).

5. This Court shall retain jurisdiction over this matter to ensure that Defendants comply with this Court's directives and this Agreement.

6. Prior to bringing any dispute regarding compliance with the Court's directives and this Agreement to the Court's attention, Plaintiff shall submit written notice alleging a breach of this Agreement to counsel for Defendants by electronic mail. Such notice shall specify precisely the

---

[1] For purposes of this Agreement, the term "Election Mail" shall refer to any item mailed to or from authorized election officials that enables citizens to participate in the voting process, including voter registration materials, absentee or mail-in ballot applications, polling place notifications, blank ballots, and completed ballots.

basis for the alleged breach, and shall describe with particularity all of the facts and circumstances supporting such claim. Defendants shall have a period of forty-eight (48) hours after the receipt of such notice described in Paragraph 6, *supra*, to take appropriate action to resolve the alleged claim. Plaintiff may not bring any dispute regarding an alleged breach to the Court until the expiration of the forty-eight (48) hour period discussed above.

7. The Parties agree that they shall jointly move that all deadlines in this action shall be stayed during the period that this Agreement is in effect. The Parties further agree that they will voluntarily dismiss this action with prejudice on November 10, 2020, assuming that there are no unresolved disputes pending on that date as to Defendants' compliance with the Court's directives and this Agreement which were brought by Plaintiff in accordance with Paragraph 6, *supra*. As of the date of the dismissal of this action, all obligations under this Agreement expire concurrent with the dismissal of this action.

8. Nothing in this Settlement Agreement shall constitute or be construed to constitute an admission of any wrongdoing or liability by Defendants, an admission by Defendants of the truth of any allegations or the validity of any claim asserted in this Action, or a concession or admission by Defendants of any fault or omission of any act or failure to act.

9. Each Party shall bear its own costs, fees, and expenses.

10. The terms of the numbered paragraphs of this Settlement Agreement constitute the entire Settlement Agreement of the Parties, and no statement, remark, agreement, or understanding, oral or written, that is not contained herein shall be recognized or enforced.

11. The Parties acknowledge that this Settlement Agreement constitutes a negotiated compromise. The Parties agree that any rule of construction under which any terms or latent ambiguities are construed against the drafter of a legal document shall not apply to this Settlement Agreement. This Settlement Agreement shall be construed in a manner to ensure its consistency with federal law. Nothing contained in this Settlement Agreement shall impose upon Defendants

any duty, obligation, or requirement, the performance of which would be inconsistent with federal statues, rules, or regulations in effect at the time of such performance.

12. This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall be deemed one and the same instrument.


FOR THE PARTIES:

VAN DER VEEN, O'NEILL, HARTSHORN & LEVIN

DATE: October 8, 2020       BY: /s/ Michael T. van der Veen_____
                                 Michael T. van der Veen
                                 Attorney for Plaintiff
                                 Attorney ID No. 75616
                                 1219 Spruce Street
                                 Philadelphia, PA 19107
                                 P: 215-546-1000
                                 F: 215-546-8529
                                 E: mtv@mtvlaw.com


                                 JEFFREY BOSSERT CLARK
                                 Acting Assistant Attorney General

                                 WILLIAM M. McSWAIN
                                 U.S. Attorney for the Eastern District of Pennsylvania

                                 ERIC WOMACK
                                 Assistant Branch Director, Federal Programs Branch

                                 /s/ Kuntal Cholera_____
                                 JOSEPH E. BORSON
                                 KUNTAL V. CHOLERA
                                 Trial Attorney
                                 U.S. Department of Justice
                                 Civil Division, Federal Programs Branch
                                 1100 L Street, NW
                                 Washington, D.C. 20005
                                 (202) 514-1944
                                 joseph.borson@usdoj.gov

                                 *Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MELVIN JOHNAKIN, individually and on behalf of all others similarly situated | : : : | |
| Plaintiff, | : : | Case No. 2:20-CV-04055 |
| vs. | : : | |
| UNITED STATES POSTAL SERVICE, LOUIS DEJOY, in his official capacity as Postmaster General of the United States Postal Service, DONALD J. TRUMP, in his official Capacity as President of the United States of America | : : : : : : : | |
| Defendants. | : : | |

## JOINT STIPULATION TO STAY CASE IN LIGHT OF SETTLEMENT AGREEMENT

AND NOW, this 8th day of October, 2020, the Parties hereto, by and through their undersigned counsel, hereby stipulate and agree to stay this case in light of the agreement between the parties to settle this case. *See* attached Settlement Agreement. The Parties further move that this Court stay all deadlines in this proceeding pending further motion of the parties and/or the entry of a stipulation of dismissal. As provided in the attached Settlement Agreement, this Court retains jurisdiction to enforce the terms of this agreement until the dismissal of this case in accordance with the Parties' agreement.

Respectfully submitted,

VAN DER VEEN, O'NEILL, HARTSHORN & LEVIN

DATE: October 8, 2020

BY: /s/ Michael T. van der Veen
Michael T. van der Veen
Attorney for Plaintiff
Attorney ID No. 75616
1219 Spruce Street
Philadelphia, PA 19107
P: 215-546-1000
F: 215-546-8529
E: mtv@mtvlaw.com

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

WILLIAM M. McSWAIN
U.S. Attorney for the Eastern District of Pennsylvania

ERIC WOMACK
Assistant Branch Director, Federal Programs Branch

*/s/ Joseph E. Borson*
JOSEPH E. BORSON
KUNTAL V. CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 514-1944
Joseph.Borson@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELVIN JOHNAKIN, individually and on behalf of all others similarly situated | : : : | |
| Plaintiff, | : : | Case No. 2:20-CV-04055 |
| vs. | : : | |
| UNITED STATES POSTAL SERVICE, LOUIS DEJOY, in his official capacity as Postmaster General of the United States Postal Service, DONALD J. TRUMP, in his official Capacity as President of the United States of America | : : : : : : : | |
| Defendants. | : : | |

## [PROPOSED] ORDER

Pursuant to the parties' stipulation, IT IS HEREBY ORDERED that all deadlines in this action are STAYED pending further Order of the Court or the dismissal of this action.

_____

Honorable Gerald Austin McHugh

United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELVIN JOHNAKIN, individually and on behalf of all others similarly situated | : | |
| | : | |
| Plaintiff, | : | Case No. 2:20-CV-04055 |
| | : | |
| vs. | : | |
| | : | |
| UNITED STATES POSTAL SERVICE, LOUIS DEJOY, in his official capacity as Postmaster General of the United States Postal Service, DONALD J. TRUMP, in his official Capacity as President of the United States of America | : | |
| | : | |
| Defendants. | : | |

## AGREEMENT

AND NOW, this 8th day of October, 2020, Plaintiff and Defendants hereby agree as set forth herein.

WHEREAS Plaintiff has brought this suit seeking to enjoin certain operational changes allegedly implemented by the United States Postal Service ("USPS"), so that such changes would not affect the 2020 November Election.

WHEREAS Defendants have implemented Operating Instructions and Supplemental Guidance making clear that the operational changes of which Plaintiff complains have been and will be resolved until after the 2020 November Election.

WHEREAS the Parties have reached agreement on a means to resolve this lawsuit without the cost and burden of additional litigation.

The Parties therefore enter into the following agreement:

1. Defendants shall comply with the "Clarifying Operational Instructions" issued on September 21, 2020, and as required by the Order entered by this Court on September 28, 2020 (ECF No. 63) in *Commonwealth of Pennsylvania v. DeJoy et al.*; No. 2:20-CV-04096 (E.D. Pa.

Sept. 28, 2020) (McHugh, J.), attached hereto as Exhibit "A." These include, but are not limited to, restrictions on the reductions of retail hours, the removal of collection boxes, the closure or consolidation of mail processing facilities, the removal of mail sorting machines, the policy establishing that "late or extra trips that are reasonably necessary to complete timely mail delivery [are] not to be unreasonably restricted or prohibited," and that overtime is not banned or newly restricted, and that hiring is permitted for Craft positions pursuant to the applicable collective bargaining agreement, subject to the time limitations provided in Paragraph 7.

2. Defendants shall comply with the "Additional Resources for Election Mail Beginning October 1" issued on September 25, 2020, attached hereto as Exhibit "B", and shall not deviate from the same except as authorized by this Court, subject to the time limitations provided in Paragraph 7.

3. Defendants shall prioritize the delivery of Election Mail[1] in a timely manner consistent with the long-standing practices of the United States Postal Service.

4. Defendants shall simultaneously provide Plaintiff with copies of any submissions made to this Court as required by the Order entered by this Court on September 28, 2020 (ECF No. 63) in *Commonwealth of Pennsylvania v. DeJoy et al.*; No. 2:20-CV-04096 (E.D. Pa. Sept. 28, 2020) (McHugh, J.).

5. This Court shall retain jurisdiction over this matter to ensure that Defendants comply with this Court's directives and this Agreement.

6. Prior to bringing any dispute regarding compliance with the Court's directives and this Agreement to the Court's attention, Plaintiff shall submit written notice alleging a breach of this Agreement to counsel for Defendants by electronic mail. Such notice shall specify precisely the

---

[1] For purposes of this Agreement, the term "Election Mail" shall refer to any item mailed to or from authorized election officials that enables citizens to participate in the voting process, including voter registration materials, absentee or mail-in ballot applications, polling place notifications, blank ballots, and completed ballots.

basis for the alleged breach, and shall describe with particularity all of the facts and circumstances supporting such claim. Defendants shall have a period of forty-eight (48) hours after the receipt of such notice described in Paragraph 6, *supra*, to take appropriate action to resolve the alleged claim. Plaintiff may not bring any dispute regarding an alleged breach to the Court until the expiration of the forty-eight (48) hour period discussed above.

7. The Parties agree that they shall jointly move that all deadlines in this action shall be stayed during the period that this Agreement is in effect. The Parties further agree that they will voluntarily dismiss this action with prejudice on November 10, 2020, assuming that there are no unresolved disputes pending on that date as to Defendants' compliance with the Court's directives and this Agreement which were brought by Plaintiff in accordance with Paragraph 6, *supra*. As of the date of the dismissal of this action, all obligations under this Agreement expire concurrent with the dismissal of this action.

8. Nothing in this Settlement Agreement shall constitute or be construed to constitute an admission of any wrongdoing or liability by Defendants, an admission by Defendants of the truth of any allegations or the validity of any claim asserted in this Action, or a concession or admission by Defendants of any fault or omission of any act or failure to act.

9. Each Party shall bear its own costs, fees, and expenses.

10. The terms of the numbered paragraphs of this Settlement Agreement constitute the entire Settlement Agreement of the Parties, and no statement, remark, agreement, or understanding, oral or written, that is not contained herein shall be recognized or enforced.

11. The Parties acknowledge that this Settlement Agreement constitutes a negotiated compromise. The Parties agree that any rule of construction under which any terms or latent ambiguities are construed against the drafter of a legal document shall not apply to this Settlement Agreement. This Settlement Agreement shall be construed in a manner to ensure its consistency with federal law. Nothing contained in this Settlement Agreement shall impose upon Defendants

any duty, obligation, or requirement, the performance of which would be inconsistent with federal statues, rules, or regulations in effect at the time of such performance.

12. This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall be deemed one and the same instrument.


FOR THE PARTIES:

VAN DER VEEN, O'NEILL, HARTSHORN & LEVIN

DATE: October 8, 2020          BY: /s/ Michael T. van der Veen_____
                               Michael T. van der Veen
                               Attorney for Plaintiff
                               Attorney ID No. 75616
                               1219 Spruce Street
                               Philadelphia, PA 19107
                               P: 215-546-1000
                               F: 215-546-8529
                               E: mtv@mtvlaw.com


                               JEFFREY BOSSERT CLARK
                               Acting Assistant Attorney General

                               WILLIAM M. McSWAIN
                               U.S. Attorney for the Eastern District of Pennsylvania

                               ERIC WOMACK
                               Assistant Branch Director, Federal Programs Branch

                               /s/ Kuntal Cholera_____
                               JOSEPH E. BORSON
                               KUNTAL V. CHOLERA
                               Trial Attorney
                               U.S. Department of Justice
                               Civil Division, Federal Programs Branch
                               1100 L Street, NW
                               Washington, D.C. 20005
                               (202) 514-1944
                               joseph.borson@usdoj.gov

                               *Attorneys for Defendants*

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 337 of
471
Case 4:20-cv-00079-BMM   Document 38   Filed 10/14/20   Page 1 of 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

STEVE BULLOCK, in his official
capacity as Governor of Montana;

                                    *Plaintiff,*

vs.                                                         Case No. 4:20-cv-00079

UNITED STATES POSTAL                                        The Honorable Brian Morris,
SERVICE; and LOUIS DEJOY, in his                            Chief Judge
official capacity as Postmaster General

                                    *Defendants.*

## JOINT STIPULATION TO STAY CASE
## IN LIGHT OF SETTLEMENT AGREEMENT

On this 14th day of October, 2020, the Parties, by and through their
undersigned counsel, hereby stipulate and agree to stay this case in light of the
agreement between the parties to settle. *See* attached Settlement Agreement.
Accordingly, the Parties move this Court to vacate the October 15, 2020
hearing, and to stay all deadlines in this proceeding pending further motion of
the parties and/or the entry of a stipulation of dismissal. As provided in the attached
Settlement Agreement, this Court retains jurisdiction to enforce the terms of this
agreement until the dismissal of this case in accordance with the Parties'
agreement.

1

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 338 of
471
Case 4:20-cv-00079-BMM   Document 38   Filed 10/14/20   Page 2 of 9

Respectfully submitted,

Date: October 14, 2020                    /s/ Raphael Graybill
                                          RAPHAEL GRAYBILL
                                          Chief Legal Counsel
                                          RYLEE SOMMERS-FLANAGAN
                                          Deputy Legal Counsel
                                          Office of the Governor
                                          P.O. Box 200801
                                          Helena, MT 59620-0801
                                          (406) 444-3179

                                          *Counsel for Plaintiff Governor Bullock*

                                          JEFFREY BOSSERT CLARK
                                          Acting Assistant Attorney General

                                          ERIC WOMACK
                                          Assistant Branch Director, Federal Programs
                                          Branch

                                          /s/ John Robinson
                                          JOSEPH E. BORSON
                                          KUNTAL V. CHOLERA
                                          ALEXIS ECHOLS
                                          DENA M. ROTH
                                          JOHN ROBINSON
                                          Trial Attorney
                                          U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, NW
                                          Washington, D.C. 20005
                                          (202) 616-8489
                                          john.j.robinson@usdoj.gov

                                          *Attorneys for Defendants*

2

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 339 of
Case 4:20-cv-00079-BMM   Document 38   Filed 10/14/20   Page 3 of 9
471

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

STEVE BULLOCK, in his official
capacity as Governor of Montana;

*Plaintiff,*

vs.

Case No. 4:20-cv-00079

UNITED STATES POSTAL
SERVICE; and LOUIS DEJOY, in his
official capacity as Postmaster General

The Honorable Brian Morris,
Chief Judge

*Defendants.*

## PROPOSED ORDER

Pursuant to the parties' stipulation, it is hereby **ORDERED** that the October

15, 2020 hearing is **VACATED**; it is further **ORDERED** that all deadlines in this action

are **STAYED** pending further Order of the Court or the dismissal of this action.

_____
The Honorable Brian Morris
United States District Chief Judge

3

Case 1:20-cv-24069-RNS Document 44-4 Entered on FLSD Docket 10/21/2020 Page 340 of
471
Case 4:20-cv-00079-BMM Document 38 Filed 10/14/20 Page 4 of 9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

STEVE BULLOCK, in his official
capacity as Governor of Montana;

*Plaintiff,*

vs.

UNITED STATES POSTAL
SERVICE; and LOUIS DEJOY, in his
official capacity as Postmaster General

*Defendants.*

Case No. 4:20-cv-00079

The Honorable Brian Morris,
Chief Judge

## AGREEMENT

WHEREAS Plaintiff has brought this suit seeking to enjoin certain operational changes allegedly implemented by the United States Postal Service ("USPS"), so that such changes would not affect the 2020 November Election.

WHEREAS Defendants have implemented Operating Instructions and Supplemental Guidance making clear that the operational changes of which Plaintiff complains have been and will be resolved until after the 2020 November Election.

WHEREAS the Parties have reached agreement on a means to postpone this lawsuit and potentially reduce the cost and burden of additional litigation.

The Parties therefore enter into the following agreement:

1. Defendants shall comply with the "Clarifying Operational Instructions" issued on September 21, 2020, and attached hereto as Exhibit A. These include,

4

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 341 of
471
Case 4:20-cv-00079-BMM   Document 38   Filed 10/14/20   Page 5 of 9

but are not limited to, restrictions on the reductions of retail hours, the removal of
collection boxes, the closure or consolidation of mail processing facilities, and the
removal of mail sorting machines; establishing the policy that "late or extra trips
that are reasonably necessary to complete timely mail delivery [are] not to be
unreasonably restricted or prohibited"; providing that overtime is not to be banned
or newly restricted; and permitting hiring for Craft positions pursuant to the
applicable collective bargaining agreement, subject to the time limitations provided
in Paragraph 7.

2.      Defendants shall comply with the "Additional Resources for Election
Mail Beginning October 1" issued on September 25, 2020, and attached hereto as
Exhibit B, subject to the time limitations provided in Paragraph 7.

3.      Defendants shall prioritize the delivery of Election Mail[1] in a timely
manner consistent with the long-standing practices of the United States Postal
Service.

4.      Defendants shall simultaneously provide Plaintiff with copies of any
reporting submissions made to Judge McHugh, Judge Bastian, or Judge Marrero,
as required by the Orders entered by federal district courts on September 28, 2020

---

[1] For purposes of this Agreement, the term "Election Mail" shall refer to any item
mailed to or from authorized election officials that enables citizens to participate in
the voting process, including but not limited to voter registration materials, absentee
or mail-in ballot applications, polling place notifications, blank ballots, and completed
ballots.

(ECF No. 63) in *Commonwealth of Pennsylvania v. DeJoy et al.*; No. 2:20-CV-04096 (E.D. Pa. Sept. 28, 2020) (McHugh, J.) (attached hereto as Exhibit C), on September 17 and October 2, (ECF Nos. 81 and 90) in *Washington v. Trump et al.*; No. 20-CV-03127 (E.D. Wa. Sept. 17 and Oct. 2, 2020) (Bastian, J.) (attached hereto as Exhibits D and E), and on September 21 and 25, (ECF Nos. 49 and 57) in *Jones v. U.S. Postal Service et al.*; No. 20-CV-6516 (S.D.N.Y. Sept. 21 and 25, 2020) (Marrero, J.) (attached hereto as Exhibits F and G).

5.      This Court shall retain jurisdiction over this matter to ensure that Defendants comply with any directives it issues and this Agreement.

6.      Prior to bringing any dispute regarding compliance with the Court's directives and this Agreement to the Court's attention, Plaintiff shall submit written notice alleging a breach of this Agreement to counsel for Defendants by email. Such notice shall specify precisely the basis for the alleged breach, and shall describe with particularity all of the facts and circumstances supporting such claim. Defendants shall have a period of forty-eight (48) hours after the receipt of such notice described herein to take appropriate action to resolve the alleged claim. Plaintiff may not bring any dispute regarding an alleged breach to the Court until the expiration of the forty-eight (48) hour period.

7.      The Parties agree that they shall jointly move that all deadlines in this action shall be stayed during the period that this Agreement is in effect. The Parties

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 343 of
471
Case 4:20-cv-00079-BMM   Document 38   Filed 10/14/20   Page 7 of 9

further agree that they will voluntarily dismiss this action without prejudice on November 30, 2020, so long as there are no unresolved disputes pending on that date as to Defendants' compliance with the Court's directives and this Agreement which were brought by Plaintiff in accordance with Paragraph 6, *supra*. As of the date of the dismissal of this action, all obligations under this Agreement expire concurrent with the dismissal of this action.

8.      Nothing in this Settlement Agreement shall constitute or be construed to constitute an admission of any wrongdoing or liability by Defendants, an admission by Defendants of the truth of any allegations or the validity of any claim asserted in this Action, or a concession or admission by Defendants of any fault or omission of any act or failure to act.

9.      Each Party shall bear its own costs, fees, and expenses.

10.      The terms of the numbered paragraphs of this Settlement Agreement constitute the entire Settlement Agreement of the Parties, and no statement, remark, agreement, or understanding, oral or written, that is not contained herein shall be recognized or enforced.

11.      The Parties acknowledge that this Settlement Agreement constitutes a negotiated compromise. The Parties agree that any rule of construction under which any terms or latent ambiguities are construed against the drafter of a legal document shall not apply to this Settlement Agreement. This Settlement

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 344 of
471
Case 4:20-cv-00079-BMM   Document 38   Filed 10/14/20   Page 8 of 9

Agreement shall be construed in a manner to ensure its consistency with federal law. Nothing contained in this Settlement Agreement shall impose upon Defendants any duty, obligation, or requirement, the performance of which would be inconsistent with federal statutes, rules, or regulations in effect at the time of such performance.

12. This Settlement Agreement may be executed in counterparts, each of
which shall be deemed an original, and all of which together shall be deemed one
and the same instrument.

For the Parties:

Date: October 14, 2020

RAPHAEL GRAYBILL
Chief Legal Counsel
RYLEE SOMMERS-FLANAGAN
Deputy Legal Counsel
Office of the Governor
P.O. Box 200801
Helena, MT 59620-0801
(406) 444-3179
*Counsel for Plaintiff Governor Bullock*

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC WOMACK
Assistant Branch Director, Federal Programs
Branch

JOSEPH E. BORSON
KUNTAL V. CHOLERA
ALEXIS ECHOLS
DENA M. ROTH
JOHN ROBINSON
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 616-8489
john.j.robinson@usdoj.gov

9

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 346 of
471
Case 4:20-cv-00079-BMM   Document 38-1   Filed 10/14/20   Page 1 of 6

# EXHIBIT A

Case 1:20-cv-24069-RNS Document 44-4 Entered on FLSD Docket 10/21/2020 Page 347 of
Case 4:20-cv-00079-BMM Document 38-1 Filed 10/14/20 Page 2 of 6
471



**UNITED STATES**
**POSTAL SERVICE**

September 21, 2020

OFFICERS, PCES, AND PAY BAND MANAGERS

SUBJECT: Clarifying Operational Instructions

The number one priority for Postmaster General DeJoy and the Postal Service between now and Election Day is the secure and on-time delivery of the nation's election mail. Effective October 1, 2020, the Postal Service will make additional resources available in all areas of operations, including collection, processing, delivery, and transportation, to satisfy increased demand and unforeseen circumstances. These additional resources will include, as needed, additional staffing, additional transportation, and expanded mail processing windows and delivery trips, among others. Further guidance on use of additional resources will be provided separately.

To address any misinformation and clear up any confusion about the status of the Postal Service's practices concerning Overtime, Hiring, Retail Hours, Collection Boxes, Late and Extra Trips, Mail Processing, and Election Mail, these Clarifying Operational Instructions detail practices as they currently stand related to those topics.

As you may also be aware, a federal district court recently issued an order imposing certain requirements for the handling of mail. These Instructions are also intended to provide guidance to assist in carrying out the specific directives required by that order, as they relate to current operational practices.

The approach to the matters outlined in these Instructions will remain in effect until further notice and supersede any previous guidance provided on these specific topics that could be seen as conflicting with these Instructions, whether from Headquarters or the field.

## 1. Overtime

Postal Service Headquarters has not imposed, and will not impose, any nationwide changes that ban or newly restrict overtime prior to Election Day. Overtime use has not been banned, nor have any caps been placed on overtime hours. Front-line supervisors and managers will continue to schedule employees' work hours and oversee employee overtime, including planning for any needed prescheduled overtime, directing unscheduled overtime, and approving employee requests for overtime work based on the workload. Supervisors will continue to set schedules with the goal of matching the expected earned work hours with appropriate staffing. Management will continue to monitor the use of work hours and overtime so that it can identify and address problems that may be the cause of work not being performed within expected work hours or managed inefficiently.

The Postal Service's consistent practice in the past is to use justified and approved overtime hours where needed to deliver the mail on time, and that practice will continue. Overtime has been, and will continue to be, utilized as necessary to fulfill our mission. As will be discussed in more detail in the forthcoming guidance regarding the use of additional resources starting on October 1, use of overtime necessary to expeditiously move Election Mail should be approved.

## 2. Hiring

Postal Service Headquarters has not implemented a total hiring freeze. Because of the realignment of the Postal Service's reporting structure announced on August 7, 2020, Postal Service Headquarters has suspended hiring for EAS positions to ensure proper placement of any current employees that may be impacted by the restructuring. Although hiring of EAS positions has been suspended, there is a process in place to request exceptions to fill critical EAS positions.

The suspension of EAS hiring does not impact the filling of craft positions. Craft positions will continue to be filled pursuant to the applicable collective bargaining agreement. The Postal Service has hired, and will continue to hire, new employees to address staffing shortages caused by the COVID-19 pandemic and otherwise.

## 3. Retail Hours

Postal Service Headquarters has not directed or authorized a reduction in retail window hours. Evaluating retail hours is part of an annual process to optimize the Postal Service retail network. The Postal Service was in the process of gathering data to make decisions regarding retail hours based on customer demand. Given both congressional and public concern, the Postal Service will not be adjusting retail hours prior to the November 2020 elections.

There may be unforeseen circumstances beyond the Postal Service's control that necessitate the temporary change of retail hours or the temporary closure of a retail facility such as natural disasters, or conditions that reduce employee availability or create an unsafe environment for employees like the COVID-19 pandemic or civil unrest. However, local managers are not permitted to reduce retail hours without review and approval by both Area and Headquarters management.

There are Village Post Offices (VPO) and Contract Postal Units (CPU) that on occasion decide to terminate their contract or close due to uncontrollable circumstances. If the Postal Service is unable to negotiate an extension of services with these non-postal entities, there is no choice but to honor the contract termination. The Postal Service is currently in communication with those VPOs and CPUs that have indicated they intend to terminate their services prior to the November 2020 elections to determine whether an arrangement can be made to extend their services until after the elections.

## 4. Collection Boxes

Pursuant to the Postmaster General's August 18, 2020 directive, the Postal Service has suspended the removal of any additional collection boxes until after the 2020 elections. The Postal Service regularly reviews the need for, and location of, collection boxes in accordance with the Postal Service Postal Operations Manual. The purpose of these reviews is to ensure that mail collection within areas served by letter carriers is accomplished in a cost-efficient manner, while still meeting customers' needs. Over the last seven years, the Postal Service has removed an average of 3,100 collection boxes per year. This year, approximately 1,500 collection boxes have been removed.

Although the Postmaster General has suspended the removal of collection boxes between now and the November 2020 elections, it is important to note that there are instances where removal of a collection box is necessary. In the event of extreme weather conditions, collection boxes may be removed or covered to prevent damage. During events that involve national security, collection boxes along the transportation route may be temporarily removed for public safety. Similarly, localized events such as wildfires or civil unrest may necessitate a temporary removal of a collection box. These removals are temporary and collection boxes must be returned as soon as possible.

Between now and the November 2020 elections, it is critical that, if any collection boxes are damaged (for example, by hurricane or a car accident) and taken out of service, that they be replaced as soon as possible. If a collection box is in an area that is restricted for security or safety reasons, any request to cover or remove a collection box must be raised through appropriate communication channels. Communication between local office and District/Area/Headquarters channels is critical. Postmaster/Station Managers must notify their District Manager when there is an issue with a collection box. District Managers must notify Area Retail & Delivery Operations Vice Presidents, who must notify the Vice President of Delivery Operations to ensure all leadership is aware of the issue and can oversee the removal and subsequent replacement of the collection box.

Postal Service Headquarters is not planning to reinstall collection boxes that were removed as part of its routine review prior to the Postmaster General's statement concerning operational commitments issued on August 18, 2020. To be clear however, no additional collection boxes should be removed until after the election, other than on a temporary basis, and only for the reasons described herein.

## 5. Late and Extra Trips

Adherence to transportation schedules has long been a priority of the Postal Service. Because noncompliance with transportation schedules was a chronic problem that was causing late deliveries and unnecessary costs, there has been an organizational focus on adhering to the transportation schedules over the last two years.

After the Postmaster General took office, he reemphasized the need to ensure that the Postal Service's trucks run on time and on schedule, with the goal of mitigating unnecessary late and extra trips. This effort does not mean that mail should be left behind, (it should not), but rather that processing schedules should align with transportation schedules. Moreover, the Postmaster General has not banned the use of late or extra trips; when operationally required, late or extra trips are permitted.

Consistent with the court order referenced above, transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments.

## 6. Mail Processing

Pursuant to the Postmaster General's August 18, 2020 directive, and consistent with the order of the federal district court, no mail processing facilities will be closed or consolidated until after the November 2020 elections. Moreover, the Postal Service has suspended all removal of letter and flat sorting machines until after the November 2020 elections. During Fiscal Year 2020, approximately 700 letter and flat sorting machines were disconnected and/or removed. These reductions were made pursuant to volume modeling and equipment reduction targets for various mail processing equipment sent to the Area Vice Presidents for review and implementation on May 15, 2020, consistent with longstanding Postal Service practice. The reduction targets, which were based on significant volume reductions in letter and flats mail volume, and with the further decline due to COVID-19, were broad targets for reduction, with the final decisions regarding machine removal being determined after discussions between local management and Headquarters. Postal Service Headquarters has determined not to make any further removal of equipment until after the November 2020 elections.

Because removed machines are generally dissembled for their usable parts, with such parts being removed to maintain or enhance other machines, there is no current plan to return removed machines to service. Over the past month, however, a limited number of machines that were disconnected, but not dismantled and removed, have been put back into service. We have more than sufficient capacity to process current and anticipated mail volumes with the existing machine fleet.

3

As of September 18, 2020, Headquarters has approved all requests to reconnect machines directed to the Headquarters Director of Processing Operations and has provided Regional Vice Presidents with authority to reconnect machines where doing so is necessary. Specifically, if it is determined that it is necessary to add processing capacity to fulfill our service commitments with regard to Election Mail, available processing equipment will be returned to service. Any requests to reconnect a sorting machine reduced since June 2020, because it is believed that the machine is necessary to ensure the timely processing and delivery of Election Mail should be made by the relevant installation head to the relevant Regional Vice President. Any request will be processed within three days, as required by the order of the federal district court.

**7.   Election Mail**

The Postal Service and Postmaster General DeJoy have repeatedly reaffirmed their commitment to the timely delivery of Election Mail. Election Mail is defined as "any item mailed to or from authorized election officials that enables citizens to participate in the voting process." This includes ballots, voter registration forms, ballot applications, polling place notifications, and similar materials. This specific mail qualifies as Election Mail both when it is sent to voters from election officials at the state and local levels and when it is returned by voters to those officials. This is distinct from "political mail," which is sent by political candidates, political action committees, and similar organizations in order to engage in issue advocacy or to advocate for candidates or other things, such as initiatives, that may appear on a ballot. *See* Postal Bulletin 22551, July 30, 2020, at 4.

Consistent with the court order referenced above, we will continue to prioritize Election Mail that is entered as Marketing Mail regardless of the paid class. Election Mail identified by the official Election Mail logo or other Postal Service visibility tools will continue to be prioritized pursuant to our long-standing practice. In that regard, please continue to use standardized log sheets to track Election Mail through processing and continue to conduct daily "all clears" as previously instructed to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly. Election Mail entered as Marketing Mail should be advanced ahead of all other Marketing Mail and processed expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail delivery standards. In that regard, to the extent necessary, please expand processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day. Please also continue to prioritize Election Mail, including ballots entered with Green Tag 191, when loading trucks.

Consistent with our long-standing practice, we recognize that it is sometimes not operationally feasible to deliver Election Mail entered as Marketing Mail in line with First-Class Mail delivery standards. This is particularly true with respect to Election Mail Marketing Mail volume that would require air transportation to meet First-Class Mail delivery standards, as this volume typically travels through our ground transportation network, and our systems do not permit Marketing Mail to travel by air. We intend to seek clarification on this item, to make sure that the court understands this limitation and that it is consistent with the court's order.

**8.   Nationwide Changes in Service**

Under the applicable law, the Postal Service cannot make changes to the nature of Postal Services without first seeking an advisory opinion from the Postal Regulatory Commission. Consistent with the order of the federal district court referenced above, the Postal Service will not make any changes to our retail, delivery or processing operations, that will generally affect service on a nationwide, or substantially nationwide, basis, prior to the upcoming national election.

Case 1:20-cv-24069-RNS  Document 44-4  Entered on FLSD Docket 10/21/2020  Page 351 of
Case 4:20-cv-00079-BMM  Document 38-1  Filed 10/14/20  Page 6 of 6
471

Thank you for your attention. If you have any questions regarding Logistics and Processing Operations, please contact Mike Barber, Vice President, Processing and Maintenance Operations. If you have any questions regarding Retail and Delivery Operations, please contact Joshua Colin, Vice President, Delivery Operations or Angela Curtis, Retail and Post Office Operations.

We are continuing to evaluate our legal obligations and will circulate updates as necessary.

Kristin A. Seaver
Chief Retail & Delivery Officer
and Executive Vice President

David E. Williams
Chief Logistics & Processing Operations
Officer and Executive Vice President

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 352 of
Case 4:20-cv-00079-BMM   Document 38-2   Filed 10/14/20   Page 1 of 4
471

# EXHIBIT B


**UNITED STATES**
**POSTAL SERVICE**

September 25, 2020

OFFICERS, PCES, AND PAY BAND MANAGERS

SUBJECT: Additional Resources for Election Mail Beginning October 1

The November 3, General Election is fast approaching. While normal First-Class and Marketing Mail volumes are down considerably, the volume of Election Mail will be at an all-time high this season. COVID-19 has changed the way millions of people will vote this year, and many are turning to the United States Postal Service to deliver their ballots. Recognizing our important role in the democratic process, the Postmaster General has reiterated that our number one priority is the proper handling and timely delivery of all Election Mail, especially ballots.

Effective October 1, additional resources are being made available for District Managers, Postmasters, Division Directors, and Plant Managers to utilize, as they determine, to support the timely and expeditious handling of the increased volume of Election Mail, which is defined by the Postal Service as any item mailed to or from authorized election officials that enables citizens to participate in the voting process, such as ballots, voter registration cards, ballot applications, and polling place notifications. District Managers, Postmasters, Division Directors, and Plant Managers are authorized and instructed to use these additional resources to ensure that all Election Mail is prioritized and delivered on time. These resources are in addition to the existing processes and procedures for Election Mail.

These resources include, but are not limited to:

1. **Processing**

   As previously provided in the Clarifying Operational Instructions distributed on September 21, Election Mail entered as Marketing Mail should be advanced ahead of all other Marketing Mail and processed expeditiously to the extent feasible so that it is generally delivered in line with First-Class Mail delivery standards. Processing windows on letter and flat sorting equipment should be expanded as necessary to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day. Further, to the extent possible, Election Mail received after the Critical Entry Time should be processed and advanced as if it arrived prior to the Critical Entry Time, unless doing so would disrupt on-time service for Election Mail received prior to the Critical Entry Time.

   Other additional processing resources are also authorized and instructed to be used to ensure that Election Mail stays current and moving through the Postal Service's network. This includes, but is not limited to, early cancellations the week before Election Day to ensure all collected ballots are processed timely.

Case 1:20-cv-24069-RNS  Document 44-4  Entered on FLSD Docket 10/21/2020  Page 354 of
Case 4:20-cv-00079-BMM  Document 38-2  Filed 10/14/20  Page 3 of 4

- 2 -

2. **Transportation**

   Extra transportation resources are authorized and instructed to be used to ensure that
   Election Mail reaches its intended destination in a timely manner. This includes, but is not
   limited to, extra trips from all points of processing and delivery (e.g., retail units and plants),
   as necessary to connect Election Mail to its intended destination or the next stage in Postal
   Service processing.

3. **Delivery/Collections**

   Extra delivery and collection trips are authorized and instructed to be used to ensure, to the
   best of our ability, that completed ballots entered on Election Day reach the appropriate
   election official by the state's designated deadline on Election Day. This includes, but is not
   limited to, early collections the week before Election Day to ensure all collected ballots are
   processed timely, and delivery of ballots found in collections on Election Day to election
   boards within states requiring ballots be returned by a designated time on Election Day.

4. **Overtime**

   Overtime is authorized and instructed to be used to support these additional resources and
   the completion of the additional work, as needed.

In addition, to further support the timely delivery of Election Mail, and consistent with our practices in
past election cycles, the use of extraordinary measures beyond our normal course of operations is
authorized and expected to be executed by local management between October 26 and November
24, to accelerate the delivery of ballots, when the Postal Service is able to identify the mailpiece as a
ballot.

These extraordinary measures include, but are not limited to, expedited handling, extra deliveries,
and special pickups as used in past elections, to connect blank ballots entered by election officials to
voters or completed ballots returned by voters entered close to or on Election Day to their intended
destination (e.g., Priority Mail Express, Sunday deliveries, special deliveries, running collected ballots
to Boards of Elections on Election Day, etc.).

We will continue to communicate closely with election officials to encourage them to send ballots
earlier. We have also educated voters across the nation to request their ballots early (if they are
required to request a ballot) and to return their ballots early, if they plan on using the mail for one or
both legs of the journey.

Despite our best efforts to educate and communicate, however, we know that there will be entries of
ballots to and from voters that will require us to take the extra steps set forth herein to ensure timely
delivery. The additional resources available beginning October 1, and our robust practices and
procedures that we employ every election cycle as described above, will help ensure that we are able

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 355 of
Case 4:20-cv-00079-BMM   Document 38-2   Filed 10/14/20   Page 4 of 4

- 3 -

to do everything in our power to meet our customers' expectations that mail will be delivered in a timely manner when our customers use the mail to facilitate or participate in the electoral process.

Thank you for your hard work and dedication in delivering America's Election Mail.


Kristin A. Seaver
Chief Retail & Delivery Officer
  and Executive Vice President

David E. Williams
Chief Logistics & Processing Operations
  Officer and Executive Vice President

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 356 of
Case 4:20-cv-00079-BMM   Document 38-3   Filed 10/14/20   Page 1 of 3
471

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,** | : | |
| **ET AL.** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 20-4096** |
| | : | |
| **LOUIS DeJOY** | : | |
| *IN HIS OFFICIAL CAPACITY AS* | : | |
| *UNITED STATES POSTMASTER GENERAL,* | : | |
| **ET AL.** | : | |

## ORDER

This 28th day of September, 2020, for the reasons stated in the accompanying

memorandum opinion, it is hereby **ORDERED** that Plaintiffs' Motion for a Preliminary

Injunction (ECF No. 18) is **GRANTED IN PART,** as follows:

1. This Court adopts the order entered by the United States District Court for the Southern District of New York in *Jones v. United States Postal Service*, No. 20 Civ. 6516 (S.D.N.Y. Sept. 25, 2020) (Marerro, J.) and makes it an Order of this Court.

2. To the extent that Judge Marerro's Order imposed reporting requirements, in complying with the Order, Defendants shall simultaneously file the same reports with this Court.

3. Defendants shall comply with the "Clarifying Operational Instructions" issued September 21, 2020, Courtroom Exhibit 57, adopted in response to the Order entered by *Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557 (E.D. Wa. Sep. 17, 2020) (Bastian, J.), and not deviate from those instructions except as authorized by Judge Bastian.

4. Additionally, Defendants, and all their respective officers, agents, servants, employees and attorneys, and persons in active concert or participation with them are hereby **ENJOINED** from the following:

   a. continued implementation or enforcement of operational changes announced in July 2020 reflected in the July 10, 2020 "Mandatory Stand-Up Talk: All Employees," and the "PMGs Expectations" PowerPoint unless and until the Postal Service presents such changes to the Postal Regulatory Commission and obtains an advisory opinion after a public hearing is held pursuant to 39 U.S.C. 3661(b) and 39 U.S.C. 3661(c).

   b. continued implementation or enforcement of the Guidelines regarding transportation sent by Robert Cintron to Area Vice Presidents and other agency representatives on

July 11, 2020 and July 14, 2020, unless and until the Postal Service presents such changes to the Postal Regulatory Commission and obtains an advisory opinion after a public hearing is held pursuant to 39 U.S.C. 3661(b) and 39 U.S.C. 3661(c).

c.  continued implementation or enforcement of any and all organizational efforts, initiatives, "operational pivots," new efforts to "better adhere to existing operating plans" or priority shifts with regard to changes in late and extra truck trips and carrier start and stop times that began during the time period of June 15, 2020 until September 16, 2020, unless and until the Postal Service presents such changes to the Postal Regulatory Commission and obtains an advisory opinion after a public hearing is held pursuant to 39 U.S.C. 3661(b) and 39 U.S.C. 3661(c);

d.  continued implementation or enforcement of any and all organizational efforts, initiatives, "operational pivots," or priority shifts with regard to work hours reduction targets, penalty overtime, pre-tour overtime, new manager approval requirements for work hours and overtime, and other overtime requests and approvals that began during the time period of June 15, 2020 until September 16, 2020, unless and until the Postal Service presents such changes to the Postal Regulatory Commission and obtains an advisory opinion after a public hearing is held pursuant to 39 U.S.C. 3661(b) and 39 U.S.C. 3661(c);

5. On October 9, October 16, October 23, and October 30, the Postal Service shall make timely submissions to this Court regarding:

a.  The rate that the Postal Service incurred overtime, starting October 2, 2020, as a percentage of total work hours nationwide and as a percentage of total work hours within the two regional processing operations areas and four retail and delivery operations areas;

b.  The number of late and extra trips taken by Network & Local PVS & HCR, starting October 2, 2020.

    /s/ Gerald Austin McHugh
United States District Judge

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 359 of
471
Case 4:20-cv-00079-BMM   Document 38-4   Filed 10/14/20   Page 1 of 14

# EXHIBIT D

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 17, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WISCONSIN, | No. 1:20-CV-03127-SAB |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; LOUIS DEJOY, in his official capacity as Postmaster General; UNITED STATES POSTAL SERVICE, | |
| Defendants. | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 1**

Before the Court is Plaintiffs' Motion for Preliminary Injunction, ECF No. 54. A hearing on the motion was held on September 17, 2020. Plaintiffs were represented by Kristen Beneski and Noah Purcell; Defendants were represented by Joseph Borson, who appeared by videoconference. The following attorneys also participated by telephone: Andrew Hughes (Washington); Cristina Sepe (Washington); Karl Smith (Washington); Emma Grunberg (Washington); Tera Heintz (Washington); Nathan Bays (Washington); Daniel DeCecco (Colorado); Danny Rheiner (Colorodo); Joshua Perry (Connecticut); Jeffrey Dunlap (Maryland); Angela Behrens (Minnesota); Nicholas Sydow (New Mexico); Elleanor Chin (Oregon); Carol Lewis (Virginia); and Colin Roth (Wisconsin). The Court also considered the briefs of amici curiae. ECF Nos. 57-1; 63-1; 66-1; and 78.

## Background Facts

The case is a result of Defendant Postmaster General Louis DeJoy's institution of "transformative" changes that caused "immediate, lasting, and impactful changes" in the operations and culture on the United States Postal Service ("Postal Service"). These changes were set forth in a "Mandatory Stand-up Talk: All Employees, July 10, 2020" document. Bullet points identified specific examples of "transformative" changes that were being implemented immediately:

- ✓ All operations must meet our 24-hour clock commitment
- ✓ All trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted
- ✓ Extra trips are no longer authorized or accepted
- ✓ There must be proper annotation in the scanner, if a Contractor Failure occurs
- ✓ All PVS/HCR drives must be notified that trips depart on time
- ✓ Function 3 must start on time and end on time and we must make scheduled DUT
- ✓ Carriers must begin on time, leave for the street on time, and return on time

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 2**

1    ✓ Carriers must make the final dispatch of value; no additional
2      transportation will be authorized to dispatch mail to the Plant after the
       intended dispatch
3    ✓ The right mail must go on the right truck – every time
4    ✓ ALL EMPLOYEES have an essential role with trips departing on time

5         The document noted that "[o]ne aspect of these changes that may be difficult

6    for employees is that–temporarily–we may see mail left behind or mail on the

7    workroom floor or docks, (in P&DCs), which is not typical."

8         Other actions taken by DeJoy include: (1) eliminating overtime; (2)

9    decommissioning sorting machines; (3) removing mailboxes; (4) reducing

10   operating hours; and (5) changing how election mail is classified. Plaintiffs assert

11   the Postal Service has indicated that it will no longer treat election mail as First

12   Class mail regardless of the paid class of service and do so could delay the delivery

13   of the ballots by 1-5 days.

14        Plaintiffs allege these changes were made for political reasons, a few months

15   before a presidential election and in the middle of a global pandemic, with no

16   analysis on how they would affect voters or people relying on delivery of time-

17   critical items. Plaintiffs allege that while the removal of sorting machines is taking

18   place across the county, the removals would particularly affect sorting capacity in

19   states where recent presidential elections have been particularly close. Plaintiffs

20   assert the removal of the sorting machines are diminishing and will continue to

21   diminish the Postal Service's capacity to speedily process flat mail, such as ballots.

22   If the states are required to pay the First Class rate, it will cost them tens of

23   millions of dollars.

24        In their Complaint, Plaintiffs state that reports have confirmed that delivery

25   has been delayed because of the new policy. "People have reported delay in

26   receiving time-sensitive medications, businesses that rely on the mail have reported

27   delays harming their finances, and state agencies have seen delays in delivery of

28

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 3**

important documents and benefits." ECF No. 1. Plaintiffs report that in Tennessee, trucks are leaving sorting facilities for cross-country trips completely empty as a result of the new policy not allowing a truck to remain even five minutes so it can be loaded with mail. They allege that postal workers report that the mail is piling up in their offices and that mail is backed up across the country. Plaintiffs assert the effects of the mail delays are widespread, with troubling impacts on vulnerable populations, small business, and political franchise. Medications and prescriptions provided by the Department of Veterans Affairs are taking weeks to be delivered, causing veterans to miss doses of their vital medications. Other Americans rely on the Postal Service for delivery of prescriptions, as well and the delays affect the delivery of their medications.

Plaintiffs assert the changes to the Postal Service operations threaten to disrupt the successful use of mail in balloting. States are reporting increased anxiety on the part of voters who have expressed concern that their mail-in ballots will not be delivered on time or at all. Officials in some states are concerned that voters may choose to vote in-person thereby increasing the risk of COVID-19 transmission at the voting centers.

On August 18, 2020, the day Plaintiffs filed their lawsuit, DeJoy announced the suspension of some operational changes to the Postal Service, including the nationwide removal of hundreds of mail processing and sorting machines, the removal of mail collection boxes, and the reduction in post office retail hours. The policy described above, referred to by Plaintiffs as the "Leave Mail Behind" policy, however, still remains in place. Moreover, it appears that the Postal Service will not treat election mail as First Class mail unless First Class postage is paid.

Plaintiffs assert that the delays in delivery and postmarking caused by the "Leave Mail Behind" policy and the Postal Service's decision to no longer treat Election Mail as First Class mail have already disenfranchised voters and will disenfranchise many more in November.

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 4**

**Plaintiffs' Complaint**

In their Complaint, Plaintiffs are bringing eight claims. First, they are seeking a writ of mandamus under 28 U.S.C. § 1361, directing Defendants to "submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion on the 'transformative' changes and enjoining Defendants from implementing these changes pending receipt of the requested advisory opinion."

Second, Plaintiffs also seek declaratory relief that declares Defendants' "transformative" changes unlawful and enjoined because they are *ultra vires.*

Third, Plaintiffs allege that Defendants' actions violate the States' right to prescribe "the Time, Places and Manner of holding Elections for Senators and Representatives" guaranteed by Article I, Section 4, Clause 1 of the United States Constitution.

Fourth, Plaintiffs assert Defendants' actions violate Article II, Section I of the United States Constitution and the Twelfth Amendment of the United States Constitution.

Fifth, Plaintiffs allege Defendants violated the Tenth Amendment to the U.S. Constitution because Defendants' actions—implemented well after the States established systems for voting using the Postal Service—interfere with the manner chosen by the States to elect state officers and deprive the States of their constitutional rights to regulate state elections and determine the manner in which state officers will be chosen.

Sixth, Plaintiffs assert Defendants' actions interfere with the ability of their residents to timely receive and return voter registration forms and ballots and have their vote counted, thereby burdening their residents' right to vote. Plaintiffs also maintain that Defendants' actions interfere with the States' constitutional interest in choosing the method of electing national officers that respects the constitutional right to vote.

Seventh, Plaintiffs allege Defendants' actions violate the Fifth Amendment

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 5**

to the United States Constitution, which guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. Plaintiffs assert Defendants' actions burden the right of qualified voters in the States to cast their ballot effectively and these actions are not supported by any interest that justifies the serious burden on the right of qualified voters the equal protection secured by the Fifth Amendment.

Eighth, Plaintiffs allege Defendants' actions violate § 504 of the Rehabilitation Act because Defendants' actions impermissibly interfere with the rights of the States' residents with disabilities to be free from discrimination; impermissibly interfere with the rights of the States' residents with disabilities to receive the benefits of and participate meaningfully in the programs and services of the Postal Service; and will have a disparate impact on individuals with disabilities, severely imperiling their ability to receive critical, life-saving medications through the mail, participate in elections, and conduct other important, time-sensitive activities.

### Jurisdiction

Plaintiffs' Complaint is properly before this Court pursuant to 39 U.S.C. § 409, which provides that "[e]xcept as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." Thus, this Court has jurisdiction to review Plaintiffs' claim that the Postal Service has violated § 3661(b).[1]

---

[1] 39 U.S.C. § 3662 does not limit this Court's jurisdiction. By its terms, § 3662 is discretionary, not mandatory. Section 3662 does not divest district courts of the broad jurisdiction granted to them under 28 U.S.C. § 1339 over "any civil action arising under any Act of Congress relating to the postal service," nor the grant of "jurisdiction over all actions brought by or against the Postal Service" in 39 U.S.C. § 409(a). Moreover, § 3662 encompasses claims that the Postal Service has failed

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 6**

1   Under 28 U.S.C. § 1361, this Court has "original jurisdiction of any action

2   in the nature of mandamus to compel an officer or employee of the United States

3   or any agency thereof to perform a duty owed to the plaintiff."

4   Under 28 U.S.C. 1331, this Court has original jurisdiction over all civil

5   actions arising under the Constitution and laws of the United States.

6                                **Motion Standard**

7   "A preliminary injunction is a matter of equitable discretion and is 'an

8   extraordinary remedy that may only be awarded upon a clear showing that a

9   plaintiff is entitled to such relief.'" *California v. Azar*, 911 F.3d 558, 575 (9th Cir.

10  2018) (quoting *Winter v. N.R.D.C.*, 555 U.S. 7, 22 (2008)). "A party can obtain a

11  preliminary injunction by showing that (1) it is 'likely to succeed on the merits,'

12  (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3)

13  'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public

14  interest.'" *Disney Enters., Inc. v. VidAngel, Inc*., 869 F.3d 848, 856 (9th Cir. 2017)

15  (alteration in original) (quoting *Winter*, 555 U.S. at 20). The Ninth Circuit uses a

16  "sliding scale" approach in which the elements are "balanced so that a stronger

17  showing of one element may offset a weaker showing of another." *Hernandez v.*

18  *Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quotation omitted). When the

19  government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*,

20  747 F.3d 1073, 1092 (9th Cir. 2014). This means that when the government is a

21  party, the court considers the balance of equities and the public interest together.

22  *Azar*, 911 F.3d at 575. "[B]alancing the equities is not an exact science." *Id*.

23

24  to adhere to its rate and service standards or that those standards are inadequate.

25  That is not the case here. Instead, Plaintiffs are arguing the Postal Service's

26  implementation of nationwide policy changes without oversight by the Postal

27  Regulatory Commission or the public was unlawful. Such claims are properly

28  brought under §§ 409 and 3661.

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 7**

1   (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952)

2   (Frankfurter, J., concurring) ("Balancing the equities . . . is lawyers' jargon for

3   choosing between conflicting public interests.")).

4        Likelihood of success on the merits is the most important factor; if a movant

5   fails to meet this threshold inquiry, the court need not consider the other factors.

6   *Disney*, 869 F.3d at 856 (citation omitted). A plaintiff seeking preliminary relief

7   must "demonstrate that irreparable injury is likely in the absence of an injunction."

8   *Winter*, 555 U.S. at 22. The analysis focuses on irreparability, "irrespective of the

9   magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir.

10  1999). Economic harm is not normally considered irreparable. *L.A. Mem'l*

11  *Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

12       "'[I]njunctive relief should be no more burdensome to the defendant than

13  necessary to provide complete relief to the plaintiffs' before the Court." *L.A.*

14  *Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting

15  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This is particularly true where

16  there is no class certification. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92

17  F.3d 1486, 1501 (9th Cir. 1996) ("[I]njunctive relief generally should be limited to

18  apply only to named plaintiffs where there is no class certification."); *Meinhold v.*

19  *U.S. Dep't of Defense*, 34 F.3d 1469, 1480 (9th Cir. 1994) (district court erred in

20  enjoining the defendant from improperly applying a regulation to all military

21  personnel (*citing Califano*, 442 U.S. at 702)).

22       That being said, there is no bar against nationwide relief in the district courts

23  or courts of appeal, even if the case was not certified as a class action, if such

24  broad relief is necessary to give prevailing parties the relief to which they are

25  entitled. *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987).

26  //

27  //

28  //

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 8**

## Analysis

Here, Plaintiffs have established a likelihood of success on the merits of their claims that the United States Postal Service and the Postmaster General violated 39 U.S.C. § 3661(b) and infringed on the States' constitutional authority to regulate elections and the people's right to vote. Plaintiffs would suffer irreparable harm absent preliminary injunctive relief, and the balance of equities and the public interest weigh in favor of a preliminary injunction.

Although not necessarily apparent on the surface, at the heart of DeJoy's and the Postal Service's actions is voter disenfranchisement. This is evident in President Trump's highly partisan words and tweets, the actual impact of the changes on primary elections that resulted in uncounted ballots, and recent attempts and lawsuits by the Republican National Committee and President Trump's campaign to stop the States' efforts to bypass the Postal Service by utilizing ballot drop boxes, as well as the timing of the changes. It is easy to conclude that the recent Postal Services' changes is an intentional effort on the part the current Administration to disrupt and challenge the legitimacy of upcoming local, state, and federal elections, especially given that 72% of the decommissioned high speed mail sorting machines that were decommissioned were located in counties where Hillary Clinton receive the most votes in 2016.

Moreover, the fact that fourteen States, members of the United States House of Representatives, members of the United States Senate, and various local and tribal governments have asked this Court to intervene to prevent the Postal Service and others from disenfranchising citizens from participating in federal, state, and local elections suggest that the Postal Service's actions are not the result of any legitimate business concerns. DeJoy's actions fly in the face of Congress's intent to insulate the management of the Postal Service from partisan politics and political influence and acknowledgement that free and fair elections depend on a reliable mail service.

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 9**

In addition, these parties have demonstrated that the recent changes implemented by DeJoy and the Postal Service have the unintended but very serious consequences of interfering with other essential government functions such as collecting fees and taxes, sending pension payments, and enforcing local ordinances, as well as interfering with the provision of critical health care services such as prescription refills, contract tracing, sexually-transmitted infection testing and opioid overdose prevention.

Defendants take the remarkable position that nothing has changed in the Postal Service's approach to election mail from past years. This is simply not true. Statistics show there has been a drastic decrease in delivery rates. Most telling is the picture of the banner that was hung at an Oregon Postal Service facility in early September. *See* ECF No. 79. That banner includes the following phrases: "No Employee has Authorization to Hold Trucks," "ALL HCR & PVS TRIPS WILL DEPART ON TIME, NO EXCEPTIONS," "DO NOT HOLD A TRUCK * NO MORE HOLDING TRUCKS," "Make sure every single employee in our building understands * All Trips Depart on Time." *Id.* The banner reflects the "Leave Mail Behind" policy that was instituted in July 2020 and is a significant change from past practice. Moreover, the letters sent to the States regarding the Postal Service's decision to change the past practice of handling election mail sent as Marketing Mail indicate a significant change in policy and practice.

Here, Plaintiffs have made an extensive showing of irreparable harm that is caused and will be caused by the Postal Service's "Leave Mail Behind" policy and the Postal Service's refusal to ensure that election mail will be treated as First Class mail to ensure timely delivery. Indeed, the Postal Service sent out mailers to all voters that warned that voters should take extra steps to minimize delays that presumably the Postal Service anticipates, which supports Plaintiffs' arguments there would be harm in the future. Moreover, Plaintiffs have shown actual harm with respect to recent primary elections. In this case, this significant and

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 10**

irreparable harm tips the balance of the scale in such a manner that Plaintiffs need not make a strong showing of substantial likelihood of success on the merits.

Even so, Plaintiffs have made a strong showing of substantial likelihood of success on the merits. The Postal Service is required under § 3661(b) to present such sweeping nationwide changes to the Postal Regulatory Commission prior to implementing such changes, and the failure to do so suggests that the Postal Service acted *ultra vires*. Plaintiffs have made a strong showing that the Postal Service's actions have infringed on the States' constitutional rights to appoint presidential electors and set the time, manner, and place of elections. Plaintiffs have made a strong showing that the recent changes are the result of an effort by the current Administration to use the Postal Service as a tool in partisan politics, which violates the spirit and purpose of the Postal Reorganization Act and the Postal Accountability and Enhancement Act.

Finally, Defendants' burden in complying with the Court's preliminary injunction is negligible.

The Court finds that a nationwide injunction is appropriate in this case. Indeed, if there ever were a mandate for the need of a nationwide injunction, it is this case. It is easy to envision situations where the mail needs to cross state lines, for example, residents who are residing out of state and want to send in an absentee ballot, medications being sent from other states, as well as small businesses who send their products to customers who live in other states. A nationwide injunction is necessary to give Plaintiffs the relief to which they are entitled.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Plaintiffs' Motion for Preliminary Injunction, ECF No. 54, is **GRANTED**.

2.    The USPS Defendants, and all their respective officers, agents, servants, employees and attorneys, and persons in active concert or participation with them are hereby **ENJOINED** from the following until the Court resolves the

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 11

merits of this case:

    a.    continued implementation or enforcement of policy changes announced in July 2020 that have slowed mail delivery, including:

        i.    instructing mail carriers to leave mail behind for processing or delivery at a later date;

        ii.    requiring mail carriers or delivery trucks to leave at set times regardless of whether the mail is actually ready;

        iii.    prohibiting or unreasonably restricting return trips to distribution centers, if necessary, to complete timely mail delivery; and

        iv.    taking any actions to implement or enforce the operational changes outlined in the USPS's "Mandatory Stand-Up Talk: All Employees" dated July 10, 2020;

    b.    deviating from the USPS's long-standing policy of treating election mail in accordance with First Class Mail delivery standards, regardless of the paid class;

    c.    taking any actions in violation of the commitments made in the "Postmaster General Louis DeJoy Statement," dated August 18, 2020, such as removal or decommissioning of any mail sorting machines, reducing hours at post offices, or closing mail processing facilities; and

    d.    implementing or enforcing any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," absent a duly issued advisory opinion of the Postal Regulatory Commission, 39 U.S.C. § 3661(b).

    3.    If any post office, distribution center, or other postal facility will be unable to process election mail for the November 2020 election in accordance with First Class delivery standards because of the Postal Service's recent removal and decommissioning of equipment, such equipment will be replaced, reassembled, or reconnected to ensure that the Postal Service can comply with its prior policy of

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 12**

1  delivering election mail in accordance with First Class delivery standards, and that

2  if any post office or distribution center has requested, or in the future requests, to

3  reconnect or replace any decommissioned or removed sorting machine(s), any such

4  request must be presented to this Court within three days of this Order or within

5  three days of the date of the request, whichever is later, unless the Postal Service

6  has already approved the request. If the Postal Service has denied the request or

7  has not responded, the Court will determine whether granting the request is likely

8  necessary to ensure that election mail is processed according to First Class delivery

9  standards or otherwise to protect the constitutional right to vote, and if the Court so

10 finds, it shall order that the request be approved by the USPS Defendants.

11        4.       The USPS Defendants shall notify their officers, agents,

12 representatives, servants, employees, attorneys, and all persons in active concert or

13 participation with them of the requirements herein.

14        5.       The Court deems no security bond is required under Federal Rule of

15 Civil Procedure 65(c).

16        6.       This injunction shall remain in effect until a final judgment is entered

17 or until further order of the Court.

18        **IT IS SO ORDERED**. The Clerk of Court is directed to enter this Order

19 and forward copies to counsel.

20        **DATED** this 17th day of September 2020.



Stanley A. Bastian
Chief United States District Judge

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** * 13

# EXHIBIT E

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 02, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WISCONSIN, | No. 1:20-CV-03127-SAB |
| Plaintiffs, | |
| v. | **ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY THE PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; LOUIS DEJOY, in his official capacity as Postmaster General; UNITED STATES POSTAL SERVICE, | |
| Defendants. | |

**ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY * 1**

Before the Court is Defendants' Motion to Clarify the Preliminary Injunction, ECF No. 83. The motion was heard without oral argument.

Defendants move to clarify the Court's preliminary injunction, asserting that some aspects of the Court's order could be interpreted to cause an overall degradation in service or create obligations that cannot be fulfilled. In response, Plaintiffs submitted a proposed Order on which the parties conferred. ECF No. 88-1. Plaintiffs indicate Defendants do not oppose the entry of Plaintiffs' proposed order. ECF No. 88. Good cause exists to grant Defendants' Motion to Clarify the Preliminary Injunction, incorporating the language set forth in Plaintiffs' proposed order.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants' Motion to Clarify the Preliminary Injunction, ECF No. 83, is **GRANTED** in part, and **DENIED**, in part as follows:

    a. Defendants' proposed clarification to Paragraph 2(a) of the Preliminary Injunction Order is **granted**, in part. Paragraph 2(a) is clarified to provide that the Postal Service is not required to delay a trip when the impact of the delay will be an overall degradation in service, *e.g.*, in order to prevent a small amount of mail from being delayed if doing so would cause a larger amount of mail to be delayed, but that the Postal Service shall use extra trips to minimize the effect of such delays and to meet service commitments, except when not feasible. "[E]xtra trips that are reasonably necessary to complete timely mail delivery [are] not to be unreasonably restricted or prohibited," as the Postal Service committed to in its September 21, 2020 memorandum to employees.

    b. Defendants' proposed clarification to Paragraph 2(b) of the Preliminary Injunction Order is **granted**, in part. Paragraph 2(b) is clarified to provide that the Postal Service is required to ensure that Election Mail "is generally delivered in line with First-Class Mail

**ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY * 2**

Case 1:20-cv-04096-RNS-SAE Document No. 490 Entered 10/02/20 Docket 10/23/20 Page Page 376 of
Case 4:20-cv-00079-BMM Document 38-5 Filed 10/14/20 Page 4 of 4
471

delivery standards," as the Postal Service committed to in its September 25, 2020 memorandum to employees, but the Court is not specifying that Election Mail entered as Marketing Mail be shipped by any particular means (such as by air). To facilitate this goal, the Postal Service will, as it has promised, take "extraordinary measures" "between October 26 and November 24, to accelerate the delivery of ballots, when the Postal Service is able to identify the mailpiece as a ballot. These extraordinary measures include, but are not limited to, expedited handling, extra deliveries, and special pickups as used in past elections, to connect blank ballots entered by election officials to voters or completed ballots returned by voters entered close to or on Election Day to their intended destination (e.g., Priority Mail Express, Sunday deliveries, special deliveries, running collected ballots to Boards of Elections on Election Day, etc.)."

c.      Defendants' proposed clarification to Paragraph 3 of the Preliminary Injunction Order is **denied,** without prejudice, to the same arguments being raised again in the future.

**IT IS SO ORDERED**. The Clerk of Court is directed to enter this Order and forward copies to counsel.

**DATED** this 2nd day of October 2020.



Stanley A. Bastian
United States District Judge

**ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO CLARIFY** \* 3

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 377 of
471
Case 4:20-cv-00079-BMM   Document 38-6   Filed 10/14/20   Page 1 of 88

# EXHIBIT F

Case 1:20-cv-2406-DRNS-OBA-Nent 424eurmen49 dFileSD/21/20cket P0/21/2027 Page 378 of
Case 4:20-cv-00079-BMM   Document 38-6   Filed 10/14/20   Page 2 of 88
471

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
MONDAIRE JONES, et al.,                :
                                       :
                    Plaintiffs,        :   20 Civ. 6516 (VM)
                                       :
     - against -                       :   **DECISION AND ORDER**
                                       :
UNITED STATES POSTAL SERVICE, et al.,  :
                                       :
                                       :
                    Defendants.        :
-------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs Mondaire Jones, Alessandra Biaggi, Chris
Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy
Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary
Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach,
Carol Sussman, and Rebecca Rieckhoff ("Plaintiffs") filed
this action against defendants United States Postal Service
("USPS" or "Postal Service"); Louis DeJoy, as Postmaster
General ("DeJoy"), and Donald J. Trump, as President of the
United States ("President," and together with the Postal
Service and DeJoy, "Defendants" or the "Government"). (See
"Amended Complaint," Dkt. No. 36.) Plaintiffs seek
declaratory relief and a preliminary injunction mandating
that the Postal Service take certain actions to ensure the
timely delivery of their absentee ballots in the upcoming
national elections being held November 3, 2020. (See
"Motion," Dkt. No. 19-1; "Notice of Motion," Dkt. No. 19.)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/21/2020

Case 1:20-cv-Case-AT0-NS-0501cmMent 4264 uEntered dFiledSD/21/2@et Pa02/21/20267 Page 379 of
Case 4:20-cv-00079-BMM   Document 138-6   Filed 10/14/20   Page 3 of 88
471

The Court held a hearing on September 16, 2020, and heard witness testimony. For the reasons that follow, the Court GRANTS in part the Motion.

## Introduction

Nothing is more essential to a true democracy than the right to vote. Where that right is constitutionally guaranteed and exercised by citizens through free and fair elections protected by government authority, democratic rule thrives. Conversely, impairing the franchise, or imposing undue burdens on the ability of voters to cast ballots for their elected leaders, necessarily threatens democracy and erodes the underpinnings of a republican form of government. For that reason, this country's founding constitutional principles have designed and enshrined by law the means to ensure free and fair balloting at every level of representative government. To that end, our system has made affirmative provisions not only to ensure maximum ease for citizens to gain access to the ballot box, but also to remove obstacles to voting and repulse attempts, whether by coercion, dilution, discrimination, or other like deleterious means, to interfere with voting rights.

One of the evident ways by which our society fosters and guarantees voting rights is by absentee balloting, accommodating the exceptional needs of citizens unable to

Case 1:20-cv-2460-BRNS-OBCorMent 424-4current4914-EdLSD/21/20et Page1817/2020207 Page 380 of
Case 4:20-cv-00079-BMM   Document 138-6   Filed 10/14/20   Page 4 of 88
471

vote in person for various legitimate reasons -- illness, travel, education or employment out of the jurisdiction, or military or diplomatic service. Protecting the franchise of such citizens, and enforcing effective rules to do so, should be no less an essential obligation of the government than is securing voting in person. In fact, the law makes no such distinction. Instead, all voters, regardless of whether they submit their ballots in person or by mail, have a right to have their votes counted and their voices heard. The case before the Court presents these principles.

The context in which this litigation arises is essential to an analysis and resolution of the controversy. The entire world is now in the grip of a catastrophic pandemic caused by the coronavirus, a phenomenon that has inflicted a heavier toll of illness and death on the United States than on any other nation. By recent government count, COVID-19 has already infected over 6.7 million Americans and claimed over 198,000 lives.[1] In its wake, and pertinent to the action before the Court, the disease has engendered widespread fear that conducting elections requiring voters to appear at the polls to cast their ballots in person, there having to occupy enclosed spaces through which thousands of people would pass

---

[1] Centers for Disease Control and Prevention, CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last accessed Sept. 19, 2020).

Case 1:20-cv-2400-RNS-Document 424-Entered on FLSD Docket 09/21/2020 Page 381 of
Case 4:20-cv-00079-BMM   Document 38-6   Filed 10/14/20   Page 5 of 88
471

throughout the day and handle the same voting equipment, would
produce conditions conducive to the spread of the illness. To
address these concerns, at least 22 states and the District
of Columbia have changed their laws to encourage voters to
cast their ballots by mail; 34 states and the District of
Columbia already permitted anyone to vote by mail, and only
five states require an excuse (beyond concerns related to
COVID-19).[2] There is no dispute that this development will
bring about a predictable effect at issue here: a significant
surge in the volume of election mail the USPS is being called
upon to handle.

These circumstances present unique challenges and
opportunities for public officials, not only those in charge
of the Postal Service but also leaders of the rest of the
government, federal and state. The crisis demands, as
Plaintiffs here urge, extraordinary measures and firm
commitment to ensure that all citizens wishing to exercise
their right to vote are able to do so without needing to
confront an untenable choice: risk contracting a potentially
fatal illness by voting in person, or foregoing their right
to vote in a presidential election. That prospect likely will

---

[2] Kate Rabinowitz & Brittany Renee Mayes, "At Least 84% of American Voters
Can Case Ballots By Mail in the Fall," Wash. Post (Sept. 17, 2020),
https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/ (last accessed Sept. 19, 2020).

Case 1:20-cv-2406D-RNS-0Document 424 Entered on FLSD Docket 09/21/2020 Page 382 of
Case 4:20-cv-00079-BMM   Document 38-6   Filed 10/14/20   Page 6 of 88
471

come to pass if a mail-in balloting option is available but gives no reliable assurance that citizens could cast their ballots and that their votes would be delivered to election authorities in time to be counted.

Against this backdrop, this case raises some central questions. Some are philosophical and implicate the Postal Service's core mission. The Postal Service has developed a proud reputation for its paramount resolve, memorialized in the famous inscription carved on the pediment of the General Post Office Building in New York City, to deliver the mail despite any obstacles.[3] Postal operations have also been guided by the ethic and spirit of the language of the USPS's charter mandate. That statute evinces a legislative design that the entity is not just another government agency rendering a necessary public service, but one that performs a vital national purpose: to "bind the Nation together." The nation's extraordinary efforts to deliver election mail from members of the armed forces during the Civil War and World War II provide compelling examples of that ingrained commitment.

Beyond these issues implicating the USPS's core values, this case presents various operational and financial

---

[3] "Neither snow nor rain nor heat nor gloom of night stays these couriers from the swift completion of their appointed rounds." Herodotus, The Persian Wars, Bk. 8, ¶ 98 (trans. George H. Palmer).

Case 1:20-cv-02461-RNS-0056 Document 41-4 Entered on FLSD Docket 10/21/2020 Page 383 of
Case 4:20-cv-00079-BMM   Document 38-6   Filed 10/14/20   Page 7 of 88
471

concerns. How has the Postal Service responded to these developments? Specifically, are the agency's organization, operations, and finances adequate to meet the unprecedented difficulties posed by the combined impact on mail service of the pandemic and the greater volume of absentee or mail-in ballots that voters will cast in a few weeks?

To these questions Plaintiffs here answer "No." They charge that in fact the Postal Service has retreated from the dedication to its institutional ethic and historical culture of delivering the mail as an overarching national function. As evidence, Plaintiffs point to the vision of a "transformative initiative" recently instituted by DeJoy upon his assumption of his office -- measures that included, for example, reduction of overtime pay, elimination of mail sorting machines on a larger scale than previously done since 2016, directing mail trucks to leave as scheduled, even if it would entail leaving mail behind for delivery another day. According to Plaintiffs, such policy and operational changes have redefined and rechanneled the USPS's mission to follow the business model of a private enterprise. Under this approach, according to Plaintiffs, the Postal Service's commitment to delivering all of the mail may be sacrificed in the name of efficiency. As evidence, Plaintiffs point out that, correlating with DeJoy's postal reforms, within weeks

Case 1:20-cv-2460-RNS-Document 24-4-Entered on FLSD Docket 09/21/2020 Page 384 of
Case 4:20-cv-00079-BMM Document 38-6 Filed 10/14/20 Page 8 of 88
471

of the adoption of the new approach the service standards for
First-Class Mail declined and have not yet fully recovered to
reach what they were before the initiatives.

Adding complication to the situation, Plaintiffs call
attention to a statement made by President Trump's deputy
campaign manager Justin Clark, quoted as having said that
"[t]he President views vote by mail as a threat to his
election." And the President himself made a statement that
was interpreted as urging voters who mail in ballots to also
vote in person, in order to test the system.[4]

Accordingly, in the midst of the exceptional demands
presented by a national health crisis, and confronted
simultaneously with a presidential election that will
generate an unprecedented surge of mail ballots, rather than
focusing efforts and resources on guaranteeing that citizens'
apprehensions about the coronavirus crisis would not impede
exercise of their right to vote, the Postal Service, the
Postmaster General, and the President have made public
statements and taken steps manifesting a somewhat ambiguous
course. They have not provided trusted assurance and comfort
that citizens will be able to cast ballots with full

---

[4] Maggie Haberman & Stephanie Saul, "Trump Encourages People in North
Carolina to Vote Twice, Which Is Illegal," N.Y. Times (Sept. 8, 2020),
https://www.nytimes.com/2020/09/02/us/politics/trump-people-vote-
twice.html (last accessed Sept. 19, 2020).

confidence that their votes would be timely collected and counted. Rather, as detailed below, their actions have given rise to management and operational confusion, to directives that tend to generate uncertainty as to who is in charge of policies that ultimately could affect the reliability of absentee ballots, thus potentially discouraging voting by mail. Conflicting, vague, and ambivalent managerial signals could also sow substantial doubt about whether the USPS is up to the task, whether it possesses the institutional will power and commitment to its historical mission, and so to handle the exceptional burden associated with a profoundly critical task in our democratic system, that of collecting and delivering election mail a few weeks from now.

The Court is persuaded that the circumstances Plaintiffs portray in their complaint, sufficiently supported by evidence on the record of this proceeding, warrant relief. The right to vote is too vital a value in our democracy to be left in a state of suspense in the minds of voters weeks before a presidential election, raising doubts as to whether their votes will ultimately be counted.

## I.    **BACKGROUND**

### A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Postal Service operates over 31,000 Post Offices, 204,274 delivery vehicles, and more than 8,500 pieces of

automated processing equipment. (See "Tinio Decl.," Dkt. No. 24, Ex. 1 at 6.)  It delivers "48 percent of the world's mail volume and more packages to the home than any other business." (Id.) But, while it is a "fundamentally strong organization," the Postal Service is "not financially strong." (Id.) Eroding mail volumes, universal service obligations, and legislative mandates strain its financial stability. (Id.)

DeJoy became the country's 75th Postmaster General on June 15, 2020. He has stated that he views his role as an opportunity to help the Postal Service "to better serve the American public and also to operate in the financially sustainable manner." (Tinio Decl. Ex. 5, at 5.)

Before his installment as Postmaster General, DeJoy was reported to have made substantial donations to President Trump's re-election campaign. (See Id. at 48.) Further, Plaintiffs note that while the Postal Service is an independent agency, "Secretary of the Treasury Mnuchin and White House Chief of Staff Mark Meadows have been in close contact with both the USPS Board of Governors and Postmaster General DeJoy." (See "Jamison Decl.," Dkt. No. 19-2, ¶ 22.) Plaintiffs suggest that, in an effort to curtail the perceived threat posed by mail-in voting, "[t]he Trump administration is intentionally involving itself in day to day postal operations." (Id. ¶ 27.)

9

Plaintiffs comprise a collection of individuals from States across the country, including a Democratic candidate for Congress from New York and several New York state and local political candidates, each with interests in the accuracy and integrity of the November 2020 national election (the "Candidate Plaintiffs"); and numerous voters (the "Voter Plaintiffs") who either plan to vote by mail for reasons related to the COVID-19 pandemic -- broadly: (1) travel restrictions that prevent voters from returning to their states of residence, and (2) exposure risks that render in-person voting dangerous -- or, in the case of Spencer, have chosen to risk infection and vote in person because of fears the USPS cannot timely handle Election Mail.

Plaintiffs filed a complaint on August 17, 2020. ("Complaint," Dkt. No. 1.) On September 2, 2020, Plaintiffs filed their Motion. (See Motion; Jamison Decl.; "Jones Decl.," Dkt. No. 19-3, "Biaggi Decl.," Dkt. No. 19-4, "Barrios Decl.," Dkt. No. 19-5; "Mac Wallach Decl.," Dkt. No. 19-6; "Matthew Wallach Decl.," Dkt. No. 19-7; "Marsie Wallach Decl.," Dkt. No. 19-8; "Rieckhoff Decl.," Dkt. No. 19-9; "Rosen Decl.," Dkt. No. 19-10; "Sussman Decl.," Dkt. No. 19-11; "Winton Green Decl.," Dkt. No. 19-12; "Rothschild Decl.," Dkt. No. 19-13; "Green Decl.," Dkt. No. 19-14.)

On September 8, 2020, the Government opposed the Motion. (See "Opposition," Dkt. No. 22; "Barber Decl.," Dkt. No. 23; Tinio Decl.; "Vo Decl.," Dkt. No. 25; "Stasa Decl.," Dkt. No. 26; "Prokity Decl.," Dkt. No. 27; "Glass Decl.," Dkt. No. 28; "DeChambeau Decl.," Dkt. No. 29; "Curtis Decl.," Dkt. No. 30; "Couch Decl.," Dkt. No. 31; "Colin Decl.," Dkt. No. 32; "Cintron Decl.," Dkt. No. 33."

Plaintiffs filed the Amended Complaint on September 9, 2020. The Amended Complaint brings claims under the First and Fifth Amendments of the Constitution against Defendants.[5] On September 10, 2020, Plaintiffs filed a reply. (See "Reply," Dkt. No. 38; "Jamison Reply Decl.," Dkt. No. 38-1; "Barrios Reply Decl.," Dkt. No. 38-4; "Spencer Decl.," Dkt. No. 38-5.)

Before the Court held the hearing in this matter, the Government submitted updated performance data and additional declarations for the Court's consideration. (See "Kochevar

---

[5] Plaintiffs' Amended Complaint brings Count One under 42 U.S.C. Section 1983. Defendants correctly note that this statute does not provide a cause of action against federal officers. See Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 n.4 (2d Cir. 1991). The Court understands Plaintiffs to be seeking relief under the Court's general equitable authority to fashion a remedy for wrongs committed by government officials. See Armstrong v. Exceptional Child Center, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.") (emphasis added). Because Defendants were on notice as to the nature of the claims against them, the Court sees no reason to hold that the claims fail as a matter of law, but will permit Plaintiffs to submit a proposed second amended complaint to correct the cause of action.

Decl.," Dkt. No. 45; "Supp. Cintron Decl.," Dkt. No. 46-1;
"Supp. Curtis Decl.," Dkt. No. 46-2.) At the hearing, the
Court heard testimony from Julia Bryan, a volunteer for
Democrats Abroad; Jose Barrios; Mark Jamison, Plaintiffs'
expert witness; Robert Cintron ("Cintron"); Angela Curtis
("Curtis"); and Justin Glass ("Glass"). Following the
hearing, Plaintiffs filed an additional exhibit. (See "Supp.
Green Decl.," Dkt. No. 47-1.)

    B. CHALLENGED POSTAL SERVICE ACTIONS

    Central to the Complaint are a handful of recent
"dramatic and profound" policy changes within USPS, including
(1) a prohibition on overtime, (2) a ban on late or extra
trips even if deliveries are not fully completed, (3) a hiring
freeze, (3) a policy titled "Expedited to Street/Afternoon
Sortation" ("ESAS") under which carriers are to spend minimal
time in the office before departing and are prohibited from
sorting mail until the afternoon when they have returned, and
(4) widespread equipment reduction, removal, or destruction.

    On July 10, 2020, DeJoy participated in a teleconference
with area vice presidents and members of headquarters.
Defense witnesses Cintron, Vice President of Logistics, and
Curtis, Vice President of Retail and Post Office Operations,
both participated in the teleconference and testified that

the subject was various initiatives to be implemented. These changes are outlined below.

### 1. Reduction of Late and Extra Trips

During the July 10 teleconference with DeJoy, participants discussed a new policy restricting late and extra trips. According to Cintron, a "late" trip is a trip that departs after its scheduled departure time. (Tr. 45:18-22.[6]) An "extra" trip would be a trip made by "another piece of transportation" to move "additional volume." (Tr. 45:24-46:2.) Cintron insisted that the statements made regarding late and extra trips at the July 10, 2020 meeting did not amount to a "ban," but they did indicate that the "aspiration" was "not to have either one of those." (Tr. 50:17-25.) Curtis echoed these sentiments, explaining that the elimination of late and extra trips was a goal, but that she understood it would not be achieved "overnight." (Tr. 75:5-8.)

Apparently, however, many postal workers received a different message. Following the teleconference, an area vice president created a "Standup Talk" document to memorialize the discussion that occurred on July 10, 2020. (Tr. 49:21-50:8; Amended Complaint Ex. 1.) The July 10, 2020 document titled "Mandatory Standup Talk: All Employees," outlines a

---

[6] All citations to "Tr." refer to the transcript of the hearing this Court held on September 16, 2020. (See Dkt. Minute Entry Dated Sept. 16, 2020.)

"long overdue" "operational pivot," including certain changes to prior procedures. First, the memo explains that: (1) "late trips" and "extra trips are no longer authorized or accepted," and (2) "[c]arriers must begin on time, leave for the street on time, and return on time."[7] The memo acknowledged that "[o]ne aspect of these changes that may be difficult for employees is that – temporarily -- we may see mail left behind or mail on the workroom floor or docks . . ." but assures that "the delayed mail volumes will soon shrink significantly."

Likewise, a banner hanging in the Portland, Oregon plant on September 6, 2020 proclaimed, "No Employee has Authorization to Hold Trucks," along with further directives stating, "Make sure every single employee in our building understands – All Trips Depart On Time." (Jamison Reply Decl. Ex. 1.) And, a post office operations manager in Ohio drafted a July 14, 2020 PowerPoint presentation regarding DeJoy's expectations for cost savings, including a directive that "[t]he plants are not to send mail late," and "[i]f the plants

_____

[7] On July 16, 2020, a similar initiative, Expedited to Street/Afternoon Sortation ("ESAS"), was introduced. (Amended Complaint Ex. 2.) The initiative was designed to "reduce[] morning office time to allow carriers to get on the street earlier." Under the new policy, carriers were directed to spend minimal time in the office in the morning and "work any unsorted mail into the delivery sequence for delivery the next scheduled day," after returning from the street. This program has been suspended as part of a union grievance process. (Motion at 2, n.3.)

are not on time they will hold the mail for the next day."
(Supp. Green Decl. at 3; Tr. 73:19-74:8.)

While Curtis was "appalled" by this July 14 PowerPoint presentation, which she considered a misrepresentation of directives from the Postmaster General (Tr. 73:22), these circumstances reflect evidence of conflicting signals or confusion, at the very least that different Postal Service employees understood their instructions differently. And, at any rate, a reduction of late and extras did in fact occur. Glass testified that because of the initiative, "[w]e have had a significant reduction in both lates and a reduction in extra services." (Tr. 47:23-48:3.)

### 2. Limits on Overtime

Jose Carlos Barrios ("Barrios"), a Mail Processing Clerk at the San Antonio Main Post Office with 33 years of experience, testified that overtime was being cut back. This measure was also listed in the July 14 PowerPoint as one of DeJoy's expectations. (Supp. Green Decl. at 1 ("POT will be eliminated. This is not cost effective and it will be taken away. Overtime will be eliminated. Again we are paying too much in OT and it is not cost effective and will soon be taken off the table.").) DeJoy, however, testified before the House Oversight and Reform Committee that he "never put a limitation on overtime," and that overtime could continue to be approved

15

"as needed." (Tinio Decl. Ex. 14, at 25; <u>see also</u> Colin Decl.
¶ 4.) Nonetheless, he stated that he intended to issue
guidance on when managers could approve overtime, presumably
to clarify, given evident confusion on the subject. (<u>See</u> <u>id.</u>
at 27.)

### 3. <u>Changes in Hiring</u>

USPS experienced staffing shortages because of the
COVID-19 pandemic. John Prokity ("Prokity"), manager of
Workforce Planning Insights & Analytics, explained that the
Postal Service adjusted its hiring processes because of these
pandemic-related staffing shortages. (Prokity Decl. ¶¶ 4-7.)
Prokity acknowledged that USPS has instituted a hiring freeze
for management-level positions, but this did not affect mail
carriers, mail handlers, and clerks. (<u>Id.</u> ¶ 6 n.1.)

Plaintiffs' expert Mark Jamison ("Jamison"), a former
Postal Service employee with over 36 years of experience,
explained that for the non-management-level positions, USPS
agreed to relax certain hiring rules, including the union-
negotiated limitation on temporary employees. That change has
"led to the addition of more than 88,000 new untrained
temporary employees." (Tr. 33:8-12; <u>see also</u> Tr. 22:22-25.)
Glass, Manager of Operations Industrial Engineering,
confirmed this statement, testifying that the USPS has hired
untrained temporary employees to fill vacancies, and further

confirming that those workers *would* be handling Election
Mail.[8] (Tr. 108:9-21.)

### 4. Equipment Destruction and Removal

In connection with Plaintiffs' claims about destruction
and removal of equipment, two items are at issue: mail
collection boxes and targeted reductions of 18 to 20 percent
in mail sorting machines.[9] Regarding the mail collection
boxes, Jennifer Vo ("Vo"), director of City Delivery and
Postal Service Headquarters and USPS employee of 26 years,
testified that blue collection boxes are regularly removed
based on volume to "ensure that mail collection within areas
served by letter carriers is accomplished in a cost-efficient
manner, while still meeting customers' needs." (Vo Decl. ¶
5.) However, "[p]ursuant to Postmaster DeJoy's recent
directive, the Postal Service has stopped removal of
collection boxes . . . not to resume until after the November
Presidential election." (Vo Decl. ¶ 18.)

Other defense witnesses gave similar accounts regarding
the sorting equipment reductions. Michael Barber, soon to be
the USPS Vice President of Processing and Maintenance

---

[8] The term "Election Mail" refers to any item mailed to or from
authorized election officials that enables citizens to participate in
the voting process, including voter registration materials, absentee or
mail-in ballot applications, polling place notifications, blank
ballots, and completed ballots. (Glass Decl. ¶ 3.)
[9] Reduction targets vary by type of machine. (Amended Complaint Ex. 3,
at 2.)

Operations, with over 29 years of experience within the postal
service, testified that, "[d]ue primarily to the large
decline in mail volume over the past decade, we have more
machines than are needed to process the mail." (Barber Decl.
¶ 5.) Barber described how the USPS monitors utilization and
performance data in real-time. He pointed to current national
utilization levels ranging between 35 and 65 percent,
concluding that even if every voter chose to vote by mail,
there would still be excess processing capacity. (Id. ¶ 6.)
Jason DeChambeau, Headquarters Director of Processing
Operations, echoed that "[t]he Postal Service has removed
and/or replaced unnecessary or outdated mail processing and
sorting equipment for many years," both when they become
outdated and need to be replaced, and when "they are no longer
needed to process the volume of mail." (DeChambeau Decl. ¶
7.) He indicated that the current equipment-reduction
initiative began in January 2017. (Id. ¶ 14.)

Plaintiffs dispute whether the removal and destruction
of this equipment was done in the normal course. Barrios
testified, for example, that, based on his experience, the
handling of machines was "a dramatic departure from past
practice." (Barrios Decl. ¶ 26.) He explained that, when
volume dipped in the past, sorting machines were powered down
rather than destroyed, leaving the facility "the ability to

18

start them back up when mail volume spiked." (Id. ¶ 27.) This flexibility allowed postal employees "to address the dramatic seasonal differences" in mail volume. (Id.) This time, however, according to an email Plaintiffs obtained dated August 18, 2020, postal employees have been directed "not to reconnect/reinstall machines that ha[d] previously been disconnected without approval from HQ Maintenance, no matter what direction they [got] from their plant manager." (Green Decl. Ex. 4, at 1.)

Plaintiffs further argue that the greatest reductions were implemented in "major cities, likely to skew Democratic." (Motion at 20.) They submitted a map created by the Washington Post titled "Postal Service Reduction in Sorting Capacity," indicating that sorting capacity, expressed as the number of pieces of mail sorted per hour, has declined disproportionately across the country, with declines concentrated in population-dense areas. (Green Decl. Ex. 5; Compl. ¶ 90.)

### 5. Changes to Election Mail Handling

The Postal Service's approach to handling Election Mail has also experienced changes in recent months. Jamison explained that "as recently as the 2018 election the USPS typically treated election mail as 1st class mail, even if it was sent at marketing mail rates." (Jamison Decl. ¶ 28). Glass

similarly testified that USPS historically devoted "excess First-Class Mail processing capacity to Election Mail." (Glass Decl. ¶ 21.) He explained, however, that this is simply a "longstanding practice" and that "no formal policy" requires it. (Id.) Cintron confirmed that some Election Mail is being delivered as "[M]arketing [M]ail." (Tr. 61:16-24.)

Barrios's testimony also points to changes in USPS's approach to Election Mail. He testified that the March 2020 primary Election Mail did not receive the special processing it did in earlier election years. (Tr. 24:2-14; Barrios Decl. ¶ 25.) For example, during the March 2020 primary, managers directed employees to run Election Mail through the first set of sorting machines initially, rather than pulling them aside to be sorted and canceled separately, as was the previous practice. (Barrios Decl. ¶ 23.) Barrios estimated that because of this directive, his facility missed about a quarter of what came through in initial sorting. (Id. ¶ 24.) This directive is still in place for the November election. (Id. ¶ 23.) When Barrios raised the issue with management, "they just simply did not" fix the problem. (Tr. 24:25.) Dennis Stasa, Senior Plant Manager at the same facility as Barrios, testified that the facility has not changed Postal Service protocols to process election mail during the last two elections, "and continues to follow this standard protocol

today." (Stasa Decl. ¶ 19.) However, Barrios testified, in remarks the Court found credible, that as a result of the changes about 600 ballots were left on the mail room floor. (Tr. 25:14-20.)

Defense witnesses have testified regarding certain practices the USPS has in place to handle Election Mail. For example, Glass testified that USPS uses "all clears" to ensure that Election Mail is accounted for. (Glass Decl. ¶ 19.) Through this process, USPS employees "use a checklist to confirm that mail scheduled or 'committed' to go out that day has gone out, and anything committed for the next day is at the front of the line." (<u>Id.</u> ¶ 19.)

Nonetheless, an August 31, 2020 report prepared by the Office of the Inspector General ("OIG") found that of seven facilities audited, none used the Postal Service's Operational Clean Sweep Search Checklist. (Tinio Decl. Ex. 4, at 5.) And "[s]ix of the seven facilities used their own variation of the Election and Political Mail logs." (<u>Id.</u>) While the OIG report did not evaluate the recent changes at issue in this case, it indicates that prior audits by the OIG found that "the Postal Service needed to improve communication between headquarters, mail processing facilities, and election officials," "train staff on Election and Political Mail processes," and "appropriately align

resources to process peak Election and Political Mail volume." (Id. at 1.)

Further, while Glass testified that there will be "no changes in service standards as it applies to election mail" (Tr. 95:19-23), Jamison disagreed, referencing letters sent between July 29 and 31, 2020 by General Counsel and Executive Vice President, Thomas Marshall, to 46 states regarding election mail. (Tr. 31:18-32:1; Jamison Decl. ¶ 28). The letters provide usual transit times for First-Class and Marketing Mail and recommend that Election Officials send out ballots using First-Class Mail. (Amended Complaint Ex. 5.) The letters further flag "mismatch[es]" between USPS delivery speeds and the state law deadlines for requesting and casting mail-in ballots. (Id. at 2.) The letters warn that "this . . . creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted . . . ." (Id.).

In light of USPS's historical practice of treating all Election Mail as First-Class Mail, Jamison viewed the letters as "a threat, like an abandonment of those long-term cultural commitments, that that mindfulness of how important ballots are is gone and they're just going to follow the regulations." (Tr. 31:18-32:1; see also Jamison Decl. ¶ 28.)

Despite DeJoy's repeated assurances that the USPS has the capacity to handle all Election Mail this November, even *before* his operational changes were introduced, the OIG found that "the amount of identifiable Election and Political Mail delivered on-time nationwide was 94.5 percent from April 2020 through June 2020, a decrease of 1.7 percentage points compared to the same period in 2018." (Tinio Decl. Ex. 4, at 5.) Further, in an apparent acknowledgment of the public doubts and precarious operational situation the USPS is experiencing, Glass explained that USPS will employ ballot monitors in every processing facility during the week before the election and through Election Day to monitor postmarking and ensure ballots are being processed. (Glass Decl. ¶ 39.)

Glass further stated that often postal employees "undertake extraordinary efforts to accelerate the delivery of ballots." (Glass Decl. ¶ 23.) Among these "extraordinary" measures, according to Glass, postal employees in one instance segregated ballots and sent them as Priority Mail Express. (Id. ¶ 25.) In another, postal employees made additional deliveries on Sunday, and in some cases have delivered ballots on a same-day basis. (Id. ¶ 26.)

Apart from the installation of ballot monitors and the use of "all clears" and logs to track Election Mail through the USPS network, the extra measures USPS contemplates taking

are considered "practices" not "policies," meaning, as Glass explained, that they are not required and are instead "typically left to local managers" to implement. (Tr. 100:5-9.) With regard to why these practices are not more uniform or formal policies, he testified that "expediting measures cannot be applied equally." (Tr. 105:8-9.) Glass pointed to measures in place to monitor such practices, but also noted that if the practices were not properly implemented, by the time headquarters investigated, it would be too late for affected ballots. (Tr. 104:11-18.) He also observed that "not in every case is every method the same and . . . valid," because "[y]ou can't deliver[] throughout the entire state of Georgia where you might be able to deliver to the city of Atlanta," for example. (Tr. 103:5-8.) Furthermore, some of these measures require the use of overtime. (Tr. 107:3-9.) Cintron testified that in the past, USPS has run late trips to ensure that Election Mail is delivered, and that the same plan would be in place this year. (Tr. 68:2-6.) However, as discussed above, USPS employees appear to lack clear guidance regarding whether, and under what circumstances, overtime is permissible. See supra Section I.B.2. Glass testified that, if overtime is restricted, the capacity of USPS employees to undertake extra measures to deliver Election Mail would be diminished. (Tr. 107:10.)

24

6. <u>Evidence of Delay and Its Impact</u>

Whether mail delivery delays have occurred is not in
dispute. At an August 24, 2020 hearing before the House
Oversight and Reform Committee, DeJoy acknowledged that there
was a decline in presort First-Class Mail service since July.
(Green Decl. Ex. 1, at 27.) The delay is likewise reflected
in an August 12, 2020 Service Performance Measurement
briefing which includes a chart showing a steep decline in
service standards for presort First-Class Mail and Marketing
Mail beginning in mid-July.[10] (Green Decl. Ex. 2, at 2, 3.)
Similarly, performance data showing nationwide service
performance for "market-dominant" products, including First-
Class and Marketing Mail, shows that between January 2020 and
August 2020, First-Class Mail declined from 91.76 percent on
time to 88.04 percent, and Marketing Mail dropped from 91.21
percent on time to 89.56 percent. (Kochevar Decl. Ex. 1, at
2.) This performance decline occurred despite a "virus-driven
decline" in mail volume, which Defendants concede.[11] While the
performance data reflect fluctuations, the largest dip with

---

[10] While the scores rebound slightly, they begin to decrease again in late
July. (Green Decl. Ex. 2, at 2, 3.) The Postal Service has indicated that
its goal is for 96.5 percent of First-Class Mail to be on time. (Tr.
36:23-24; Glass Decl. ¶ 17; Tinio Decl. Ex. 5, at 34.) When the service
standard has a score of 88.04 percent, therefore, it is 8.5 percentage
points below the goal. (Tr. 58:17-18.)
[11] Tinio Decl. Ex. 2 (Quoctrung Bui & Margot Sanger-Katz, <u>Can the Post
Office Handle Election Mail?</u>, N.Y. Times, Aug. 20, 2020). The New York
Times additionally reports that "recent restrictions on overtime do appear
to have slowed postal processing in some parts of the country." (<u>Id.</u>)

respect to both classes of mail occurred the week of July 18, coinciding with the rollout of DeJoy's initiatives, and the on-time rate for First-Class Mail has not rebounded. (Id.)

The parties do not disagree that, to some degree, the restrictions on late and extra trips caused these delays. Curtis testified that the delays resulted from a "perfect storm," including the effects of COVID-19, and "this increased energy and focus on trips on time." (Tr. 86:4.) Likewise, Cintron agreed that, the focus on strict schedule adherence did come at the cost of service in July and August. (Tr. 66:22-67:3.) As Plaintiffs' expert Jamison explained, "[i]f processing the mail intended for [a particular] truck hasn't been completed, when the truck leaves, delays in delivery occur. And those delays escalate and pyramid over days." (Tr. 34:15-18.) He characterized the "insistence on maintaining the rigid adherence to postage transportation Schedules" as having "[p]erhaps the greatest impact." (Tr. 34:5-7.)

But the other operational changes have contributed to these postal service delays as well. For example, in a letter dated July 29, 2020, the American Postal Workers Union stated that machine removal has "a direct negative impact on reduced service standards" and "has contributed to delayed mail." (Green Decl. Ex. 7, at 5.) Barrios agreed, testifying that

"[t]he absences of these machines will place a burden on our ability to process the mail as our Seasoned Holiday Mail would start . . . coming in." (Barrios Decl. ¶ 20.) And while Barber testified that, despite the equipment reductions, if changes in volume occur, USPS will be able to "quickly address and remedy any machine processing capacity issue" that results (Barber Decl. ¶ 6), this notion is undermined by an email from Kevin Couch, Director of Maintenance Operations, dated August 18, 2020, indicating that postal employees were "not to reconnect/reinstall machines that ha[d] previously been disconnected without approval from HQ Maintenance, no matter what direction they [got] from their plant manager." (Green Decl. Ex. 4, at 1.)

Barrios testified that the San Antonio facility is currently running on average two to three days behind its usual service standard, and that the current delays in mail delivery will continue into November because there are not enough "qualified supervisors that know how to properly expedite the mail." (Barrios Decl. ¶ 6; Tr. 22:17-20.) And because USPS is "hiring brand new employees with no official training," while limiting overtime, experienced postal employees are effectively prohibited from lending a helping hand. (See Tr. 22:22-23:3.)

Taken together, these delays have a direct bearing on the fundamental voting rights issues now before the Court. Specifically, if the Postal Service's mail delivery levels remain at current levels or continue to decline, under operational policies apparently still in place, such curtailed performance would put the ability of voters to timely cast their ballots at risk. On this point, Cintron expressly testified that Election Mail could be included among the mail left behind as a result of the heavy focus on adhering to departure schedules. (Tr. 68:20-24.) Barrios explained that "[w]hile our past practices would position us well to handle what is likely to be a significant task in pulling out and specially handling an unprecedent volume of election mail, the reduced capacity from missing machines, as well as the (constantly shifting) micro-management and inflexibility is a disaster in the making." (Barrios Decl. ¶ 30.)

The impact of these operational changes is even greater this year considering the significant number of voters who plan to cast their ballots by mail. In plaintiff Mondaire Jones's primary election in New York's 17th Congressional District, which includes Rockland and parts of Westchester County, approximately 61.1 percent of the ballots were cast

by mail. (Jones Decl. ¶ 6). The voter Plaintiffs in this
action all plan to vote by mail. (E.g., Spencer Decl. ¶ 6).

International voters face even greater obstacles. Julia
Brown ("Brown"), a volunteer for Democrats Abroad living in
Prague, testified about the "nixie issue," which arises "when
a ballot or other voting material, such as a ballot request,
is received within the U.S. postal system" but ultimately
returned to sender. (Tr. 12:22-13:2.) The issue has arisen
earlier in 2020 than it did in 2016. Brown added that
international voters cannot use private mail carriers as an
effective alternative because they can be costly, unreliable,
and for regions where ballots must be addressed to P.O. boxes,
simply unable to deliver. (Tr. 16:14-22.)

C. THE PARTIES' ARGUMENTS

Plaintiffs argue that the changes in Postal Service
policies and operations detailed above will undermine the
integrity of the November national election by causing delays
in delivery (and, ultimately, counting) of mail-in ballots.
While Plaintiffs admit they do not know the precise measure
of the potential disenfranchisement, they allege that it will
be undoubtedly meaningful in light of the "record volume of
absentee and other mail ballots" expected because of the
pandemic. Plaintiffs offer evidence -- internal memos and
publications -- both substantiating that these changes were

implemented and suggesting that delay has already begun to
occur. The evidence includes several news articles appearing
in reputable publications drawing that conclusion. Attached
to their motion, Plaintiffs offer evidence indicating that
the reductions in machinery have been concentrated in swing
states or major cities "likely to skew Democratic."

Plaintiffs argue that these deviations from past USPS
policies and practices will result in the infringement of
their First Amendment right to vote and to have their votes
equally counted under the Fifth Amendment. They seek a
declaratory judgment holding that Defendants have violated
their rights under the Constitution, and an injunction both
(1) ensuring that USPS may proceed with Election Mail
operations unencumbered by these policy changes, and (2)
unwinding or mitigating any damage that has already occurred.

In response to the Plaintiffs' factual allegations, the
Government asserts that "nearly all" of the operational
changes have been suspended, including "equipment and
collection box removal, certain routine aspects of overtime
management, . . . changes to retail hours, . . . plans to
consolidate or close any facilities, and a limited pilot
program for mail carriers." (Opposition at 13.) The "ongoing
effort to improve compliance with existing schedules,"
however, has not been suspended and will continue. (Id. at 13

n.9.) The Government further disclaims responsibility for certain of the policy announcements (i.e., relating to overtime, parking restrictions, and prohibitions on late and extra trips), explaining that they were communicated by "local manager[s]" without approval from headquarters. (Opposition at 19 n.14; see also id. at 18 n.13.) Regarding delay, the Government admits that some delay has occurred but insists it has been mitigated by the suspension of policy changes and adjustment to the procedures (such as the new transportation compliance rules).

## II.  <u>JURISDICTION</u>

As it must, the Court first determines whether it has jurisdiction to hear this suit. While Defendants argue that Plaintiffs do not have standing because they have failed to show a certainly impending injury, and also fail to demonstrate that their injury is traceable to and redressable by Defendants, the Court holds that Plaintiffs satisfy Article III standing requirements. Defendants also argue that Plaintiffs' claims are moot, but the Court disagrees again, and holds that Plaintiffs have presented a live controversy.

### A. <u>STANDING</u>

#### 1. Legal Standard

The "Constitution requires that anyone seeking to invoke federal jurisdiction . . . have standing to do so." <u>Crist v.</u>

Case 1:20-cv-03010-APM Document 44 Entered on FLSD Docket 10/13/2020 Page 409 of
Case 4:20-cv-00079-BMM Document 138-6 Filed 10/14/20 Page 33 of 88
471

Comm'n on Presidential Debates, 262 F.3d 193, 194 (2d Cir.
2001). "The law of Article III standing, which is built on
separation-of-powers principles, serves to prevent the
judicial process from being used to usurp the powers of the
political branches." Clapper v. Amnesty Int'l, 568 U.S. 398,
408 (2013). To demonstrate that Article III's standing
requirements are met, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a)
> concrete and particularized and (b) actual or imminent,
> not conjectural or hypothetical; (2) the injury is
> fairly traceable to the challenged action of the
> defendant; and (3) it is likely, as opposed to merely
> speculative, that the injury will be redressed by a
> favorable decision.

Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), 528 U.S.
167, 181–82 (2000). "[E]ach element must be supported in the
same way as any other matter on which the plaintiff bears the
burden of proof, i.e., with the manner and degree of evidence
required at the successive stages of the litigation." Lujan
v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citations
and quotation marks omitted); see New York v. Trump, No. 20-
cv-5770, 2020 WL 5422959, at *9 (S.D.N.Y. Sept. 10, 2020).

The injury-in-fact requirement is meant to "ensure that
the plaintiff has a personal stake in the outcome of the
controversy." Susan B. Anthony List, 573 U.S. at 158 (internal
quotation marks and citation omitted). A "future injury" can
suffice, if it is "certainly impending, or there is a

32

substantial risk that the harm will occur." Id. at 157; see
Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013)
(explaining that plaintiffs need not "demonstrate that it is
literally certain that the harms they identify will come
about"); House of Representatives, 525 U.S. at 332-33
(finding standing where certain jurisdictions were
"substantially likely . . . [to] suffer vote dilution")
(internal quotation marks and citation omitted).

Traceability requires showing "a causal connection
between the injury and the conduct complained of — the injury
has to be fairly traceable to the challenged action of the
defendant, and not the result of the independent action of
some third party not before the court." Lujan, 504 U.S. at
560 (internal quotation marks, alterations, and citation
omitted). However, traceability does not require "[p]roximate
causation." Lexmark Int'l, Inc. v. Static Control Components,
Inc., 572 U.S. 118, 134 n.6 (2014). "Article III 'requires no
more than de facto causality.'" Dep't of Commerce v. New York,
139 S. Ct. at 2566 (quoting Block v. Meese, 793 F.2d 1303,
1309 (D.C. Cir. 1986) (Scalia, J.)). Traceability is
satisfied when a "theory of standing" relies "on the
predictable effect of Government action on the decisions of
third parties," Dep't of Commerce v. New York, 139 S. Ct. at
2566, "even when the decisions are illogical or unnecessary,"

New York v. U.S. Dep't of Homeland Sec., 969 F.3d 42, 59 (2d
Cir. 2020).

Redressability requires a showing that is "likely, as
opposed to merely speculative, that the injury will be
redressed by a favorable decision." Lujan, 504 U.S. at 561
(internal quotation marks and citation omitted). The
plaintiff need not "show that a favorable decision will
relieve his *every* injury." Dep't of Texas, Veterans of
Foreign Wars of U.S. v. Texas Lottery Comm'n, 760 F.3d 427,
432 (5th Cir. 2014) (citing Larson v. Valente, 456 U.S. 228,
243 n.15 (1982)).

"[A] plaintiff must demonstrate standing for each claim
and form of relief sought." Cacchillo v. Insmed, Inc., 638
F.3d 401, 404 (2d Cir. 2011). The standing inquiry is
"especially rigorous when reaching the merits of the dispute
would force [a federal court] to decide whether an action
taken by one of the other two branches of the Federal
Government was unconstitutional." Raines v. Byrd, 521 U.S.
811, 819-20 (1997). To demonstrate standing for injunctive
relief, a plaintiff "cannot rely solely on past injuries;
rather, the plaintiff must establish how he or she will be
injured prospectively and that the injury would be prevented
by the equitable relief sought." Marcavage v. City of New
York, 689 F.3d 98, 103 (2d Cir. 2012).

34

2. Application

Voter Plaintiffs have shown a "substantial risk" that the ballots of voters in certain regions are less likely to be counted because of delayed mail service. See Susan B. Anthony List, 573 U.S. at 157; House of Representatives, 525 U.S. at 332-33 (finding standing where certain jurisdictions were "substantially likely . . . [to] suffer vote dilution").

Defendants argue that the Voter Plaintiffs have not demonstrated standing because their alleged injury is too speculative. Defendants contend that USPS has already suspended many challenged procedures and is endeavoring to ensure the timely delivery of mail, such that mail delays are unlikely. But, as discussed above, there is sufficient evidence suggesting that substantial mail delivery delays persist, and the rollback of policies has not been fully implemented or adequately communicated throughout the entire Postal Service organization, which is tiered in multiple national, regional, and local levels.

Additionally, in letters addressed to officials in 46 states, USPS acknowledged that, even absent a slowdown, voters face a "significant risk that [they] will not have sufficient time to complete and mail the completed ballot back to the election official in time for it to arrive by the state's return deadline" and that risk is (in some cases)

"exacerbated by the fact that the law [in some states] does
not . . . impose a time period by which election officials
must transmit a ballot to the voter." (See, e.g., Amended
Complaint Ex. 5, at 1-2.) A two-day mail delivery delay
occasioned by postal operations, even if unintentional, would
only increase the likelihood of impairing voting rights. As
USPS has "itself forecast[ed] the injuries," it is
"disingenuous for [USPS] to claim that the injury is not
sufficiently imminent." See New York v. U.S. Dep't of Homeland
Sec., 2020 U.S. App. LEXIS 24492, at *25 (2d Cir. Mar. 2,
2020).

        Defendants suggest that the Voter Plaintiffs have not
shown an injury, because they can avoid injury by mailing
their ballots early. The Court is not persuaded. Defendants'
argument overlooks that the mail delays will predictably
force some citizens -- such as plaintiff Shannon Spencer --
to vote in person and potentially suffer harm in the form of
exposure to COVID-19. See Black Voters Matter Fund v.
Raffensperger, No. 20 Civ. 01489, 2020 U.S. Dist. LEXIS
143209, at *55-61 (N.D. Ga. Aug. 11, 2020) (finding injury
and standing where state law forced plaintiff to choose
between paying postage or risking COVID-19 infection by
voting in-person); see Dep't of Commerce v. New York, 139 S.
Ct. at 2566. This prospect constitutes an injury even if

voters "decisions [to vote in person] are illogical or unnecessary," by, for example, overlooking the possibility of voting early. New York v. U.S. Dep't of Homeland Sec., 969 F.3d at 59.

Given the substantial likelihood that, due to mail delays, certain votes are likely not to be counted, Candidate Plaintiffs also have standing. Contrary to Defendants' contention, Candidate Plaintiffs need not allege that the mail issues will cause them to lose to show an injury. The challenged mail procedures injure electoral candidates because "[c]andidates have an interest not only in winning or losing their elections, but also in ensuring that the final vote tally accurately reflects the votes cast." Gallagher v. N.Y. State Bd. of Elections, 20 Civ. 5504, 2020 WL 4496849, at *9 (S.D.N.Y. Aug. 3, 2020).

The Court further concludes that Plaintiffs have shown traceability and redressability. The rollout of the challenged policies coincided with a sharp decline in on-time delivery rates from the already-depressed pandemic rates. This fact, together with the testimony described above, makes clear that the challenged mail procedures have slowed mail service and are thus a de facto cause of Plaintiffs' claimed injuries. This harm may be lessened by declaratory and

injunctive relief targeted at minimizing delays in mail
delivery.

　　B. <u>MOOTNESS</u>

　　Defendants argue that the Court lacks jurisdiction
because Plaintiffs' claims are moot. Defendants contend that
USPS has suspended many measures that Plaintiffs criticized
and has a demonstrated commitment to delivering Election Mail
in a timely fashion.

　　"A case becomes moot -- and therefore no longer a 'Case'
or 'Controversy' for purposes of Article III -- 'when the
issues presented are no longer live or the parties lack a
legally cognizable interest in the outcome.'" <u>Already, LLC v.
Nike, Inc.</u>, 568 U.S. 85, 91 (2013) (quoting <u>Murphy v. Hunt</u>,
455 U.S. 478, 481 (1982) (per curiam)). However, "a defendant
cannot automatically moot a case simply by ending its unlawful
conduct once sued." <u>Id.</u> (citing <u>City of Mesquite v. Aladdin's
Castle, Inc.</u>, 455 U.S. 283, 289 (1982). Otherwise, as the
Supreme Court explained in <u>Nike</u>:

> a defendant could engage in unlawful conduct, stop when
> sued to have the case declared moot, then pick up where
> he left off, repeating this cycle until he achieves all
> his unlawful ends. Given this concern, our cases have
> explained that "a defendant claiming that its voluntary
> compliance moots a case bears the formidable burden of
> showing that it is absolutely clear the allegedly
> wrongful behavior could not reasonably be expected to
> recur."

<u>Id.</u> (quoting <u>Laidlaw</u>, 528 U.S. at 190).

Here, Defendants have not even shown that the challenged practices have ceased. Tellingly, they declare that "nearly all" of the challenged USPS policies and operations have been suspended. But, how many potentially uncounted votes could remain in undelivered mail in the gap between "all" and "nearly all" of the practices at issue? The Government concedes that one practice -- the "ongoing effort to improve compliance with existing schedules" -- has not been, and will not be, suspended. (Opposition at 13 n.9.) As discussed above, USPS has not fully restored mail delivery service levels. <u>See supra</u>. And substantial evidence indicates that the supposed rollback of the challenged practices is either unenforced and not yet fully implemented or possibly insincere. <u>See supra</u>. The controversy Plaintiffs raise remains very much alive.

## III. <u>LEGAL STANDARDS</u>

### A. <u>PRELIMINARY INJUNCTION</u>

Ordinarily, a preliminary injunction may be granted when the party seeking the injunction establishes that "1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." <u>Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.</u>, 175

F.3d 266, 270 (2d Cir. 1999). But when the injunction sought
is mandatory, i.e., when it "will alter rather than maintain
the status quo," the movant must show 'clear' or 'substantial'
likelihood of success. No Spray Coalition, Inc. v. City of
New York, 252 F.3d 148, 150 (2d Cir. 2001) (quoting Rodriguez
v. DeBuono, 175 F.3d 227, 233 (2d Cir. 1999)).

    B. APPLICABILITY OF ANDERSON-BURDICK

    One important open question with respect to the legal
standards applicable in this case, though ultimately not a
dispositive one, is whether the Court should apply the so-
called Anderson-Burdick test, derived from Anderson v.
Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504
U.S. 428 (1992). In Anderson, Burdick, and their progeny, the
Supreme Court "articulated a 'flexible standard' to evaluate
'Constitutional challenges to specific provisions of a
State's election laws.'" Daunt v. Benson, 956 F.3d 396, 406
(6th Cir. 2020) (quoting Burdick, 460 U.S. at 434; Anderson,
460 U.S. at 789). When applying the Anderson-Burdick test, a
court first considers the "character and magnitude of the
asserted injury to the rights protected by the First and
Fourteenth Amendments." Anderson, 460 U.S. at 789. This
inquiry requires a determination of "content-neutrality and
alternate means of access." Citizens for Legislative Choice
v. Miller, 144 F.3d 916, 921 (6th Cir. 1998). For example, a

limitation on political participation by an identifiable political group would not be content-neutral, and thus would impose a severe burden. Id. As another example, a law would impose a severe burden if it left "few alternate means of access to the ballot" and so "restrict[ed] the availability of political opportunity." Daunt, 956 F.3d at 407 (quoting Miller, 144 F.3d at 921).

After determining the burden, the court evaluates the state's justifications for its rule. The level of scrutiny depends on the burden; for severe restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." Burdick, 504 U.S. at 434. If the state election law imposes "reasonable, nondiscriminatory restrictions" on First and Fourteenth Amendment rights, then "the State's important regulatory interests are generally sufficient to justify" the restrictions. Id. (quoting Anderson, 460 U.S. at 788). If the state election law burden is "moderate," then the court uses a flexible analysis, which involves simply weighing the burden against the state's asserted interest and means of pursuing it. Daunt, 956 F.3d at 408-09 (citations omitted).

The parties dispute whether the Anderson-Burdick test applies to Plaintiffs' claims. The Government argues the test is used solely to evaluate state election laws, and so is

41

inapplicable here. The Government further argues that the
framework should not be extended to this case because the
assumptions underlying the framework do not apply here,
relying on the premise that this case does not implicate "the
counting of votes," apportionment, or "election regulations,"
and also does not raise any First Amendment concerns.
(Opposition at 30.)

Plaintiffs counter that even if the Anderson-Burdick
framework does not apply, the test does not increase the level
of scrutiny applied to restrictions on the right to vote, but
rather can only reduce the applicable level of scrutiny.
Plaintiffs argue that in older cases predating Anderson-
Burdick, courts simply applied strict scrutiny without regard
to the severity of the burden. Thus, Plaintiffs assert that
even if the Court finds that Anderson-Burdick should not be
applied in a suit challenging federal actions, the claims
should still be assessed under strict scrutiny given that the
fundamental right to vote is at stake.

It is unsurprising that Anderson-Burdick has never been
applied to federal actors. After all, our country has a highly
decentralized system of election administration, in which
states and localities are primarily responsible for
regulating and managing elections. See U.S. Const. art. 1, §
4; Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S.

1, 8 (2013) ("The Elections Clause . . . imposes the duty"
on states "to prescribe the time, place, and manner of
electing Representatives and Senators"). The Court also
disagrees with the Government that this case does not
implicate "the counting of votes." To hold otherwise would be
to ignore the facts at hand: a large number of voters will be
exercising their right to vote in the November 2020 election
by placing their ballots in the mail. There is simply no
reason for the Court to ignore the severe reality that the
country is in the middle of a deadly pandemic, that only five
states require an affirmative excuse for citizens to vote by
mail, and one state (Oregon) conducts elections entirely by
mail. Indeed, the USPS has affirmatively held itself out as
a partner to state and local election authorities, and
recognizes that it is a crucial player in the election.

Nevertheless, the Court need not decide whether
Anderson-Burdick applies. First, Plaintiffs are correct that
the test can only lower the level of scrutiny. Since the Court
finds that Plaintiffs have shown a substantial likelihood of
success on the merits even when reviewing the restrictions
under a lower standard, Anderson-Burdick is largely beside
the point. Second, and relatedly, the framework may not yield
a different outcome than the traditional equal protection and
First Amendment analyses. Indeed, at the first step --

deciding the burden -- a court asks essentially the same questions that are relevant to straightforward First Amendment and Equal Protection analyses, e.g., content-neutrality and alternative means of access. For these reasons, the Court declines to answer whether Anderson-Burdick should be extended to cases challenging the constitutionality of restrictions on voting caused by a federal entity.

    C. APPLICABILITY OF MCDONALD

    The Government also argues that under McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802 (1969), the Court should apply rational basis review.[12] McDonald involved an Illinois statute that denied certain inmates mail-in ballots. The Court held that the statute did not restrict their right to vote, but rather only their asserted right to an absentee ballot, and that they were thus not "absolutely prohibited from voting by the State." Id. at 808 n.7. The Court observed that the record lacked evidence that the State would not, for example, "furnish the jails with special polling booths . . . or provide guarded transportation

---

[12] The Court notes a tension in the Government's position. The Government argues that Anderson-Burdick applies only to cases involving state election laws, but McDonald similarly involved a state election law, and asked whether voters were being prohibited from voting "by the State." 394 U.S. at 808 n.7. If Anderson-Burdick should not apply, neither should McDonald.

to the polls." Id. at 808 n.6. On these facts, the Court applied rational basis review and upheld the statute.

The Court finds that McDonald is inapposite. The Supreme Court has expressly restricted its applicability to cases in which there is no evidence showing that the challenged restriction will prohibit the plaintiff from voting. As the Supreme Court recognized just a few years later, first in Goosby v. Osser, 409 U.S. 512 (1973), and then again in O'Brien v. Skinner, 414 U.S. 524 (1974), McDonald was a case that "[e]ssentially . . . rested on failure of proof," because there was nothing in the record to show that the inmates were "in fact absolutely prohibited from voting by the State." O'Brien, 414 U.S. at 529 (quoting McDonald, 394 U.S. at 808 n.7). And again, in Hill v. Stone, 421 U.S. 289, 300 n.9 (1974), the Court distinguished McDonald as a case in which "there was nothing in the record to indicate that the challenged Illinois statute had any impact" on the right to vote. The Court pointed to language in McDonald stating that "[a]ny classification actually restraining the fundamental right to vote . . . would be subject to close scrutiny." Id. Where the facts demonstrate that there is a "not trivial" burden on the right to vote, McDonald is inapplicable. Price v. New York State Bd. of Elections, 540 F.3d 101, 110 (2d Cir. 2008); see also id. at 109 ("[I]t is important only that

45

there is at least some burden on the voter-plaintiffs' rights."); see also id. at 109 n.9 ("McDonald does not alter our analysis . . . [because] the record in this case is not similarly barren."). Because such facts are in the record before the Court, McDonald is distinguishable and rational basis review inappropriate.[13]

## IV. LEGAL ANALYSIS

Because the Court finds that Anderson-Burdick does not govern the analysis, Plaintiffs' claims must be assessed as standalone equal protection and First Amendment violations. The Court begins with Plaintiffs' Fifth Amendment equal protection claim.

### A. EQUAL PROTECTION CLAIM

Plaintiffs argue that USPS's policies and practices generally, and specifically as they relate to Election Mail, do not comport with the Fifth Amendment's guarantee of equal protection because they render voters' ability to cast an effective vote dependent on arbitrary factors, such as the particular USPS branch that handles their ballots.

---

[13] While the Fifth Circuit recently upheld the continued validity of McDonald in the equal protection context in Texas Democratic Party v. Abbott, 961 F.3d 389 (5th Cir. 2020), that court did not squarely address whether there may be a right to access an absentee ballot in conditions of national emergency, such as this country has been facing for several months now, given that a law requiring in-person voting presents severe burdens -- a proposition not contested by the Government.

Case 1:20-cv-03010-BNS-05516-MNt 24-4 Entrd49d 51lFd LSD/21/20t Pa0e1420f087Page 424 of
Case 4:20-cv-00079-BMM  Document 38-6  Filed 10/14/20  Page 48 of 88
471

"[E]qual protection . . . require[s] the uniform
treatment of" similarly situated individuals. Reynolds v.
Sims, 377 U.S. 533, 565 (1964). "The right to vote is
protected in more than the initial allocation of the
franchise. Equal protection applies as well to the manner of
its exercise." Bush v. Gore, 531 U.S. 98, 104 (2000) (per
curiam). Once citizens have been granted the right to vote,
the government "may not, by later arbitrary and disparate
treatment, value one person's vote over that of another." Id.
at 104-05 (citing Harper v. Virginia Bd. of Elections, 383
U.S. 663, 665 (1966)).[14]

In a series of apportionment cases in the 1960s, the
Supreme Court developed the one person, one vote standard,
which requires that congressional, state, and local
legislative districting schemes be designed to weight votes
equally.[15] In Reynolds, for example, the Court held that "the

---

[14] Harper and Bush v. Gore were decided under the Fourteenth Amendment
Equal Protection Clause, which applies only to the states. Although the
Fifth Amendment, which binds the federal government, contains no explicit
guarantee of equal protection, "[e]qual protection analysis in the Fifth
Amendment area is the same as that under the Fourteenth Amendment."
Buckley v. Valeo, 424 U.S. 1, 93 (1976), superseded on other grounds by
statute, see McConnell v. Fed. Election Comm'n, 540 U.S. 93 (2003);
Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 214-218 (1995);
Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975) ("This Court's
approach to Fifth Amendment equal protection claims has always been
precisely the same as to equal protection claims under the Fourteenth
Amendment."). Indeed, it would be "unthinkable that the same Constitution
would impose a lesser duty on the Federal Government" than on the states.
Bolling v. Sharpe, 347 U.S. 497, 500 (1954).
[15] Of course, exceptions always exist. Special purpose districts, for
example, are not subject to the one person, one vote standard. See, e.g.,
Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719

Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis" to ensure votes are weighted equally. 377 U.S. at 568. The Court explained that "[d]iluting the weight of votes because of place of residence" violates the Equal Protection Clause "just as much as invidious discriminations based upon factors such as race or economic status." Id. at 566 (internal citations omitted).

The Reynolds Court offered two theories to explain the importance of an equally weighted vote. First, the Court explained that an equally weighted vote is necessary to ensure that citizens have effective representation:

> [R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature.

Id. at 565. Second, the Court reasoned that malapportioned districts communicate a message of inequality, suggesting that some are "less a citizen" than others. Reynolds, 377

_____

(1973) (holding that elections for the directors of a water-storage district could weight votes according to the assessed valuation of each voter's land).

48

U.S. at 567. The Court deemed such a message inconsistent
with "[t]he concept of 'we the people' under the Constitution"
which "visualizes no preferred class of voters." <u>Id.</u> at 558.

The Supreme Court extended the equal protection
principles of its one person, one vote jurisprudence in <u>Bush
v. Gore</u> to decide the constitutionality of the mechanisms
used to recount votes in Florida. The Court's analysis began
by observing that "the right to vote as the legislature has
prescribed is fundamental; and one source of its fundamental
nature lies in the equal weight accorded to each vote and the
equal dignity owed to each voter." <u>531 U.S.</u> at 104. The Court
then articulated the rule that equal protection entails an
"obligation to avoid arbitrary and disparate treatment of the
members of [the] electorate" that results in "valu[ing] one
person's vote over that of another." <u>Id.</u> at 104-05.

Applying these principles, the Supreme Court concluded
that the "the recount mechanisms implemented" in Florida did
"not satisfy the minimum requirement for nonarbitrary
treatment of voters." <u>Id.</u> at 105. "Much of the controversy"
in that case "revolve[d] around ballot cards designed to be
perforated by a stylus but which, either through error or
deliberate omission, ha[d] not been perforated with
sufficient precision for a machine to register the
perforations." <u>Id.</u> The Florida Supreme Court "ordered that

the intent of the voter be discerned from such ballots." Id. The Supreme Court deemed this command "unobjectionable as an abstract proposition and a starting principle." Id. at 106.

The problem, in the Supreme Court's view, was "the absence of specific standards to ensure its equal application." Id. Absent precise guidance from the Florida Supreme Court, different counties "used varying standards to determine what was a legal vote." Id. at 107.[16] Even dissenting Justices Souter and Breyer agreed with the majority that more uniform recount standards should have been applied. See id. at 134 (Souter, J., dissenting) ("I can conceive of no legitimate state interest served by these differing treatments of the expressions of voters' fundamental rights. The differences appear wholly arbitrary."); id. at 146 (Breyer, J., dissenting) ("I agree that, in these very special circumstances, basic principles of fairness should have counseled the adoption of a uniform standard to address the problem.").

In Gallagher v. New York State Board of Elections, No. 20 Civ. 5504, 2020 WL 4496849, at *19 (S.D.N.Y. Aug. 3, 2020),

---

[16] Additional equal protection problems the Supreme Court identified included (1) differences in the treatment of undervotes and overvotes, (2) the lack of "assurance that the recounts included in a final certification must be complete," and (3) the failure to specify who would count ballots and how observers could make objections. See Bush v. Gore, 531 U.S. at 107-09.

the district court relied on <u>Bush v. Gore</u> to hold that
plaintiffs demonstrated a likelihood of success on their
equal protection claim where due to the "inconsistent
application of postmarks to absentee ballots" by USPS, the
primary election "suffered from a lack of 'specific standards
to ensure . . . equal application' of [the state statute's]
postmark rule." Specifically, the Court found "strong
evidence that USPS locations in Brooklyn handled absentee
ballots differently from the postal service locations in the
other boroughs" and that "a significant number of Brooklyn
ballots that should have been postmarked were not." <u>Id.</u> The
court reasoned that "[w]hether an individual's vote will be
counted in this race, therefore, may depend in part on
something completely arbitrary -- their place of residence
and by extension, the mailbox or post office where they
dropped off their ballot." <u>Id.</u> Such an arbitrary process, the
court explained, lacked "sufficient guarantees of equal
treatment" and constituted "the type of differential
treatment that the Supreme Court has found to violate the one
person, one vote principle." <u>Id.</u> (quoting <u>Bush v. Gore</u>, 531
U.S. at 107).

    Defendants contend that Plaintiffs' equal protection
claim cannot succeed because Plaintiffs have not alleged
purposeful or intentional discrimination. This argument

Case 1:20-cv-03010-APM Document 24-4 Entered on FLSD Docket 11/20/20 Page 429 of
471
Case 4:20-cv-00079-BMM   Document 38-6   Filed 10/14/20   Page 53 of 88

reflects a fundamental misunderstanding of the one person, one vote standard. The one person, one vote doctrine does not "place on plaintiffs any burden of proving that" a system that unequally weights or counts votes "represents a deliberate effort to dilute some group's voting power." Tucker v. U.S. Dep't of Commerce, 958 F.2d 1411, 1414 (7th Cir. 1992); see Grant M. Hayden, The False Promise of One Person, One Vote, 102 Mich. L. Rev. 213, 222 (2003) ("[T]he one person, one vote standard . . . enjoys the doctrinal privilege of being one of the few Equal Protection Clause violations actionable without a showing of discriminatory intent."). In cases where a showing of intentional discrimination is required, that requirement serves "to prevent the concept of equal protection from being used to invalidate governmental policies that just happen to bear more heavily against a vulnerable group." Tucker, 958 F.2d at 1414. In contrast, the one person, one vote cases "vindicate a right that the Supreme Court has found to be implicit in the Constitution" to an election system that fairly counts and weights votes. Id. The "failure to create the required mechanism is an intentional denial of the right to an equally weighted vote." Id.

Thus, in Bush v. Gore, the Court concluded that a violation of equal protection occurred without making a

finding of discriminatory intent on the part of the Florida Legislature or the Florida Supreme Court. See Gallagher, 2020 WL 4496849, at *20. Similarly, in Harper, on which Bush v. Gore relied, the Supreme Court invalidated a poll tax absent evidence of an intent to discriminate based on race or wealth. Harper, 383 U.S. at 670. With regard to the state's argument that the poll tax was as innocuous as a driver's license fee, the Court remarked that "[t]he degree of discrimination is irrelevant." Id. at 668. Likewise, when a plaintiff challenges a Congressional districting plan on a one person, one vote theory, the plaintiff need only show that "the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." Karcher v. Daggett, 462 U.S. 725, 730 (1983); see Franklin v. Massachusetts, 505 U.S. 788, 806 (1992) (citing Karcher for the proposition that plaintiffs "bear [the] burden of proving disparate representation").[17] The burden then shifts to the government to show "that each significant variance between districts was necessary to achieve some legitimate goal." Karcher, 462 U.S. at 731.

---

[17] Although Defendants cited Franklin in their Opposition, they do not discuss this aspect of the Supreme Court's decision. (See Opposition at 25 n.20 (citing Franklin, 505 U.S. at 802-03).)

In sum, the Supreme Court has consistently declined to require a showing of discriminatory purpose in the context of one person, one vote cases. Defendants offer no authority to the contrary. Accordingly, the Court will not impose such a requirement in this case. In any event, the Court observes that OIG reports had put USPS on notice of inconsistencies in the handling of Election Mail and the need for improved communications and training on Election Mail processes. (See Tinio Decl. Ex. 4, at 1 (discussing prior audits)).

Defendants further contend that the equal protection principles Plaintiffs invoke do not apply to USPS's handling of Election Mail. Yet, states are relying on USPS as a "vital partner in administering a safe, successful election." (Amended Complaint Ex. 7 (Letter from the leadership of the National Association of Secretaries of State to DeJoy dated August 7, 2020)). And, even the nuts and bolts of election administration must comport with equal protection. Bush v. Gore stands for the proposition that an equal protection violation occurs when arbitrary disparities in voting mechanisms make it less likely that voters in certain areas will cast votes that count. Nonuniform mail service functions in the same way as the nonuniform vote counting standards at issue in Bush v. Gore, making it less likely that absentee voters in certain areas will cast votes that count, due in

substantial part to failures in the Postal Service's Election
Mail operations. Defendants offer no persuasive explanation
for why USPS should be exempt from the same standards that
apply to other government entities that handle ballots.
Defendants cannot seriously contend, for example, that the
Constitution permits USPS to refuse to carry the ballots of
minority voters or to arbitrarily shred ballots. See Wesberry
v. Sanders, 376 U.S. 1, 17 (1964) ("Not only can this right
to vote not be denied outright, it cannot, consistently with
Article I, be destroyed by alteration of ballots or diluted
by stuffing of the ballot box.") (citing United States v.
Classic, 313 U.S. 229 (1941); United States v. Saylor, 322
U.S. 385 (1944)).

The cases described above all concern disparities in the
weighting and counting of votes cast within the same state.
Defendants contend that "it is not clear how the 'one person,
one vote' principle could ever be applied across state lines."
(Opposition at 25 n.19.) Defendants' point is that, in federal
elections, a voter's vote is not weighted exactly the same as
those of voters in other states. Consider, for example,
elections for the United States Senate. The two Senators from
Wyoming represent around 580,000 people, while the two
Senators from California represent over 39 million people. An
individual voter in Wyoming therefore comprises a larger

share of the electorate than an individual voter in California. This deviation from population-based representation reflects the "Great Compromise" that resolved the "bitter controversy" between large and small states that "came near ending the [Constitutional] Convention without a Constitution." Wesberry, 376 U.S. at 10-13. With regard to the United States House of Representatives, the Great Compromise called for Representatives to "represent the people as individuals, and on a basis of complete equality for each voter." Id. at 14. This aim, however, cannot be perfectly achieved. Although Congressional districting schemes can achieve near mathematical equality *within* each state, it is "virtually impossible to have the same size district in any *pair* of states." U.S. Dep't of Commerce v. Montana, 503 U.S. 442, 463 (1992) (emphasis added). This result follows because Article 1, Section 2 of the Constitution requires that a fixed number of Representatives be allocated among states of varying sizes, so that even the smallest states have at least one Representative, and that Representatives not be split between states. See id. And, due to the design of the Electoral College -- in which each state has as many electors as it has Senators and Representatives in Congress -- these interstate disparities carry over into presidential elections. See U.S. Const. art. II, § 1. Thus,

in the interstate context, votes are weighted with constitutional proportionality rather than exact mathematical equality.

The Defendants are not sure what to make of this electoral phenomenon. They offer no precedent or argument on what the right to an equal vote means in the interstate context. Defendants' only remark in this regard is that "it is not clear . . . ." (See Opposition at 25 n.19.)

But one proposition is abundantly clear. The Supreme Court's one person, one vote decisions are concerned with ensuring voters' rights to fair and effective representation and equal dignity, and these rights retain their force even when votes are not weighted with precise mathematical equality. In Gray v. Sanders, 372 U.S. 368, 380 (1963), the Court observed that "the Constitution visualizes no preferred class of voters," and underscored "the dignity" of "the right to have one's vote counted." The Court's decision in Reynolds echoed this emphasis on the equal dignity of voters, recognizing that "[a] citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm." 377 U.S. at 568. The Court in Reynolds further proclaimed that "every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies." Id. at 565. And, in Bush v. Gore,

the Court reaffirmed "the equal dignity owed to each voter." 531 U.S. at 529.

To effectuate these rights, the Court required that votes be weighted equally for purposes of Congressional and state legislative elections. See Reynolds, 377 U.S. at 565 ("Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature."); id. at 567 ("To the extent that a citizen's right to vote is debased, he is that much less a citizen."). In other words, an equally weighted vote is a means of putting into operation a broader right of political equality. The Supreme Court endorsed this understanding in Gaffney v. Cummings, 412 U.S. 735, 748 (1973), explaining that the "reason" the Court "insisted on substantial equality of populations among districts" in Reynolds was to "achiev[e] fair and effective representation for all citizens."

It follows that a voter's right to fair and effective representation and equal dignity can be vindicated even when her vote is not accorded exactly equal weight to that of other voters. "Fair and effective representation . . . does not depend solely on mathematical equality among district populations." Id. at 748-49. The Supreme Court has cautioned against "[a]n unrealistic overemphasis on raw population

figures." Id. at 749.[18] Indeed, with regard to the United
States House of Representatives, the Supreme Court has
plainly instructed:

> While it may not be possible to draw congressional
> districts with mathematical precision, that is no excuse
> for ignoring our Constitution's plain objective of
> making equal representation for equal numbers of people
> the fundamental goal for the House of Representatives.
> That is the high standard of justice and common sense
> which the Founders set for us.

Wesberry, 376 U.S. at 18.

In sum, Defendants' doubts about the applicability of
the one person, one vote cases in the interstate context
reflect a reductivist reading of those cases as focused on
equipopulous districts. But the one person, one vote cases
recognize a voter's rights to fair and effective
representation and equal dignity -- rights which retain force
in the interstate context. Consider, for example, a voter in
Portland, Oregon, who intends to cast a vote in a
Congressional race. If her ballot is not transmitted in time
due to her local post office's delays, her "right to full and

---

[18] An equally weighted vote is a legal fiction insofar as apportionment
reflects imperfect census data. See Karcher, 462 U.S. at 732 ("[C]ensus
data are not perfect . . . ."); Gaffney, 412 U.S. at 745 (recognizing
that census data "are inherently less than absolutely accurate").
Moreover, even where the requirement for equally populated districts
applies, districts can deviate somewhat from equal population to achieve
permissible goals. See Gaffney, 412 U.S. at 741-42 (discussing permissible
deviations for Congressional districts and state legislative districts);
see also Mahan v. Howell, 410 U.S. 315, 319 (1973) (upholding an
apportionment plan for a state legislature with a 16.4 percent maximum
variation).

effective participation in the political processes of h[er]
[Nation]'s legislative bodies" is impaired relative to that
of both in-state and out-of-state voters with access to USPS
branches functioning effectively. <u>Reynolds</u>, 377 U.S. at 565.

Though the election challenges now confronting our
nation are unprecedented, a suit against the federal
government for violating the right to an equal vote is not
novel. <u>See</u>, <u>e.g.</u>, <u>Wisconsin v. City of N.Y.</u>, 517 U.S. 1
(1996); <u>Franklin</u>, 505 U.S. 788; <u>U.S. Dep't of Commerce v.
Montana</u>, 503 U.S. 442. In <u>Montana</u>, plaintiffs sued the federal
government, alleging that the method used to determine the
number of Representatives to which each state is entitled in
the House of Representatives violated Article I, Section 2.
Essentially, plaintiffs disagreed with the mathematical
formula that Congress adopted to apportion seats among the
states. The method that Congress selected aimed to minimize
the relative differences between the size of Congressional
districts. Plaintiffs preferred an approach that would have
minimized absolute deviations from the ideal district size.
Recognizing that the claims raised a question of interstate,
rather than intrastate, voting equality, the Court deemed the
questions justiciable, but ultimately concluded that "the
polestar of equal representation does not provide sufficient
guidance to allow" the Court to decide between the parties'

preferred mathematical measures of inequality. Id. at 463;
see id. at 461 ("[I]t is by no means clear that the facts
here establish a violation of the Wesberry standard."). The
Court further reasoned that Congress is due "a measure of
discretion that is broader than that" due the states in making
apportionment decisions. Id. at 464. As plaintiffs had not
shown that any alternative method was more consistent with
equal representation than Congress's chosen method, and
because Congress's choice was supported by historical
practice and entitled to deference, the Court upheld
Congress's "apparently good-faith choice." Id.

Franklin involved a challenge to the Secretary of
Commerce's decision to allocate federal employees serving
overseas to states for purposes of the apportionment count.
The Secretary's decision to allocate oversees federal
employees to their home states altered population counts
enough to shift a Representative from Massachusetts to
Washington. The Court concluded that "[t]he Secretary's
judgment does not hamper the underlying constitutional goal
of equal representation" and "assuming that employees
temporarily stationed abroad have indeed retained their ties
to their home States, actually promotes equality." Franklin,
505 U.S. at 806.

In <u>Wisconsin</u>, relying on <u>Franklin</u> and <u>Montana</u>, the Supreme Court upheld the Census Bureau's decision not to statistically adjust the 1990 Census results to correct for a differential undercount of racial and ethnic minority groups. 517 U.S. 1. The Second Circuit had applied heightened scrutiny to review the Secretary's decision because it affected the fundamental right to an equal vote. <u>Id.</u> at 4. The Supreme Court reversed, emphasizing that "the text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual enumeration,'" and that the Secretary's decision was made "pursuant to Congress' direct delegation of its broad authority . . . ." <u>Id.</u> at 19, 17. The Court further observed that application of strict scrutiny to the Secretary's decision concerning a statistical adjustment would be inconsistent with <u>Montana</u>'s recognition that constitutional goal of equal representation does not provide a means of choosing between various measures of equality. <u>Id.</u> at 17-18. Rather than applying strict scrutiny to the Secretary's decision, the Supreme Court set forth the following standard:

> [S]o long as the Secretary's conduct of the census is consistent with the constitutional language and the constitutional goal of equal representation, it is within the limits of the Constitution. In light of the Constitution's broad grant of authority to Congress, the Secretary's decision not to adjust need bear only a reasonable relationship to the accomplishment of an

Case 1:20-cv-02692-BMM-05716-LMM-BMM Document 24-1 Filed 11/21/20 Retrieval 02 16 20 7 Page 440 of
Case 4:20-cv-00079-BMM   Document 138-6   Filed 10/14/20   Page 64 of 88
471

actual enumeration of the population, keeping in mind
the constitutional purpose of the census.

Id. at 19-20 (quotations and citations omitted). On the
facts, the Court concluded that the Secretary's decision
conformed to constitutional requirements.

Collectively, these decisions confirm that the right to
equal representation recognized in the Supreme Court's one
person, one vote cases applies in the interstate context,
even though an equal vote in the interstate context is one of
constitutionally proportional -- as opposed to mathematically
equal -- weight. They also suggest that, when an agency is
exercising authority delegated by Congress, the agency is due
greater deference than states are given in malapportionment
cases.

Applying the above principles, the Court concludes that
Plaintiffs have demonstrated a substantial likelihood of
success on their Fifth Amendment equal protection claim.
Equal protection entails an "obligation to avoid arbitrary
and disparate treatment of the members of [the] electorate"
that results in "valu[ing] one person's vote over that of
another." Bush v. Gore, 531 U.S. at 104-05. An equal
protection violation occurs when arbitrary disparities in
voting mechanisms make it less likely that voters in certain
areas will cast votes that count. See id.

Here, Plaintiffs have identified a profound and
troubling lack of standards and uniformity with regard to
USPS's handling of Election Mail. One example is the July 14
PowerPoint. This PowerPoint states that because of "HIS
expectations" (i.e., DeJoy's), "[o]vertime will be
eliminated." (Supp. Green Decl. at 2.) Yet DeJoy testified to
Congress, "I have never put a limitation on overtime." (Tinio
Decl. Ex. 14 at 25.) The PowerPoint warns that "[a]ll routes
will have no more than 4 park points. We will be moving
towards that this summer." (Supp. Green Decl. at 4.) Yet
Defendants submit that "there is no nationwide USPS policy
setting a fixed cap on the number of park points." (Opposition
at 20; Colin Decl. ¶¶ 13-14.) Defendants argue that this
document was "prepared by a local manager," that it never
represented Postal Service policy, and that the district-
level manager issued a clarification. (Opposition at 19
n.14.) Yet the fact remains that the creator of the document
perceived the content to reflect DeJoy's expectations. This
demonstrates a stunning lack of uniformity and a high level
of confusion at various points in the USPS hierarchy regarding
the standards to be followed by USPS employees on the ground.

So too with other evidence in the record. The Mandatory
Standup Talk states in clear terms that "late trips are no
longer authorized or accepted," and the same for extra trips.

(Amended Complaint Ex. 1.) Defendants have insisted that this document mischaracterizes official policy. (Opposition at 18 n.13; Cintron Decl. ¶ 24 n.1.) Yet Curtis and Cintron both testified that the contents of this Talk "draw[] from a July 10, 2020 teleconference, conducted with [Area Vice Presidents] and members of Headquarters," and that during the teleconference, "members of Headquarters made statements reflected, in part," in the Talk. (Supp. Cintron Decl. ¶ 3; Supp. Curtis Decl. ¶ 3.) Curtis testified at the hearing that, "at least" for her part, she "walked away with the understanding that . . . [they] were going to have to work through," in each case, what had caused a late trip, and so did not perceive the guidance to mean "a ban on late or extra trips." (Tr. 75:18–76:8.) In other words, the Talk contained "some absolutes" where Defendants contend Headquarters intended none. (Tr. 75:17–18.) Needless to say, the author of the Standup Talk perceived the applicable rule differently.

With respect to both the July 14 PowerPoint and the Standup Talk, Defendants stress that USPS took corrective action, specifically that clarifications were issued, and the employee who wrote the PowerPoint was even demoted. Yet on reply, Plaintiffs submitted a Twitter post-dating to September 6, 2020, displaying a photo of a banner in the Portland, Oregon plant that states, in no uncertain terms,

that trucks must depart on time with no exceptions. According
to the person who posted the image, Postal Service truck
drivers have claimed some trucks leave nearly empty due to
DeJoy's "mandate." (Jamison Reply Decl. Ex. 1.) Months later,
it appears that whatever top-down communication issues caused
the creation and communication of the July 14 PowerPoint and
the Standup talk have not been resolved. A conclusion that
these managerial and communication deficiencies are likely to
impact the handling of Election Mail finds strong support in
the OIG's reports, which have identified the need for improved
communications and training regarding the handling of such
mail. (See Tinio Decl. Ex. 4, at 1.) The Court is left with
little reason to believe that the USPS policy and operational
picture will be any clearer for postal employees as the
November election approaches.

Plaintiffs have thus made a sufficient showing that the
lack of uniformity in the Postal Service's treatment of
Election Mail among local post offices will result in
intrastate and interstate disparities in citizens' voting
power. As in Bush v. Gore, the "absence of specific standards"
facilitates the "arbitrary and disparate treatment [of]
voters" and, ultimately, the unequal weighting of votes
across geographic areas. 531 U.S. at 106-107. Specifically,
"[w]hether an individual's vote will be counted . . . may

depend in part on something completely arbitrary -- their
place of residence and by extension, the mailbox or post
office where they dropped off their ballot." Gallagher, 2020
WL 4496849, at *19. The predictable outcome of the
differential treatment of ballots within and across states by
reason of mail handling delays would constitute a dilution of
votes, an impairment of the right to fair and effective
representation, and a violation of the equal dignity owed to
each voter.

The Court need not decide the level of scrutiny that
should apply to USPS's actions because it is likely that
Plaintiffs would succeed under any standard. If, for example,
the Court applies a deferential standard similar to the test
announced in Montana, Plaintiffs will likely establish an
equal protection violation. USPS's non-uniform, and at
different times and places conflicting or confusing Election
Mail policies and practices are not consistent with securing
"the goal of equal representation." 503 U.S. at 462 n.41.

USPS has offered no satisfactory explanation for failing
to set clear, uniform policies for the handling of Election
Mail. It has given no persuasive assurances that the
"practices" it touts to ensure the delivery of Election Mail
will be uniformly applied. USPS's purported rollback of
"nearly all" policies linked to mail delays is either

incompletely implemented, inadequately communicated throughout the organization, or unreliable. The institutional confusion in Postal Service communications, operations, and practices that Plaintiffs have identified can serve no legitimate purpose. With regard to the one challenged policy that USPS is officially retaining -- the restriction of "lates and extras" (Tr. 47:25-48:1) -- Plaintiffs will likely succeed in demonstrating that USPS lacks a legitimate justification for rolling out (and retaining) the policy, which has contributed to meaningful documented delays in service, in the middle of a pandemic when service standards were already impaired and a vast influx of mail-in ballots expected. (See Green Decl. Ex. 2.)

For these reasons, the Court concludes that USPS has "not satisf[ied] the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right." Bush v. Gore, 531 U.S. at 106.

B. FIRST AMENDMENT CLAIM

Because the Court finds that Plaintiffs have demonstrated that injunctive relief is warranted under the Fifth Amendment, it need not reach Plaintiffs' arguments regarding the infringement of their First Amendment right to vote. However, given the uncharted territory and open legal questions raised by the facts in this case, and to obviate a

remand in the event, on appeal, the Second Circuit disagrees with the Court's Fifth Amendment holding, the Court alternatively finds that Plaintiffs have demonstrated a clear and substantial likelihood of success on the merits of their First Amendment claim.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." It is well established that voting implicates First Amendment rights. Yang, 960 F.3d at 130 ("[Plaintiffs'] interest . . . 'to cast their vote effectively' falls squarely within the ambit of the protection offered by the First Amendment."). While election-related cases generally involve states and not the federal government, given states' "broad power to regulate the time, place, and manner of elections," the "responsibility to observe the limits established by the First Amendment," Eu v. S.F. Cty. Democratic Cent. Comm., 489 U.S. 214, 222 (1989) (quoting Tashjian v. Republican Party of Conn., 479 U.S. 208, 217 (1986)), applies with no less force to the federal government. Furthermore, laws enacted under the postal power must also comply with the First Amendment. See Hiett v. United States, 415 F.2d 664, 669 (5th Cir. 1969) (a law that affects expression -- here, a prohibition on mailing an advertisement for getting a divorce abroad -- must not violate the First Amendment "even if enacted under the

69

postal power," despite its broad nature); <u>Tollett v. United
States</u>, 485 F.2d 1087, 1091 (8th Cir. 1973) (construing a law
"in the light of the First Amendment rather than in the light
of any regulatory power granted to the Postal Service");
<u>Greenberg v. Bolger</u>, 497 F. Supp. 756, 775 (E.D.N.Y. 1980)
(noting "the obvious relationship" between access to the
mails and the First Amendment).

Defendants assert, however, that this case does not
implicate either "First Amendment voting interests" or "free
expression through the mail." (Opposition at 31.)[19] Instead,
Defendants urge that the challenged conduct consists of
"operational decisions" that concern "only the timing of the
physical delivery of mailed ballots." (Opposition at 31.) The
Government further argues that in any event, such a claim
would fail because "a conduct-regulating statute of general
application that imposes an incidental burden on the exercise
of free speech rights does not implicate the First Amendment."

---

[19] Defendants also argue that plaintiffs have waived any stand-alone First
Amendment claim other than the <u>Anderson-Burdick</u> framework. The Court
disagrees, given that the Complaint and Amended Complaint clearly allege
an infringement of their First Amendment Right to Vote, and Plaintiffs'
opening brief devotes an entire section to the applicability of the First
Amendment to the Postal Service. (Brief at 11-12 ("First Amendment
Scrutiny Applies to Acts of USPS . . . .").) Defendants cannot claim they
were not on notice with respect to a First Amendment claim, and indeed
the Opposition disputes the validity of such a claim. <u>See</u> <u>Beckman v. U.S.
Postal Serv.</u>, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000). Furthermore,
because the Government does not argue that First Amendment scrutiny does
not apply in general to the USPS, they have conceded that point.

(Opposition at 37 (quoting <u>Church of Am. Knights of the Ku
Klux Klan v. Kerik</u>, 356 F.3d 197, 209 (2d Cir. 2004)).)

The Court disagrees. Plaintiffs allege more than an
incidental burden on their right to vote: Plaintiffs allege
that due to confusion and misdirection at the Postal Service,
and coinciding with a pandemic that effectively necessitates
voting by mail, there is a substantial likelihood that their
ballots will not be counted because of delays in Election
Mail service. See <u>Florida Democratic Party v. Scott</u>, 215 F.
Supp. 3d 1250, 1257 (N.D. Fla. 2016) (explaining that because
"statutory framework completely disenfranchises thousands of
voters," it "amounts to a severe burden on the right to
vote"). Couching the challenged actions as operational
decisions cannot convert this risk to an incidental burden on
Plaintiffs' First Amendment rights. Even if the challenged
actions could be construed as operational decisions, the USPS
cannot accomplish through such means what would otherwise
constitute a burden on the right to vote. This outcome holds
especially when the Government hails the herculean efforts by
the USPS to assist state election officials, including by
conducting outreach and implementing purported special mail
handling practices. (Opposition at 34 ("USPS is undertaking
extensive efforts to ensure timely delivery of Election Mail,
with the express aim of preventing the possible

disenfranchisement which plaintiffs hold up as a severe burden.").) By the same token, election officials rely on USPS as a "vital partner in administering a safe, successful election." (Amended Complaint Ex. 7.)

The Court thus finds that the First Amendment is implicated in Plaintiffs' voting rights claim. In the usual First Amendment context, a court assesses multiple factors, including whether the forum subject to the restriction is public. Here, it is settled that the mail is not a public forum. See USPS v. Council of Greenburgh Civic Assocs., 453 U.S. 114 (1981). Normally, when the government regulates speech in a nonpublic forum, the regulation need only be reasonable and content-neutral. Silberberg v. Bd. of Elections of N.Y., 216 F. Supp. 3d 411, 417 (S.D.N.Y. 2016); Longo v. U.S.P.S., 983 F.2d 9, 11 (2d Cir. 1992) (upholding USPS regulation prohibiting campaigning on postal premises). For example, in Council of Greenburgh, a civic association umbrella group wanted to distribute messages in residents' letterboxes without going through the USPS, and challenged a law that forbid them from doing so. The Court recognized the broad postal power conferred by Article I, but noted that "it may not of course be exercised by Congress in a manner that abridges the freedom of speech or of the press protected by the First Amendment." Nevertheless, the Court rejected the

civic group's First Amendment claim. Because mail is not a
public forum, the Court simply determined whether the
challenged restriction was reasonable and content-neutral.
<u>Greenburgh</u>, 453 U.S. at 131 n.7. Because it was, it was
permissible. <u>Id.</u> at 132.

Because this case involves voting rights, the usual non-
public forum analysis is rendered less apt. Indeed,
Plaintiffs suggest that because Defendants have infringed
their voting rights, if Defendants' conduct is not assessed
under <u>Anderson</u>-<u>Burdick</u>, strict scrutiny automatically
applies. (Reply at 12 n.9 ("[M]any older voting rights
decisions apply strict scrutiny automatically as soon as the
right to vote is restrained . . . .").) To be sure, "[t]he
right to vote derives from the right of association that is
at the core of the First Amendment." <u>Storer v. Brown</u>, 415
U.S. 724, 756 (1974) (Brennan, J., dissenting).

For example, in <u>Evans v. Corman</u>, 398 U.S. 419 (1970),
the Court struck down a Maryland statute that barred residents
of a federal enclave (the National Institutes of Health) from
voting. The Court noted that "the right to vote, as the
citizen's link to h[er] laws and government, is protective of
all fundamental rights and privileges. And before that right
can be restricted, the purpose of the restriction and the
assertedly overriding interests served by it must meet close

constitutional scrutiny." <u>Id.</u> at 422 (citations omitted). The Court rejected Maryland's only asserted interest, which was ensuring that only those citizens who were substantially affected by electoral decisions could have a voice. Similarly, in <u>Cipriano v. City of Houma</u>, 395 U.S. 701 (1969), another Fourteenth Amendment case, the Court applied strict scrutiny because the challenged state statute only permitted some people to vote in a utility bond election. <u>See also</u> <u>Kramer v. Union Free Sch. Dist. No. 15</u>, 395 U.S. 621, 626 (1969) ("[A]ny alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.").

The most recent and most relevant example of application of strict scrutiny to assess a voting rights claim in the Election Mail context is <u>Gallagher</u>. There, the court noted that the question before the court was not the abstract burden presented by the New York statute, but rather the "as applied" burden, which was "the burden created by enforcing the postmark requirement in an election where thousands of ballots . . . were rendered invalid by its application." 2020 WL 4496849, at *16. The court found this burden "exceptionally severe," because a large number of ballots would be invalidated. The court found that "in light of the ongoing COVID-19 pandemic, there was an uncommonly compelling reason for many voters to vote by absentee ballot." <u>Id.</u> Because the

burden on voters' rights was severe, the court applied strict scrutiny and concluded that the state statute was unconstitutional as applied.

If strict scrutiny applies in the instant case, the Government's asserted interests are insufficient. The Government offers no justification for its incomplete rollback of its prior postal policies that concededly produced a decline in mail service. As for the one retained policy that restricts "lates and extras", the Government asserts that the Postal Service's "operational choices . . . reasonably relate to timely and efficiently delivering the nation's mail" and "continuing its regular operations" (Opposition at 32, 36). That explanation is not enough. The Bill of Rights was "designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy." Stanley v. Illinois, 405 U.S. 645, 656 (1972). Thus, the Supreme Court has held that the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." Watson v. City of Memphis, 373 U.S. 526, 537 (1963). Moreover, "[t]he possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing [Plaintiffs'] First Amendment rights." Tashjian, 479 U.S. at 218. And here,

considering the Government's justifications in context, with respect to timeliness and efficiency, the Government does not show why, after two years of planning, it increased urgency around an initiative to encourage adherence to shipping schedules in the middle of election season coinciding with a pandemic. The Postal Service met or was near its service standard goals for First-Class Mail in May, and despite dips into performance levels in the 80s in April, service standards had begun to enter the low 90s before DeJoy's "transformative initiative" rolled out. The most recent data in the record, however, reflects an 88 percent standard, a significant deviation from the USPS's 96.5 percent target.

Of course, not every passing reference to voting rights in a First Amendment claim will trigger strict scrutiny, which is why the Anderson-Burdick test is useful; it accounts for the severity of the burden upfront and adjusts the level of scrutiny accordingly, so that "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." Rogers v. Corbett, 468 F.3d 188, 194 (3d Cir. 2006) (quoting Bullock v. Carter, 405 U.S. 134, 143 (1972)). But even assuming, for the sake of argument, that some lesser form of scrutiny applied here, the Court finds that the Government has not met its burden of demonstrating a sufficient interest in sustaining mail

policies or operations that potentially curtail voting rights. Intermediate scrutiny also demands some showing of tailoring and necessity. As noted above, the Government provides scant reason for the Court to find that the challenged USPS actions could not wait until after the November national election. Thus, it does not matter whether the Postal Service's actions are evaluated under strict scrutiny or a more intermediate level of scrutiny; the result is the same.

Because Plaintiffs have asserted a sufficient burden on their right to vote, it is immaterial whether the restrictions here are content-based or content-neutral. The Court notes, however, that there is some ambiguity in that regard. Plaintiffs initially seem to make the argument that the Postal Service's actions raise equal protection concerns because sorting capacity was reduced more dramatically in swing states and cities likely to vote Democratic. Defendants have raised no authenticity concerns with the map included in the Amended Complaint, which demonstrates where sorting capacity was most reduced. But there are other plausible explanations. It is possible that sorting capacity was most reduced in areas with the most excess sorting capacity. Conceivably the reduced capacity has no practical significance -- that is, the reduced capacity will not actually affect the Postal

Service's ability to sort the mail in those demarcated areas.
But given that Plaintiffs have brought forward at least some
evidence to the contrary, there is simply not enough factual
basis in the record for the Court to make such a finding.
(See Barrios Decl. ¶ 6 (the removal of two sorting machines,
"the pandemic, and other policy changes" caused
"extraordinary mail backlog and delay").)[20] Cf. Crawford v.
Marion Cty. Election Bd., 553 U.S. 181, 189 (2008).

C. INJUNCTIVE RELIEF

For the reasons discussed above, the Court finds that
Plaintiffs have demonstrated a clear and substantial
likelihood of success on the merits. The parties disagree
whether Plaintiffs can show the other elements of injunctive
relief, particularly irreparable harm. "In the Second
Circuit, it is well-settled that an alleged constitutional
violation constitutes irreparable harm." Gallagher, 2020 WL
4496849, at *14 (citing Conn. Dep't of Envtl. Prot. v.
O.S.H.A., 356 F.3d 226, 231 (2d Cir. 2004)). Thus, "no
separate showing of irreparable harm is necessary." Statharos
v. N.Y. City Taxi & Limousine Comm'n, 198 F.3d 317, 322 (2d
Cir. 1999). In any event, the Court finds that Plaintiffs

---

[20] While the Court does not suggest or make any specific finding that the
Postal Service intended to target certain areas, doing so would obviously
be enough to constitute a content-based burden on speech, even if the
Postal Service's actions were facially neutral. Reed v. Town of Gilbert,
576 U.S. 155 (2015).

have made a strong showing of irreparable harm and
demonstrated a clear and substantial likelihood of success on
the merits, for the reasons discussed above. The Court does
not construe Plaintiffs' assertion that "the scale of
disenfranchisement . . . is unclear" as a concession but
rather an apt description of the lack of clarity surrounding
the Postal Service's actions and how voters will respond to
the decline in service standards. (Motion at 7.) The test for
a preliminary injunction is satisfied.[21]

Consequently, the question becomes what the scope of
that relief should be. Federal Rule of Civil Procedure 65(d)
requires that "[e]very order granting an injunction . . .
must . . . state its terms specifically[] and describe in
reasonable detail -- and not by referring to the complaint or
other document -- the act or acts restrained or required."
Defendants argue that some of Plaintiffs' proposed relief is
insufficiently precise, including the proposed prohibition on
"[a]ny change in the nature of postal services which will
generally affect service on a nationwide or substantially

---

[21] As the Second Circuit has explained, district courts are permitted "to
enter nationwide injunctions." New York v. United States Dep't of
Homeland Sec., 969 F.3d at 88. The Court determines a nationwide
injunction is appropriate here because, given the nationwide scope of
Defendants' conduct, to impose anything less would "risk running afoul of
the Constitution's guarantee of equal treatment." Gallagher, 2020 WL
4496849, at *23 (citing Bush, 531 U.S. at 109).

nationwide basis."[22] (Notice of Motion.)  Plaintiffs agree on
reply that the Court may narrow their requested relief as
appropriate.   See Richmond Tenants Org. v. Kemp, 956 F.2d
1300, 1308 (4th Cir. 1992) ("It is well established . . .
that a federal district court has wide discretion to fashion
appropriate injunctive relief . . . .").

While some of the requested elements of injunctive
relief are specific enough to pass muster under Rule 65(d),
other elements are too vague to be permissible. For example,
Plaintiffs request that the Court enjoin the enactment of any
rule, policy, or standard the purpose of which would delay
the delivery of mail to or from a government entity. But
government entities apart from state and local boards of
elections are outside the scope of this case. The Court will
therefore limit the scope of relief accordingly.

Finally, the Government argues -- in a footnote -- that
the Court lacks authority to enjoin the President in the
context of his official, non-ministerial duties. (Opposition
at 25 n.20.) The Government also argues that the same
principles that prevent federal courts from enjoining the

---

[22] Plaintiffs counter that this language is borrowed directly from a
statute that already governs USPS services and so does not impose any
additional investigative burden. (Reply at 19-20 (quoting 39 U.S.C. §
3661(b)).) However, courts have generally held that a restrained party
does not have fair notice of what conduct will risk contempt if the
injunction merely enjoins a party to obey the law or comply with an
agreement. Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531 (11th Cir. 1996).

President's official acts also prevent them from entering declaratory relief.

Generally, arguments raised only in a footnote need not be considered. Weslowski v. Zugibe, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) (collecting cases). Nevertheless, the Court agrees with the Government's first proposition. See Mississippi v. Johnson, 71 U.S. 475, 501 (1866) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties . . . ."). While it is an "open . . . question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty," Franklin v. Massachusetts, 505 U.S. at 802, "the law is clear that the Court cannot issue such relief to require performance of official duties that are *not* ministerial." Citizens for Responsibility and Ethics in Washington v. Trump, No. 19 Civ. 1333, 2020 WL 619959, at *9 (D.D.C. Feb. 10, 2020). Because the duties at issue here appear entirely official and non-ministerial -- the running of a major department of the Executive Branch -- the type of broad injunctive relief Plaintiffs seek is unavailable as to the President. Napolitano v. Flynn, 949 F.2d 617, 622 (2d Cir. 1991) (actions are "ministerial" when "nothing is left to discretion").

The Court has some doubts as to the accuracy of the Government's argument that the Court may not even enter declaratory relief against the President. Indeed, the Government cites two recent cases from this district suggesting the contrary. See Pen American Center, Inc. v. Trump, 448 F. Supp. 3d 309, 327-28 (S.D.N.Y. 2020); Knight First Amendment Institute at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018), aff'd, 928 F.3d 226 (2d Cir. 2019), reh'g en banc denied, 953 F.3d 216 (Mem.). However, given that legal process is generally directed to lower-level executive officials, Nixon v. Sirica, 487 F.2d 700, 709 (D.C. Cir. 1973)(en banc), the Court need not decide the matter, because it finds that injunctive relief is available against DeJoy and the Postal Service. See Knight First Amendment Institute at Columbia Univ., 302 F. Supp. 3d at 579. Therefore, the Court will deny the Motion insofar as it seeks relief against the President.

## Conclusion

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Wesberry v. Sanders, 376 U.S. at 17. It may be, as Defendants' witness stated, that the Postal Service is facing a "perfect storm" of events causing delays in mail delivery. (Tr. 86:4.) The

Court fully understands that the Postal Service's operations face an exceptional test during the impending national election. But now, more than ever, the Postal Service's status as a symbol of national unity must be validated by the demonstrated degree of its commitment to utmost effectiveness of Election Mail service. And while the Court has no doubts that the Postal Service's workforce comprises hardworking and dedicated public servants, multiple managerial failures have undermined the postal employees' ability to fulfill their vital mission.

Accordingly, it is hereby

**ORDERED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 19) is **GRANTED IN PART**. Plaintiffs are directed to submit a proposed second amended complaint as discussed above; and it is further

**ORDERED** that by not later than noon on September 25, 2020 the parties shall settle an Order providing Plaintiffs appropriate relief consistent with this opinion and notify the Court of such settlement. In the event the parties fail to file such notice by that date the terms of the following Order shall take effect without further action by this Court:

1. The United States Postal Service ("USPS") shall, to the extent that excess capacity permits, treat all Election Mail as First-Class Mail or Priority Mail Express.

a. For purposes of this Order, the term "Election Mail" shall refer to any item mailed to or from authorized election officials that enables citizens to participate in the voting process, including voter registration materials, absentee or mail-in ballot applications, polling place notifications, blank ballots, and completed ballots.

2. No later than September 25, 2020, USPS shall provide to this Court and Plaintiffs a cost estimate for treating all Election Mail as First-Class Mail beginning on October 15, 2020.

3. USPS shall pre-approve all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020.

4. No later than October 1, 2020, USPS shall submit to the Court a list of steps necessary to restore First-Class Mail and Marketing Mail on-time delivery scores to the highest score each respective class of mail has received in 2020, which are 93.88 percent for First-Class Mail and 93.69 percent for Marketing Mail, and shall thereafter make a good faith effort to fully implement the listed steps.

5. No later than September 25, 2020, USPS shall submit to the Court a list of all USPS recommended practices

concerning of the treatment of Election Mail that are
not binding policies.

6. USPS shall provide this Court and Plaintiffs with a
weekly update that includes:

    a. The same weekly update USPS is providing Congress;
    and

    b. Separate, unmerged 2-day and 3-5 day weekly service
    reports and variance reports; and

    c. A summary, not to exceed 10 pages in length, of any
    and all data and information collected regarding
    USPS's handling of Election Mail and compliance
    with the USPS policies regarding Election Mail,
    USPS recommended practices regarding Election Mail,
    and the terms of this Order specifically pertaining
    to Election Mail.

7. No later than September 29, 2020, USPS shall submit to
the Court and Plaintiffs a proposed memorandum to all
USPS managerial staff (the "Guidance Memorandum"). The
proposed Guidance Memorandum shall in clear terms and
with the aid of examples:

    a. Identify and explain all USPS policy requirements
    concerning the treatment of Election Mail;

    b. Identify and explain all USPS recommended practices
    concerning the treatment of Election Mail;

c. Clarify that late and extra trips are not banned, do not require pre-approval, and will not result in disciplinary action;

d. Clarify that late and extra trips that facilitate the prompt delivery of Election Mail are encouraged;

e. Explain that, pursuant to this Court's Order, to the extent excess capacity is available, Election Mail shall be treated as First-Class Mail or Priority Mail Express;

f. Explain that USPS has pre-approved all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020;

g. Direct managers to explain to each of their direct reports the policies and practices described in the Guidance Memorandum that are relevant to each direct report, taking into account their individual responsibilities;

h. Provide contact information for persons available to answer questions concerning the Guidance Memorandum; and

i. Provide contact information for persons responsible for tracking and responding to reports of

violations of USPS policies and recommended
practices concerning the treatment of Election Mail
and direct personnel to contact this person in the
event of any such violation.

8. No later than October 1, 2020, Plaintiffs shall submit
any comments concerning the Guidance Memorandum to this
Court. Plaintiffs shall attach a copy of Defendants'
proposed Guidance Memorandum containing any of
Plaintiffs' suggested edits in track changes.

9. Within 7 days of the date of an Order of this Court
approving the Guidance Memorandum, USPS shall certify to
this Court whether all USPS managerial staff members
have certified that they have read, reviewed, and
understand the Guidance Memorandum; to the extent any
managerial staff member has not yet certified that they
have read, reviewed, and understand the Guidance
Memorandum, USPS shall describe each attempt it has made
to contact the relevant managerial staff member.

**SO ORDERED.**

Dated:    New York, New York
          21 September 2020

Victor Marrero
U.S.D.J.

87

Case 1:20-cv-24069-RNS   Document 44-4   Entered on FLSD Docket 10/21/2020   Page 465 of
Case 4:20-cv-00079-BMM   Document 38-7   Filed 10/14/20   Page 1 of 7
471

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/25/2020

| | |
|---|---|
| MONDAIRE JONES, *et al.*, | **No. 20 Civ. 6516 (VM)** |
| Plaintiffs, | |
| - against - | ~~[PROPOSED]~~ **ORDER** |
| UNITED STATES POSTAL SERVICE, *et al.*, | |
| Defendants. | |

VICTOR MARRERO, United States District Judge:

WHEREAS, Plaintiffs brought this case challenging certain policies and practices of the

United States Postal Service ("USPS") under the First and Fifth Amendments to the United

States Constitution;

WHEREAS, on September 2, 2020, Plaintiffs moved the Court for a preliminary

injunction;

WHEREAS, on September 16, 2020, the Court conducted a hearing on Plaintiffs' motion,

during which the Court took testimony and heard oral argument;

WHEREAS, on September 21, 2020, the Court issued a Decision and Order (the "PI

Decision," ECF No. 49) granting Plaintiffs' motion in part, and directing the parties to make

efforts to settle and submit an Order providing Plaintiffs with relief consistent with the PI

Decision;

WHEREAS, on September 21, 2020, USPS issued a memorandum entitled "Clarifying

Operational Instructions" (the "September 21 USPS Instructions," attached hereto as Exhibit A)

to all Officers, Postal Career Executive Service (PCES) managers, and Pay Band (Management

and Technical Pay Band) employees, with instructions to share the memorandum with their

1

Executive and Administrative Schedule (EAS) employees, which, among other things, noted that "[f]urther guidance on use of additional resources [to facilitate the handling and timely delivery of Election Mail] will be provided separately";

WHEREAS, the parties have conferred and have reached agreements consistent with the PI Decision, as reflected herein;

WHEREAS, the parties propose that the Court so-order the agreements reflected herein;

WHEREAS, for purposes of this Order, the term "Election Mail" shall refer to any item mailed to or from authorized election officials that enables citizens to participate in the voting process, including voter registration materials, absentee or mail-in ballot applications, polling place notifications, blank ballots, and completed ballots;

NOW, THEREFORE, upon the parties' agreement, IT IS HEREBY ORDERED that:

1.      USPS shall, to the extent that excess capacity permits, treat all Election Mail as First-Class Mail or Priority Mail Express.

      a.   Specifically, USPS shall prioritize identifiable Election Mail that is entered as Marketing Mail, regardless of the paid class, including advancing Election Mail entered as Marketing Mail ahead of other Marketing Mail and processing it expeditiously so that it is generally delivered in line with the First-Class Mail delivery standards; expanding processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day; and prioritizing Election Mail, including ballots entered with Green Tag 191, when loading trucks.

      b.   This paragraph (Paragraph 1) shall not be construed to require USPS to change its policies that generally do not include the transportation of Election Mail entered

as Marketing Mail by air; or to extend other features of First-Class Mail, distinct from delivery speed, to Election Mail entered as Marketing Mail. However, USPS will employ special individualized measures to expedite handling of individual voter ballots mailed close to Election Day, regardless of paid class, which may include manually separating them and moving them by air or according to Priority Mail Express delivery speed standards, consistent with practices used in past elections.

2.      To the extent it has not already done so, no later than September 25, 2020, USPS shall provide to this Court and Plaintiffs a cost estimate for treating all Election Mail, as defined herein, as First-Class Mail beginning on October 15, 2020.

3.      USPS shall pre-approve all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020.

4.      No later than October 1, 2020, USPS shall submit to the Court a list of steps necessary to restore First-Class Mail and Marketing Mail on-time delivery scores to the highest score each respective class of mail has received in 2020, which are 93.88 percent for First-Class Mail and 93.69 percent for Marketing Mail, and shall thereafter make a good faith effort to fully implement the listed steps.

5.      To the extent it has not already done so, no later than September 25, 2020, USPS shall submit to the Court a list of all USPS recommended practices concerning the treatment of Election Mail that are not binding policies.

6.      USPS shall provide this Court and Plaintiffs with a weekly update, to be provided

every Friday[1], that includes:

    a.  The same weekly update USPS is providing Congress, with respect to USPS's

        Market-Dominant products (First-Class Mail, Marketing Mail, and Periodicals);

    b.  Separate, unmerged 2-day and 3-5 day weekly service reports for both pre-sort

        and single-piece First-Class Mail, and variance reports;

    c.  A summary, not to exceed 10 pages in length, of any and all data and information

        collected by USPS Headquarters regarding USPS's handling of Election Mail at

        the Headquarters level and compliance with the USPS policies regarding Election

        Mail, USPS recommended practices regarding Election Mail, and the terms of this

        Order specifically pertaining to Election Mail.

7.      No later than September 29, 2020, USPS shall submit to the Court and Plaintiffs a

proposed Supplemental Guidance Document, to be distributed to all USPS managerial staff.  The

September 21 USPS Instructions, the forthcoming further guidance on the use of additional

resources, and the proposed Supplemental Guidance Document shall together, in clear terms and

with the aid of examples:

    a.  Identify and explain all USPS policy requirements concerning the treatment of

        Election Mail;

    b.  Identify and explain all USPS recommended practices concerning the treatment of

        Election Mail;

    c.  Reemphasize that late and extra trips are not banned, and clarify that pre-approval

---

[1] The parties agree that on Friday, September 25, 2020, USPS will provide the
information described in Paragraphs 6(a) and 6(b), but not the variance reports described in
Paragraph 6(b) or the information described in Paragraph 6(c), herein.

is not needed for late and extra trips and that authorizing late and extra trips

through November 6, 2020, will not result in disciplinary action;

d. Reemphasize that USPS commits to, authorizes, and encourages the use of any

late and extra trips that would facilitate the timely delivery of Election Mail;

e. Explain that USPS shall prioritize Election Mail as described in Paragraph 1 of

this Order;

f. Explain that USPS has pre-approved all overtime that has been or will be

requested for the time period beginning October 26, 2020 and continuing through

November 6, 2020;

g. Direct managers to explain to each of their direct reports the policies and practices

described in the Supplemental Guidance Document that are relevant to each direct

report, taking into account their individual responsibilities;

h. Provide contact information for persons available to answer questions concerning

the Supplemental Guidance Document; and

i. Provide contact information for persons responsible for tracking and responding to

reports of violations of USPS policies and recommended practices concerning the

treatment of Election Mail and direct personnel to contact this person in the event

of any such violation.

8.      No later than October 1, 2020, Plaintiffs shall submit any comments concerning

the Supplemental Guidance Document to this Court.  Plaintiffs shall attach a copy of

Defendants' proposed Supplemental Guidance Document containing any of Plaintiffs' suggested

edits in track changes.

9.      Within 7 days of the date of an Order of this Court approving the Supplemental

Guidance Document, USPS shall certify to this Court whether all USPS managerial staff

members have certified that they have read, reviewed, and understand the Supplemental

Guidance Document; to the extent any managerial staff member has not yet certified that they

have read, reviewed, and understand the Supplemental Guidance Document, USPS shall

describe each attempt it has made to contact the relevant managerial staff member.

     10.    Paragraphs 3 and 7(f) of this Order are hereby stayed pending an order of this

Court resolving Defendants' forthcoming Motion to Modify, Clarify, or, Alternatively, Stay this

Order.



**SO ORDERED.**

9/25/2020

DATE

VICTOR MARRERO, U.S.D.J.