

Office of Inspector General | United States Postal Service

# Operational Changes to Mail Delivery

Report Number 20-292-R21 | October 19, 2020



# Table of Contents

Cover

Highlights ....................................................................................................................1

    Objective ..................................................................................................................1

    Conclusion ................................................................................................................1

    Looking Forward ......................................................................................................4

Transmittal Letter ........................................................................................................6

Results ..........................................................................................................................7

    Introduction/Objective ............................................................................................7

    Background ...............................................................................................................7

    Conclusion ................................................................................................................8

    Issue #1: Postal Service Operational Efficiency Initiatives ...................................10

    Issue #2: Impact of Operational Changes ..............................................................14

    Issue #3: Compliance with Policies and Legal Requirements ................................17

    Issue #4: Communications With Congress and Customers ....................................20

    Issue #5: Postmaster General Compliance with Ethical Requirements ..................22

    Looking Forward ....................................................................................................23

    Postal Service's Comments .....................................................................................24

    Evaluation of Postal Service's Comments ..............................................................24

Appendices .................................................................................................................25

    Appendix A: Additional Information .....................................................................26

        Scope and Methodology .....................................................................................26

        Prior Audit Coverage .........................................................................................27

    Appendix B: Customer Service and Delivery Operations Flowchart ......................28

    Appendix C: "Do It Now FY Strategies" ................................................................29

    Appendix D: Total Mail Volume ...........................................................................32

    Appendix E: Delayed Mail .....................................................................................33

    Appendix F: Schedule of Congressional Inquiries/Requests ..................................34

    Appendix G: Postal Service's Comments ................................................................35

Contact Information ....................................................................................................37

# Highlights

## Objective

This report responds to an August 7, 2020, congressional request regarding concerns that Postmaster General Louis DeJoy's modifications to U.S. Postal Service staffing and policies had an adverse effect on Postal Service operations, leading to slower and less reliable mail delivery. This report also responds to a number of recent similar congressional requests. We are issuing a separate report to the Postmaster General which details these issues with recommendations for corrective action.

Our objective was to address specific concerns related to Postal Service changes put in place after the Postmaster General was sworn in on June 15, 2020, and their effect on operations; whether the changes comply with internal policies and legal requirements and sufficient notice was provided to Congress and customers; and whether the Postmaster General complied with ethical requirements.

The Postal Service is required to fulfill its universal service obligation and meet other statutory obligations in a self-sufficient manner by covering its costs through revenue generated from the sale of its products and services. Since 2007, the Postal Service has experienced sizeable financial losses, resulting from a combination of legislative and economic factors, as well as the shift in consumer and business behavior toward digital correspondence, transactions, and advertising. In its 2020 *Integrated Financial Plan*, the Postal Service projected a net loss of $7.6 billion for fiscal year (FY) 2020.

Unexpected at the time of these projections was the global novel coronavirus (COVID-19) disease outbreak. The effects of this pandemic are still being felt across the country and its impact on the Postal Service continues to be significant. While the Postal Service experienced a sizeable increase in package volume in the initial months following the emergency declaration, letter and flat mail volume has declined by up to 20 percent since the pandemic began in March 2020.

As we have noted in a series of reports, the Postal Service has struggled in recent years to meet mail service performance standards, which it measures based on mail speed and reliability. In FY 2019, it met annual performance targets for only seven of 22 mail products (32 percent). Our recent reports have also noted that the Postal Service has numerous opportunities for greater efficiencies and cost savings.

On May 6, 2020, the Postal Service's Board of Governors announced its selection of Louis DeJoy to serve as the 75th Postmaster General. In his remarks at an August 7, 2020, Board of Governors meeting, Mr. DeJoy announced implementation of an organizational realignment and noted that the Postal Service's financial position was dire, stemming from substantial declines in mail volume, a broken business model, and a management strategy that has not adequately addressed these issues. Given the current situation, he noted it was critical that the Postal Service review operations and make necessary adjustments.

*"In June and July 2020, Postal Service operations executives initiated various significant cost reduction strategies on top of three initiatives the Postmaster General launched to achieve financial targets."*

## Conclusion

In June and July 2020, Postal Service operations executives initiated various significant cost reduction strategies on top of three initiatives the Postmaster General launched to achieve financial targets. No analysis of the service impacts of these various changes was conducted and documentation and guidance to the field for these strategies was very limited and almost exclusively oral. The resulting confusion and inconsistency in operations at postal facilities compounded the significant negative service impacts across the country.

Although the Postal Service followed applicable legal and policy requirements regarding notification of the Postal Regulatory Commission (PRC), these requirements are limited. We also found that documentation of the operational changes provided to Congress and customers was generally accurate but incomplete. Information the OIG reviewed to date indicates that Mr. DeJoy has met the ethics requirements related to disclosure, recusal, and divestment. We address the congressional concerns in these areas below.

## Implementation of Operational Changes

After his appointment, the Postmaster General implemented the following three operational and organizational changes in July and August 2020:

- *Elimination of late and extra trips to transport mail.* Started July 10, 2020, this initiative was to eliminate all late and extra trips outside of regularly scheduled transportation service.

- *Organization Restructure:* On August 7, 2020, the Postmaster General announced a reorganization of field operations and headquarters functions to align functions based on core business operations.

- *Expedited Street Afternoon Sortation (ESAS):* This initiative began as a pilot program at 384 facilities nationwide on July 25, 2020, and was designed to eliminate excessive pre- and post-tour overtime.

In addition to these three changes, Postal Service operations executives outlined 57 initiatives to achieve FY 2021 financial targets and reduce workhours, one of which matched the Postmaster General's strategies (Late/Extra Trips). These operational change initiatives were developed to achieve an estimated 64 million workhour savings.

These initiatives undertaken individually may not have been significant. However, launching all of these efforts at once, in addition to the changes instituted by the Postmaster General, had a significant impact on the Postal Service. According

to the Chief Operating Officer, these 57 strategies constituted "transformational changes" in Postal Service operations. Termed "Do It Now FY Strategies," these initiatives outlined changes from current operations in each function including mail processing, vehicle and maintenance, and post office operations (delivery and retail). They included eliminating pre-tour overtime in city delivery operations, elimination of certain mail processing operations on Saturday, and alignment of clerk workhours to workload. Although these initiatives were generated from and executed by operations executives, the initiatives were discussed at an introductory meeting with the new Postmaster General on July 7, 2020.

One of the 57 initiatives – the removal of mail processing equipment – was in progress prior to July 2020, but the pace of removals was accelerated beginning in June 2020. Specifically, removal of letter and flat processing machines across the country increased from an average of 375 removals a year from FY 2015 to FY 2019. Between October 2019 and August of 2020, 712 letter and flat processing machines were reduced – 437 (61 percent) of these machines were removed from June to August 2020, and 325 of these were Delivery Barcode Sorters. We also noted that while removing under-utilized collection boxes occurs each year based on an annual density study, collection box removals significantly exceeded the average annual removals in two of the seven geographic areas of the country in July 2020.

While the Postal Service estimated workhour savings for many of the initiatives, it did not complete a study or analysis of the impact the changes would make on mail service prior to implementation. Further, the Postal Service did not pilot test or otherwise consider the impact of the changes even though critical employee availability issues were being felt as pandemic cases rose following the July 4 holiday weekend. Lastly, we noted that these initiatives were implemented quickly and were communicated primarily orally, which resulted in confusion and inconsistent application across the country.

## Impact of Operational Changes

The collective results of these initiatives, combined with the ongoing employee availability challenges resulting from the pandemic, negatively impacted the quality and timeliness of mail delivery nationally. The Postal Service's mail service performance significantly dropped beginning in July 2020, directly corresponding to implementation of the operational changes and initiatives.

Most notably, service performance indicators declined significantly in July 2020, for all mail products we reviewed:

- First-Class Single Piece declined from 90.1 to 79.7 (10.4 percentage points).

- First-Class Presort declined from 92.2 to 82.9 (9.3 percentage points).

- First-Class Packages declined from ███ to ███ percentage points).

- Priority Mail declined from ███ to ███ percentage points).

We also noted:

- Delayed mail reported in Postal Service systems for mail processing facilities increased 21 percent, from 2 billion pieces for the week ending July 10, 2020 to 2.4 billion pieces for the week ending July 31, 2020.

- Delayed mail, which is self-reported at post offices, increased 143 percent, from 4.7 million for the week ending July 10, 2020, to 11.4 million for the week ending July 31, 2020.

To further evaluate these impacts, we conducted a non-statistical mail test of 300 mailpieces in August 2020. Our results showed █ percent of Priority Letter Flats,

> *"The collective results of these initiatives, combined with the ongoing employee availability challenges resulting from the pandemic, have negatively impacted the quality and timeliness of mail delivery nationally."*

24 percent of Certified Letters, and 14 percent of First-Class Letters ████ ████████████████████████████████████.

We also observed operations at five mail processing and eight delivery facilities in August 2020 and found delayed mail at all five mail processing facilities and significant amounts of delayed mail at seven of the eight delivery units. According to management at these facilities, the increased delayed mail was due to COVID-19 impacts, such as employee availability, increases in package volume, local directives to reduce overtime and a requirement for carriers to stop mail delivery at 8 p.m., and the restrictions on extra trips.

## Compliance with Policies and Legal Requirements

Based on our review of the applicable legal requirements for consulting the PRC at the time the Postal Service was making its determination, the Postal Service was in compliance with policies and legal requirements. The law requires the Postal Service to seek an advisory opinion from the PRC "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis[.]" The Postal Service reports that it looked at each initiative individually and did not perform an analysis of the combined service impacts of changes made. Thus, in the absence of evidence that these initiatives were intended to disrupt service performance, the Postal Service was not required by then existing precedent to request an advisory opinion. This highlights the fact that the PRC's statutory authority to render advisory opinions on service changes does not provide a robust check on Postal Service actions. The PRC's authority to evaluate service degradation is effectively limited to an after-the-fact evaluation, as a part of the annual compliance determination process.

At the time of this report's publication, many of the Postal Service's actions (including declining to seek a PRC advisory opinion) have been challenged in multiple federal jurisdictions. Upcoming court decisions could change this analysis.

Regarding notification to employees and others, the Postal Service generally complied with policies and legal requirements for employee and public notifications. Regarding the notification of employees, the unions were

notified of the ESAS pilot program and the organizational restructure prior to their implementation on July 25, 2020 and August 7, 2020, respectively. No requirements existed for employee notifications related to the elimination of late and extra trips to transport mail or the other operational initiatives implemented.

## Communications With Congress and Customers

Although information provided by the Postal Service was generally accurate, the responses to Congress and the public on the extent and impacts of operational changes were incomplete. The Postal Service did not:

- Fully respond to questions and document requests made by members of Congress in July 2020.

- Share information on many of the specific initiatives implemented, including the additional cost-reduction actions that were initiated during the last several months, beyond those the Postmaster General initiated directly or was specifically asked about by members of Congress.

- Indicate that some of the initiatives that started prior to the arrival of the Postmaster General were being accelerated to more quickly achieve projected savings.

- Broadly communicate the planned changes with mailing industry customers or coordinate on potential service impacts.

## Postmaster General Compliance with Ethical Requirements

We reviewed documentation obtained from the Postal Service, Office of Government Ethics, and Mr. DeJoy's investment firms; conducted interviews with Postal Service ethics officials and other staff; interviewed staff from Mr. DeJoy's investment firms; and analyzed federal ethics regulations in consultation with the OIG's Office of General Counsel. Information the OIG reviewed to date indicates that Mr. DeJoy has met the ethics requirements related to disclosure, recusal, and divestment upon entering the position of Postmaster General. However, we have not yet had the opportunity to review Mr. DeJoy's ▮▮▮▮▮▮▮ accounts and that process is ongoing.

## Looking Forward

Service performance had improved as of September 3, 2020, from the July lows as follows:

- First-Class Single Piece improved from 79.7 to 86.8 (7.1 percentage points) but was still below the target of 96.

- First-Class Presort improved from 82.9 to 88.6 (5.7 percentage points) but was still below the target of 96.

- First-Class Packages improved from ▮▮ to ▮▮▮▮ percentage points) ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

- Priority Mail improved from ▮▮ to ▮▮▮▮ percentage points) ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

According to Postal Service officials, the service impacts caused by the operational changes were temporary and will not impact election mail for the upcoming 2020 election. The Postal Service has established processes for handling election mail and efforts have been ongoing to train and prepare their employees on Election Mail policies and procedures. Training includes proper postmarking, proper handling and processing, and recognition and use of Tag 191, which identifies ballots. The Postal Service is now also subject to preliminary orders from at least four federal district courts imposing additional requirements on the handling of election mail.

"*On August 18, 2020, the Postmaster General announced that he would cease removal and reconfiguration of mail processing equipment and postpone collection box removals until after the 2020 election to avoid the appearance of any impact on Election Mail.*"

On August 18, 2020, the Postmaster General announced that he would cease removal and reconfiguration of mail processing equipment and postpone collection box removals until after the 2020 election to avoid the appearance of any impact on Election Mail. The ESAS pilot in Delivery Operations was also cancelled on that day.

In a September 21, 2020, memo to officers, executives, and managers, the Chief Retail and Delivery and Chief Logistics and Processing Operations officers disclosed that beginning October 1, 2020, the Postal Service would make additional resources available in all areas of operations, including collection, processing, delivery, and transportation to satisfy increased demand and unforeseen circumstances. They also provided clarifying guidance in the areas of overtime, hiring, retail hours, collection boxes, late and extra trips, mail processing, and election mail.

# Transmittal Letter



OFFICE OF INSPECTOR GENERAL
UNITED STATES POSTAL SERVICE

October 19, 2020

**MEMORANDUM FOR:**    BOARD OF GOVERNORS
UNITED STATES POSTAL SERVICE

MARK DUDA

**FROM:**    Mark Duda
Assistant Inspector General for Audit

**SUBJECT:**    Operational Changes to Mail Delivery
(Report Number 20-292-R21)

This report presents the results of our evaluation of recent operational changes to mail delivery. This responds to an August 7, 2020, congressional request regarding concerns that modifications Postmaster General Louis DeJoy made to U.S. Postal Service staffing and policies had an adverse effect on Postal Service operations, which led to slower and less reliable mail delivery. This report also responds to a number of recent similar congressional requests.

We appreciate the cooperation and courtesies provided by your staff. If you have any questions or need additional information, please contact Rita F. Oliver, Acting Deputy Assistant Inspector General for Retail, Delivery and Marketing, or me at 703-248-2100.

Attachment

# Results

## Introduction/Objective

This report presents the results of our evaluation of operational changes to mail delivery (Project Number 20-292). This report responds to an August 7, 2020, congressional request regarding concerns that modifications to U.S. Postal Service staffing and policies put in place by Postmaster General Louis DeJoy had an adverse effect on Postal Service operations, which led to slower and less reliable mail delivery. This advisory also responds to a number of recent similar congressional requests. We are issuing a separate report to the Postmaster General which details these issues with recommendations for corrective action.

Our objective was to address specific concerns related to Postal Service changes put in place after the Postmaster General was sworn in on June 15, 2020, and their effect on operations; whether the changes complied with internal policies and legal requirements, and sufficient notice was provided to Congress and customers; and whether the Postmaster General complied with ethical requirements. See Appendix A for additional information about this review.

## Background

The Postal Service's mission is to provide prompt, reliable, and efficient services to all communities to bind the nation together through delivery of the personal, educational, literary, and business correspondence of the people. The Postal Service is required to fulfill its universal service obligation and meet other statutory obligations in a self-sufficient manner by covering its costs through revenue generated from the sale of its products and services.

Since 2007, the Postal Service has experienced sizeable financial losses, resulting from a combination of legislative and economic factors, as well as the shift in consumer and business behavior toward digital correspondence, transactions, and advertising. In its *2020 Integrated Financial Plan*, the Postal Service projected a net loss of $7.6 billion for fiscal year (FY) 2020.

Unexpected at the time of these projections was the global novel coronavirus (COVID-19) disease outbreak pandemic.[1] The effects of this pandemic are still being felt across the country and its impact on the Postal Service continues to be significant. While the Postal Service experienced a sizeable increase in package volume in the initial months following the emergency declaration, letter and flat mail volume has fallen significantly.

The Postal Service measures its service performance against established standards that specify timeliness targets for delivering mail. Service standards are determined by the class of mail, where it originates, and where it is going, or destined. As we have noted in recent reports, the Postal Service has struggled to meet mail service performance standards – measured based on mail speed and reliability – and has opportunities to improve operational efficiency and cost cutting efforts, as follows:

- *Assessment of the U.S. Postal Service's Service Performance and Costs* (Report Number NO-AR-19-008, September 17, 2019). This report determined the Postal Service had not met the majority of its service performance targets over the five-year period we reviewed (FYs 2014-2018).

- *U.S. Postal Service's Processing Network Optimization and Service Impacts* (Report Number 19XG013NO000-R20, June 16, 2020). This report concluded that the Postal Service's drive to meet service performance targets has increased costs and inefficiency due to issues with integrating mail processing, transportation, and delivery operations.

- *Assessment of Overtime Activity* (Report Number 20-209-R20, August 25, 2020). This report determined that the Postal Service needs to strengthen controls over managing overtime to successfully contain these costs. From FY 2014 to FY 2019, overtime costs and hours have trended upward and consistently exceeded their planned overtime budgets.

---

[1]   On March 13, 2020, the President of the United States issued the national emergency declaration concerning the COVID-19 pandemic. Since the Postal Service is part of the critical infrastructure of the United States, its employees provide an essential public service of the federal government for the American people. This means they are exempt from "lockdown," "shelter-in-place," general quarantines, and other restrictions imposed by state and local governments.

- *Processing Readiness of Election and Political Mail During the 2020 General Elections* (Report Number 20-225-R20, August 31, 2020). This report concluded that while the Postal Service has made progress in preparing for the 2020 general election, there are concerns surrounding integrating stakeholder processes with Postal Service processes to help ensure the timely delivery of Election and Political Mail.

The Postal Service's national network includes the key operational functions of mail processing, transportation, and post office operations, including delivery and retail operations. Each of these functions are interdependent, and must align to achieve prompt and efficient operations (see Appendix B). Specifically:

- **Mail Processing:** The Postal Service processes mailpieces at 285 processing facilities throughout the country, using more than 8,500 pieces of automated processing equipment.

- **Transportation:** Every day, 390 million mailpieces move on transportation throughout the Postal Service network using the nation's highway, air, rail, and maritime infrastructures. This is a critical function to connect mail collection to processing facilities, and processing facilities to post offices for delivery.

- **Post Office Operations:** Over 35,000 post offices across the country provide retail and delivery services. The Postal Service uses over 168,000 city letter carriers and over 70,000 rural carriers to deliver mail to the nearly 158 million delivery points each day.

On May 6, 2020, the Postal Service's Board of Governors (Board) announced its selection of Louis DeJoy to serve as the 75th Postmaster General. Postmaster General Louis DeJoy assumed office on June 15, 2020. Shortly, thereafter, in July and August, public reports emerged concerning changes at the Postal Service (see Figure 1). In his remarks at the August 7, 2020, Board meeting, Mr. DeJoy outlined his strategy for a transformative process for the Postal Service. He announced implementation of an organizational realignment to refocus the Postal Service's business into three core areas as well as other initiatives. He also noted that the Postal Service's financial position was dire, stemming from substantial declines in mail volume, a broken business model, and a management strategy that has not adequately addressed these issues. Given the

> "*The Postal Service's financial position was dire, stemming from substantial declines in mail volume, a broken business model, and a management strategy that has not adequately addressed these issues.*"

current situation, he noted it was critical that the Postal Service review operations and make necessary adjustments.

## Conclusion

In June and July 2020, various cost-reduction strategies were initiated throughout Postal Service operations on top of the three initiatives the Postmaster General launched to meet financial targets. No analysis of the service impacts of these various changes was conducted and documentation and guidance to the field around these strategies was very limited and almost exclusively oral. The resulting confusion and inconsistency in operations at postal facilities resulted in significant negative service impacts across the country.

Although the Postal Service followed applicable legal and policy requirements regarding notification to the Postal Regulatory Commission (PRC), these requirements are limited. We also found that documentation of the operational changes provided to Congress and customers was generally accurate but incomplete. Information the OIG reviewed to date indicates that Mr. DeJoy has met the ethics requirements related to disclosure, recusal, and divestment.

In a September 21, 2020, memo to officers, executives, and managers, the Chief Retail and Delivery and Chief Logistics and Processing Operations officers disclosed that beginning October 1, 2020, the Postal Service would make additional resources available in all areas of operations, including collection, processing, delivery, and transportation to satisfy increased demand and unforeseen circumstances. They also provided clarifying guidance in the areas of overtime, hiring, retail hours, collection boxes, late and extra trips, mail processing, and Election Mail.

**Figure 1. Postmaster General Event Timeline**



Source: U.S. Postal Service Office of Inspector General (OIG) analysis of various media outlets.

## Issue #1: Postal Service Operational Efficiency Initiatives

After his appointment, the Postmaster General implemented the following three operational and organizational changes in July and August 2020:

- **Elimination of late and extra trips to transport mail:** This initiative was started July 10, 2020, and was designed to eliminate unnecessary late[2] and extra trips[3] outside of regularly scheduled transportation service. This initiative would require mail to be transported on regular routes or held until the next regular route is available. Since implementation in July, late and extra trips have declined significantly (see Figure 2).

**Figure 2. Postal Vehicle Service (PVS) Late & Extra Trips Compared to the Same Period Last Year (SPLY)**



Source: OIG analysis data obtained from Surface Visibility (SV).

- **Organization Restructure:** On August 7, 2020, the Postmaster General announced a reorganization of field operations and headquarters functions to align functions based on core business operations. He stated the organizational change would capture operating efficiencies by providing clarity and economies of scale that will allow the Postal Service to reduce their cost base and capture new revenue. The new business organizational structure is focused on three operating units and their core missions – Retail and Delivery Operations, Logistics and Processing Operations, and Commerce and Business Solutions. The reorganization also reduced the number of geographic areas from seven to four and reorganized the associated reporting structures.

- **Expedited Street Afternoon Sortation (ESAS):** This initiative began as a pilot program at 384 facilities nationwide on July 25, 2020, and was scheduled to run through August 28, 2020. In a letter dated July 16, 2020, the Postal Service informed the National Association of Letter Carriers (NALC) of the new ESAS delivery initiative pilot. The pilot program, which was designed to improve efficiency by reducing morning office time, allow earlier carrier leave times and promote carrier safety, was terminated on August 18, 2020 by the Postmaster General based on concerns with the scale and impact of site selection. The OIG understands that the NALC has pursued a grievance with respect to the pilot. The initiative may be revisited in the future as part of the overall delivery strategy.

In addition to these three initiatives, Postal Service operations executives launched 57 strategies to achieve FY 2021 financial targets and reduce workhours, one of which matched the Postmaster General's strategies (Late/Extra Trips). These operational change initiatives were developed to achieve an estimated 64 million workhour savings.

These initiatives undertaken individually may not have been significant. However, launching all of these efforts at once, in addition to the changes instituted by the Postmaster General, had a significant impact on the Postal Service. According to the Chief Operating Officer, these 57 strategies constituted "transformational changes" in Postal Service operations. Termed "Do It Now FY Strategies," these initiatives outlined changes from current operations in each function including mail processing, vehicle services, equipment maintenance, and post office operations (delivery and retail). They included strategies such as eliminating pre-tour overtime in city delivery operations, elimination of certain mail processing operations on Saturday, and alignment of clerk workhours to workload. Although these initiatives were generated from and executed by operations executives, the

---

2   **Late trips** occur when various conditions cause a delay in the arrival or departure of transportation beyond the scheduled times, and result in costly delays and contract penalties.
3   **Extra trips** occur when mail processing operations do not process mail timely or mail volume is above normal or expected levels, managers may have to call extra trips to transport this mail.

initiatives were discussed at an introductory meeting with the new Postmaster General on July 7, 2020. See Appendix C for a complete listing of initiatives.

Based on our analysis, we determined that one of the 57 initiatives – the removal of mail processing equipment – in progress prior to July 2020, was accelerated. However, the Postal Service noted that they did not intentionally accelerate machine removal, but rather were responding to the drop in volume, the addition of stackers to some machines, and that removal typically occurred during summer months, a lower volume period. Specifically:

■ **Machine Removals:** The Postal Service has been reducing letter and flat mail processing machines over the last several years to better align its processing capacity with actual workload, in light of the decline in letter and flat mail. Specifically, removal of the letter and flat processing machines across the country, increased from the average of 375 (average of FY 2015 to FY 2019) to 712 (FY 2020). In May 2020, management concluded letter and flat mail volumes, which had declined by up to 30 percent since the pandemic began in March 2020, would not return to prior levels and sent instructions to facilities to remove an additional 969 machines. Of the 712 letter and flat processing machines removed from October 2019 to August of 2020, 437 (61 percent) were removed from June to August 2020 (see Table 1).

**Table 1. Mail Processing Machine and Letter and Flat Volume Reductions**

| Fiscal Year | Machines at Start of Fiscal Year | Machines Removed | Percent of Machines Removed | Fiscal Year Letter and Flat Volumes[4] | Volume Change to Prior Fiscal Year |
|---|---|---|---|---|---|
| FY 15 (October 2014) | 7,818 | 1,136 | 14.5% | 327,678,315,608 | |
| FY 16 (October 2015) | 6,682 | 184 | 2.8% | 325,016,223,241 | -0.81% |
| FY 17 (October 2016) | 6,498 | 352 | 5.4% | 310,577,294,312 | -4.44% |
| FY 18 (October 2017) | 6,146 | 78 | 1.3% | 300,451,396,468 | -3.26% |
| FY 19 (October 2018) | 6,068 | 124 | 2.0% | 290,542,827,323 | -3.30% |
| FY 20 (October 2019) | 5,944 | 712 | 12.0% | 240,435,003,293 | -17.25% |
| FY 20 (August 2020) | 5,232 | | | | |
| **FY 15 to FY 20 as of 8/31/2020** | | **2,586** | **33.1%** | **-87,243,312,315** | **-26.62%** |

Source: Mail and Image Reporting System and Management Operating Data System.

■ Of the 712 letter and flat processing machines reduced from October 1, 2019 through August 31, 2020, 528 were Delivery Barcode Sorters (DBCS), about 74 percent. Our analysis showed that the pace of machine removal was accelerated after the May 2020 decision, with 325 (60 percent) of the DBCS removals occurring from June through August 2020. Additionally, the

Postal Service has an initiative to increase the capacity of the remaining letter machines by adding sorting bins from the removed machines. The initiative will allow the expanded capacity machines to run more ZIP Codes on their sort programs improving mail processing efficiency by reducing the number of sort programs run and processing setup preparations. Since the start of

---

4   Fiscal Year Letter and Flat Volume for FY 2020 is from October 1, 2019 – August 31, 2020.

the initiative on July 1, 2020, the Postal Service has increased capacity on 281 (or 29.6 percent) letter machines and reduced the sort programs they run by 311 (or 5.4 percent).

- Postal Service management stated the machines removed from service will not be replaced. As these machines were disassembled, some parts were used in other machines and unusable parts were to be sold. However, the Chief Retail and Delivery and Chief Logistics and Processing Operations officers noted in a memo dated September 21, 2020, that over the past month, a limited number of machines that were disconnected but not dismantled and removed, were put back into service. As of September 18, 2020, Headquarters approved all requests to reconnect machines and provided regional vice presidents the authority to reconnect machines and return them to service when doing so is necessary to add processing capacity or fulfill service performance commitments with regard to election mail.

We also noted that while removal of under-utilized collection boxes occurs each year based on an annual density study, collection box removals significantly exceeded the average removals in two of the seven geographic areas of the country in July 2020, as follows:

- **Collection Box Removal:** The Postal Service has over 140,000 blue collection boxes and has been reducing them over the last several years as part of their effort to adjust their infrastructure to match declining First-Class Mail volume. From FY 2015 through August 31, 2020, the Postal Service removed 15,779 collection boxes, averaging 2,630 box removals a year. In FY 2020, the Postal Service removed approximately 1,730 collection boxes through August 31, 2020, or about two-thirds the average annual removals per year – 954 collection boxes prior to the Postmaster General starting and an additional 776 boxes from June 15, 2020 through August 31, 2020. Seventy-four percent of these were from the Southern and Western areas (see Table 2).

**Table 2. Collection Box Removals June 15 – August 31, 2020**

| Area | June 2020 | July 2020 | August 2020 | Total Removals June 15 – August 31, 2020 | Percentage of Removals June 15 – August 31, 2020 | October through May 2020 Monthly Average[5] |
|---|---|---|---|---|---|---|
| Capital Metro | 7 | 7 | 4 | 18 | 2% | 5 |
| Eastern | 17 | 10 | 9 | 36 | 5% | 12 |
| Great Lakes | 5 | 1 | 2 | 8 | 1% | 6 |
| Northeast | 65 | 20 | 13 | 98 | 13% | 31 |
| Pacific | 0 | 0 | 40 | 40 | 5% | 42 |
| Southern | 9 | 32 | 191 | 232 | 30% | 11 |
| Western | 28 | 129 | 187 | 344 | 44% | 8 |
| **Total** | **131** | **199** | **446** | **776** | **100%** | **115** |

Source: FY 2020 Collection Point Management System.

[5] Average monthly collection box reductions from October through May 2020.

According to Postal Service officials, the collection box removals made in 2020 were part of a long-standing process and handled no differently than in previous years, with density tests conducted to determine which boxes to remove. They stated there was no direction from the Postmaster General to remove collection boxes and he suspended the further removal of boxes on August 18, 2020, until after the election.

## Rationale for Changes

In his July 28, 2020 public statement, Postmaster General DeJoy noted "The Postal Service is in a financially unsustainable position, stemming from substantial declines in mail volume and a broken business model." Based on discussions with key Postal Service executives and document reviews, we determined the three changes implemented by the Postmaster General were designed to achieve financial targets. The Postmaster General also noted that the OIG's recent *Transportation Network Optimization and Service Performance* report (Report Number 20-144-R20, June 5, 2020) was an impetus for his mandate on late transportation trips. In that report, we concluded that the Postal Service routinely used the surface and air networks to mitigate mail processing, delivery, and other delays, and identified $550 million in extra transportation costs to mitigate delays that occurred in the network. The recommendations focused on addressing the causes that impacted the optimization of the surface and air networks to include misaligned scheduling, insufficient management oversight, imbalanced performance measurements, employee availability, and the inefficient allocation of mail.

Similarly, the strategies outlined by the operational executives were designed to save an estimated 64 million workhours in FY 2021. Executives noted that these strategies needed to be started in FY 2020 to achieve the FY 2021 targets. Executives also noted that many of these strategies were part of ongoing initiatives, started before the appointment of Postmaster General DeJoy and were motivated by findings and recommendations in previous OIG reports. We reviewed strategy and operational documents from 2019 and noted that cost cutting strategies were part of an annual process Operations conducts to ensure they meet the Business Plan. While the Postal Service identified initiatives related to cost containment and improved efficiency, including eliminating late transportation trips, prior year initiatives were not executed with the same velocity and consistency as the July 2020 initiatives.

As recently as June 2020, the OIG noted the Postal Service's processing network was not operating at optimal efficiency. In our *U.S. Postal Service's Processing Network Optimization and Service Impacts* report (Report Number 19XG013NO000-R20, June 16, 2020), we concluded that the Postal Service's drive to meet service performance targets had increased costs and inefficiency due to issues with integrating mail processing, transportation, and delivery operations. While our reports have identified opportunities for cost control and improved efficiency, our recommendations did not prescribe implementation strategies that would have significant negative service impacts.

## Service Impact Analysis

While the Postal Service provided an estimate of workhour savings for many of the initiatives, it did not complete a study or analysis of the impact of the changes on mail service prior to implementation. Further, the Postal Service did not pilot test or otherwise consider the impact of the changes even though critical employee availability issues were being felt as pandemic cases rose following the July 4 holiday weekend.

We noted that while some concerns were raised by area officials regarding potential service impacts of the initiatives, these initiatives were broadly implemented across all geographic areas. One executive noted "achieving service and efficiencies are not mutually exclusive – we are expected to do both." When discussing these changes, the Chief Operating Officer noted that changing mail processing machine schedules was key and should have been done in tandem with the changes to transportation. He stated that he did expect a temporary service impact due to the significant changes made collectively within a short period of time, but expected a sharp recovery. Lastly, we noted that these initiatives were implemented quickly and were communicated primarily orally, which resulted in confusion and inconsistent application across the country. Based on discussions with management at the 13 sites we visited, we noted confusion around:

- Overtime changes.

- Deliveries after 8:00 p.m.

- Handling late mail arrivals in delivery units.

- Hiring freezes on Executive Administrative Schedule (EAS) positions.

- Whether to leave mail behind in delivery units if it was not ready in the morning.

## Issue #2: Impact of Operational Changes

The collective results of these initiatives, combined with the ongoing employee availability challenges resulting from the pandemic, negatively impacted the quality and timeliness of mail delivery nationally. The Postal Service's mail service performance significantly dropped beginning in July 2020,[6] directly corresponding to the implementation of the operational changes and initiatives. We reviewed service standards and service performance targets to determine how service performance has trended since the implementation of the operational changes and initiatives.

Our analysis of service standards and service performance targets found that the performance indicators declined significantly for all mail products we reviewed, beginning in July 2020, as noted below and in Figure 3.

- First-Class Single Piece declined from 90.1 to 79.7 (10.4 percentage points), below the target of 96.

- First-Class Presort declined from 92.2 to 82.9 (9.3 percentage points), below the target of 96.

- First-Class Packages declined from ▮ to ▮ percentage points), ▮▮

- Priority Mail declined from ▮ to ▮ percentage points), ▮▮

> *"Our analysis of service standards and service performance targets found that the performance indicators declined significantly for all mail products we reviewed, beginning in July 2020."*

### Figure 3. Service Performance Product Score Comparison March 7 through August 29, 2020



Source: OIG analysis of service performance targets nationwide.

To better understand the factors that impacted service nationally, we reviewed Transportation, Customer Service, and Delivery Operations measures nationwide. Specifically, we analyzed mail and package volume, delayed mail in both mail processing and in delivery operations, employee availability, and customer inquiries. Our analysis of these relevant data sources showed:

- While mail volumes were generally lower from March – August 2020 than the same period last year (SPLY), package volume increased significantly during this period (see Appendix D).

- Delayed mail inventory[7] at mail processing plants heading next to the delivery units increased about 21 percent, from about 2 billion pieces for the week ending July 10, 2020, to about 2.4 billion pieces for the week ending July 31, 2020. Afterward, the delayed mail volume at the plants returned to rates seen earlier in the year at the end of August.

- Delayed mail in post offices, stations, and other facilities, was higher than SPLY values and even exceeded the average of peak values. It gradually

---

6   Service scores reflect the weeks ending July 3 through July 24, 2020.

7   Delayed Inventory provides a count of committed mail pieces not processed and finalized in time to be dispatched on time to meet the programmed delivery day. The delayed inventory volume under the following processing categories were excluded from our calculations: cancellation, forwarded mail, international, and unknown.

increased with a significant increase of about 143 percent, from about 4.7 million for the week ending July 10, 2020, to about 11.4 million for the week ending July 31, 2020. Afterwards, the volume significantly decreased through the week ending August 28, 2020 (see Appendix E).

- Reduced employee availability has continued to impact postal operations since the start of the COVID-19 pandemic in March 2020. Specifically, employee availability for all operational functions was generally worse in 2020[8] during the period analyzed than compared to SPLY. In both 2019 and 2020, mail processing operations had the worst employee availability when compared to Delivery (City) and Customer Service Operations. In addition, mail processing operations experienced the greatest percent change in employee availability from SPLY when compared to the other functions (see Figures 4, 5, and 6).

**Figure 4. Mail Processing Employee Availability for Current Period and SPLY**



Source: OIG analysis data extracted from the Postal Service's Enterprise Data Warehouse (EDW).

**Figure 5. Customer Service Employee Availability for Current Period and SPLY**



Source: OIG analysis data extracted from the Postal Service's EDW.

**Figure 6. City Delivery Employee Availability for SPLY and Current Period**



Source: OIG analysis data extracted from the Postal Service's EDW.

- Customer inquiries submitted were higher than SPLY values. Inquiries increased 79 percent nationwide from March 2020 through July 2020. Afterward, customer inquiries have started to decrease (see Figure 7).

---

8    Includes the Memorial Day and July 4, 2020, holidays.

**Figure 7. Total Customer Inquiries Submitted October 2019 – August 2020**



Source: OIG analysis of Enterprise Customer Care (eCC) archive/ Customer 360 (C360).

## OIG Mail Test

To test the timeliness of mail delivery for Certified Mail First-Class letters, Priority Mail envelopes, and First-Class letters, we conducted a non-statistical mail test[9] of 300 mail pieces[10] in August 2020. Our results showed:

- Twenty-four percent of Certified Mail First-Class Letters were not delivered within the service window of one to three days.

- Fourteen percent of First-Class Letters were not delivered within the service window of one to three days.

- ▮▮▮▮ percent of Priority Mail envelopes ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (plus an extra day for coronavirus impact).

- Six letters (3 percent) – three Certified Mail and three First-Class – were not delivered as of September 22, 2020.

## OIG Observations

We observed operations at five mail processing and distribution centers (P&DC) and eight delivery facilities in August 2020. OIG observations, analysis, and discussions with management identified mail delays at all five P&DCs on the days of our site visits. For example, the Cardiss Collins P&DC in Chicago had approximately 230,000 delayed DPS letter volume on August 18, 2020. In addition, on August 20, 2020, auditors observed about 141,900 delayed standard mailpieces at the Philadelphia P&DC (see Figure 8). According to management at all five P&DCs, they've encountered mail delays due to COVID-19 related issues, such as employee availability and package volume increases. In addition, management at the Cardiss Collins P&DC indicated that the restrictions on late and extra trips and local protests have also disrupted their operations.

**Figure 8. Delayed Mail at Philadelphia P&DC**



Source: OIG observation of about 141,900 delayed standard mailpieces on August 20, 2020.

---

9   The mailings all originated from Upper Marlboro, MD 20772, and were sent to 21 states and Puerto Rico. The mailings included ZIP Code zones 1 through 8.

10  Total mail pieces included: 100 Certified Mail First-Class letters sent on August 28, 2020; 100 Priority Mail envelopes sent on August 27 – 28, 2020; 100 First-Class letters sent on August 27, 2020.

Seven of the eight delivery facilities visited also had significant amounts of delayed mail. For example, auditors observed about 17,000 pieces of delayed Delivery Point Sequenced letter mail[11] at the Kingsessing Post Office in Philadelphia on August 19, 2020 (see Figure 9). In addition, auditors observed about 20,000 pieces of delayed mail, including First-Class Mail, at the Patterson Post Office in NJ. Management indicated that the delayed mail was caused primarily by employee availability and increases in package volume related to COVID-19. However, some management officials in Van Nuys Post Office in CA and Union City Post Office in NJ noted that local directives instructing carriers to not deliver mail after 8 p.m. and reduced overtime also impacted delayed mail. According to the Chief Operating Officer, the decrease in mail delivery quality and timeliness was exacerbated by the operational changes to the transportation schedules. However, management at the Tarzana, CA Post Office and the Patterson, NJ Post Office noted the recent operational changes helped improve efficiency by adhering to the 24-hour clock to include staffing, sortation, and on-time mail distribution to carriers.

> *"According to the Chief Operating Officer, the decrease in mail delivery quality and timeliness was exacerbated by the operational changes to the transportation schedules."*

> *"Based on our review of the applicable legal requirements for consulting the PRC at the time the Postal Service was making its determination, the Postal Service was in compliance with policies and legal requirements."*

**Figure 9. Delayed Mail at the Kingsessing Post Office, Philadelphia, PA**



Source: OIG observation of delayed mail on August 19, 2020.

## Issue #3: Compliance with Policies and Legal Requirements

Based on our review of the applicable legal requirements for consulting the PRC at the time the Postal Service was making its determination, the Postal Service was in compliance with policies and legal requirements. The law requires the Postal Service to seek an advisory opinion from the PRC "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis[.]" The Postal Service reports that it looked at each initiative individually and did not perform an analysis of the combined service impacts of changes made. Thus, in the absence of evidence that these initiatives were

---

11  Delivery Point Sequenced letter mail is bar-coded letter mail sorted at the processing plants and delivery units into the carrier's line-of travel.

intended to disrupt service performance, the Postal Service was not required by then existing precedent to request an advisory opinion.[12] This highlights the fact that the PRC's statutory authority to render advisory opinions on service change does not provide a robust check on Postal Service actions. The PRC's authority to evaluate service degradation is effectively limited to an after-the-fact evaluation as a part of the annual compliance determination process.

## Postal Service Complied with Policies and Legal Requirements for PRC Consultations

Since the enactment of the Postal Reorganization Act of 1970, the Postal Service has been required to seek an advisory opinion from the PRC or its predecessor, the Postal Rate Commission, for certain proposed changes in postal services.[13] PRC rules require requests for advisory opinions to be submitted 90 days in advance of the proposed change. The advisory opinion requirement is triggered when the Postal Service determines that there should be a change in the nature of postal services, but the statute leaves much to Postal Service determination and intent. If the Postal Service does not conceptualize its actions, instructions, and directives as a change in the nature of postal services, those actions likely fall outside the scope of this requirement. To fall within the scope of the advisory opinion requirement, actions by the Postal Service must satisfy three elements:

1. **The action must involve a "change."** Not all changes require an advisory opinion, as the law applies only to changes that have a "meaningful impact on service" and not changes with "minimal effect on the general class of postal users."[14]

2. **The change must be a change "in the nature of postal services."** Whether a change is a change "in the nature of postal services" turns on an "examination of the manner in which postal services available to the user will be altered." While this examination is necessarily fact-intensive, the PRC has

opined that the advisory opinion requirement "deals with broader questions involving the nature of postal services generally" rather than "changes to individual products."

3. **The change must have a "substantially nationwide" effect on service.** To have a substantially nationwide effect "a broad geographical area must be involved."

In this regard, it is instructive that there have been only four challenges to Postal Service actions that were taken without a PRC advisory opinion and the PRC dismissed them all. Actions that have the unintended effect of reducing service performance have not been seen as "changes in the nature of postal services," triggering the requirement for an advisory opinion. One PRC decision[15] is particularly instructive for application of this requirement, as the PRC held that failure to meet service standards does not trigger the requirement absent (1) implementation or planned implementation of a new standard or (2) knowing and/or intentional degradation of service. The requirement for an advisory opinion is not a mechanism for policing compliance with existing service standards. In the PRC's interpretation of the advisory opinion requirements, the failure to meet standards without intentional degradation of service does not give rise to a *de facto* change in the nature of postal services; poor service is, instead, a matter for the PRC's Annual Compliance Determination.

The PRC's prior rulings appear in part to be grounded in the policy judgment that the Postal Service's failure to adhere to current service standards is best addressed through the PRC's year-end annual compliance determination process, whereas the advisory opinion process relates to the adoption of new service standards. In reading the few opinions on the matter and based on the OIG's conversation with PRC officials, it appears that the PRC believes it has more leverage in the annual compliance determination process because the process is not merely advisory. Review of recent annual compliance

---

12  The OIG reaches this conclusion relying on analysis of the statute and interpretations from the PRC and applicable court decisions. At the time of this report's publication, many of the Postal Service's actions (including declining to seek a PRC advisory opinion) have been challenged in multiple federal jurisdictions on various theories, including Constitutional grounds. None of these cases has yet reached a final disposition. A final decision in one or more of these cases could require a reconsideration of this issue. See generally, *Complaint of American Postal Workers Union*, PRC Docket No. C2013-10, Order No. 1892 (November 27, 2013).

13  39 U.S.C. §3661(b).

14  The leading judicial opinion to interpret the PRC advisory opinion requirements observed that while a decision to combine two high management positions could ultimately have a nationwide effect, it would not fall within the scope of the requirement because it is not a "change in the nature of postal services." *Buchanan v. U.S. Postal Service*, 508 F.2d 259, 262 (5th Cir. 1975).

15  Complaint of American Postal Workers Union, PRC Docket No. C2013-10, Order No. 1892.

determination reports however, reflects that the Postal Service has not met their service performance targets for most products since 2015 and that annual directions from the PRC aimed at remedying this noncompliance are also unmet. The PRC also observed in their prior ruling[16] that violations of service standards are actionable,[17] but the rules of the commission essentially require a complainant to have conclusive evidence before allowing any discovery, a very high bar to proceeding.

Where the impacts of postal actions are large, a factual question remains whether the cumulative effects of multiple, broadscale changes constitute a "knowing and/or intentional degradation of service." In the absence of any analysis of the cumulative effects of the many changes, there is no clear and direct evidence as to the intent underlying those actions. The possibility that a "head-in-the-sand" approach to multiple, broad changes could circumvent the process intended to invite stakeholder input highlights the limitations of the current review process established by the Postal Reorganization Act of 1970.

## Postal Service Complied with Policies and Legal Requirements for Employee Notifications

The Postal Service generally complied with policies and legal requirements for employee notifications. Regarding the notification of employees, the unions were notified of the ESAS pilot program and the organizational restructure, prior to their implementation on July 25, 2020 and August 7, 2020, respectively. No requirements existed for employee notifications related to the elimination of late and extra trips to transport mail operational change or the other initiatives implemented. Public notifications were required for collection box removals or post office retail hour changes.

*"The Postal Service generally complied with policies and legal requirements for employee notifications."*

While the Postal Service may not unilaterally change conditions of employment,[18] not all unilateral changes made by management are subject to collective bargaining. The operational changes examined in this report did not require collective bargaining, as they were within management's right to determine the methods, means, and personnel by which such operations are to be conducted. However, employee and customer notifications may have been required based on the collective bargaining agreements (CBA) or Postal Service policies (see Table 3).

**Table 3. Employee and Customer Notification Requirements for Postmaster General Operational Changes**

| Operational Change/ Initiative | Employee Notification Required | Customer Notification Required |
|---|---|---|
| Eliminate Extra and Late Trips | None | None |
| Headquarters Restructuring | None | None |
| ESAS Pilot | 15-day notice | None |

Source: OIG analysis.

- *Eliminate Extra and Late Trips.* Operational changes to eliminate unnecessary extra and late trips did not require any employee or customer consultations. The Postal Service has stated that this operational change was intended to get trucks on the existing schedule and prevent carrier and delivery delays. It therefore, would not constitute a change in the conditions of employment requiring collective bargaining.

- *Organizational Restructure.* Operational changes to restructure the Postal Service organization did not require any customer consultations or notifications to employees. Specifically, Postal Service policies set forth guidance at a sufficiently high level of generality to allow Postal Service management wide flexibility when it comes to organizational structure.

---

16  Complaint of American Postal Workers Union, PRC Docket No. C2013-10, Order No. 1892.
17  39 U.S.C. §3691(d).
18  NLRB v. Katz, 369 U.S. 736, 743 (1962); 39 U.S.C. §1203.

Announced with the restructure were plans to implement a hiring freeze and a request Voluntary Early Retirement Authority (VERA) for non-bargaining employees. As the organizational restructure announced on August 7, 2020, did not target employees covered by a collective bargaining agreement, the Postal Service was not required to communicate these plans to any postal employee union. The Postal Service did state they orally briefed each of the unions on August 6 and the morning of August 7 prior to the organizational realignment announcement.

- *ESAS Pilot.* In a letter dated July 16, 2020, the Postal Service informed NALC of a new ESAS delivery initiative pilot that began on July 25, 2020, in 384 units nationwide. According to the NALC CBA, the Postal Service was required to notify the Union at least 15 days in advance of any test or tests of new work measurement systems or work or time standards in one or more installations.[19] The OIG understands that NALC has pursued a grievance with respect to the pilot and it is the OIG's longstanding practice to refrain from opining on the substance of matters that are the subject of ongoing grievance proceedings. Accordingly, the OIG will not further opine on whether the ESAS pilot was implemented consistent with CBAs covering any affected employees other than to note that the NALC was notified of the pilot.

Of the 57 strategies executives outlined to reduce workhours in July and August 2020, none required the Postal Service to collectively bargain to make the changes; however, two required customer notifications by Postal Service policies. Specifically, operational changes to close Level 18 Post Offices for 1 hour at lunch time and remove collection boxes both require 30-day notification to customers. Postal Service policy[20] requires temporary signs to be posted to inform customers of the coming change thirty days in advance and facilities that change their hours of operation are required to display permanent, standardized "Hours of Operations" decals reflecting their new schedule the day before the change is made. Postal service policy[21] also requires the Postal Service to post a notice for customers on a collection box 30 days prior to the removal or relocation

showing the locations and collection schedules for other collection points in the vicinity. However, the box may be removed immediately without notice, if the collection box has been vandalized or tampered with and the location is determined to be unsecure.[22] Documentation of these notices are maintained at a local level.

## Issue #4: Communications With Congress and Customers

Although information provided by the Postal Service was generally accurate, the responses to Congress and the public on the extent and impacts of operational changes were incomplete. The Postal Service stated that their responses to Congress were based on their understanding that Congress was inquiring about directives issued by the Postmaster General, and not ongoing, routine matters.

> "*Although information provided by the Postal Service was generally accurate, the responses to Congress and the public on the extent and impacts of operational changes was incomplete.*"

The information provided by the Postal Service did not respond fully to information requests made by Congress, share information on many initiatives implemented, or indicate that some of the initiatives, started prior to the arrival of the Postmaster General, had accelerated. In addition, the Postal Service did not broadly communicate the planned changes with mailing industry customers or coordinate on potential service impacts.

### Responses to Congressional Requests

Based on our review of Congressional exchanges between members of Congress and the Postal Service between July 17 and August 14, 2020, we determined the Postal Service did not respond fully to information requests made

---

19  Handbook EL-901, *Agreement between USPS and National Association of Letter Carriers, AFL-CIO*, 2016-2019, Article 34C.
20  Handbook PO-209, *Retail Operations Handbook*, Section 5-3, October 2012.
21  *Postal Operations Manual* (POM) Issue 9, Section 315.3, July 2002, updated with *Postal Bulletin* revisions through December 24, 2015.
22  POM Issue 9, Section 315.4, July 2002, updated with Postal Bulletin revisions through December 24, 2015.

by the members of Congress related to the Postmaster General's operational changes and the impacts the changes had on service performance. For example, we noted:

- In response to a July 17, 2020, letter from Senator Peters and a July 20, 2020, letter from Representatives Maloney, Connolly, Lynch, and Lawrence about the operational changes published in several national publications, the Postal Service stated that neither document originated from Postal Service Headquarters and should not be treated as official statements of Postal Service policy. The correspondence did not include a requested full explanation of each operational change that would be implemented, with a timeline and justification for each. Further the letter did not state whether the documents reflect the views and plans of the Postmaster General, nor indicate what effect these changes will have on the Postal Service's service performance and its ability to meet service standards, which measure its ability to deliver mail on time to all customers.

- In an email exchange between Senator Carper's staff and Postal Service Government Relations staff beginning July 21, 2020, the Postal Service did not acknowledge service impacts or answer the staffer's questions. For example, citing a recent surge in constituent complaints about mail delays and lack of delivery in Delaware, Senator Carper's staff asked the Postal Service whether "something happen[ed] in the mail system … to cause this problem" and "broadly, has something happened" to cause an increase in complaints. Postal Service Government Relations staff replied that "broadly speaking, the internet and social media happened," and "operationally we're not seeing anything that has really changed in the last two or three weeks."

- In response to a July 30, 2020, letter from Senators Peters, Schumer, Carper, and Klobuchar, the Postal Service did not respond to most of the specific questions and document requests including:

  - Clarification on whether the Postmaster General directed the changes and his position on them.

  - Postal Service Headquarters communications and written directives to employees and area and district leadership regarding these changes.

- Listings of all processing centers and post offices that have implemented operational changes.

- Nationwide service performance data and Daily Mail Condition Reports for the past month from each location that has implemented operational changes.

- Analysis conducted on the operational changes including potential effect on service performance, cost of implementation, and cost savings.

- Explanation for why the Postal Service did not consult meaningfully with any stakeholders, including unions, mailing industry stakeholders, or others, before implementing these operational changes and whether these operational changes, or any other potential operational changes, were discussed with administration officials outside the Postal Service.

- In response to an August 6, 2020, letter from House Speaker Pelosi and Senate Minority Leader Schumer, the Postal Service did not provide the requested documentation of the operational changes made or planned by the Postmaster General, since the beginning of his term.

- In response to an August 6, 2020, letter from 85 members of Congress about the previous responses from Postal Service about the operational changes, the Postal Service did not respond to concerns about the lack of an explanation for why these Postal Service officials issued these directives, or how they came to believe these policies should be implemented in their offices. In addition, an explanation was not given for why the Postal Service did not issue a directive to all Postal Service offices and employees explaining the validity and applicability of the operational changes reported by national publications.

We also noted that the Postal Service was fully responsive to several Congressional requests related to election mail during this time period. In addition, following the Postmaster General's testimony before the Senate Committee on Homeland Security and Governmental Affairs on August 21, 2020, and the House Committee on Oversight and Reform on August 24, 2020, the Postal Service provided some of the information to Congress that had been

requested in previous correspondence. For example, calendar year 2020 service performance data is now being provided weekly to these committees and briefing slides were provided documenting some of the transportation impacts of the operational changes.

## Information Sharing

The Postal Service did not share with Congress information on many of the additional cost-reduction actions initiated during the last several months. Instead they only discussed the operational changes that the Postmaster General implemented directly and the initiatives specifically asked about by members of Congress or that had been reported in the media. For example, the operational changes and initiatives addressed in the correspondence included elimination of late and extra trips, the organization restructure, ESAS pilot, machinery reductions, post office hour changes, and collection box removals. Despite inquiries about all operational changes, the Postal Service did not include in their correspondence many of the "Do It Now FY Strategies" started in June and July 2020 by Headquarters officials. Specifically, initiatives eliminating pre-tour overtime in city delivery operations, elimination of certain mail processing operations on Saturday, and alignment of clerk workhours to workload were not disclosed.

## Initiative Acceleration

We also noted the Postal Service did not indicate that some of the initiatives reported in the media, in particular the machine and collection box removals, which were part of ongoing efforts to adjust infrastructure to match the declining mail volumes started prior to the arrival of the Postmaster General, were accelerated to more quickly achieve projected savings. For example, the correspondence we reviewed related to machinery reductions, focused on shifting or removing equipment as appropriate by adhering to planned start and stop times, and running sort plans based on current volumes. The Postal Service did not discuss that the removal of the DBCS machines had accelerated. In addition, the correspondence we reviewed related to collection box removals, accurately noted the number of removals made in FY 2020 were below the average from

the last seven years, but did not address the substantial number of box removals made by the Southern and Western areas following the national density test completed on June 6, 2020.

## Issue #5: Postmaster General Compliance with Ethical Requirements

We reviewed documentation obtained from the Postal Service, Office of Government Ethics (OGE), and Mr. DeJoy's investment firms; conducted interviews with Postal Service ethics officials and other staff; conducted interviews with staff from Mr. DeJoy's investment firms; and analyzed federal ethics regulations in consultation with the OIG's Office of General Counsel. Information the OIG reviewed to date indicates that Mr. DeJoy has met the ethics requirements related to disclosure, recusal, and divestment upon entering the position of Postmaster General. However, we have not yet had the opportunity to review Mr. DeJoy's ███████ accounts and that process is ongoing.

Government ethics rules require disclosure of financial interests to prevent conflicts of interest and to ensure confidence in the integrity of the federal government. Certain federal employees, including the Postmaster General, must file a public financial disclosure form within 30 days of entering the covered position. The Postal Service's designated agency ethics official (DAEO) serves as the reviewing official and must review and certify the report within 60 days after filing.[23] If a conflict of interest is identified, a remedy (such as recusal, divestiture, or other means) must be completed no later than three months after the date the filer received notice that a

> *"Information the OIG reviewed to date indicates that Mr. DeJoy has met the ethics requirements related to disclosure, recusal, and divestment upon entering the position of Postmaster General."*

---

23  See 5 CFR § 2634.605(a).

remedy is required.[24] Once approved, the public filer's report is sent to the Office of Government Ethics (OGE), which has a 60-day period to complete the public financial disclosure certification process and determine whether the public filer is free from actual or perceived violations of the ethics rules.[25]

Specifically, we determined:

- After entering the Postmaster General position on June 15, 2020, Mr. DeJoy completed his financial disclosure form and subsequently sold certain stock holdings that were listed on the form.

- Postal ethics staff identified specific holdings that Mr. DeJoy had in various investment accounts that might create potential conflicts of interest. Postal ethics staff also identified potential remedies for these specific holdings, which included a qualified trust, recusal, and divestiture. Postal ethics staff recommended divestiture.

- Mr. DeJoy initially provided written memoranda recusing himself from participating in matters involving all holdings specifically identified by postal ethics staff. Mr. DeJoy also instituted a screening process to avoid participating directly or indirectly in any matters involving the identified holdings. This occurred within the three-month period required by regulation.

- The Postal Service DAEO subsequently prepared a Request for Certificate of Divestiture for all of Mr. DeJoy's holdings specifically identified by postal ethics staff.

- On August 14, 2020, Mr. DeJoy's Request for Certificate of Divestiture, listing the holdings identified by the DAEO, was submitted to OGE. The Request was submitted to OGE within the three-month period required by ethics regulations. The written Request includes a signed memorandum from Mr. DeJoy, which states he will divest the identified holdings within 60 days of receiving the Certificate of Divestiture. The Request for Certificate of Divestiture is pending OGE review and certification, which will take an undetermined amount of time. In the interim, the previously prepared recusal

and screening process will continue to be in place while this divestiture process is proceeding.

- For the accounts reviewed, we did not identify any stocks in the investment accounts that had not been previously disclosed by Mr. DeJoy. Mr. DeJoy also restricted his investment firms from purchasing specific stocks, or making investments in certain sectors, on his behalf, to avoid creating a future conflict of interest.

## Looking Forward

Service performance had improved as of September 3, 2020, from the July lows as follows:

- First-Class Single Piece improved from 79.7 to 86.8 (7.1 percentage points) but was still below the target of 96.

- First-Class Presort improved from 82.9 to 88.6 (5.7 percentage points) but was still below the target of 96.

- First-Class Packages improved from ▮▮▮ to ▮▮▮▮ percentage points) ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Priority Mail improved from ▮▮▮ to ▮▮ ▮▮ percentage points) ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

According to Postal Service officials, the service impacts caused by the operational changes were temporary and will not impact election mail for the upcoming 2020 election. The Postal Service has established processes for handling election mail and efforts have been ongoing to train and prepare their employees on the Election Mail policies and procedures. Training includes proper postmarking, proper handling and processing, and recognition and use of Tag 191, which identifies ballots. The Postal Service is now also subject to preliminary orders from at least four federal district courts imposing additional requirements on the handling of election mail.

---

24  See 5 CFR § 2634.605(b)(6).
25  See 5 CFR § 2634.605(b)(2).

On August 18, 2020, the Postmaster General announced that he would cease removal and reconfiguration of mail processing equipment and postpone collection box removals, until after the 2020 election, to avoid the appearance of any impact on election mail. The Expedited Street Afternoon Sortation pilot in Delivery Operations was also cancelled on the same day.

However, the sharp drop in service performance in July 2020, lack of transparency over operational changes, and uncertainty about future operational performance have resulted in litigation in multiple states and concerns from the American public about the reliability of mail delivery. In addition, the future Business Plan being developed by the Postmaster General to transform the Postal Service may face additional scrutiny and skepticism by Congress and other stakeholders, which could impact the ability of some of those strategies to be implemented.

## Postal Service's Comments

The Board of Governors (Board) agreed with our evaluation of the requirements for an advisory opinion from the PRC and our conclusion regarding the Postmaster General's ethical requirements. However, the Board did not agree with a number of conclusions in our report, including the characterization of the initiatives, the impact of the Postmaster General's organization and transportation changes, and the Postal Service's need to communicate recent changes to Congress. The Board also disagreed with our conclusion regarding the authority of the PRC. Specifically, their response asserted:

- The initiatives were not strategic or transformational in nature, either individually or collectively. Instead, they noted the tactics and measures are pursued every year during July and August in an effort to meet the annual financial plan and pre-date Postmaster General DeJoy. In addition, the Chief Operating Officer did not recall characterizing these initiatives as transformational, as noted in our report, but rather part of an annual process.

- The report conflates the Postmaster General's foundational changes of on-time transportation and the organizational restructure with the ordinary July/August operational actions, improperly suggesting that these combined efforts caused service issues. The Postmaster General has acknowledged the emphasis on conforming to transportation schedules revealed a disconnect

between the mail processing machine schedules and transportation schedules, which resulted in service issues that should not have occurred.

- The responsibility to provide accurate information to Congress and its members is taken very seriously. However, since they viewed the initiatives as routine they do not believe the Postal Service needed to include them in their Congressional responses.

- The report incorrectly concludes that the PRC's authority does not provide a robust check on Postal Service actions. The Board noted that the Postal Service's managerial flexibility would be substantially, if not entirely, curtailed if the Postal Service's actions to reduce costs and improve efficiency were subject to "before-the-fact review."

See Appendix G for Postal Service's comments in their entirety.

## Evaluation of Postal Service's Comments

The OIG appreciates the Board's perspective and timely response to our report. Regarding the characterization of the operational initiatives as transformational, we stand by our conclusion that the collective impact of these changes resulted in service degradation. As noted in our report, a focus on transportation was included in both the Postmaster General's initiatives and the operational initiatives. While we recognize that there were annual initiatives to reduce costs, those from previous years were not deployed with the same speed and consistency as those in June and July 2020. Further, given the challenges resulting from the COVID-19 pandemic, including reduced employee availability, increased package volume, and a heightened focus on voting by mail, these operational initiatives should have been analyzed and evaluated ahead of deployment to fully understand the impact of implementation.

Regarding the Postal Service's communication with Members of Congress, we continue to believe that the Postal Service should have provided more complete information to promote transparency and understanding of Postal Service operations. Lastly, we recognize the disagreement we have regarding the intent of the PRC's role, but stand by our conclusion that the PRC's inherent role does not provide a robust check on the Postal Service's actions.

# Appendices

Click on the appendix title below to
navigate to the section content.

Appendix A: Additional Information ........................................................................26

    Scope and Methodology...........................................................................26

    Prior Audit Coverage...............................................................................27

Appendix B: Customer Service and Delivery Operations Flowchart........................28

Appendix C: "Do It Now FY Strategies" ..................................................................29

Appendix D: Total Mail Volume ..............................................................................32

Appendix E: Delayed Mail ......................................................................................33

Appendix F: Schedule of Congressional Inquiries/Requests ...................................34

Appendix G: Postal Service's Comments.................................................................35

# Appendix A: Additional Information

## Scope and Methodology

Our scope of this was a nationwide review of the impact of Postal Service operational changes made from June 15, 2020 to September 3, 2020 on mail delivery services. In addition, this review responds to multiple requests from members of Congress with concerns that modifications to the Postal Service staffing and policies put in place by Postmaster General Louis DeJoy have had an adverse effect on Postal Service operations that have led to slower and less reliable delivery (see Appendix F). To perform this review we:

- Interviewed Postal Service officials responsible for the development and implementation of the Postmaster General strategic initiatives and the 57 "Do It Now FY Strategies" and reviewed documentation related to them to obtain a better understanding of their development, implementation, rationale, and communication of these strategies.

- Obtained and analyzed FY 2020 Postal Service Collection Box removal data from the Postal Service Collection Point Management System and reviewed documentation related to the removals.

- Obtained and analyzed reductions in mail sorting equipment from the Mail and Image Reporting System, reviewed documentation related to the removals, and interviewed Headquarters Processing Operations officials.

- Analyzed service performance nationwide for Priority Mail, First-Class single piece, First-Class presort, First-Class package, and Parcel Select mail classes to determine how service performance has trended since the recent Postmaster General operational plans were implemented.

- Reviewed Transportation, Customer Service, and Delivery Operations measures nationwide, including but not limited to:

  - Customer Complaints (eCC/C360)

  - Mail Volume

  - Informed Delivery

- Distribution Uptime (DUT)

- Delayed Mail in Plants

- Delayed Mail in Units

- PVS Late & Extra Trips

- Last Mile Failures

- Employee Availability

- Judgmentally selected sample sites by analyzing service performance metrics for Last Mile Failure rates from March 7, 2020 – August 8, 2020, and delayed mail in the Customer Service Daily Reporting System from July 2020.

- Conducted site visits at thirteen selected delivery units and P&DCs nationwide to identify the causality of service impacts due to the new operational changes put in place by Postmaster General DeJoy. Specifically, we observed and conducted interviews with delivery unit and P&DC management, to determine the operational changes made by the Postal Service and the impacts on mail delivery service.

- Conducting a test mailing of 300 Certified Mail First-Class letters, Priority Mail envelopes, and First-Class letters. The mailings all originated from Upper Marlboro, MD. 20772, and were sent to 21 states and Puerto Rico. The mailings included ZIP Code zones 1 through 8.

- Reviewed applicable laws, regulations, policies, and procedures related to the Postal Service operational changes, to determine if the implementation was consistent with the Postal Service's internal policies and procedures and applicable legal requirements, including requirements governing consultation with the PRC and postal employees and customers.

- Reviewed correspondence and documentation sent to Congress related to the operational changes made by the Postal Service to verify the accuracy and completeness of the response provided.

- Interviewed representatives from labor unions.

We conducted this review from August through October 2020, in accordance with the Council of the Inspectors General on Integrity and Efficiency, *Quality Standards for Inspection and Evaluation*. We shared our observations and conclusions with management on September 23, 2020, and included their comments where appropriate.

We assessed the reliability of any computer-generated data for the purposes of this report and found it generally reliable. Specifically, we assessed the reliability of eFlash, C360, Customer Service Daily Reporting System (CSDRS), Informed Visibility, SV, Scan Point Management System, and EDW by performing logical tests of these system's data by identifying duplicates to ensure no entity existed more than once within the data, except when intended, looked for data conflicts, or non-compliance with pre-defined data constraints, checked totals compared to previous representative time periods, and looked for gaps in fields where we would expect sequential ordering.

## Prior Audit Coverage

| Report Title | Objective | Report Number | Final Report Date | Monetary Impact |
|---|---|---|---|---|
| *Processing Readiness of Election and Political Mail During the 2020 General Elections* | Evaluate the U.S. Postal Service's readiness for timely processing of Election and Political Mail for the 2020 general elections. | 20-225-R20 | 8/31/2020 | $0 |
| *Assessment of Overtime Activity* | Assess U.S. Postal Service controls over managing overtime. | 20-209-R20 | 8/25/2020 | $667,098,942 |
| *U.S. Postal Service's Processing Network Optimization and Service Impacts* | Determine if the U.S. Postal Service's processing network is operating at optimal efficiency and meeting service standards. | 19XG013NO000-R20 | 6/16/2020 | $385,597,500 |
| *Transportation Network Optimization and Service Performance* | Assess opportunities to optimize the U.S. Postal Service's transportation network and meet service performance goals. | 20-144-R20 | 6/05/2020 | $199,558,680 |
| *Assessment of the U.S. Postal Service's Service Performance and Costs* | Analyze service performance and cost trends of the Postal Service over the last five years. | NO-AR-19-008 | 9/17/2019 | $0 |

# Appendix B: Customer Service and Delivery Operations Flowchart

## Mail Flow from Plant to Delivery



**LEGEND**

**AAU** - Arrival at Unit
**ADUS** - Automated Delivery Unit Sorters
**DSS** - Delivery Schemeless Sortation
**IMD** - Intelligent Mail Device
**MDD** - Mobile Delivery Devices
**Pass** - Passive Adaptive Scanning System

Source: OIG created.

# Appendix C: "Do It Now FY Strategies"

| Function | Initiative Title | Start Date | Status[26] |
|---|---|---|---|
| **Function 1 Operations - Mail Processing** | Supervision: Achieve Earn Hours Mail Processing Variance (MPV) | 7/20/2020 | Ongoing |
| | Automated Distribution Letters and Flats: Eliminate Saturday 918 in Applicable Plants[27] | 7/20/2020 | Implemented |
| | Mechanized Distribution Letters and Flats: Eliminate Saturday Carrier Route (CRRT) Flats | 7/20/2020 | Implemented |
| | Mechanized Distribution Other: ███ Universal Sorting System (USS) Operations | 7/20/2020 | Ongoing |
| | Manual Distribution: Manual Letter Case Reduction | 7/20/2020 | Suspended |
| | Manual Distribution: Manual Flat Case Reduction | 7/20/2020 | Suspended |
| | Mail Processing Other Direct Operations: Improve Transportation SweepSide Assignment (TSA) Printer Usage | 7/20/2020 | Ongoing |
| | Tour turnover Agreement at Miami International Service Center (MIA ISC) | 7/20/2020 | Ongoing |
| | Improve Automated Guided Vehicle (AGV) utilization | 7/21/2020 | Ongoing |
| **Function 2A Operations - Delivery Services, Rural Delivery** | Office - Address Rural Carriers Assistant Starting Time | 7/23/2020 | Ongoing |
| | Office - Set Leave Time For The Street Expectations | 7/23/2020 | Ongoing |
| | Office - Manage New Employees For First 10 Weeks | 7/23/2020 | Ongoing |
| | Street - Appropriately Assigning Auxiliary Assistance | 7/23/2020 | Ongoing |
| | Street - Review Delivery Management System For Stationary Events | 7/22/2020 | Ongoing |
| | ███ - Rural Carrier Assistant Start Time | 7/20/2020 | Ongoing |
| | ███ - Management Expectations For ███ | 7/20/2020 | Ongoing |
| | Office - Require Delivery Point Sequence To The Street | 7/27/2020 | Ongoing |
| | ████████████ | 7/22/2020 | Ongoing |
| | Street - Reduction In Rural Miles Leveraging Technology | 7/22/2020 | Just Starting |
| | ████████████ | 7/22/2020 | Ongoing |

26  This column reflects the status of Functions 1 and 3 initiatives as of September 18, 2020, and Functions 2 and 4 initiatives as of September 21, 2020.
27  The project plan actions were intended for those sites that had not implemented yet. Any further implementations were put on hold with the PMG's announcement on August 18.

| Function | Initiative Title | Start Date | Status |
|---|---|---|---|
| **Function 2B Operations - Delivery Services, City Delivery** | District Approval - 8 Hours - 40 Hours | 7/20/2020 | Suspended |
| | Start Times No Earlier < 30 Minutes Of Distribution Uptime | 7/20/2020 | Ongoing |
| | Eliminate Pre-tour Overtime | 7/22/2020 | Ongoing |
| | Postal Form 1813- Leave Time Expectation | 7/22/2020 | Ongoing |
| | Office Efficiency Indicator Daily Target | 7/20/2020 | Ongoing |
| | Tracking Loading Time | 7/22/2020 | Ongoing |
| | Daily Stationary Time – Employees Discussion | 8/5/2020 | Ongoing |
| | ████████████████████████ | 7/20/2020 | Ongoing |
| | ██████ - Management Expectation | 7/20/2020 | Ongoing |
| | 60-Day FY 2020 Strategies | 7/21/2020 | Ongoing |
| **Function 3A Operations - Vehicle Services** | Complement - Hire to Authorized | 7/13/2020 | Ongoing |
| | Phase 2 Strategies FY 2020 | 8/24/2020 | Ongoing |
| | Complement - Utilize Flexible Work (i.e., Part-time flexible (PTFs)) | 7/20/2020 | Ongoing |
| | Utilization - Eliminate Unauthorized Extras[28] | 7/13/2020 | Suspended |
| | Utilization - Eliminate Underutilized Trips | 6/11/2020 | Suspended |
| | Utilization - Eliminate Late Trips | 7/13/2020 | Suspended |
| | Utilization - Eliminate Underutilized Lease Trailers | 7/13/2020 | Suspended |
| | Utilization - Review Spotter Schedules | 7/20/2020 | Suspended |

---

28  The Postal Service noted the utilization projects have not had any further activity since the re-organization announcement on August 7.

| Function | Initiative Title | Start Date | Status |
|---|---|---|---|
| **Function 3B Operations - Plant & Maintenance Equipment** | Inventory Savings From Reduced Equipment Sets | 7/22/2020 | Suspended |
| | Utilities Savings From Reduced Equipment Sets | 7/20/2020 | Suspended |
| | Phase 2 Strategies FY 20 / Update EAS Staffing – (Maintenance Supervisor) (Work with Org Design) and Craft Staffing | 7/22/2020 | Suspended |
| | Phase 2 Strategies FY 20 / Office - (Maintenance Series Handbook MS-1) Savings – Reduced Staffing Levels | 7/22/2020 | Suspended |
| **Function 4 Operations - Customer Services** | Match Earned vs. Scheduled vs. Actual | 7/22/2020 | Ongoing |
| | Higher Level Approval With District Manager For Non Scheduled Day | 7/22/2020 | Ongoing |
| | Match Schedule To First Truck (Within 15 Mins) | 7/22/2020 | Ongoing |
| | ███ Parcel Distribution – ███████████ | 7/22/2020 | Ongoing |
| | ███ Productivity | 7/22/2020 | Ongoing |
| | Retail - Match Schedule Earned vs. Scheduled vs. Actual | 7/22/2020 | Ongoing |
| | Retail - Add/Expand Lunch Breaks Based on Workload | 7/22/2020 | Ongoing |
| | Small Offices - Level 18 Postmaster– Perform Up to 15 Hours/Week Clerk Work | 7/20/2020 | Ongoing |
| | Small Offices - Add/Expand Lunch Breaks Based on Workload | 7/22/2020 | Ongoing |
| | Align Bids Jobs With Customer Service Variance Earned Workhours | 7/22/2020 | Ongoing |
| | Increase Delivery Point Sequence Percent - Reduce Manual Mail - Station Input | 8/14/2020 | Ongoing |
| | Eliminate Pre-Tour Overtime (Delivery) | 8/14/2020 | Ongoing |
| | New Employees Process Parcels | 8/14/2020 | Suspended |
| | Align Retail Workhours to Customer Demand/Reduce Full Window Service/Split Work Week | 8/14/2020 | Ongoing |
| | Align Retail Workhours to Customer Demand/Conduct Modified Level 2 Reviews and Complete Actions From Reviews | 8/14/2020 | Ongoing |

Source: OIG created.

# Appendix D: Total Mail Volume

**Total Letter and Flat Volume Compared to Employee Availability**



Source: OIG analysis data obtained from eFlash and EDW.

**Total Package Volume Compared to Employee Availability**



Source: OIG analysis data obtained from eFlash and EDW.

# Appendix E: Delayed Mail

**Nationwide Delayed Mail at Post Offices, Stations, and Other Facilities**



Source: OIG analysis data obtained from the CSDRS.

# Appendix F: Schedule of Congressional Inquiries/Requests

| Members | Date | Issues |
|---|---|---|
| **Senator Elizabeth Warren (MA)**<br>**Senator Gary C. Peters (MI)**<br>**Senator Thomas R. Carper (DE)**<br>**Senator Ron Wyden (OR)**<br>**Senator Tina Smith (MN)**<br>**Chairwoman Carolyn Maloney (NY), House Committee on Oversight and Reform**<br>**Representative Stephen F. Lynch (MA)**<br>**Representative Gerald E. Connolly (VA)**<br>**Representative Brenda Lawrence (MI)** | 8/7/2020 | Request for the OIG to conduct an audit of all operational changes, including modifications to staffing and policies, put in place by Postmaster General Louis DeJoy and their effects on Postal Service operations. It includes examining the financial holdings of the Postmaster General for potential conflicts of interest. |
| **Representative Bill Pascrell, Jr. (NJ)** | 8/12/2020 | Request for the OIG to examine whether operational changes made by the Postal Service are in contravention of the Universal Service Obligation to maintain timely delivery of mail. |
| **Representative Gerald E. Connolly (VA)** | 8/13/2020 | Request for the OIG to review organizational and operational changes in the Postal Service to ensure the Postmaster General has complied with all statutory, regulatory, and administrative processes. |
| **Representative Lisa Blunt Rochester (DE)**<br>**Representative Brendan F. Boyle (PA)**<br>**Representative Rashida Tlaib (MI)**<br>**and 73 other House Members** | 8/21/2020 | Request for the OIG to investigate the operational and organizational changes made by Postmaster General DeJoy as well as the severe mail delays that have impacted millions of Americans. |
| **Representative Chris Pappas (NH)** | 8/21/2020 | Request for the OIG to investigate the decommissioning, sale, and destruction of mail sorting machines. |
| **Senator Tammy Duckworth (IL)** | 8/21/2020 | Request for the OIG to investigate whether Postmaster General DeJoy and the Postal Service complied with relevant statutory, regulatory, and administrative processes in making operational and service changes. |

Source: OIG created.

# Appendix G: Postal Service's Comments



**BOARD OF GOVERNORS**

October 15, 2020

JOSEPH WOLSKI
DIRECTOR, AUDIT OPERATIONS

SUBJECT:  Operational Changes to Mail Delivery
            (Project Number 20-292-DRAFT)

Thank you for the opportunity to review and comment on your report entitled:  Operational Changes to Mail Delivery - Project Number 20-292-DRAFT, and for your ongoing efforts to help the Postal Service to improve our operations.

We understand that you will be issuing a separate report to postal management that will contain your particular recommendations, and for that reason we will defer to postal management to address the specifics of that report and its recommendations.  That said, because we have concerns about a number of the conclusions that you reach, we offer the following comments on selected areas of your report.

- As an initial matter, we do not agree with the premise that underlies your report that the initiatives you reviewed are strategic in nature, or that they are "transformational" to postal operations, either individually or collectively.  Instead, in our view the items you reviewed are essentially the tactics and measures that the Postal Service pursues every year during July and August as part of its normal "blocking and tackling."  This is an effort to meet the annual financial plan and to adjust to the perennial declines in mail volume.  The efforts this year are similar to efforts that the Postal Service pursued over the last number of years during similar timeframes, and predate the selection of Louis DeJoy as the Postmaster General.  We also note that the Chief Operating Officer does not recall making the comment that is attributed to him.  To the contrary, rather than being transformational, he considered the operational items referenced in your report to be a product of the annual process that Operations pursues every year, as reflected in the letter that he signed and sent to Lazerick Poland on September 28, 2020.

- Further, while the report correctly states that Postmaster General DeJoy emphasized on July 10 that trucks should conform to the existing transportation schedules, and announced on August 7 an organizational restructuring plan, the report conflates those two foundational changes with the ordinary July/August operational actions to inappropriately suggest that the combined efforts caused service issues.  The Postmaster General has acknowledged that his emphasis on conforming to the transportation schedules revealed a disconnect between the processing machine schedules and the transportation schedules that resulted in service issues that should not have occurred, and that are being resolved.  We do not believe, however, that you have demonstrated that the more mundane tasks which are the subject of your report contributed to those service issues in any way.

UNITED STATES POSTAL SERVICE
475 L'ENFANT PLAZA SW ROOM 10300
WASHINGTON DC 20260-1000
usps.com

- 2 –

- The Board of Governors takes very seriously the responsibility of the Postal Service to provide accurate information to Congress and its members in an appropriate fashion. We believe the Postal Service did so here. In our view the conclusion in the report is circular in nature, because the report assumes that the tactics that you reviewed were transformational. The Postal Service, however, did not agree with that assumption, but instead viewed them as routine, ongoing matters. The Board has reached the same conclusion. The Postal Service concluded that under such circumstances there was no reason to include routine operational actions in its Congressional responses, and that conclusion seems eminently reasonable.

- Regarding the PRC, while we agree with your conclusion that the Postal Service was not required to seek an advisory opinion from the Postal Regulatory Commission before pursuing any of these efficiency measures, we firmly disagree with your conclusion that the PRC's authority "does not provide a robust check on Postal Service actions." As postal management has articulated to you, the Postal Service's ability to achieve our statutory mission of providing prompt, reliable, and efficient universal postal services in a self-sustaining manner depends fundamentally on Postal Service management continually undertaking efforts to reduce costs and improve efficiency (as well as to grow revenue and improve service). The purpose of such routine continuous improvement efforts that you reviewed here is to enhance efficiency while continuing to meet the Postal Service's service standards. If such efforts were subject to before-the-fact review, because of the possibility that implementation problems could arise that result in a temporary impact on the Postal Service service levels before those problems could be corrected, then the Postal Service's managerial flexibility would be substantially, if not entirely, curtailed. The need for such flexibility is a key reason why Congress limited the advisory opinion process to only Postal Service initiatives that are designed to have a nationwide or substantially nationwide impact on the service received by customers. There are ample "checks" on the Postal Service's actions, as evidenced by the numerous sources of oversight over Postal Service management, including from OIG itself.

We are pleased that your report confirms that PMG DeJoy met all ethical requirements concerning his position as PMG.

We appreciate again the opportunity to review your report and to provide these comments, which we hope will be received in the constructive spirit in which they are offered. To the extent you have any questions or concerns, or if a further dialogue would be useful, please do not hesitate to give me a call.

*Robert M. Duncan*

Robert M. Duncan
Chairman

cc:  Manager, Corporate Audit Response Management

**OFFICE OF**

# INSPECTOR GENERAL

**UNITED STATES POSTAL SERVICE**

Contact us via our Hotline and FOIA forms.
Follow us on social networks.
Stay informed.

1735 North Lynn Street
Arlington, VA  22209-2020
(703) 248-2100

For media inquiries, contact Agapi Doulaveris
Telephone: 703-248-2286
adoulaveris@uspsoig.gov