UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman, and Rebecca Rieckhoff, *individually, and on behalf of all others similarly situated,*<br><br>       Plaintiffs,<br><br>v.<br><br>United States Postal Service, Louis DeJoy, as Postmaster General of the United States Postal Service, and Donald J. Trump, as President of the United States,<br><br>       Defendants. | No 20 Civ. 6516 (VM) |

**DECLARATION OF ROBERT CINTRON**

1

I, Robert Cintron, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, state as follows:

1. I am currently employed by the United States Postal Service as Vice President Logistics at Postal Service Headquarters in Washington, D.C.

2. I have worked for the Postal Service for 35 years, six months, mostly in operations. I began in the Northeast Area, where I served in management positions in facilities, including Manager of In-Plant support for the Northeast Area and District Manager in Western Pennsylvania. I began working at Postal Service Headquarters approximately seven years ago, serving as Vice President Product Information, Vice President Enterprise Analytics, and Vice President Network Operations, where I was responsible for both mail processing operations and the logistics organization. When those two functions were separated, I became Vice President Logistics, the position I occupied both prior to and after Louis DeJoy's appointment to the position of Postmaster General of the United States.

3. I am familiar with the complaint in this matter and plaintiffs' claims therein. This declaration is based on my personal knowledge, as well as information conveyed to me by other knowledgeable Postal Service personnel in the course of my official duties and responsibilities, including oversight of nationwide transportation schedules and mail processing operations.

4. The Postal Service operates 24 hours a day through an integrated network of retail and delivery functions (performed by facilities such as post offices and station branches), processing and distribution functions (performed by processing and distribution centers), and transportation functions (largely via ground and air transportation contractors). All

2

of these functions have operating plans and transportation schedules that work together to timely deliver mail throughout the nation.

5. The Postal Service has over 31,000 retail post offices, over 230,000 delivery routes, and approximately 289 processing facilities. We deliver to approximately 160 million residences and businesses six days per week.

6. Attached as Exhibit 1 to this Declaration is a PowerPoint slide that provides a simple overview of the complex 24-hour flow of ingoing and outgoing mail, which travels through delivery units and processing and distributions centers at scheduled time periods, and between all facilities by means of trucks (including large highway tractor trailers) and airplanes. These operations enable the public to visit post offices, retail units, and other facilities to deposit or pick up mail, and to send and receive mail that letter carriers pick up and deliver to and from residences, businesses, and collection boxes throughout the nation.

7. The Postal Service's current operating plan has been in place for years prior to 2020 and has had no recent nationwide adjustments. The plan is designed to ensure that mail is timely and efficiently delivered according to the Postal Service's established service standards.

8. Service standards reflect the time a mailpiece or package is expected to take from origin to destination. The standard varies according to the class of mail (e.g., First-Class, Standard Mail) and the distance traveled. The service standards for the Postal Service's Market Dominant Products (including First-Class Mail, Marketing Mail, and periodicals) are set forth in 39 C.F.R. Part 121.

9. The daily cycle of U.S. mail has an originating mail flow and a destination mail flow. In the originating mail flow, mail is collected from carriers, retail delivery units, and customers, and mail is entered from our customers at processing facilities. This mail is then processed and transported by ground or air transportation to the rest of the nation. It becomes part of the destination mail flow, along with mail that is entered by customers, to the destination processing facilities. The mail is then processed and transported to the delivery units serviced from the processing facility.

10. At originating processing facilities, mail is sorted to 3-digit ZIP Codes, then packaged and transported to delivery units within that area or to the appropriate destination and processing distribution centers. At destination facilities, mail is sorted to 5-digit and 11-digit Zip Code addresses and packaged for transportation to delivery units. Letter volumes that are transported to delivery units are mostly ready to go directly to the carrier for delivery. At the delivery unit, clerks sort packages to the carriers' routes, and carriers sort mail according to addresses for delivery on their designated routes.

11. The Postal Service has long had established schedules for all stages of mail processing, customer service, retail, delivery, and transportation throughout the nation, which are designed to operate in alignment. All schedules are distributed to Postal Service employees via signage in facilities, logistic transportation systems, and electronic scanners utilized by our employees.

12. Delivery schedules have long been built around the Postal Service's operating plan to ensure that mail is timely transported from collection points to mail processing facilities and distribution facilities, and from there to delivery units, in compliance with service standards. For example, facilities have established schedules for when carriers leave

4

delivery units to deliver mail and return to the facility with collected mail. Mail processing facilities have established schedules for when they are to begin processing mail and for when mail that processing is be completed and containers filled with sorted mail are loaded onto trucks.

13. Transportation schedules must mesh with facilities' schedules in order to consistently meet service standards. Truck schedules are aligned to make sure all connections are made timely to adhere to the operating plan of each of the network's nodes.

14. Noncompliance with transportation schedules presents a risk of mail delay. In other words, if trucks do not arrive at a facility in time to load all incoming mail scheduled for that day and to then depart on time, they may arrive late to the next destination, which could be another processing and distribution center, a delivery unit, or an airport. The mail may miss a flight to a destination processing and distribution center and arrive later than the scheduled time for the destination center's processing. If mail arrives too late to a delivery unit, it may interfere with the facility's schedule for additional sorting or casing, delaying or missing the carriers' departure and causing customers to receive their mail later than planned.

15. The transportation network connects the movement of mail among all delivery units, processing and distribution centers, and surface transportation centers. The transportation network is comprised of USPS-owned vehicles, air logistics contractors, and surface logistics contractors, all which also have operating plans.

16. The Postal Service has annual costs of over $1.5 billion for negotiated agreements with its top five surface transportation contractors. The contracts require the contractors to transport mail according to specific schedules and service levels and provide for the

5

contractor's submission of charges for extra trips not contemplated by the contractual transportation schedule and for late charges, i.e., extra time outside the schedule that trucks have to wait for mail processing and loading to be completed.

17. The Postal Service also has contracts with rail and commercial air carriers; contracts with terminal handling services that tender mail to our air contractors; and contracts with surface transfer centers that have a cross-dock operation in our surface network cargo carriers.

18. The Postal Service operates approximately 68,000 truck trips a day. We move approximately 5.5 million pounds of mail a week on the air networks.

19. Adherence to delivery schedules has long been a priority of the Postal Service in order to comply with service standards and to improve cost efficiency. The Postal Service incurs unnecessary costs when trucks do not leave on time. When they arrive late to a processing facility, for example, that facility may have to use extra work hours to complete the processing, thus incurring overtime costs. Trucks scheduled for transportation from the processing and distribution center may have to wait for processing to be completed, causing the trucking company to charge the Postal Service the late or retention charges they are due under their contracts. Last year for example, the Postal Service incurred $15 million in late charges and $258 million in extra service.

20. During the past two years Postal Service Logistics operations has been focused on controlling these costs, working with the operations teams to improve efficiencies in the network.

21. Based on my experience overseeing mail processing and logistics, for years I have known that ineffective management of transportation services in numerous facilities was often

6

the cause of distribution and processing centers' and other facilities' inability to consistently adhere to transportation schedules and to limit unnecessary trucking costs. About two years ago, because noncompliance with transportation schedules was ongoing, causing late deliveries and unnecessary costs, I began an initiative to improve compliance with the Postal Service's long-established delivery schedules throughout the network with the goal of consistently adhering to existing service standards and the Postal Service's operating plan, with a focus on adhering to the transportation schedules.

22. To implement this initiative, Headquarters operations, including my office and I, participated in biweekly "Learn and Grow" meetings with all executives in the field, including Area Vice Presidents, district managers, and plant managers, to discuss operating issues and address any noncompliance with transportation schedules. On the intervening weeks, I participated in biweekly operational conferences with the Area Vice Presidents to address compliance with our operating plan, including the transportation network's schedules. I have continued participating in these meetings to date, including before and after Postmaster General Louis DeJoy took office in June 2020.

23. After June 15, 2020, I attended numerous meetings with the Postmaster General and other postal executives to discuss postal operations. Noncompliance with transportation schedules was one of many topics discussed. Postmaster General DeJoy advised that management should continue its efforts to comply with the operation plan that is in place and emphasized that adhering to transportation schedules was essential to improve service performance and improve cost efficiency with the existing operation plan. For example, currently, the surface transportation network operates at a utilization rate of

7

only approximately 40%. Simply stated, too many trucks are transporting too little volume per truck.

24. Therefore, in July 2020, in order to renew our focus on compliance with transportation schedules, my team and I developed written guidelines as to whether various circumstances presented acceptable or unacceptable reasons for scheduling extra trips. For example, where trucks in place have been fully loaded with doubled-stacked bins, but the Postal Service cannot meet service standards without an extra trip, it is acceptable to utilize an extra trip, whereas when more volume can be added to a truck that is not fully loaded, scheduling an extra trip may be unacceptable. Where a contractor's truck does not show up on time, extra or late trips may be acceptable. Identifying the circumstances causing late or extra trips provides management an opportunity to find a solution to the problem. In the latter situation, for example, the contract of a trucking company that fails to comply with its contractual schedule may have to be terminated and replaced with a more reliable contractor. The guidelines were generally consistent with past practices. A copy of the guidelines is attached as Exhibit 2 to this Declaration.[1] Postmaster General DeJoy was not involved with the development, planning, or implementation of these guidelines.

25. On July 14, 2020, I provided the guidelines to the Area Vice Presidents and advised them of Operations' renewed focus on mitigating unplanned extra transportation and advised them, to extent possible, to use under-utilized-trips, i.e., trucks less than half full, to

---

[1] I have seen a copy of a July 10, 2020 memo called "Mandatory Stand-Up Talk: All Employees," which discusses some issues relating to late and extra trips. This document includes statements relating to late and extra truck trips and other topics. It appears to be a locally prepared document. It was not prepared, reviewed, or approved by Headquarters, and does not represent official Postal Service guidance or direction. For example, Headquarters did not ban all overtime or all extra or late trips.

reduce or eliminate extra trips. My email transmitting the guidelines included reminders of major goals that I discussed with the Areas, including that trucks must depart on time. I did not direct any field managers never to use extra trips, to let trucks leave on time even if it meant that mail scheduled to be delivered that day was left behind, or to prevent all late and extra trips under any circumstances, as was clear from our discussions.

26. During the following week, compliance with transportation schedules improved, but there was a temporary decline in meeting service standards, i.e., delivery of some mail was delayed so that it was not delivered within the times set by service standards, due to the need to adjust other parts of the mail flow. Management began efforts to correct the decline through focusing on meeting mail processing and delivery schedules, conducting a root cause analysis of why some mail was not timely being loaded on trucks, and identifying corrective measures to improve these issues.

27. Compliance with transportation schedules has improved during the past five or more weeks and service performance is also improving. Service performance data through August 26, 2020, shows that service performance is rapidly returning to early July levels. Charts detailing the improvement in compliance with both transportation schedules and service performance standards in recent weeks are including in the presentation provided to Congress on August 31, 2020. See https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf.

28. To the best of my knowledge, either before or after June 15, 2020, no one at Postal Service Headquarters directed that extra or late trips would never be permitted under any circumstances or that trucks should leave mail at the processing facility. In fact, the guidelines we developed provided a way to document the authorized use of extra trips.

9

Nor did the Postmaster General or Headquarters direct that overtime hours were not permitted or were curtailed. On August 18, 2020, Postmaster General DeJoy announced that Headquarters would engage standby resources in all areas of operations, including transportation, to ensure prompt and efficient mail service for the November election.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Washington, DC on this 8 day of September 2020.

_____
Robert Cintron



**Keys to Success for Elimination of Extras and Lates**

- TSA Printer must be activated this week
- Use of SV is imperative
- Double Stacking is a requirement when bulking out
- Repurpose underutilized afternoon DU runs to pickup mailer volume

| Extra Trip Reasons: |
|---|
| Late FedEx Flight |
| Extra Flight due to Mitigation |
| THS Pickup |
| Current Customer Pickup |
| New Customer |
| THS Drop |
| Late Break at THS |
| Regularly Scheduled Network Extra |
| DRO |
| Unplanned Excess Volume |
| Contractor Omitted Service |
| Contractor Late trip |
| Driver health Emergency |
| Contingency Planned Offloads |
| ISC Offloads |
| Emergency (civil unrest, Covid related, weather) |
| Sunday Transportation |

| |
|---|
| Directs via the STC |
| MTE |
| Parcel returns |
| STC |

| Decision Point | If Yes | If No |
|---|---|---|
| Can it be processed in time to meet service | Acceptable | Not Acceptable |
| Was extra flight authorized by HQ | Acceptable | Not Acceptable |
| Normal Flight - Scheduled | Acceptable | Not Acceptable |
| Is it a scheduled trip | Acceptable | Not Acceptable |
| Must be approved through HQ | Acceptable | Not Acceptable |
| Should be scheduled - not an extra | Acceptable | Not Acceptable |
| HQ Notification- Can we make service | Acceptable | Not Acceptable |
| Requires HQ approval | See notes | See notes |
| Are you RPGs and volume aligned properly | See notes | See notes |
| Will you make service and is the last service responsive trip Double stacked | Acceptable | Not Acceptable |
| Did the contractor fail to run the trip | Acceptable | Not Acceptable |
| Can service be achieved | See notes | See notes |
| Will this cause regular trip to not run | Acceptable | Not Acceptable |
| Are these trips approved by Area | Acceptable | Not Acceptable |
| Are current trips being fully utilized | Acceptable | Not Acceptable |
| Notify/Approval from NOCC | Acceptable | Not Acceptable |
| Bulk out expected on Monday, Trips on both days will be fully utilized | Acceptable | Not Acceptable |

| | | |
|---|---|---|
| Extra or regular service to move directs to the STC - Requires HQ approval - STO | Acceptable | Not Acceptable |
| Have 48 postions been loaded on the trailer | Acceptable | Not Acceptable |
| Requires HQ approval | Acceptable | Not Acceptable |
| Same as the Plants | See notes | See notes |

| Note |
|---|
|  |
|  |
| THS runs should be scheduled and aligned properly to arrival - should not be extra service |
| Must be fully utilized |
| Must be utilized , deviation first |
| SV will be utilized to determine if the extra is allowable, Operating plan must be met |
| Normal Trip should be held and run late.  Late trip for this reason is authorized. |
| Consult with HQ Surface Operations to set up regular trip and find offsetting cuts |
| Ensure RPGs reflect actual processing times and volumes.  Adjust last trip to current processing capabilities |
| SV will be utilized to determine if the extra is allowable, Operating plan must be met |
| will it be service responsive , if not can it be combined the following day |
| Extra only if service can be made and if the late will not be service responsive |
| Notify HQ NOCC |
| Should be part  of mitigation |
| Notify HQ operations |
| Notify HQ NOCC/STO |
| SV will be utilized,  if you run Sunday , must eliminate Monday unless SV supports bulk out |

| |
|---|
| Directs must not be moved to the STC , trip should be double stacked and dispatched from origin |
| Requires HQ Approval, trips to the MTESC must follow SOP - 48 scans |
| Request approval, we should not be running transportation for returns unless we have it in an NSA |
| Same rules as above apply |