UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman, and Rebecca Rieckhoff, *individually, and on behalf of all others similarly situated,*<br><br>　　Plaintiffs,<br><br>v.<br><br>United States Postal Service, Louis DeJoy, as Postmaster General of the United States Postal Service, and Donald J. Trump, as President of the United States,<br><br>　　Defendants. | No 20 Civ. 6516 (VM) |

**DECLARATION OF JOSHUA COLIN, Ph.D.**

I, Dr. Joshua Colin, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, hereby declare as follows:

1. I am currently employed by the Postal Service as Vice President, Delivery Operations. In this role, I oversee national operations, initiatives, and programs pertaining to delivery. I have been with the Postal Service for 34 years, in which time I have worked as a letter carrier, supervisor, station manager, postmaster, district manager, and area vice-president. I am also part of the COVID-19 command team, leading the Postal Service's response to the pandemic.

2. I have direct and personal knowledge, through my job functions, of the Postal Service's policies and practices around overtime, delivery practices (e.g., the Expedited to Street/Afternoon Sortation pilot program and carrier park points), and operational changes due to the COVID-19. This declaration is based on my personal knowledge, as well as information conveyed to me in regular meetings by other knowledgeable Postal Service personnel in the course of my official duties and responsibilities.

**Postal Service Overtime Policies**

3. Overtime in the Postal Service is generally evaluated and authorized on the local level by supervisors and managers based on workload efficiencies. Higher-level management at the district, area and headquarters levels conduct oversight of overtime usage by communicating with facility managers about how best to use overtime efficiently and effectively. There is no Postal Service ban or cap on the amount of overtime that local supervisors and managers are permitted to approve.

4. The Postal Service has long attempted to increase efficiency and limit unnecessary overtime, including pre-tour overtime and unearned overtime, which are defined below. I

am not aware of any changes in Postal Service overtime policies or practices since Postmaster General DeJoy took office.

5. Pre-tour overtime takes place when Postal Service employees clock in before they are scheduled to start their shift. This is inefficient, as there may not always be useful work for these employees to do if they clock in early.

6. Unearned overtime is overtime that is a result of workers working below expected levels. If, for example, Postal Service data analyses indicate that a facility is expected to be able to process 50,000 pieces of mail in a particular period, and used overtime to process 70,000, that would be earned overtime. If the facility used overtime to process 30,000 pieces of mail, executive leadership or management (*e.g.*, area or district managers or postmasters) might investigate why that facility is operating inefficiently and needs overtime to do work it should be able to accomplish during its regular working hours, according to data analyses, such as the Time and Attendance Control System (TACS), which records employee hours of work and the job functions performed.

**Expedited to Street/Afternoon Sortation Pilot Program**

7. The Expedited to Street/Afternoon Sortation (ESAS) pilot program was a limited test of a new method of delivery conducted in 384 delivery units (out of a total of approximately 18,755 delivery units). The test took place from approximately July 25, 2020, until approximately August 21, 2020, when Postmaster General DeJoy ordered that the test be suspended. The delivery units that were selected to participate in the test were generally units with a high number (ten or more) of delivery routes, high overtime usage, and significant occurrence of carriers returning late from their routes.

8. Typically, when a carrier comes into work in the morning, most of the mail that carrier will deliver on the route has already been sorted into delivery point sequence by machine, but some mail will need hand sorting, or "casing" (in which the carrier or a clerk hand-places mail or packages into a case arranged by delivery point sequence). The carrier would then go out to deliver all of the mail that had been machine- and hand-sorted. This typical procedure often requires carriers to wait to receive all the day's mail from the mail processing units. Exacerbating the problem is the fact that in the last several years, package volume has increased, and there are an increased number of delivery points (addresses to which mail must be delivered).

9. Under the ESAS pilot program test, a carrier would come in, spend minimal time hand-casing the mail, deliver the mail earlier in the day, and spend the time after delivery casing mail to be delivered the next day. The primary goal of the test was to minimize the time that carriers spent doing nothing, reduce unproductive work hours, and increase efficiency. Mail would be delivered to homes and businesses earlier in the day, but, if a letter arrived at the delivery unit while a carrier was out on their route making deliveries, that piece would be delivered the next day.

10. The ESAS Pilot Program test was implemented after Postmaster General DeJoy took office, but it was already being discussed and planned before that time. The initiative came from the Vice-President of Delivery and Retail, and the Chief Operating Officer.

11. Postmaster General DeJoy ordered the test stopped on approximately August 21, 2020, and it will not resume, if at all, until after the November election. To my knowledge, the Postmaster General has not had any involvement in the ESAS Pilot Program test other than directing that it be stopped.

**Restrictions on carrier park points**

12. When carriers deliver to non-rural neighborhoods via vehicle, their route typically calls for them to drive to a location called a park point, park the vehicle, deliver to nearby houses/businesses on foot, and then return to the vehicle and drive to the next park point.

13. When planning routes, the Postal Service does analysis on route efficiency (including by using a route examination program), and tries to optimize routes so carriers are spending more time delivering the mail, and less time driving from park point to park point. There is, however, no policy creating a maximum number of park points on a route. Rather, localities have the ability to examine routes and local conditions to establish efficient park points along a route. The Postal Service's route examination practices have not been changed since Postmaster General DeJoy took office.

14. There has not been a change in national policy regarding limitations on park points since Postmaster General DeJoy took office; for example, there has been no national directive capping the permissible number of park points per route.

**Operational impact of COVID-19**

15. The COVID-19 pandemic has had operational impacts on the Postal Service throughout the country. This has created challenges to our ability to meet our service standards. As part of the COVID command team, I helped to lead the Postal Service's response to the pandemic.

16. A big part of the problem is how concentrated the COVID impact can be at particular postal facilities, even if the overall nationwide number of infected employees is relatively low. For example, if an employee in one unit or plant became infected, the available

workforce at that worksite could quickly decline. In some units, we have experienced only 50% employee availability at certain points during the pandemic. When employee availability declined significantly in certain localities, we could not process mail as fast as normal, and delays occurred.

17. The command team was established by the Postal Service to address COVID-19 issues, and to communicate with the mailing industry to keep them informed and to minimize the impact on mailers. We also worked to procure protective equipment for our employees, install screens at retail windows in post offices without them, and to address enforcement of mask requirements. We worked with our postal unions on memoranda of understanding allowing us to hire above our usual complements, which helped to compensate for our availability issues.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Washington, D.C. on this ___8th___ day of September, 2020

_____
JOSHUA COLIN, Ph.D.