```
1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
2
                       CASE NO. 20-24069-CV-SCOLA
3
  1199SEIU UNITED HEALTHCARE
4 WORKERS EAST,                            Miami, Florida

5              Plaintiff(s),
                                           October 22, 2020
6          vs.

7 Louis Dejoy, Postmaster General
  and Chief Executive Officer of the
8 United States Postal Service; and
  the UNITED STATES POSTAL SERVICE,
9
               Defendant(s).
10 ------------------------------------------------------------

11                      MOTION HEARING
              BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
12                 UNITED STATES DISTRICT JUDGE

13 APPEARANCES:

14 FOR THE PLAINTIFF(S):   David J. Bradford, Esquire
                           Daniel J. Weiss, Esquire
15                         Ashley M. Schumacher, Esquire
                           Jenner & Block, LLP
16                         353 North Clark Street
                           Chicago, Illinois 60654
17
                           Steven Art, Esquire
18                         Loevy & Loevy
                           311 North Aberdeen Street
19                         Chicago, Illinois 60607

20                         Igor Hernandez, Esquire
                           2525 Ponce de Leon Boulevard
21                         Suite 300
                           Miami, Florida 33134
22

23

24

25
```

```
 1

 2      APPEARANCES (Cont.):

 3

 4                              Jonathan Manes, Esquire
                                Roderick & Solange
 5                              MacArthur Justice Center
                                160 East Grand Avenue, Sixth Floor
 6                              Chicago, Illinois 60611

 7                              Nayiri K. Pilikyan, Esquire
                                Jenner & Block, LLP
 8                              633 West Fifth Street
                                Suite 3600
 9                              Los Angeles, California 90071

10

11      FOR THE DEFENDANT(S):   Joseph E. Borson, Esquire
                                United States Department of Justice
12                              P.O. Box 883
                                Washington, D.C. 20044
13

14

15      REPORTED BY:            Tammy Nestor, RMR, CRR
                                Official Court Reporter
16                              400 North Miami Avenue
                                Miami, Florida 33128
17                              tammy_nestor@flsd.uscourts.gov

18

19

20

21

22

23

24

25
```

```
 1   The following proceedings began at 11:01 a.m.:
 2          THE COURT:  We are here for the case of United
 3   Healthcare Workers East versus Louis Dejoy and the United
 4   States Postal Service.
 5          What I would like to do is to have one attorney for
 6   the plaintiffs identify themselves, and then they can identify
 7   all the other people that are going to be appearing today and
 8   also identify which attorney or attorneys are actually going to
 9   be speaking.  Whenever anybody speaks, please identify
10   yourself.  Even if you have spoken ten other times, identify
11   yourself before you start.
12          Who is the lawyer that is going to take the lead and
13   introduce themselves and the other attorneys?
14          MR. BRADFORD:  Good morning, Your Honor.  This is
15   David Bradford from Jenner & Block on behalf of the plaintiffs.
16   If I might introduce other members of our team, Mr. Igor
17   Hernandez, Jonthan Manes, Daniel Weiss, Ashley Schumacher,
18   Nayiri Pilikyan, and with us our client representatives
19   including Mr. Dale Ewart, executive vice president and Florida
20   regional director for the plaintiffs.  Thank you so much, Your
21   Honor.
22          THE COURT:  Can you spell the name of the
23   representative.
24          MR. BRADFORD:  Yes, sir.  It's Dale Ewart, E-W-A-R-T.
25   He is a gentleman who has also submitted a declaration in
```

1   connection with our motion.

2          THE COURT:  Thank you.

3          Who is here on behalf of the defendants?

4          MR. BORSON:  Good morning, Your Honor.  Joseph Borson

5   from the U.S. Department of Justice on behalf of all of the

6   defendants.

7          THE COURT:  Good morning.

8          So this is set for a hearing on the plaintiff's

9   request, emergency request, for an injunction.

10          Mr. Bradford, are you going to take the lead in making

11   the argument?

12          MR. BRADFORD:  Yes, I am, Your Honor.  I apologize.  I

13   failed to introduce an important member of our team which is

14   Mr. Steve Art.

15          THE COURT:  Okay.  Thank you.

16          All right.  Just as a starting point, I would like you

17   to address some of the concerns that I have.  Some of them were

18   later pointed out by the government in its response.  It seems,

19   based upon your complaint, it's generally based upon actions

20   allegedly taken by Postmaster General Dejoy that would

21   interfere with the ability of ballots to be timely counted.

22          Subsequent to those acts being publicized, many

23   lawsuits were filed and several different federal judges have

24   entered nationwide injunctions.  And as far as I understand,

25   none of those have been appealed.  No stays have been

1    requested.  In fact, the teams like the government and the post

2    office are trying to work in unison to comply with those

3    injunctions.

4          I know there are a lot of jokes about whether Florida

5    is part of the United States, but legally it is part of the

6    United States.

7          So my two concerns initially are, number one, those

8    prior injunctions have already enjoined Postmaster Dejoy and

9    the postal service from taking actions that would interfere

10   with the ballots being timely counted.  And if there are

11   already injunctions in place that apply to Florida, if there is

12   some tweaking -- and I know some or all of the judges have

13   required the parties to submit ongoing reports of the status

14   and there have been clarifications and modifications slightly

15   of those orders.

16         So if there's something about Florida, okay, that

17   isn't covered or isn't quite covered, why are we starting a new

18   litigation?  Why aren't we going back to one of those judges to

19   say, Judge, here is something that is going on in Florida that

20   we would like you to specifically address?

21         MR. BRADFORD:  Thank you, Your Honor.

22         To respond to the Court's question, our focus is, the

23   question appreciates, is the application of these nationwide

24   injunctions to the unique circumstances of Florida.  We were

25   very pleased to see the extraordinary procedure memorandum

```
 1    which issued on October 20 after our motion.  And it did

 2    address a number of concerns.  But as Your Honor can

 3    appreciate, the response to these nationwide injunctions have

 4    been nationwide responses.  There are some circumstances in

 5    Florida, particularly with the willingness of two counties but

 6    apparently not others, to implement procedures that are not

 7    burdensome and that would go a long way toward assuring that

 8    ballots will count and that there will not be

 9    disenfranchisement.

10         And we are focused, if I might address it, on some of

11    the unique circumstances in Florida.  And we are particularly

12    concerned that several of the procedures which have been

13    authorized to take place if a local official deems it

14    appropriate are purely discretionary and, in fact, have been

15    adopted in at least two counties, and that is Broward and Palm

16    Beach, but not in other counties so as to create a real

17    patchwork in Florida where your geography can be very

18    determinative whether your ballot makes it there on time even

19    though you have deposited it in the mail well in advance of the

20    deadline and completely in compliance with state law.

21         To back up to the problems that create the

22    circumstances we find ourselves in today, among the many steps

23    taken by Mr. Dejoy illegally upon his appointment in May of

24    2020 was that promptly in June of this year he started

25    directing the illegal removal of sorting machines, high speed
```

1   sorting machines.

2        As Exhibit 1 reflects, there were 59 sorting machines

3   removed from Florida, more than any state in the country other

4   than California.  That has not been remedied.  That has not

5   been repaired.

6        And, in fact, we have in Exhibit 21 an acknowledgment

7   by the postal service that they disassembled these sorting

8   machines, they took them apart, and so they can't put them back

9   in place.

10       And what has happened in Florida specifically to first

11  class mail is a dramatic decline in service standards.  The

12  service standard for first class mail is supposed to be

13  96.5 percent of that mail gets there on time per the post

14  office standard.  And through May 2 of this year, if I just

15  take the Southern Florida Postal District which is one of the

16  three large postal districts in Florida, there was always

17  90 percent and above compliance with that standard.

18       Within a month of the removal of those sorting

19  machines, that dropped to 85.21 percent on July 11.  And this

20  is all contained in Exhibit 27, Your Honor.  By July 18, it

21  went down to 77.95 percent.

22       Then we had these commitments to various courts around

23  the country that on a national basis they would begin to try to

24  remedy the situation.  But the most recent information we have,

25  which is from October 3, is that first class mail in the

1    Southern District of Florida is still only meeting the standard

2    less than 83 percent of the time.  It had never been below

3    90 percent prior to the removal of these sorting machines.

4         So we believe we still have a problem in Florida that

5    is a Florida problem.  And it's compounded by the fact that

6    Florida is one of only a number of states that has a hard

7    election deadline where it doesn't matter when you are

8    postmarked, but if it doesn't get in the hands of the election

9    officials by 7:00 p.m. on November 3, regardless if it was

10   postmarked three days earlier, it's not going to count and that

11   voter will be disenfranchised.

12        We have already requested in Florida over 5.8 million

13   ballots.  The deadline is in 48 hours.  It could be as much as

14   6 million ballots requested.  That will certainly be more than

15   50 percent of the votes cast in Florida given that there were

16   approximately 9 million plus votes cast in 2016.

17        And we know from the August primary, after these

18   machines were removed, that there was a significant level of

19   disenfranchisement and that it was an uneven level of

20   disenfranchisement based upon late delivery.

21        For example, 25 percent of the late ballots in the

22   primary, the August primary, came from Miami-Dade even though

23   it was only approximately 11 percent of the vote.  We had one

24   county where there were 1,500 votes that were in postal

25   authorities' hands apparently for days that were just never

1    handed off.

2          That's one of the concerns we have with our motion,

3    Your Honor, is the handoff.  Given the high unprecedented level

4    of vote by mail in Florida with an elderly population that

5    understandably does not want to risk their health in order to

6    exercise their most vital First Amendment right, it is critical

7    that there be specific focus on remedying this issue in

8    Florida.

9          And that's why we have come to Your Honor as opposed

10   to a Court in Washington state or elsewhere, because these are

11   unique local circumstances that we would ask Your Honor to help

12   us address.

13         And I think our ask is very simple because it's based

14   upon what has already been agreed upon in two major counties,

15   Broward and Palm Beach.  Those are two of the three largest

16   voting counties.  For whatever reason, Miami-Dade has not been

17   willing to implement those safety procedures.

18         If I might just simply explain what the procedures are

19   so that it's apparent, they are simply not burdensome.  And I

20   want to articulate these in a slightly different way than we

21   did in our order because I appreciate the affidavit that was

22   filed last night by the postal service took issue with the

23   practicality of certain of our requests.  I believe a lot of

24   that is just semantics.

25         So, for example, we requested that the post office

1    most proximate to the election office in each county have a

2    plan.

3            THE COURT:  Which paragraph number are you talking

4    about in your order?

5            MR. BRADFORD:  Certainly, Your Honor.  So this would

6    be paragraph 1.  I apologize for not flagging that.

7            In paragraph 1 of our proposed order, we ask

8    essentially that the most proximate post office to an election

9    office make a plan with that election office either for dropoff

10   or pickup.  In some counties thankfully the election officials

11   are willing to pick it up from the post office.  That obviously

12   creates extra time.  But however they arrange to do that, that

13   we not have a situation as we did in Volusia where the ballots

14   are sitting there and it's, to use the expression Alphonse and

15   Gaston, where one is waiting on the other to essentially come

16   get them or to drop them off and it never happens.

17           We use the phrase most proximate to the election

18   office.  It's been pointed out appropriately that there are

19   situations where a neighboring county's postal system might be

20   more proximate to another county's election office.  We didn't

21   mean that literally.  I understand the appropriate phrase is

22   the servicing center.

23           In other words, for every election office, there is a

24   specific post office that always is the last stop before the

25   mail or ballots are delivered to that election office.  That's

1   referred to as the servicing office for that election office.

2         And so the servicing postal facility or whomever they

3   designate simply ought to have a coordinated plan.  And that

4   ought to be reported back to the Court that they have, in fact,

5   spoken -- and the affidavit that was submitted said they have

6   spoken, but then it says they intend to make plans.

7         So I think there is an intentionality to do this.  We

8   just want to make sure that it actually happens and that there

9   is no misunderstanding, that they actually make a plan for the

10  handoff.

11        The other critical feature, two other critical

12  features that we have asked for, and I believe these come up in

13  the context of paragraphs 3 and 5 -- and we are happy to

14  resubmit the order, Your Honor, to reflect some of the points

15  or concerns that were raised in last evening's opposition, so

16  I'm just attempting to explain these conceptually.

17        When we get down to that weekend before election

18  Tuesday, there comes a point in time where, if a ballot is

19  already in Orlando, let's say, and it needs to be delivered

20  within Orlando, if it gets sent to a processing center in

21  Apalucha (phonetic), for example, or elsewhere, that's hundreds

22  of miles away to be sorted and redistributed, it's not going to

23  get back in time.

24        The new procedures recognize this because they make

25  arrangements for what's called a hub and spoke type of

1    delivery.  And it's very simple.  Ballots are easily extracted

2    from the mail.  They are readily identifiable.  All that needs

3    to happen is, in the larger counties, they set up perhaps four

4    or five hubs, and every postal facility in that county, when

5    they start getting election mail that Saturday, instead of

6    sending it hundreds of miles away to come back into the county,

7    simply send it to a hub which collects a sufficient volume and

8    then they take it to the servicing facility that makes the

9    final handoff to the post office.  It just keeps the delivery

10   local.

11          And how they actually go about implementing that local

12   delivery is not a concern to us, just that it be done.  Again,

13   as we understand it, Palm Beach has committed to do this.

14   Broward has committed to do this.  Maybe in certain counties

15   they would say it's unnecessary because they are so small they

16   do it naturally.  But there ought to be a plan that ballots not

17   get sent out of a county that is already the destination county

18   only to be returned back into that county because that can take

19   precious days at a point in time when a critical portion of the

20   mail is at risk.

21          I should note just in terms of the numbers here that

22   we expect if there are over 6 million ballots or 6 million

23   ballots requested, at least 80 percent of those may be returned

24   by mail.  That's 4.8 million ballots.  I believe in the last

25   go-round, the last primary, 9 percent of those came in on

```
1    election day or the day before.  If we had even 8 percent on
2    election day or the day before, that's over 300,000 ballots
3    that are at risk if we lose a single day here.  It's an
4    enormous amount of voters who could be disenfranchised by the
5    lost of a single day.
6             So this local delivery process, and we defer to the
7    expertise of the post office on how you specifically implement
8    that in this county or a different county, but there should be
9    a plan in place in each county to ensure that that local
10   delivery happens.
11            The final ask was what was referred to as -- early
12   sortation was the phrase we used because one of the
13   postmasters, I believe, in Broward used that phrase, were told
14   in the affidavit last night that that should really be called
15   early collection -- or early sweep, rather.  We are happy to
16   use the phrase early sweep.  I think we are all saying the same
17   thing, which is, first thing in the morning on election day,
18   all these postal facilities should sweep their own facilities
19   and make sure they have every last ballot in hand because
20   that's the critical day for the handoff.
21            Those are the three specific requests that we've made
22   with reference to Florida, and we make them in light of the
23   very unique and challenging circumstances we find ourselves in
24   with very dramatic decline in delivery standards in Florida,
25   the removal of more sorting machines than anywhere in the
```

1    country but California, and the overwhelming number of citizens

2    in Florida who rightfully have come to depend upon in this

3    pandemic will rely upon the U.S. Post Office to make their vote

4    count.

5              I hope that's responsive to Your Honor's question.

6              THE COURT:  It is.

7              MR. BRADFORD:  Thank you.  I am happy to address other

8    questions or to address other parts of the merits.

9              So I don't forget, we did reach a stipulation with

10   counsel for the post office that, with respect to the 30

11   exhibits we have identified, and we said we would do the same

12   with their exhibits, that we have stipulated to the foundation

13   for each of those exhibits, that they may be made part of the

14   hearing record, subject, of course, to argument and objection

15   with respect to their relevancy or weight that Your Honor may

16   choose to give them.

17             But on the basis of that stipulation, I would like to

18   move our Exhibits 1 through 30 into evidence.

19             THE COURT:  All right.  Mr. Borson, let's take up

20   that issue first.  Do you have any objection to their exhibits?

21             MR. BORSON:  No, Your Honor.

22             THE COURT:  Mr. Bradford?

23             MR. BRADFORD:  Similarly, Your Honor, we reached an

24   agreement that with respect to both of the substantive

25   declarants with Mr. Ewart, who I indicated is present here

1    today, and also Professor Dan Smith, who is the chair of the

2    political science department at University of Florida and has

3    provided an expert affidavit, that if each of them were called

4    to testify, they would testify as set forth in their

5    affidavits.  And on that basis, we would request that their

6    affidavits be considered as part of the evidentiary record for

7    purposes of this proceeding.

8           THE COURT:  Mr. Borson, any objection to that?

9           MR. BORSON:  No objection, Your Honor.

10          THE COURT:  Mr. Bradford, do you have any other

11   objections to the government's exhibits?

12          MR. BRADFORD:  We do not, Your Honor.

13          THE COURT:  Okay.  So all those exhibits then will be

14   received in evidence for the purpose of this hearing only, as

15   well as the affidavits of Professor Smith and Mr. Ewart.

16          Let me hear from Mr. Borson.

17          MR. BORSON:  Thank you, Your Honor.

18          THE COURT:  And why is there a problem with Miami-Dade

19   County relative to Broward and Palm Beach in terms of agreeing

20   to some method to facilitate the ballots?

21          MR. BORSON:  Good morning, Your Honor.

22          So I think the short answer is that the extraordinary

23   resources memorandum that was issued on Monday addresses pretty

24   much everything that the plaintiffs are seeking and addresses

25   it recognizing there are some local discretion issues.

1          In terms of Miami-Dade specifically, I am not aware of

2     any specific context about that.  So the declaration from

3     Mr. Costello does indicate that there's been communication

4     between the election coordinators and the individual county

5     executives.

6          I think one of the issues that was expressed to me

7     when we were putting this together is that counties have

8     different structures in terms of how the mail facilities are

9     physically located.  My understanding is that some of the

10    facilities where the local postmasters have made these

11    arrangements are facilities where processing plants and post

12    offices are geographically co-located in such an area that some

13    of these measures may make sense while in other counties for

14    physical or structural reasons facilities are located in

15    different places, you know, trucks are in different locations,

16    sorting machines are in different locations, that there is not

17    an all size fits all approach that would make any sense.

18         The Costello declaration explains this in some detail,

19    why the local supervisors need to have at least some discretion

20    to work with the individual state and local officials to figure

21    out what specific measure makes sense to expedite as many

22    ballots as possible in the last 48 and 72 hours.

23         THE COURT:  Okay.  And it seems that in these other

24    cases involving the other injunctions that the government, the

25    postal service, has been working in good faith to try and

1   comply with the injunction, to try and make sure that every

2   ballot is counted, which they can reasonably do so.

3        So what are the specific requests -- forget the legal

4   issue of whether there is irreparable harm.  That's a big one.

5   I'm just putting that aside for now.  But if there were going

6   to be some measures that were implemented that don't exist at

7   11:22 today, what are they suggesting that needs to be done

8   that is not reasonable or practical to make sure that every

9   ballot counts?

10        MR. BORSON:  So we laid this out a bit in our brief,

11  which I understand was filed late at night.  I will confess, it

12  sounds like they are changing a little bit the scope of relief

13  they are talking about, so if I can address the specific things

14  I think they are now focusing on if my notes are correct.

15        So the first thing I understand them focusing on is

16  having some sort of plan involved between the election -- the

17  United States Postal Service election coordinators or the

18  postmasters, whichever sort of unit makes the most sense in a

19  particular county or jurisdiction, to talk with the state and

20  local election coordinators to figure out some sort of a plan

21  in place.

22        So the extraordinary resources memorandum mandates

23  this, that this has happened.  And as we put in the

24  declaration, these conversations have either happened or are

25  already ongoing.  It's an ongoing dialogue to figure out what

1    makes the most sense based on who has the most resources, who

2    can pick up, who can drop off, those types of things.

3          So that is already going on.  And I think if this

4    Court was to issue something different than what is going on,

5    it would risk confusion, it would risk restarting those

6    conversations and having confusion over what exactly these

7    individuals are supposed to be discussing.

8          So they are already required to be having these

9    conversations so we think the postal service is already doing

10   exactly what the plaintiffs want them to do.  And having the

11   plaintiffs micromanage exactly how that process works, we

12   believe, would ultimately be counterproductive because it would

13   just risk a great deal of confusion in the last few days before

14   the election.

15         The second thing that they now seem to be focusing on

16   is what I am going to call the last 48-hour, 72-hour

17   transportation process.  So right now the way that most mail in

18   general, and there's 150 million pieces of mail per week in

19   Florida, are transferred is they would be collected at a local

20   post office -- or actually, stepping back, they would be

21   collected at a blue collection box or an office location to the

22   extent that mail is still being mailed in offices.  They would

23   then be brought to a central location.  They would be brought

24   to (inaudible) mail machines, mail sortation machines, that can

25   do the high speed processing, and then they are sent out at a

1    consolidated level out to delivery points.

2           So the entire system depends on that automated

3    structure.  And to the extent that plaintiffs are suggesting,

4    and I think they still are, that the postal service basically

5    scrap this existing system and, for lack of a better term,

6    MacGyver a mandatory system of having individuals sort of

7    drive -- sort ballots at post offices where they are not

8    equipped to do that type of mass sortation, bring them to other

9    post offices that are not necessarily equipped to do that sort

10   of sortation, and then bring them to individual localities that

11   may not be equipped to receive them en masse doesn't work on a

12   holistic level.

13          There may be some situations where, because of the

14   individual logistics or the individual geography, that does

15   make sense, and the extraordinary resources memorandum makes

16   clear that that type of activity is absolutely authorized, but

17   to mandate it in the way that the plaintiffs are suggesting,

18   particularly, you know, in the last few days before the

19   election, would be both problematic from an implementation

20   perspective, and it would also potentially be problematic even

21   from a ballot security perspective because right now there are

22   existing processes that I think the second page makes clear to

23   make sure that there are sort of checks in terms of making sure

24   that these ballots have custody and are moving forward.

25          If the postal service is trying to scramble a system

```
 1    in the entire state or in almost all of the state to basically
 2    rely on ballots being put in the back of cars and moving
 3    around, there is no way to have that type of quality control,
 4    which is why we think that the mandatory -- the extraordinary
 5    resources memorandum which authorizes and instructs
 6    extraordinary resources to be used but recognizes there might
 7    be some differences in different jurisdictions based purely on
 8    infrastructure or processing needs makes the most sense.
 9            And then the last thing that I think they are focusing
10    on now is this early sortation which -- or early sweeping.  So
11    there's a couple of -- it's not entirely clear what exactly
12    they are referring to, but there's basically one of two things.
13    So first is that the mail processing machines, the way it
14    generally works is they usually run in the mid to late
15    afternoon into the evening.  So the mail is collected in the
16    morning, it's brought to those facilities and plants, and then
17    it's sorted.  And then in the afternoon and evening, it's then
18    put into basically the outgoing mail channel.  So it's brought
19    to transportation to be moved to wherever the mail needs to be
20    moved to.
21            What the postal service has already committed to in
22    the September 25 memorandum -- I know there's lots of
23    memorandums, but this one was also partially in response to
24    some of the injunctions and partially the postal service's
25    commitment to make the mail move is it authorized these
```

1   sortation machines to start running earlier on.  So the

2   machines -- the window for the machines to be open is already

3   able to be moved up.

4           And then there's also processes for sweeping the

5   facilities to have -- make sure all the ballots are processed.

6   There's what's called an all clear process where there is

7   checklists that postal service employees do to ensure that they

8   are tracking all of these ballots and moving them through.

9   There are ballot monitors and ballot ambassadors who are

10  physically located in these plants to track these facilities.

11          So to the extent they are suggesting, the plaintiffs

12  are suggesting, that those types of things are required, they

13  already are required, sometimes by mandate of injunctions or

14  settlement agreements that are subject to court supervision and

15  sometimes simply as a matter of the commitment that the postal

16  service has made affirmatively, publicly, and repeatedly.

17          So most of what I think they are trying to do is

18  already being done and it's already subject to court

19  jurisdiction.  And the things they are trying to add on to this

20  would have the effect of really making significant changes to

21  the postal service's processing transportation or operations

22  right at the exact worst time when the postal service should be

23  focused on executing its existing plan, not creating the new

24  plans.

25          So I know you mentioned sort of not wanting to focus

1    on irreparable harm and the balance of the equities, but at

2    least on that last point about developing these new procedures,

3    that is exactly the types of changes to voting systems that the

4    Supreme Court and the Eleventh Circuit and courts throughout

5    the country repeatedly instruct should not be done right before

6    an election.

7         And so I think it is important also to mention that

8    this would be a mandatory injunction that is very different

9    from how many of the other injunctions have worked.  Those

10   injunctions have said, okay, the postal service, we think we

11   are likely to -- we, the court, think that we are likely to

12   find that this particular policy change is illegal, it's either

13   unconstitutional or it violates the statute, and, therefore, we

14   are going to enjoin this change.  We think you should

15   (inaudible) latent extra trips; therefore, we are enjoining a

16   policy of latent extra trips.  And the postal service has put

17   in place guidance to do that.  It said, no, latent extra trips

18   are okay.  And, in fact, there were, I think, 2,000 latent

19   extra trips in some days last week.

20        But what the plaintiffs are seeking to do here is

21   affirmatively put in place a new structure for processing mail

22   not just enjoined in the illegal change.

23        And to the point that Your Honor made earlier, all of

24   the changes that I think they are actually complaining about

25   are all things that have been enjoined by other federal

1   district courts.  We have not sought to stay them.  We have not

2   sought to appeal them.  In fact, we have had several agreements

3   where we have affirmatively agreed that we will follow these

4   mandates through November 30, through the last date that

5   ballots are processed.

6           So these injunctions, to be clear, will be in place

7   through the election.  There is no dispute about that.  But

8   they are seeking an entirely new type of injunction that would

9   go into effect immediately in the last days of the election

10  that would have significant operational consequences.

11          So just to sort of sum up where I think we are, the

12  plaintiffs are either asking the United States Postal Service

13  to do things it's already committed to do and, in fact, in some

14  cases is already mandated to do, or it's trying to require the

15  postal service to do new significant operational changes in the

16  last few days before the election.

17          And the first one is unnecessary and risks confusion.

18  And, for that matter, there is no injury because this relief is

19  already in place so there's no addressability.

20          And the last ones could be catastrophic for the postal

21  service, particularly depending on what the plaintiffs are

22  actually seeking, which I admit is a little unclear here.

23          But to the extent they are requesting operational

24  changes, as the Costello declaration goes in and details, those

25  could have significant difficulties because they don't work

```
 1    within the framework of what the postal service does in its

 2    existing transportation network.  That's why the existing

 3    injunctions are sufficient and why the injunction they are

 4    seeking would be affirmatively harmful.

 5              THE COURT:  Thank you.

 6              Let me go back to Mr. Bradford because we kind of

 7    skipped over the legal aspects to get into some of the

 8    practical aspects.

 9              Look, again, I am a strong believer that every vote

10    should count, and I'm perfectly willing to enter any order that

11    I am legally authorized to do to make sure that that happens.

12    I have some limitations, which is, number one, when you are

13    asking for injunction, you know, there has to be irreparable

14    harm.  And I'm still trying to figure out -- there are all

15    these injunctions that are already in place.  There's

16    apparently a good faith effort on behalf of the postal service

17    to work to comply with these injunctions and go beyond that.

18    So how is there irreparable harm to have me enter an additional

19    order?

20              MR. BRADFORD:  Certainly, Your Honor.

21              The irreparable harm obviously is the potential

22    disenfranchisement of the, let's call it 350,000 ballots that

23    we would expect based on Mr. Smith's declaration, Professor

24    Smith's declaration, to be on the cusp of making it there on

25    time but as to which a one-day loss of time would make all the
```

1    difference in whether that ballot counts.

2          That's the circumstance that we have experienced on a

3    percentage basis here in Florida already in connection with the

4    primary.  We have seen the impact of the removal of the sorting

5    machines in Florida.  It's particularly acute.  And there is a

6    modest set of procedures that we believe would supplement that

7    which has been requested.

8          At page 10 of our brief, we explained that other

9    courts have specifically mandated extraordinary measures

10   because to return to a status quo that existed prior to the

11   illegal removal of those machines, it does take certain

12   extraordinary measures to try to put the delivery system back

13   to where it should be.

14         That's why we have an extraordinary measure memorandum

15   is because the post office was compelled by order to develop

16   extraordinary measures.

17         As those extraordinary measures relate to Florida

18   specifically, there is an agreement in them that there should

19   be a conversation, and that's what we heard again this morning,

20   a conversation between election officials and the postal

21   authorities.  But there's no requirement in those procedures

22   that they actually agree upon a concrete plan for the handoff.

23         So all we have asked for is, if they are going to have

24   that conversation, it ought to end in some specific plan for

25   the handoff that gets certified to the court or sent to us or

1    somebody else who can be assured that the handoff is actually

2    going to take place.

3            There's virtually no burden in making that happen, but

4    what they have proposed so far doesn't go far enough, at least

5    as far as Florida is concerned.

6            Second, the affidavit submitted last night

7    acknowledges that on November 2 and 3, that all the offices are

8    authorized to make this separate hub and spoke delivery process

9    to implement it.  There is a recognition that that will be

10   necessary on those two days, that if ballots leave a county on

11   those two days, they are not going to return on time.  But,

12   again, the extraordinary measures simply authorizes that.  It

13   doesn't require it.

14           We would ask that it either be required or required at

15   least in the large volume counties.  We understand that part of

16   the practical pushback is there may be small counties where

17   that's impractical.

18           But we have approximately ten counties, and I could

19   identify them, where we have at present roughly a hundred

20   thousand undelivered ballots that are kind of hanging in the

21   balance here.  And at least as to those large counties, there

22   ought to be a hub and spoke option that's available, not just

23   discretionary or authorized, but required to the extent it's

24   reasonably feasible.  And if the post office determines in its

25   judgment that it's not feasible, we will respect that judgment.

1   But there ought to be some presumption that they are going to

2   go ahead and have a plan on the 2nd and 3rd that allows the

3   ballots to actually be delivered.

4            THE COURT:  What are those ten counties?

5            MR. BRADFORD:  Those ten counties would be Miami-Dade.

6   Broward has already agreed to this as we understand it.  Palm

7   Beach has agreed.  Hillsborough, Pinellas, Orange, Duval,

8   Brevard --

9            THE COURT:  Hold on.  Hold on.  Slow down.

10           MR. BRADFORD:  I'm sorry, Your Honor.

11           THE COURT:  Miami-Dade, Broward, Palm Beach,

12   Hillsborough.

13           MR. BRADFORD:  Pinellas, Orange, Duval, Brevard if I

14   am pronouncing that correctly, and Lee all, as of last night,

15   had 96,000 or more undelivered ballots.  Seminole would be next

16   with 89,000, and then there's a dropoff to 75,000 or less with

17   the remaining counties.  Those are sizeable counties where

18   having a plan in place particularly for November 2 and 3 --

19   because, again, we expect that 8 to 10 percent of all of these

20   ballots are going to wind up being delivered on those two

21   dates, and we have seen in every instance that ballots wind up

22   getting delivered one day too late.

23           So the post office has agreed this hub and spoke

24   process makes sense.  I have talked to people who have retired

25   and done this work, and they say it's exactly how it should be

1    done.  Ballots are easily identified.  When they see a ballot,

2    it ought to get sent to the appropriate facility in that

3    county.  However they choose to do that, we are respectful of.

4    We don't want to be micromanaging.  We just want to make sure

5    that we don't have two major counties in Broward and Palm Beach

6    that are getting their ballots there because they are engaged

7    in these processes, they are demonstrating these processes are

8    feasible, they implemented them very recently, but because some

9    voter lives in a different county, they are not going to get

10   their ballot there on time because this very same process has

11   not been implemented.

12           And that's the limits of our request, Your Honor.  We

13   believe it's a very modest injunction apropos of Your Honor's

14   comments at the outset really tweaking or localizing what has

15   been required elsewhere to the unique circumstances of Florida

16   where we do have perhaps more absentee ballots on a percentage

17   basis than we are going to see -- or mail-in ballots, I should

18   say, on a percentage basis than we will see virtually anywhere

19   in the country and where the impact of the sorting machine

20   removal has been most acute relative to other jurisdictions in

21   the country.

22           And I know we are trying not to approach this with a

23   one size fits all response, but at the same time, the post

24   office response to these injunctions has been a national

25   response.  And we understand that's why they say you may do

```
 1    this or you have authority to do it, it's not required.  These

 2    are the circumstances where it should be required.  It's very

 3    doable.  It's very feasible.  These are the circumstances where

 4    it should be mandatory, and that's why we are here.

 5            THE COURT:  All right.  Mr. Borson, what is your

 6    response to having some kind of hub and spoke collection

 7    delivery system for the last few days in those, I guess, ten

 8    counties?

 9            MR. BORSON:  So a couple of points, Your Honor.  First

10    of all, just to be clear, the extraordinary resources

11    memorandum, and this is at the top -- the two bullets on the

12    top of page 3, already makes clear that this is authorized, and

13    the memorandum generally makes clear that these procedures are

14    authorized and expected to be used if it's something that's

15    feasible.

16            So I don't know the specific context of those ten

17    counties well enough to address each of them specifically, but

18    I think this is a situation where it makes sense to trust the

19    judgment of the operators on the field to determine when and

20    how these things make sense.

21            I think the premise of Your Honor's original statement

22    is that the postal service is working in good faith to comply

23    with these injunctions and to ensure that election mail is

24    expeditiously delivered.  And that is the postal service's top

25    priority right now.
```

1            So in this context, given that the postal service has

2       authorized these types of measures and expected measures to be

3       used whenever they are feasible, I think this is a situation

4       where it makes sense to defer to the specific technical

5       judgment of postal service operators and managers on the ground

6       about precisely how this makes sense.

7            And I think that is exactly what this memorandum does.

8       It's not a way of saying, oh, it's discretionary; therefore,

9       you don't have to do it, we don't really expect you to do it.

10      The postal service is committed to election mail and has made

11      that commitment repeatedly clear.  The only reason that these

12      measures are not mandatory in all circumstances is simply

13      because all circumstances don't allow it.  And when you are

14      issuing this type of guidance even within a state, it makes

15      sense to recognize that there may be local situations in some

16      context where other things are actually more expeditious in

17      delivering the mail.

18            And I wanted to make a couple of other points, if I

19      may, in response to --

20            THE COURT:  Let me just finish my thoughts about this.

21            So that part of the relief that they are seeking is

22      not really going to kick in until the 31st and 1st, 2nd, and

23      3rd, those last few days.  So why can't you all, limited to ten

24      counties, those ten major counties, why can't you all, sometime

25      between like now and Tuesday, figure out how those ten counties

```
 1    are actually going to do it, not whether they are authorized to
 2    do it or may do it.  Let's figure out how they are actually
 3    going to do it, and let the plaintiffs know this is how it's
 4    going to be done, and either it's going to be done the same way
 5    in all ten or it's being done differently in these two or three
 6    counties because it's not feasible for the following reasons.

 7         And if they agree to that, there is no reason for me
 8    to intervene.  But if they don't agree and they think that's
 9    still going to be a problem, I still have time to enter an
10    order as to at least that aspect of it that can hopefully be
11    implemented during the last few days.  Why isn't that something
12    that can be done?

13         MR. BORSON:  So obviously if the Court orders the
14    postal service to go out and document that, we, of course,
15    will.  I would note that it is burdensome to impose these types
16    of reporting requirements.  And I say that not to avoid
17    reporting to the Court because we have been doing a number of
18    reporting to the Court, but simply that these are election
19    coordinators who are focused on doing their job.  And to the
20    extent they are responding to requests from headquarters or
21    from lawyers, that does take them away from them.

22         But obviously if that is something that the Court
23    orders, we can reach out to figure out what the specific plans
24    in those counties are.

25         Even regardless, I think we can document that, but I
```

1    would urge Your Honor that the reason for the plans and the

2    reason that they would be making those decisions are based on

3    local contacts and local mechanics and local logistics, and

4    those really are determinations that we believe that this Court

5    ought to be sensitive to because these are the people who best

6    understand the infrastructure that they have out there.

7            THE COURT:  Okay.  As a starting point, yes.  Okay.

8    But I also -- you know, there are human beings involved in this

9    process.  Okay.  And sometimes people let their personal views

10   interfere with their professional obligations.  I hope that is

11   not going to happen.  So that's why I don't understand.  So if

12   somebody says, oh, we can't do that or we won't do that, okay,

13   I think the plaintiff has the right to know and you have the

14   right to know whether they are doing that because it's not

15   feasible or because they just won't do it because they have

16   some personal reason for not doing it.

17            So, I mean, I just think all of us agree, right, that

18   all of us and everybody in the postal service should do

19   everything we can to make sure that every vote counts?  So all

20   I am asking you to do is meet informally.  I'm saying you all.

21   You reach out to your people in those ten counties and figure

22   out, you know, with them how they can best make sure that those

23   ballots are delivered on the last few days, and then you can

24   report back to Mr. Bradford.

25            And if they are satisfied with that, then you can just

```
 1    file a notice to me saying, okay, we have agreed that it's been

 2    resolved.

 3            If there are two counties or ten that the plaintiffs

 4    don't believe are in good faith trying to accomplish our goal

 5    of every vote counting, then we can meet here again on Tuesday,

 6    and then there's time to have a hearing and decide whether this

 7    is really not feasible, whether there is somebody who is

 8    putting some impediment to people's constitutional rights.

 9    That's all.  So I'm trying not to order you to do it, but I'm

10    just trying to move it --

11            MR. BORSON:  We can do that, Your Honor.

12            THE COURT:  Okay.  So as to that aspect of it, I am

13    going to tentatively reset this for a hearing on October 28 at

14    9:00, and that is to address the issue of the last few days of

15    delivery at that point.

16            One of the reasons I feel handcuffed -- and I will go

17    back to Mr. Bradford.  I know that you said you want to make

18    some other arguments, Mr. Borson, but while I have that in my

19    pea brain of a head here, let me ask Mr. Bradford.

20            So all of these or most of these other cases were

21    filed many weeks ago.  Your complaint was filed October 6

22    later, but your emergency motion wasn't filed until the 16th.

23    So how is it that the government is not correct that

24    implementing all these changes at the last minute is going to

25    cause more mayhem and more disruption and is something that
```

1    shouldn't be done based upon Eleventh Circuit and Supreme Court

2    precedent?  How is it putting me in a position to say on

3    October 22 you got to make these changes tomorrow literally

4    because I think Saturday is the last day that ballots can be

5    mailed out in Florida, and November 3rd is the last day they

6    can be received.  You are basically giving ten days for a whole

7    new system to be implemented, training people, and you have

8    other memos that have already been produced and procedures that

9    have been implemented based upon these other injunctions.  Why

10   legally -- forget practically now because we have been talking

11   a lot about practically -- why legally isn't the government

12   right that these kind of disruptions on the eve of the election

13   shouldn't be done?

14        MR. BRADFORD:  Your Honor, we accept the premise there

15   should be no disruptions on the eve of the election and for

16   that reason attempted to limit the relief we were seeking to

17   that which the government has already agreed it's either

18   intending to do but yet hasn't actually done or has authorized

19   and said is feasible.

20        And to back up to the timing of why it took us this

21   long to request this hearing, we did start discussions with

22   Mr. Borson before we even filed the complaint to try to obtain

23   information.  We did not want to create a new lawsuit if it was

24   not necessary.  We have been carefully monitoring what has and

25   hasn't been done.  We were extremely encouraged when two major

1    counties agreed to implement very specific procedures and put

2    that in writing, and we were hopeful and requested that this

3    simply be extended to other counties.

4         And it was only at that point -- I believe it was

5    October 6 we filed our suit.  It was only when we determined

6    that, yes, this is very feasible because you have got two of

7    the three biggest counties committed and actually doing it but

8    it's not going to be done elsewhere that it became apparent we

9    are going to have a patchwork here.

10        And Miami-Dade does seem to be a problem area in terms

11   of what happened in the primary.  It's one of the places where

12   this hasn't happened yet.  And that was the reason we thought

13   we had better come in before all ballot deadlines have passed,

14   that is to make a decision to request or not, and to come in

15   and request this emergency hearing under those circumstances.

16        So we tried to calibrate as best we could in terms of

17   imposing upon the judicial system as to whether or not that was

18   necessary and we have tried to calibrate very carefully the

19   limited relief that we are seeking.  The last thing we want to

20   do is get in anybody's way when they are trying to do their job

21   and get the mail delivered.

22        We believe Your Honor's suggestion as to letting us

23   know what the plan is for those ten counties and to the extent

24   we have a specific problem where we believe the evidence will

25   show it's very feasible, it's just a lack of will or whether

1   it's personal, political, or other reasons to implement that

2   which is very doable, that that is appropriately brought to

3   Your Honor's attention, and we would do that next week.

4          But our strong hope and expectation is that these

5   plans will be reasonable.  I think today's hearing has been

6   helpful in that respect.

7          The only other relief that we would ask for at this

8   point is a similar report that simply certifies that as to each

9   of the counties there has been an agreement or plan reached

10  with the election board as to what will happen on election day.

11  Who is coming to who.  Is the mail supposed to get picked up by

12  the election officials or dropped off.

13         There's already been a commitment in a representation

14  that they have had conversations, a statement that there is an

15  intention to make a plan.  I think we are at that point in time

16  less than two weeks from the election where there should

17  actually be a plan.

18         And, again, we are not asking you or anyone else to

19  say what that plan should be, simply a certification that, in

20  fact, there has been a communication and a plan put in place.

21         Again, I hope that's responsive, Your Honor.

22         THE COURT:  And are the plans that have been agreed to

23  by Broward and Palm Beach identical to each other?

24         MR. BRADFORD:  They are not if I understand it

25  correctly.  I believe in Broward the election officials are

```
 1    going to come to the postal facility, the servicing facility,
 2    to pick up the mail.  And I will be corrected if that's wrong.
 3    I don't believe that's necessarily the case in Palm Beach.  But
 4    that's why it's important to have that understanding, because
 5    it does vary from county to county, that we not have a
 6    misunderstanding for each side waiting for the other, if you
 7    will, to come get the mail.
 8         THE COURT:  One of the problems is I -- one of the
 9    parties is not or are not the supervisors of elections of each
10    county.  I can't order them to do anything because they are not
11    part of this case.  All I can do is order the plaintiffs and/or
12    the defendants to do something.  I guess that's an issue for
13    another day if they are not cooperating.
14         Okay.  So, Mr. Borson, you said that you had other
15    arguments to make, and I told you to hold off on those.  I will
16    give you a chance to make those now.
17         MR. BORSON:  Thank you, Your Honor.  Just a couple of
18    points in response to Mr. Bradford.
19         First of all, he's mentioned sorting machine removal a
20    couple of times.  I just wanted to briefly highlight that
21    because that is addressed by one of the other injunctions.  In
22    the Eastern District of Washington, the court ordered that if
23    machines were -- if processing machines were removed and their
24    return to service was necessary to process election mail in
25    accordance with first class standards, that those machines were
```

1    to be put back in place.  And area vice presidents were

2    authorized to do that.

3            Some of that happened back in September when the court

4    issued its order.  There is an existing process for plant

5    managers to request that and for the Eastern District of

6    Washington court to supervise that if that's happening.

7            So while machines have been removed, to the extent

8    they have not been returned to service, that's because the

9    people on the ground have determined -- who would be best

10   suited to know whether that is necessary, have determined that

11   those are not necessary for election mail purposes.  So I just

12   wanted to make that clear right there.

13           And then the only other issues I would make, I think

14   we have addressed the issue of sort of the hub and spoke, and

15   we will go back and get additional information on that.

16           In terms of the requiring contact, I mean, this is

17   something that is mandated by the extraordinary measures

18   memorandum, the first two bullets under postmaster action on

19   page 3.  So this is not something that is optional.  This is

20   something that is being required by the postal service.

21           And while I certainly take your point that there may

22   be individuals who may have their own motivations, I think in

23   this context the postal service really is working with good

24   faith and is focused on making that plan, and there is the

25   contact there so I think that is also important.

1          And then just sort of the final stages, I mean, we

2     haven't really talked about the merits here today and I think

3     we have appropriately focused on the practicalities and the

4     irreparable injury, but I just would want to note that the

5     injuries they are complaining about as the legal basis for

6     their claims are, as best as we understand them, all things

7     that have been enjoined and have been enjoined for months.

8          So while I take their point that, you know, maybe not

9     all service is back entirely, back to where it was, and there

10    is a number of reasons for that that, for example, the Southern

11    District of New York court has addressed, that are not all

12    related to these types of issues, some are weather, some are

13    COVID, there are a number of reasons, that the actual injuries

14    that they are complaining about as the basis for this relief

15    are things that have been addressed and will be addressed

16    through the election.

17         So in that sense, there's not a lot of foundation for

18    the legal claims here, though we certainly do appreciate their

19    practical concerns, and the postal service shares those, which

20    is why it has done all of these steps in order to ensure that

21    election mail is delivered expeditiously, which is something I

22    think all parties here certainly agree on.

23         THE COURT:  Okay.  So I am going to reset this hearing

24    until Wednesday, the 28th at 9:00.  I am going to ask the

25    parties to work together to resolve as many of these issues

1  voluntarily as they can since it's all of our desire that every

2  vote get counted.  And if there are any remaining disputes, we

3  will take those up on Wednesday, the 28th at 9:00.

4         If it is not resolved, then I want each party to

5  submit a memorandum to me by, let's say, 3:00 p.m. on the 27th

6  of what issues have been agreed to, what issues are in dispute,

7  and how they suggest that we should resolve those on the 28th.

8         If you agree to everything, just send me a memo, a

9  notice, on the 27th, and we will cancel the hearing on the

10  28th.  Okay?

11         MR. BRADFORD:  Very good.  Thank you so much, Your

12  Honor.  And, again, thank you for accommodating us on an

13  emergency basis.  We greatly appreciate it.

14         THE COURT:  Thank you all.  We will be in recess on

15  this matter.  Thank you.

16         (The hearing concluded at 11:59 a.m.)

17                            -  -  -

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.

        Please note: This hearing occurred during the

COVID-19 pandemic and is therefore subject to the technological

limitations of reporting remotely.


10/22/20                s/ Tammy Nestor
                        Tammy Nestor, RMR, CRR
                        Official Court Reporter
                        400 North Miami Avenue
                        Miami, Florida 33128
                        tammy_nestor@flsd.uscourts